# United States District Court
# Southern District of Texas

## Case Number: H-05-3424

## ATTACHMENT

Description:

☐ State Court Record        ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _2_ of _____

☐ Exhibit to: _____Vol I_____
number(s) / letter(s) _____

Other: _____Petition For Writ of_____

_____Habeas Corpus_____

_____

had a preconceived notion toward capital punishment, we exercised our strike." 22 RR 17. The court found that to be a race-neutral reason. 22 RR 16. The defense stated that other jurors articulated the same view, and characterized the prosecution's reason as a "pretext." 22 RR 17.

As to Ms. Melba Goodman, the prosecution stated that she refused to answer questions regarding capital punishment, she reluctantly agreed that capital punishment should be available for killers of police officers, and demonstrated through her demeanor that she was very anti-capital punishment. 22 RR 18. The court found the reason to be race-neutral. *Id.*

As to Mr. McQueen, the prosecution claimed "he was weak on the death penalty" and stated that there were instances where he could not give the death penalty even if the law permitted it. 22 RR 18. The defense argued that this reason was pretextual and pointed out that this juror had checked on his questionnaire that he was in favor of the death penalty. 22 RR 18. The court again held the reason for the strike to be race-neutral. 22 RR 19.

As to Betty Owens, the prosecution claimed her attitude was somewhat "humorous" and was leaning toward defense counsel and therefore she "would certainly be leaning toward a life sentence." 22 RR 19. The prosecution thought she would have a disposition toward a life sentence. *Id.* The defense pointed out that her questionnaire indicated she would be leaning toward the State's case and it reflected that "only after the Court indicated to her that capital murder was that she would have caused a lesser burden of proof on the part of the State." 22 RR 20. The defense argued that she indicated she could be fair and

-10-

impartial to both sides, she understood the law and would not be biased to either side, and it was a misconception that she as friendly toward defense counsel. 22 RR 20.  The court again found the State's reasons to be race-neutral.  *Id.*

### C)  The State's case at the guilt/innocence phase of the trial.

Trial testimony commenced on September 13, 1999. Mr. Haynes pled not guilty.  23 RR 5.  Both sides gave opening statements.

**Robert T. Stump,** who lived at 7627 Plumtree Forest Circle in Harris County, was the State's first witness.  23 RR 13.  On the evening of May 22, 1998, at about 10:30 or 11 PM, after being alerted by his wife, Mr. Stump went outside and, about five houses down, saw an SUV in the street with the driver's door open and a body lying next to it.  23 RR 15. Mr. Stump later discovered that the victim was Sgt. Kincaid of the Houston Police Department (23 RR 21) whom he had seen riding around the neighborhood before this incident.  23 RR 27.

Mr. Stump ran toward the body and saw a woman he later knew to be Mrs. Kincaid on a neighbor's porch.  23 RR 16.  The body was on the driver's side of the vehicle.  23 RR 18.  Mr. Stump could feel a pulse from the man and observed massive swelling on the left side of his face.  23 RR 18.  The man was wearing brown cowboy boots and blue jeans with a pullover and a greenish blue shirt.  23 RR 23, 25. He was not in any way recognizable as a police officer.  23 RR 25, 27.

The SUV did not have the markings of a police vehicle, and there was nothing inside it that would identify it as such.  23 RR 23, 26-27. The windshield was cracked with a

-11-

concentric fracture on the driver's side. 23 RR 20. A patrol car soon arrived on the scene. 23 RR 22. The location of the shooting was not within the City of Houston and is not patrolled by the Houston Police Department. 23 RR 24-25.

**Deputy Jeff Patrick,** of Harris County Precinct 5 Constable's Office, testified that on May 22, 1998 he was on duty patrolling the northwest side of the county in the Copperfield area. 23 RR 30. The deputy responded to an emergency call at 7605 Plumtree Forest Circle at about 11:09 PM. 23 RR 30. He saw a black Jeep SUV parked in the middle of the roadway and a male lying on the ground, on his back, with a female next to him. 23 RR 31-32. The male appeared to have a gunshot would to his head and was not able to communicate. 23 RR 32. An emergency unit arrived within seconds and placed the victim in an ambulance and he was then helicoptered to Hermann Hospital. 23 RR 33. Thereafter, Deputy Patrick secured the crime scene. 23 RR 33-34. He noticed a hole on the windshield of the victim's vehicle. 23 RR 35. There was nothing about the vehicle that would indicate it had any connection to law enforcement. 23 RR 42.

The deputy then attempted to locate a dark-colored pickup with silver on the tailgate, from a description provided by Mrs. Kincaid, who described it as driven by a young dark-skinned male. 23 RR 36, 43. In the course of the investigation, he prepared a report. 23 RR 37.

The deputy admitted that sometimes people are stopped by others who are impersonating police officers. 23 RR 47. As far as the deputy knew, there was no prohibition against the Houston Police Department assisting the Harris County Sheriff's

-12-

Department in this matter.  23 RR 48.

Houston Police Department Assistant Chief **Jeraldine A. Stewart** testified that she had responsibility for seven patrol stations and 1700 police personnel. 23 RR 59.  At the time of his death, Sgt. Kincaid was assigned to the westside patrol division.  23 RR 62.  The witness identified Sgt. Kincaid's state license and police department identification.  23 RR 66.

Chief Stweart testified that the HPD has general orders that govern the conduct of officers when they are on and off duty.  23 RR 60.  "On duty" means when an officer is at work.  23 RR 81.

Chief Stewart testified that police officers are classified employees who "are required to respond and take prompt and effective police action for any violations of the law that are committed in their presence."  23 RR 61-62. This obligation applies when they are not on duty, in an unmarked vehicle or not in uniform and would apply if someone threw something at an officer's windshield. 23 RR 61.  If an officer was driving on a street and saw someone throw something that shattered a windshield, that officer would be duty bound to investigate, whether he was on or off duty.   23 RR 63.  Such an investigation would be a lawful discharge of the policeman's duties.  23 RR 63.

It was the opinion of this witness that on the night of this incident, Sgt. Kincaid was performing a lawful police action.  23 RR 64. In her opinion, he would be considered to be

"on duty." 23 RR 83.[8] Once he stopped the vehicle, he was considered to be on duty, performing an official police function. *Id.,* and at 72.[9] The witness also opined that Sgt. Kincaid was in the performance of his official duties when he turned around and started following the suspect's car. 23 RR 78.

Police officers are required to carry official police identification at all times. 23 RR 64. The State of Texas has a licensing agency, TCLEOSE, that issues a license to police officers (23 RR 65) but this license is not required to be carried on the person of the officer. *Id.* According to the witness, there was no prohibition on Houston Police Department officers investigating incidents in the unincorporated areas of the county. 23 RR 68.

The witness acknowledged that she could not tell or know for certain whether a person was a police officer just by looking at them or just by verbal interchange. 23 RR 70-72. The witness reiterated that if an off-duty officer saw something committed in their presence and followed through, they would be considered to be on duty. 23 RR 72-73.

The reports showed that Sgt. Kincaid did not have his weapon on his person at the time of the incident. 23 RR 73. The lack of a firearm would not obviate the duty to

---

[8] However, in contrast to this opinion given a year after the shooting, reports at the time of the shooting show that the officer was clearly off-duty. The Harris County Medical Examiner Investigator Report, attached to the autopsy report of Deputy Chief Medical Examiner Tommy J. Brown, indicates on page 1 of the investigator report that the police officer was "off-duty." Exhibit 10. Page 4 of the same report has the notation that "according to HCSO [Harris County Sheriff's Office] Hom[icide] . Det.Wedgeworth,...this dec.[edent] is an HPD Ofc. Who was off duty at the time of the incident." *Id.* The CCA recognized that the officer was off-duty. Exhibit 5, direct appeal opinion, at 3.

[9] The implication that to be performing official duties the officer had to be "on-duty" was not developed by the defense.

-14-

investigate an incident observed by an off-duty officer, in the opinion of this witness. 23 RR 82.

