# United States District Court
# Southern District of Texas

## Case Number: H-05- 3424

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __3__ of _____

☐ Exhibit to: _____Vol I_____
   number(s) / letter(s) _____

Other: _____Petition For Writ of_____

_____Habeas Corpus_____

_____

teachers and staff.  28 RR 169-170.  People accepted  into the Navy often have records of violence, according to Father Smith's experience.  28 RR 170-174.

The defense called **George E. Burrell,** a staff chaplain with the Harris County Sheriff's Department.  29 RR 26.  He came to know Anthony while he was an inmate at the Harris County Jail, and had contact with him up to two times a week.  29 RR 27.  He never had any arguments with staff or other inmates, or gotten into any fights or was disrespectful. 29 RR 28-29.  The witness never saw him violate jail rules or lose his temper, use drugs or possess weapons, or attempt to strike any guards.  29 RR 30.  Anthony was housed in a secure unit of the jail, where he did not have much contact with the other inmates.  29 RR 33.  Where he was housed, he could not have any physical contact with other inmates.  29 RR 34.

**Larry Earl Britt,** who worked for the City of Houston fire marshal's office, testified that he knew Anthony and his father, who is a colleague working for the same entity.  29 RR 37.  Anthony went to live with his father at the age of 13 to 14 years of age.  29 RR 38.  As he grew up, he seemed a moral kid, respectful and obedient.  29 RR 39.  Anthony worked and volunteered in the hospital system.  29 RR 39. Mr. Britt had not heard of the incident when Anthony was handcuffed at school, or about trying to kill the family pet, or threatening medical personnel.  29 RR 43-44.

**Deloyd T. Parker, Jr.,** executive director of the Shape Community Center, a center for building and strengthening families, testified that Anthony was enrolled in the summer youth program as a younger person, in about early middle school.  29 RR 47-48. Anthony

-49-

was a good student and he completed the program. 29 RR 49. Mr. Parker had known the family for 18 years. 29 RR 50.

**Evelyn Jackson Haynes,** Anthony's paternal grandmother, testified that she was a recently retired social worker who held a master's degree in guidance and counseling. 29 RR 51. She counseled many people as a psychiatric social worker. 29 RR 57. Anthony's mother is Patricia Hinton Davis, who was never married to Anthony's father, Donald Haynes. 29 RR 52. After his birth, Donald cared for him due to his mother's illness. 29 RR 52. In Anthony's early years, he was raised by his mother and grandmother. 29 RR 53. His mother, Myrtle Hinton, is an airline stewardess. 29 RR 53. Anthony was very intelligent and made good grades. 29 RR 54. He was very respectful. 29 RR 54. When Anthony was in his last year of high school, Ms. Haynes would see him on weekends. 29 RR 55. He did not seem to be using drugs, and she did not detect it in his behavior or eyes. 29 RR 56, 62.

Drugs can cause aggression in someone who is not normally aggressive. 29 RR 58. A co-worker of hers, a Mr. Bailey, saw Anthony on occasion before he was admitted to West Oaks. 29 RR 58. Anthony's parents put him in this drug program. 29 RR 59.

**Myrtle L. Hinton,** Anthony's maternal grandmother, testified that she worked for Memorial Southwest Hospital and Medicare and Medicaid. 29 RR 65. Anthony did well in elementary school, got good grades, and participated in programs and sports activities, as well as attending church and church programs. 29 RR 66-68. His father was active in his life. 29 RR 67.

There was an incident at Christmas when Anthony was spanked by his father and went

-50-

to the hospital for an ear infection; they felt he had been abused and Child Protective Services were called. 29 RR 68. They released Anthony to Ms. Hinton. 29 RR 68. Various awards Anthony had won as a child were introduced as defense exhibits, which were read to the jury. 29 RR 70-71.

When Anthony was 10, it he decided he wanted to live with his father, as his mother was an airline stewardess. 29 RR 72. After that, she still maintained weekly contact with Anthony. 29 RR 72. She never feared him and he was not disrespectful. 20 RR 73. She never knew he was involved with drugs. *Id.*

**Donald Wayne Haynes,** Anthony's father, testified that he was employed by the Houston Fire Department as a senior investigator in the Arson Bureau. 29 RR 78. He received a master's degree in criminal justice from Sam Houston University and a bachelor's degree from the University of Houston. 29 RR 78. After being born, Anthony went home to his maternal grandmother's, as his mother was sick. 29 RR 79. When Anthony was seven, he came to live in his father's house. 29 RR 79. After that, he went back to his mother for about a year and a half, who was living in California at the time. 29 RR 80. In 1991, after Anthony's mother had returned from California, they went to court and agreed that Anthony would live with his father. 29 RR 81. There were disagreement with his mother about how Anthony was to be raised. 29 RR 82.

Anthony attended Missouri City Middle School. 29 RR 82. When he was attending elementary school, Anthony was diagnosed as having attention deficit disorder, and Ridlin (sic) [Ritilin] was prescribed, and he took it for a year or two. 29 RR 83-84. Anthony did

-51-

well academically in middle school, getting mostly A's and B's. 29 RR 84. He was involved in sports and church and church activities. 29 RR 84.

After middle school, Anthony attended Dulles High School, where he was also in ROTC. 29 RR 85. In his junior year, Colonel Davis gave him a very favorable recommendation for Anthony to attend the BOOST Program, and he did receive a four-year scholarship to Prairie View University. 29 RR 85. In high school, he played in the band, was in ROTC and football. 29 RR 86.

In his senior year, he began to rebel, and discipline was needed, which included hitting him with a belt. 29 RR 87, 94. Once, Mr. Haynes was called to Dulles High School in regard to the incident regarding ROTC related above, and Anthony was taken home. 29 RR 88. At that time he was under a doctor's care for anger management. 29 RR 88-89. There was also a suspicion that he was involved with drugs. 29 RR 89. Mr. Haynes decided to take him from school to the West Oaks Hospital, a psychiatric hospital, where he stayed for two or three weeks. 29 RR 90. Both parents participated in counseling and therapy sessions. 29 RR 91. There was a chemical imbalance and he was prescribed drugs. 29 RR 91. Anthony was released in November and allowed to go back to school. 29 RR 91-92. After his stay at West Oaks, his behavior improved. 29 RR 92. Anthony told his father he had been on drugs since 13 or 14, including something called "aunt," which is marijuana laced with embalming fluid. 29 RR 93.

Also in his senior year, there was an incident when his father slapped Anthony, the first time he had done so, and Anthony came back carrying his father's 9 millimeter service

-52-

weapon and crying saying "Dad, something bad is happening. I have bad thoughts."  29 RR

94.  Anthony did not point the gun at his father nor his Mr. Haynes feel threatened.  29 RR

95.  At that time they contacted Mr. Bailey, a therapist, for Anthony.  29 RR 94.  The

therapist later said there was a chemical imbalance that was causing his behavior.  29 RR

118.  After treatment, Anthony returned to school and graduated on time from Dulles High

School.  29 RR 95.

Anthony then had several jobs, at various supermarkets, and than went into the Boost

Program in Newport, Rhode Island.  29 RR 96.  He did not complete the program, returned

to Texas and went to live with his mother in April of 1998, about one month before this

crime happened.  29 RR 97. He had obtained a job at Ross Dress for Less, at the cash

register.  29 RR 98.

On May 25, 1998, Mr. Haynes first found out that Anthony was charged with the

capital murder of a police officer, and he contacted an attorney.  29 RR 98.  Mr. Haynes was

not allowed to see his son until the next week.  29 RR 99.  Before this incident, there was

nothing to alert Mr. Haynes that he would be dealing with this kind of situation.  29 RR 99.

