# United States District Court
# Southern District of Texas

## Case Number:  H-05- 3424

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __4__ of _____

☐ Exhibit to: _____Vol I_____
        number(s) / letter(s) _____

Other: _____Petition For Writ of_____

_____Habeas Corpus_____

_____

Ct. at 2064,[52] falls below an objective standard of reasonableness, deficient performance is established. The writ will issue if the failings amount to counsel being functionally absent[53] **or** if prejudice is shown such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland, supra. See Williams v. Washington,* 59 F.3d 673 (7th Cir. 1995) (counsel ineffective in investigating and presenting defense); *Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995) (counsel ineffective for failing to investigate and present available evidence of bipolar disorder); *Baxter v. Thomas,* 45 F.3d 1501 (11th Cir. 1995) (trial counsel ineffective during penalty phase of capital trial for failing to adequately investigate and present mitigation evidence); *Bryant v. Scott,* 28 F.3d 1411 (5th Cir. 1994) (counsel ineffective for failure to interview alibi witnesses); *Hill v. Lockhart,* 28 F.3d 832 (8th Cir. 1994) (trial counsel ineffective at penalty phase for failing to prepare and present evidence of defendant's mental state at the time of the offenses); *Loyd v. Whitley,* 977 F.2d 149 (5th Cir. 1992) (counsel ineffective in sentencing phase for failing to obtain an independent mental health evaluation when funds were available); *Griffin v. Warden,* 970 F.2d 1355 (4th Cir. 1992) (trial counsel ineffective for failure to contact alibi witnesses); *Harris v. Reed,* 894 F.2d 871 (7th Cir. 1990) (counsel ineffective for failure to interview eyewitnesses); *Blake v. Kemp,* 758 F.2d

---

[52] *See also Curry v. Zant,* 371 S.E.2d 647, 649 (Ga. 1988) (notwithstanding an otherwise reasonable performance by counsel, the single error of failing to obtain "an independent psychiatric evaluation of [the defendant] deprived his client of the protection of counsel.")

[53] *See Holloway v. Arkansas,* 435 U.S. 475, 98 S. Ct. 1173, 1181 (1978) ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee").

523, 531 (11th Cir. 1985) ("[T]he courts have 'long recognized a particularly critical relationship between expert psychiatric assistance and minimally effective assistance of counsel.'") (citations omitted).

### b. Objective Standards

This Court is entitled to refer to guidelines such as the *ABA Standards for Criminal Justice* to determine what level of performance is required by reasonably competent counsel in a capital sentencing trial. As the Supreme Court stated in *Strickland*:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e. g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable....

466 U.S. at 687.

The need to investigate is an essential part of the duty of competent representation and is set forth in the ABA's *Standards*:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

American Bar Association, *Standards for Criminal Justice: The Defense Function, Standard 4-4.1, Duty to Investigate*, at 4-53 (2d ed. 1980)(emphasis added).

> Counsel's duty to investigate in preparation for sentencing is even more critical: The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the Court at

-90-

> sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like will be relevant, as will mitigating circumstances surrounding the commission of the offense. **Investigation is essential to the fulfillment of these functions.**

American Bar Association, *Standards for Criminal Justice: The Defense Function,* Standard 4-4.1, Commentary, at 4-55 (2d ed. 1980)(emphasis added).

### c. Sentencing Phase Ineffectiveness and the *Wiggins* case.

This standard, regarding the duty to investigate, applies acutely to a capital sentencing trial because the Constitution requires that the sentencer be provided with and must consider "any aspects of the defendant's background and record" that may be "proffer[ed] as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604 (1977). The standard of performance in a capital case is, and must be, higher than in a non-capital case since "death is different." *See, e.g., Gardner v. Florida*, 430 U.S. 349, 357-358 (1977)(plurality opinion). Courts, therefore, have given particular attention to capital cases where little or no mitigating evidence is presented in support of a life sentence. *See, e.g., Harris v. Dugger,* 874 F.2d 756 (11th Cir. 1989); *Kubat v. Thieret,* 867 F.2d 351 (7th Cir. 1989); *Cook v. Lynaugh,* 821 F.2d 1072 (5th Cir. 1987)[54].

Courts have long considered evidence of mental illness, emotional disturbance, the

---

[54] The Seventh Circuit reasoned that trial counsel's failure had produced "'a breakdown in the adversarial process that our system counts on to produce just results.'" *Id.* at 369 (quoting *Strickland v. Washington,* 466 U.S. 688 (1984)). The Court of Appeals further found that by not presenting mitigating evidence "no effort was made to present Kubat to the jury as a human being." *Id.* at 368.

defendant's and victim's background, character, and childhood abuse to be types of mitigating evidence that juries should be allowed to hear. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S. Ct. 869, 68 L.Ed.2d 378 (1982); *Franklin v. Lynaugh*, 487 U.S. 164, 108 S. Ct. 2320, 101 L.Ed.2d 2320 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

Independent investigation of the facts and circumstances of a case in preparation for trial is one of the cornerstones of the Sixth Amendment right to effective assistance of counsel. Sixty years ago, in the landmark case of *Powell v. Alabama,* 287 U.S. 45 (1932), the Supreme Court recognized that thorough factual investigation is at the heart of effective representation:

> It is not enough that defense counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts.
>
> *Powell,* 287 U.S. at 58. *See also Strickland,* 466 U.S. at 668, 691 (reiterating the primacy of counsel's duty to investigate client's available defenses at both phases of trial).[55]

The Supreme Court's directives on this subject have been clear. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not

---

[55] The Fifth Circuit has repeatedly recognized the vital importance of meaningful investigation. *See, e.g., Bell v. Watkins,* 692 F.2d 999, 1009 (5th Cir. 1982), *cert. denied sub nom Bell v. Thigpen,* 464 U.S. 843 (1983); *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984) (unless counsel undertakes "a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived," he cannot provide effective assistance).

to investigate must be directly assessed for reasonableness in all the circumstances[.]"

*Strickland v. Washington*, 466 U.S. at 691 (1984). *See also Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("[a]t the heart of effective representation is the independent duty to investigate and prepare.").

In *Martinez-Macias v. Collins*, 810 F.Supp. 810, 817-818 (W.D. Texas 1991), *aff'd* 979 F.2d 1067 (1992), for example, the Court found that:

> If Petitioner's concern for his mother was Mr. Weiser's reason for not interviewing her and using her testimony, this reason does not justify Mr. Weiser's failures. *Thomas v. Kemp*, 796 F.2d 1322, 1324 (11th Cir.), *cert. denied*, 479 U.S. 996, 107 S. Ct. 602, 93 L. Ed. 2d 601 (1986); *Cf., Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir. 1985), *cert. denied*, 483 U.S. 1026, 107 S. Ct. 3248, 97 L. Ed. 2d 774 (1987) (where petitioner repeatedly told his attorney not to use his family at the sentencing phase and contacts with petitioner's father disclosed his indifference to petitioner's case, the attorney was not required to investigate further); *Gray v. Lucas*, 677 F.2d 1086, 1093, 1094 (5th Cir. 1982), *cert. denied*, 461 U.S. 910, 103 S. Ct. 1886, 76 L. Ed. 2d 815 (1983) (where petitioner refused to identify witnesses for the sentencing phase and "steadfastly maintained" that he did not want anyone to testify for him at the sentencing phase, his attorney was not required to investigate further). When a defendant opposes the use of his family members' testimony, the attorney needs to interview the family to determine the value of their testimony and, if it is valuable, attempt to convince the defendant of the need for their testimony. Tr. V 1376-1377; *see Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 2065, 80 L. Ed. 2d 674 (1984) (the attorney's basic duties include keeping the defendant informed of important developments and consulting with the defendant on important decisions); Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir. 1985), cert. denied, 483 U.S. 1026, 107 S. Ct. 3248, 97 L. Ed. 2d 774 (1987) (the attorney must make an "'informed evaluation of potential defenses'" and conduct "'meaningful discussion with [the defendant] of the realities of his case'").

