# United States District Court
# Southern District of Texas

## Case Number: ___H-05- 3424___

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __5__ of __5__

☐ Exhibit to: _____Vol I._____
        number(s) / letter(s) _____

Other: ___Petition For Writ of___

___Habeas Corpus___

_____

U.S.___, 125 S. Ct. 1183 (2005) it was widely recognized that youth, immaturity and unsophisticated behavior were mitigating factors. All that would have been required of the trial attorneys would have been only the most perfunctory of consultations with psychiatric experts, not necessarily specialists in youth psychiatry, who would undoubtedly have pointed out the need for further investigation and evaluations, in view of the obvious youth of the client and the nature of the crime.

Additional evidence of Anthony's adolescent status at the time of this offense demonstrated in the interpersonal context of the armed robberies and capital offense on May 22, 1998. First, there was an aimless and shifting plan for the evening's activities, which did not initially contemplate criminal activities. Second, the offenses are committed in the presence of two male peers, one of whom initially indicated a willingness to participate in the armed robberies and one who was simply along as an observer. This is a classically adolescent pattern of behaving as, or in the company of, a group. Adolescents define themselves, their identity, and the meaning of their behavior and relationships by how their peers perceive and react to them. They live their life in the group. Thus Anthony engaged in armed robberies in a group setting, even though the presence of his two peers created witnesses, might require a distribution of the proceeds, and dramatically increased the likelihood of eventual apprehension. That one of the accompanying youth, Timothy Reese, apparently expected that he could ride along during armed robberies without becoming implicated in the associated conduct also reflected the operation of an adolescent group process that does not appreciate the role of collective responsibility and the associated law of parties.

Anthony's inability to keep the offense to himself is also reflective of his adolescent psychological status. Within hours after the offense, Anthony telephoned Sergeant Quarracy Lamar Smith, recent Boost program mentor, and confessed his participation in the shooting of a police officer. That same night, Anthony telephoned LaToya Terry, a friend, and confessed to her as well. Tiffany Deckard, another friend, reported that Anthony came to her the day after the shooting and confessed. This need to disclose, even when creating grave jeopardy for himself, is typical of adolescent processing of a disturbing event. Obviously, it is inconsistent with a cool, hardened killer. Anthony's reported "bragging" regarding the offense is also most appropriately

viewed through the lens of his being a teenager.[94]

As the obvious factors of Anthony's age and the unplanned nature of his crime went unexplored by his defense counsel, the consequences were that they also missed other factors that, as Dr. Cunningham states, would lead one to believe that "Anthony was even more psychologically *immature* at age 19 than most of his age mates." [95]   Some of these less-evident factors include:

> 1.   ADHD (hyperactivity, attention/concentration deficits, and impulsivity) implicates mild nervous system immaturity reflected in deficiencies in motor inhibition, attention, and impulse control processes. This serves to reduce the effectiveness of cognitive processes associated with "maturity."
>
> 2.   The adverse developmental factors in Anthony's childhood would act to delay functional emotional maturity. This factors associated with this disrupted developmental trajectory are detailed in above sections of this affidavit.
>
> 3.   As described above, Anthony's heavy alcohol and substance abuse during his teen years would act to slow the onset of age-appropriate coping capacity and functional maturity.
>
> 4.   That Anthony's social and psychological development lagged behind his peers is also evident in his being unable to adapt to the academic and social requirements of the Boost college preparatory program.[96]

**Claim I(d): Counsel were ineffective for failing to investigate and present evidence that their client was suffering from Attention Deficit Hyperactivity Disorder and a major mood disorder.**

---

[94]   *Id.* at 17.

[95]   *Id.* at 18.

[96]   *Id.* *Also see* Exhibit 27, Boost program academic records.

**A. Facts in Support of Claim.**

Largely as a result of the perfunctory and last-minute investigation, Anthony's counsel failed to discover, develop and present mitigating evidence that their client suffered from Attention Deficit Hyperactivity Disorder (ADHD) and a major mood disorder. As Dr. Cunningham summarizes the readily-available evidence:

> In elementary school Anthony was diagnosed as suffering from Attention Deficit Hyperactivity Disorder and was treated with Ritalin. His maternal grandmother, Myrtle, reported that Anthony had always been hyper, and as a child had difficulty focusing his attention as he jumped from one activity to another. Patrica also described Anthony as being very busy and being unable to focus on one play activity. Even when watching television Anthony would be moving. Patrica reported that in school Anthony had trouble sitting still, often did not complete his seat work, talked excessively in class, and disrupted his peers. She described that Anthony was often moved away from other students so that he would not distract them. Patrica reported that Anthony's ADHD symptoms were reduced by Ritalin (stimulant medication), which he took for several years until Junior High. Unfortunately, there is no indication that either of his parents reported Anthony's history of ADHD diagnosis and treatment to the mental health professionals evaluating him when he was admitted to West Oaks psychiatric hospital.

