IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT   5 2005

MICHAEL N. MILBY, CLERK OF COURT

| | |
|---|---|
| ANTHONY CARDELL HAYNES, | § |
| | § |
| Petitioner, | § |
| | § |
| -VS- | § |
| | § |
| DOUG DRETKE, Director, Texas | § |
| Department of Criminal Justice, | § |
| Correctional Institutions Division, | § |
| | § |
| Respondent. | § |

MISCELLANEOUS  NO. H-04-319
Judge Sim Lake

H-05-3424

# PETITION FOR WRIT OF HABEAS CORPUS

## VOLUME II
## PAGES 150-298

A. RICHARD ELLIS
Texas Bar No. 06560400

75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
(415) 389-0251 (FAX)

Attorney for Petitioner

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY CARDELL HAYNES, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| -VS- | § | MISCELLANEOUS  NO. H-04-319 |
| | § | Judge Sim Lake |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

# PETITION FOR WRIT OF HABEAS CORPUS

## <u>VOLUME II</u>
## PAGES 151-298

**A. RICHARD ELLIS**
**Texas Bar No. 06560400**

**75 Magee Avenue**
**Mill Valley, CA 94941**
**(415) 389-6771**
**(415) 389-0251 (FAX)**

**Attorney for Petitioner**

Mr. Haynes' records further indicate that he began to experience difficulties with anger management and explosive outbursts in middle school. In addition, Mr. Haynes' began experimenting with drugs and alcohol around this time. From this point forward, I read several accounts of incidents involving Mr. Haynes' losing his temper, and escalating problems with self-regulation and self-control. Although Mr. Haynes was at one point diagnosed as suffering from, both, an intermittent explosive disorder and an oppositional defiant disorder, the early onset of these types of anger management problems are often associated with the later development of a major mood disorder, such as a Bipolar disorder.[129]

Dr. Rosin further elaborates that Anthony's problems should have been recognized by his attorneys, as they were well documented in his records from West Oaks Hospital, which his attorneys failed to obtain:

These symptoms, along with the medications he was prescribed while at the hospital, i.e., Thorazine and Depakote, suggest that his treating physician or physicians might have suspected a major mood disorder at that time. Unfortunately, Mr. Haynes' opted to cease taking the prescribed medications following his release from West Oaks, and the many of the troubling symptoms appeared to have resurfaced shortly thereafter. Mr. Haynes' records then continue to make reference to substance abuse, explosive outbursts, abuse of pets, homicidal threats made against the father (as reported by Mr. Hayes' therapist), etc. Mr. Hayne's BOOST records indicate that he became involved in several incidents that eventually led to his being dropped from the program. These incidents, again, suggest to a mental health expert that Mr. Haynes was still experiencing difficulties with self-regulation and impulse control. In retrospect, Mr. Haynes appeared to have become depressed following his ejection from the BOOST program, as this appeared to have been something he truly wanted to accomplish in order to move on to the Naval Academy and attend college. Instead, Mr. Haynes returned to Houston, continued to abuse substances and go into a downward spiral that included purchasing a gun, participating in robbing several individuals and finally shooting [Ofcr.] Kinkaid.[130]

Dr. Seth Silverman also explains the importance of this failure in terms of the

---

[129] *Id.*

[130] *Id.*

-150-

punishment phase:

> Anthony Haynes has been convicted of Capital Murder. It is the medical opinion of this forensic psychiatrist that at the time that he committed the offense, he was probably intoxicated with MA. His behavior appeared to be illogical and to be inconsistent with his previous behaviors and appeared to be influenced by the toxic effects of the MA. His voluntary use of drugs, in particular MA, decreased his volitional capacity.

> It is the medical opinion of this forensic psychiatrist that, in all medical probability, Mr. Haynes did not have a complete psychiatric and neurological evaluation prior to the instant offense and prior to the trial. With appropriate diagnostic tests and treatment, his risk to commit future violent offenses or be an ongoing threat to society could be reduced.

> In all medical probability, understanding that Mr. Haynes is at lower risk to offend because his behavior is not ingrained, if he is treated for his MA abuse, if he is able to maintain sobriety, if he is accurately diagnosed and appropriately treated, the likelihood that he will commit future violent offenses or be an ongoing risk to the community will be severely and significantly reduced.[131]

## B. Argument.

As Dr. Cunningham points out, "[t]hough offered as aggravation by the State, psychological disorders are not voluntary – anymore than a physical disease is willfully selected. Intermittent Explosive Disorder is not a volitional disease."[132] Psychological disorders in childhood can significantly affect the child's abilities to "accomplish developmental tasks and make a healthy transition from childhood to adulthood. Childhood psychological disorders can increase the risk of substance abuse, delinquency, and

---

[131]   *See* Declaration of Dr. Seth Silverman, Exhibit 23. *See also* collected articles on the effects of methamphetamine at Exhibit 28.

[132]   Declaration of Dr. Mark Cunningham, Exhibit 17, at 40.

criminality. The presence of impairing psychological factors acts to reduce moral culpability."[133] Additionally, Dr. Cunningham states that "[c]ontrary to the testimony of Sgt. Quarracy Smith, in my experience as a former active duty clinical psychologist in the U.S. Navy, had Anthony's psychiatric history been known to military it would have disqualified him from enlistment, service academy entrance, and/or officer training."[134] Had the defense performed even a little investigation in this area, they would have been aware of these facts.

**Claim I(I): Counsel were ineffective for failing to fully investigate and present evidence related to their client's drug abuse and dependence and drug use at the time of the crime.**

    **A. Facts in support of claim.**

Despite abundant evidence of Anthony's drug abuse and dependence, some of which was known to a defense investigator, this evidence was not presented to his jury. The evidence was as follows:

> Anthony reported to a defense investigator in late July 1999 that he had begun abusing marijuana at age 13-14, and thereafter smoked heavily and daily. He described discontinuing marijuana abuse during the time that he was in the Boost program, but resumed a pattern of heavy, daily marijuana smoking after being dropped from the Boost Program in April 1998 and returning to Houston.

> Anthony reported that he drank alcohol daily during high school, including before he went to school in the mornings. He described discontinuing use of alcohol in the nine months that he was in Boost program, and resumed this abuse on his return to Houston. Anthony described drinking a 12-pack nightly during the five weeks prior to the offense.

---

[133] *Id.*

[134] *Id.* at 41.

Anthony reported abusing "fry" (i.e. marijuana dipped in a solution of embalming fluid and PCP) on approximately 10 occasions.

Anthony reported daily use of methamphetamine during the five weeks prior to the capital offense. He described snorting methamphetamine in the morning when he awakened. He described that he would start feeling low at lunchtime and snort some more and smoke a joint. After work he snorted methamphetamine every 30-40 minutes.

As his abuse of methamphetamines increased, Anthony reported that he used more marijuana to calm himself down. Anthony also described abusing Rohypnol (i.e. "roofied") during the 4-week period prior to the capital offense.[135]

Likewise, Dr. Seth Silverman points out the importance of this evidence:

METHAMPHETAMINE (MA) USE AND ITS INFLUENCE ON BEHAVIOR
MA is a powerful stimulator of the Dopamine pathways of the Central Nervous System. It was originally synthesized in this country to be used in decongestants and for the treatment of narcolepsy (falling asleep at inappropriate times). It became a popular street drug because
It is powerful and disorienting
- It can be synthesized in a lab that can be contained in a small suitcase
- Minimal training is required to make MA
- The ingredients to make MA are easily obtainable
- It can be obtained without smuggling

The initial effects of MA can not be predicted. However, small amounts of the drug can cause euphoria, psychosis, paranoia, irritability, sleeplessness, confusion, tremors, and instant death. Different from Cocaine, the effects of MA last long after the drug has been metabolized. These effects impair the mental state of the individual, cause a delirium, and compromise the capacity of the individual to process and respond to situations logically. MA is well documented to be associated with severe aggressive behaviors.

Records indicated that Mr. Haynes manifested many of the symptoms of MA intoxication during the period when he committed the robberies and fired his gun. His behaviors were much more aggressive than his previous behaviors, and his behaviors did not appear to be well thought out or well planned. His aggressive behaviors are consistent with a reaction to a misperception or distortion of information. Otherwise stated, his diminished capacity, in all medical probability, was due his due to his

---

[135] *Id.* at 41.

voluntary use of MA. Data that support the hypothesis that he suffered from a cognitive impairment consistent with MA-induced delirium and a decreased capacity to respond appropriately at the time of the incident is the method that he employed during the robberies and the circumstances surrounding the time when he shot the victim.

