# United States District Court
# Southern District of Texas

## Case Number: H-05-3424

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part 2 of _____

☐ Exhibit to: ___Vol II_____
number(s) / letter(s) _____

Other: ___Petition For Writ of_____
___Habeas Corpus_____
_____

In particularizing this group data to Mr. Haynes, base rate data regarding capital offenders and their disciplinary outcome in the general prison population revealed that 20-30% committed acts of assaultive violence. Less than 10% were guilty of chronic violent rule infractions - and these inmates could be managed in administrative segregation. Cumulative incidence of inmate-on-inmate homicide across multi-year follow-up in these studies was approximately 1%. Incidence of inmate on staff homicide is approximately one per million inmates annually.[204]

Another failure of trial counsel was the absence of any references to available preventative measures that were available in TDCJ to reduce the risk of violence in the prisons. Psychotropic medication would have been available if needed.[205] This would have neutralized the prosecution's argument that Anthony would be a risk of killing a correctional officer. 30 RR 55. Additionally, the defense failed to introduce expert testimony to deal with the management of Intermittent Explosive Disorder. When Anthony was hospitalized at West Oaks, anticonvulsant medications and mood stabilizers were used.[206] The availability of these drugs in TDCJ, along with a high number of inmates with psychiatric disorders and a relatively low rates of violence in Texas prisons demonstrates the ability of TDCJ to effectively deal with such mentally disturbed inmates.

**Claim I(o): The defense attorneys were ineffective for failing to investigate and review petitioner's mental health records.**

A major failure of the defense was their inadequate investigation into Anthony's mental health issues. Despite the fact that he had been hospitalized at the West Oaks Hospital after the

---

[204] *Id.* at 60.

[205] *Id.* at 61.

[206] *Id.*

-188-

altercation with Col. Davis, a mere year and a half before his arrest, defense counsel failed to even obtain these records.  In light of the recent holding in *Rompilla, supra,* where counsel was held ineffective for failure to review a file regarding their client's past criminal history, this failure merits relief in and of itself. As Anthony's mother Patrica Davis states, "Mr. Nunnery did not obtain the records from West Oaks Hospital; the prosecutor did and used them at the trial."[207]

As Dr. Rosin comments, these records would have been vitally important for the punishment phase of Anthony's trial:

> First, it is noteworthy that when Mr. Haynes was initially admitted into West Oaks Hospital while a senior in high school, his toxicology screen **did not** reveal the presence of any drugs whatsoever in his system. This is a very significant finding because street drug use **cannot** then be used to help explain what was described as Mr. Haynes' violent and erratic behaviors, and mood swings at the time of admission. Other medical and psychiatric factors were likely at play.
>
> Secondly, Mr. Haynes was treated for his severe emotional and behavior problems while at West Oaks with drugs that have both **antipsychotic** and **mood stabilizing** properties. These drugs included Tegretol and Depakote. Although I am not a medical doctor nor licensed to prescribe medications, the types of medications that were used to treat Mr. Haynes are **not** considered typical for the treatment of an uncomplicated depression.
>
> Thirdly, several of the nursing and group therapy notes I reviewed described Mr. Haynes as exhibiting behaviors and expressing comments that raise questions regarding his reality testing. For example, Mr. Haynes made comments during one particular group session whereby he claimed to have participated in several drive-by shootings, and killed several people and animals. It should be noted that, at this point in time, there had not been any evidence whatsoever that Mr. Haynes had ever killed any human beings or animals. Therefore, these comments, which were apparently made seriously and appeared believable to the group leader, lead me to suspect that Mr. Haynes could have been potentially expressing delusional ideation during at least a portion of his hospitalization.
>
> In addition, there were apparently several instances during which Mr. Haynes

---

[207] *See* Declaration of Patrica Davis, Exhibit 11.

became so out of control and aggressive toward the staff at West Oaks that he had to be restrained. These behaviors again suggest to me the presence of an underlying major mood disorder. Mr. Haynes was described at times as acting erratically and violently and unable to control his impulses or reactions. In addition, his outlandish claims of having killed many people and animals and beaten people with baseball bats lead me to suspect emerging difficulties with reality testing in this young man at the time.

Mr. Haynes was followed by a Dr. Robert Woodham while at West Oaks, and received diagnoses that appeared to address his symptoms at a more superficial level. These include: Intermittent Explosive Disorder (DSM IV 312.34) and Cannabis Dependence (DSM IV 304.30). In addition, Rule out Major Depression was listed as an additional potential diagnosis for Mr. Haynes. It is well known and accepted, however, that major mood disorders will typically first manifest themselves in children and adolescents as difficulties with anger control and uncontrollable rages. The fact that Mr. Haynes appeared to have responded well to the Tegretol and Depakote offers, in my opinion, yet more supporting evidence that Mr. Haynes was beginning to develop a major mood disorder, such as Bipolar Mood Disorder, during this time. It is unfortunate that Mr. Haynes did not continue to take his medications and be followed up psychiatrically once he left the West Oak Program. If Mr. Haynes, as I suspect, was in the process of developing a major mood disorder during this time, he would have required ongoing pharmacological treatment and psychiatric follow-up to control his symptoms.

It is my strong opinion that this information should have been presented to the jury at the time of Mr. Haynes' original capital murder trial. The presence of an untreated manic-depressive or bipolar illness could have certainly contributed to impair Mr. Haynes' judgment and volitional capacity at the time of the offense. In addition, as I discussed in my prior letter, the defense attorneys did not explore other possibilities at the time of trial to help account for Mr. Haynes' escalating behaviors and rage episodes. These other medical possibilities can include a focal lesion in the brain, temporal lobe seizures and/or other metabolic conditions. To my knowledge and from the review of these additional records, Mr. Haynes was never administered any neurological tests such as a computerized EEG, CT scan or MRI in an effort to rule out neuro-physiological problems. It is still my strong recommendation that Mr. Haynes be evaluated by a neurologist to rule out any of these problems.

These medical records and Mr. Haynes' mental health history should have been introduced and discussed at the time of his trial. It is highly probably that Mr. Haynes was in the process of developing a major mood disorder throughout his adolescence. It is also tragic that psychiatric treatment was not continued, particularly the medication, as mood stabilizers have been found highly effective in controlling the mood swings, manic phases and anger episodes in these individuals. However, it would have also been

a mitigating factor and highly important for the jury to consider that Mr. Haynes had been treated for his emotional problems with anti-psychotics and mood stabilizers. I also find it very significant that nobody at West Oaks ever labeled this young man as an antisocial personality disorder. Therefore, it is likely that the treating staff held the opinion that all the behaviors displayed by Mr. Haynes at that time were largely out of his control. That is, in my opinion, another highly significant finding that should have been presented to the jury. Back then, it would have been possible for Dr. Woodham to testify at trial and discuss his impressions and treatment of Mr. Haynes for the jury. All these are important sources of information that the jury in this case was not able to hear or consider.[208]

As to the question of prejudice, had Anthony's defense counsel been familiar with this file, they could have completely changed the picture of him at the penalty phase.[209]  Dr. Cunningham's affidavit clearly shows the harm inflicted on the case from this failure.  In addition, because the defense was not familiar with the West Oaks records, they were totally unprepared to counter the prosecution's arguments that they showed that Anthony would be a danger of committing future criminal acts of violence.  That unfamiliarity led to the failure to use expert testimony to build a case on both Special Issues.

**Claim I(p)**: **Defense counsel were ineffective for failing to object to the intimidating and prejudicial courtroom atmosphere that prevailed at Petitioner's trial.**

Anthony's trial was characterized by the continual presence of many uniformed officers of the Houston Police Department, who escorted the victim's widow  in and out of the courtroom and also sat in the courtroom during the testimony.  Additionally, the victim's widow and her family wore badges that prominently identified themselves as such, which gave a clear

---

[208]  *See* Letter of Dr. Susana Rosin of July 13, 2005, Exhibit 22.

[209]  *See* Affidavit of Dr. Mark Cunningham, Exhibit 17.

indication that there was much community pressure for a death sentence.