Chief Stewart was not aware of any rules regarding the duty to respond of an off-duty officer who was accompanied by his family when he viewed an incident. 23 RR 75, 79. The witness was also not aware of any policies or regulations regarding the investigation of incidents that involved them personally. 23 RR 77. If an off-duty officer happens to get into a dispute with a citizen, he can generate his own report and do his own investigation, according to this witness, even though he would end up being both the investigating officer and the witness. 23 RR 77.

Assistant Chief Stewart was later recalled in order to clarify the definition of "off-duty." 25 RR 99-100. She stated that "off-duty" referred to the "status of employees when they are free of the responsibility to perform their routine duties."  25 RR 100. The restrictions regarding off-duty officers enumerated in an exhibit offered by the defense (Defendant's Exhibit 4) were replaced in September of 1996, and the current restrictions are that off-duty officers "will not arrest traffic violators on sight unless the violation poses an immediate threat of bodily injury." 25 RR 101.[10] It also states that "if the off duty officers or members are involved in a dispute that requires police action, off duty officers will not arrest any of the persons involved unless there is an immediate threat of serious bodily injury or death.  A police unit will be called to the scene." 25 RR 100-102. The newer order has

---

[10]   The new regulation was substituted as an exhibit, and the old one was withdrawn. 25 RR 104-107.

the clause "unless there is an immediate serious threat or bodily injury or death." 25 RR 102. Unless there is a threat of serious injury or death, the off-duty officers are expected to take action. 25 RR 102. The witness stated that if an officer was driving with his wife and became aware of a situation involving possibly serious bodily injury, he would have a duty to respond and investigate. 25 RR 110-111.[11]

**Jerry Chandler,** an employee of the City of Houston Human Resources Department, testified that he oversees the city's workmen's compensation program. 23 RR 85, 95. The witness proposed to testify regarding workmen's compensation paid to Sgt. Kincaid's beneficiaries. 23 RR 85. The defense objected to this testimony, as it was irrelevant, was paid as a result of some extra-judicial proceeding which had a different standard of proof, encroaches on the province of the jury, and the witness was not qualified to testify. 23 RR 85-86, 89-90. The prosecution stated they only wished to show how much was paid and that there was "a line of duty on the initial act he was performing." 23 RR 86. Outside the presence of the jury, the Court allowed limited testimony as to whether or not a workmen's compensation claim was paid in this matter.

In front of the jury, Mr. Chandler testified that a claim was submitted on behalf of Kent Kincaid and was paid. 23 RR 94. The basis was that he had been acting in the line of duty. 23 RR 94. However, the claim was not contested, and the witness did no independent

---

[11]    However, the record established that there was no such threat of serious bodily injury present when the victim followed and stopped the defendant. This means that the officer was not acting in the official course of his duties. Additionally, the witness was not cross-examined about the autopsy report that stated the officer was off-duty at his death.

investigation of the claim.    23 RR 96, 99.    This witness did not make a personal determination to pay the claim. 23 RR 101. If a claim is contested, there are processes to appeal that decision.  23 RR 97.

**Nancy Kincaid,** the widow of the victim, testified that she met Kent Kincaid when he graduated from the police academy.  23 RR 103.  After they moved to Texas, they had two daughters. 23 RR 104.  They lived in the Copperfield subdivision in northwest Houston. 23 RR 106.

On May 22, 1998, Ms. Kincaid and her husband had been at the house of Cindy and Doug Carmen, some friends of theirs who lived  in the same subdivision.  23 RR 106, 136. At some time they left to go to a sports bar, and they went home first to check on the children.  23 RR 107.  They were driving a Jeep Cherokee.  23 RR 108.

While they were driving on Forest Heights, "[w]e saw something was thrown at our windshield....something hit our windshield." 23 RR 109-110.  It cracked the windshield,  on the driver's side.  23 RR 110-111.  A truck passed her car when it hit, so her husband turned around and followed it.  23 RR 111-112.   The dark colored truck was going only 20 to 25 miles an hour.  23 RR 111-112.  He followed it for five blocks.  23 RR 112, 139.   At that time Sgt. Kincaid was calm.  23 RR 113.

The truck turned and pulled into the first driveway on Plumtree Forest. 23 RR 113. The truck pulled out in reverse and Sgt. Kincaid's car stopped, and the truck stopped next to their Jeep. 23 RR 113-114. There was a streetlight that provided illumination. 23 RR 140. Her husband got out of the car.  23 RR 115.  He was dressed in jeans with a pullover short-

-17-

sleeved shirt and boots. 23 RR 116, 138.   There was nothing in his appearance to indicate he was a police officer. 23 RR 141.

Her husband began to question the occupant of the truck in a calm tone, without yelling. 23 RR 116. The driver of the truck, who appeared to be a fair-skinned male, about 15 to 20 years old,  stayed in his vehicle. 23 RR 116-117, 121.   Her husband asked the driver why he threw a rock at his car. 23 RR 117, 139, 141. Mrs. Kincaid could not hear what the driver was saying. 23 RR 117. Sgt. Kincaid asked again and then told the driver he was a Houston police officer,  asked to see a driver's license, and then reached in his back pocket to show his police identification. 23 RR 118-119, 140, 142. Then the driver shot him and he fell. 23 RR 119. He did not have his identification out when he was shot.  23 RR 145. Mrs. Kincaid saw the flash and heard the pop. 23 RR 119. The man in the truck, who was the shooter, then drove away rapidly. 23 RR 119-120. The conversation took less than a minute. 23 RR 142.

Mrs. Kincaid got out of her car and went over to help her husband, but he was not able to communicate. 23 RR 120. She yelled for help and someone across the street came out. 23 RR 120. An ambulance was called and her husband was transported to the hospital, and he died a few hours later. 23 RR 121.

The witness was interviewed by an investigator and provided a description of the shooter. 23 RR 123. Mrs. Kincaid testified she thought there was someone else in the truck, but didn't know if there was someone in the bed of the pickup. 23 RR 123. In her first interview, Mrs. Kincaid did not indicate that her husband reached to get his billfold to

produce his identification. 23 RR 144. She identified pictures of a Chevrolet blue truck that appeared to be the same one she saw that evening, and the police identification he was carrying that night. 23 RR 125, 127. She had told the investigators about a chrome strip across the tailgate on the shooter's pickup. 23 RR 126.

Based on her description, a composite sketch of the suspect was drawn. 23 RR 128.[12] She identified Mr. Haynes as someone who appeared to be the person who shot her husband, except for the length of his hair. 23 RR 132. Mrs. Kincaid had never before been with her husband in their private vehicle when he performed an investigation. 23 RR 146.

The day of the incident was a Friday, and Sgt. Kincaid had the day off from duty, having worked the evening shift on Thursday, from 11 PM to 7 AM. 23 RR 137. On her first statement, Mrs. Kincaid stated the suspect could have been a white male. 23 RR 147.

At the time of his death, Sgt. Kincaid was in a supervisory capacity and did not normally perform investigations personally. 23 RR 148. At the time of his shooting, he was not carrying a gun. 23 RR 148.

**Kenneth Culver,** a Harris County Sheriff's Dept. employee, testified that he worked in the identification division, in the crime scene unit, as a crime scene investigator. 24 RR 4, 49. On May 22, 1998 he was called to the scene of the crime in the 7600 block of Plumtree Forest Circle, arriving at about 12:25 AM. 24 RR 5. Other police officers were present when he arrived. 24 RR 47-48. He looked inside the Jeep Cherokee and saw a .25

---

[12] A later witness, a Houston Police Department homicide investigator, testified that the composite sketch did not resemble a photograph of the defendant. 24 RR 177.

caliber Remington Peters spent fired shell casing on the driver's side floorboard.  24 RR 6.

Mr. Culver also saw what appeared to be blood in the street.  24 RR 6, 17.