Anthony has told his father what he did, and, as a father and a police officer, "it breaks

my heart."  29 RR 100.  Anthony had no particular dislike for police officers, and he

interacted well with his father's colleagues and police officer friends.  29 RR 100.  Prior to

this incident, Anthony had never been arrested for anything or convicted of anything, as an

adult or as a juvenile.  29 RR 120.

On August 27, 1996, when Anthony was at home, Mr. Haynes received a call at work

-53-

from the Missouri City Police Department, who asked him to come home because an officer had found marijuana in the home.  29 RR 104-105.  Anthony told the officer that he had purchased the marijuana from a location in southeast Houston, and it looked like it might be for resale.  29 RR 106.  The officer said they were not going to pursue charges.  29 RR 107. After that, Anthony went to see therapist Bailey on September 17, 1996.  Mr. Haynes told the therapist he did not remember telling him that his son did not respect authority.  29 RR 109.  The therapist did not warn Mr. Haynes that he was in danger from his own son, but did tell him that Anthony was making homicidal threats.  29 RR 111.  Mr. Haynes was aware that his son beat the family dog.  29 RR 112.  Mr. Haynes told one of the therapists that they had become aware that their son had been dealing drugs for about two months.  29 RR 113. Mr. Haynes did not recall his son boasting that he had gained respect as a result of the crime or that he was going to "beat" the case.  29 RR 114-115.  There were no psychotic symptoms when he was examined, Anthony was above average intelligence, and there was no organic brain disorder.  29 RR 118.[30]  Mr. Haynes was also not aware that his son had beaten people with bats, jumped people and killed dogs and cats.  29 RR 119.

The defense rested after this witness.  29 RR 121.

**G) The State's rebuttal at the punishment phase of the trial.**

The State proposed calling the victim's wife in rebuttal as "victim impact testimony." 29 RR 121.  The defense objected that such testimony was circumscribed by several factors:

1) the evidence must be relevant to a special issue during punishment or offer to rebut

---

[30]  This diagnosis was by a Dr. Leewood.

a defense theory

    2) the probative value cannot be outweighed by the danger of undue prejudice

    3) the testimony must come from the surviving victim of the crime itself or from a family member or a legal guardian of the victim, specifically the testimony must regard the impact the crime has had on that individual's life but the testimony cannot create a comparative judgment situation i.e., it must show the uniqueness of the loss of victim as an individual only as it pertains to the immediate family, guardian or survivors

    4) the evidence may not pertain to the character of the victim unless it is introduced in rebuttal of the defensive theory offered during the punishment

    5) the testimony may not discuss the value of the individual to the community as such testimony could create a comparative judgment situation which has been expressly discouraged.

    29 RR 122.

    Despite the fact that the proposed testimony violated all of these prohibitions, the Court allowed the testimony.  29 RR 126.

    **Nancy Kincaid,** the victim's widow, testified that she had a very strong relationship with her husband, that they were married for  18 years, and were very close.  29 RR 127. Everybody liked the victim, and he would help people when they needed it, and he was very handy.  29 RR 127.  He worked the night shift so that he could be around his two daughters a lot.  29 RR 128.  He helped them with softball and tee ball and karate classes.  29 RR 128. His daughter Courtney was six at the time and it was hard for her to understand what was

going on. 29 RR 128. As she had a hard time verbalizing, she did a lot of crying and had temper tantrums, and was at the nurse and counselor a lot at school. 29 RR 128. The other daughter, Jenna, who is now eleven, was devastated and would cry at night for two hours for several months, and, although she has gotten stronger, it still affects her a lot. 29 RR 129.

Mrs. Kincaid depended on her husband a lot, he took care of the cars and the household, and she had to take a full-time job. 29 RR 129.

The State and defense rested. 29 RR 130.

On September 24, 1999, in accordance with the special issues submitted pursuant to Tex. Code Crim. Pro. Article 37.07, Anthony Haynes was sentenced to death. (CR 477-478; Exhibit 3). On November 12, 1999, after a hearing, the trial court denied his motion for a new trial.

### III.

### THE MEANING AND STANDARD OF REVIEW UNDER §2254(d)(1) OF THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 AND ITS APPLICATION TO PETITIONER'S CASE.

This Court, in ruling on Mr. Haynes's Petition for Writ of Habeas Corpus, will be faced with the task of interpreting and applying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and deciding its applicability, if any, to his case. Since the passage of the AEDPA, the Supreme Court has issued a number of crucial decisions interpreting and clarifying the standard of review, in particular the cases of *Williams(Terry) v. Taylor*, 529 U.S.____, 120 S. Ct. 1495 (2000) (*Williams I*) and *Williams (Michael) v.*

*Taylor*, 529 U.S.____, 120 S. Ct. 1479 (2000) (*Williams II*).  This section of Mr. Haynes's writ application deals with the standard of review under the AEDPA in light of the two *Williams* cases.

**A.    The *Williams v. Taylor* Decisions Reaffirm the Vital Role of Federal Habeas Corpus in Cases Involving Colorable Claims of Constitutional Error.**

**I. Overview**.

The Supreme Court has spoken in an unambiguous voice: the AEDPA did not vitiate meaningful federal review of a state prisoner's federal constitutional claims. Federal habeas corpus remains a powerful remedy whose "most basic traditions and purposes" are "to protect individuals from unconstitutional convictions and to help guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." *O 'Neal v. McAnnich*, 513 U.S. 432,442 (1995). In a series of decisions beginning with *Felker v. Turpin*, 518 U.S. 651(1996) the United States Supreme Court has  rebuffed the contentions of various state's Attorneys General that AEDPA – for all practical purposes -- eliminated federal review. *See, e.g, Felker* (rejecting state's argument that AEDPA removed the Supreme Court's jurisdiction to entertain original habeas petitions); *Lindh v. Murphy*, 117 S. Ct. 2059 (1997) (rejecting the state's argument that AEDPA applies to cases already pending in federal court at time of its enactment); *Stewart v. Martinez-Villareal*, 118 S. Ct. 1618, 1621 (1998) (rejecting the state's interpretation of AEDPA's provision governing second or successive petitions as having "far reaching and seemingly perverse" implications for habeas practice); *Hohn v. United States*, 524 U.S. 236,  118 S. Ct. 1969 (1998) (rejecting government's

-57-

argument that AEDPA eliminated the Court's jurisdiction to review denials of application for certificates of appealability by a circuit judge); *Slack v. McDaniel*, 120 S. Ct. 1595 (2000) (rejecting the state's argument that a habeas petition refiled in federal court after being dismissed without prejudice as a "mixed" petition was a second or successive petition). Any unresolved questions about the vitality of the "Great Writ's" role as "the best and only sufficient defense of personal freedom," *Lonchar v. Thomas*, 517 U.S. 314, 324(1996), were definitively answered by the Court's recent decisions in the two *Williams v. Taylor* cases. *See (Terry) Williams v. Taylor*, 120 S. Ct. 1495 (2000) *(Williams I)*; *(Michael) Williams v. Taylor*, 120 S. Ct.1479 (2000) *(Williams II)*.