The Court concluded that:

> Mr. Weiser's decision to forego investigation and use of the testimony of these family members, having been made without knowledge of what their

testimony would be, was not a strategic or tactical decision; nor was it a reasonable one. [emphasis added] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674 (1984); *Bouchillon v. Collins*, 907 F.2d 589, 596-597 (5th Cir. 1990); *Harris v. Reed*, 894 F.2d 871, 877-879 (7th Cir. 1990); *see Wilson v. Butler*, 813 F.2d 664, 671-672 (5th Cir. 1987), *cert. denied*, 484 U.S. 1079, 108 S. Ct. 1059, 98 L. Ed.2d 1021 (1988). Thus, these failures constitute deficient performance. *Bouchillon*, 907 F.2d at 596-597; *Harris*, 894 F.2d at 877-879; *Stephens v. Kemp*, 846 F.2d 642, 652-653 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S. Ct. 189, 102 L. Ed. 2d 158 (1988); *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S. Ct. 374, 88 L. Ed. 2d 367 (1985).The family members' testimony that could have been presented at the sentencing phase establishes prejudice. *Thomas v. Kemp*, 796 F.2d 1322, 1325 (11th Cir.), *cert. denied*, 479 U.S. 996, 107 S. Ct. 602, 93 L. Ed. 2d 601 (1986); *see also, Stephens v. Kemp*, 846 F.2d 642, 653-654 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S. Ct. 189, 102 L. Ed. 2d 158 (1988).

Similarly in *Ford v. Lockhart*, 861 F.Supp. 1447 (E.D. Arkansas 1994), the Court held

that:

The failure of Cook to even investigate Ford's background and family falls "outside the range of professionally competent assistance . . . " *Strickland*, 466 U.S. at 690. Numerous cases have pointed to the duty of the lawyer to investigate all available evidence which might bear on a defendant's guilt and punishment. *See e.g. Hill v. Lockhart*, 28 F.3d 832, 1994 WL 316460 (8th Cir. July 5, 1994) slip op. at 26 (counsel was ineffective for failure to obtain evidence of psychiatric history); *Kenley v. Armontrout*, 937 F.2d 1298, 1304-08 (8th Cir.), *cert. denied*, 112 S. Ct. 431 (1991) (counsel was ineffective for failing to investigate thoroughly defendant's social history, psychiatric disorders, disadvantaged childhood, and drinking problems in preparation for penalty phase); *Laws v. Armontrout*, 863 F.2d 1377, 1385 (8th Cir. 1988) (*en banc*), *cert. denied*, 490 U.S. 1040, 109 S. Ct. 1944, 104 L. Ed. 2d 415 (1989) (failure to discover mitigating evidence because of inadequate trial preparation and investigation is ineffective assistance); *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983) (failure to investigate and present any mitigating evidence was ineffective assistance). "'Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake,'" Ford's counsel had a duty to collect as much information as possible about Ford for use at the penalty phase. *Hill v. Lockhart*, slip op. at 26 (cite omitted).

-94-

In *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), the Court found that

> Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty. To fail to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms. Second, our case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them. *See King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir. 1984).

Based upon this finding the Court determined "[w]e, therefore, cannot conclude, as the state urges us, that Horton's attorneys failed to introduce mitigating evidence because they believed that the evidence was too weak; his attorneys never investigated or evaluated the evidence." *Id.*

The Court in *Horton* then held "that Horton's trial attorneys' performance during the sentencing phase of the trial was unreasonable in light of prevailing professional norms. We find their performance unreasonable because they failed to investigate and present mitigating evidence. *Id.*, at 1463.

In *Baxter v. Thomas*, 45 F.3d 1501, (11th Cir., 1995), trial counsel was found ineffective where he conducted some limited investigation into the client's background, but failed to discover evidence of mental deficiency. *See also Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995), *cert. denied,* 116 S. Ct. 753 (1996).

In *Blanco v. Singletary*, 943 F.2d 1477, 1502 (11th Cir. 1991), *cert. denied,* 504 U.S. 943 (1992), the court held that because counsel "failed to discover and present any of the available mitigating evidence....the errors committed by Blanco's counsel fell below an

-95-

objective standard of reasonable representation " *Id.*  This case involved a situation where the defense attorneys' only attempt to procure witnesses to testify at the penalty phase was to leave messages for them and wait for them to call back. The court rejected the explanations offered by counsel for their failure to call the witnesses, including the fact that the defendant himself instructed them not to present evidence. In this case, the court concluded that no adequate investigation had been conducted:

> The ultimate decision that was reached not to call witnesses was not a result of investigation and evaluation, but was instead primarily a result of counsel's eagerness to latch onto Blanco's statements that he did not want any witnesses called...From these facts, we do not see that counsel conducted a reasonable investigation into the availability of mitigation evidence, or that there was a strategic reason for not presenting such evidence.

*Id.* at 1503.

When an attorney fails to collect medical records, interview family members or conduct any other investigation into the defendant's background, his decision cannot be considered a "tactical" one. "An attorney's trial decisions must be based on a proper exercise of judgment based on adequate knowledge" of the facts and relevant law. *United States v. Cronic*, 839 F.2d 1401, 1404 (10th Cir. 1988); *see also McDougall v. Dixon*, 921 F.2d 518, 537 (4th Cir. 1991) (a "strategic" choice by counsel is one "made with **full knowledge** of the facts and the law, and the options available to him"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("`[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary.'"); *Baxter v. Thomas*, 45 F.3d 1501, (11th Cir. 1995) ("An attorney's decision to limit his [mitigation] investigation must

-96-

`flow from an informed judgment.'")

Any deference that courts must afford trial counsel under *Strickland* in judging whether such failures were constitutionally deficient, as opposed to "tactical" or "strategic" trial decisions, presupposes that an attorney's trial decisions are fully informed and reasonable exercises of professional judgment. "Judges wisely defer to true tactical choices -- that is to say, to choices between alternatives that each have the potential for both benefit and loss." *Profitt v. Waldren,* 831 F.2d 1245, 1249 (5th Cir. 1987). Moreover, "`[t]his measure of deference ... must not be watered down into a disguised form of acquiescence.'" *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (quoting *Profitt v. Waldren*, *Supra* at 1248).

Any choice that flows "from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir. 1991), *cert. denied sub nom Deleo v. Kentucky,* 112 S. Ct. 431 (1991). As the *Kenley* court stated:

> We will not fault a reasonable strategy not to investigate further if it is based on sound assumptions. Here it was not a reasonable strategy that led counsel not to investigate, but lack of thoroughness and preparation. "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."

*Id.* at 1308 (quoting *Chambers v. Armontrout,* 907 F.2d 825, 835 (8th Cir. 1990) (en banc), *cert. denied,* 111 S. Ct. 369 (1990).[56]

---

[56] *See also Wilson v. Butler,* 813 F.2d 664, 672 (5th Cir. 1987), *cert. denied,* 484 U.S. 1079 (1988).

-97-

Courts have not characterized omissions by trial counsel as "strategic" based merely on counsel's assertion that they were. For instance, *in Holsomback v. White*, 133 F.3d 1382 (11th Cir. 1998), the petitioner challenged the adequacy of his trial counsel's investigation of the medical evidence, specifically his failure to interview and call as witnesses two doctors and introduce a report prepared by one of them. The trial attorney justified his failure to contact the physicians and introduce the records based on his view that there was nothing to be gained by doing so, as there was no medical evidence to substantiate the alleged crime of molestation. *Id.,* at 1387. The trial attorney also stated that he feared that some harmful evidence may have surfaced had he called the doctors to the stand. *Id.*

The Eleventh Circuit Court of Appeals found this unpersuasive. *Id.*, at 1388. If the doctors had been interviewed, a decision not to call them as witnesses at trial may well have fallen within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. But

> [h]aving conducted no investigation into the significance of the lack of medical evidence...counsel could not have made an informed tactical decision that the risk...outweighed 'what potential benefit might come from [their testimony].' Because counsel never actually spoke with the physicians, he remained entirely unaware...of whether and to what extent their testimony might have helped Holsomback's case. In these circumstances, we cannot say that counsel's decision not even to contact the physicians as part of his pre-trial investigation was professionally reasonable...[W]e are also persuaded that counsel's failure to conduct an adequate pre-trial investigation satisfies the prejudice prong of *Strickland.*

*Holsomback*, at 1388.