> Patrica reported that Anthony's younger half-sister, Alexandra (age 11) has also been diagnosed with ADHD and is medicated with Concerta.[97]

Dr. Susana Rosin also comments on this failure:

While Mr. Haynes' family and friends described him as a generally cooperative, respectful and easy going young man until the year prior to the unfortunate shooting of Mr. Kinkaid, from a mental health expert's point of view, Mr. Hayes' records contain many red flags regarding the possible early onset of mental illness. Mr. Haynes, for example, was apparently first diagnosed as suffering from A.D.H.D. and placed on Ritalin by a Dr. Rosenstock at age six. This decision suggests that Anthony must have displayed early behavior management and/or academic difficulties that led

---

[97] *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 20.

his parents to pursue this treatment option.[98]

Dr. Rosin further states:

> However, to my knowledge, Mr. Anthony Haynes has never received a proper neurological work-up to rule out a seizure disorder or some other type of neurological impairment that could help account for the onset of the explosive outbursts in early adolescence. In addition, Mr. Haynes has developed and displayed through the years symptoms that strongly suggest a more serious form of mental illness, i.e., a Bipolar Mood Disorder. In fact, Mr. Haynes' anger, his drug abuse (possibly as a form of self-medication), his explosive outbursts and disinhibition, all strongly suggest to me that he may suffer from a major mood disorder. It is possible that the physicians who evaluated him at West Oak might have noted several of his symptoms and considered a major mood disorder diagnosis at that time. He was certainly prescribed medications that are typically prescribed to help treat symptoms of thought disorder and mood deregulation. However, without access to those medical records, it is impossible for me to ascertain whether such diagnoses were ever considered. At any rate, it is my opinion that these inpatient treatment records are extremely important and the potential that Mr. Haynes suffers from a serious form of mental illness should have been included as a mitigating factor at Mr. Haynes' trial. The use of any drugs by an individual with a genetic or constitutional predisposition to a mood disorder can also have devastating effects. Drugs can exacerbate or precipitate psychotic and manic symptoms and certainly lead someone to engage in atypical and risky behaviors.[99]

As Dr. Rosin summarizes:

> To summarize my opinions and recommendations, it is very likely that Mr. Haynes suffers from a major mood disorder and began to show symptoms of such a disorder in early adolescence. Reviewing his psychiatric and other outpatient therapy records will be paramount in ascertaining whether other treating professionals entertained similar opinions at the time. The presence of a major mood disorder or even its possibility should have been introduced at Mr. Haynes' trial given that he exhibited such serious symptoms, i.e., auditory hallucinations, agitation, explosive

---

[98]  Letter of Dr. Susana Rosin, June 28, 2005, Exhibit 21.

[99]  Letter of Dr. Susana Rosin, June 28, 2005, Exhibit 21. Dr. Rosin was furnished with West Oaks Hospital psychiatric records and these are evaluated in her second letter of July 13, 2005, Exhibit 22. Dr. Rosin's letters contain recommendations for further assessments which would have been undertaken, but this has not been possible as the Court has denied all funding for investigation or expert assistance.

-131-

outbursts, disrespect toward authority figures he previously respected, escalating drug use, academic failure, etc. A psychiatrist should also review Mr. Haynes' medical/psychiatric records to render an opinion regarding the use of Thorazine and Depakote in treating these types of disorders. Thorazine and Depakote are certainly not typically used to treat uncomplicated depression or an adjustment/behavior disorder. In addition, Mr. Haynes should receive a proper neurological workup that includes the types of diagnostic tests, i.e., computerized EEG and/or MRI, that can help document the presence of neuropsychological deficits and/or seizure disorders.

     All these should be considered mitigating factors and could have certainly been introduced at his capital murder trial. While the testimony of family and friends could have certainly helped present a more balanced picture of Mr. Haynes at trial, the type of medical and neurological evidence that I am suggesting should clearly carry greater scientific weight.[100]

Likewise, Dr. Seth Silverman writes that

During his adolescence, Mr. Haynes had a history of aggressive behavior that formed some of the basis for a diagnosis of a Conduct Disorder and an Intermittent Explosive Disorder. Medical records document that
this 16 year old was initially evaluated in the crisis clinic where he had been brought by these parents because of increasing problems of explosive and violent behavior. The day before he tried to kill the dog, hitting him with a shovel... Family had been afraid he would try to harm him and was concerned about his potential for assaultiveness towards his 3 years old sister. There were increasing problems with behavior in the past 6 months ... anger from an unidentified source has began (sic) to arise, and he is unable to control it. He admits to periods of blackouts were (sic)[during which] all he sees is "red" and really does not know what he is doing...."