Sources indicated that he pointed a gun at the potential robbery victims from the driver's side of a truck and apparently had no back-up or follow-through plan if the victims refused to hand over their money or if they simply ran away from the truck in which he was sitting.

Mr. Haynes manifested more symptoms of MA intoxication and a decreased capacity to respond appropriately when, during the same period of intoxication when he attempted to or actually committed the robberies, he later shot a gun two times. The first time he shot the gun it was an apparent random shot that grazed the windshield of a random individual. The second bullet that he fired eventually killed the random individual. The robberies and killing appear to be

- More aggressive behaviors than previously manifested by Mr. Haynes
- Events that occurred during the same time period and
- Reactions or actions based on misperceptions or cognitive impairments
- Cognitive impairments consistent with the use of MA and its toxic effects on behavior
- Influenced by the use of MA and its documented effects on cognitive impairment or decreased capacity
- Not ingrained behaviors and because of that less likely to reoccur[136]

This evidence of meth addiction would have had crucial importance at the punishment phase according to Dr. Seth Silverman:

Anthony Haynes has been convicted of Capital Murder. It is the medical opinion of this forensic psychiatrist that at the time that he committed the offense, he was probably intoxicated with MA. His behavior appeared to be illogical and to be inconsistent with his previous behaviors and appeared to be influenced by the toxic effects of the MA. His voluntary use of drugs, in particular MA, decreased his volitional capacity.

It is the medical opinion of this forensic psychiatrist that, in all medical probability, Mr. Haynes did not have a complete psychiatric and neurological evaluation prior to the instant offense and prior to the trial. With appropriate diagnostic tests and treatment, his risk to commit future violent offenses or be an ongoing threat to society could be reduced.

---

[136]   *See* Affidavit of Dr. Seth Silverman, Exhibit 23.

-154-

In all medical probability, understanding that Mr. Haynes is at lower risk to offend because his behavior is not ingrained, if he is treated for his MA abuse, if he is able to maintain sobriety, if he is accurately diagnosed and appropriately treated, the likelihood that he will commit future violent offenses or be an ongoing risk to the community will be severely and significantly reduced.[137]

A significant witness for the defense would have been Lawrence Hughes, a friend of Anthony's, who introduced him to crystal meth, the same meth which affected his actions on the night of the shooting of the off-duty officer:

I am the person that introduced Anthony to crystal meth. Through Tim Reese. Anthony knew that I didn't like Tim Reese, but would sell crystal meth to him.
Anthony wanted to make some money but he was not working and his mother was riding him hard about not getting a job, so he approached me about selling some meth. Anthony asked me for the meth 2 days before the murder. I did not know that Anthony had taken the meth until I received a phone [call] after I had left to go to Dallas to attend a graduation. I learned at the time that Anthony had taken meth and was acting weird and talking crazy. Anthony had told me that a few days before the murder that he had been "jacked" in his car by someone driving a jeep. It really scared him.
After taking the meth Anthony called me at 5:00 a.m. in Dallas talking crazy about wanting a gun because he was being followed again by a jeep.
A guy named Octavias from Missouri City had a .22 pistol and sold it to Anthony, however I gave Anthony $60.00 for the pistol and hid it in a drawer before I went to Dallas.
Within 2 days before the murder I am not sure how much crystal meth Anthony had ingested, but I know through people that were around him like Lisa and Melonie that he had not slept at all and was acting very paranoid and talking about being followed.
I later learned that on the day of the murder Anthony had met up with Tim Reese and they were together during the day and up until the incident.
I was never asked to testify and if I had I would have. This was the drug [acting] not Anthony, and I feel so responsible for placing Anthony in the position that brought him to this situation that he is in today.[138]

## B. Argument

---

[137]  *Id.*

[138]  *See* Declaration of Lawrence Hughes, Exhibit 29.

Anthony's risk of drug abuse was exacerbated by the genetic and environmental factors discussed above. Additionally, "in the face of his substance dependence, there is an increased likelihood that Anthony was intoxicated at the time of the capital offense. In fact, Anthony described to a defense investigator that he had been snorting methamphetamine on the evening of the robberies and capital offense."[139]

In terms of diminished responsibility and volitional capacity, Anthony's meth intoxication on the night of the shooting would have been very important information to furnish his jury:

> Chronic abuse of cocaine or methamphetamines is associated with marked psychological and behavioral disruption. Further, cocaine and amphetamine abuse set up conditions in which violent behavior is profoundly more likely to occur... To explain, chronic abuse of these stimulants is typically associated with prolonged "runs" of several days to over a week's duration. The subsequent adverse behavioral and physical effects are due not just to the drug, but also to the effects of sleep deprivation and malnutrition. Sustained runs frequently result in marked paranoia, which may develop into a frank psychosis. Impulsiveness, restlessness, irritability, and hypervigilance are also frequently observed. Mood fluctuations associated with chronic abuse may be characterized by abrupt shifts from warmly congenial to furiously hostile for the most trivial of reasons. Suspiciousness often combines with irritability, impulsiveness, and hyperactivity to induce spontaneous and unwanted assaultive behavior. Chronic abusers often simultaneously consume large amounts of alcohol and other drugs. This combination increases violence potential. Mutual enhancement of suspiciousness and paranoid ideas with other "speed freaks" adds to the likelihood of violence. The combination of weapons access and using large doses of amphetamines/cocaine is awesomely dangerous.
>
> *While all of the adverse developmental factors described in this declaration contributed to Anthony's risk of delinquency and criminal violence, including the capital offense, his heavy abuse and probable intoxication with methamphetamine during the month preceding and encompassing the evening of the capital offense was the most immediate and significant factor in increasing his sense of vulnerability and impulsive*

---

[139] *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 42.

*reactivity, as well as impairing his judgment and reducing his volitional capacity at the time of the capital offense.*[140]

Mr. Haynes, on the night of the shooting, was under the influence of the stimulant crystal methamphetamine. Mr. Haynes used heavy amounts of the drug up to and including the day of the incident.

Methamphetamine, particularly in its more potent crystal form, had well-documented effects on Mr. Haynes's behavior.[141] He was described as hyperactive, acting "weird," and unable to sleep at the time of the offense. He had impairments in his ability to attend and concentrate. The drug exacerbated the effect of his already-diagnosed Attention Deficit Hyperactivity Disorder. Stimulants are also frequently the drug of choice in the self-treatment of depression, clearly what he was undergoing upon his failure in the BOOST Program.

Methamphetamine intoxication is characterized by maladaptive psychological and behavioral changes.[142] Judgment is impaired and there may be sudden changes in mood, irritability, hypervigilance, hyperactivity, heightened sensitivity, tension and anxiety. The initial stage usually begins with a sense of euphoria. Despite the impairments in judgment, the individual often feels more confident and can be more talkative and outgoing. All aspects of the immediate environment take on intensified qualities but usually there are no hallucinatory perceptual distortions. At higher doses there are typically repetitive and stereotypic behaviors

---

[140]   *Id.* at 43-44 (emphasis added).

[141]   *See* Exhibit 28 on the effects of methamphetamine.

[142]   *Id.*

-157-

– continually repetitive acts that serve no apparent purpose. There are also concomitant physiological signs or symptoms of intoxication. They include such things as increased or slowed heart rate, elevated or lowered blood pressure, pupillary dilation, psychomotor agitation or retardation. There can also be nausea, vomiting, chills, weight loss, chest pain and cardiac arrhythmias, seizures, confusion or coma. The extent to which any user exhibits these manifestations depends on the individual characteristics of the user. Relevant factors are the rate of absorption, the individual tolerance for the drug, and the chronicity of use.[143]

High-dose amphetamine abuse can lead to what is referred to as an amphetamine psychosis. The individual develops paranoid ideation usually accompanied by perceptions that benign activities are threatening in some way (ideas of reference) and the development of a well-formed delusional system. The paranoid system is reinforced by the hypervigilant awareness of the environment and is exacerbated by the ensuing isolation as the individual withdraws. In later stages rather than the intense and suspicious observation of others, the user becomes convinced that others are watching or following him. With continued consumption the individual can lose all insight and develop extremely well-formed delusions of persecution. Episodes of violence have occurred in that state, as happened here. There is evidence from the record that Mr. Haynes's amphetamine use on the days preceding the crime resulted in psychotic episodes.