As Anthony's mother states:

> During the trial, the victim's family were identifiable by decorative jewelry, round pins that they wore. The victim's wife was always escorted by police officers and they sat with her and her family at the trial. There were 6 to 8 family members at the trial most days, in two rows, and usually close to a dozen uniformed police officers. They wore pins on their clothing identifying them, such as "Big Sister," or "Baby Sister." I felt like they were trying to intimidate the jury.[210]

Eric Haynes also attended part of the trial:

> I attended 3 or 4 days of the trial. I observed uniformed police officers present during the trial, at least 4 to 6 when I was there. The victim's family sat up front. One day, there were quite a few officers present at the trial, about 15 or 20 in uniform.[211]

Earl Washington, Sr., a Houston firefighter and friend of the family also attended the trial

and saw evidence of the atmosphere of intimidation and prejudice:

> I did attend two days of the trial. I saw some officers in uniform, 2 or 3. There were also some out of uniform when I attended, 2 or 3 or 4. I knew their faces. The judge seemed to favor the prosecution.[212]

Richard Haynes, Anthony's uncle, attended part of his trial and also noticed the presence

of many Houston Police Department officers:

> I sat through the trial and only missed one or two days... There were a lot of police officers in uniform with weapons at the trial. At least eight were there every day, surrounding the victim's widow. Other officers were standing along the wall.[213]

---

[210]   *See* Declaration of Patrica Davis, Exhibit 11.

[211]   *See* Declaration of Eric Haynes, Exhibit 13.

[212]   *See* Declaration of Earl Washington, Sr., Exhibit 36.

[213]   *See* Declaration of Richard Haynes, Exhibit 42.

Rhonda Jackson, a friend of the family, also heard reports of uniformed officers in the courtroom:

> Although I didn't attend the trial, I know there were a lot of uniformed officers in the courtroom, from what I saw and heard from the television coverage of the case.[214]

Renita Royal, a long time friend of the family, did attend several days of the trial, "and on each day I observed sis to eight police uniforms with black tape on their badges."[215] Mr. Courtney Davis, Anthony's stepfather, also stated that in the courtroom, the "front seats were roped off for the victim's family. The room was surrounded with blue (cops).[216]

Long-time friend of the family Debbie Lucas Moerbe also observed the massive and intimidating Houston Police Department presence at Anthony's trial:

> I attended part of the trial, and was present at most of the guilt/innocence phase. The day the verdict was read, I remember that there was many uniformed police officers in the courtroom, somewhere between 12 and 25. The other days, they were also there, but not as many.[217]

Larry Britt also observed

> While I testified I did observe at least 4 officers in uniform. On the day of sentencing, I observed approximately 20badges with black ribbons across the badge on uniformed officers.[218]

The trial judge also had the Ten Commandments posted on the courtroom wall. 27 RR

---

[214]  *See* Declaration of Rhonda Jackson, Exhibit 44.

[215]  *See* Declaration of Renita Royal, Exhibit 48.

[216]  *See* Declaration of Courtney Erwin Davis, Exhibit 63.

[217]  *See* Declaration of Debbie Lucas Moerbe, Exhibit 50.

[218]  *See* Declaration of Larry Britt, Exhibit

30.

**Claim I(q): The defense attorneys were ineffective for failing to present good character evidence.**

The State pictured Anthony as an out-of-control, violent and unpredictable individual, who was subject to intermittent fits of rage. This picture was totally at variance with his actual character. There were many uncalled witnesses who could have shown the jury his true character, but as these witnesses were never investigated, this facet of their client's background was unknown to his trial attorneys.

Beverly Scott, a next door neighbor of Anthony, could have told the jury that:

> I was a next door neighbor of Mr. Donald Haynes. Anthony Haynes was in grade school when I first met him, in the fourth or fifth grade. He was a nice, respectable kid, and I had no problems from him. Anthony has been in my house many times. I never saw him get into trouble and he didn't hang around with bad kids. Occasionally, Anthony would help me take groceries into my house. He would also help his father out in the yard. I knew that Anthony drove his father's truck, but never knew him to drive recklessly.
> Anthony was a good student at school and he said he got good grades. I knew he was in ROTC at high school. I knew him up until he was arrested for the killing of the officer.
> Anthony was not hostile toward the police. I did not know he used drugs. He was a respectful kid, an all-around good kid. I knew he had a scholarship to Prairie View A & M, and he was proud of that. Anthony was looking forward to attending college.
> ....
> I was never talked to or contacted by attorneys or investigators for Anthony at the time of his trial. If they had contacted me, I would have told them what I have said in this declaration. If they had asked me to be a witness for Anthony Haynes at his trial, I would have been willing to do so.[219]

Debra Swisher, a friend of Anthony's, could also have given important good character

---

[219] *See* Declaration of Beverly Scott, Exhibit 32.

evidence:

> I used to own a restaurant, RonDee's Diner, in the 2300 block of Texas Parkway. I closed it in 1998. Before the incident in which Anthony was charged with the killing of the police officer, Anthony would come in to the restaurant and talk to me. I liked him a lot. He was soft-spoken, intelligent, polite, and often gave me a hug when he left. For a period of about six months, before he graduated from high school, Anthony would come in to the diner about twice a week. He wanted to talk, about school and his fellow students, just general stuff. He would talk about his teachers, his favorites and his not-so-favorites. I never knew him to be disrespectful or violent or to be involved in drugs, and I never saw him in any angry outbursts. I was always glad to see him come into the restaurant.[220]

Sgt. Allen Harris, the deputy director of the Dulles High School ROTC Program, would

have had many positive things to say about Anthony that would have negated the testimony of

his superior, Col. Davis:

> I first met Anthony when he came into the ROTC program as a freshman. He loved ROTC. He saw it as a way to make a mark. He once said that one of the things he was interested in was flying. He was aiming at attending the Naval Academy.
> In the ROTC program, Anthony was on the drill team and eventually became an officer in the program. There are about 125 students in the program. In freshman year, the emphasis is on doing what you are asked to do. There is also a summer leadership school, which Anthony completed. In the second year, there are more leadership responsibilities. Only 50 of the 125 students go to the summer leadership program.
> Of the 125 students in the program, about 25 to 30 become officers. Anthony came through well and he was made an officer. He had some problems but I always had a good student-teacher relationship with him. Anthony loved the structure of ROTC and loved the program because of its consistency. I saw Anthony grow up and mature in the program....
> Anthony would hang out mainly with other ROTC cadets. On the whole, Anthony did very well in the Dulles High ROTC program. He became an officer, and he had good honors. Out of all the students in ROTC, at the time he graduated, Anthony was fourth best in the program....
> I saw Anthony the week he came back from the BOOST program. He told me he did not make it in the program. But he said he had another option of attending Prairie View A & M which had a Navy program. His goal was to go to Prairie View and prove

---

[220] *See* Declaration of Debra Swisher, Exhibit 33.

himself.[221]

Earl Washington, Sr., a Houston firefighter, had known Anthony all his life and could have presented excellent "good character" evidence to the jury that would have been valuable and relevant as to both special issues:

> I treated Anthony like my own son, and I was like a second father to him. My son and Anthony played T-ball together, and I would take them to games. Anthony was very interested in sports, such as flag football. We would have birthday parties and go on out-of-town trips, such as a visit to 6 Flags Amusement Park.
> We all went to church together, to New Faith Baptist Church. Anthony would regularly attend church with his father. Anthony attended Sunday school and was in the youth ministry, an after-church program. Instead of hanging around, he was in various programs. When I moved from Missouri City, I did not change churches, so I kept in contact with Anthony and his dad.
> At school, Anthony joined the ROTC, and he spoke well of it. His aim was to obtain a navy scholarship.... Anthony played football at Dulles High School. He was in the BOOST program later.
> Anthony was a good kid. He was respectful to adults, and would always say "Yes sir" or "No sir." He would cooperate.[222]

Substitute teacher Leon Tousant would also have been a very effective character witness[223] had the defense attorneys bothered to interview him:

> Anthony and I had a friendship in high school. It centered around football and we were both on the Dulles High School team. I played running back as did Anthony. I first met Anthony in the tenth grade....He enjoyed being in ROTC and had his eye on a military career. In his earlier grades, he did well in school. I never knew him to be a trouble-maker. He was not a quitter, but instead was a hard worker. Anthony would always try to do the best he could. He was very sociable and got along with people.