He then received information that caused him to proceed to another location about

four-tenths of a mile east of this, to Forest Heights at Sunny Oaks Way.  24 RR 7, 43.   At

that location, another .25 caliber Remington Peters spent shell casing was found, near the

curb  24 RR 8, 11.  Both shells were center-fired.  24 RR 45.  A shell is ejected if fired from

an automatic weapon, but remains in the pistol if fired from a revolver.  24 RR 36.

Automatics and semi-automatics generally eject to the right.  24 RR 50.  If the pistol is held

sideways, it would eject down.  24 RR 52.

Additionally, a can of potted meat was found in the street.  24 RR 8. The can was the

approximate diameter of the fracture on the windshield of the Jeep Cherokee.  24 RR 11.  It

was later submitted to the latent print lab.  24 RR 48.  That fracture measured one and three-

quarters of an inch on one side and extended out to about six and a half inches.  24 RR 14.

The two spent casings were submitted to the HPD latent lab and the ballistic lab.  24 RR 23.

The ballistics work had to be sent out to the Houston Police Department firearms examiner

as the Harris County Sheriff's Department had no such expert.  24 RR 24.  A Mr. Elliott and

a Bob Baldwin did this examination of the windshield.  24 RR 25. The investigation was a

joint enterprise between the Houston Police Department and The Harris County Sheriff's

Office.  24 RR 23.

The investigation later determined that a purple Chevrolet pickup was involved.  24

RR 27.  From the blood splatter evidence, it appeared that the victim was standing fairly

close to the back wheel of the Jeep Cherokee when he was hit and when he fell. 24 RR 36.

The witness testified that if there had been a vehicle facing south alongside Sgt. Kincaid's vehicle, and a semi-automatic weapon was fired, it would be reasonable to expect that a shell would be ejected to the right and the rear, probably inside the vehicle if the door was open. 24 RR 38. It was impossible to tell where Sgt. Kincaid was standing from the photos alone, but there was no splattering of blood close to the door of the Jeep Cherokee or inside. 24 RR 39, 41.

The State next called **Charles E. Jackson,** a sergeant with the Houston Police Department. 24 RR 58. He heard about the killing of Sgt. Kincaid on May 24, 1998. 24 RR 60. When a composite drawing of the suspect was posted at the police station, it reminded him of a Timothy Reese. 24 RR 61.[13] Sgt. Jackson first came in contact with Timothy Reese in June or July of 1996 . 24 RR 59. Mr. Reese pulled up to Sgt. Jackson's house in a small pickup and began verbally attacking his stepson. 24 RR 59, 61. Mr. Reese was the passenger. 24 RR 61. After that incident, Sgt. Jackson saw Mr. Reese as the passenger in a small pickup that cut him off as Sgt. Jackson was driving along Highway 6. 24 RR 62. Mr. Reese leaned out of the pickup and flipped him off. 24 RR 63. Sgt. Jackson did not do anything in response. 24 RR 63.

Sgt. Jackson told of a later incident when he was in his yard and saw someone in the back of his truck. 24 RR 63. This was in the summer of 1996. 24 RR 79. The individual

---

[13]    Sgt. Jackson later stated that the composite photo resembled Mr. Haynes better than Mr. Reese. 24 RR 91; 25 RR 7-12.

was challenged and drove off in a vehicle. 24 RR 63. Sgt. Jackson pursued the vehicle after first obtaining his service weapon. 24 RR 64, 86. His brother accompanied him in the pursuit. 24 RR 86. At that time, he considered himself to be on duty. 24 RR 64. When the pickup being pursued hit a curb, Sgt. Jackson observed that he thought Mr. Reese was a passenger. 24 RR The truck stopped in a cul de sac, Sgt. Jackson exited his vehicle and then the truck jumped the curb and got away. 24 RR 65. Sgt. Jackson was pretty sure the passenger was Mr. Reese. 24 RR 66. A warrant was eventually issued for Mr. Reese. 24 RR 89-90. The witness had no knowledge that any of the run-ins with Mr. Reese also involved Mr. Haynes. 24 RR 77.

Various incidents of vandalism occurred on Sgt. Jackson's property. 24 RR 68. He knew who did it but could not prove it. 24 RR 68. On May 20, 1998, he observed that the windows of his pickup truck had been shot out. 24 RR 69. A .25 caliber shell was found under the glass, and Sgt. Jackson kept it. 24 RR 70. Upon learning of the shooting of Sgt. Kincaid, Sgt. Jackson took the .25 caliber spent casing to the homicide division and turned it over to firearms examiner Bob Baldwin. 24 RR 72.

The witness testified that officers are required to get involved in incidents that may be misdemeanors but may be serious offenses, and police officers can be disciplined for not getting involved. 24 RR 80-82. Police officers can be compensated for the involvement. 24 RR 81. There is a duty to take action if evidence could be destroyed, if the threat could be perpetuated, if there is a threat to other people or a loss of property. 24 RR 83. The policy is not in a manual. 24 RR 83. The officer was not aware of any policy by the

-22-

Houston Police Department that forbade having family members along when action was taken on these incidents. 24 RR 86.

Sgt. Jackson agreed that normally a policeman in civilian clothes would not be identifiable as a police officer. 24 RR 76.

**Dr. Tommy J. Brown,** who identified himself as a contract pathologist for Jefferson County, and the medical examiner for Jefferson County. 24 RR 99. He was employed as the deputy chief medical examiner for the Harris County Medical Examiner's Office since May of 1998. 24 RR 100. Dr. Brown claimed to have as his sole academic credential a "DO" degree from the Kansas City College of Osteopathic Medicine, and to be board-certified in anatomical and clinical pathology and forensic pathology, and to have a Texas medical license. 24 RR 101.[14] He claimed to have medical licenses on file in Harris and Jefferson Counties. 24 RR 102.

Dr. Brown testified that he performed an autopsy on the victim Kent Kincaid on May 24, 1998. 24 RR 102.[15] In this report, the victim is identified as an off-duty officer.[16] The victim had a bandage on the top of his head and gauze bandages over both eyes. 24 RR 104. He also had tubes and catheters visible. 24 RR 104. The examiner observed an entrance

---

[14] As he indicated, Dr. Brown is not a medical doctor but a "D.O.," a doctor of osteopathy (osteopathy is defined as "a system of treatment of disease based on the manipulation of bones or other parts of the body," (New Penguin English Dictionary, 2000, at 988) in other words he is a chiropractor, and hence he has not graduated from a medical college. *See* Exhibit 10. There was no defense challenge as to Dr. Brown's lack of qualifications.

[15] *See* autopsy report on Kent Kincaid, Exhibit 10.

[16] *Id.* As noted *supra*, the defense failed to cross-examine on this.

gunshot wound in the upper eyelid about four inches below the top of the head. 24 RR 105, 114. There was evidence of stripling to the left side of the victim's face, powder particles that come out of the gun barrel if it is fired within a couple of feet. 24 RR 105. It was the opinion of the examiner that the gun was fired within two feet of the victim's face. 24 RR 106. He did not observe any external injuries to the body of the deceased. 24 RR 109.

The examiner found the bullet in the posterior parietal area on the right side of the victim's head. 24 RR 111. It was a small caliber, fully jacketed bullet, identified by the witness. 24 RR 112. It was the witness's opinion that the victim's head was slightly turned and slightly turned up when he was shot. 24 RR 115. He also testified that the movement may have been defensive, as an effort to turn away. 24 RR 116. The cause of death was a gunshot wound to the head. 24 RR 116. This type of wound from a small-caliber weapon is not always fatal. 24 RR 120. If the bullet had gone two and a half inches to the left, it would have missed the victim. 24 RR 121. The victim's blood was clear of all drugs and alcohol. 24 RR 123. But the blood had not been typed or analyzed for the DNA of the victim. 24 RR 125.

**C. E. Elliott,** a Houston Police Department homicide investigator, was called to the crime scene at 7600 Plumtree Forest Circle on May 22 and 23, 1998. 24 RR 128. The HPD began a joint investigation with the Harris County Sheriff's Department. 24 RR 129.