In *Williams I*, the Court was confronted with several questions regarding the meaning and scope of §2254(d) of Section 2254(d)(1) of AEDPA, widely considered to be its key provision. That section provides that a writ of habeas corpus shall not be granted with respect to a claim "adjudicated on the merits in State Court proceedings" unless "the adjudication" "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In construing §2254(d), the Court rejected the Fourth Circuit's view that habeas relief could be granted only if "state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." 120 S. Ct. at 1521. The Court deemed the reference to reasonable jurists to be of "little assistance" to federal courts reviewing habeas claims, and, in fact, could be

-58-

"mislead[ing]." *Id.* [31] The Court held "[t]he placement of this additional overlay on the 'unreasonable application' clause was erroneous." *Id.*

## B. The Supreme Court in *Williams I* specifically overruled the subjective standard of review.

*Williams I* specifically overruled the Fifth Circuit's subjective "reasonable jurist" interpretation of AEDPA as enunciated in *Drinkard v. Johnson,* 97 F.3d 751 (5th Cir. 1996). As discussed above, the Court rejected the "unreasonable jurist" overlay on the "unreasonable application" language of the statute:

> Defining an 'unreasonable application' by reference to a 'reasonable jurist,' however, is of little assistance to the courts that must apply 2254(d)(1) and, in fact, may be misleading. Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. The 'all reasonable jurists' standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one. *Williams I,* at 1521-22.

In *Drinkard,* the Fifth Circuit had earlier ruled that the reasonable jurists in question were those deciding the case, and then held that the state court's application of federal law

---

[31] The Court also rejected Virginia's view of §2254(d), which was even narrower than the Fourth Circuit's interpretation of the statutory provision. Virginia argued that 2254(d) established a general rule prohibiting federal relief if the state courts addressed the issue. The state viewed §2254(d) as a modified *res judicata* rule which could be overcome only if the petitioner satisfied two very narrow exceptions. *Id.* at 1504 n. 8. "The first "contrary to" exception, in his [Virginia's] view, applies only to "starkly unreasonable" errors of law...The second exception likewise replaces the 'de novo' standard of reviewing mixed questions of law and fact with the standard of 'objective reasonableness' as formulated by the Court of Appeals." *Id.* No member of the Court adopted this draconian view of §2254(d): "We are convinced that that interpretation of the amendment is incorrect." *Id.* at 1504.

-59-

was not unreasonable because the Fifth Circuit panel split 2 to 1 on the underlying mixed constitutional question. The other danger inherent in this misleading subjective test was also obvious to the Supreme Court: by making themselves the arbiters of what is reasonable and what is not, and this created a tautological absurdity where the result would always be deemed "reasonable," split panel or not. In *Williams I*, the Supreme Court explicitly rejected the *Drinkard subjective* standard. ("For, example, the Fifth Circuit appears to have applied its 'reasonable jurist' standard in just such a subjective manner..." *Id.* at 1522). *See also Miller-El v. Johnson,* 2000 WL 724534, (N.D. Tex. June 5, 2000), at *1 ("It appears that the *Drinkard* opinion has been overturned to the extent it required a subjective inquiry into what is an 'unreasonable application' of facts to the law.")

### C. The Supreme Court granted relief in the *Williams* cases.

As is often true, it is important to look not only at what the Court said §2254(d) meant, but to examine what the Court actually did. In Terry Williams' case, the Court concluded that Mr. Williams was entitled to a new capital sentencing trial because of his attorney's incompetent and prejudicial "failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances." 120 S. Ct. at 1524. Furthermore, the Supreme Court determined that the Virginia Supreme Court's decision rejecting Mr. Williams' ineffective assistance of counsel claim was both "contrary to" and an "unreasonable application of" clearly established federal law. *Id.* at 1525.

In *Williams II,* the Court was faced with several issues regarding the proper interpretation of AEDPA's evidentiary hearing provision, §2254(e). Section 2254(e) states

that a federal court shall not hold an evidentiary hearing, subject to two narrow exceptions, "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings." In concluding that Michael Williams was entitled to a federal evidentiary hearing in connection with several claims of juror and prosecutorial misconduct – claims raised for the first time in federal court— the Court unanimously rejected the State's "no-fault reading of the statute," 120 S. Ct. at 1487, holding instead that §2254(e)'s general rule against evidentiary hearings only comes into play if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 1489. The Court stated: "The 'failed to develop' language does not bear this [no-fault] harsh reading which would attribute to Congress a purpose or design to bar evidentiary hearings for diligent prisoners with meritorious claims just because the prosecution's conduct went undetected in state court." *Id.* The Court remanded Michael Williams' case to the district court for proceedings consistent with its opinion.

In sum, the Supreme Court's post-AEDPA decisions have uniformly rejected the arguments of the various states maintaining that AEDPA eviscerated meaningful federal review of state prisoner's constitutional claims. Federal courts are not mere "rubber stamps" for the state courts, and federal habeas corpus still performs its vital function as "a remedy designed to interpose the federal courts between the States and the people, as guardians of the people's federal rights. *Reed v. Ross,* 468 U.S. 1, 10 (1984).

### D. Section 2254(d)

Because this case was filed after AEDPA's effective date, a more detailed discussion

of §2254(d) and the Supreme Court' s decision in *Williams I* is in order. The controlling

opinion in *Williams I* was authored by Justice O'Connor. Before parsing the relevant part os

her opinion, however, it will help to review the relevant statutory language. Section

2254(d)(1) states:

> (d)    An application for writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> Court proceedings unless the adjudication of the claim—

> (1)resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States...

Because Justice O'Connor concluded that the "contrary to" and "unreasonable

application" clauses each have "independent meaning," petitioner will address the two

provisions separately. 120 S. Ct. at 1519.[32]

1. *"Contrary to" clearly establish federal law.*

Justice O'Connor first stated that "a state court decision will certainly be contrary to

our clearly established precedent if the state court applies a rule that contradicts the

governing law set forth in our cases." *Id.* at 1519.  As an example of such an error, Justice

O'Connor posited that a state court decision which interpreted the *Strickland v. Washington*

---

[32]    The Court did note that, in some cases, the line between "contrary to" and
"unreasonable application" will be difficult to draw.  120 S. Ct. at 1519-21.  And, in some cases,
a state court decision will be both "contrary to" and an "unreasonable application" of federal
law.  *Williams* I was such a case.  Justice O'Connor's opinion and Justice Stevens' opinion
agreed that the Virginia Supreme Court's decision rejecting Terry Williams' ineffective
assistance of counsel claim was contrary to the Court's decision *Strickland v. Washington* and an
unreasonable application of *Strickland v. Washington.  Id.* at 1516.

[466 U.S. 668 (1984)] prejudice inquiry as requiring the prisoner to demonstrate by a preponderance of the evidence that the result would have been different would be "contrary to" *Strickland,* since pursuant to *Strickland* a prisoner need only demonstrate a reasonable possibility that the result of the proceeding would have been different." 120 S. Ct. at 1519. Additionally, according to Justice O'Connor, a "state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from out precedent." *Id.* at 1520.[33]

The *Williams* Court determined that the state court decision was contrary to *Strickland* because an examination of the opinion revealed that the Virginia Supreme Court believed that *Lockhart v. Fretwell,* 506 U.S. 364 (1993), "somehow modified or supplanted the rule set forth in Strickland" and thus held that "a focus on outcome determination was insufficient standing alone." 120 S. Ct at 1524. While agreeing with the dissent that the state court did also discuss whether "Williams had demonstrated a reasonable probability that, but for his trial counsel's unprofessional errors, the result of the proceeding would have been different, . . . [i]t is impossible to determine, however, the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice." *Id.*

    *2. Unreasonable application of clearly established federal law.*

-----

[33] Justice O'Connor did state that a "run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within §2254(d)(1)'s 'contrary to clause." 120 S.Ct. at 1520.