Thus, adequate performance of counsel in a capital case requires that counsel

undertake an independent investigation to unearth any potential mitigating circumstances or evidence that may be offered during the sentencing phase. This objective standard may be established by either national performance guidelines such as the *ABA Standards for Criminal Justice* or by reference to relevant case law. Based upon either standard, trial counsels' performance in this case fell below that of a "reasonably competent attorney" defending a capital case during the penalty phase trial. In Mr. Haynes's case, his counsels' decision to conduct a last-minute, bare-bones investigation and thereby remain unaware of the vast bulk of the potential mitigation testimony and evidence was made without knowledge of what that testimony or evidence would be. This decision was, therefore, not a strategic or tactical decision nor was it a reasonable one.

In *Wiggins v. Smith,* 123 S. Ct. 2527 (2003) , the Supreme Court, in an important recent decision, addressed the standards for ineffective assistance of counsel at the punishment phase of a capital trial under *Strickland* and *Williams.* Specifically, that Court held that Wiggins' counsel rendered ineffective assistance of counsel at the punishment phase of his capital trial by their failure to perform an adequate investigation of his background, which included evidence of his dysfunctional family background and physical and sexual abuse. The Supreme Court held that trial counsel's punishment-phase strategy of disputing Wiggins' direct responsibility for the murder was not owed the deference usually accorded trial strategy, because it was not the product of a professionally reasonable investigation into other potential mitigation themes. Wiggins' trial counsel's performance was held deficient under the standards of the Anti-Terrorism and Effective Death Penalty

-99-

Act of 1996 ("AEDPA").

*Strickland, Williams* and *Wiggins* are the definitive triad of holdings on ineffectiveness of counsel, and the Supreme Court has made clear they are to be read together: *Strickland* "established the legal principles that govern claims of ineffective assistance of counsel" (*Wiggins* at 2535), and *Williams* "is illustrative of the proper application of these standards" (*Id.*).[57] *Wiggins* specifically addresses the scope of background investigation *Strickland* requires in a capital case in order to make a reasonably informed strategic judgment concerning the mitigation presentation.

**(1) Extent of background investigation.**

Crucially, the investigation deemed inadequate in *Wiggins* was fairly substantial. Wiggins' counsel:

- arranged for a psychologist to conduct a number of tests on their client, in which he was found to have "an IQ of 79, had difficulty coping with demanding situations and exhibited features of a personality disorder." *Wiggins* at 2536;

- hired a criminologist who interviewed Wiggins and testified he would adjust adequately to life in prison (*Id.* at 2538, 2547);

- secured access to Wiggins' PSI report, which included an account of his disadvantaged and, in his own words "disgusting" youth; and

- "'tracked down' records kept by the Baltimore City Department of Social Services

---

[57] The Supreme Court "made no new law in resolving Williams' ineffectiveness claims" (*Wiggins* at 2535) and likewise no new law was made in *Wiggins*.

(DSS) documenting petitioner's various placement in the State's foster care system."

(*Id.* at 2536).

Trial counsel in *Wiggins* were held ineffective for abandoning a mitigation investigation that should have been completed; here, counsel simply never began it.

**(2) Presentation of a "half-hearted mitigation case" crippled by lack of adequate preparation and investigation.**

The Supreme Court noted that Wiggins' attorneys "put on a halfhearted mitigation case" (*Wiggins* at 2538).

**(3) Reliance on dubious and unconvincing strategic justification for failure to perform adequate investigation.**

The Supreme Court in *Wiggins* emphasized that "our principal concern...is not whether counsel should have presented a mitigation case. Rather we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." *Wiggins,* at 2536 (emphasis in original). In *Wiggins,* the trial attorneys had  much more credible reasons  for their failure than here: "trial counsel made 'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder." *Wiggins* at 2533, quoting *Wiggins v. State,*  724 A.2d 1, 15 (1999).[58]

*Wiggins* elaborates on the *Strickland* standard:

---

[58]   Additionally,  Wiggins' "counsel likely knew further investigation 'would have resulted in more sordid details surfacing'" (*Wiggins v. Corcoran,* 288 F.3d 629, 641-42 (4th Cir. 2002) and "conflicting medical testimony with respect to the time of death, the absence of direct evidence against Wiggins, and unexplained forensic evidence at the crime scene supported counsel's strategy." *Id.* at  641, quoted in *Wiggins* at 2534.

"[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [the attorneys] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."
*Wiggins* at 2538.

Even with Wiggins' attorneys' explanations of their strategic reasons, the Supreme Court found their performance deficient. Counsel for Wiggins

sought, until the day before sentencing, to have the proceedings bifurcated into a retrial of guilt and a mitigation stage... On the eve of sentencing, counsel represented to the court that they were prepared to come forward with mitigating evidence...and that they intended to present such evidence in the event the court granted their motion to bifurcate.

*Wiggins* at 2537. The motion was, of course, not granted. Mr. Haynes's trial record trial shows the same inattentiveness seen in *Wiggins*.

**(4) Performance shown deficient under prevailing professional standards**.

The Supreme Court held in *Wiggins* that counsels' investigation "fell short of the professional standards prevailing in Maryland in 1989." *Wiggins* at 2536. Texas lawyers routinely performed more thorough mitigation investigations than performed by Haynes's counsel, *and* made conscious strategic decisions to put evidence of their clients' troubled backgrounds and mental problems before Texas sentencing juries.[59] It should further be

---

[59]   *See, e.g., Jurek v. Estelle,* 593 F.2d 672, 675 (5th Cir. 1979) (verbal IQ of 66, possible brain damage, and inability to recite alphabet, give change or say how many weeks in a year); *Riles v. McCotter,* 799 F.2d 947, 952 (5th Cir. 1986)(history of mental illness as possible mitigating factor); *Wicker v. McCotter,* 783 F.2d 487, 496 (5th Cir. 1986)(physicians called to

-102-

noted that this formidable collection of cases does not, of course, include capital cases in which Texas death penalty lawyers *avoided a death sentence* by the presentation of compelling mitigation evidence.[60]

The *Wiggins* case provides additional powerful confirmation that Mr. Haynes has met the *Strickland* standards on this issue.