     The symptoms of aggression stated above formed the basis for the diagnoses of Conduct and Intermittent Explosive Disorders. However, those same symptoms might also have formed the basis for the diagnoses of a Mood Disorder (for example, a Bipolar Affective Disorder) and/or a Neurological Disorder (for example, a Seizure Disorder). The diagnoses of Mood and Neurological disorders might coexist with the diagnoses of Conduct and Intermittent Explosive disorders that were made when he was 16.

     Alternatively, the diagnoses of Mood and Neurological disorders might even be preferred. These diagnoses might be preferred because the aggressive behaviors

---

[100] *Id.*

that Mr. Haynes exhibited at the time at age 16 tend to be precipitated by unclear situations and are more cyclical than the aggressive behaviors generally associated with Conduct and Intermittent Explosive Disorders.[101]

Again, trial counsel's failure is readily apparent in this failure. The mitigating value of these afflictions was widely known and appreciated in 1999 at the time of his trial.[102] Through no fault of his own, Anthony was burdened with an increased risk of negative psychiatric, social, legal and academic outcomes.

**B. Argument.**

As Dr. Cunningham states, "ADHD is characterized by a triad of symptoms: inattention, impulsivity, and excessive motor activity. It is a form of brain dysfunction that can have a hereditary as well as congenital or neurological insult etiology. The presence of this disorder is a significant risk factor for disturbed peer relationships, school failure and maladjustment, conduct disorder, antisocial traits and behaviors, alcohol and drug abuse, juvenile delinquency, and adult criminal activity..." [103]   The most important implication of Anthony's ADHD is that "[a]dults with a history of ADHD are more likely to develop conduct disorders, alcoholism, and sociopathy. Relatives of individuals with ADHD are more likely to suffer ADHD, antisocial behaviors, and mood disorders....Individuals with a history of childhood hyperactivity are 7 times more likely to suffer from an antisocial personality disorder

---

[101]  *See* Affidavit of Dr. Seth Silverman, Exhibit 23.

[102]  *See* References accompanying Dr. Cunningham's Declaration, at 65-70.

[103]  *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 20.

or drug abuse problem."[104] About 63 per cent of male prison inmates have been observed to have a history of conduct disorder and 41 per cent have a history of ADHD, showing that this diagnosis would not have been especially negative in terms of the special issue which asks about the probability of the defendant committing acts of criminal violence, as most prisoners have a similar history.[105]

The well-documented effects and the expected future prognosis of Anthony as a sufferer from such afflictions were much more mitigating than the picture painted of him by the prosecution, as Dr. Cunningham points out:

> Anthony's treatment for ADHD ended in adolescence. This is inexplicable as his emotional and behavioral problems continued. The ceasing of medication support also appears to generally coincide with his beginning to self-medicate with marijuana. Anthony's problems with anger regulation and impulsive over-reaction are also consistent with ADHD. Anthony's untreated ADHD provides some explanation for his delinquent activities as a teen. ADHD is also an important factor in explaining his difficulty focusing on his academics when in the Boost program. Obviously, the role of ADHD in Anthony's life trajectory would be far less pejorative than that ascribed by the State:
>
>> …This is the complete opposite. This is a kid that had every opportunity, a young man that had a chance to be somebody, to make something of his life. ([Vol. 30] Page 24: lines 10-13)
>>
>> …He had those opportunities, every opportunity he was given he stomped on, he walked away from it. ([vol. 30] Page 63: lines 5-7)
>
> In the absence of adequate investigation and consultation, the defense embraced the State's characterization of Anthony willfully failing to take advantage of the opportunities afforded him, rather than as psychologically compromised:

---

[104] *Id.*

[105] *Id.* at 21.

-134-

He didn't avail himself of all the opportunities they [his family] had. ([Vol. 30] Page 41: line 2).[106]

Anthony's ADHD, had it been properly investigated and presented to the jury, would have had dramatic mitigating effects in terms of the focus of the trial, the shooting of off-duty Officer Kincaid. Instead of the image of a cold-blooded killer than Anthony's jury heard, the ADHD evidence explains the impulsive and ill-planned nature of the incident:

> Broadly, there are two types of impulsivity. Anthony exhibited both of these on the night of the offense. There is what might be described as reactive impulsivity, where there is an immediate and unreflective action. Anthony's shooting of Officer Kincaid in response to the officer reaching toward his back pocket and/or having just announced that he was a police officer would represent this reactive form of impulsivity. This reactive impulsivity gives little opportunity for considerations of mercy or the setting aside of compassion. Accordingly, reactive impulsivity is an important consideration in weighing whether a given act is "merciless" or "cold-blooded." Reactive impulsivity is also without sufficient planning to be reasonably considered as "predatory." In the absence of an explanation of reactive impulsivity, all of these pejorative characterizations of Anthony's capital conduct were asserted by the State:

> You learned that prior to the cold-blooded, senseless, merciless killing of Sergeant Kent Kincaid he had robbed three other people. ([Vol. 30]Page 15: line 23 to Page 16: line 1)

> ...before Sergeant Kincaid was mercilessly killed.