This evidence of methamphetamine abuse at the time of the crime would have been relevant to the culpable mental states of malice, premeditation, intent to kill, knowledge of the

---

[143]   *Id.*

victim as a police officer and intent to rob the alleged earlier victims.  It would also have been relevant to the defenses of voluntary intoxication, involuntary intoxication, imperfect self-defense, and diminished actuality.[144]

With respect to the guilt phase, the affidavit of Dr. Mark Cunningham identifies two major areas of deficiency in the defense investigation, preparation and presentation: attacks on the prosecution's case in chief and affirmative testimony relating to Mr. Haynes's drug intoxication and mental impairments at the time of the crime.  Mr. Haynes's counsel did not adequately investigate and pursue *either* strategy.  No reasonable tactical choice justified counsel's failure to investigate adequately, so the failure to investigate amounted to ineffective assistance in violation of the Constitution. *See Seidel v. Merkle*, 146 F.3d 750, 756-57 (9th Cir. 1998).

As a result of the acts and omissions of counsel, the jury's guilt and special issues determinations were based on incomplete, misleading, and unreliable evidence.  Had these acts and omissions not occurred, there is a reasonable probability that the jury would not have found Mr. Haynes guilty  as charged and would not have found the special issues to be true.

Each of the acts and omissions of counsel described in this claim fell below an objective standard of reasonableness and was without legitimate strategic purpose.  To the extent that trial counsel's actions and omissions were the product of purported strategic and or tactical decisions, such decisions were based upon inadequate and unreasonable investigation, discovery and consultation with trained independent experts and therefore were not reasonable, rational or informed.  But for counsel's unreasonable acts and omissions, individually and collectively,

---

[144] *Id.*

-159-

there is a reasonable probability that a result more favorable to Mr. Haynes would have occurred at the trial.

**Claim I(j): Counsel were ineffective for failing to present significant mitigating evidence that there was not a probability that the defendant would commit criminal acts of violence in the future.**

Despite the significance of the First Special Issue, which asked whether the jury found "from the evidence beyond a reasonable doubt that there is a probability that the defendant, Anthony Cardell Haynes, would commit criminal acts of violence that would constitute a continuing threat to society,"[145] his attorneys failed to present a significant amount of evidence that strongly suggested the answer to this question was "no." This Special Issue should have been a hard burden for the State to prove, as Mr. Haynes had never been in trouble with the law prior to this incident, had a good record at school, and was well thought of with his family and in the community. The State had to resort to bringing in victims of the robberies that occurred on the same night as the shooting of off-duty Officer Kincaid, who were not of much predictive value in terms of Anthony's probability of committing future acts of criminal violence. Even more of a stretch was the use of the verbal altercation with Col. Davis at high school ROTC, which should have been a clue to the jury of the weakness of the State's case.

A major cause for this defense failure was the neglect of the penalty phase preparation until the last moment, as discussed *supra.*[146] This failure meant that the superficial investigation

---

[145]    *See* Exhibit 3.

[146]    *See* letters of Dr. Geffner and Young, Exhibits 18 and 19.

performed was ineffective for purposes of the special issue relating to the probability of acts of criminal violence:

> The failure of defense counsel to adequately consult with the mental health experts also extended to the evaluation procedures. Dr. Geffner administered the Psychopathy Checklist – Revised (PCL-R). This instrument is irrelevant to a defense-retained evaluation at capital sentencing as it does not illuminate how a defendant came to be damaged, and is not predictive of serious violence in American prisons (Cunningham & Reidy, 1998a, 1999, 2001; Cunningham, Sorensen, & Reidy, 2005). This instrument does have the enormously aggravating potential, though, to inject the word "psychopath" into the capital sentencing proceeding.[147]

Dr. Susana Rosin also comments on Anthony's low probability of committing criminal acts of violence in the future, were he to receive

> With respect to future dangerousness, were Mr. Haynes to be properly diagnosed and treated for his psychiatric difficulties, he would likely be at a very low risk to commit capital murder or other such violent crime again...        It is, indeed, a tragedy that this is a young man who appears to have fallen through the cracks with respect to proper diagnosis and follow up for his psychiatric symptoms.[148]

Similarly, Dr. Seth Silverman, who reviewed extensive records on Mr. Haynes and interviewed him at length in person, opines that the defense attorneys had many good arguments against a positive answer to Special Issue Number One:

> REDUCED LIKELIHOOD OF FUTURE VIOLENT OFFENSES
> Mr. Haynes' behavior appears to be isolated and not ingrained when compared to that of other MA abusers, who are more habitual in their use of the drug and their perpetration of violence. When compared to habitual users of MA, Mr. Haynes' likelihood to commit future violent offenses or be an ongoing risk to the community is decreased.

---

[147]  *See* Declaration of Dr. Mark Cunningham. Exhibit 17, at 10.

[148]  *See* Letter of Dr. Susana Rosin of June 28, 2005, Exhibit 21.

Without the active abuse of substances by Mr. Haynes, his underlying mental disorders could be more accurately diagnosed utilizing the recommendations made earlier in this affidavit.

If he is sober, Mr. Haynes' psychiatric disorders might receive a greater benefit from the same mood stabilizer (Tegretol) that he received at age 16. He might also benefit from the use of other psychotropics, such as antidepressants and major tranquilizers, and from the use of antiseizure medications or other neurological interventions.

If Mr. Haynes is sober and does have underlying psychiatric or neurological disorders that are appropriately treated, the likelihood that he will commit future violent offenses or be an ongoing risk to the community will be reduced even further.[149]

As we have seen, the defense did not properly investigate this case and never talked to many potentially crucial mitigating witnesses, even though Mr. Haynes's family furnished them with extensive lists of people to contact.  As a result, the jury did not hear much evidence of Anthony's essentially non-violent nature:

1) His mother, Patrica Davis, could have told the jury about her son's past behavior:

When Anthony was growing up, he was well behaved and did not get into fights with other kids at school or in the neighborhood.  He was well-liked by the  students at his school as well as his teachers.  He was not aggressive but mannered and respectful.  He would do tasks asked of him and I never had to keep on him to get things done.  Anthony was respectful of me and of his grandparents.[150]

Despite a large and supportive family and relatives, trial counsel or their investigators did not even talk to most of the potential penalty phase witnesses, did not even interview them, and hence had no way to make a "strategic" decision as to whether their testimony would be helpful or harmful.  As Anthony's mother states,

---

[149]   *See* Declaration of Dr. Seth Silverman, Exhibit 23.

[150]   *See* Declaration of Patrica Davis, Exhibit 11.

I made a list of people for Mr. Nunnery to talk to, but none of the people on the list were contacted. These people included 4 or 5 neighbors. The list had at least ten people on it, including teachers at his school and his counselor. But the attorneys never talked to most of these people, and they were not called as witnesses at Anthony's trial. They never followed through on contacting these people on the list. I was never given a reason why this was not done. There were some military people on the list but they too were not contacted. Mr. Nunnery told me that he had people that would testify. Mr. Nunnery also told me, as a reason why more witnesses were not called, that "we can't make the deceased look bad," but none of the potential witnesses had anything to do with the victim. I also wanted to testify, but Mr. Nunnery said it would not be a good idea, without saying why.[151]

Anthony complained to me about the attorneys during the trial, because they did not call the witnesses they said they would. He told me they were not doing a good job.[152]

2) Anthony's neighbor Kenneth Porter knew him as he grew up, and his testimony would have been important at the penalty phase:

My wife and I were neighbors of Anthony Haynes and his family. My wife's name is Lee Esther Porter. We lived three houses down from them. We lived there from when Anthony was 12 or 13. Our two daughters, now aged 26 and 22, were about Anthony's age. Anthony was friends with our daughters.

Anthony was a good kid, always smiling, always joking around, and very respectable. He was the kind of kid you would not mind hanging around your house. I would see him in the neighborhood, helping out his dad in the yard. Anthony was always helping his father, and would never give any back talk. We would also see him at the store, and he was always very polite. He never expressed any animosity toward the police or police officers. Anthony was a humble kid, not boastful. I was shocked when this happened. I never knew him to hang out with the wrong crowd.