---

[221]  *See* Declaration of Sgt. Allen Harris, Exhibit 35.

[222]  *See* Declaration of Earl Washington, Sr., Exhibit 36.

[223]  In addition to countering the State's evidence of the probability of acts of criminal violence, discussed *supra*.

Anthony was usually neat and clean and correct... All in all, Anthony was a pretty straight-laced guy. In my presence, he had respect for others, was kind, and didn't have an attitude....

I was not contacted by Anthony's defense attorneys or investigators. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here in this declaration.[224]

Barbara Taveras, in addition to being able to testify that Anthony would not be likely to commit future dangerous or violent acts (discussed *supra*), would have been a good general character witness:

Anthony was into his school work and he was interested in a military career, and he tried hard in ROTC. A certain number of the kids were offered a chance to attend boot camp and Anthony was one of them. This was summer camp in San Antonio, Texas and Anthony attended this.

Anthony was respectful of his parents. I did not see him getting into fights and never saw any hostility in him. I never saw him use drugs. Anthony would hang around outside school. He would do his homework and chores. Most of our friends had single parents who were strict disciplinarians.

I couldn't believe it when we heard the news of Anthony's arrest. I followed the crime and visited Anthony in jail.

I was not contacted by Anthony's defense attorneys or investigators. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here in this declaration.[225]

Similarly, Ron Royal, a customer service representative, could have provided a picture of Anthony that was much more accurate than the one presented either by his defense counsel of the State:

I knew Anthony Haynes at Dulles High School. I met him in freshman year. I was on the football team with him. I played outside line-back. We hung around a lot.

---

[224] *See* Declaration of Leon Tousant, Exhibit 38.

[225] *See* Declaration of Barbara Taveras, Exhibit 39.

Anthony was laid back and he liked to chill out. Anthony wanted a career in the military and was interested in football. He would generally like to keep busy, with ROTC and sports. I did not know Anthony's family.

I had a couple of classes with Anthony. He got along well with the teachers, and he was a little shy. He took pride in his ROTC and said that if he didn't get a military scholarship, he would still go into the military. My opinion is that he went into the ROTC program so that he could be like his dad.

I heard out about Anthony's arrest when a mutual friend called. I was shocked. This was totally out of character for Anthony. I had never known Anthony to get into fights, he was just not the kind of person to get into altercations. Anthony was very laid back and he knew when to be calm.

At the time of his trial, my opinion was that Anthony was not and is not now a high risk of committing future dangerous acts or acts of violence. I would say he was a Anthony wanted to fit in and be around his friends. He was well-liked. He never did anything to anybody. He always spoke well of his father.

I was not contacted by Anthony's defense attorneys or investigators. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here in this declaration.[226]

Anthony's grandmother, Myrtle Hinton, did testify at the punishment phase of his trial.

But even the few witnesses that were called were not extensively interviewed or asked about many facts relative to the special issues. Had Ms. Hinton been properly interviewed, and had the investigation been even minimally adequate, this witness could have been much more effective at the punishment phase of the trial, especially as to the voluntariness of his "confession":

When Anthony was arrested, the police read him the statement that he gave. Anthony told me this, and he said he was forced to read it. He was forced into making his "confession." I asked him why he read it if it wasn't true. He said someone was standing over him with a gun and he could have shot him and said he was resisting. I know he was forced into making the statement. He had just been robbed. In his wallet were receipts for property belonging to him that he had pawned, rings, necklaces and jewelry.

---

[226] *See* Declaration of Ron Royal, Exhibit 40.

-198-

Anthony's attorneys did not talk to me extensively before the trial. One meeting was for about 30 or 35 minutes when I went to Mr. Jones's office to take him money for the case. Mr. Nunnery had not yet been involved in the case. They did not properly prepare me to testify and I was asked only a few questions at this meeting.

Later, there were seven or eight of us at Mr. Nunnery's office for a meeting on a Saturday. We were questioned together as a group and then he called us in individually and these individual meetings only lasted a few minutes. This was the only time I talked to Mr. Nunnery.

I could have told the jury a lot more than I did about Anthony's background when I testified at his trial, but because the attorneys did not ask me much about Anthony's background, they didn't ask me. On the stand, I said I would not change the way I had dealt with Anthony...

Although I did briefly talk with Anthony's defense attorneys, and was called as a witness, they did not ask me much of what is in this declaration. If they had, I would have been willing to tell the jury what I have said in this declaration.[227]

Anthony's aunt Debra Haynes, in addition to having important knowledge of Anthony's non-violent nature (discussed *supra*) would also have been willing to give testimony of his character in general:

I have known Anthony since he was a little boy. He was a good boy, obedient and he did not cause problems and was well behaved. Anthony was interested in football, basketball and ROTC, as well as church activities. Anthony was not violent. It was a real shock when he was arrested, because the crime was so out of character for him. I had a hard time believing that he had done this. It was a real shock to the entire family.

I never talked to Anthony's trial attorneys and they never called me. I would have been willing to be a witness at Anthony's trial...[228]

Anthony's uncle, Richard Haynes would also have had positive things to tell the jury about his nephew:

I am Donald Haynes's brother and Anthony Haynes's uncle. I have known

---

[227]  *See* Declaration of Myrtle Hinton, Exhibit 16.

[228]  *See* Declaration of Debra Haynes, Exhibit 41.

Anthony ever since he was born. ...Anthony was very intelligent and had a strong religious background. Anthony would travel with his mother and this broadened his social skills. We would attend soccer games together and for awhile I had a lot of contact with Anthony. Sometimes he was withdrawn, but he was not violent. During his teenage years he would sometimes not want to go to family functions, but he was normally very well behaved. He would do a lot of night fishing in Galveston. I never knew him to use drugs. And this did not come to my attention until his arrest[229].

Rhonda Jackson, a Houston Police Department officer, would also have had much good

character evidence to offer if the defense attorneys had taken the time to interview her:

> I am a civilian employee of the Houston Police Department.
> I have known Anthony Haynes all his life. My acquaintance with his parents, Donald Haynes and Patrica Davis dates to before Anthony's birth. My daughter Summer is about Anthony's age and was a friend of his. She was going to ask Anthony to take her to her high school prom, but Anthony was out of state in the Boost Program in Rhode Island.
> When he was young, Anthony was a good kid, somewhat spoiled but well behaved. When his mom and dad split up, he had both households to help with his upbringing. When Anthony was older, he mainly lived with his father. During his childhood, his mother had to live out of state because of her job.
> When Anthony was in high school, he was basically seen by all of us as well behaved and respectful. He did not get into fights as far as I could see. His behavior around my kids was fine. In fact, my older daughter Summer used to call him "nerdy." Anthony was certainly not seen by me as wild or out of control.
> Don and Pat tried to point Anthony in the right direction, and we were all very shocked when we heard the news of his involvement with the killing of the Houston Police Department officer. It was hard for us to believe that it was Anthony who was accused of the crime. Because of what I know about Anthony, at the time he was arrested and the time of his trial I did not think that he was a high risk for committing future dangerous or violent acts. This is also my opinion today....
> Anthony's attorneys or investigators never talked to me. If they had, I would have told them what I have said here.[230]

Angela Malcolm, a long time friend of the family, would also have been an excellent

---

[229]   *See* Declaration of Richard Haynes, Exhibit 42.