A Jeep Cherokee was parked under a streetlight, partly blocking a driveway at 7602 Plumtree Forest Circle. 22 RR 129, 163, 165. A .25 caliber shell casing was found on the floor of the Jeep, and some blood was found near the back left bumper of the vehicle. 24 RR

-24-

130. The front windshield was fractured. 24 RR 130. Another spent casing was found about 14 blocks east of this crime scene, along with a can of goose liver pate.  24 RR 131, 134. In the daylight, the witness canvassed the neighborhood from door to door but did not develop any leads. 24 RR 135.

On Sunday, May 24, 1998, Sgt. Jackson came to the witness with information and a .25 caliber casing. 24 RR 135. Based on the information obtained from Sgt. Jackson, a photo spread was put together. 24 RR 137, 168.  The suspect in the spread was Timothy Reese. 24 RR 138. The spread was shown around, and based on that showing, an arrest warrant was obtained for Timothy Reese. 24 RR 138.

The officers set up surveillance on Reese's house, and the police officers who took part were dressed in civilian clothes. 24 RR 139, 169.  About 10:50 PM that night, Mr. Reese arrived at his house in a dark van and entered the house. 24 RR 140, 171.  Another vehicle then approached Reese's house. 24 RR 141-142. This vehicle was a Chevrolet S-10 pickup truck, with a chrome strip across the back, which matched the type of vehicle they were looking for in regard to the killing of Sgt. Jackson. 24 RR 142, 175.[17] A black male got out of the pickup and talked with Reese in the yard. 24 RR 143.[18] They then got in the truck and left. 24 RR 143. The witness now knows that the other black male was Anthony Haynes. 24 RR 143. The police were about a block away when they observed this 24 RR

---

[17]  The witness later checked the registration on the pickup and it was registered to Mr. Haynes' father, Donald Haynes. 24 RR 147.

[18]  The witness testified that they had information that the pickup truck was possibly being driven by a black male. 24 RR 178.

176.

The pickup was stopped by police units in the 15600 block of West Little York, and Reese, Haynes and a juvenile were detained.  24 RR 144-145.  Haynes was driving the vehicle.  24 RR 145.  Mr. Haynes was transported to the homicide division of the Harris County Sheriff's Department.  24 RR 146.  The defendant directed the police to the intersection of Barkers Cypress and West Little York, where a  magazine for a .25 caliber pistol was found in a storm grate in front of the Texas Wild Country Club.  24 RR 148-149, 155.  The officers then made another trip to Missouri City in Fort Bend County.  24 RR 153-155.  The investigation was a concurrent operation of the Houston Police Department and the Harris County Sheriff's Department.  24 RR 160.

The State called **Timothy Reese,** who was arrested with Mr. Haynes.  25 RR 14.  He testified that he knew Anthony Haynes, and had first met him through Mr. Haynes' brother Courtney.  25 RR 15.  They first met when Mr. Reese was in elementary school.  25 RR 17. Mr. Haynes lived in Missouri City across the street from Mr. Reese.  25 RR 17.

On May 22, 1998, Mr. Reese left his home and went to the barber shop with Mike Tunson, who is white.  25 RR 19.[19]Anthony Haynes arrived at the barber shop and Mr. Reese left with him and Mr. Tunson in Mr. Haynes' Chevrolet pickup.  25 RR 20.  They went to Mr. Haynes' house and played basketball most of the evening.  25 RR 20-21.  All three youth then left to go to the mall, but stopped at Tunson's house so he could change clothes.  25 RR 22.  They left him there and Mr. Haynes and Mr. Reese went to Jack in the Box to get

---

[19]  Earlier, Mr. Reese had introduced Mike Tunson to Mr. Haynes.  25 RR 53.

something to eat, went back to pick up Mr. Tunson and then went to the Willowbrook Mall. 25 RR 22.

When they arrived at the mall, Mr. Reese asked Mr. Haynes to take him home, and then they went to an apartment complex. 25 RR 23-24. Anthony and Mike got out and went into the apartment, leaving Mr. Reese in the truck. 25 RR 25. Mr. Reese got out of the truck as he wanted to leave the apartment complex, and then the others pulled up behind him and Mr. Reese got into the back of the truck. 25 RR 26. Anthony Haynes was driving and Mike Tunson was in the passenger seat. 25 RR 26. The truck made about three stops while Mr. Reese was lying down in the back of the pickup. 25 RR 28, 127.

While he was lying on his stomach, he heard a sound that sounded like a gun shot. 25 RR 29. He had seen a gun belonging to Anthony Haynes in the pickup earlier that night. 25 RR 29-30. The gun Mr. Reese identified in court, State's Exhibit 47, was similar to the one he saw in the pickup, except that the one he saw had grips on it. 25 RR 30. Anthony Haynes had the gun about three or four months prior to May 22, 1998, and Mr. Reese had previously fired it. 25 RR 31.

When Mr. Reese heard the gunshot, he glanced at the tailgate and saw a dark-colored "Cherokee-type truck." 25 RR 32. It was headed away from them, but it turned around and began to follow them. 25 RR 32-33. Anthony Haynes was driving the pickup at that time. 25 RR 33. He speeded up but the dark vehicle continued to follow them. 25 RR 33. Mr. Haynes made a right-hand turn,  pulled into a driveway, and backed out. 25 RR 34. The pickup  then stopped and Mr. Reese peeped out and saw a Jeep Cherokee and a man inside

-27-

it. 25 RR 36.

While still lying in the back of the pickup, he saw a man walk over to the vehicle and talk to Mr. Haynes. 25 RR 128-129. The man got out of the Cherokee and said calmly "You hit my window." 25 RR 36. He was not aggressive. 25 RR 37. Mr. Reese heard Anthony say "I accidentally threw something at your window." 25 RR 37. The man then said calmly "I'm a police officer, let's talk about it." 25 RR 37. He was reaching for something in the back of his pocket and then Mr. Reese heard a bang as soon as the man said he was a police officer. 25 RR 38-39, 130. He did not see who fired the shot. 25 RR 41. The gunshot came from the driver's side, where Mr. Haynes was sitting. 25 RR 40, 41 Mr. Reese, still peering over the pickup bed, saw the man drop to the street. 25 RR 39. Mr. Reese then heard a lady scream "no, no, no." 25 RR 40.

Then they took off in the pickup. 25 RR 40, 42. Mr. Reese got up and started banging on the roof of the cab and hollered for them to stop. 25 RR 42. He looked in the window and saw Anthony and Mike arguing. 25 RR 44. When they stopped at a stop sign in the park, Mr. Reese got out of the truck. and ran across the street. 25 RR 45. The pickup then left. 25 RR 47.

Mr. Reese then went to a bowling alley and called home and asked his mother to pick him up. 25 RR 47. Instead, his aunt's boyfriend came and picked up Mr. Reese at the bowling alley and took him home. 25 RR 48. After he got home, Mike Tunson visited and they had a conversation. 25 RR 49.

While Mike was there, Mr. Reese got a phone call from Anthony Haynes. 25 RR 50.

-28-

Mr. Haynes allegedly said "Tell Mike that he better not say nothing." 25 RR 50.  Other things were allegedly said, including a statement that he had taken a U.S. Navy sticker off the car. 25 RR 51. Mr. Haynes also said he had gotten rid of the gun. 25 RR 52.  He also said that Mr. Reese "better not say anything either." 25 RR 52.  Mr. Reese did not tell anyone about what had happened or the telephone conversation. 25 RR 54.

The next morning, Saturday May 23, Anthony Haynes called, but Mr. Reese did not talk to him. 25 RR 54. Later, Mr. Haynes came to the house on a bicycle. 25 RR 55. Mr. Haynes repeated that Reese was not to say anything and that Haynes had taken apart and hidden the gun. 25 RR 55-57.  Mr. Haynes then left and Mr. Reese went to Splash Town with his girlfriend and her friend. 25 RR 58-59.  When he returned home, his mother said that Anthony Haynes had called many times. 25 RR 60.