As for the unreasonable application clause, Justice O'Connor first concluded that a state court decision which "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would be a decision involving an unreasonable application of... clearly established Federal law.'" 120 S. Ct. at 1520. Justice O'Connor went on to say that a federal habeas court making the unreasonable application inquiry "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. Justice O'Connor made clear however that the reviewing court should not transform the inquiry into a subjective one by "resting its determination on the simple fact that at least one of the nation's jurists has applied the relevant federal law in the same manner that the state court did in the habeas petitioner's case." 120 S. Ct. at 1522.[34] In doing so, the Court specifically stated that the Fifth Circuit had committed precisely this "subjective manner" error in its decisions applying §2254(d) when it applied the *Drinkard* standard. While the Court noted that the term "'unreasonable' is no doubt difficult to define," *id.* at 1522, it believed that it was a term with which federal judges were familiar. The Court did state that an unreasonable application of federal law is different from an incorrect application of federal law. *Id.*

Justice O'Connor's explanation of why the Virginia Supreme Court's decision was an unreasonable application of federal law is also instructive. First, the state court decision revealed "an obvious failure to consider the totality of the omitted mitigation evidence." *Id.*

---

[34] Justice Stevens made this same point in his opinion for four members of the Court: "The statue says nothing about "reasonable judges,' presumably because this in retrospect may be characterized a 'unreasonable.'"

at 1525. Echoing Justice Stevens' holding, the state court decision was also deemed unreasonable in failing to "entertain the possibility" that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death eligibility case." 120 S. Ct. at 1516.[35] Finally, for the same reason the state court decision was "contrary to" *Strickland* – its conclusion that a "mere difference in outcome not sufficient to establish constitutionally ineffective assistance of counsel" – it was also an "'unreasonable application of' the clear law as established by this Court." 120 S. Ct. at 1515.

### 3. *Clearly established Federal Law.*

Justice O'Connor's opinion also held that "clearly established Federal Law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of this Court's decisions." 120 S. Ct. at 1523. Her opinion also reveals that the relevant time frame is the law as it existed "as of the time of the relevant state-court decision." *Id.* The inquiry is different from the Court's prior focus in its nonretroactivity/*Teague* decisions, which surveyed the legal landscape at the time the case was final on direct review. *Id.* Section 2254(d)'s focus in on the law at the time the state court actually decided the case. But Justice O'Connor did make clear that "whatever would

---

[35] Justice Stevens noted that the state court failed "even to mention the sole argument in mitigation that trial counsel did advance," that Williams turned himself in, cooperated with the police and was remorseful. 120 S. Ct. at 1515. Justice Stevens reasoned that this argument coupled with the prison records and guard testimony may not have overcome a finding of future dangerousness, "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.*

-65-

qualify as an old rule under our *Teague* jurisprudence will constitute clearly established Federal Law." *Id.* The only caveat is that §2254(d)(1) "restricts the source of clearly established law to this Court's jurisprudence." *Id.*

### E. Qualifying State Court Decisions.

While the Supreme Court was not confronted with this issue in *Williams I*, the clear language of §2254(d) reveals that it does not apply in all cases, but is instead reserved for claims "adjudicated on the merits in State court proceedings." *See Williams II*, 120 S. Ct. at 1487 ("We start, as always, with the language of the statute). To satisfy this "adjudication" requirement, a state court's resolution of a claim must both decide the claim on the merits, and do so via a "decision" articulating a basis in federal law with sufficient clarity that the federal habeas court can ascertain and review it. As the Fifth Circuit has recently held, "In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural." *Neal v. Puckett,* 286 F.3d 230, 235 (5th Cir. 2002) (*per curiam*).

Thus, claims erroneously rejected by the state courts through application of state procedural rules subsequently determined by the federal court not to be adequate, independent, clearly established, or consistently and regularly applied, are not subject to §2254(d)'s standard of review.[36] Similarly, procedurally defaulted claims for which the

---

[36] *See, e.g., Weeks v. Angelone*, 176 F.3d 249, 258-260 (4th Cir. 1999) ("[w]hen a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim, . . . our review of questions of law and mixed questions of law and fact is *de novo*"); *Fisher v. Texas,* 169 F.3d 295, 299-300 (5th Cir. 1999) (state court's denial of relief on ground petitioner violated contemporaneous objection rule not an "adjudication on the merits");

petitioner establishes "cause and prejudice"[37] or a "miscarriage of justice"[38] excusing the default likewise fall outside the purview of §2254(d).

Additionally, even when a claim does appear to have been decided on the merits by the state court, the face of the state court's decision still must fairly afford the federal habeas court some insight into the state court's federal constitutional basis for rejecting the claim. *See, e.g., Delgado v. Lewis*, 181 F.3d 1087, 1091 (9th Cir. 1999) ("when a state court does not articulate the rationale for its determination, a review of that court's 'application' of clearly established federal law is not possible"). At a minimum, the state court's decision must identify the Supreme Court precedent upon which it relied, and give some indication as to how it applied the law to the facts. *See Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997) (expressing "some reservation about applying the more stringent AEDPA standards" where "not convinced that the state habeas court sufficiently addressed" petitioner's claim under governing federal law).

Although the requirement that a decision reveal something about the way in which the state court went about rejecting a petitioner's claim was not directly addressed in *Williams I*, the method by which the Court analyzed the merits of Terry Williams' ineffective

---

*Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (§2254(d) inapplicable where state appellate court erroneously relied on procedural default to deny petitioner's claims); *Mainiero v. Jordan*, 105 F.3d 361, 365 n.5 (7th Cir. 1997) (because state "appellate court did not adjudicate this second issue on the merits, the amendments to section 2254 mentioned above (. . .) are not applicable").

[37]   *See e.g., Strickler v. Greene,* 119 S. Ct. 27 (1998).

[38]   *See, e.g. Schlup v. Delo,* 513 U.S. 298, 321-22 (1995).

assistance of counsel claim underscores the necessity of an explanatory state court decision

to the proper application of §2254(d). Unlike some lower federal courts in pre-*Williams*

cases,[39] the Court in *Williams* looked as closely at the *way* in which the Virginia Supreme

Court rejected Terry Williams' claim as it did at the *outcome* of the state court's decisional

process.[40] *See Williams I*, 120 S. Ct. at 1512 (state court "erred in holding that our decision

in *Lockhart v. Fretwell*, . . . modified or in some way supplanted the rule set down in

*Strickland*"); *id.* at 1513 (condemning state court's "separate inquiry into fundamental

fairness even when [petitioner] is able to [satisfy *Strickland*]").   Indeed, the Court's

conclusion that the state court's rejection of petitioner's claim was both "contrary to" and an

"unreasonable application of" clearly established federal law drew heavily from – and would

have been impossible without – the explanation set forth in the state court's opinion. *See*

*Williams I*, 120 S. Ct. at 1515 (state court's decision was "contrary to" federal law because

it "turned on [the] erroneous view that a 'mere' difference in outcome is not sufficient to

---

[39]   *See, e.g., Wright v. Angelone*, 151 F.3d 151, 156 (4th Cir. 1998); *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

[40]   The Fifth Circuit, in *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (*per curiam*) has held that the focus of the review is only on the state court's ultimate legal conclusion, and not the reasoning used to reach that conclusion: "our focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal*, 286 F.3d at 246. This decision seems to conflict with the Supreme Court's analysis in *Williams*, as it would not seem possible for a federal court to apply the "contrary to" standard, as the Supreme Court itself did in *Williams*, if it is "authorized by section 2254(d) to review only a state court's 'decision' and not the written opinion explaining that decision." Additionally, without reviewing the opinion, it is impossible to know even whether a state court applied the correct legal standards. Therefore, the discussion herein will focus on both the state court's ultimate conclusions and on their reasoning.