### d) *Rompilla v. Beard*

Recently, in *Rompilla v. Beard,* 125 S. Ct. 2456 (2005), the Supreme Court reaffirmed the *Williams-Wiggins* high standards for effective assistance of counsel at the punishment

---

establish psychiatric disease and drug and alcohol abuse); *Brock v. McCotter,* 781 F.2d 1152, 1160 (5th Cir. 1986)(troubled childhood and heavy drug abuse); *Williams v. Lynaugh,* 809 F.2d 1063, 1065 (5th Cir. 1987)(defendant hit by automobile at age six, slow learner, headaches, borderline mentally retarded); *Elliason v. State,* 815 S.W.2d 656, 663 (Tex. Crim. App. 1991)(drug addiction, intense paranoia); *Ex parte Patrick Rogers,* 819 S.W.2d 533, 534-37 (Tex. Crim. App. 1991)(habitual drug use, youth, remorse); *Ex parte Jewel Richard McGee, Jr.,* 817 S.W.2d 77, 79-80 (Tex. Crim. App. 1991)(mental retardation, abandonment, severe child abuse); *Ex parte David Ray Harris,* 825 S.W.2d 120, 121 (Tex. Crim. App. 1991)(alcoholism); *Joiner v. State,* 825 S.W.2d 701, 706 (1992)(emotional problems, suicide attempts, no prior criminal record); *Ex parte Carl Kelly,* 832 S.W.2d 44, 45 (Tex. Crim. App. 1992)(difficulty in school, drug use, youth, good work ethic); *Nobles v. State,* 843 S.W.2d 503, 505-06 (Tex. Crim. App. 1992)(drug use, severe child abuse and neglect); *Ex parte Toby Lynn Williams,* 833 S.W.2d 150, 151-52 (Tex. Crim. App. 1992)(mental retardation and child abuse); *Kemp v. State,* 846 S.W.2d 289, 309 (1992)(positive character traits, religious devotion, poor parenting, youth); *Nelson v. State,* 848 S.W.2d 126, 136-37 (19920(drug use, molestation, child abuse, youth); *Gunter v. State,* 858 S.W.2d 430, 446 (Tex. Crim. App. 1993)(childhood physical and sexual abuse, abandonment, emotional problems, etc.); *Richardson v. State,* 879 S.W.2d 874, 883 (Tex. Crim. App. 1993)(parental neglect, starvation, learning disabilities); *Emery v. State,* 881 S.W.2d 702, 711 (Tex. Crim. App. 1994)(unstable and abusive upbringing, parental neglect); *Ex parte Henry Lee Lucas,* 877 S.W.2d 315, 317 (Tex. Crim. App. 1994)(physical and emotional abuse, poor parenting, low IQ).

[60] See, e.g. Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 300-01 (1983) (describing extremely aggravated capital murder case tried in Harris County, Texas during the 1970s in which the jury spared the defendant's life after hearing an extensive mitigation presentation).

phase of a capital trial. In this case, the Court held that Rompilla was entitled to sentencing phase relief on the ground that his trial counsel had been ineffective in failing to obtain and review a readily available court file which, had it been reviewed, would have led to a range of mitigating evidence. As the Court held, "[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 125 S. Ct. at 2460. Even though trial counsel took efforts to interview various family members and presented testimony from five of them at trial, and consulted with three mental health experts, this was held insufficient. The Court noted that petitioner's "own contributions to any mitigation case were minimal" as he was uninterested in helping counsel and at times "even actively obstructive." 125 S. Ct. at 2462.

The Court described the ABA Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as "well recognized." The state court decision to the contrary that "defense counsel's efforts were enough to free them from any obligation to enquire further" was held to be objectively unreasonable. 125 S. Ct. at 2467. These lapses were found prejudicial under the second prong of *Strickland,* as "[t]his evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury...the undiscovered 'mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal of [Rompilla's] culpability,' and the likelihood of a different result if the evidence had gone in is 'sufficient

-104-

to undermine confidence in the outcome..'" 125 S. Ct. at 2469.

### e) Fifth Circuit holdings on sentencing phase ineffectiveness.

The Supreme Court's holdings in *Williams, Wiggins* and *Rompilla* show unmistakably that Courts cannot pay lip-service to trial counsel's invocation of "strategic" reasons for their failures, and these decisions have echoed in recent holdings of the Fifth Circuit. In *Smith v. Dretke*, 417 F.3d 438 (5th Cir. 2005) that Court held counsel ineffective in a murder case for failing to adequately prepare and present evidence of self-defense, as here. Although petitioner identified four witnesses for counsel, counsel did not interview them or call them to testify to corroborate the petitioner's testimony concerning the victim's history of violence. Counsel did not do so because of his erroneous belief that the testimony of these witnesses was inadmissible and that only evidence known to the defendant was permitted. Prejudice was found because petitioner's only plausible defense was that he acted in self-defense and he testified to that affect but his testimony was easily discounted and disparaged by the prosecutor in argument without corroboration. "[A]n objectively reasonable court could not conclude otherwise." *Id.* at 444.

In *Tenny v. Dretke*, 416 F.3d 404 (5th Cir. 2005), a similar case, the Fifth Circuit held counsel ineffective in murder case for failing to adequately prepare and present evidence of self-defense. Prejudice was found because the evidence counsel failed to prepare and present included evidence that the victim, the defendant's live-in girlfriend, had threatened to kill him in the days prior to her death and even on that day, she had stabbed him within the week before, she had threatened to burn the house down, she had violent tendencies and

-105-

would have "insane rages," and she was strong enough to throw almost any grown man to the ground. Under the AEDPA standards, the state court's and the district court's upholding of it were unreasonable.

Based upon the above standards, Petitioner's trial counsel rendered ineffective assistance of counsel at the sentencing trial in this case.

### 2. Standard for meeting the "prejudice" prong.

In order to demonstrate prejudice under *Strickland*, the defendant must show that it is **reasonably likely** that the jury would have reached a different decision absent counsel's unprofessional errors. *Strickland,* 466 U.S. at 696. This showing must be sufficient to undermine confidence in the outcome of the proceeding. 466 U.S. at 693. Importantly, *Strickland* does not require Mr. Haynes to prove the errors of counsel were outcome-determinative. Indeed, the Court in *Strickland* expressly considered and rejected such a test:

> [W]e believe that a defendant need not show that counsel's conduct more likely than not altered the outcome in the case...The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

466 U.S. at 693-94.[61]

In assessing whether confidence is undermined in the punishment trial verdict (and

---

[61] The Fifth Circuit, in *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990), observed that the prejudice prong imposes "a lower burden of proof than the preponderance standard." Even when "the evidence arguably supports a different result under a preponderance standard", the court can still be "confident that it meets the 'reasonable probability' standard." *Id.* at 595. As demonstrated herein, the evidence available to counsel in this case establishes a "reasonable probability" that the result of the proceeding would have been different but for counsel's unprofessional performance.

thus whether *Strickland* "prejudice" has been established), this Court must look at trial counsel's deficiencies both individually **and cumulatively** during the course of the penalty trial.[62] *See Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir. 1992); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989). *See also Hendricks v. Calderon,* 70 F.3d 1032 (9th Cir. 1995), *cert. denied,* 116 S. Ct. 1335 (1996) (trial counsel held ineffective for failing to prepare and present mitigation evidence even though a defense expert was called; although the jury was given some lay evidence in mitigation, it was given no guidance of how to connect the facts and expert testimony about background to the mitigating factors; and the "quantum of prejudice the case law seems to require for deficient penalty phase performance is relatively low").

Because a single hold-out juror during the punishment phase would have resulted in a life sentence, *see* Tex. Code Crim. Pro. Art. 37.071(e) (Vernon 1983), this Court's "prejudice" analysis regarding errors in the **sentencing** phase must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel

---

[62] As a constitutional matter, the punishment phase trial in Texas is a full-blown trial in and of itself and thus entitled to the same due process rights, including the right to the effective assistance of counsel, as the guilt-innocence phase trial. *See, e.g., Barclay v. Florida*, 463 U.S. 939, 952-954 (1983); *Bullington v. Missouri*, 451 U.S. 430 (1981). "A capital sentencing proceeding ...is sufficiently like a trial in its adversarial format and in the existence of standards for decision...that counsel's role in the proceeding is comparable to counsel's role at trial -- to ensure that the adversarial testing process works to produce a just result under the standards governing decision. For purposes of describing counsel's duties, therefore...[a]... capital sentencing proceeding need not be distinguished from an ordinary trial." *Strickland*, 466 U.S. at 684. Thus, the proper application of the cumulative assessment of the constitutional ineffectiveness of Petitioner's trial counsel on the issue before this Court is whether counsel was ineffective considering all of their performance during the penalty trial.

performed effectively. *See Mak v. Blodgett,* 970 F.2d 614, 619-21 (9th Cir. 1992) (considering the Washington death penalty statute's "single holdout juror" provision in analyzing a *Strickland* claim); *Cf. Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death.").