> This is a dangerous predator that nothing can mitigate. He showed no mercy whatsoever to Sergeant Kincaid, and just because he was good in school and is a young person, that is insufficient. ([Vol.30] Page 65: lines 1-3)

> The second type of impulsivity may demonstrate some planning, but is still characterized by profoundly poor judgment and failure to consider the consequences. For example, a man might meet a woman in the morning, spend lunchtime planning the wedding and their lives together, and marry her that afternoon. Though by no means "reactive," and while demonstrating some planning, the act of meeting and marrying on the same day is profoundly impulsive. Anthony's behavior in committing the armed

---

[106] *Id.* at 21.

robberies that preceded the capital offense represents this second type of impulsivity. Such explanations of impulsivity, and the relationship of both youthfulness and ADHD to impulsivity, were important data for the jury to consider in weighing the arguments of the State.[107]

**Claim I(e): Counsel were ineffective for failing to investigate their client's intellectual capacity and school performance and inflating them at the trial.**

### A. Facts in support of claim.

Although there was no mitigating value to presenting their client as intelligent and an honors student, trial counsel did exactly that as a result of their failure to conduct a reasonably competent investigation and evaluation of Anthony's life history. Although such a distorted picture held no advantages for the defense, it certainly held disadvantages and allowed the prosecution to argue that Anthony was a person who had squandered his many advantages.

As Dr. Cunningham points out:

> In closing argument, the defense reported that Anthony was an "intelligent person" and an "honor student."
> But yes, he was an intelligent person. He was an honor student. He had opportunity. (Page 40: lines 16-18)

State characterized Anthony as having "above average intelligence" and as being "good in school."

> Let's take a real quick look at some of the offenses of Anthony Haynes. He is a person of above-average intelligence. Above-average intelligence. So that tells you he is going to put his mind to work. (Page 54: lines 12-16)

---

[107] *Id.* at 21-22.

-136-

...and just because he was good in school and is a young person, that is insufficient. (Page 65: lines 3-4).

In fact, both the defense and State characterizations of Anthony's intellectual ability and scholastic performance were inaccurate. Review of Anthony's Dulles High School Transcript revealed grades in core subjects (excluding PE, ROTC, Band, keyboard, office aide) that ranged from "D" to low "B." In Anthony's entire 4-year high school transcript I identified only a single low "A," scoring a 90 in the second semester of Spanish in his sophomore year. In averaging his grade for core subjects during his high school tenure, Anthony averaged 78.4 in 9th grade, 78 in 10th grade, 80.5 in 11th grade, and 82 in 12th grade. Anthony's rank in his graduating class was 184 in a class of 460, placing him in the middle third of the class. While such performance was adequate, it would hardly qualify him to be characterized as an "honor student," nor would it point to exceptional intellectual ability.[108]

Consistent with the above school performance, intellectual assessment by Dr. Geffner in August 1999 revealed a WAIS-R Full Scale IQ score of 109.[109] This score would be considered in the "average range" and would correspond to the 73rd percentile. There is reason to believe, however, that this IQ score is inflated by the "Flynn Effect" – an increasing inflation of IQ scores as the time from test standardization increases. Correcting Anthony's IQ score for the Flynn Effect would result in a Full Scale IQ score of 103 which corresponds to the 53rd percentile. To place Anthony's intellectual ability in some perspective, the average IQ score of professionals (doctor, lawyer, architect, college professor) is 125. The minimum IQ score to function as an attorney is considered to be 115.[110]

## B. Argument.

The failure of Anthony's defense counsel to investigate was the direct cause of this inflation of his scholastic performance and intelligence. As the record is clear that the defense did not seriously delve into sentencing phase issues until virtually the eve of trial,

---

[108]　*See* schools transcripts of Anthony Haynes, Exhibit 24. *Also see* Boost transcripts, where his cumulative GPA was only 1.88. Exhibit 27.

[109]　*See* Neuropsychological Deficit Scale report, Exhibit 25 at 3.

[110]　*See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 22-23.