I think that the likelihood of Anthony committing future violent or dangerous acts is very low, and I would have been willing to testify to this at the time of Anthony's trial. The defense attorneys or investigators never contacted me at the time of the trial. If these attorneys or defense investigators had contacted me, I would have told them what is in this declaration. If I had been asked to be a witness for Anthony Haynes, I would have been willing to do so.[153]

---

[151]  *Id.*

[152]  *See* Declaration of Patrica Davis, Exhibit 11.

[153]  *See* Declaration of Kenneth Porter, Exhibit 30 .

-163-

3) Mr. Porter's wife, Lee Esther Porter, would have been able to give the same favorable testimony regarding Anthony's non-violent nature and low risk of committing future dangerous and violent acts.[154] Yet she too was never contacted by the defense attorney or investigators.

4) Beverly Scott, a next-door neighbor, could also have painted a different picture as to Anthony's risk of committing future violent acts:

> I was a next door neighbor of Mr. Donald Haynes. Anthony Haynes was in grade school when I first met him, in the fourth or fifth grade. He was a nice, respectable kid, and I had no problems from him. Anthony has been in my house many times. I never saw him get into trouble and he didn't hang around with bad kids. Occasionally, Anthony would help me take groceries into my house. He would also help his father out in the yard. I knew that Anthony drove his father's truck, but never knew him to drive recklessly.
> Anthony was a good student at school and he said he got good grades. I knew he was in ROTC at high school. I knew him up until he was arrested for the killing of the officer.
> Anthony was not hostile toward the police. I did not know he used drugs. He was a respectful kid, an all-around good kid. I knew he had a scholarship to Prairie View A & M, and he was proud of that. Anthony was looking forward to attending college.
>
> Based on what I know about Anthony Haynes, I think he is a very low risk of committing future dangerous or violent acts. This was my opinion at the time of the trial and it is still my opinion now.
> I was never talked to or contacted by attorneys or investigators for Anthony at the time of his trial. If they had contacted me, I would have told them what I have said in this declaration. If they had asked me to be a witness for Anthony Haynes at his trial, I would have been willing to do so.[155]

5) Anthony's uncle, Eric Haynes, could also have told the jury that Anthony would not be likely to commit future violent or dangerous acts:

---

[154] *See* Declaration of Lee Ester Porter, Exhibit 31.

[155] *See* Declaration of Beverly Scott, Exhibit 32.

-164-

I am the youngest brother of Donald Haynes, Anthony Haynes' brother. I have known and been around Anthony since his birth. Anthony was a good kid, always very respectful. He was my first nephew, and we did a lot of things together... Anthony rarely got into trouble... I never saw Anthony show anger or blow up around my boys....When I heard about Anthony's arrest for the killing of the police officer, I was shocked. Based on my knowledge of Anthony Haynes, I believe he would be a very low risk of committing future dangerous acts or acts of violence. This was my belief at the time of the trial and it is my belief now.[156]

6) Debra Swisher, a friend and former restaurant owner, could also have given important

testimony as to the low potential of Anthony committing future dangerous acts. Her testimony

would have been important because she was not a relative of the defendant:

I was a friend of Anthony Haynes. I used to own a restaurant, RonDee's Diner, in the 2300 block of Texas Parkway. I closed it in 1998. Before the incident in which Anthony was charged with the killing of the police officer, Anthony would come in to the restaurant and talk to me. I liked him a lot. He was soft-spoken, intelligent, polite, and often gave me a hug when he left.

For a period of about six months, before he graduated from high school, Anthony would come in to the diner about twice a week. He wanted to talk, about school and his fellow students, just general stuff. He would talk about his teachers, his favorites and his not- so-favorites. I never knew him to be disrespectful or violent or to be involved in drugs, and I never saw him in any angry outbursts. I was always glad to see him come into the restaurant.

I knew Anthony when he was in high school and after he graduated in 1997. When he was in high school, I was aware he was in ROTC as he would tell me about it.

When I heard about the crime, I was shocked. I did not attend the trial. Based on what I know about Anthony, I believe he would be a very low risk of committing future acts of violence or acts endangering the safety of others. This is my belief now and it was my belief at the time of Anthony's trial.

At the time of the trial, I was never contacted by Anthony's defense attorneys or his investigators. Neither of the defense attorneys spoke to me. If the defense attorneys or the investigator had talked to me at the time of the trial, I would have told them what

---

[156] *See* Declaration of Eric Haynes, Exhibit 13.

I have said in this declaration. Had they asked me to be a witness for Anthony at the trial. I would have been willing to do so.[157]

7) Tiffany Deckard, who knew Anthony at high school and after, would also have been

a valuable witness as to his low probability of committing future dangerous acts:

> I have seen Anthony get mad but nothing serious. He would help people out, share food with them and loan money. He never displayed any hostility toward authority figures. At the time of the trial, it was my opinion that Anthony was a very low risk for committing future dangerous or violent acts, and I would have told Anthony's jury this if I had been called as a witness. Today, this is still my opinion, that Anthony is essentially a very non-violent person.[158]

8) Shelia Haynes, Anthony's aunt, was close to him when he was growing up, and could

have helped with this special issue:

> I have lived in Houston since 1970. Anthony was born in 1979. I lived near Anthony and his father Donald and his mother Pat. Donald eventually got custody of Anthony, and I had a lot of contact with him as he grew up. Anthony was very smart and well behaved. I did not know his friends but I was aware of his drug use. Anthony and I were close before this incident. I think the problems started when Anthony began to hang around with the wrong crowd.
> My opinion is that Anthony is a very low risk of committing future dangerous acts. I thought this at the time of his trial and it is my opinion now.
> At the time of his trial, I was not talked to by Anthony's attorneys or investigators. If they had talked to me, I would have told them what I have said here. I would have been willing to be a witness at his trial if I had been asked.[159]

---

[157]   *See* Declaration of Debra Swisher, Exhibit 33.

[158]   *See* Declaration of Tiffany Deckard, Exhibit 14.

[159]   *See* Declaration of Shelia Haynes, Exhibit 34.

9) Sgt. Allen Harris, in addition to countering the misleading testimony of Col. Davis regarding a verbal altercation involving Anthony, would have testified that he was a low risk of committing future acts of violence.[160]

10) Earl Washington, Jr. is a firefighter in the Houston Fire Department whose son was 4 or 5 years younger than Anthony. He knew Anthony from birth, and was close to him while Anthony was growing up. His testimony would have been very valuable in countering the State's case for Anthony committing future acts of criminal violence:

> I am a firefighter in the Houston Fire Department, where I have been for 27 years. I have known Anthony Haynes since he was born, right up until the incident when he was charged with killing the police officer... My son is 21 years old, and his name is Earl Washington, Jr. He is 4 or 5 years younger than Anthony...
> I treated Anthony like my own son, and I was like a second father to him. My son and Anthony played T-ball together, and I would take them to games. Anthony was very interested in sports, such as flag football. We would have birthday parties and go on out-of-town trips, such as a visit to 6 Flags Amusement Park.
> We all went to church together, to New Faith Baptist Church. Anthony would regularly attend church with his father. Anthony attended Sunday school and was in the youth ministry, an after-church program. Instead of hanging around, he was in various programs...Anthony was a good kid. He was respectful to adults, and would always say "Yes sir" or "No sir." He would cooperate.
> I had seen Anthony shortly before the incident, at church. He was acting normally. I did not see any indication anything was out of the ordinary. I never knew Anthony to use drugs. Anthony was taking Ritalin. It seemed OK since Anthony was doing well in school on it.
> I don't think the defense attorneys were sufficiently on the offensive. It did not look like they were giving it their all. They really did not get down to defending Anthony. While I knew Anthony had done the crime, I did not think the punishment was appropriate, as it was his first time in trouble with the law.
> Anthony's defense attorneys and investigators never talked to me. Donald Haynes had a list of people to whom the defense attorneys started to talk, and I was on that list. However, they never contacted me, and I was surprised at this. If I had been contacted by them, I would have told them what I have said in this declaration. If they

---

[160]  *See* Declaration of Sgt. Allen Harris, Exhibit 35.

had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here.[161]

11) Another family friend, Bonita Denyse Thierry, an attorney in Houston, could also have provided important testimony to overcome the State's contention that Anthony would be likely to commit future acts of violence:

> I was a sorority sister with Anthony's mother Patrica. We were instantly friends. I have known her since 1996.
> Anthony is a great kid. He was well behaved and I never saw him acting out. He never got into fights. I never had the impression he was violent, and this was my feeling at the time of his trial. Therefore, I would have told the jury that I thought his potential risk for committing future dangerous or violent acts was very low.
> Anthony was interested in joining the Navy and when he was back east in Rhode Island at the training program, he would send souvenirs. I can't believe that he is on death row. I still have his picture hanging on my wall.
> Anthony's defense attorneys and investigators never contacted me. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here in this declaration.[162]

Ms. Thierry's testimony, added to that of the others, would have made it very difficult for the State to obtain an affirmative answer as to the first special issue.