[230]   *See* Declaration of Rhonda Jackson, Exhibit 44.

witness at the punishment phase of the trial:

> I met Anthony at a very young age, when his father would bring him to the credit union. ...He was always very courteous and respectful...I have always known Anthony and his family to be well respected and of good moral character. I was never contacted by the defense attorney to testify as a character witness, and I would have gladly done so.[231]

Socorro Herda, who met Anthony in the BOOST program and became a good friend of his, has submitted an extensive declaration that shows she would have been an excellent punishment phase witness for Anthony. She too was willing to do so, but she was never talked to by defense counsel. Ms. Herda would have had much mitigating good character evidence to offer Anthony's jury:

> I still think he is one of the most sincere and honest people I have ever known. Anthony did tell me about things he had done in Houston, such as joyriding, and using marijuana, but he seemed determined to turn his life around. Anthony became one of the few people I considered a true friend, and still do...
> Toward the end of his attendance at BOOST, Anthony seemed to undergo a change in personality. He became fervently involved in a church group and I recall him chiding me on my lifestyle, that it was wrong to go to clubs and being around drinkers.[232]

Renee Lewis, a long-time friend of the family, in addition to giving important evidence as to Special Issue No. One, discussed *supra,* would also have given important positive character evidence if defense counsel had bothered to talk to her:

> For approximately 25 years I have been friends with Donald Haynes and I have known Anthony Haynes since about the age of 8 or 9 months old. I have to say to you that I was completely shocked to learn of this tragic event involving Anthony Haynes because,

---

[231] *See* Declaration of Angela G. Malcolm, Exhibit 64.

[232] *See* Declaration of Socorro Herda, Exhibit 46.

given the type of kid Anthony is, this behavior does not fit with his personality. Anthony's character and disposition has always been one of politeness...This incident is totally uncharacteristic of Anthony's demeanor...My feelings are that Anthony will not be a threat to society if given the chance at a release...Anthony is a good person and I am sure that rehabilitation is a possibility for Anthony if given the chance.[233]

Yolondo Gaines, Anthony's mother's best friend, also would have had many positive things to say at the punishment phase of Anthony's trial:

He was bright, intelligent, good manners, respected authority...He had no behavioral problems....In high school he seemed more mature. He had spiritual values. He was never angry or belligerent. I was devastated when I heard the news of the murder. I cried and thought it couldn't have happened. It was hard to believe they were talking about Anthony. I thought they had to have the wrong person.[234]

Long-time friend of the family Debbie Lucas Moerbe was only briefly talked to by someone, presumably an investigator, on the phone. Despite the fact the she attended a good part of the trial, the defense attorneys never talked to her or asked her to be a witness. She would have had important mitigating evidence regarding Anthony's good character to offer the jury:

At the time we met, my daughter was 12 years old, a little younger than Anthony, and they became friends. I would see Anthony every day when he lived with his mother, and when he lived with his father in Missouri City, I would typically see him on weekends. I liked Anthony from the minute I met him. Anthony is honest and open, and he has never lied or tried to deceive me. He talked to me all the time.
As she grew older, at age 16 or 17, my daughter became rebellious. Anthony was a mediator between us. He would talk to her and then try to reassure me that she would turn out fine. Anthony was a voice of reason to her and he acted very maturely for his age.
Once, I was confronted with a snake in my house, and became hysterical. Anthony came

---

[233]   *See* letter of Renee Lewis, Exhibit 47.

[234]   *See* Declaration of Yolondo Gaines, Exhibit 49.

over and killed the snake for me.  He was a person you could rely upon and who would do anything you asked of him.

I trusted Anthony completely.  I would let him take my car.  He was often in my house at night.  Even when he was living with his father, he would stop by or say hello if I saw him in the neighborhood.

I remember Anthony talking about the Naval Academy, which he was eager to attend.  He also did volunteer work at a local hospital.  It looked like he was an orderly, as he wore white clothes.  He took this hospital volunteer work very seriously.

Anthony would also do spur-of-the-moment good deeds.  Once I took in a Rottweiler dog to help a homeless person.  The dog needed veterinarian attention, and it was too expensive, so Anthony helped me take the dog over to a Rottweiler dog rescue organization in Missouri City who were able to have the work done more inexpensively.  When Anthony's mother married a man named Courtney Davis, Anthony accepted him and they became close.  They had a good relationship.  Anthony never had a disagreement with Courtney Davis.  The step-father- child relationship was very good, better than a subsequent relationship with my daughter and husband.

Courtney Davis had two children: the boy's name was Courtney Jr. and the girl was named Christie.  Anthony also had a good relationship with them.  Courtney was about four years younger than Anthony and Christie was about eight years younger than him.  Anthony would take care of them.  Courtney and Patrika had a child together whose name was Ally, and Anthony baby-sat her.[235]

Lawrence Aaron Tate, a friend of Anthony's , was also not interviewed by the defense and states that "no one in ROTC was asked to testify."[236] If called as a witness, he would have testified to Anthony's good mood and disposition. *Id.*

Cherrie McGlory, an administrator at Baylor College of Medicine, in addition to being an important witness as to Special Issue No. One would also have been an excellent witness as to Anthony's good character:

I came to know Anthony through his father Donald Haynes.  I knew Anthony for 19 years, since he was small.  I got to know him through church attendance with his father, at the New Faith Baptist Church.  Anthony attended regularly with his father.

---

[235]   *See* Declaration of Debbie Lucas Moerbe, Exhibit 50.

[236]   *See* Declaration of Lawrence Aaron Tate, Exhibit 51.

Anthony was a well-mannered and polite kid. He was always very respectful, and a good student, never in trouble. I did not have a lot of contact with him when he was in high school, but saw him periodically over the years. My son, Cory McGlory, is a year older than Anthony. I was not aware of Anthony's friends or any drug use on his part. I knew he wanted to go into the navy...

I did not attend Anthony's trial. I was never talked to by the defense attorneys or investigators. If they had contacted me, I would have told them what is in this declaration. If they had asked me to be a witness for Anthony at his trial, I would have been willing to be one.[237]

Portia Rose, whose son was a year younger than Anthony, would also have had many

good things to say about him had she been interviewed by the defense attorneys:

I have a son a year younger than Anthony. I was friends with Anthony's father Donald Haynes. We were at the University of Houston together. I was a freshman and he was a senior. We also lived in the same neighborhood, and would do things together. Donald and I would coach our son's teams.

I got to know Anthony through sports activities and when Don was at my house. Don was a good parent. Anthony was a pretty good kid. Don was a strict disciplinarian, and Anthony was respectful. Don took Anthony to church. Anthony was also in ROTC in high school. Don had modified his life to make it conducive to raising his son. Anthony seemed like a good student, and I never knew that he used drugs. I did not know Anthony's friends.

The last time I saw Anthony was when a friend had a Christmas party and Don picked Anthony up at the airport. Anthony told us about the BOOST program he was in. He spoke well about the program and he was animated....

Anthony's defense attorneys never talked to me at the time of his trial. I did not attend the trial. If the defense attorneys or investigators had talked to me, I would have told them what I have said in this declaration. If they had asked, I would have been willing to be a witness for Anthony at his trial.[238]

Darryl Smith, a Police Officer with the Missouri City Police Department, also had some

important background information to tell the jury:

---

[237]   *See* Declaration of Cherrie McGlory, Exhibit 53.

[238]   *See* Declaration of Portia Rose, Exhibit 56.

-204-

I have known Anthony Haynes since he was a child.   He lived in the same neighborhood, and played with my son Darryl Smith Jr.  Anthony always displayed good manners and was very polite and respectful.   Anthony and my son played football together, fished and did normal activities.  In my opinion Anthony was a[n] all around good kid.[239]

Bonita Padmore, a long-time friend of the family, was likewise never contacted by the defense attorneys but would have been an excellent witness at the punishment phase of the trial: "He (Anthony) was a very mannerly person and showed much respect for me...Anthony was a Junior Groomsman at my wedding."[240]

Devlin Jackson, a correctional officer who was never talked to by the defense attorneys, would have told Anthony's jury that he "visited the family frequently and had first hand knowledge of Anthony and his character which has always been very good."[241]

Toya Terry, a friend of Anthony's, would also have had much positive information to give to his jury:

My relationship with Anthony was one of the best things to happen to me. He was very gentle, compassionate, and sensitive. But at the same time strong-minded and assertive in what he wanted. He strove to be a good student and accomplished great achievements in the ROTC at Dulles High School. He loved my family, my friends, and me and did his best to please us all. I never felt, nor did anyone close to me, as though Anthony was a danger or would cause harm at any point in our relationship.  He always showed respect towards my loved ones and me...
They [the media] played him out to be a common thug with no direction and no goals, someone who was out looking to be a nuisance to society and a troublemaker. Anthony was none of these.  He worked hard and cared about his family and friends and would

---

[239]   *See* Declaration of Darryl Smith, Exhibit 57.