That Saturday night, they talked again, and Mr. Haynes said he was in Missouri City. 25 RR 61.  Mr. Haynes said that the drawing of the person that did it, which he had seen on television,  did not look anything like him and that he would not be caught. 25 RR 61. After that conversation, Mr. Reese went to sleep. 25 RR 62.

On Sunday morning, Anthony came over in his truck on his  lunch break. 25 RR 63. A girl with short hair was with him, along with a friend of theirs named Curly. 25 RR 63. All four of them got in the truck and went to some apartments. 25 RR 65. The girl went off by herself, and the three others had a conversation in the back of the pickup about what happened on Friday night. 25 RR 66. Anthony told Curly that "I am  hard" and "I am  down" and "ask Tim what I did." 25 RR 66. Mr. Reese said Anthony had shot a police officer and

-29-

Mr. Haynes said he was "hard and down." 25 RR 67. This means that he was cool and tough. 25 RR 67. Mr. Haynes admitted he shot a police officer, but did not say why he did it. 25 RR 68. Mr. Reese told Anthony "you are stupid for doing it." 25 RR 69. Anthony asked Mr. Reese for $15 and Mr. Reese gave him some money. 25 RR 70. Mr. Haynes then took the others back home. 25 RR 70.

Later that night, Anthony Haynes and Curley came over to Mr. Reese's house. 25 RR 72. Anthony was in the S-10 pickup truck. *Id.* Mr. Reese got into the truck and as they drove away, they were pulled over by the police in unmarked cars. 25 RR 74. All three were detained. 25 RR 74.

At the police station, Mr. Reese told them the same story he told the jury, and he was put in the county jail. 25 RR 75. Eventually, charges relating to the shooting of Kent Kincaid were brought against Mr. Reese, but they were dismissed. 25 RR 76-77. He was charged with aggravated assault with a deadly weapon, relating to a different incident on a different date, and this charge was not dismissed as a result of his testifying against Mr. Haynes. 25 RR 76-77. This charge carries a two to twenty year sentence. 25 RR 83. The charges were brought shortly after he was released from jail. 25 RR 87. In order to allow the witness to be released, an agreement regarding bond in the amount of $10,000 was made between the state and the witnesses's attorney. 25 RR 88.

The witness admitted that he talked with the prosecutor on August 4, 1998. 25 RR 91. He had been formally charged with robbery on May 27, 1998 and was released on a $20,000 bond on August 5. 25 RR 112. When he was arrested on the new aggravated

-30-

assault case, he was released a second time on January 10, 1999 on a $10,000 bond. 25 RR 113. That case was still open at the time of Mr. Haynes' trial. 25 RR 120.

Mr. Reese had talked to the prosecutors before this second release. 25 RR 113. The first time he talked, Mr. Vinson, Mr. Smyth and Mr. Reese's attorney John Phillips were present. 25 RR 114. The witness thought the prosecutors had requested the interview. 25 RR 117. At that time, he was facing a sentence of five years to life. 25 RR 117. Mr. Reese also talked to the prosecutors a number of times before the trial. 25 RR 120-122. He claimed he did not expect to gain anything from testifying. 25 RR 123.

Mr. Reese testified that he had a conversation with Mr. Haynes in the courtroom where Mr. Haynes stated that he should have killed the lady because there would be no witnesses. 25 RR 78, 80. The defense objected to this testimony, but the objection was overruled. 25 RR 78-79. Mr. Reese stated that he was scared of the defendant. 25 RR 80. Mr. Reese was allowed to testify that he didn't know what the officer was reaching for in his back pocket. 25 RR 82.

Mr. Reese denied ever rummaging through Sgt. Jackson's vehicle or shooting out one of his windows. 25 RR 124. He admitted that on May 22, 1998 he had smoked marijuana. 25 RR 125-126.

**Dana Griffin,** a special agent with the Federal Bureau of Investigation, testified that on May 22, 1998 at about 11 p.m. she was driving in the Copperfield area on Forest Heights. 25 RR 137. At a stop sign, she noticed a truck in her rearview mirror with only the parking lights on. 25 RR 138. There were two individuals in the cab and one in the back of a dark

-31-

gray pickup. 25 RR 139. The persons in the cab were either white or Hispanic males. 25 RR 139. The person in the back of the truck jumped out and ran off. 25 RR 140. Her attention was drawn to the vehicle because she suspected that she was about to be car-jacked. 25 RR 140, 146. Ms. Griffin proceeded to the next stop sign and the truck remained behind her. 25 RR 141. The truck made a right turn. 25 RR 142. The agent related this information to the Houston Police Department the next day. 25 RR 149.

**L. R. Vervitskey,** a Houston Police Officer assigned to the homicide crime scene unit, testified that on May 28, 1998, he went to the sheriff's vehicle print stall to photograph a dark brown Jeep Cherokee. 25 RR 151-152. The windshield was fractured in a circle formation. 25 RR 154. The windshield was removed, packaged, and tagged, and the witness identified State's Exhibit 51 as that windshield. 25 RR 156-160.

**Todd William Miller,** a Houston Police Department officer assigned to the homicide division, testified that on May 23, 1998, he was called to participate in the investigation of the shooting of a Houston Police Department officer. 25 RR 164-165. Officer Miller went to the crime scene and asked neighbors about the crime. 25 RR 168. The next day, Sergeant Chuck Johnson, who lived near the Copperfield subdivision, supplied the name of Timothy Reese as a suspect to the shooting of Sgt. Kincaid. 25 RR 169-170. A warrant for the arrest of Mr. Reese was obtained, which was taken before Judge Garrett who determined there was probable cause for the arrest. 25 RR 170.

After obtaining the warrant, the officers proceeded to Mr. Reese's residence to set up a surveillance. 25 RR 172. They set up at the entrances and exits to the subdivision and

-32-

Case 4:05-cv-03424  Document 1-1  Filed in TXSD on 10/05/05  Page 25 of 40

soon they observed a van drive up and someone matching the description of Timothy Reese got out of it. 25 RR 174. A second vehicle drove up, a dark blue Chevrolet S-10 pickup with several bumper stickers and a chrome rear bumper that matched the description of the one involved in the homicide. 25 RR 175-176. A person knocked on the door of Reese's home and Reese came out, and they got in the pickup and left the subdivision. 25 RR 176-177.

Patrol units stopped the pickup at the 15600 block of West Little York. 25 RR 178. Officer Miller pulled up alongside and held up his badge and identified himself to the occupants of the truck. 25 RR 179. The three males were in the pickup, including Anthony Haynes, were all taken into custody. 25 RR 180, 181.[20] Mr. Reese and Mr. Haynes were separately transported to the police station. 25 RR 183.

Haynes, who matched the description of the shooter given by Mrs. Kincaid (25 RR 181), stated that the vehicle belonged to him. 25 RR 182. The registered owner of the truck was Donald Haynes, his father. 25 RR 180. At this time, the officer did not know Mr. Haynes' name. 26 RR 59.

Officer Miller interviewed Mr. Reese and Mr. Haynes at homicide division offices after his arrest. 25 RR 184. The police officer told Mr. Haynes that he was a suspect in the shooting death of Sgt. Kincaid, and read him his Miranda rights and warnings, which he appeared to understand. 25 RR 186-189. Mr. Haynes stated he wished to waive his right to remain silent. 25 RR 188-189. He denied any involvement in the murder and said he did not

---

[20]  No charges were ever brought against the juvenile who was in the truck with Mr. Reese and Mr. Haynes. 25 RR 183.

-33-

know anything about it. 25 RR 190.

At the time of the interview, Mr. Reese had implicated Mr. Haynes in the shooting. 25 RR 190. Upon being told what Mr. Reese had said, Mr. Haynes became nervous and asked whether there were any witnesses to the murder, and was told there were. 25 RR 191-192. The officer testified that no threats or promises were made to him. 25 RR 193-194. Mr. Haynes was told the police officers were picking up Michael Tunson, also known as Michael Turner, a juvenile, and then the defendant agreed to tell what had happened. 25 RR 193-194.