-68-

establish constitutionally ineffective assistance of counsel"); *id.* (state court's decision was "unreasonable" because it: "mischaracterized at best the appropriate rule . . . for determining whether counsel's assistance was effective"; "relied on the inapplicable exception recognized in *Lockhart*"; and "failed to evaluate the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation").[41]

That the "adjudicated on the merits" clause limits the application of §2254(d)'s more state-friendly standard of review to explanatory state court decisions is completely consistent with the AEDPA's core policy of making state court resolution of federal constitutional claims more meaningful. In any sensible system, heightening the respect owed by one court to the decisions of another court is not automatic or blind, but is instead a two-way street: if the state court takes its duty to protect federal constitutional rights seriously, then the decision should be treated with respect; if, on the other hand, the state court elects to summarily reject constitutional claims, then federal habeas review should not – and under the "adjudicated on the merits" clause and the example set by *Williams I* is not – constrained by §2254(d)'s limitations on the availability of habeas relief.

### F. The Applicability of Amended Section 2254(d) to Mr. Haynes's Case.

### I) Basic principles of determining the applicability of amended 2254(d).

---

[41] Even prior to *Williams*, some federal courts of appeals were applying a similar approach. *See Delgado, supra; Paxton v. Ward*, 199 F.3d 1197, 1218 (10th Cir. 1999) (state court's decision "not entitled to deference" where court did not apply correct constitutional standard and disregarded relevant facts); *Hogan v. Gibson*, 197 F.3d 1297, 1305 (10th Cir. 1999) (state court so misapplied *Beck v. Alabama* as to render its opinion incapable of qualifying as an "adjudication on the merits").*See* the prior note regarding the Fifth Circuit's approach in *Neal v. Puckett*.

As we have seen, the United States Supreme Court's decision in (*Terry*) *Williams v. Taylor*, 120 S. Ct. 1495 (2000), clarified in several ways the standard of review and the methodology to be employed by federal courts entertaining habeas corpus petitions pursuant to 28 U.S.C. §2254.[42] Under *Williams*, the emphasis of the federal court's inquiry is on the nature and quality of the state court decision. Presented here is an outline to assist this Court in determining whether §2254(d)'s standard of review is applicable in this matter, and, if so, whether the state court's decision denying relief on that claim is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Following this outline, the procedures are applied to the specifics of Mr. Haynes's case.

### 1. Did the last state court to which the claim was presented decide the claim on the merits, as opposed to disposing of the claim on one or more procedural grounds, or not addressing the claim at all?

Here, we need to examine Mr. Haynes's state habeas claims individually.

1) The first ground—the mitigation special issue.

The state court, in adopting verbatim the State's proposed findings and conclusions, found this claim to be procedurally barred because "applicant did not challenge Texas' death penalty sentencing statute on direct appeal...[it] need not be considered in the instant habeas

---

[42] The Supreme Court's decision in *Williams* represents a considered rejection of the Fourth, Fifth, Seventh, and Eleventh Circuits' unduly deferential constructions of §2254(d)'s "unreasonable application" standard. As the Ninth Circuit observed in an early post-*Williams* decision, by repudiating those circuits' subjective no-reasonable-jurist standard in favor of an "objective reasonableness" inquiry, "[t]he Supreme Court . . . chose to adopt the interpretation of AEDPA that espoused the more robust habeas review." *Van Tran v. Lindsey*, 212 F.3d 1143 (9th Cir. 2000), *cert. denied,* 121 S. Ct. 340 (2000).

proceeding or any subsequent proceeding." State's proposed Findings of Fact and Conclusions of Law (Exhibit 7, Habeas Tr. at 158).

The claim was also denied on the merits. *Id.* (Exhibit 7).

2) The second ground—the jury charge.

This claim too was held to be procedurally barred because defense counsel failed to object to it during the trial. *Id.* But the trial court and the Texas Court of Criminal Appeals also held alternatively that "the trial court properly did not instruct the jury as to the result of their failure to agree on a special issue." *Id.* at 158-159 (Exhibit 7).

3) The third ground—ineffective assistance of counsel.

This claim was denied on the merits. *Id.* The Texas Court of Criminal Appeals, in adopting verbatim the State's conclusions, also found the claim to be procedurally barred "because the applicant fails to cite authority supporting his ground for relief that the applicant was entitled to a limiting instruction that the victim impact evidence could be considered solely with respect to the mitigation special issue and that trial counsel was ineffective for failing to request such instruction, the applicant's ground for relief is not properly before this Court for review." *Id.*, Habeas Tr. at 160 (Exhibit 7).

4) The fourth ground—improper State's punishment argument.

This claim was also denied on procedural grounds "[b]ecause the applicant failed to object at the trial level..." *Id.* at 160 (Exhibit 7). The state court declined to adopt another proposed procedural bar. *Id.* The Texas Court of Criminal Appeals declined to adopt conclusion eleven, which would have held it to be procedurally barred on the merits. *Id.*

-71-

Thus, these claims were denied both procedurally and on the merits by the state trial court and the Texas Court of Criminal Appeals. Habeas Tr. at 153-62.[43] However, the "conclusions of law" adopted by the state courts are simply bare statements denying that Haynes's rights were violated or that various failures of trial counsel to object or appellate counsel to raise issues on direct appeal did not deprive him of the effective assistance of counsel. *Id.* There is some doubt this can even qualify as a "merits" denial.

When the state courts are afforded an opportunity to rule on a petitioner's constitutional claims, but fail to do so, the AEDPA standard of review does not apply. *See Hameen v. State of Delaware*, 212 F.3d 226 (3d Cir. 2000) (exercising "pre-AEDPA independent judgment" on claim that state court "did not pass on, . . . even though it had the opportunity to do so"); *Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir. 1999); *Hooks v. Ward*, 184 F.3d 1206, 1223 (10th Cir. 1999) ("In the absence of a state court adjudication on the merits we believe we must apply the standard of review that predated the recent amendments to § 2254); *Weeks v. Angelone*, 176 F.3d 249 (4th Cir. 1999), *aff'd*, 120 S. Ct. 727 (2000); *Goins v. Angelone*, 52 F.Supp.2d 638, 675 n. 32 (E.D. Va. 1999) ("In those instances in which the merits of a properly presented claim have not been addressed by the [state court] either on direct review or in state habeas proceedings, the claim is reviewed *de novo*."); *Sweet v. Carter*, 22 F.Supp.2d 707, 719 (N.D.Ohio 1998) (holding that in light of state courts' failure to address petitioner's claims as federal constitutional issues, "this Court

---

[43]  *See* Exhibit 7, Court's Findings of Fact and Conclusions of Law and Exhibit 8, Order of the Texas Court of Criminal Appeals adopting these findings and denying state writ.

will address those claims on the merits."); *Burris v. Parke*, 948 F.Supp. 1310 (N.D. Ind. 1996), *aff'd*, 116 F.3d 256 (7th Cir. 1997) (same).

### 2. Did the state court provide any explanation for its denial of relief on the merits, or was relief denied summarily?

If the state court did *not* provide any explanation for its denial of relief on the merits, then *Williams* suggests §2254(d) should not govern the federal court's review of the claim. Without an explanation of what federal law the state court applied, and how it applied that law, the §2254(d) analysis exemplified in *Williams* is impossible.

As we have seen, as to all claims the state court merely issued a bare-bones denial of the claims, without any explanation of the governing law. Habeas Tr. at 147-162 (Exhibit 7). The holding is not based on federal constitutional law, nor is federal constitutional law even mentioned, except for two references. Although the Eighth Amendment of the United States Constitution is mentioned, it is only to deny that petitioner's rights were violated, without any discussion as to the reasons why. Even the *Strickland* case, the basis for all the state writ claims, is only mentioned once. Habeas Tr. at 159 (Exhibit 7). Thus, it is impossible to even tell whether federal law was even applied to the claims, and from a reading of the findings and conclusions, it appears it was not. This summary denial without any discussion as to the federal constitutional rationale precludes the application of the amended standard of review of 2254(d).