In *Moore v. Johnson,* 185 F.3d 244 (5th Cir. 1999) the Fifth Circuit held that trial counsel's performance was constitutionally insufficient and prejudicial to the outcome of the penalty phase. Counsel in Moore failed to investigate potentially mitigating evidence, including an abusive and deprived childhood, impaired mental functioning and an early release from prison on a prior conviction. At an evidentiary hearing in state court, counsel for Moore admitted that he was cognizant of some elements of Moore's turbulent childhood but failed to engage in investigation of potentially mitigating evidence because it was "per se inconsistent with an alibi defense." *Id.,* at 271. The Fifth Circuit rejected counsel's explanation stating:

> Moore maintains that counsel's failure to present mitigating evidence is not entitled to a presumption of reasonableness because it was neither informed by a reasonable investigation nor supported by any logical position that such failure would benefit Moore's defense. We agree.

*Moore* at 273. The Fifth Circuit characterized counsel's view as "over broad and insufficient alone, without any reference to why that justification would apply in this case, to justify counsel's complete failure to investigate for the purpose of making an informed

decision and failure to offer any mitigating evidence." *Moore* at 275. The Court went on to clarify that:

> To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented during the punishment phase of Moore's trial. The fact that distinguishes this case from those cases in which we have rejected similar claims because the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a potential backlash effect on the defense.

*Moore* at 274. Finally, the Fifth Circuit substantially based its conclusion that counsel's failures were harmful "upon the fact that counsel also failed to use what limited mitigating evidence was readily available." *Moore* at 278.

Counsel's ineffective performance was more egregious, and the resulting prejudice more harmful to Mr. Haynes than the circumstances in *Moore, supra.* As in *Moore*, trial counsel failed to investigate or present much of the potentially favorable character or background evidence. As in *Moore,* there was in Mr. Haynes's case "no logical or factual support and no conceivable strategic purpose" in failing to present this potentially mitigating evidence.

In *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) the Fifth Circuit granted penalty phase relief, reversing the district court, for failure to conduct an adequate penalty phase investigation. After an evidentiary hearing, the magistrate judge found that counsel attempted to speak with family members about Lewis' abusive background, but that they were "not forthcoming." This "mere modicum of evidence" was held insufficient to support the district court's conclusion that counsel's very limited presentation of Lewis' childhood

abuse was reasonable. To assess counsel's performance in preparing for the sentencing phase of trial, the proper focus is not whether counsel should have presented a mitigation case, but "whether the investigation supporting counsel's decision not to introduce mitigation evidence ... *was itself reasonable*." (citing *Wiggins v. Smith*, 539 U.S. 510 (2003) (emphasis in original)). "It is axiomatic – particularly since *Wiggins* – that [a decision not to present mitigating evidence] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose."

Three of Lewis' sisters could have provided detailed testimony about the severe abuse suffered by Lewis at the hands of his father. These sisters attended Lewis' trial but counsel never asked them to testify. Though counsel did present testimony from Lewis' grandmother, "her conclusional testimony contained none of the details provided by Lewis' siblings at the habeas hearing, which could have been truly beneficial. [The grandmother's] skeletal testimony concerning the abuse of her grandson was wholly inadequate to present to the jury a true picture of the tortured childhood experienced by Lewis." Furthermore, the sisters' testimony could have been corroborated by abundant records documenting numerous hospital visits and domestic disturbance calls.

The district court's reasons for finding that Lewis was not prejudiced by the failure to present detailed evidence of his childhood abuse were held to be flawed. The district court held that the amount of time elapsed between the alleged child abuse and the commission of the crime, and Lewis' intervening criminal convictions, diminished the weight that could be

-110-

given to the omitted mitigation. The circuit court, however, noted that in both *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins*, the time that elapsed between the abuse and commission crime were greater than in Lewis' case, and that the defendant in *Williams* had many intervening criminal convictions. "It is obvious to us that the level of abuse to which Lewis was exposed mandates the conclusion that, had this evidence been produced, it is quite likely that it would have affected the sentencing decision of at least one juror."

In *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir. 1983), the Court held that "it is only **after** a full investigation of **all** the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case." (emphasis in original). The Pickens Court noted that when "no investigation into any possible mitigating evidence is done," counsel and the accused are "left with no case to present" during the sentencing phase trial. *Id*. The Court in *Pickens* held in conclusion that "a reasonably competent attorney would have presented mitigating evidence on Pickens' behalf in the sentencing phase of the trial. We deem the failure to present **any** evidence highly prejudicial." *Id*. at 1469.

In *Collier v. Turpin,* 155 F.3d 1277 (11th Cir. 1998) trial counsel was ineffective in failing to adequately prepare and present mitigation evidence at the sentencing hearing. In *Collier*, the preparation was much more extensive than in Mr. Haynes's case, as counsel there presented ten witnesses at the hearing.   As the Eleventh Circuit held, "[t]he jury was called upon to determine whether a man they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of

-111-

the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life." *Collier,* at 1296. In Mr. Haynes's case, the jury was not informed of significant facts surrounding his drug use at the time of the crime as well as significant background information that was only briefly presented.

In *Kubat v. Theiret*, 867 F.2d 351, 369 (7th Cir. 1989), the Seventh Circuit held that trial counsel's failure to present available and compelling mitigation evidence at the sentencing phase, including the testimony of a law enforcement officer, was prejudicial because "if just one juror had been sufficiently influenced by the character testimony, the death penalty could not have been imposed." Like the Eleventh Circuit, the Seventh observed that performance by counsel which was sufficiently ineffective to amount to "no defense at the sentencing hearing" should be considered in the prejudice analysis: "On this basis alone, our confidence in the outcome is sufficiently undermined to find that Kubat was prejudiced." *Id.* at 369.

In *Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991), the Seventh Circuit was again presented with a case in which the defendant's attorney offered no mitigating evidence despite his awareness of his client's "borderline intelligence" and "minimal education level." *Id.* at 854. The Seventh Circuit found prejudice from the errors:

> While the sentencing judge did not find the [potential] evidence sufficiently mitigating to overcome the aggravating circumstance of the murder, there is a reasonable probability that the jury, if presented with the evidence of Brewer's entire history -- troubled childhood, low I.Q., deprived background, and myriad of other psychiatric problems, might very well have felt differently.

-112-

*Id.* at 858-59. Like the Eleventh Circuit, the Seventh Circuit eschewed extended speculation about the jury's thought processes, and focused mainly on the extent and nature of the mitigating evidence.[63]

In *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) the court observed that one element of performing a prejudice analysis is *comparing* the amount of evidence *actually introduced* with the amount that could have been introduced:

> With no evidence of mitigation before the jury despite irrefutable evidence of aggravating circumstances, with need to convince only one of twelve jurors to refuse to go along with a death sentence, . . . the possibility that a case in mitigation along the lines devised by [Emerson's habeas] lawyers cannot confidently be reckoned trivial.

All of these cases are consistent with the Supreme Court's directives on this subject. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances[.]" *Strickland v. Washington*, 466 U.S. at 691 (1984).  *See also Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("[a]t the heart of effective representation is the independent duty to investigate and prepare.").

Similarly, it has been held that "...a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but must instead make a reasonable investigation." *Becton v. Barnett,* 920 F.2d 1190, 1192 (4th Cir. 1990).  After all, "the fact that a person is

---

[63] Justice Easterbrook, in a colorful concurrence, agreed with the majority's conclusion, emphasizing that "counsel should have appreciated from the beginning that there was not much chance of an acquittal.  Sentencing was to be the main event." *Id.* at 860.

intelligent does not represent proof that he is free from mental illness." *United States v. Tate*, 419 F.2d 131, 132 (6th Cir. 1969).