-137-

they missed and misinterpreted many facets of their client's life history. As to this claim, the

consequences were severe in that the state could plausibly present Anthony as a youth who

had many advantages that were missed:

> It is inexplicable why defense counsel would inflate Anthony's intellectual ability and academic potential. Certainly, this misrepresentation facilitated the State's assertions that Anthony was a young man with "every opportunity" which he had proceeded to "stomp on." In fact, Anthony was a teen of simply average intellectual ability and mediocre academic achievement. In light of this limited ability, it is not surprising that Anthony was in need of the Boost college preparatory assistance or that he struggled with the academic demands of the program after arriving there. Anthony's only average intellectual capabilities, combined with his untreated ADHD, emotional problems, and history of substance dependence provides a very different explanation of his Boost program failure than his simply squandering this opportunity to attend a service academy.[111]

**Claim I(f): Counsel were ineffective for failing to investigate and present evidence of generational family dysfunction.**

**A. Facts in Support of Claim.**

Another unfortunate result of trial counsel's inadequate and last-minute punishment

phase investigation is that they completely failed to uncover much evidence of dysfunction

in Anthony's family that extended back for several generations. Dr. Cunningham

summarizes this family history as follows:

> Anthony was the product of a family system that had been significantly dysfunctional for generations. Discovering this multi-generational family history required no more than interviewing Anthony's parents and extended family regarding their family history. Had the defense conducted an adequate investigation, it would have discovered the following.

---

[111] *Id.* at 23.

Anthony's maternal great-grandparents were Jimmy and Hattie Butler. Jimmy Butler was an alcoholic who was violently abusive of Hatti and his children. In one of these episodes of domestic violence, a police officer who responded to the residence shot Jimmy. Jimmy then retrieved his own gun and shot the officer (who survived). Jimmy was apparently acquitted at trial. His children, however, were taunted by their peers about this offense. This story is well-known in the family to the younger generation. Jimmy was also exploitative as he would demand half of his daughter's (Myrtle's – subsequently maternal grandmother of Anthony) paycheck from working in a café at age 14-15 to fund his purchase of alcohol. Jimmy and Hattie had 14 children. According to Myrtle, many of her siblings had checkered and sometimes tragic histories:

Jim Jr. drank heavily and was jailed for DWI. Alford was stabbed to death in a bar when Myrtle was age 13. Maylene had psychiatric problems and suffered domestic violence. Joe Nathan "ran women" and drank heavily. Matthew had alcohol-related arrests and would not repay the money he borrowed. According to Gladys (see below), Matthew was shot to death by a girlfriend. Marie drank heavily, had emotional problems, and survived a suicide attempt of shooting herself in the stomach after breaking up with a married man. Charles was confined in an institution for the mentally retarded from childhood. David was described as suffering from psychological problems, with symptoms that implicate bi-polar disorder (i.e. social isolation, hyperactivity, impatience, and belligerence). He also drank heavily and was violent when drinking. Gladys was a heavy drinker and recurrently exploited in her domestic relationships. Regarding other siblings of Myrtle, Patrica reported that Billy was schizophrenic, and that Richard "had issues." Gladys described that Louise "got tipsy" on weekends, but that Rachel did not drink after becoming violently ill on alcohol as a teen.

Gladys' son, Andre, who Anthony grew up with, has a history of confinement in the California Youth Authority and the California Department of Correction. Andre is currently in TDCJ on drug possession/distribution charges. Matthew's son, Keith, shot a by-stander "by accident" and was recently released from prison for this offense. Rachel's son was tried for murder.

Myrtle, Anthony's maternal grandmother, was the 9th of the 14 children. She became pregnant out of wedlock at age 17 by Joseph Hinton and then married him. (Patrica, Anthony's mother is the child of this union). The marriage ended after five years as Joseph "shot pool and smoked up his paycheck on weed." When Patrica was age 12 Joseph was shot to death in Dallas in a dispute with a white service station owner who allegedly swapped out a tire Joseph had left to be repaired with a much more worn tire. As the family understands it, the service station owner was never

-139-

prosecuted for this shooting. Patrica reported being devastated by the death of her father, and attempting suicide by drug overdose. Myrtle reported that Patrica was "like a zombie."