12) Leon Tousant, a substitute teacher for the Fort Bend Independent School District would also have been an important witness for the defense at the punishment phase of Anthony's trial:

> Anthony and I had a friendship in high school. It centered around football and we were both on the Dulles High School team. I played running back as did Anthony. I first met Anthony in the tenth grade.

---

[161]  *See* Declaration of Earl Washington, Sr., Exhibit 36.

[162]  *See* Declaration of Bonita Denyse Thierry, Exhibit 37.

Anthony was not a violent kid. He enjoyed being in ROTC and had his eye on a military career. In his earlier grades, he did well in school. I never knew him to be a trouble-maker. He was not a quitter, but instead was a hard worker. Anthony would always try to do the best he could. He was very sociable and got along with people. Anthony was usually neat and clean and correct.

Anthony only got into one fight that I knew about, but it was not serious. Someone was messing with him and Anthony did not start it. All in all, Anthony was a pretty straight-laced guy. In my presence, he had respect for others, was kind, and didn't have an attitude.

When I heard about this, I was shocked. I never thought something like this could happen to him. After it happened, we did not have contact.

I was not contacted by Anthony's defense attorneys or investigators. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here in this declaration.[163]

13) Barbara Taveras knew Anthony from Dulles High School and would also have been an important witness to counter the State's case for Anthony's probability of committing future acts of criminal violence:

Anthony was respectful of his parents. I did not see him getting into fights and never saw any hostility in him. I never saw him use drugs. Anthony would hang around outside school. He would do his homework and chores. Most of our friends had single parents who were strict disciplinarians.

I couldn't believe it when we heard the news of Anthony's arrest. I followed the crime and visited Anthony in jail.

I was not contacted by Anthony's defense attorneys or investigators. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here in this declaration.[164]

---

[163] *See* Declaration of Leon Tousant, Exhibit 38.

[164] *See* Declaration of Barbara Taveras, Exhibit 39.

14) Ron Royal, a friend of Anthony's, would also have been able to counter the State's

case for him committing future acts of criminal violence:

> I heard out about Anthony's arrest when a mutual friend called. I was shocked.
> This was totally out of character for Anthony. I had never known Anthony to get into
> fights, he was just not the kind of person to get into altercations. Anthony was very laid
> back and he knew when to be calm.
> At the time of his trial, my opinion was that Anthony was not and is not now a
> high risk of committing future dangerous acts or acts of violence....
> I was not contacted by Anthony's defense attorneys or investigators. If I had been
> contacted by them, I would have told them what I have said in this declaration. If they
> had asked me to be a witness on behalf of Anthony, I would have been willing to testify,
> and I would have told the jury what I have said here in this declaration.[165]

15) Although Anthony's grandmother Myrtle Hinton was a witness at the punishment

phase, she could have been better prepared to answer the crucial question as to the probability

of Anthony committing future dangerous or violent acts:

> At the time of the trial, I did not think there was a high probability of Anthony
> committing future violent or dangerous acts. Anthony never did anything around me that
> was a problem. He was not violent, he was always considerate and wanted to help
> people. I would have testified that he was not a future danger if I had been asked by his
> attorneys.[166]

16) Another of Anthony's aunts, Debra Haynes, was similarly not interviewed by the

defense, yet she too had important knowledge of Anthony's non-violent nature that would have

been important for the jurors to hear:

---

[165]   *See* Declaration of Ron Royal, Exhibit 40.

[166]   *See* Declaration of Myrtle Hinton, Exhibit 16.

-170-

I have known Anthony since he was a little boy. He was a good boy, obedient and he did not cause problems and was well behaved. Anthony was interested in football, basketball and ROTC, as well as church activities. Anthony was not violent. It was a real shock when he was arrested, because the crime was so out of character for him. I had a hard time believing that he had done this. It was a real shock to the entire family.

I never talked to Anthony's trial attorneys and they never called me. I would have been willing to be a witness at Anthony's trial. At the time of his trial, I thought Anthony was a low risk of committing future dangerous acts and would have told this to the jury if I had been a witness. If Anthony's attorneys had talked to me, I would have told them this and the other things I have stated in this declaration.

This act was very out of character for Anthony, and I believe now as I did then that there is a very low risk of his ever committing an act like this again. Anthony had never been in trouble before he was arrested for this crime.[167]

17) Richard Haynes, Anthony's uncle, would also have been a good witness to counter

the State's case as to special issue number one:

When I heard Anthony had been arrested, I was shocked. Donald told us about it. I do not believe that he has a propensity toward violence and I did not believe he did at the time of his trial. I never talked to Anthony's two trial attorneys, but I met them once, at the first day of the trial.[168]

18) Sharon McElroy, who was a friend of Anthony's father, could also have given

important testimony as to Anthony's risk of committing future acts of violence:

As Anthony grew up, I kept in contact with him. I would see him occasionally. My daughter is Anthony's age and we would meet eight to ten times per year. Anthony was very quiet and obedient. Donald was very strict with Anthony and had him under a lot of restrictions. Donald had a lot of rules and he was very strict with Anthony and kept him under a lot of restrictions. I never saw Anthony talk back, and he was very obedient. He was never violent or out of control.

---

[167]   *See* Declaration of Debra Haynes, Exhibit 41.

[168]   *See* Declaration of Richard Haynes, Exhibit 42.

> When I heard he had been arrested for murder, it was a real shock for me. At first, I thought it was someone with the same name. Later, I still could not believe it was the same person.
>
> I had contact with Anthony until about one year before he was arrested. I never saw him use drugs or even suspected that he might be using them. Anthony was a nice kid, not the usual self-centered only child. My daughter enjoyed hanging around with him. I was stunned when I heard about the crime because Anthony did not seem violent to me.[169]

19) Rhonda Jackson, a Houston Police Department employee, would also have given valuable testimony regarding this special issue had the defense attorneys conducted even the most superficial investigation:

> Don and Pat tried to point Anthony in the right direction, and we were all very shocked when we heard the news of his involvement with the killing of the Houston Police Department officer. It was hard for us to believe that it was Anthony who was accused of the crime. Because of what I know about Anthony, at the time he was arrested and the time of his trial I did not think that he was a high risk for committing future dangerous or violent acts. This is also my opinion today.[170]

20) Shelia Waters, a friend of Anthony's, would also have been an excellent witness as to Anthony's low probability of committing future dangerous acts of violence:

> When I heard about what he was charged with, I was shocked. It was such a shock because I did not think that Anthony was a violent person. And I thought he would be one of the least likely to commit an act like this. This is my opinion now, that he is essentially not a person prone to violence.[171]

---

[169]   *See* Declaration of Sharon McElroy, Exhibit 43.

[170]   *See* Declaration of Rhonda Jackson, Exhibit 44.

[171]   *See* Declaration of Shelia Waters, Exhibit 45.