[240]   *See* Declaration of Bonita Padmore, Exhibit 58.

[241]   *See* Declaration of Devlin Jackson, Exhibit 59.

never intentionally jeopardize his well being or those whom he was associated.[242]

Despite the wealth of mitigating information Ms. Terry had, Anthony's attorneys never

called her as a witness. Given the importance the Supreme Court has placed on such

**Claim I(r): The defense attorneys were ineffective for failing to present evidence of remorse on the part of their client.**

Despite much evidence that Anthony was extremely remorseful after the shooting, the

defense failed to use this evidence, which would have been very relevant as to both special

issues at the penalty phase of his trial.

Both parents and both grandmothers could have testified as to Anthony's remorse, as

they had frequent contact with him after his arrest. Tiffany Deckard, a close friend of

Anthony's, could also have told the jury of his remorse had she been interview by the defense:

> The day after the incident, Anthony showed up at my house. He was scared and did not know what to do. Someone turned on the Channel Two News and his picture was on. Anthony said he had shot someone and said he had done some things with other people first. In these other incidents, he said he did not point the gun at them, but they saw it. Regarding the incident when he shot someone, he aid the man was reaching for something in his back. Anthony also said the person was cursing and calling him names. Anthony also said he was trapped by the guy who was cursing up a storm. As soon as the person walked up, Anthony said his voice got louder and Anthony said he felt that he was going to be grabbed or dragged out of his vehicle. The man's hand went to his back and Anthony felt he had to protect himself. As soon as the gun went off, Anthony said he was in shock. Anthony said he was sorry and remorseful. He told me all this the next afternoon, when I was life-guarding at a local pool. I told him to go to the police...
>
> During the trial, I talked with Mr. Jones, one of the defense attorneys, twice, and with Mr. Nunnery four times, but this was just outside the courtroom. But they never went into detail about anything I had to say. Mr. Nunnery would just want to know things quickly, and once he knew I was "the girlfriend," he did not want to know anything else. A male investigator talked to me once for about five minutes. I told the attorneys about the incident when Anthony told me about the shooting and how he was

---

[242] *See* Declaration of Toya Terry, Exhibit 61.

remorseful, but Mr. Nunnery told me he was not going to put me on the stand because I had a short relationship with Anthony. Terese was angry with Mr. Nunnery for not doing anything. I did not talk with Mr. Jones at all, and he was distant. Mr. Jones basically brushed me off...

I attended the trial every day, thinking that I was going to be a witness. The attorneys never asked me to testify. If they had, I would have been willing to testify and I would have told them what I have said here.[243]

Tonya Terry also speaks of Anthony's remorse directly after the shooting.[244]

**Claim I(s): The defense attorneys were ineffective in failing to offer evidence that would have discredited misleading punishment phase testimony from Col. Davis regarding a verbal altercation at school.**

As summarized *supra* in the statement of facts, the State's case at the punishment phase was so weak they had to resort to using Col. Larry Ray Davis to testify to a verbal altercation between him and Anthony at the Dulles High School ROTC Program. The incident occurred in November of 1996, at the beginning of an ROTC class, when Anthony did not stand to attention properly. 28 RR 50, 69. An exam was then administered and returned to the defendant and he became upset at the grading. 28 RR 49. Mr. Haynes looked at another student's test and said "This wasn't right, it wasn't fair." 28 RR 51, 70. Col. Davis testified that, even though Anthony's prior demeanor and behavior had been correct, he directed another ROTC official to call the campus police to ensure the safety of the other students. 28 RR 52. Col. Davis then asked Anthony to go to his office. 28 RR 53, 71.      The picture painted by Col. Davis was very misleading, and could have been effectively countered had the defense

---

[243]   *See* Declaration of Tiffany Deckard, Exhibit 14.

[244]   *See* Declaration of Tonya Terry, Exhibit 61.

-207-

bothered to call as a witness the individual who actually ran the Dulles ROTC Program, Sgt.

Allen Harris.[245]  Sgt. Harris would have given a dramatically different picture of both Anthony

and the incident:

> I first met Anthony when he came into the ROTC program as a freshman.  He loved ROTC.  He saw it as a way to make a mark.  He once said that one of the things he was interested in was flying.  He was aiming at attending the Naval Academy.
>
> In the ROTC program, Anthony was on the drill team and eventually became an officer in the program.  There are about 125 students in the program.  In freshman year, the emphasis is on doing what you are asked to do.  There is also a summer leadership school, which Anthony completed.  In the second year, there are more leadership responsibilities. Only 50 of the 125 students go to the summer leadership program.
>
> Of the 125 students in the program, about 25 to 30 become officers.  Anthony came through well and he was made an officer.  He had some problems but I always had a good student-teacher relationship with him.  Anthony loved the structure of ROTC and loved the program because of its consistency.  I saw Anthony grow up and mature in the program.
>
> I remember one day in November of 1996 when Anthony got into a shouting match with my boss, Col. Davis.  I got between them and I asked Anthony, "What are you doing?"  I then took him aside.  Anthony said "You're right."  I came at him a different way than Col. Davis, because I wanted him to be successful.  Anthony then went to the administration office voluntarily.  This is the only incident I saw when Anthony was not well behaved.  After that, Col. Davis saw Anthony differently. It made him see Anthony negatively.  Col. Davis handled the incident differently than I would have.
>
> I am aware that after this incident, the kids were setting up a military ball and Col. Davis said he was going to exclude Anthony from it.  We worked it out so that Anthony's grandmother and his mother Pat would accompany him to the Military Ball, as he wanted to attend very much.
>
> Anthony would hang out mainly with other ROTC cadets.  On the whole, Anthony did very well in the Dulles High ROTC program.  He became an officer, and he had good honors.  Out of all the students in ROTC, at the time he graduated, Anthony was fourth best in the program.

---

[245]   Although Sgt. Harris was the deputy director of the program, and Col. Davis was the director, Sgt. Harris actually had more day-to-day, hand on responsibility, and Col. Davis was seen as a figurehead, and something of an ineffectual one at that. *See* Declaration of Barbara Taveras, Exhibit 39.

The BOOST program is a program to enable minorities to become officers in the Navy, to get them ready. BOOST is a pre-academy program. I did not want Anthony to go into the BOOST program, but Anthony wanted to attend the Naval Academy. Anthony needed a little help to get his grades up, and I thought a learning center would have been better. In the BOOST program, if a person doesn't do everything right, they are out. Anthony tried to make a good decision.

I saw Anthony the week he came back from the BOOST program. He told me he did not make it in the program. But he said he had another option of attending Prairie View A & M which had a Navy program. His goal was to go to Prairie View and prove himself.

I spoke with both of Anthony's defense attorneys on the phone and told them essentially what I have said in this declaration. I also talked with two persons who were probably from the prosecution, as they told me "We have Col. Davis." Since they had Col. Davis, they said they would not call me as a witness at the trial. I think it was a prosecution investigator that called me first, then a prosecutor. No one asked me to be a witness for Anthony, but I would have been willing to be a witness if I had been asked. At the time of the trial, my feeling was that the act that he was charged with, the killing of the police officer, was totally out of character from the Anthony I knew. I did not see anything like what he was charged with in his character. At the time of the trial, it was my opinion that Anthony was a very low risk for committing future violent acts, and that is my opinion now. I would have told this to the jury at Anthony's trial.[246]

As Col. Davis's testimony was seen as important by the State, there would have been no valid reason not to call Sgt. Harris to put a proper perspective on both the incident and their client. The reason it was not done was an obvious lack of investigation and preparation, which prevented the trial attorneys from realizing the significance of this witness.