The statement was tape recorded. 25 RR 196. The officer read the defendant's rights and warnings twice, as he did not understand them the first time. 25 RR 197. He again indicated he wished to give up his rights. 25 RR 198. A tape of the first statement by the defendant was introduced as State's Exhibit 52A. 25 RR 200.

The taped conversation between the defendant and Officer Miller was played to the jury. 26 RR 21.[21] On the tape, the defendant showed how he had handled the pistol. 26 RR 21. Mr. Haynes was then brought before the magistrate judge, over two hours after he was

---

[21] In the first statement, Mr. Haynes states that he was in the truck with Mr. Reese and Mike Tunson and shot a gun out the window, in the air, but did not aim it at the Jeep that passed them. Statement 1 at 6-14. It jammed at the first shot. *Id.* at 13. He stated that he was followed by that car, which blocked him in a driveway. *Id.* at 14-15. The occupant got out, identified himself as an off-duty policeman, and talked with Mr. Haynes. *Id.* The policeman asked what had happened and Mr. Haynes said he had thrown a rock out his window. *Id.* at 15-16. He was afraid of being caught with a gun, and pulled the trigger, and the policeman went down. *Id.* at 16-17. He then left the scene and Tim Reese jumped out of the truck. *Id.* at 18. Mr. Haynes tried to get rid of the pistol by throwing the clip in a sewer, the black handles in a dumpster and hiding the gun itself in his home and then throwing it in a field. *Id.* at 19-23.

arrested. 26 RR 22-23. The first statement was taken at about 1:40 a.m. 26 RR 24.

The officer asked whether Mr. Haynes wished to make another statement, whether there was anything he had left out, and the defendant stated that he wished to make a second statement. 26 RR 25. The warnings were given again. *Id.* This second statement was received as State's Exhibit 54A[22] and was played for the jury. 26 RR 28. The officer testified that no promises or threats were made to induce the defendant to make this statement. 26 RR 29.[23]

After the second statement, Haynes directed the officers to the two locations where he had dropped the magazine and the weapon itself. 26 RR 29, 56. The magazine was found in a sewer in the middle of a parking lot facing West little Rock. 26 RR 30-31. The defendant next directed the officers to a location in Missouri City, but the weeds were too tall to conduct the search at night. 26 RR 34.

Mr. Haynes asked to use the telephone when he was at the magistrate's court. 26 RR 35. This was after the first interview. 26 RR 35. But he did not ask later at the station. *Id.*, 26 RR 55.

---

[22] In the second statement, Mr. Haynes stated that the pistol jammed frequently. Statement 2 at 2. The three were driving in Northwest Houston, and Tim Reese wanted to go home and Mr. Haynes got upset. *Id.* at 8. He shot the pistol in the air, at an angle. A car that had passed them turned around and started following them. Haynes tried to turn around and the car pulled up behind him and the driver got out. *Id.* at 8. The guy that got out was "a nice guy." *Id.* at 8. He wasn't trying to kill the officer and the gun just went off. *Id.* at 10. Mr. Haynes told the driver there he threw a rock out of the window, and the man identified himself as a police officer. *Id.* at 9.

[23] However, due to a lack of requested investigative funds, Petitioner was unable to conduct an investigation into this allegation.

When the officers returned from the search for the pistol, Mr. Haynes was placed in a lineup at around 4:30 a.m. on  May 25, 1998, which consisted of black males of his approximate age. 26 RR 37, 57.  Mrs. Kincaid was unable to make any identification when she viewed the lineup. 26 RR 39.

Officer Miller admitted that he always testified in court that the statements were voluntary and that he never threatened the suspects. 26 RR 42.  The officer testified that he did not delay in bringing Mr. Haynes before a magistrate so that he could obtain a statement from him. 26 RR 45.  He also denied telling Mr. Haynes that he could use a telephone only after he talked to him. 26 RR 49.  The officer also testified that Haynes did not ask to use the telephone to call his father before the first statement was taken, but only when he was before the magistrate. 26 RR 49, 55.  Mr. Haynes would have been taken to the magistrate at about the same time whether or not he had made a statement.  26 RR 51.

**Carol Carrier,** a criminal court hearing officer for Harris County, testified regarding the statutory warning given to Mr. Haynes. 26 RR 6-7.  The defendant was brought before her and signed the Miranda warning, introduced as State's Exhibit 53A.  26 RR 6.  At the time Mr. Haynes was brought before the hearing officer, he had not yet been charged with a crime.  26 RR 10.  Under Article 15.17, it is the responsibility of the law enforcement officials to have a defendant brought before a magistrate without unnecessary delay.  26 RR 10.  Mr. Haynes asked to use the telephone, and it was her understanding that he would be given the opportunity to do that. 26 RR 13.  She did not know who he wanted to call. 26 RR 14, 18.  It was also her understanding that Mr. Haynes would be questioned after he left her

-36-

courtroom. 26 RR 14. Mr. Haynes was brought before her at about 1:30 a.m. on May 25, 1998.

**Todd Duncan,** a Houston Police Department officer, testified that he was employed as a homicide crime scene investigator and participated in the investigation of Sgt. Kincaid's shooting. 26 RR 63. On May 23, he was dispatched to the crime scene and took photographs of the Jeep Cherokee. 26 RR 78. On May 25, 1998, he was dispatched to a parking lot on Barkers Cypress and West Little York and recovered the magazine or ammunition clip for an automatic pistol in a sewer drain. 26 RR 66. From there, the magazine was taken to the latent print lab. 26 RR 67.

The officer then proceeded to a Missouri City location to look for the weapon that the clip allegedly came from. 26 RR 67. It was too dark at that location to look for the weapon due to high weeds at the location. 26 RR 69. Later in the morning, the officers purchased grass cutters and searched the lot. 26 RR 72. The weapon was found after about a two-and-a-half-hour search (26 RR 71), more than fifteen feet from the roadway. 26 RR 81.

**Debbie Benningfield,** a latent print examiner with the Houston Police Department, explained that a latent print was an unintentional print that normally can't be seen by the naked eye that has to be developed using a powder or chemical. 26 RR 89-91. In connection with the investigation of the shooting of Sgt. Kincaid, the witness was brought two shell casings, a magazine, a pistol, and a can of pate, but she did not find any latent prints on the items. 26 RR 93. She then submitted the items to firearms examiner Robert Baldwin. 26 RR 95.

**Larry Baimbridge,** a Houston Police Department homicide division officer, testified that he worked in the crime scene unit. 26 RR 99. The officer came into possession of a spent slug that was recovered from the head of the victim during the autopsy at the Harris County Medical Examiner's Office. 26 RR 100. The slug was delivered to Bob Baldwin of the firearms lab. 26 RR 101.

**Robert Baldwin,** a criminalist employed in the firearms lab of the Houston Police Department, testified that he received the slugs and the gun from Sgt. Benningfield. 26 RR 105. In his opinion, the two cartridge cases were fired from the same gun. 26 RR 106. He also testified that the casing given to him by Sgt. Jackson was also fired from the same gun. 26 RR 108. The bullets were determined to be .25 caliber. 26 RR 108. The pistol and magazine were delivered to the witness by Officer Benningfield. 26 RR 109.

From test firings, the witness determined that all three .25 auto cartridges were fired in the .25 auto Sterling pistol designated as State's exhibit 47. 26 RR 110, 125. The fracture to the windshield was also consistent with this gun caliber. 26 RR 112. If a projectile was fired at the window from a low angle, much less than 90 degrees, it might not penetrate the windshield. 26 RR 121. The pistol lacked a safety mechanism and the trigger pull was between eight and eight and a half pounds. 26 RR 116. There was rust on the outside of the pistol. 26 RR 119.

The State then rested. 26 RR 128.