When state courts are afforded an opportunity to rule on a petitioner's federal constitutional claims, but fail to do so, then no "deference" is due the state court denial and

-73-

thus the pre-AEDPA standard of review prevails.

### 3. Did the state court correctly identify and articulate the legal principles governing the claim? *Williams*, 120 S. Ct. at 1519 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases").

Answering this question requires a careful review of the state court's decision for indications that the state court: identified the wrong precedent; identified the correct precedent but misstated the rule of that precedent; misunderstood the rule established by governing precedent; incorrectly determined that the governing precedent had been modified; or made some other mistake in selecting or stating the governing federal rule. *See generally Williams*, 120 S .Ct. at 1512-1513, 1515 (explaining why state court's decision was objectively unreasonable).[44] Looking first at all the in the state habeas court's order, no federal cases were cited at all, except one reference to *Strickland,* and there is merely a bare-bones denial as we have seen. The applicable federal constitutional principles are not identified, let alone discussed. Thus, the amended standard of review cannot apply to these claims.

A state-court decision can be "contrary to" controlling decisions of the U.S. Supreme

---

[44]Another, albeit pre-AEDPA, example of a case that would fit under the Court's "contrary to" analysis is *Stansbury v. California*, 511 U.S. 318 (1994). *Stansbury* held a police officer's subjective and undisclosed view that the person being interrogated was not a "suspect" was irrelevant to the determination whether the individual was "in custody" for *Miranda* purposes. The Court held that the California Supreme Court's analysis was "not consistent in all respects" with the Court's prior decisions which "make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual . . .is not relevant. 511 U.S. at 326

Court, in the sense of misinterpreting the Supreme Court's precedents, even though the state court's reading of the relevant precedents is supported by a substantial number of other lower-court decisions, including a majority of the federal circuit court opinions on point. This was the case in *Williams*, in which the Supreme Court found any notion that *Lockhart v. Fretwell* clarified the *Strickland* standard of prejudice "contrary to" *Strickland* and *Fretwell*, notwithstanding the fact that nine federal circuits had read *Fretwell* as clarifying *Strickland*.

A state-court decision can be "contrary to" a decision of the U.S. Supreme Court, in the sense of misinterpreting the Supreme Court's decision, even though the state court's opinion is susceptible of the reading that this misinterpretation was only an alternative ground for its decision, and that it would have reached the same decision on a proper interpretation of Supreme Court precedent. For instance, the Virginia Supreme Court opinion under review in *Williams* twice stated explicitly that *Strickland* prejudice (a reasonable probability of a different result) had not been shown, *in addition to* invoking the mistaken notion that *Lockhart v. Fretwell* had clarified the *Strickland* standard. As Justice O'Connor explained, however, it was "impossible to determine . . . the extent to which the Virginia Supreme Court's error with respect to its reading of *Lockhart* affected its ultimate finding that Williams suffered no prejudice." (68 USLW at 4278). *Williams*, 120 S. Ct. at 1524 (O'Connor, J., concurring in grant of relief).

However, in Mr. Haynes's case, the state court cannot be held to have correctly identified and articulated the federal constitutional principles underlying the claims.

-75-

**4.** **Did the state court correctly apply the governing legal principles to the facts of the claim?** *Williams*, 120 S. Ct. at 1521 ("a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"); *id.* at 1522 ("a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable").

Answering this question also requires careful review of the state court's explanation for denying relief. While *Williams* does not explain what elevated the state court's application of *Strickland v. Washington* in that case from "erroneous[] or incorrect[]" to "objectively unreasonable," the Court's discussion of the merits of Terry Williams' ineffective assistance claim does afford a few examples.

A failure to consider all record facts legally relevant to the federal question, *Williams*, 120 S. Ct. at 1515; or a failure to recognize or appreciate the impact of legal principles made relevant, but not necessarily controlling, by the facts of the case, *see Williams*, 120 S. Ct. at 1516 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case") will mean that the amended 2254(d) does not apply. As to Mr. Haynes's claims no federal legal precedents were discussed at all, save for a brief mention of the Eighth Amendment and *Strickland,* hence the amended standard of review cannot apply.[45]

A state-court decision can be "objectively unreasonable" in finding that prejudice has not been established, or that a federal constitutional error is harmless, even though the

---

[45]   *See* discussion, *supra,* and Exhibit 7 herein.

evidence against the petitioner is quite compelling. In *Williams*, the Virginia Supreme Court concluded that the mitigating evidence undeveloped by Williams' trial lawyer was inconsequential in the light of the overwhelming evidence in aggravation, a finding the U.S. Supreme Court subsequently determined to be objectively unreasonable.

**ii) Application of these principles to Mr. Haynes's case.**

As discussed above, the purpose of the enaction of the AEDPA was to reward state courts for good faith interpretations of federal constitutional law. This is one of the prerequisites for the application of the new standards, and if the state court "adjudication" did not meet this threshold requirement, then there must be *de novo* federal review of a petitioner's constitutional claims. The various deficiencies of the state court findings, discussed below, mean that not only are they not entitled to any "deference" or "presumption of correctness" by this Court, but these deficiencies also preclude the imposition of the new AEDPA standard of review to Mr. Haynes's case. Mr. Haynes's state court habeas proceedings utterly failed to meet the threshold requirements, as shown below.

**1) The state court proceedings in this case do not qualify as an "adjudication on the merits" because they failed to deal with his claims and their basis in federal law, and thus deprived Mr. Haynes of his federal due process rights and his right to an impartial and fair determination of his federal constitutional challenges to his conviction and death sentence.**

In Mr. Haynes's case, the state habeas processes were unequivocally deficient, as will be discussed in more detail in this section. As we have seen, the state court findings were merely denials of the claims, without much substantive legal analysis or the discussion or even citation of any federal legal principles, save for the mention of a few amendments to

-77-

the United States Constitution. The Texas Court of Criminal Appeals did not engage in substantive analysis of Petitioner's claims, but simply adopted almost verbatim the state's proposed findings and conclusions of law.[46] Thus, the state habeas proceedings did not result in a qualifying "adjudication" for purposes of the application of the AEDPA.

As discussed above, in deciding whether §2254(d) of the AEDPA applies, this Court must first determine whether or not Mr. Haynes's claims have been "adjudicated on the merits" by the state courts. If so, §2254(d) applies; if not, §2254(d) does not apply. A state court has adjudicated a federal claim on the merits when its disposition of the claim reveals a basis in federal law with sufficient clarity so that the federal habeas court can ascertain it. This, as examined herein, is both the necessary and sufficient condition for according a state-court adjudication the respect which subsections 2254(d)(1) and (2) contemplate.

**2) Federal constitutional law is not even considered in the state habeas court's findings and conclusions.**

A state court has adjudicated a federal claim on the merits when its disposition of the claim reveals a basis in federal law with sufficient clarity so that the federal habeas court can ascertain it. This, as examined herein, is both the necessary and sufficient condition for according a state-court adjudication the respect which subsections 2254(d)(1) and (2) contemplate. In the state habeas findings in Mr. Haynes's case, however, there is little evidence that federal law was even considered, let alone that it furnished a basis for the

---

[46] *See* Exhibit 8, Order of the Texas Court of Criminal Appeals denying Petitioner's writ; Exhibit 7, the State's Proposed Findings of Fact and Conclusions of Law adopted verbatim by the trial court.

-78-

decision.[47]  Despite the fact that all of Petitioner's state claims were grounded in his federal constitutional rights, **federal law is not discussed in the state court's findings, save for a brief invocation of the Eighth Amendment, and only one federal case is even mentioned.** Thus, the state habeas court never reached the federal constitutional basis of Mr. Haynes's claims.   As such, the state habeas process cannot be considered an "adjudication on the merits" for purposes of § 2254(d), and the AEDPA does not apply.