Trial counsel were at least bound to conduct more than a bare-bones investigation into Petitioner's background and life history. *See, e.g., Strickland*, 466 U.S. 688, 706 (1984) (Brennan, J., concurring in part and dissenting in part); *Gray v. Lucas*, 677 F.2d 1086, 1093-94 (5th Cir. 1982), *cert. denied*, 461 U.S. 910 (1983); *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983), *cert. denied*, 469 U.S. 1028 (1984); *Thompson v. Wainwright*, 787 F.2d 1447, 1451, 1452 (11th Cir. 1986); *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982). The most minimal investigation of this sort would have revealed the very information that is set forth in detail below.

The *Wiggins* case also reiterates the *Strickland* standard for showing prejudice:

> ...to establish prejudice, a 'defendant must show that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.
> *Wiggins* at 2542.

The *Wiggins* court, echoing *Williams*, twice stressed that in assessing prejudice, the mitigating evidence must be evaluated as a *totality* (*Wiggins* at 2542 and 2543) and without reference to its constitutional or trial-based dimensions.

Finally, *Wiggins* confirms that a court should find prejudice and grant punishment-phase relief upon a finding that " there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins* at 2543. That standard was met in *Wiggins*,

*Williams*, and *Rompilla* and is met here as well.

**Facts in support of ineffectiveness claim in general.**

Through the many affidavits and expert opinions included herein, a picture emerges of virtual indifference on the part of Anthony's trial attorneys, an indifference to his chances of an acquittal at the guilt phase and his chances of a life sentence. Many potential witnesses were not used as witnesses, despite their availability, and, in most cases, their willingness to testify.

Anthony's mother Patrica Davis states in her declaration,

We called and talked to Mr. Nunnery during the breaks in testimony. My husband would ask him why he was not doing this or that, and he would reply that "you can't make the victim look bad" even though the questions had nothing to do with the victim.   It felt like he was intimidated by the prosecutor and the judge, as if he did not want to get them annoyed....During the trial, Mr. Nunnery pretty much ran the defense. He and Mr. Jones did not seem like they were a team. This was Mr. Jones's first capital case. When he would cross-examine, his questions did not seem relevant. Anthony would pass noted to them, but they would not respond.  The attorneys did not want Anthony to testify, as they said the district attorney would discredit him. I told the attorneys I wanted to be a witness, but they said it would not be a good idea. Mr. Nunnery never told me why it was not a good idea."[64]

Donald W. Haynes, Anthony's father, was one of the few who did testify, but he was inadequately interviewed and hence was not an effective witness:

I was not satisfied with the job Anthony's attorneys did for him both before and at his trial.  Mr. Nunnery did not properly prepare me to testify in that he did not go over some of the important details I wanted brought out and he did not prepare me for questions the prosecutor was likely to ask me.  I once went to Mr. Nunnery's office. A family friend, Cynthia Brown, was there. Mr. Nunnery just outlined in vague terms what the prosecutor would ask, not in any depth.  He talked Cynthia Brown out of

---

[64]   *See* Declaration of Patrica Davis, Exhibit 11.

-115-

testifying.

I don't remember who it was that recommended Mr. Nunnery to us. The judge had picked an attorney, but he couldn't be ready for trial quickly, as the judge was pressing him to be ready in two to three months. Mr. Jones and Mr. Nunnery did not get along during the trial. Mr. Nunnery would complain that he asked Mr. Jones to do certain things but he didn't do them. The investigator Mr. Nunnery hired was inadequate. It seemed like a low-budget or no-budget operation.[65]

Likewise, Anthony's uncle Eric Haynes was not effectively interviewed, and hence the defense attorneys could not have presented his valuable testimony:

I spoke once with Mr. Jones about six months before the trial, and maybe once more. I just met Mr. Nunnery once but did not really speak to him. I never spoke with a defense investigator.

When I heard about Anthony's arrest for the killing of the police officer, I was shocked. Based on my knowledge of Anthony Haynes, I believe he would be a very low risk of committing future dangerous acts or acts of violence. This was my belief at the time of the trial and it is my belief now.

Neither of the defense attorneys spoke to me at the time of the trial. I was living at home in the Houston area at the time of the trial, and I was easy to reach.

Once the trial started, Mr. Nunnery took over. It seemed the trial was rushed because of finances. Suddenly, they were going to trial in a few weeks. If the defense attorneys or the investigator had talked to me at the time of the trial, I would have told them what I have said in this declaration. Had they asked me to be a witness for Anthony at the trial, I would have been willing to do so.[66]

Tiffany Deckard, a friend of Anthony's, was basically given what can only be termed a brush-off by the trial attorneys.[67] Although she attended the trial every day, expecting to be called as a witness, she never was. Ms. Deckard could have testified about Anthony's remorse and his non-violent nature. She also notes in her declaration that the two trial

---

[65]   *See* Declaration of Donald W. Haynes, Exhibit 12.

[66]   *See* Declaration of Eric Haynes, Exhibit 13.

[67]   *See* Declaration of Tiffany Deckard, Exhibit 14.

-116-

attorneys did not seem to be working together as a team.[68]

Earl Washington, Sr., despite being a Houston firefighter and a life-long friend of

Anthony and his family, was never even interviewed by the defense attorneys:

> I don't think the defense attorneys were sufficiently on the offensive. It did not look like they were giving it their all. They really did not get down to defending Anthony. While I knew Anthony had done the crime, I did not think the punishment was appropriate, as it was his first time in trouble with the law.
> Anthony's defense attorneys and investigators never talked to me. Donald Haynes had a list of people to whom the defense attorneys started to talk, and I was on that list. However, they never contacted me, and I was surprised at this. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here.[69]

Even the few witnesses who were called by the defense were neither interviewed

extensively or asked about the most relevant areas of their potential testimony. Anthony's

grandmother Myrtle Hinton did testify, but her declaration shows how much of her potential

was wasted due to a woefully inadequate investigation:

> Anthony's attorneys did not talk to me extensively before the trial. One meeting was for about 30 or 35 minutes when I went to Mr. Jones's office to take him money for the case. Mr. Nunnery had not yet been involved in the case. They did not properly prepare me to testify and I was asked only a few questions at this meeting.
> Later, there were seven or eight of us at Mr. Nunnery's office for a meeting on a Saturday. We were questioned together as a group and then he called us in individually and these individual meetings only lasted a few minutes. This was the only time I talked to Mr. Nunnery.
> I could have told the jury a lot more than I did about Anthony's background when I testified at his trial, but because the attorneys did not ask me much about Anthony's background, they didn't ask me. On the stand, I said I would not change the way I

---

[68]  *Id.*

[69]  *See* Declaration of Earl Washington, Sr., Exhibit 15.

had dealt with Anthony. At the time of the trial, I did not think there was a high probability of Anthony committing future violent or dangerous acts. Anthony never did anything around me that was a problem. He was not violent, he was always considerate and wanted to help people. I would have testified that he was not a future danger if I had been asked by his attorneys. I also heard that some of the jurors voted for death because they thought he would have a chance to have it overturned on appeal.

Although I did briefly talk with Anthony's defense attorneys, and was called as a witness, they did not ask me much of what is in this declaration. If they had, I would have been willing to tell the jury what I have said in this declaration.[70]

Dr. Mark Cunningham, a nationally recognized expert in capital sentencing and forensic psychology, has submitted an extensive report based on a review of virtually the entire case file and lengthy family interviews.[71] He has this to say about the level of defense preparation for the punishment phase of the trial:

This [report]...subsequently outlines adverse developmental factors and experiences in Anthony Haynes' history that singularly and collectively increased the likelihood of psychological and social maladjustment, morality deficits, poor impulse control, poor judgment, criminal activity, and violent criminal offending. Only a few of these factors were touched on in a cursory fashion during evidence offered by the defense at Mr. Haynes' capital sentencing...As the defense obtained only 11th hour mental health expert consultations and then failed to call such an expert to testify regarding Mr. Haynes' developmental history; perspectives on the linkage of developmental injury and/or psychological disorder to criminal violence were entirely absent from Mr. Haynes' capital sentencing phase. Accordingly, the jury was deprived of a

---

[70] *See* Declaration of Myrtle Hinton, Exhibit 16.