Myrtle reported that several years after her divorce from Joseph, Myrtle married Cornell McCall. This marriage lasted only 30 days as he began physically abusing her on their wedding night. Myrtle then had 14-year relationship with Thomas Hawkins who was recurrently physically abusive of her. Ultimately Thomas Hawkins had to be removed from the house by the police. Patrica (Anthony's mother), however, reported that Myrtle's domestic history was more complicated. She described that following the divorce of her parents her mother was married for several years to a man who was regularly physically abusive of her. Patrica described that Myrtle was then married for six years to another man who regularly abused her. Patrica described observing these men beat her mother, and routinely observing her mother's black eyes, busted lips, swollen face, and bruises. She estimated that Myrtle was beaten up approximately twice monthly for over 6-7 years of Patrica's childhood and adolescence. Patrica described that the instances of Myrtle being beaten often occurred when both she and her partner were drunk.[112]

Additionally, Patrica reported that her mother was involved in relationships with many other men who were in and out of the house, with these men typically being in the household for 1-2 months. As a result of the chaos and priority of her mother's involvement in romantic relationships, Patrica reported that when younger she was often in the care of her maternal grandparents, and from age 10 was often left alone in the home while Myrtle went out. Patrica reported that her mother would "fuss and cuss" in her parenting. More disturbingly, Patrica reported routinely being exposed to her mother's sexual interactions with these men. She described that she and her mother resided in a very small 2-bedroom house, so that she could often overhear noisy sexual activity in the next room. Because Patrica had to go through her mother's bedroom to access the toilet or other parts of the residence, Patrica repeated observed her mother having intercourse with these men.

The chaos and indiscretion of the home setting was no doubt aggravated by Myrtle's pattern of heavy alcohol consumption. Patrica reported her mother went out 2-3 nights during the week and always on weekends. As a teen, Patrica accompanied her mother to these clubs, and then watched television in the back while her mother

---

[112] In addition, defense attorneys failed to investigate Myrtle Hinton's own psychological problems, including severe "mental trauma...that resulted in [her being] totally disabled from being able to return to her regular job." Report of The Rosenstock Clinic, by Dr. Harvey A. Rosenstock, April 1, 1992. Exhibit 26.

drank. Patrica described that her mother had been arrested 1-2 times for DWI. Patrica also described her mother as being emotionally disturbed, characterizing her as "having issues" and being a hypochondriac. Myrtle acknowledged a lengthy outpatient psychiatric history.[113]

Anthony's paternal family system has also been troubled. Anthony's father, Donald Haynes, is the product of a relationship between Talmadge Blueatt and Evelyn Jackson Haynes, who were never married to each other. Donald did not meet his father until age 18, and did not see him again until he was almost 40. Evelyn subsequently married Elwin Haynes, who was a career enlisted man in the U.S. Navy. Elwin and Evelyn had three children: Richard, Sheila, and Eric. Donald reported that both Richard and Eric are both daily drinkers, consuming 2-4 beers daily. Richard's daughter, Brandi, was released from prison this past year on a 4-5 year sentence for drug possession/distribution.

None of this history of extensive generational dysfunction was presented to the jury at Anthony's sentencing.[114]

## B. Argument.

As discussed *supra* in *Williams, Wiggins* and *Rompilla,* the Supreme Court has repeatedly emphasized the importance of obtaining a full family history, of having a social historian to compile such a history, and the important mitigating effects of family histories such as this that reveal a significant amount of dysfunction. Defense counsel here, far from making a strategic decision not to present this evidence, were never aware of its existence and thus were not in a position to make an informed decision as to its mitigating value.

Some of the important mitigating effects of this history of generational dysfunction are summarized by Dr. Cunningham:

---

[113] *See* Exhibit 26.

[114] *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 23-25.

-141-

Family history is critically important to character and background. There are several reasons for this. Some personality characteristics and vulnerabilities are genetically transmitted. Genetic susceptibility to substance abuse and psychological disorder that Anthony faced will be discussed in subsequent sections. Other dysfunctional patterns are conveyed by scripts and modeling, as well as by sequential damage from generation to generation.

Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family. Such scripts in Anthony's generational extended family included substance (alcohol) abuse and dependence, violence, irresponsibility, family instability, and emotional neglect or abandonment of children.

Individuals tend to model their behavior after the behavior of family members near them in childhood, whether or not these "role models" are positive. In Anthony's multigenerational family system, "role models" presented mixed models. On one hand there were histories of education and employment. At the same time the lives of various models were characterized by substance abuse and dependence, volatile reactions and relationships, irresponsibility, poor sexual boundaries, and/or other deviant processes.

Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Consistent with this observation, Green (1988) reported that "the childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these abusive parents are then in turn emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including parental abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect is particularly damaging. Because effective emotional regulation, interpersonal relationship capacity, and social functioning throughout life begin with stable secure attachments to a primary parent figure, deficient parental care and attachment results in fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood. This sequential damage is particularly notable in Anthony's maternal family system. His maternal grandmother, Myrtle, was emotionally impacted by the chaos and violence of her own childhood. She in turn reared Patrica, Anthony's mother, in a context of alcohol dependence, family violence, traumatic sexual exposures, and emotional neglect. Importantly,

-142-

these emotionally limited individuals were Anthony's primary mother figures during his childhood.[115]

Had defense counsel adequately investigated this history, a number of avenues to explain the facts of this case would have been opened.  The genetic predisposition to alcohol and drug dependence would have allowed the defense to present evidence relating to Anthony's use of crystal methamphetamine on the night of the shooting (if, again, this had been investigated) in a manner that would have had mitigating consequences, and not simply as an isolated case of irresponsible drug use.