21) Socorro Herda, who met Anthony in the BOOST program and became a good friend of his, has submitted an extensive declaration that shows she would have been an excellent punishment phase witness for Anthony. She too was willing to do so, but she was never talked to by defense counsel. Ms. Herda would have had much mitigating evidence regarding Special Issue No. One to offer the jury:

> I do not know him as a violent man...As I have stated here, I believe Anthony would be a very low risk of committing future violent or dangerous acts, and I would have told that to his jury if I had been given the opportunity. My opinion is that the risk of Anthony's repeating such an act is extremely low, based on my knowledge of him.[172]

22) Renee Lewis, a long-time friend of the family, would also have been a good witness as to Special Issue No. One, if defense counsel had bothered to talk to her:

> For approximately 25 years I have been friends with Donald Haynes and I have known Anthony Haynes since about the age of 8 or 9 months old. I have to say to you that I was completely shocked to learn of this tragic event involving Anthony Haynes because, given the type of kid Anthony is, this behavior does not fit with his personality. Anthony's character and disposition has always been one of politeness...This incident is totally uncharacteristic of Anthony's demeanor...My feelings are that Anthony will not be a threat to society if given the chance at a release...Anthony is a good person and I am sure that rehabilitation is a possibility for Anthony if given the chance.[173]

23) Renita Royal, a long-time friend of the family, would also have testified that, if she had been asked to be a witness, "I would have clearly stated that Anthony would not have been a future danger to society."[174]

---

[172] *See* Declaration of Socorro Herda, Exhibit 46.

[173] *See* letter of Renee Lewis, Exhibit 47.

[174] *See* Declaration of Renita Royal, Exhibit 48.

24) Yolondo Gaines, Anthony's mother's best friend, also would have been an important witness regarding this Special Issue:

> He was bright, intelligent, good manners, respected authority...He had no behavioral problems....In high school he seemed more mature. He had spiritual values. He was never angry or belligerent. I was devastated when I heard the news of the murder. I cried and thought it couldn't have happened. It was hard to believe they were talking about Anthony. I thought they had to have the wrong person.[175]

25) Long-time friend of the family Debbie Lucas Moerbe was only briefly talked to by someone, presumably an investigator, on the phone. Despite the fact the she attended a good part of the trial, the defense attorneys never talked to her or asked her to be a witness. She would have had important mitigating evidence regarding Anthony's low probability to commit future criminal acts of violence to offer the jury:

> When I heard of the incident of the shooting of the police officer, I was very distraught. I could not believe Anthony had done it. It was as if I had lost a loved one. I told people it was out of character and not something that he would have been likely to do.
> Before the trial, someone called me on the phone and we spoke for about 15 minutes. I think it must have been a defense investigator, as it was not the prosecution. They merely wanted to know my opinion on some things, but nothing concrete was asked. I told them I wanted to be a witness for Anthony. ... At the trial, the defense attorneys did not speak to me or attempt to interview me.
> Based on what I know about Anthony, he would be a very low risk of committing future violent or dangerous acts. I don't think he would be a high risk of abusing drugs and in his normal state of mind he would not have considered doing these acts or any acts of violence. His risk of repeating such an act is extremely low, based on my knowledge of him. I have never seen anything that resembled anger or violence from him.
> Had the defense attorneys or investigators talked to me in detail, I would have told them what I have said here in this declaration. I was willing to be a witness, and had even told the person I talked to that I wanted to be one, but I was never called upon to do so by the attorneys or investigators for Anthony at the time of his trial.[176]

---

[175] *See* Declaration of Yolondo Gaines, Exhibit 49.

[176] *See* Declaration of Debbie Lucas Moerbe, Exhibit 50.

26) Lawrence Aaron Tate, a friend of Anthony's from ROTC who was never interviewed by the defense would have told the jury that "I was totally shocked when [I] heard about the murder.  At no time did I ever think that Anthony would be a future danger to society."[177]

27) Ryan Braud, another classmate of Anthony's from Dulles High School, would also have been a valuable witness in terms of the first Special Issue:

> I knew Anthony at Missouri City Middle School and at Dulles High School.  We played football together and were good friends.  Anthony was one of my best friends.  Anthony was very outgoing, when he was comfortable.  Generally, he was laid-back and not aggressive.  Anthony was picked on a lot, by his peers and by adults, because he was light-skinned.  He could be intimidated by people, and often I had to reassure him.  I knew that he was into drugs...
> Anthony was never violent and I was surprised when I found out he was charged with the killing of a policeman.  I do not think he is likely to be violent in the future.
> I did not attend the trial.  The defense attorneys or investigators never talked to me.  If they had, I would have told them what is in this affidavit.  If they had asked me to be a witness for Anthony at his trial, I would have been willing to do that.[178]

28) Cherrie McGlory, an administrator who works at the Baylor College of Medicine, could also have been an important witness at the punishment phase of the trial as to Special Issue No. One:

> I came to know Anthony through his father Donald Haynes.  I knew Anthony for 19 years, since he was small.  I got to know him through church attendance with his father, at the New Faith Baptist Church.  Anthony attended regularly with his father.
> Anthony was a well-mannered and polite kid.  He was always very respectful, and a good student, never in trouble.  I did not have a lot of contact with him when he was in high school, but saw him periodically over the years.  My son, Cory McGlory, is a year older than Anthony.  I was not aware of Anthony's friends or any drug use on his part.  I knew he wanted to go into the navy.

---

[177]  *See* Declaration of Lawrence Aaron Tate, Exhibit 51.

[178]  *See* Declaration of Ryan Braud, Exhibit 52.

-175-

The last time I saw Anthony was shortly before he graduated from high school. I was shocked when I heard about the incident regarding the killing of the policeman.

Anthony is not a high risk for committing future acts of violence. I think he just got caught up in a situation. I would never have seen him as a person who would have been involved in a criminal act, because of how he was raised. He is not a high risk of future acts of violence at all. This was my opinion at the time of the trial and it is my opinion now.

I did not attend Anthony's trial. I was never talked to by the defense attorneys or investigators. If they had contacted me, I would have told them what is in this declaration. If they had asked me to be a witness for Anthony at his trial, I would have been willing to be one.[179]

29) Ivory Jackson, who is currently retired, would also have been an important witness as to this issue:

When I heard about this tragic incident I was in shock as it was totally out of character for Anthony. I was never contacted by Anthony's attorneys or investigators. At the time of his trial, my opinion was that Anthony was not and is now not a high risk of committing future dangerous acts or acts of violence. If I had been contacted by anyone regarding this matter I would have been willing to testify, and would have told the jury what I have stated in this declaration.[180]

30) Melvin Brock, who works in the oil refineries and who had known Anthony from birth, would also have testified that Anthony was a low risk of committing acts of criminal violence in the future.[181]

31) Portia Rose, whose son was a year younger than Anthony, would also have been an excellent witness for the defense as to this issue:

---

[179]   *See* Declaration of Cherrie McGlory, Exhibit 53.

[180]   *See* Declaration of Ivory Jackson, Exhibit 54.

[181]   *See* Declaration of Melvin Brock, Exhibit 55.

-176-

I have a son a year younger than Anthony. I was friends with Anthony's father Donald Haynes. We were at the University of Houston together. I was a freshman and he was a senior. We also lived in the same neighborhood, and would do things together. Donald and I would coach our son's teams.

I got to know Anthony through sports activities and when Don was at my house. Don was a good parent. Anthony was a pretty good kid. Don was a strict disciplinarian, and Anthony was respectful. Don took Anthony to church. Anthony was also in ROTC in high school. Don had modified his life to make it conducive to raising his son. Anthony seemed like a good student, and I never knew that he used drugs. I did not know Anthony's friends.

The last time I saw Anthony was when a friend had a Christmas party and Don picked Anthony up at the airport. Anthony told us about the BOOST program he was in. He spoke well about the program and he was animated.

I heard about the incident in which Anthony was accused of killing a policeman when my son was watching television and he said that Anthony killed someone. It showed his mother Pat's house. I was shocked because Anthony did not seem to be a violent person. This was my belief at the time of Anthony's trial and it is still my belief today.

Anthony's defense attorneys never talked to me at the time of his trial. I did not attend the trial. If the defense attorneys or investigators had talked to me, I would have told them what I have said in this declaration. If they had asked, I would have been willing to be a witness for Anthony at his trial.[182]

32) Darryl Smith, a police officer with the Missouri City Police Department, also would have testified that "[a]t the time of the trial, my opinion was and still is that Anthony is not at a high risk for committing future dangerous acts, or acts of violence. Anthony was a very well liked person and well respected."[183]

33) Ms. Bonita Padmore, now working in Iraq but formerly an employee of a school district in Houston, has known Anthony since he was eight. She states in her declaration that

---

[182]   *See* Declaration of Portia Rose, Exhibit 56.

[183]   *See* Declaration of Darryl Smith, Exhibit 57.