Earl Washington, Sr., a Houston Fire Department officer, spoke to Col. Davis before the latter testified, and could have also discredited him had the attorneys called him as a witness:

At school, Anthony joined the ROTC, and he spoke well of it. His aim was to obtain a navy scholarship. Anthony did tell me of a blow-up at school. I met Col. Davis after the incident, and in court. He spoke highly of Anthony at the court. He said he had been trying to persuade Anthony to pursue higher degrees and extend his scholarship. Col. Davis said he could not believe what happened in regard to the killing of the police

---

[246]  *See* Declaration of Sgt. Allen Harris, Exhibit 35.

-209-

officer.  At court, Col. Davis' opinion of Anthony was twisted around.[247]

Yet Mr. Washington was never even interviewed by the defense attorneys.[248]

Similarly, Barbara Taveras attended Dulles High School and the ROTC program with Anthony Haynes and could have told the jury that Sgt. Harris had more input into running the program than Col. Davis, making the defense's failure to call Sgt. Harris as a witness all the more prejudicial and damaging, as the jury would likely have believed Harris over Davis had he been called as a witness:

> I knew Anthony at Dulles High School.  I first met him in the seventh or eighth grade, and also knew him outside of school.  We were in ROTC together. Col. Davis was the highest ranking officer in that program, and he was tough.  Although he was higher ranking than Sgt. Harris, Sgt. Harris was more in touch with the kids.  Although Col. Davis would sometimes instruct, often he was not there, and Harris ran the program more than Davis.[249]

Even more important would have been the testimony of Tiombe Davis, who was also in the ROTC program at Dulles High School with Anthony, and could have given a much more accurate picture of Col. Davis:

> The ROTC program at Dulles High School was actually run by Sgt. Harris and not by Col. Davis.  Col. Davis was an angry old man who mainly stayed in his office or went golfing.  If it was sunny, Col. Davis was usually golfing.  He did yell at the cadets sometimes.  Col. Davis was there mainly for the military structure, but Sgt. Harris gave most of the lectures, took roll call and told us what we had to do.
> I remember an incident once when Col. Davis was teaching a class and Sgt. Harris was

---

[247]   *See* Declaration of Earl Washington, Sr., Exhibit 36.

[248]   *Id.*

[249]   *See* Declaration of Barbara Taveras, Exhibit 39.

-210-

talking to a group of us in the office. Col. Davis came in after yelling at Anthony. Col. Davis had not liked Anthony's response to something, and said that Anthony did not have leadership skills. Anthony did go to the principal's office because o this incident, but it was not a big deal because he did not get a write-up over it. Col. Davis decided to punish Anthony by denying him permission to attend the Military Ball. Other than this incident, I never saw Anthony in trouble and never saw him blow up in class.[250]

**Claim I(t):** **Trial counsel were ineffective for failing to object to speculative testimony.**

Defense counsel failed to object to Officer Miller's testimony regarding the handgun's propensity to jam. The following testimony was received:

Q.  During the conversation you had with the defendant when he gave his two statements, I think you indicated that the weapon was a horrible weapon and it was only fired one time?

A. Yes.

Q. If it only fires one time, then this means he would have to get it ready to fire a second time, correct?

A. If it jammed, like he said that it did, then he would have had to clear the jam and get it ready to fire again, yes. He would have had to have done that.

Q. He would have had to take the deliberate steps to jam, to clear it and then rearm it; is that correct?

A. Yes, that's correct. He would have had to clear the jam and remove the jam casing from the gun and then reload it again and cock it.

26 RR 40-41.

---

[250]  *See* Declaration of Tiombe Davis, Exhibit 65.

There was no defense objection to this testimony. It is common knowledge that not all hand gun jams have to be manually cleared, as, depending on the cause of the malfunction, a gun will often misfire or jam on a first shot, and a second shot will clear the jam. As even the state's own witness, Houston Police Department firearms expert Robert Baldwin, testified that "the fact that the firearm functioned at a given point in time doesn't necessarily exclude the possibility of a misfeed at some other time." 26 RR 120. In the same manner, a misfeed at some point would not necessarily mean a subsequent misfeed would occur. Additionally, the prosecutor's representation of what Mr. Haynes stated is also inaccurate, as he said only that "[t]he gun was a horrible pistol it jammed on the first shot anyway...it jammed...it went...it never shot one shot." Statement No. 1 at 14. He later stated that "I put the gun in my ...in my...in my lap you know I'm thinking it's not gone shoot noway you know." *Id.* Thus far from the impression the jury received that there was a deliberate manual clearing of the jam, Mr. Haynes actually thought the pistol would not fire after the jam.

**Claim I(u): Trial counsel were ineffective for preventing Petitioner from testifying and presenting the only two defenses available to him.**

**A. Facts in Support.**

As discussed above in the Statement of Facts, evidence was presented at trial to show that Kent Kincaid was an off-duty Houston police officer traveling with his wife in his personal vehicle, a jeep, on the way to a bar at approximately 11 p.m. on the evening of May 22, 1998, when his windshield was damaged. He turned his car around to pursue a pickup truck whose occupants he believed responsible for the damage. When the truck stopped he exited his vehicle

and confronted the driver of the pickup, who remained inside the truck. Mr. Kincaid said he was a police officer and reached toward the rear side of his waist. At that point Petitioner allegedly fired one shot, killing the off-duty officer. 23 RR 109-146.

## B. Argument.

Petitioner has never denied shooting Sgt. Kincaid. In fact he gave statements to the police in which he admitted the shooting. 25 RR 200; 26 RR 27. However, he has maintained that he did not know the decedent was a police officer, although he heard Mr. Kincaid say something about police, and the only reason he fired was because he thought that the man who was confronting him, Kincaid, was reaching for a gun. As Petitioner indicates in his affidavit, attached to his state writ as Attachment A,[251] he was aware that he was the only one who could tell the jury that he fired because he thought, rightly or wrongly, that he was acting in self-defense. He was the only one who could explain that at the time of the shooting, he did not know Sgt. Kincaid was a police officer, although he did hear Kincaid say something to that effect. He did learn that Sgt. Kincaid was an off-duty officer from the television news, after the shooting, but before his arrest and subsequent interrogation.

His lawyers did not attempt to present any evidence that Petitioner was acting in self-defense. They attempted to show, through argument and cross-examination, that Petitioner might not have known Sgt. Kincaid was in fact an officer, but they dissuaded Petitioner, the only one who could explain what was in Petitioner's mind at the time of the shooting, from testifying.

---

[251]   Exhibit 6 at 67-69; Habeas Tr. 67-69.

As discussed above, Petitioner is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner understands that he had the right to testify or not, but he decided to place his faith in his attorneys. Mr. Haynes contends that any reasonably competent attorney could not but recognize that his only hope of showing the jury that he was not guilty of capital murder was to convince them that he was not sure the decedent was an officer, and to explain to them that he was in fear, justified or not, when he fired. On advice of counsel, Petitioner abandoned his only chance to tell the jury what really happened. No other defense was possible other than those which only the Petitioner could put forward because both pertained to his own perceptions and state of mind. By advising Petitioner not to testify, trial counsel deprived him of his only defenses and explanations of what happened that night. To advise a defendant not to proceed with his only available defenses in a capital murder case is to provide less than reasonably effective assistance of counsel. Counsel failed to pursue, by the best means possible, the only two defenses which Petitioner could offer.

**Claim I(v): Counsel were ineffective for failing to have bench conversations recorded.**

Trial counsel repeatedly failed to have crucial bench conversations recorded. *E.g.,* 23 RR 4; 23 RR 75 (unrecorded off-bench conversation relating to Houston Police Department rules and regulations); 23 RR 157 (unrecorded conversation at bench conference at end of victim's wife's testimony); 23 RR 159 (unrecorded bench conversation at end of day's testimony); 24 RR 97(unrecorded and possibly crucial bench conference relating to the admission of a prejudicial autopsy photograph); 24 RR 172 (unrecorded bench conversation relating to the raid on Mr. Reece's house); 25 RR 99 (unrecorded and potentially important

bench conversation relating to a Houston Police Department order regarding the definition of "off-duty").