The defense made a motion for a judgment of acquittal, based on the ambiguity of the victim acting as a police officer or a private citizen. 26 RR 129. The motion was denied.

-38-

26 RR 129.

**D) The defense case at the guilt/innocence phase of the trial.**

The defense offered only Defense Exhibits 2 and 3, general orders of the Houston Police Department, and rested without calling any witnesses. 26 RR 131.

After final arguments, the jury on September 17, 1999, found Mr. Haynes guilty of capital murder. 27 RR 63.

**E) The State's case at the punishment phase of the trial.**

**Todd Miller,** the Houston Police Department officer who testified at the prior phase, was called as the State's first punishment phase witness. 28 RR 4. Officer Miller identified unedited versions of the tapes of interviews of the defendant. 28 RR 5. On the first tape, Mr. Haynes mentions two robberies he committed immediately before the shooting of Sgt. Kincaid. 28 RR 7. In the second statement, he mentions a third robbery. 28 RR 8. As a result of the tapes, the prosecutors were able to locate two of the victims. 28 RR 8. Chris Dicken who was robbed on Musket Trail and Alex Aglesis was robbed on High Village. 28 RR 9.[24] In only one of the robberies was anything taken. 28 RR 10. A man at Willowbrook Mall ran off as soon as they pointed a gun at him, a second man gave up his wallet, and a third man ran off after they demanded his property. 28 RR 10. Mr. Haynes said on the tape that he was scared during the robberies, that it was not in his nature to do them, and he didn't want to hurt anyone. 28 RR 12.

**Chris Dicken,** one of the robbery victims, testified that he lived on Musket Trail on

---

[24] Michael Tunson, a juvenile, was also present during these robberies. 28 RR 9-10.

-39-

May 22, 1998. 28 RR 15. As he was outside saying goodbye to visitors, a pickup stopped and asked directions to Interstate 290. 28 RR 18. Mr. Dicken walked up to the truck and gave him directions to Interstate 290 and he noticed a bird tattoo on the driver's shoulder. 28 RR 19. The driver said "One more thing. Give me your wallet." 28 RR 20. He saw a gun pointed at him and gave the driver the wallet. 28 RR 20. There were two other people in the truck. 28 RR 21. The witness identified photos of the truck as similar to the one he saw the day he was robbed. 28 RR 22. Mr. Haynes showed the jury what the witness identified as a similar tattoo on his right shoulder. 28 RR 23. At the time of the robbery, a passenger had a stocking cap on his head. 28 RR 24. This passenger was Michael Tunson. 28 RR 26.

**Alexandro Aglesis,** an attempted robbery victim, testified that on May 22, 1998 he was in the Copperfield area to visit friends. 28 RR 32. The friend's house was at the corner of Royal Gardens and High Village. 28 RR 33. As he was getting out of his car, a truck pulled up and the driver asked directions. 28 RR 34, 41. There were two people in the cab and someone was in the bed of the truck. 28 RR 35. As the witness walked over to the passenger's side, he heard a something that sounded like a gun being loaded. 28 RR 35. The driver pointed the gun at Mr. Aglesis and said "Give me all your money." 28 RR 35. The witness took off running to the back of his car. 28 RR 36. The gun was not fired. 28 RR 37. Then the truck took off rapidly and left in a west direction. 28 RR 37-38.

Mr. Aglesis told the police the driver was a black male about 17 or 18 years old. 28 RR 38. The person in the back of the truck seemed bigger. 28 RR 39. There were some

-40-

stickers on the back of the truck. 28 RR 40. The witness identified picture of the truck as similar to the truck he saw that evening. 28 RR 40. It seemed like the people in the truck wanted to get away from the scene quickly. 28 RR 42. No one in the truck came after the victim when he ran. 28 RR 43.

**Larry Ray Davis,** who worked at Dulles High School as an ROTC instructor and was called as a State's witness, testified he was a retired lieutenant colonel with the United States Air Force. 28 RR 45. Anthony Haynes became a member of the program in 1993 and graduated in 1997. 28 RR 45. He was in the program, and the class taught by Col. Davis, for four years. 28 RR 62. About one hundred students were in the class. 28 RR 62. The junior ROTC program is a character development program. 28 RR 62. In the fall of 1996, Anthony was a junior and had risen to the level of officer, having fulfilled the requirements. 28 RR 46.[25]

Col. Davis explained that a boost program is a Navy program that takes students with potential to develop them so that they can pursue a military career. 28 RR 65. The witness was shown a letter in which he stated that Anthony "displayed excellent leadership" and that Col. Davis had personally selected him as a deputy squadron commander of his unit and as an operations officer. 28 RR 67.

In November of 1996, at the beginning of an ROTC class, Anthony did not stand to attention. 28 RR 50, 69. An exam was then administered and returned to the defendant and

---

[25]   The students in the program are given ranks as in the active military and Anthony had risen to the level of operations commander and could have been a deputy commander at one time. 28 RR 64.

he became upset at the grading. 28 RR 49. Mr. Haynes looked at another student's test and said "This wasn't right, it wasn't fair." 28 RR 51, 70. His previous demeanor was normally very quiet and this was out of character. 28 RR 51. Col. Davis directed another ROTC official to call the campus police to ensure the safety of the other students. 28 RR 52. Col. Davis then asked Anthony to go to his office. 28 RR 53, 71.

Anthony sat down and the campus security arrived in a few minutes and escorted Anthony away. 28 RR 53. Before this incident, Anthony had shown proper respect. 28 RR 72. After this incident, Anthony was allowed to return to the class. 28 RR 73. Normally, Anthony was conscientious and concerned about his grades. 28 RR 73.

After this incident, the ROTC Ball, a regular event, was held in May, at the River Bend Country Club. 28 RR 54. At a conference, attended by school officials and Anthony's parents, Col. Davis made known his desire that Anthony not attend the event. 28 RR 55. The school principals overruled Col. Davis and Anthony was allowed to attend on the condition that one parent accompany him. 28 RR 57.

Anthony at one time, probably after the classroom incident, told Col. Davis about an incident in which he had held a gun to his father's head. 28 RR 57. As a result, Col. Davis suggested to Anthony's mother that she have him tested for drugs. 28 RR 58. There had been changes in his personality, which was sometimes quiet and sometimes boisterous, and changes in his class performance that suggested drug use. 28 RR 58. Based on this behavior, Col. Davis did not recommend him for further military training. 28 RR 59.

**Michael Rios,** an officer with the Fort Bend ISD Police Department, testified that in

November of 1996 he was assigned to Dulles High School in Sugar Land. 28 RR 77. Mr. Rios was responsible for handling any violations of the law or disruptive behavior. 28 RR 78. In November of 1996, he was called to the nurse's office to assist an officer. 28 RR 79, 90. The officer was trying to calm Anthony Haynes who was very upset about something and was cursing.[26] 28 RR 80. He appeared to be under the influence of drugs or alcohol. 28 RR 80. He was not doing anything to hurt anyone. 28 RR 91.

Anthony slammed a telephone receiver down and the officer was trying to calm him down. 28 RR 81. Initially, Anthony would not let the officers check his backpack for possible contraband. 28 RR 81. Officer Rios grabbed Anthony by the hand and the backpack was surrendered and Anthony was handcuffed. 28 RR 82, 99.[27] Once the uniformed officers grabbed his arm, he let loose of the backpack. 28 RR 84. Then they sat him down in a chair and handcuffed him. 28 RR 84. Some minutes later, his father arrived at the school and he had calmed down at that point. 28 RR 85. Officer Rios did not write a report on this incident. 28 RR 89. No charges were filed because he calmed down and Sgt. Thompson told them to just let him go. 28 RR 87. Anthony was released to his father and he was taken home. 28 RR 85.[28]

---

[26]  The witness testified that students commonly curse and use foul language when they are upset and sometimes when they are not upset. 28 RR 94. Foul language is very common in the school. 28 RR 95.

[27]  There was no contraband, such as drugs or weapons, in the backpack. 28 RR 97. Anthony let himself be handcuffed. 28 RR 99.