It has frequently been held that when the state court does not reach the federal constitutional questions presented, through denial of the claims based on state law, that the amended standard of review under the AEDPA does not apply. *See, e.g., Green v. Cain,* 1998 WL 259970, at *1 (E.D. La. May 19, 1998) ("since the state court relied on a state procedural (non-constitutional) bar, the Court is unable to review questions of fact or law under the amended AEDPA standards"); *Swann v. Taylor,* 1999 WL 92435, at *5 (4th Cir. Feb. 18, 1999), *cert. denied,* 119 S. Ct. 1591 (1999) (there was no state court adjudication of federal issue on merits within meaning of section 2254(d) because state court relied exclusively on state law and did not "mention or appear to apply the controlling federal precedent..., nor...cite or rely upon state precedents that, in turn, cite or rely upon [controlling federal precedent]"; *Smith v. Smith,* 1998 WL 764761, at *2 (6th Cir. Oct. 19, 1998) (ineffective assistance claims are "reviewed *de novo"* because state courts resolved claims on procedural grounds and never reached merits); *Trice v. Ward,* 196 F.3d 1151, 1166 n.5

---

[47]  *See* Court's Findings of Fact and Conclusions of Law, Exhibit 7 herein;  the Order of the Texas Court of Criminal Appeals denying habeas relief,  Exhibit 8.

(10th Cir. 1999) ("In disposing of Trice's arguments, the Court of Criminal Appeals did not cite any federal law, but looked only to state law.  Accordingly, it is questionable whether the standards of review set forth in §2254(d)(1) apply.  Assuming *arguendo* those standards do not apply, we proceed to review Trice's arguments *de novo*.").

### 3) The claims were not denied on the merits.

Adjudication "on the merits" is a prerequisite for the application of the new standard of review under the AEDPA.[48]  It is Petitioner's contention that the bare-bones denial of the claims, citing little federal law or cases, was not a merits denial, as the "merits" of the claims were not discussed in any federal constitutional context.  There were preceding findings of fact ( *see* Exhibit 7), but taken alone those are insufficient to call this a "merits" denial.  At best, there was a "factual" merits denial, but not a legal merits denial.  As we have seen, even the "merits" denial is for the most part simply a bare-bones denial, and the issues are not discussed in depth.  Thus, Mr. Haynes's federal constitutional claims have never been "adjudicated on the merits."  This is a prerequisite to the application of the new 2254(d) of the AEDPA.

The Fifth Circuit has  held that "section 2254(d) [amended under the AEDPA] **applies only to issues that have been adjudicated on the merits in state court."**  *Miller v.*

---

[48]   The AEDPA prescribes the following standard of review: [2254(d)] "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless..." (Emphasis added).  *See also Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000); *Neal v. Puckett,* 286 F.3d 230, 235 (5th Cir. 2002) (*per curiam*) ("In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural.")

*Johnson,* 200 F.3d 274, 281 (5ᵗʰ Cir. 2000).  The Fifth Circuit in *Miller* also pointed out that

"[r]eview is *de novo* when there has been no clear adjudication on the merits" *Id.,* at 281, n.4,

citing *Nobles v. Johnson,* 127 F.3d 409, 416 (5ᵗʰ Cir. 1997).  The court in *Miller* added that

"[i]n the context of federal habeas proceedings, a resolution (or adjudication)  on the merits

is a term of art that refers to whether a court's disposition of the case was substantive, as

opposed to procedural." *Id.* at 281.  As it is impossible to tell how these claims were denied,

the new standard of review under section 2254(d) does not apply.[49]

Since the passage of the AEDPA, numerous federal courts, including the Fifth Circuit

have found the state decisional process  deficient, or have found that the state process did not

amount to an "adjudication on the merits,"  and have  refused to apply the Act.  *See, e.g.,*

*Lockhart v. Johnson,*  104 F.3d 54, 57-58 (5ᵗʰ Cir.), *cert. denied,* 117 S. Ct. 2518 (1997)

("AEDPA's provision altering our standard of review, when the petitioner's claim has been

adjudicated on the merits by a state court, has no application to this claim" because it was not

presented to the state court and the Director has waived the exhaustion requirement"); *Fisher*

*v. Texas,* 169 F.3d 295, 299-300 (5ᵗʰ Cir. 1999) (because state court's rejection of claim on

procedural grounds was not "adjudication on the merits"—notwithstanding that state court

opinion contained  footnote addressing merits as alternative ground of decision—state

determination deserves no deference under section 2254(d)); *Jones v. Wood,* 114 F.3d 1002,

---

[49]  *See also Blankenship v. Johnson,* 106 F.3d 1202, 1204 (5ᵗʰ Cir.), *superseded,* 118 F.3d
312 (5ᵗʰ Cir. 1997) ("when faced with a silent or ambiguous state habeas decision, we 'look
through' to the last clear state decision," and adopting additional rule that "[w]here, as here,
there is no clear state decision, we determine, on a case-by-case basis, whether the adjudication
was 'on the merits'").

1013 (9th Cir. 1997) (holding that when a state court has made no findings of fact, "the district court's duty to ascertain the sufficiency of the evidence by engaging in a thorough review of the complete state court record is unaffected by the AEDPA"); *Baylor v. Estelle,* 94 F.3d 1321, 1325 (9th Cir. 1996) (stating that the district court's evidentiary hearing was the first chance that the petitioner had to develop the factual basis of his claim and therefore finding that it would be inappropriate to disregard the facts developed in the district court even in the light of AEDPA), *cert. denied,* 520 U.S. 1151, 117 S. Ct. 1329 (1997); *Tucker v. Prelesnik,* 181 F.3d 747 (6th Cir. 1999) ("Having reviewed the performance of trial counsel in Mr. Tucker's case, we are persuaded that the unreasonableness of the state courts' application of *Strickland* is not debatable among reasonable jurists"); *Moore v. Park,* 148 F.3d 705 (7th Cir. 1998) ("A prerequisite for applying [section 2254(d)] is that the state court adjudicated the issue before us on the merits. In this case, the state court denied Moore's petition because he failed to satisfy [a procedural rule]. Therefore, the state courts did not address Moore's sufficiency of the evidence argument on the merits, and the new standard of review in AEDPA does not apply"... The court addressed the merits of Moore's claims *de novo,* and granted relief); *Neeley v. Nagle,* 138 F.3d 917 (11th Cir. 1998), *cert. denied,* 119 S. Ct. 811 (1999) (The state court analyzed *Brady* material individually, and did not consider its collective effect; this approach is 'contrary to' clearly established federal law; therefore the court must independently consider the merits of Neeley's claim); *Jeffries v. Wood,* 114 F.3d 1484 (9th Cir. 1997) (The state court erred in requiring Jeffries to shoulder the burden of proof on prejudice on a juror misconduct issue; this was contrary to clearly established

-82-

federal law as determined by the Supreme Court and it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, the AEDPA would not preclude the issuance of the writ of habeas corpus); *Hall v. Washington,* 106 F.3d 742 (7th Cir. 1997), *cert. denied,* 118 S. Ct. 264 (1997) (granting penalty phase relief in capital case on grounds that petitioner received ineffective assistance of counsel at sentencing phase because counsel failed to present readily available mitigating evidence, even though state judge to whom penalty phase was tried concluded during state post-conviction proceedings that had the mitigating evidence been presented to him, he still would have imposed death...the state court's finding that Hall's counsel provided effective assistance at sentencing 'involved an unreasonable application of clearly established Federal law' as determined by the supreme Court in *Strickland v. Washington*); *Childress v. Johnson,* 103 F.3d 1221 (5th Cir. 1997) (granting relief in noncapital case where the state courts entirely failed to apply the law pertaining to constructive denial of the right to counsel, which was 'contrary to' or an unreasonable application of Supreme Court precedent); *Mata v. Johnson,* 99 F.3d 1261 (5th Cir. 1996), *vacated on other grounds,* 105 F.3d 209 (5th Cir. 1997) (it was unreasonable for the state court to hold that the exclusion of all eight African-American prospective jurors under an agreement between Mata and the State did not violate equal protection); *Dickerson v. Vaughn,* 90 F.3d 87 (3rd Cir. 1996) ("To the extent that the state Supreme Court appears to have adopted a per se rule that a defendant's facially incorrect responses during a plea colloquy bar claims for involuntariness, the holding is contrary to clearly established federal law as articulated in [*Blackledge v.*] *Allison,* [431 U.S.