[71] Exhibit 17. All references to Dr. Cunningham and the other experts in relation to the ineffective assistance of counsel issues are not, of course, merely arguments that trial counsel was ineffective in failing to present *these particular* experts at Anthony's trial, nor does Petitioner have to show that. All expert opinions referenced herein are made on the basis of widely accepted and widely known scientific and psychiatric knowledge at the time of the 1999 trial, and thus any expert in the relevant fields would have rendered similar opinions had they been consulted by defense counsel. *See* the extensive References Section of Dr. Cunningham's Declaration, Exhibit 17, at 65-70. All three experts, however, were available to serve as experts at the time of Petitioner's trial in 1999.

-118-

scientifically informed basis to give weight to that history and psychological status.[72]

In the discussion of the individual instances of ineffectiveness to follow, Petitioner hereby incorporates by reference the above general discussion of the law and the facts to each individual claim below.

**Claim I(a): Counsel were ineffective for failing to competently investigate, present or explain the relevance of damaging developmental experiences of their client, and for delaying the inadequate investigation until the last moment.**

**A. Facts in Support of Claim:**

Despite a wealth of mitigating evidence relating to their client's background, family, personal circumstances, almost none of this was presented to Mr. Haynes's jury. The defense presentation was so deficient that the prosecution was able to argue that they had presented nothing in terms of mitigation:

> **The evidence is also clear that there is no mitigation.** The fact that he has had every opportunity in life and still did what he did to Sergeant Kent Kincaid, the fact that he had loving parents who never, even to this day, have not abandoned him, is that mitigation? The fact that he had loving and caring grandparents, is that mitigation? The fact that he chose to take – not take advantage of the opportunity of that abuse [sic Boost] program, the pipeline that enabled him, is that mitigation? The fact that he didn't take advantage of his career scholarship from the Army ROTC to Prairie View A & M, is that mitigation? The fact that he blew all of chances to go to Morehouse College in Atlanta, is that mitigation? Is there anything that you see that mitigates against this. I suggest to you not. What does the defense bring you to show, to suggest that there's mitigation? A bunch of little awards, diplomas, certificates from elementary school that's supposed to be mitigating?
> (30 RR 28)(emphasis added)

---

[72]    *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 8.

As Dr. Cunningham summarizes trial counsel's preparation:

Mr. Haynes' defense failed to adequately investigate Anthony's background, identify and explore the numerous damaging developmental factors apparent in that background, or articulate these factors and the supporting evidence. By failing to identify and provide evidence of such factors, the defense effectively put almost no mitigation before the jury. So sparse was the history and associated damaging developmental factors offered by the defense that the State could assert that there was no mitigation.[73]

The primary reason for the deficient investigation was the fact that it was ignored until virtually the eve of the trial. A review of the record reveals only hasty, incomplete, last minute efforts that proved to be too little and too late:

The failure of the defense to discover and develop this potentially critically important mitigating information appears to lie in the 11th hour nature of the investigation into Anthony's background. My review of the pre-trial mitigation investigation found one interview of Anthony on 7-29-99, only three weeks before voir dire of the jury; and another on 8-21-99, only three days prior to jury voir dire.[74] Most if not all of the interviews of family members were also not performed by defense investigators until August 1999, and were correspondingly limited in number and depth. The evaluation by Robert Geffner, Ph.D., neuropsychologist, took place between 8-19-99 and 8-23-99, on the very eve of voir dire of the jury which began on 8-24-99.[75] A single page letter from Dr. Geffner to Alvin Nunnery summarizing the evaluation findings was dated 9-12-99. Accordingly, this summary would have been received on the literal eve of opening statements - if it had been faxed. The evaluation by Mitchell Young, M.D.[76] was performed on 9-19-99, two days *after* Anthony had been convicted of capital murder, and on the literal eve of the opening of the penalty phase.[77]

---

[73] *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 8-9.

[74] *See* Letter of Dr. Robert Geffner, Exhibit 18.

[75] *See* Letter of Dr. Robert Geffner, Exhibit 18.

[76] *See* Letter of Dr. Mitchell Young, Exhibit 19.

[77] *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 9.

Thus, with such a late start, the defense counsel ran the unreasonable risk that they would fail to uncover significant mitigating evidence, as actually happened at the trial. This caused a major failure at Anthony's trial, the failure of the defense to use expert testimony to present his background:

> The defense-retained experts can hardly be faulted for the less than comprehensive nature of their evaluations under the time and funding restrictions placed on them by defense counsel. Dr. Geffner took pains to explain in his one-page summary why he required an additional two hours to review the file, much less seek additional records or third party data.[78] Beyond funding pressures, the unconscionably late timing of these consultations did not allow sufficient time for the experts to interview family or other third parties. This was a critical lapse, as mental health experts are likely to explore areas that are not apparent to investigators. The role of the interviews undertaken by the mitigation investigators is to provide a foundation for, not act as a substitution for direct interviews of family and third parties by mental health experts. The importance of these interviews and the history they may uncover increases when it is realized that testimony by mental health experts at capital sentencing is most importantly directed toward describing damaging developmental factors and their effects, as opposed to diagnosis.

> Similarly, there was insufficient time for the mental health experts to test their hypotheses regarding Anthony against the reports of these third parties or to engage in more specific evaluation procedures. For example, whether Anthony had an Antisocial Personality Disorder as reported by Dr. Geffner and Dr. Young would depend on family and third party reports of evidence of a childhood Conduct Disorder.[79] Though noting an Intermittent Explosive Disorder (which may be associated with the presence of a seizure disorder), Dr. Young acknowledged that an EEG had not been done. Similarly, he identified the potential for an "emergent thought disorder" (i.e. psychosis), but apparently did not have an opportunity to rule this out. Dr. Geffner's was apparently not provided with sufficient background information regarding Anthony to observe the multiple family dysfunctions noted by Dr. Young. Dr. Young's findings in this regard would have arrived too late to allow reasonable consultation with Dr. Geffner for his findings to be supplemented. Further,

---

[78]   *See* Letter of Dr. Robert Geffner, Exhibit 18.

[79]   *See* Exhibits 18 and 19.

-121-

Dr. Young reported that he had only reviewed "excerpts" from the West Oak Psychiatric Hospital records. His having reviewed these West Oaks records in their entirety appears to have been critical given the emphasis placed on these by the State, and as Anthony now reports that he fabricated the history of delinquent activity that he provided to the West Oak staff. Anthony's disavowal of this history of delinquency is consistent with numerous affidavits from peers and adults who had long, close observation of his interactions and behaviors.[80]

## B. Argument.

As a result of the egregiously late start to the penalty phase investigation, counsel were unprepared to give their experts even the most minimal of assistance in order for them to render meaningful assistance at the penalty phase. Anthony had a well-documented history of psychotic disorders, auditory hallucinations and the like that was not presented to his jury, largely as a result of the neglect of this area of the trial until it was too late:

> The apparent defense request that the evaluation findings from the mental health experts be boiled down to a one page report (e.g. "Enclosed please find requested one page report..." Cover letter from Dr. Young to Alvin Nunnery dated 9-20-99)[81] only aggravated the cursory nature of the associated summaries. Reducing a mitigation evaluation to a single page can result in the loss of important detail. For example, Dr. Geffner reported: "His [Anthony's] psychological assessment did not indicate psychotic disorders" when, in fact, Anthony likely did not appear overtly psychotic.[82] However, Anthony's MMPI-2 profile obtained by Dr. Geffner raised the potential of a psychotic disorder, or a mood disorder with manic and psychotic features.[83] Dr. Geffner's failure to note this potential is of greater concern in the face of Anthony's historical experience of auditory hallucinations, documented well prior to his capital murder charge, and an adolescent psychiatric hospitalization where he

---

[80] *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 9-10.