The evidence of genetic predisposition to psychological disorders would have allowed the defense to present Anthony's history of ADHD and conduct disorders in a much more mitigating framework, as it was a product not of his own volition but of multi-generational influences.  It is clear that trial counsel knew very little about Anthony's history of hospitalization for psychiatric problems, his ADHD and substance dependence.  A reasonable investigation would have followed up on these well-documented leads in an effort to discover additional information for the punishment phase.  Instead, the investigation was truncated when counsel knew very little, leaving their client completely vulnerable to the prosecution's inaccurate characterizations of Anthony.

**Claim I(g): Counsel was ineffective for failing to present evidence of parental dysfunction.**

**A. Facts in Support of Claim.**

---

[115]   *Id.* at 25-26.

-143-

The parental dysfunction is also discussed in Dr. Cunningham's report.[116] This evidence would have had important mitigating effects, in terms of explaining Anthony's actions on the night of the shooting as partly a function of these familial influences, as discussed above in terms of the generational influences, and also of countering the prosecution's presentation of him as a product of a privileged family who had squandered the many opportunities offered to him. As Dr. Cunningham summarizes this evidence:

> Anthony is the product of the relationship of Patrica Hinton Davis and Donald Haynes. The relationship between Patrica and Donald was characterized by chronic conflict throughout Anthony's childhood. The pregnancy was unplanned. Patrica and Donald lived together for approximately six months during Anthony's second year of life, but never married. Donald reported that he had not married Patrica because he did not trust her, and regarded her as self-centered, manipulative, and a recurrent liar. He described her as failing to have parenting as a first priority. Patrica characterized Donald as rigid, controlling, and punitive. There are medical records of his having physically abused Anthony at age seven. Donald acknowledged that he continued to use corporal punishment with Anthony into his senior year of high school. Donald reported that he had questioned his paternity of Anthony, particularly as Anthony was so much lighter in skin tone than Donald. This resulted in a paternity blood test when Anthony was approximately age five. Donald does not consider this test to be as conclusive as a DNA test, which has never been performed. There is a marked discrepancy in Donald's involvement with Anthony as a pre-schooler. Patrica reported that neither Donald nor his parents were significantly involved in Anthony's life until Anthony was age five. Donald asserted that he had every other weekend visitation with Anthony during these years. Patrica moved from Houston to California when Anthony was approximately age seven, and Anthony resided with her there for 20 months. During this tenure Donald's contact with Anthony was reduced. Patrica then became an airline stewardess with United Airlines, and Anthony returned to the household of his maternal grandmother until age 12. He then resided with Donald from about age 12 through high school, though with recurrent shifts back to Patrica for periods of time. Both parents acknowledged that they had very different discipline and parenting philosophies. A cooperative posture of co-parenting was never established. Neither Anthony's subsequent shifts between parents nor other aspects of his parenting reflected joint consensus regarding his best interest. This contributed

---

[116] *Id.* at 28-37.

-144-

to inconsistent limits and chronic tension as each parent acted unilaterally.

Additional information was readily available regarding alcohol abuse on the maternal side of Anthony's family and emotional and supervisory neglect.[117]  Instances of physical abuse by both parents were also identified.[118]  Evidence of sexually traumatic exposures were also readily available had the defense counsel properly interviewed various family members.[119]  Corrupting community influences were also identified as part of the dysfunctional family background.

### B. Argument.

Far from being the child of privilege portrayed by the prosecution, Anthony and his family have struggled to deal with many problems, a significant number of them extending back generations, as discussed in the prior claim.  The problems of hostility between Anthony's parents were readily discoverable by his trial counsel, but their failure to delve into the family background left them either unaware of this factor or, because of their incomplete knowledge, afraid to use it as they did not understand its value as mitigating evidence.

Anthony experienced many of the aspects of such an emotionally charged atmosphere, and his parents hostility toward each other had the effect of undermining their efforts at

---

[117]  *Id.* at 29-30. Anthony's grandmother, Myrtle Hinton, has also had psychiatric problems. *See* Exhibit 26.

[118]  *See* Declaration of Dr. Mark Cunningham, Exhibit 17,  at 32-34.

[119]  *Id.* at 35.

-145-

discipline and supervision. All of this could have been used to mitigating effect at the punishment phase of the trial.