"Anthony was a Junior Groomsman in my wedding...It is just not in Anthony's character to commit such a crime...I do not believe that Anthony would be a threat to [society] whether out or in the free world."[184]

34) Devlin Jackson, a correctional officer who was never talked to by the defense attorneys, would have told Anthony's jury that when he heard about the crime he "was shocked then as I am today, because Anthony has never displayed any type of violence."[185]

35) Nezdra Ward, a tax auditor, was also never contacted by the defense attorneys or investigators, but had known Anthony since he was young. She would have told his jury that

Anthony was always well behaved, and had good manners and was very respectful. When I heard about this tragic incident I was in shock as it was totally out of character for Anthony...At the time of his trial, my opinion was that Anthony was not and is not now a high risk of committing future dangerous acts or acts of violence.[186]

36) Toya Terry, a close friend of Anthony's, would also have been a valuable witness as to this issue:

He [Anthony] loved my family, my friends, and me and did his best to please us all. I never felt, nor did anyone close to me, as though Anthony was a danger or would cause harm at any point in our relationship. He always showed respect towards my loved ones and me...
They [the media] played him out to be a common thug with no direction and no goals, someone who was out looking to be a nuisance to society and a troublemaker. Anthony

[184]  *See* Declaration of Bonita Padmore, Exhibit 58.

[185]  *See* Declaration of Devlin Jackson, Exhibit 59.

[186]  *See* Declaration of Nezdra Ward, Exhibit 60.

-178-

was none of these. He worked hard and cared about his family and friends and would never intentionally jeopardize his well being or those whom he was associated.[187]

37) Cleophis Lewis, a friend of Anthony's, would have testified that he did "not believe that he would have been a future threat to society."[188]

The cumulative effect of these thirty-seven punishment phase witnesses would have been to give a completely different picture of Anthony than the one his jury receives. *Wiggins, supra; Lewis v. Dretke, supra.*

**Claim I(k): Trial counsel were ineffective for failing to accurately characterize and respond to the prosecution's mischaracterizations of Special issue No. 1.**

**A. Facts in Support.**

The defense allowed the prosecution to re-frame Special Issue No. 1, which asked whether the jury found "from the evidence beyond a reasonable doubt that there is a probability that the defendant, Anthony Cardell Haynes, would commit criminal acts of violence that would constitute a continuing threat to society,"[189] in terms of 'future dangerousness." As Dr. Cunningham points out:

> Consistent with the predictable reframing of the special issue as one of "dangerousness" in light of the capital offense, in closing statements the State argued:
>
> You've already unanimously found that he is guilty of [sic] capital murder of Sergeant Kincaid. You now have to decide whether or not this defendant is a future danger to society, and I argue that includes society in prison. You also have to determine

---

[187]  *See* Declaration of Toya Terry, Exhibit 61.

[188]  *See* Declaration of Cleophis Lewis, Exhibit 62.

[189]  *See* Exhibit 3.

-179-

whether there is any mitigation, any reason not to impose the death penalty. If you answer that question unanimously yes, he is a future danger, and you unanimously answer, no, there is no mitigation, he will receive the death penalty. ([Vol. 30]Page 15: lines 9-18)

And if you follow your oath and the law and answer to the questions regarding whether this defendant is a future danger is obviously unquestionably yes, he is a future danger. ([Vo. 30] Page 28: lines 1-4)

…there could only be one verdict in this case and that is the answer to Question No. One is future danger, the yes, and the Foreman signs it so. ([Vol. 30]Page 29: line 17-19)

The defense attorneys, both of them, no, [sic] he won't be a future danger. ([Vol. 30] Page 59: 21-22)

So, just like Mr. Smyth said. We have proven to you, we've proven to you this issue on future dangerousness. We've proven that to you. ([Vol. 30] Page 61: line 15-17)

Similarly, the State artfully separated the "continuing threat to society" from the essential preceding clause "probability the defendant would commit acts of criminal violence that would constitute a…" – effectively making it a synonym for "future dangerousness."

In this defendant's background, I don't think there's any question that he is a continuing threat to society. ([Vol. 30]Page 23: lines 2-4)

Inexplicably, the defense joined the State in this focus on "threat" as opposed to probability to criminal acts of violence:

With those controls if Anthony Cardell Haynes is a continuing threat to society. ([Vol. 30] Page 38: lines 4-6)

Equally problematic, the defense failed [to] sponsor expert testimony or provide argument that adequately distinguished between "probability" and "any possibility." If probability as contemplated by the special issue means any risk whatsoever or any possibility, then the answer to the special issue is always "yes." There is a *possibility* that every convicted capital murderer, every convicted murderer, and every defendant convicted of any offense will commit an act of serious violence in prison. Conceptualizing this issue as any risk or any possibility results in the special issue always being answered in the affirmative and, accordingly, having no narrowing or individualizing value in the application of the death penalty. The State's reframing

-180-

probability as possibility is demonstrated in the retrospective logic of their final argument:

> Well, Sergeant Kincaid's death was predicted not on the 22nd day of May of 1998, it was predicted four years back. And I guarantee you that if we would have made such a prediction, Mr. Smyth and myself, back in 1994 to say, ladies and gentlemen, this will happened [sic], it's going to happen as reasonable – it is reasonable to believe that this person will be a continuing threat, there's the probability there, they would have said no proof, absolutely no proof, he's just having a bad day. That is what they would have said. Mind you, four years before Sergeant Kincaid's death there was some officer out there that was going to die at the hands of this defendant because he was suffering from this intermittent explosive disorder. ([Vol. 30] Page 55: lines 12-25)

It is also predictably evident in the State's warning of the jury taking any risks:

> Who will be around the next time that it explodes? Ask yourself that. What will the result be? Ask yourself that. What will his excuse be at that point? Will it be another grieving widow? Do you want to run that risk?

This argument of reframing the special issue as an avoidance of any risk is an extension of the testimony of Royce Smithey on cross examination:

> Q: Yes, sir. Is that a solution to any problems in the prison system?

> A: Sure it is. You have an individual who is violent, he certainly won't be violent after he is executed. ([Vol. 28] Page 21: line 18-21)[190]

## B. Argument.

Simply put, a prediction of "dangerousness" is not what Special Issue No. 1 asks for.

As Dr. Cunningham summarizes the argument:

> This redefining of the special issue in terms of dangerousness departs from the language of the issue, which is focused on the probability of acts (i.e. "Whether there is a probability the defendant would commit acts of criminal violence that would constitute a continuing threat to society." Article 37.071, Texas Code of Criminal Procedure). This special issue as affirmed in *Jurek v Texas* is not an assessment of a static characteristic

---

[190]  *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 46-47.

of dangerousness. Rather it calls for an evaluation of the likelihood of violent acts. This is not an inconsequential distinction (see Cunningham, in press; Cunningham & Goldstein, 2003; Cunningham & Reidy, 1998; 2001). If the special issue is re-framed as "danger," it ceases to be definable or measurable in a scientifically reliable and reasonably discriminating fashion. More problematically, when construed as "dangerousness" the issue loses any individualizing value in the application of the death penalty. All violent felons, and particularly all capital offenders, would be considered to be dangerous. Their "dangerousness" is a significant rationale for their long-term confinement in highly secure correctional facilities. It is understandable why the State would seek to reframe this special issue as "dangerousness" as opposed to "probability of acts of criminal violence." A jury, having just convicted the defendant of a capital murder, is much more likely to agree with the proposition that a defendant is "dangerous" than they are to find that he is disproportionately probable to commit acts of criminal violence in prison or on old age parole - particularly when the jury has the benefit of expert testimony on the relevant probabilities...

Such conceptualizations of the special issue as a decision to eliminate any possibility do nothing to individualize the application of the death penalty to Anthony Haynes, or to demonstrate that he was disproportionately likely to commit acts of serious violence in prison. The defense neither provided testimony that would have preempted such a reframing of the special issue nor responded with objection or argument to the "no risk after he's dead" testimony of Royce Smithey or the State's recasting the issue as "dangerousness" in final argument.

More fundamentally, the totality of Royce Smithey's testimony was directed to describing that there is a risk of violence in prison; and accordingly that that risk of institutional violence imputed to the defendant as he would be in prison. With a single exception, nothing in Mr. Smithey's testimony particularized that risk to Anthony Haynes or any characteristic of Anthony Haynes. The possible exception was his assertion regarding "predator-type" murderers on cross examination:

Q: And do you find that people who have been convicted of murder, as a rule, are people who you may end up having less trouble because it is a one on one situation?