These unrecorded conversations prevented Mr. Haynes from having the issues preserved for appeal and prevented a complete appellate record from being prepared. Mr. Haynes was thus deprived of his constitutional right to due process and a fair trial under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

**Claim I(w): Counsel were ineffective for failing to object to hearsay.**

Trial counsel failed to object and allowed the custodian of records to testify as to what happened at the hospital, which is hearsay. 28 RR146. They also failed to object to harmful hearsay about Anthony attempting to kill the family dog and assaulting a staff member. 28 RR

1) Pam Rogers, a medical record custodian for the University of Behavioral Health (28 RR 144) was the custodian of records for the defendant's psychiatric records. 28 RR 145. She testified that Anthony was first seen on September 17, 1996 and again on October 22 and October 29, 1996. 28 RR 146. She also testified, on the basis of the records, that he had anger issues (28 RR 146) and he was admitted to the hospital on November 1, 1996 for intermittent explosive disorder and cannabis dependence. 28 RR 146. The admission form stated that he had tried to kill the family dog, and he attempted to attack a staff member with a shower curtain rod. 28 RR 147. During his stay, Ms. Rogers testified that Mr. Haynes received Ativan, Thorizine, and Tetregol medications. 28 RR 148.

These records were obviously allowable under the official records exception to the hearsay rule. But this testimony went far beyond that allowed under the medical records

-215-

exception to the hearsay rule, as she was interpreting various diagnoses, and the records themselves.

2) Judy Miller, the health information manager for the West Oaks Hospital, and the custodian of records for that institution, testified that Anthony Haynes was admitted to the facility on November 1, 1996 on a provisional diagnostic profile of intermittent explosive disorder. 28 RR 151. A nursing note stated that on November 3, 1996 he became agitated, slammed the door and had an angry affect. 28 RR 151. Also in the notes are a statement that if anyone touched him they would be dead in 48 hours. 28 RR 152. The notes also indicated that the next day, he became agitated and kicked the doors while using profanity. 28 RR 152. The notes also indicated he tried to hit one of the staff with a curtain rod. 28 RR 153. He also said he was going to get a gun and "blow them all away." *Id.* This witness never had any personal contact with the defendant. *Id.* He was released on November 10. *Id.* He was finally released from day treatment on November 22. 28 RR 154.

Here again, by interpreting the records, and commenting on them, the testimony went beyond that allowed under the official records exception to the hearsay rule.

**Claim I(x): Counsel failed to request a limiting instruction with respect to victim impact evidence.**

When the State offered through the decedent's wife's testimony concerning the effect which her husband's killing had upon her and her two young daughters, defense counsel, obviously aware of the powerful effect of such testimony, objected. His objection was

-216-

overruled, and the testimony was admitted. Counsel was entitled to and subsequently should have requested a limiting instruction to the effect that the victim impact evidence cannot be considered for any special issue other than the mitigation issue. *Smith v. State*, 919 S.W.2d 96. However, no such limiting instruction was requested, and none was given. Counsel's failure to attempt to limit the damaging effect of this inflammatory testimony falls short of the standard expected of reasonably effective counsel. There can be no sound trial strategy for failing to get the limiting instruction in this instance, therefore, counsel's performance was deficient. *Young v. State*, 991 S.W.2d 835 (Tex. Crim. App. 1999).

Petitioner's sentence should be overturned, and the Court should impose a sentence of life, or, in the alternative, order a new trial on punishment.

**Claim I(y): Cumulative errors and omissions of counsel rendered his trial unfair.**

As *Strickland* makes clear, the evaluation of attorney error should be done as a whole:

> In making this determination, a court hearing an ineffectiveness case must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. *Strickland,* 104 S. Ct. at 2069.

The prejudice prong is met if the errors of counsel, taken as a whole, constitute error which tends to diminish the Court's confidence in the outcome of the trial.[252] There are two

---

[252]   As the *Strickland* court stated, "in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 2069.

components of this claim: "cumulative-prejudice"---that counsel's constitutionally deficient actions, viewed together, give rise to a finding of prejudice---and "cumulative error"---that counsel's deficiencies together amount to ineffective assistance of counsel.

The Ninth Circuit has found on at least two occasions that counsel's numerous deficiencies amounted to cumulative prejudice. In *Harris By and Through Ramseyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995), the court that counsel's numerous deficiencies---at least eleven--- cumulatively prejudiced the defendant.[253] In so holding, the court relied strongly on *Strickland's* emphasis on the fundamental fairness of the proceeding and the seriousness of the numerous errors:

> We do not hesitate to conclude that there is a reasonable probability that, absent the deficiencies, the outcome of the trial might well have been different. Indeed, the plethora and gravity of [counsel's] deficiencies rendered the proceeding fundamentally unfair.
> *Id.* at 1438-39.

The court concluded that analysis of the individual prejudicial effect of each deficiency was unnecessary. *Id.* at 1439.[254]

Similarly, in *Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992), *cert. denied,* 113 S. Ct. 1363 (1993), the Ninth Circuit held that the cumulative effect of counsel's errors at the penalty phase

---

[253]  Many of counsel's errors in *Harris* were similar to those in Mr. Haynes's case: "(1) failure to investigate and prepare adequately for trial; (2) failure to consult adequately with [defendant]; (3) failure to investigate adequately [defendant's] mental and emotional status; (4) failure to challenge the admissibility of [defendant's] statements made before [trial] regarding the events of the murder;...and (11) closing argument in the guilt phase." *Id.* at 1438.

[254]  The court noted that it did not rule out that some of the deficiencies were individually prejudicial.

of a murder defendant's trial amounted to prejudice to the defendant. The court reasoned:

> We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel [a finding of prejudice].
> *Id.* at 622[255]

Each of the individual deficiencies of counsel described above in this claim, *and* the combination and totality of these errors, resulted in a violation of Mr. Haynes's right to competent counsel and a fair trial.

## CLAIM II: PETITIONER WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL BECAUSE THE PROSECUTION USED RACIALLY-MOTIVATED PEREMPTORY CHALLENGES TO EXCLUDE AFRICAN-AMERICANS FROM HIS JURY.

A state cannot challenge potential jurors solely on account of their race. The State's purposeful or deliberate denial of jury participation to African American veniremembers Kirkling, Goodman, McQueen and Owens, respectively, violated Petitioner's constitutional rights to a jury selection process free of racial discrimination. U.S. Const. Amend. XIV; *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712 (1986); *Miller-El v. Dretke,* 125 S. Ct. 2317 (2005).

By any analysis, Mr. Haynes made a very strong *prima facie* case of racial motives for the exclusionary striking of African-American prospective jurors by the prosecution. Four out of six African-Americans were struck by the prosecution; only one African-American out of five eligibles was accepted by the prosecution (20%); and the State used roughly thirty-three percent

---

[255] *Citing United States v. Tucker,* 716 F.2d 576, 595 (9th Cir. 1983); *Ewing v. Williams,* 596 F.2d 391, 395 (9th Cir. 1979); *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir. 1978). Although *Mak* did not address the issue, the *Harris* court explicitly noted that the cumulative-prejudice theory established in the Ninth Circuit's pre-*Strickland* cases survived that decision. *Harris,* 64 F.3d at 1439.

-219-

of its strikes to remove approximately eighty per cent of the African-Americans from the jury panel.[256] 22 RR 14 *et. seq.* This *prima facie* case of racial discrimination was not discussed by the state court opinion, except to mention it in passing. Exhibit 5 at 13-18. Instead, the Texas Court of Criminal Appeals uncritically adopted virtually verbatim the prosecutor's trial explanations of the strikes, despite the fact the record did not support the explanations and despite the disparate treatment and questioning of white jurors who sat on the jury, all of which showed the prosecution's rationale was pretextual.