[28]  Officer Rios also escorted Anthony from class another time, the ROTC incident described by Col. Davis. 28 RR 103.

After that incident, Anthony and Mr. Rios got along "real good" as they "developed a relationship where we both respected each other"...[he] was able to talk to Anthony and Anthony would listen. He would, in turn, tell me he liked me a lot." 28 RR 87-88. Although Anthony said he did not like police officers, he would say "hey, there's Officer Rios, he is a cop I like. He is cool. He is a cop I like." 28 RR 88.

Anthony seemed proud that he knew Officer Rios and this was a relationship the officer would want with all young students. 28 RR 101. Officer Rios learned that Anthony needed someone to talk to and who took an interest. 28 RR 92-93. Anthony's statements about not liking policemen "was a little more than babbling." 28 RR 93.

**Vicki Ann Ruhmann,** another officer of the Fort Bend Independent School District Police Force, testified that she worked at Dulles High School and came into contact with Mr. Haynes in November of 1996. 28 RR 112-114. She received a call that there was a disturbance and she proceeded to the nurse's office. 28 RR 115. Anthony had a phone in his hand and was yelling and telling people to get away from him and leave him alone or he would hit them with a phone. 28 RR 116, 127. He appeared to be very angry. 28 RR 116. Officer Ruhmann walked over and told Anthony he needed to calm down and put the phone down. 28 RR 116. Then she called for officer Rios for assistance. 28 RR 117. Anthony never attempted to throw the phone at anyone. 28 RR 128. Then she grabbed the phone and took it away from Anthony as she thought he might throw it at someone. 28 RR 118-120, 132. Once the phone was removed, he was still yelling and said "I could kill you." 28 RR 120, 139. Then officer Rios arrived and Anthony was still yelling and combative. 28 RR

-44-

121. He would not sit down, and there was a short struggle when he was handcuffed and he sat down in the chair. 28 RR 122.[29] He was kicking, so the chair was turned toward the wall. 28 RR 122, 133. Eventually he did calm down when a supervisor and his father arrived. 28 RR 123, 133. No one was hurt during this incident. 28 RR 129. After this incident, the officer did not have any more run ins with the defendant. 28 RR 123. She did not write a report about this incident. 28 RR 127. The sergeant in charge did not write a report. 28 RR 136.

**Pam Rogers,** a medical record custodian for the University of Behavioral Health. 28 RR 144. Psychiatric therapy services are offered by the hospital. 28 RR 144. The defendant's psychiatric records were introduced into evidence. 28 RR 145. Anthony was first seen on September 17, 1996 and again on October 22 and October 29, 1996. 28 RR 146. He had anger issues. 28 RR 146. He was admitted to the hospital on November 1, 1996 for intermittent explosive disorder and cannabis dependence. 28 RR 146. The admission form stated that he had tried to kill the family dog, and he attempted to attack a staff member with a shower curtain rod. 28 RR 147. He was in the hospital until November 10 and then he went to a day treatment program. 28 RR 147. His final discharge date was November 22, 1996. 28 RR 147. During his stay, Mr. Haynes received Ativan, Thorizine, and Tetregol medications. 28 RR 148.

**Judy Miller,** the health information manager for the West Oaks Hospital, and the

---

[29] The officer testified that the defendant was somewhat cooperative in his handcuffing. 28 RR 130.

-45-

custodian of records for that institution, testified that Anthony Haynes was admitted to the facility on November 1, 1996 on a provisional diagnostic profile of intermittent explosive disorder. 28 RR 151. A nursing note stated that on November 3, 1996 he became agitated, slammed the door and had an angry affect. 28 RR 151. Also in the notes are a statement that if anyone touched him they would be dead in 48 hours. 28 RR 152. The notes also indicated that the next day, he became agitated and kicked the doors while using profanity. 28 RR 152. The notes also indicated he tried to hit one of the staff with a curtain rod. 28 RR 153. He also said he was going to get a gun and 'blow them all away." *Id.* This witness never had any personal contact with the defendant. *Id.* He was released on November 10. *Id.* He was finally released from day treatment on November 22. 28 RR 154.

The State then rested. 28 RR 155.

Called out of order for the State was **Roy Smithy,** chief investigator for the special prosecution unit of the Governor's Office. 29 RR 5. This is a prosecutor assistance program which investigates offenses within the prison system. 29 RR 5. Mr. Smithy stated that there are instances of violence and alcohol and drug use within the prison system. 29 RR 7. He described the handling of a person given a death sentence in Texas. 29 RR 7. He will first be processed through the diagnostic unit at Huntsville. 29 RR 8. An inmate who receive life for a capital offense could be sent to any number of facilities in the general population. 29 RR 8. If an inmate messes up, he will be placed in a higher security area. 29 RR 9. He would come into contact with other inmates and prison guards and other personnel. 29 RR 9. A person receiving a life sentence could become a trustee. 29 RR 10.

-46-

A person receiving a death sentence would be on death row, which is more secure than the general population. 29 RR 10. They would be watched more closely. 29 RR 11. There is less violence on death row. 29 RR 11. Inmates can obtain drugs and alcohol on death row as well as in general population. 29 RR 12. Predator-type murderers are more difficult to rehabilitate than other kinds of murderers, but on the whole one cannot say that one person is a greater risk than another based on the category of his murder. 29 RR 16. Although an inmate's crime may not be known to other prisoners and guards, sometimes violent prisoners make it known for their own protection. 29 RR 17.

Of the 145,000 to 150,000 inmates in the Texas system, as many as 60 to 70 per cent can be trustees. 29 RR 18. The Texas system controls violence better than any other system in the country, according to the witness. 29 RR 20. The execution of inmates is a solution to the violence problems in the prison, because if "[y]ou have an inmate who is violent, he certainly won't be violent after he is executed." 29 RR 21. A person who is sentenced to life for the murder of a police officer can be safely housed in the Texas system. 29 RR 22.

**F) The defense case at the punishment phase of the trial.**

**Quarrancy Lamar Smith,** a minister from San Diego, California, was called by the defense. 28 RR 156. Mr. Smith met Anthony in Rhode Island in July or August of 1997, at the boost program. 28 RR 156. This program was for outstanding cadets who are seen as officer material. 28 RR 157. If it is completed successfully, it is a direct ticket into the United States Naval Academy, which was the main purpose of the program. 28 RR 169.

-47-

There were about 300 or 350 people in the program.  28 RR 158.  Mr. Smith acted as a mentor for Anthony since he was an ordained minister.  28 RR 159.  At the beginning, Anthony was having trouble adjusting.  28 RR 160.  There was an incident at a concert he had attended.  28 RR 185.  He had been accepted at Morehouse College.  *Id.*  After the mentoring, Anthony did very well and received an award.  28 RR 161.  Academically, he had advanced classes and did well at the beginning but less well toward the end.  28 RR 161.  Anthony admitted that he would drink alcohol and associate with unsavory friends.  28 RR 162.  He began to take an interest in religion.  28 RR 163.  But he did not finish the program because his grades fell below the 75 per cent required.  *Id.*  This meant he could not attend Morehouse College, and he changed his plans to enlist in the Marines or attend Prairie View A & M in Houston.  28 RR 164.

On May 23, 1998, Anthony called Mr. Smith and told him that he had killed a man. 28 RR 165.  He was scared and remorseful could not believe what had happened.  28 RR 165.  Anthony took responsibility for the killing.  28 RR 166.  In a later call, he said he thought the person was a policeman or a cop.  28 RR 166.  The minister suggested he turn himself in to the authorities.  28 RR 166.  Father Smith asked him why he killed the person and Anthony said he didn't know, that it was just spur of the moment.  28 RR 179.

A few days later, Anthony called from the Harris County Jail.  28 RR 167.  He expressed his remorse for the killing and his sympathy for Mrs. Kincaid and her family.  28 RR 168.

Father Smith was familiar with Anthony's background of threatening his family and

-48-