-83-

63 (1977)] and the other opinions we have cited"); *Weeks v. Angelone,* 176 F.3d 249, 258, 263 (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits, ...our review of questions of law and mixed questions of law and fact is de novo."); *id,* at n.32 ("In those instances in which the merits of a properly presented claim have not been addressed by the Supreme Court of Virginia either on direct review or in state habeas proceedings, the claim is reviewed de novo"); *Lakin v. Stine,* 44 F. Supp.2d 897 (E.D.Mich. 1999) ("The waiver of counsel did not comply with the requirements of *Faretta v. California,* 422 U.S. 806 (1975). The failure of the state to provide counsel was exacerbated by compelling Mr. Lakin to represent himself." Applying § 2254(d), the court grants habeas relief."); *Spicer v. Warden,* 31 F.Supp.2d 509 (D.Md. 1998) (District court applies § 2254(d), as amended by the AEDPA, and concludes that the "decision of the State post-conviction courts involved an unreasonable application of clearly established Supreme Court law and an unreasonable determination of the facts in light of the evidence presented. Accordingly, the writ of habeas corpus will issue.").; *Atley v. Ault*, 21 F.Supp2d 949 (S.D.Iowa 1998) ("This court is compelled to find the majority opinion of the Iowa Supreme Court an unreasonable application of clearly established federal law, as established by the Supreme Court of the United States. The Iowa Supreme Court failed to require the constitutionally mandated inquiry by the trial court and also failed to require the substitution of counsel free from the constitutionally prohibited constraints of a conflict of interest...").

Therefore, there has been no "adjudication on the merits," a prerequisite to the

conflict of interest...").

Therefore, there has been no "adjudication on the merits," a prerequisite to the application of the amended standard of review under the AEDPA. Thus, the state habeas proceeding in Mr. Haynes's case do not qualify as an "adjudication on the merits" for purposes of §2254(d), and the AEDPA does not apply to this case.

## IV.

## CLAIMS FOR RELIEF

**CLAIM I: PETITIONER'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL THROUGHOUT THE COURSE OF PETITIONER'S TRIAL.**

Mr. Haynes's conviction and sentence are invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation, and a reliable sentence due to the failure of trial counsel to provide reasonably effective assistance at the guilt/innocence and punishment phases of his trial. U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV.

\*\*\*\*\*\*\*\*\*\*\*\*

We hope, of course, that the defendant whose life is at risk will be represented by competent counsel -- someone who is inspired by the awareness that a less-than-vigorous defense truly could have fatal consequences for the defendant. We hope that the attorney will investigate all aspects of the case, follow all evidentiary and procedural rules, and

-85-

*Callins v. Collins*, 114 S. Ct. 1127 (1994) (J. Blackmun, dissenting). Unfortunately, for the indigent accused of a capital crime, it is the rare case indeed where competent counsel is appointed. *See* Stephen Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime, But for the Worst Lawyer*, 103 YALE L.J. 1832 (1995). Mr. Haynes is a perfect example of a man who was denied a fair trial because he had the misfortune to be represented by counsel who put on a "less than vigorous" defense, did not diligently investigate readily available mitigating evidence, were not aware of significant facts concerning the background of their client and his behavior at the time of the offense, and did not present an accurate picture of him to the jury.

### A.　The Legal Standard under *Strickland v. Washington*

The Sixth Amendment to the United States Constitution guarantees criminal defendants the fundamental right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771, n.14 (1970) ("[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel.")[50] As the Court in *McMann* explained, the existence of a right to *effective* assistance of counsel follows logically and necessarily from the existence of the Sixth Amendment basic right to the assistance of counsel: "[I]f the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel." *McMann,* at 771. Our adversary system of criminal

---

[50] *See also Avery v. Alabama,* 308 U.S. 444, 446 (1940); *Glasser v. United States,* 315 U.S. 60, 69-70 (1942); *Reece v. Georgia,* 350 U.S. 85, 90 (1955); *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir. 1974) (a criminal defendant has the right to be represented by counsel "reasonably likely to render and rendering reasonably effective assistance.")

justice, and the concept of counsel contemplated by the Sixth Amendment assumes, at a minimum, that counsel will act as an *advocate* for the accused. *Anders v. California,* 386 U.S. 738, 87 S. Ct. 1396 (1967); *United States v. Cronic,* 466 U.S. 648, 104 S. Ct. 2039 (1984). The Sixth Amendment also demands that counsel be able to provide the "guiding hand" necessary to adequately prepare and present a defense, and not simply the physical presence of one who is licensed to practice law. *Powell v. Alabama,* 287 U.S. 45, 68-69 (1932).

In the 1984 decision of *United States v. Cronic,* 466 U.S. 648 (1984), the Supreme Court reiterated the logical connection between the existence of a constitutional right to effective assistance of counsel and the text of the Sixth Amendment, reasoning that

> [t]he special value of the right to the assistance of counsel explains why "[i]t has long been recognized that the right to counsel is the right to affective assistance of counsel."....The text of the Sixth Amendment itself suggests as much. The Amendment requires not merely the provision of counsel for the accused, but "Assistance", which is to be "for his defense." Thus, "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor."...If no actual "Assistance" "for" the accused's "defense" is provided, then the constitutional guarantee has been violated.[51]

*Cronic,* at 654 (footnote and citations omitted).

The constitutional standard for judging the effectiveness of counsel under the Sixth Amendment is a two-prong test, requiring that the petitioner show: (I) counsel's performance was so "deficient" that counsel did not provide "reasonably effective assistance," and (ii) that counsel's errors "prejudiced" the defense by depriving the defendant of a fair trial whose

---

[51] *See also Strickland v. Washington,* 466 U.S. 668, 686 (1984).

result is reliable. *Strickland v. Washington*, 466 U.S. 668 (1984) An attorney is ineffective if his or her performance "fell below an objective standard of reasonableness." *Id*. at 688. "Prejudice" is established if, but for counsel's errors, there is a "reasonable probability" that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to **undermine confidence** in the outcome." *Strickland*, 466 U.S. at 694 (emphasis added). The *Strickland* test is the proper standard to gauge the effectiveness of counsel at the guilt/innocence phase of a non-capital trial and at the guilt/innocence and punishment phases of a capital trial. *Livingston v. Johnson*, 107 F.3d 297, 304-05 (5th Cir. 1997).

### 1. Standard for Deficient Performance.

Counsel owes the accused a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980). Although the effectiveness of counsel must be determined on a case-by-case basis, *Strickland v. Washington, supra* at 688-89 (1984), Courts are entitled to look to objective standards and to the appropriate case law to determine what constitutes "reasonably competent counsel" in a particular death penalty case.

### a. Case Law

When "counsel's performance as a whole," *United States v. Cronic,* 466 U.S. 648, 657 n.20, 104 S. Ct. 2039, 2046 (1984), or through individual errors, *Strickland, supra,* 104 S.