[81] *See* Letter of Dr. Mitchell Young, Exhibit 19.

[82] *See* Exhibit 18.

[83] *See* MMPI-2 Report on Anthony Haynes, 8/17/99, Exhibit 20.

-122-

was treated with antipsychotic medication. These failures in evaluation integration again point to insufficient data and insufficient time to adequately consult with mitigation investigators and defense counsel.[84]

As Dr. Cunningham observes, "[d]efense counsel was then faced with whether to call mental health experts whose evaluations were rushed and cursory, whose findings were based in part on a paucity of inadequate 11th hour defense investigation summaries, and whose conclusions might be aggravating because of evaluation limitations, weaknesses, and incorporation of irrelevant but potentially profoundly aggravating procedures.[85]

**Claim I(b): Counsel were ineffective for failing to present a coherent theory of mitigation.**

As discussed above, the failure of the investigation left defense counsel with little to present to the jury in terms of mitigating evidence. The few family members that did testify did not collectively present enough relevant evidence or a coherent theory upon which defense counsel could make a persuasive plea for life. As a result, the prosecution was able to emphasize the lack of mitigating evidence, as it was not presented by the defense:

> While the defense failed to articulate a coherent theory of mitigation for the jury, this lapse was perhaps unavoidable when the defense offered little to no mitigation for the jury's consideration. To explain, the concept of moral culpability acknowledges an elementary psychological reality: we do not all arrive at our choices out of equivalent raw material. It follows that the degree of "blameworthiness" of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped, influenced, or compromised that choice. The relationship of developmental damage and other impairing factors to the exercise of choice, and subsequently to moral culpability is illustrated in the graphic models below. As the damage and impairing factors (e.g. psychological disorder, mental deficiency, drug

---

[84]  *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 9-10.

[85]  *Id.* at 11.

dependency/intoxication, "risk factors" in the U.S. Department of Justice model) increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced.[86]

The defense, either through neglect or ignorance, did not formulate a theory of mitigation with which to counter the prosecution's portrait of Anthony in terms that could only have led the jury to believe there was a probability he would commit future acts of criminal violence:

> That a defendant had a choice is a settled issue at the point of conviction, as is whether the defendant knew right from wrong. A moral culpability analysis at capital sentencing, then, is not a dichotomous determination of whether the defendant had a choice or wrongful awareness. Rather, it is an appraisal of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and that exercise of volition or free will.
> This consideration, however, becomes irrelevant if the defense offers no evidence regarding how the defendant was adversely shaped, influenced, or compromised. In the absence of investigation and testimony regarding such adverse factors by the defense, it is not surprising that the State advised the jury that Anthony's conduct was simply "merciless," "predatory," and "cold-blooded." Similarly, it is not surprising that the jury would find Anthony's level of moral culpability to be death-worthy.[87]

There were many familial and environmental factors in Anthony's background that put him at a significantly higher risk of delinquency and youth violence, such as perinatal difficulties, minor physical abnormalities, family conflict and history of alcohol abuse, as identified by Dr. Cunningham in his evaluation.[88] On the other hand, Anthony exhibited few

---

[86] *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 11.

[87] *Id.* at 12.

[88] *Id.* at 12-14.

of the protective factors that would have lessened the risk.[89]  It is important to note these are

not *predictive* factors, as called for in the special issue that asks for predictions of the

probability of the defendant committing acts of criminal violence, but are backward-looking

and mitigating in that they can explain a defendant's behavior as due to factors beyond his

control.  With the cessation or diminishment of these factors in prison, a positive prognosis

would be indicated.

This theme, the failure to develop, investigate and present a coherent theme of

mitigation, will be developed more fully in the discussions of individual failures and

instances of ineffectiveness.  It is however a systemic failure which both overshadows and

explains the individual failures of Anthony's trial counsel.

**Claim I(c): Counsel were ineffective for failing to develop, investigate and
present evidence regarding the implications of their client's youth and developmental
immaturity.**

**A. Facts in Support of Claim.**

At the time of the crime, Anthony was only nineteen, fresh out of high school and the

Boost training program.  As Dr. Cunningham states, "Anthony's teenage status at the time

of the capital offense is critically important to considerations of his moral culpability and

hence his death-worthiness.  Unfortunately, there was no evidence presented at sentencing

regarding the implications of his developmental immaturity."[90]  As a nineteen year old, he

had not fully matured, and was not very far from the cut-off age (18) at which the Supreme

---

[89]  *Id.* at 13-14.

[90]  *Id.* at 15.

Court has held executions to be unconstitutional, in the *Roper v. Simmons* [125 S. Ct. 1183 (2005)] case.[91]

Unfortunately, defense counsel presented no evidence at the punishment phase regarding the implications of his developmental immaturity. Had they consulted with any reasonably competent expert in this field, they would have been able to dramatically change the prosecution's picture of Anthony as a hardened killer:

> Adolescent immaturity has a clear neuro-developmental basis. To explain, brain development of the frontal lobes continues into the early twenties...
>
> Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and appreciation of the emotional reactions of others, and recognition of consequences. Significant age related growth in these capabilities, conventionally referred to as "maturing" or "growing up," occurs between the ages of 19 and 22 in all individuals. While the age-related endpoint of adolescence varies by function or role, neurologically it can be considered to continue through this full frontal lobe mylenization in the early to mid-twenties. All 19 year olds are thus "immature" in brain development and in relation to adults. This neurological immaturity is reflected in limitations in psychological functioning and behavioral control, and accounts for the poor decision-making and poor impulse control often observed in adolescents, even in their late teens.[92]

## B. Argument

The implications of this evidence of developmental immaturity for the sentencing hearing were immense. In a case characterized by an unpremeditated shooting, in which the main aggravating evidence was a series of similarly unplanned and unpremeditated robberies occurring on the same night, the failure to even address this central issue through expert

---

[91] Although this case was decided several years after Anthony's trial, the youth of a defendant was a widely-recognized mitigating factor well before 1999, as the decision points out.

[92] *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 15.

testimony was negligent *per se*. The crimes all have the hallmarks of impulsiveness, a lack of planning and a lack of contingency plans, all common to crimes committed by juveniles.

Many other helpful mitigating factors could have been developed at the punishment phase of Anthony's trial, had counsel taken even the most basic steps to acquaint themselves with either the background of their client or the state of expert opinion in this area at the time of Anthony's trial:

> Compounding the judgment and behavior control problems associated with frontal lobe immaturity, the adolescent male brain is experiencing markedly rising levels of testosterone, and subject to the aggression-inducing effects of this hormone. At the same time, physical development is rapidly proceeding, psychosocial roles are changing, and identity is being transformed. Such instability is seen in Anthony's teens as he apparently shifted between respect to adults on one hand and defiance with his mother on the other, or ROTC participation on one hand and delinquent activities on the other. That Anthony would have been hyper-religious during the Boost program, only to commit armed robberies and a capital murder only a month later is further evidence of this adolescent identity instability.

> Additionally, adolescence is also characterized by egocentric perceptions of self-uniqueness, with an associated "personal fable" that the risks and consequences that might befall others do not apply to them. These classically adolescent perspectives explain the involvement of teens in high risk and even illegal activities, and their deficits in identifying and empathizing with others. The almost irresistible striving for independence among adolescents, combined with their continuing perception of themselves as children rather than adults, interferes with their accepting behavioral direction, identifying with the collective community, or perceiving any sense of responsibility for upholding collective moral values. In other words, an adolescent is unable to see beyond his own world, his personal perceptions, and/or his own need to be separate sufficiently to experience a sense of moral responsibility to his community.[93]

It is remarkable that the obvious mitigating consequences of their client's youth were not investigated or presented by Anthony's attorneys. Well before *Roper v. Simmons*, 543

---

[93] *Id.* at 16.