The mitigating effects of alcohol abuse on the maternal side of Anthony's family are that it established corruptive models of adaptive behavior, increased his risk of psychological injury and physical neglect, and putting him at a higher risk of having significant depression, anger, and behavior problems. Familial problems of emotional and supervisory neglect are also important as "[t]he long-term impact of child neglect includes distorted cognitive, perceptual, emotional, and interpersonal capacities; pervasive anxiety; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; psychological disorder; behavior disturbance; and violent and criminal conduct...Child maltreatment can also involve the failure to provide supervision, appropriate discipline, and moral guidance...Quite simply, lack of parental structure and appropriate discipline contribute to aggressiveness and predisposes to violence in the community. "[120]

Physical and emotional abuse has been long accepted as having mitigating value, as it exacerbates "low self-esteem, depression, anger, exaggerated fears, suicidal feelings, poor concentration, eating disorders, excessive compliance, regressive behavior, health problems, withdrawal, poor peer relations, acting out, anxiety disorders, sleep disturbance, lack of trust, secretive behavior, excessively rebellious behavior [and] drug or alcohol problems."[121]

Evidence of Anthony's sexually traumatic exposures would have had mitigating value

---

[120]   *Id.* at 31.

[121]   *Id.* at 34.

as it has been associated with an increased risk of depression, self-esteem deficits, and alcohol and substance abuse problems, among others.[122] The corrupting community influences as a result of Anthony's residency in low-income areas of Houston and Los Angeles were also seen as giving him a significantly higher degree of risk of youth delinquency and criminality/violence.[123]    Thus, the mitigating value of this familial dysfunctional behavior was never presented to Anthony's jury, and consequently they never received an accurate picture of his family life and behavior.

**Claim I(h): Counsel were ineffective for failing to investigate and present evidence of their client's severe psychological disorders in adolescence.**

**A. Facts in Support.**

Although Anthony had been admitted to the West Oaks Psychiatric Hospital on November 11, 1996, only a year and a half before his arrest, defense counsel failed to procure the records of his stay there and, instead, the State introduced these records into evidence.[124] Further, the defense, not knowing what was in the records, were in no position to explain or clarify their contents to Anthony's jury.  As a result, the State was allowed to draw various unfavorable inferences from the records which the defense was powerless to oppose.

The records themselves have been summarized by Dr. Cunningham:

---

[122]   *Id.* at 37.

[123]   *Id.* at 37.

[124]   The voluminous records were introduced by the State and they are in the record at 41 RR (unpaginated).

To summarize this record, on 11-01-96 Anthony was admitted to West Oaks Psychiatric Hospital after displaying significant volatility and explosiveness, which continued in the hospital until his dosage of Tegretol (anticonvulsant and mood stabilizer), which had been initiated five days previous on an outpatient basis, was increased. On 11-10-96 Anthony had been sufficiently stabilized that he was transferred from the inpatient to the residential unit where he remained until 11-20-96. His admission evaluation described a 4-5 year history of rage episodes. Anthony also reported on admission a history of youth gang involvement and associated violence toward people and animals. This latter history of gang involvement and violence received significant focus in the State's closing arguments, but was markedly inconsistent with numerous family, community, and peer descriptions of Anthony. Anthony now reports that he fabricated this portion of his history. There is some evidence that Anthony was exaggerating his reports to hospital staff. For example, he reported that he broke his dog's back with the shovel shortly before admission, though family described the dog as uninjured.

As has been noted previously, on 09-19-99, on the eve of the sentencing phase of Anthony's capital murder trial, he was evaluated by Mitchell Alan Young, M.D., psychiatrist. In his one page report, Dr. Young identified Anthony as suffering significant psychological disorder:

There is a longstanding history of mental disorder since early childhood with in the context of unstable and chaotic caretaking environments. Symptoms over his life span included inattention, hyperactivity, rage attacks, destruction of property, pet abuse, suicidal and homicidal ideation, self-mutilatory behaviors, stuttering, running away, alcohol and substance abuse, and violation of the basic rights of others. Treatment occurred on outpatient and inpatient bases with poor compliance and follow up. An EEG was not obtained. Current mental status evaluation revealed stuttering, prominent homicidal ideations and "auditory hallucinations," present since 6th grade, which were specific and command in nature, viewed by the defendant as coming from inside his head.[125]

Dr. Mitchell [Young's] 's diagnoses of Anthony were:

Axis I
    Adult Antisocial Behavior
    Intermittent Explosive Disorder
    Alcohol and Mixed Substance Dependency, predominantly methamphetamine

---

[125] *See* Declaration of Dr. Mark Cunningham, Exhibit 17 at 39-40; Dr. Young's report is at Exhibit 19.