A: It depends on what you are referring to as a person convicted of murder. There are different types of murders, different types of people, different situations within the murder realm that we could be talking about here. The predator-type murderers are usually the ones we have the most problems out of. The people that are doing time for murder, for passion killings, a heat of type passion type of murder is what I am talking about, those individuals are different that the predator type that are in the – ([Vol. 28] Page 15: lines 10-21)

-182-

There are two problems with this testimony from Mr. Smithey that the defense made no response to, either in expert testimony, objection, or argument. First, Mr. Smithey's assertion that there is a distinction in the prison behavior of "predator-type" and "passion-type" murderers is without supporting data from TDCJ or the scholarly literature. Similarly, his assertion that "predator-type" murderers are disproportionately involved in assaultive prison misconduct is contrary to existing data drawn from TDCJ. ... Second, as virtually all capital murders would be characterized as predatory-type murderers, such a distinction does nothing to individualize or narrow the application of the special issue to the particular capital defendant before the jury – in this case Anthony Haynes.[191]

Thus, as defense counsel failed to properly characterize this crucial special issue, they allowed the prosecution to define it in terms of "dangerousness" that was contrary to the law and allowed an incorrect standard to be applied by the jury.

**Claim I(l): Defense counsel were ineffective for failing to provide expert testimony regarding the implications of their client's pre-trial good conduct in jail and to put the prosecution's aggravating evidence into proper context.**

The defense briefly noted Mr. Haynes's model inmate status in jail awaiting trial, but failed to point to that behavior as being a valuable predictor of his not being a high probability of committing future acts of criminal violence. Because the relevant conduct of the defendant in a situation similar to what he was facing (a life sentence in prison) would have been the most relevant indicator for an answer to Special issue No. 1, the failure of the defense to provide expert testimony to this resulted in another major failure in the punishment phase.

Mr. Haynes's conduct in the Boost program was also highly relevant conduct to help the jury answer this crucial Special Issue. There were no indications of disciplinary or behavioral

---

[191] *Id.* at 47-49.

-183-

problems in the highly structured setting of that program. Further, he gravitated toward and excelled in ROTC program, a context of more structure and authority hierarchy than typical high school activities. Although the prosecution concentrated on Mr. Haynes's two high school verbal outbursts, they were both isolated and treated as indications of emotional disturbance rather than as antisocial or a reason for expulsion. Finally, numerous adults Mr. Haynes had interacted with in childhood and adolescence described him as respectful and compliant.[192]

Additionally, Dr. Cunningham points out that

[m]uch of the State's case at sentencing focused on the involvement of Mr. Haynes in several armed robberies in the hours before the capital offense. These offenses, however, were in the company of the same companions as were present at the shooting of Sergeant Kincaid, and were part and parcel of a sequence of conduct on the evening in question that encompassed the capital offense. As such, these make only a minor contribution to the defendant's risk of violence in prison, and may represent a form of "double counting" regarding the special issue.[193]

**Claim I(m): The defense attorneys were ineffective for failing to describe the low predictive value of past community violence or the capital offense for risk of violence in prison.**

The prosecution's case at the punishment phase was characterized by emphasizing the armed robberies committed immediately prior to the shooting of the victim and on isolated instances of temper. Despite ample evidence at the time of Anthony's trial that none of the State's case was of much predictive value for an answer to Special Issue No. 1, the defense failed to counter the prosecution's faulty methodology and arguments. As Dr. Cunningham states, ""[s]tated plainly, prison violence does not predictably follow from pre-confinement

---

[192] *See* numerous family, relative and friend declarations herein.

[193] *See* Declaration of Dr. Mark Cunningham, Exhibit 17, at 50.

violence or the capital offense of conviction."[194]  This evidence has been extensively summarized by Dr. Cunningham, and need not be repeated here.[195]  Capital murderers have relatively low rates of assaults or violence in prison; past community violence is not strongly or consistently associated with prison violence; current offense history is only weakly associated with prison misconduct; and the severity of the offense is not a good predictor of  prison adjustment.[196]  The failure of the defense to counter the misleading arguments of the prosecution virtually doomed Anthony's chances of a life sentence.

**Claim I(n): Defense counsel were ineffective for failing to individualize their client's risk of violence in prison.**

As Mr. Haynes faced a sentence of life in a TDCJ prison if he received a life sentence, the rate of prison violence in that society is fundamental to assessing his probability of committing future acts of criminal violence in that society.  As Dr. Cunningham points out, a capital jury is very likely to over-estimate the likelihood of prison violence because of over-sensational concentration on it by the media.[197]  The actual incidence is quite low, as only 1% of inmates were cited for inmate-on-inmate assaults in 1998, according to data readily available at the time of Anthony's trial.[198]  As for homicides in prison, the rate is about one-seventh that

---

[194]  *Id.* at 50.

[195]  *Id.* at 50-52.

[196]  *Id.*

[197]  *Id.* at 53.

[198]  *Id.*

-185-

of the male population of Houston in 1995-1996.[199]  As for inmate-on-staff homicides, that is

also extraordinarily low, as it has occurred only 1-2 times in TDCJ in the last 20 years.[200]

These statistics could have effectively rebutted punishment phase testimony from Royce

Smithy, the prosecution expert on prison adjustment, as Dr. Cunningham states:

> Thus when Mr. Smithey testified that there were "many" instances of violence
> in TDCJ (Page 7: line 6) he was technically correct: inmates committed over 3,000
> assaults in TDCJ in 1998. What was misleading by omission is that these involved 2%
> or fewer of the inmates in Texas prisons that year. This is not unlike an inquiry regarding
> whether there are many homicides in the United States each year (i.e. there were over
> 15,000 in 1996), yet the likelihood in 1996 of being a homicide victim was exceedingly
> remote (8.2 per 100,000 community residents). Without this detailed statistical data, the
> jury had no way to make an informed appraisal of Mr. Smithey's characterization of
> "many" and its associated risk implications.
> These statistics demonstrating the remarkable violence-containment effect of
> prison incarceration among an at-risk population are a convincing rebuttal to Mr.
> Smithey's assertion that rehabilitation or violence is entirely up to the inmate:
>
> A: Yes, sir. I would say probably 98% of their rehabilitation depends on that individual.
> (Page 15: line 8-9)
>
> A: ...you know, like I testified before, if that inmate wants to be violent, he can be
> violent. (Page 22: line 14-15)
>
> ...Mr. Smithey described the access of inmates to these prison staff members:
>
> Q: Will that inmate come into contact with people who are not prisoners?
>
> A: Yes, sir.
>
> Q: Who could that be?
>
> A: Certainly you have your prison guards. You have employees that work within the
> system, secretaries, doctors, nurses, librarians, teachers. Each unit has educational

---

[199]  *Id.*

[200]  *Id.*

facilities within the unit. You have maintenance personnel. So you have a wide variety of civilian employees that work in the system other than the security guards. (Page 9: line 20 to Page 10: line 4 .....

Expert testimony or informed cross examination of Mr. Smithey with the readily available data on assaults and homicides in TDCJ, as well as explanations for the control that prison offers, would also have preempted final arguments of the State that embraced Mr. Smithey's assertion that prison violence is simply the choice of the inmate:

And remember, the mind is a powerful thing. I can do what I want when I chose to do it and I can pick my own timing and nobody in that jury box can stop me. You know why? Because I am in control of my mind and you are not. You may control my body but you don't control my mind. And that's true. You won't control his mind. When he makes his mind up he is going to do what he wants to do. And I suggest to you can a leopard change his spots? I say no. Nor can he change his conduct. (Page 61: line 3-12)[201]

The defense also failed to individualize their client by looking at group statistical data in assessing individual risk in terms of Special Issue No. 1. As Dr. Cunningham points out, group statistical or actuarial data is much more accurate in assessing future risk than the methodology employed by the prosecution at Anthony's trial, which essentially just looked at him and his offenses.

Dr. Cunningham describes the formulation of base rates using actuarial data.[202] The data shows that capital offenders are at a very low risk of re-offending, and this data is based on many surveys that were readily available at the time of Anthony's trial.[203] As Dr. Cunningham summarizes:

---

[201] *Id.* at 53-55.

[202] *Id.* at 55-60.

[203] *Id.* (*Also see* References Section to his declaration).