### A. Facts in Support:

On September 13, 1999, upon completion of voir dire and prior to impaneling the jury, Petitioner's counsel asserted a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986) to the State's exercise of peremptory challenges. 22 RR 12-13. The following exchange transpired:

NUNNERY: Your Honor, first of all, for the record, I would ask that the Court take judicial notice that the defendant in this cause, Anthony Cardell Haynes, is a black American. I'd ask the record to further take notice of the fact that of the 50 jurors in the pool—one, two, three, four, five, six, seven—seven that qualified are African-American origin. That with the exception of Mr. Alton Moore, juror number 47, who we were not able to reach, all the other jurors of African American descent were reached.

I would ask the record to further reflect that juror...Twanna Kirkling, a black female, was struck by the State of Texas.

---

[256] "There were 50 people in the venire, seven were African-Americans and six appeared for voir dire." Exhibit 5 at 14. The State used four of its thirteen strikes to exclude four out of five African-Americans. Only one African-American was seated on the jury. *Id.*

-220-

THE COURT: That's number 11.

NUNNERY: Black female was struck by the State,...Melba Goodman.

...

NUNNERY: Juror number 15, Melba H. Goodman, is a black female that the State struck.

Juror,...L.V. McQueen...

THE COURT: Yes.

NUNNERY: ...is a black male the State struck, and juror number 40, Betty Owens.

THE COURT: 41

NUNNERY: 41 is a black female and the State struck.

And judge, what were the total number of strikes that the State used?

THE COURT: Not counting the alternates, 15...I'm sorry.  13 strikes.

NUNNERY: Well, they used one, two...four of their 13 strikes which is roughly 30 percent of...33 percent of their strikes, Your Honor, to eliminate roughly 80 percent of those blacks in the veniremen.  We think just the sheer numbers raise a presumption of a racial motive for the strikes, and we would ask the Judge to order that they articulate on the record why those black jurors were excluded.

THE COURT: All right.  Number 11, Ms. Kirkling, from the State.

THE STATE: First of all, I would like to make the record clear on the list before I proceed.  We accepted Melba Williams [sic] [Melba Lynett White]

THE COURT: Let's talk about numbers.  Number 8.

-221-

THE STATE: Number 8 was a black female. We accepted her. The defense struck.

...

Twanna Kirkling, number 11, the State exercised a strike for Ms. Kirkling because, during her interview, she said capital punishment was a last resort, meaning several times she hesitated in responding to the questions about the death penalty. She never would give a firm conviction, Your Honor. For that purpose, I did not trust her. I would strike her again if I had another strike.

THE COURT: I find that to be a reasonable race neutral reason.

NUNNERY: Your Honor, just for the record, two things I would like to at this point assert: The [sic] record needs to reflect in this matter that with respect to the individuals voir dired, that this Judge, namely, Judge Wallace, was not present but Judge Harper so the Court does not have the benefit of having participated in the individual voir dire. Let the record further reflect with respect to juror number 8, Melba Williams White [sic] the defense during individual voir dire made a motion to challenge her for cause and the State obviously knew that I would strike her and, if so, I'm just not impressed with the fact that they found her acceptable. They had to know that I was going to strike her.

THE COURT: Mr. Vinson.

THE STATE: With respect to Mrs. Kirkling, again, I want to put some more on, Your Honor, that as she looked at capital punishment she said she sees it as a necessary evil. I feel it meant indication [sic] that there is something impermissible about having such punishment available to the State. She further avoided giving any direct position on

-222-

capital punishment that it was a viable object for the State, and, furthermore, she stated that life, 40, is a justifiable punishment. And for that, since she had a preconceived notion toward capital punishment, we exercised our strike.

NUNNERY: For the record, we believe that is a mischaracterization of her voir dire...those reasons exercised by the state with respect to that juror are pretext and simply does not equate with what some of the jurors in the pool said that have already been accepted.

THE COURT: Very well. Number 15.

THE STATE: Ms. Goodman, number 15. Ms. Goodman, during...again, these are my impressions of the interview. I think I have the right to have that impression. We [sic] opposed [sic] death punishment. She refused to answer questions about capital punishment. She reluctantly agrees [sic] that capital punishment for police officers [sic] should be available. She also demonstrated through her demeanor that she was very anti-capital punishment and I have picked a number of capital jurors and I did not trust this juror.

THE COURT: I find it to be race neutral.. Number 30.

THE STATE: And where Ms. McQueen [sic], again, when questioned, Ms. McQueen [sic] would give me all the indications that in response to my questions by the language of demeanor [sic] that he was very weak on the death punishment and did not...and stated that there were some cases that I could not give a death sentence even if the law permitted such and again I struck him as well.

-223-

NUNNERY: Your Honor, for the record, they have a challenge of [sic] cause if, in fact, he said that they could challenged [sic] her for cause and, furthermore, the questionnaire will reflect that he checked four that he was in favor of capital punishment on his questionnaire.

Again Judge, it's pretext for an obvious racial reason to eliminate that juror.

THE COURT: It's race neutral.  Number 41 [Betty Owens] please.

THE STATE: During the interview, this lady's demeanor was one, I guess, best I can describe it, somewhat humorous.  She never did take on a serious attitude during the interview.  She would say one thing but her body language would indicate that this is not her true feeling.  And I'm sure that Mr. Jones reasonable expected us to strike this lady after she was interviewed because I think Mr. Jones voir dired her and he only talked to her for a very short time because he was very pleased with the things she said, more as she was leaning toward them.  If the defendant was found guilty, she would certainly be leaning toward a life sentence.  And with that, I drew a conclusion in my mind, based on my observation, that she  already had a predisposition and would not look at it in a neutral fashion.

JONES: ...in regard to that juror, her questionnaire certainly shows that she was a juror who had a leaning toward the State's case in a capital case.  As a matter of fact...she indicated she understood the law and she would apply the law and she would not be biased to either side.  I think it is a misconception that I had a feeling that she was friendly towards me and she was responsive to the questions.

-224-

NUNNERY: Let me indicate, for the record, having tried a number of capital cases, that's it's always been my feeling that the state does not want educated blacks on their jury. This particular juror is a nurse and she has a college degree and, therefore, she would probably bring thought processes and that' something the State has consistently shown not to be interested in.

...

THE COURT: It's race neutral.

(22 RR 13-20; 2 CR 435)

## B. Argument.

The trial court's finding that the State's exercise of its peremptory strikes against these veniremembers was based upon race-neutral reasons was clearly erroneous and unsupported by the record, and, as it was made by a judge who did not preside over the voir dire and is not entitled to any presumption of correctness by either the state courts or this Court. The trial judge, having not presided over the individual voir dire process of the prospective venire, abdicated his position of judicial impartiality by fully accepting the State's explanations for their strikes against the prospective minority veniremembers. The Texas Court of Criminal Appeals' upholding of this finding was clearly erroneous and was a decision that was contrary to and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States (the *Batson* and *Miller-El* cases).

To summarize the three-step inquiry created by *Batson v. Kentucky*, 476 U.S. 79 (1986), the defendant must first make a *prima facie* showing that the prosecution exercised its

-225-

peremptory challenges based on race.  Under *Batson,* a defendant establishes a *prima facie* case by showing that:

1) He is member of a cognizable racial group.  Petitioner did this, as it was acknowledged by the state courts that he is African-American.  *See, e.g.,* Exhibit 5 at 14 ("the record establishes that Haynes is African-American").

2) The prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race.  Petitioner also established this, as the prosecutor struck four of five African-Americans from the jury and used approximately thirty-three percent of its strikes to remove approximately eighty per cent of the African-Americans from the jury panel.  *See* Exhibit 5 at 14 and discussion herein.

3) These facts and any other relevant circumstances raise an inference the prosecutor used peremptory challenges to exclude the venire members on account of their race.  Petitioner also showed this, as the strikes were overwhelmingly focused on African-Americans and mere chance could not likely account for the manner in which they were directed.  There were many additional "relevant circumstances" here, ignored by the state courts, such as disparate questioning of blacks, allegedly race-neutral reasons for the strikes that were not supported by the record, reasons for the strikes that did not make sense, and disparate treatment of whites accepted on the jury who answered questions similarly to blacks who were excluded.  Thus, a *prima facie* showing was made here.

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson, supra,* at 97.  Finally,

-226-