# United States District Court
# Southern District of Texas

## Case Number: H-05-3424

## ATTACHMENT

Description:

☐ State Court Record        ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part 4 of 4

☐ Exhibit to: _____ Vol. II _____
number(s) / letter(s) _____

Other: _____ Petition For Writ of _____
_____ Habeas Corpus _____
_____

sustained. A motion for a mistrial was denied. 27 RR 50. Even after these two warnings, the

prosecutor persisted:

Because it would be hypothetically critical and I didn't come in here neutral. I want you
to know where I am coming from. I didn't come in here neutral. It would be the same if a
family member of yours...

27 RR 50.

Another defense objection was sustained and another motion for a mistrial was denied.

*Id.*

**Claim VI(e):** **The prosecutor attempted to shift the burden of proof at final
argument.**

At guilt/innocence final argument, the prosecutor stated the following:

Did anyone come in here and say he was not on duty? Have you heard anybody come
in here and say Sergeant Kincaid was not on duty? Not one. And I say if somebody was
around can say it, don't you know they would have been in here. Those are two very
bright lawyers. Do you think that they would let that chance slip by?
27 RR 53.

A defense objection was sustained and a motion for a mistrial was denied. *Id.*

**Claim VI(f):** **The prosecutor engaged in improper and irrelevant questioning
regarding religion:**

The prosecutor Mr. Vinson asked the following question:

Well, then as a religious man, being a religious man do you know if Sergeant Kincaid

had an opportunity to be at peace with God when he was shot and killed?

28 RR 190.

This was obviously improper questioning regarding religion. This line of questioning

-267-

was repeated:

> Q. And listen to my question, sir. The defendant here, based on what you have testified to this jury, has had an opportunity to pray and ask for forgiveness?
> A. Yes, sir.
> Q. But you don't know if Sergeant Kincaid ever had an opportunity?
> A. I do know.
> Q. Just a minute. As God has accepted him into His Kingdom, do you know?
> A. I know that he has had the opportunity.
> Q. You don't know that because this defendant took that away?
> A. I know that. He was alive. He heard something about Jesus.
> 28 RR 191

**Claim VI(g):** The prosecutor asked about gang allegations in an effort to improperly prejudice the jury.

The prosecutor engaged in improper questioning regarding gang affiliations of the defendant, in an attempt to prejudice the jury, although there had been no such evidence. Mr. Smyth asked prison expert Roy Smithy as follows:

> Q. Sir, there are gangs in the Texas prison system, violent gangs?
> A. Yes, sir.
> Q. Is there a group of inmates, an inmate join (sic) if he wants to?
> 29 RR 24.

There was a defense objection which was sustained, but the damage was still done.

**Claim VI(h):** The prosecution engaged in improper questioning of a defense witness at the punishment phase.

Prosecutor Mr. Smyth asked the following question of the prison chaplain:

> Q. Sir, the defendant, you said he is fairly intelligent; is that correct?
> A. Yes, sir.
> Q. So it means that it (sic) is smart enough to know that it is in his best interests to behave in the Harris County Jail prior to going to trial for a capital murder of Kent Kincaid, wasn't it.
> 29 RR 31.

-268-

A defense objection, on the basis that it called for speculation, was sustained, but the damage was done.

**Claim VI(i): The prosecution asked questions that misrepresented the evidence**.

The prosecutor asked family friend Mr. Larry Britt the following:

Q. Have you heard that when he gets angry, he likes to kill, kill, kill?  Have you heard that?

29 RR 44.

This was not objected to by the defense.  There was no such evidence that he "liked to kill" when he was angry, only that some threats may have been made when he was angry.  This would have had immense impact on the jury's answer to the question of the probability of Anthony committing acts of criminal violence.

**Claim VI(j):  The prosecutor improperly gave his opinion at punishment phase final argument.**

The prosecutor Mr. Smyth stated the following to the jury in final argument:

And before you ever walk up to another car...I know I would.  I'm not going to walk up. I'm going to step back and maybe I'll tell them the directions but I'm not going...

30 RR 17.

A defense objection was sustained, but the damage had been done.

**Claim VI(k): The prosecutor made repeated improper arguments to the jury at the punishment phase.**

The prosecutor, upon commencing his final argument, told the jury that what he had to say to them "comes from the heart."  30 RR 15.  Defense counsel did not object.  Shortly

thereafter, the prosecutor told the jury "I'll bet you the next time somebody comes or hollers at you to give directions you are going to think about [petitioner]. He added, "[b]efore you ever walk up to another car, I know I would." *Id.* at 17. The defense objected until an adverse ruling was obtained, thus preserving error. *Id.* The prosecutor went on to state, "You know your life will be changes because of this trial." Again the defense objected and preserved error. The court overruled the objection and the prosecutor asked for more time to argue due to the defense objections. The defense objected to this sidebar, but the court, without ruling on the defense objection, instructed defense counsel to be seated. Counsel asked for a ruling but was told to remain seated lest he be removed from the courtroom. *Id.* at 18-19.

Shortly thereafter, the prosecutor told the jury "And you and I both know that Kent Kincaid would be alive today if he hadn't uttered those fateful words." *Id.* at 22. This time, mindful of the court's instruction, defense counsel did not object.

It was clearly not within the proper scope of argument for the prosecutor to inject his personal opinion about the case into the argument. The prosecution's repeated efforts to inject personal opinion into the argument and vouch for its case were inflammatory and prejudicial.

**Claim VI(l):    The cumulative effect of these errors "infected the trial with unfairness."**

These instances of prosecutorial misconduct do not individually have to have risen to the standard of a denial of due process or an unfair trial, but they should be seen in the aggregate as having "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986).

**B. The Standard of Review**

-270-

Decisions concerning penalty phase prosecutorial misconduct, like those regarding other aspects of a capital trial, have been predicated by the maxim that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida,* 430 U.S. 349, 357 (1977). This difference has required the courts to ensure, by means of procedural safeguards and a heightened degree of judicial scrutiny under this super due process standard, that the death penalty is not the product of arbitrariness or caprice. "To pass constitutional scrutiny under this heightened standard, the death penalty must not be applied in an arbitrary or capricious manner. Rather, there must be 'an individualized determination whether the defendant in question should be executed, based on the character of the individual and the circumstances of the crime.'" *Adamson v. Ricketts,* 865 F.2d 1011, 1021 (9th Cir. 1988) (*en banc*).

It has long been recognized that misconduct by a prosecutor in closing argument may be grounds for reversing a conviction. *Berber v. United States,* 295 U.S. 78, 85-88 (1934). Part of this recognition stems from a systematic belief that a prosecutor, while an advocate, is also a public servant "whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.,* at 88.

It is the responsibility of the trial court to ensure that final argument is kept within proper and accepted bounds. *United States v. Young,* 470 U.S. 1, 6-11 (1985). That responsibility must be discharged with full awareness that "the prosecutorial mantle of authority can intensify the effect on the jury of any misconduct." *Brooks v. Kemp,* 762 F.2d 1383, 1399 (11th Cir. 1985) (*en banc*).

-271-

Consequently, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law." *Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir. 1986). The avoidance of arbitrariness in the jury's exercise of its discretion also requires that jurors be "confronted with the truly awesome responsibility of decreeing death for a fellow human..." *Lockett v. Ohio,* 438 U.S. 586, 598 (1978).

The United States Supreme Court has made it quite clear that the prosecutor may not "attach the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens,* 462 U.S. 862, 885 (1983). It has also been held that it is "clearly improper for a prosecutor to urge the imposition of death because of the race, religion, sex, or social status of the victim." *Brooks v. Kemp,* 762 F.2d 1383, 1409 (11th Cir. 1985) *(en banc)*. *See also Derden v. Wainwright,* 477 U.S. 168, 181-82 (1986) ("the prosecutor's argument may not manipulate or misstate the evidence, or implicate other specific rights of the accused such as the right to counsel or the right to remain silent").

A prosecutor's improper closing argument violates the due process clause of the Fourteenth Amendment if it was so prejudicial that it "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). Whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify is reviewed *de novo. United States v. Johnston,* 127 F.3d 380, 396 (5th Cir. 1997); *United States v. Martinez,* 151 F.3d 384, 391 (5th Cir. 1998).

-272-

### C. The Petitioner was prejudiced by these improper comments.

The improper questioning here was particularly prejudicial because it played to the atmosphere of hostility and sympathy for the victim's widow that permeated the courtroom during Mr. Haynes's trial. The obviously pre-planned remark that the victim "went off duty permanently" was designed both to ridicule the defense theory of the case and to inflame prejudice against the defendant. The statements of the prosecutor saying that he believed in the case achieved the same result. The questioning about whether the victim had an opportunity "to pray and ask forgiveness" was well beyond the bounds of proper questioning, and so irrelevant that its only purpose could have been to arouse anger and improperly prejudice the defendant.

The cumulative effect of these egregious errors in the prosecution's arguments was that they "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). Thus, even if this Court holds that any one of the errors alone was not sufficient to create this fundamental unfairness, the proper framework for the analysis is to examine the argument as a whole, as the jury heard it, and not simply to test the individual claims separately.

**CLAIM VII: THE TRIAL COURT ERRED IN FAILING TO GRANT PETITIONER'S MOTION TO SUPPRESS HIS AUDIOTAPED STATEMENTS AS THEY VIOLATED HIS RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

The trial court denied Petitioner's motion to suppress his two audiotaped statements and thereby violated his rights under the Fourth and Fourteenth Amendments of the United States

Constitution.

### A. Facts in Support.

Petitioner filed two pretrial motions requesting a hearing on the voluntariness of his statements and requesting that all evidence tainted by his illegal arrest be suppressed, including his first and second custodial statements. 1 CR 131, 169. In support of these motions, Petitioner invoked the Fourth and Fourteenth Amendments to the United States Constitution as well as parallel protections under Texas law. *Id.* A hearing on these motions was conducted on August 16, 1999. 3 CR 547-548; RR 65, 68. Following the hearing on these suppression motions, the trial court denied the motions. CR 169-173; 3 RR 143-144.[280]

Todd William Miller, a homicide investigator with the Houston Police department, testified that he initially participated in the investigation of the underlying offense in the early morning of May 23, 1998. 3 RR 67. Miller was initially assigned to investigate a robbery which led to the identification of Timothy Reese as a possible suspect. 3 RR 67-69. A warrant for the arrest of Timothy Reese was obtained. 3 RR 69.

On May 24, 1998 a police surveillance of Reese's home was set up on May 24, 1998. 3 RR 70. Several hours later, Reese was observed returning to his home in a dark-colored pickup truck. About ten minuted later, at 11 p.m., a car drove up to the house and the driver exited the vehicle and approached the front door. 3 RR 70-71. Moments later, both the driver and Reese got into the vehicle and drove away. 3 RR 71.

---

[280]   Petitioner renewed his objections at trial and was again overruled. 25 RR 200. He also brought the issue on direct appeal. Exhibit 5, at 19 *et. seq.* He has thus properly preserved the issue for habeas review.

Miller had uniformed officers stop the vehicle. 3 RR 73. As Petitioner was the driver of the vehicle, he was detained, arrested and immediately questioned. 3 RR 73, 119-120. While Petitioner was cooperative, admitted owning the vehicle which he was driving, presented a valid driver's license and ownership papers, he was immediately handcuffed and transported to HPD Detective Division for interrogation.3 RR 105-106.

Miller agreed that prior to and including the time of Petitioner's arrest, "no one had identified Anthony Haynes as even a participant in an aggravated robbery case." 3 RR 101, 104. Thus, Miller explained, "[a]fter examining the vehicle and observing the defendant in this case, it was my opinion that this defendant was involved in not only the aggravated robbery, but very well *could have been involved* in the murder of Sergeant Kincaid." 3 RR 73. (emphasis added). Miller conceded that there was no warrant for Petitioner's arrest and that he had not observed Petitioner commit any breaches of the peace nor any felony, aggravated robbery or homicide. 3 RR 101-103, 113. Additionally, Miller conceded that at the time of Petitioner's arrest, he had no reason to believe that he would or intended to flee the jurisdiction. 3 RR 113. However, Miller gave several reasons for Petitioner's immediate arrest on May 24, 1998: he admitted to owning the vehicle he was driving; the vehicle matched the description of a vehicle involved in a robbery; the vehicle matched a description provided to the police by Sgt. Kincaid's wife and Petitioner matched a description provided by the victim's wife. 3 RR 73-75; 107-109.

Thus, upon the police-initiated traffic stop, Petitioner was immediately handcuffed and arrested on May 24, 1998., at 11 p.m., placed in a police vehicle and transported to the Harris County Sheriff's Department homicide headquarters at 601 Lockwood. 3 RR 70, 83, 85, 106.

-275-

Petitioner's vehicle was impounded and towed away. 3 RR 111. Miller and Petitioner, handcuffed, arrived at the homicide division at 11:52 p.m. 3 RR 76, 116-117.

Miller noted that prior to escorting Petitioner there, he chose not to take him before a magistrate to receive the proper admonishments and *Miranda* warnings because he wanted to investigate Petitioner's level of involvement in "either/or the murder or the robbery." 3 CR 114-115. Miller asserted that upon arrival at homicide headquarters, Petitioner was escorted to an interview room. 3 RR 77. Miller gave him *Miranda* warnings and informed him he was a suspect in both a robbery and the death of Kincaid. 3 RR 78, 84. Petitioner initially denied any involvement in a robbery or a shooting of a police officer. 3 RR 84.

Miller noted that Petitioner became very nervous when he subsequently informed him that Reese, also arrested and interrogated in a separate room, had implicated Petitioner in the underlying offense. 3 RR 84. When Miller informed him that officers were en route to arrest a juvenile suspect, Michael Tunson, Petitioner asked what would happen to him if he gave a statement. 3 RR 85. Miller answered that it depended upon his statement. 3 RR 85. Petitioner then asked Miller whether there were any witnesses to the alleged robbery and shooting death of Kincaid. 3 RR 86. Miller asserted that there were witnesses and that petitioner would be placed in a lineup for identification. 3 RR 86.

Miller testified that at this time Petitioner said "all right, I'll tell you about it." 3 RR 86. Thereafter, petitioner finally agreed to provide a formal statement and assented to the creation of an audiotaped recording. 3 RR 87. Miller identified State's Exhibit 1H as the recording. 3 RR 87. The process of recording the first custodial statement began at 12:32 a.m. on May 25,

-276-

1998. 3 RR 92.

After the taping of the first statement, Petitioner was brought before a magistrate whereupon he received further *Miranda* warnings. 26 RR 23. Thereafter, Petitioner was returned to the homicide division. After additional questioning, Petitioner provided a second statement, which was introduced as evidence against him at trial. 3 RR 91.

### B. Argument

Centuries of precedent hold that seizures of the person are reasonable only if supported by probable cause. In this case, Petitioner's detention and seizure for questioning severely compromised his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

Generally, encounters between individuals and police fall into three categories: 1) consensual meetings; 2) detention based upon reasonable suspicion and 3) full arrests based upon and requiring probable cause. *United States v. Cortez,* 449 U.S. 411, 101 S. Ct. 690 (1981). This arrest required a finding of probable cause, but the record is clear that it did not exist here.

In a motion to suppress a statement, the movant bears the burden of proof to show that a warrantless search has occurred. Once the movant has shown this, the burden of proof shifts to the State to present sufficient facts to justify this action. As we have seen, Miller thought that Petitioner *"could have been involved"* in the murder of Sergeant Kincaid. 3 RR 73. (emphasis added). Miller also conceded that there was no warrant for Petitioner's arrest and that he had not observed Petitioner commit any breaches of the peace nor any felony, aggravated robbery or

-277-

homicide. 3 RR 101-103, 113.[281] The police were attempting to arrest Timothy Reese and Petitioner was not even a suspect at the time of his encounter with the police. The decision to arrest Petitioner should have been made by a magistrate and not by Officer Miller. Mere conclusions or suspicion does not allow the police to verify these suspicions by means of an arrest. *Florida v. Royer,* 460 U.S. 491, 103 S. Ct. 1319 (1983). A trial court may find probable cause for arrest based solely on facts, not conclusions. *Aguilar v. Texas,* 378 U.S. 108, 84 S. Ct. 1509 (1963). Thus, Miller's explanation based on conclusions were insufficient for the warrantless arrest.

Where a search and seizure of a suspect is conducted in violation of the Fourth Amendment, all fruits of the illegal activity must be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407 (1963). The legality of an arrest, for Fourth Amendment purposes, turns first upon whether the arrest is lawful under state law or statute. *Michigan v. DeFlippo,* 443 U.S. 31, 99 S. CT. 2627 (1979). Here, Officer Miller's unfounded failure to obtain a warrant before arresting Petitioner requires the suppression of all evidence obtained as a result of his arrest. Petitioner's custodial statements qualify as the fruit of his unlawful arrest. The trial court committed reversible error in failing to suppress these statements.

In *Brown v. Illinois,* 422 U.S. 590, 604-605, 95 S. Ct. 2254, 2261-2262 (1975) the Court adopted a four-part analysis to determine whether a confession was gained by exploitation of an illegal arrest or whether there were sufficient intervening circumstances between the two

---

[281] Nor was there any evidence that the officer believed Petitioner was about to flee or escape.

events to attenuate the connection. First, the state failed to show that Petitioner's statements had been purged of the taint of his arrest. The burden of showing this is upon the State. *Taylor v. Alabama,* 457 U.S. 687, 102 S. Ct. 2664 (1982). Secondly, the time between the arrest and the statements, an hour and a half, was not sufficient to purge the statements of the taint. *Brown v. Illinois, supra; Dunaway v.. New York,* 442 U.S. 200, 99 S. CT. 2248 (1979). Third, there were no intervening circumstances between the arrest and the statements, such as an appearance before a magistrate. Fourth, looking at police conduct, it is clear that the officer's actions stemmed from his belief that there was insufficient probable cause to arrest Petitioner, as he did not attempt to obtain a warrant.

The fact that the truck matched a description of the truck involved in the robbery in which Reese was a suspect be cause for the arrest, as Reese was a passenger in Petitioner's truck. An individual may not be arrested simply because of his proximity to others suspected of criminal activity or to the scene of the alleged crime. *Ybarra v. Illinois,* 444 U.S. 85, 100 S. Ct. 338 (1979). The second reason for the arrest was Officer Miller's belief that Petitioner matched a description of the driver of the truck provided by Mrs. Kincaid. 3 RR 108. But the description of the driver was not presented to the Court during the hearing on Petitioner's motions, and thus that court was restricted to Officer Miller's conclusions only and the record fails to show the missing evidentiary link required to establish probable cause for Petitioner's arrest. The court is required to examine the totality of the circumstances to determine if the proffered facts amount to probable cause. *Illinois v. Gates,* 462 U.S. 213, 103 S. Ct. 2317 (1983). The record is clear that Petitioner was handcuffed and arrested without a warrant,

-279-

without probable cause and transported to police headquarters. 3 RR 101, 113. Petitioner's immediate arrest for custodial interrogation was unreasonable, illegal and in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### C. The claim is not precluded under *Stone v. Powell.*

In *Stone v. Powell,* 428 U.S. 465 (1976), the Supreme Court considered the question of whether "state prisoners—who have been afforded the opportunity for full and fair consideration of their reliance upon the exclusionary rule with respect to seized evidence by the state courts at trial and on direct review—may invoke their claim again on federal habeas corpus review." *Id.* at 489. The Court concluded that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494-95.

However, *Stone v. Powell* does not bar Fourth Amendment exclusionary claims as to which the petitioner did not have the "opportunity for full and fair litigation" at "trial and on direct appeal." *Stone, supra,* 428 U.S. at 494-95. *See also Wright v. West,* 505 U.S. 277, 292 (1992) (opinion of Thaomas, J.) (Interpreting *Stone's* bar to apply "as long as the state courts have provided a full and fair opportunity to litigate [Fourth Amendment claims] at trial or on direct appeal"). Since *Stone,* numerous courts including the Fifth Circuit have interpreted the situation where the state courts, on direct appeal, have not addressed or ignored Petitioner's Fourth Amendment claim, and have held that in these circumstances, the *Stone* bar does not apply. *See, e.g., Agee v. White,* 809 F.2d 1487, 1490 (11th Cir. 1987) (evidence that state

-280-

appellate court "ignored" 4th Amendment claim—state court addressed only one of petitioner's two 4th Amendment claims—renders *Stone* bar inapplicable); *Brunson v. Higgins,* 708 F.2d 1353, 1360-61 (3rd Cir. 1983); *Scott v. Maggio,* 695 F.2d 916, 920 (5th Cir.), *cert. denied,* 463 U.S. 1210 (1983); *Moore v. Cowan,* 560 F.2d 1302 (6th Cir. 1977), *cert. denied,* 435 U.S. 929 (1978). *See also Townsend v. Sain,* 372 U.S. 293, 313-14 (1963) (no "semblance of a full and fair hearing unless the state court actually reached and decided the issues...tendered by the defendants"). As the Eleventh Circuit has held, "[T]he *Stone v. Powell* bar ...is not honored in federal courts unless the state courts considered the claims fully and fairly." *Tukes v. Dugger,* 911 F.2d 508, 513 (11th Cir. 1990), *cert. denied,* 502 U.S. 898 (1991) (citing *O'Berry v. Wainwright,* 546 F.2d 1204 (5th Cir. 1977).

Simple fairness requires this result. This is a death penalty case. As the Supreme Court has repeatedly recognized, the 'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley,* 115 S. Ct. 1555, 1560 (1995) (citation omitted). For over two decades, it has been held that capital cases require "meaningful appellate review" in state court. *See, e.g., Parker v. Dugger,* 498 U.S. 308, 321 (1991).

Here, Petitioner was not afforded a "full and fair" opportunity to litigate this claim in state court because the state court's analysis did not even discuss Petitioner's main point, that the arrest was predicated merely on Officer Miller's suspicions that Mr. Haynes was involved in the crimes (3RR 73) and that probable cause was thereby not established.[282] It also did not

---

[282] *See* the state court analysis in *Haynes v. Texas,* No. 73,685 (Tex. Crim. App. 2001), Exhibit 5, at 6-11. Petitioner's arguments on direct appeal are in Exhibit 4 at 19 *et. seq.*).

discuss Petitioner's point that the police may not verify their suspicions by means that approach an arrest. *Florida v. Royer,* 460 U.S. 491, 103 S. Ct. 1319 (1983).

Also, the trial court failed to file any written findings of fact and conclusions of law regarding the voluntariness of the statements, contrary to state law. Tex. Code. Crim. Pro. Art. 38.22 Sec. 6.[283] The defense had requested that such written findings and conclusions be filed. 3 RR 144. The court acknowledged its statutory duty and asked the state to prepare the findings, but they never did. Thus, the basis of the court's rulings cannot be determined. As Petitioner's arguments were not considered by the state court, he is not precluded here under *Stone.*

### D. Harmless Error Analysis.[284]

The State has a burden to prove that a Fourth Amendment violation was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18 (1967). Under *Chapman,* it was held that a conviction must be reversed unless it can be said beyond a reasonable doubt that the *jurors did not give any weight* to any of the tainted evidence. *Sullivan v. Louisiana,* 508 U.S. 275, 279 (1991) ("Harmless-error review [under *Chapman*] looks...to the basis on which the jury *actually rested* its verdict...The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict surely would have been rendered, but whether the guilty verdict in *this* trial was surely unattributable to the error." (emphasis in original; citations and internal quotation marks omitted).

---

[283]   The Clerk's Transcript, CT 1, 2 and 3, are devoid of any such findings and conclusions.

[284]   This analysis is applicable not just to this claim, but to any claim in which harmless error analysis may be thought appropriate.

Under *Chapman,* reversal is required unless the state can show beyond a reasonable doubt that the constitutional violation had no effect on the judgment. *Arizona v. Fulminante,* 111 S. Ct. 1246, 1258 (1991). The *Chapman* standard has been applied to many constitutional violations, including admission of improperly obtained confessions and other "trial error...error which occurred during the presentation of the case to the jury." *Id.* at 1263-64. *Chapman* is an exacting standard of review—the state must prove that the error "did not contribute to [the petitioner's] conviction." *Id.* at 1257.

In *Brecht v. Abrahamson,* 113 S. Ct. 1710 (1993), the Supreme Court held that a different, more deferential standard of review should govern federal habeas courts' treatment of state court constitutional violations. In *Brecht,* the Court ruled that a new harmless error test would apply in federal habeas corpus proceedings with respect to claims heretofore subject to the *Chapman* standard. In *Brecht,* the Court held that "the standard for determining whether habeas relief must be granted is whether...the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* 113 S. Ct. at 1713-14 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946). Petitioner contends that ***Brecht is not applicable to any of his claims***, including this one, for the following reasons:

1) Although a claim which was previously raised and rejected on direct appeal may not be cognizable on habeas corpus *Ex parte Acosta,* 672 S.W.2d 470, 472 (Tex. Crim. App. 1984), this doctrine "should not be applied where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding." *Ex parte Torres,* 943 S.W.2d

-283-

469, 475 (Tex. Crim. App. 1997).

All of Petitioner's claims involve the violation of his federal constitutional rights. In this situation, even if some claims were raised and denied on appeal, they also may be considered on federal habeas, because of their constitutional dimension. Those claims not raised on direct appeal, with federal constitutional considerations, should have been considered by the state habeas court, but were not.

2) The Fifth Circuit and other circuits have held that the correct standard is *Chapman* and not *Brecht*. The *Brecht* majority premised their ruling on an assumption that a finding of harmlessness by the state courts under the more stringent *Chapman* rule will always precede habeas corpus review of the harmlessness question under the less stringent *Brecht* rule. The Fifth Circuit has adopted this interpretation of *Brecht*. *See Barber v. Johnson*, 145 F.3d 234, 238 (5[h] Cir.), *cert. denied*, 119 S. Ct. 518 (1998) (Dennis, J., concurring) (*Chapman*, not *Brecht*, standard governs "when state courts on direct review have disregarded their constitutional duty to apply the rigorous 'beyond a reasonable doubt' standard to constitutional error;' circuit's contrary rule in *Hogue v. Johnson*, 131 F.3d 466 (5th Cir. 1997) is "inconsistent with the Supreme Court's underlying reasoning"). *See also Seiler v. Thalacker*, 101 F.3d 536, 539 (8[h] Cir. 1996), *cert. denied*, 117 S. Ct. 1447 (1997) ("When a state court has not reviewed on direct appeal whether a constitutional error was harmless, this court examines the error to determine whether it 'was harmless beyond a reasonable doubt'...The record is reviewed *de novo*, and the issue is 'whether there is a reasonable possibility' the error contributed to the conviction."; *Fields v. Leapley*, 30 F.3d 986, 991 (8[h] Cir. 1994); *Starr v. Lockhart*, 23 F.3d 1280, 1291-92

(8th Cir. 1993); *Orndorff v. Lockhart,* 998 F.2d 1426 (8 Cir. 1993), *cert. denied,* 511 U.S. 1060 (1994) (federal courts should apply harmless error rule *de novo,* giving no deference to state court determinations). As there was no such application, or any harmless error review at all by the state courts, *Brecht* does not apply.[285]

3) *Brecht* does not apply to capital cases, as it was a noncapital case, and it did not present, and the Court did not address, the applicability of its new rule to capital cases. *See, e.g., Barber v. Johnson, supra,* 145 F.3d 234, 238 (5 Cir.) (Dennis, J., concurring), *cert. denied,* 119 S. Ct. 518 (1998) ("*Brecht* was a non-capital case; it did not present, and the Court did not address, the applicability of its rule to capital cases.)

4) There are some constitutional violations as to which "there is no need for...harmless error review" because the error "could not be treated as harmless," *Kyles v. Whitley,* 514 U.S. 419, 435 (1995). Examples are the kind of official police misconduct analyzed in this claim and others herein. This exception was announced in Justice Stevens concurring opinion in *Brecht:*

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not "substantially influence" the jury's verdict. *Cf. Greer v. Miller,* 483 U.S. 756, 769 (Stevens, J., concurring in judgment), *Brecht,* 507 U.S. at 638 n.9.

As Justice Stevens explained in his concurrence in *Greer v. Miller,* "there may be

---

[285] The Supreme Court, in *O'Neal v. McAninch,* 513 U.S. 432 (1995) effectively assigned the burden of proof on harmlessness to the state, and made clear that it is legal error to "say [ ] that the habeas petitioner must bear the 'burden of establishing' whether the error was prejudicial." *O'Neal,* at 436.

extraordinary cases in which the...error is so egregious, or is combined with other errors or incidents of prosecutorial misconduct, that the integrity of the proceeding is called into question." *Greer,* at 768-69.

Thus, the *Brecht* standard is not proper here, and, if the Court engages in harmless error analysis, *Chapman* is the proper standard.   Whether this Court believes that the remaining evidence is sufficient to support the guilty verdict is irrelevant under *Chapman. See id.*  Here, Petitioner audiotaped statements were necessary in order to secure his conviction, as the victim's wife never identified him as the person who shot Officer Kincaid.   23 RR 129, 132. Additionally, Petitioner's taped statements also assisted the State at the punishment phase as he also admitted his involvement in three other robberies, and these were the centerpiece of the State's case at that phase of the trial.   Thus, under *Chapman,* this court should reverse Petitioner's conviction.

## CLAIM VIII: THE TRIAL COURT ERRED IN FAILING TO GRANT PETITIONER'S MOTION TO SUPPRESS HIS AUDIOTAPED STATEMENTS AS THEY WERE COERCED AND VIOLATED HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The trial court denied Petitioner's motion to suppress his two audiotaped statements and thereby violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

### A. Facts in Support.

The trial court erred in overruling Petitioner's objections to the admissibility of his

audiotaped custodial statements as they were involuntary.[286] Petitioner hereby incorporates by reference the facts from the previous issue.

Based on the facts adduced at the hearing to suppress the statements, it is clear that Petitioner, aged eighteen, did not eat anything during the course of or prior to his interrogation, was not afforded an opportunity to use the restroom, was not provided the opportunity to call his father despite frequent requests (3 RR 125-130; 26 RR 12-13) and was extremely fatigued. (3 RR 123; 26 RR 48). He was also not able to pay attention during this interrogation.  25 RR 197.  Also, he was under the influence of methamphetamine.[287]  Under these circumstances, Petitioner was unable to knowingly waive his rights against self-incrimination.

Petitioner was deliberately not taken before a magistrate as required prior to his interrogation and the making of his first statement.  Officer Miller conceded that prior to escorting Petitioner to the interrogation offices he chose not to take him before a magistrate to receive the proper admonishments and *Miranda* warnings because he wanted to investigate the level of his involvement in "either/or the murder or the robbery."  3 CR 114-115.  Miller anticipated Petitioner's statement and brought his own tape recording device into the interview room. 25 RR 195.[288]

---

[286]   As noted in the prior claim, these objections were renewed at trial (25 RR 200) and on appeal (Exhibit 4).  Hence this claim is preserved for review in federal habeas corpus.

[287]   *See* Exhibits 17, 22, 23, etc..

[288]   Carol Carrier, a criminal court hearing officer for Harris County, testified regarding the statutory warning given to Mr. Haynes.  26 RR 6-7.  The defendant was brought before her and signed the Miranda warning, introduced as State's Exhibit 53A.  26 RR 6.  At the time Mr. Haynes was brought before the hearing officer, he had not yet been charged with a crime.  26 RR 10.  She also testified that under Article 15.17, it is the responsibility of the law enforcement

As to the second taped statement, it was recorded at about 2 a.m. 3 RR 142.  The trial court overruled Petitioner's objections to the statements after a hearing on their admissibility and found that both statements were voluntary. 1 CR 169-173; 3 RR 143-144.  At trial, Officer Miller denied threatening or coercing Petitioner to procure the statements. 26 RR 29.

### B. Argument.

An accused's custodial statement is inadmissible against him at trial where the statement has been coerced and is the product of an unlawful custodial interrogation. U.S. Const. Amends. V and XIV.  An involuntary statement is inadmissible as a matter of federal constitutional law. *Jackson v. Denno,* 378 U.S. 368, 84 S. Ct. 1774 (1964); *Wong Sun v. United States, supra,* 371 U.S. at 471.

A confession must be suppressed where the arresting officer's conduct is such as to overbear an accused's will to resist and bring about a confession which would not otherwise be freely given. *Rogers v. Richmond,* 335 U.S. 534, 81 S. Ct. 735 (1961).  Here, Miller's actions were coercive and calculated to overbear Petitioner's will to resist the giving of a confession. Miller purposely delayed escorting Petitioner before a magistrate until after he had made his first audiotaped statement. 3 CR 113-115; 26 RR 51.  Miller repeatedly refused to permit Petitioner telephone his father, who was an arson investigator employed by the Houston Fire Department. 3 RR 125-129; 26 RR 49-50. Miller took advantage of Petitioner's youth, fatigue and inability

---

officials to have a defendant brought before a magistrate without unnecessary delay.  26 RR 10. Mr. Haynes was brought before her at about 1:30 a.m. on May 25, 1998, about two and a half hours after his warrantless arrest.

to understand the *Miranda* warnings when Petitioner made it clear that he did not so understand them. 25 RR 197. Thus, Miller sabotaged Petitioner's ability to exercise free will and resist the giving of a statement.  26 RR 43-44.

Petitioner's first statement was directly and causally related to Miller's actions in this case. The record clearly shows that Petitioner's statements were not the product of his free will.

Petitioner hereby incorporates by reference the arguments contained in the prior claim, including the arguments regarding harmless error.

It is clear that Petitioner was continuously questioned by Miller from the time of his arrest at 11 p.m. until 1:50 a.m. on May 25, 1998. 3 RR 125-130.  The momentary pause for the magistrate's warnings did not break or attenuate the taint of the involuntariness of Petitioner's first taped statement. Based upon the facts adduced at the hearing, Petitioner's second custodial statement was essentially a continuation of his earlier coerced confession, procured by Miller in his continued overreaching efforts to force Petitioner to implicate himself in the death of officer Kincaid or in the commission of a robbery. 3 RR 112. The admission of both statements was a violation of Petitioner's rights against self-incrimination under the Fifth Amendment to the United States Constitution and right to due process of law under the Fourteenth Amendment to the United States Constitution.


**CLAIM IX: THE TRIAL COURT ERRED IN OVERRULING PETITIONER'S MOTION TO STRIKE VENIREMEN MELBA WILLIAMS, JOHN MUNOZ, JACQUELINE NELSON AND HORACE SNYDER, VIOLATING HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.**

-289-

The trial court violated Petitioner's rights under the Sixth and Fourteenth Amendments to the United States Constitution in failing to grant his motion to strike veniremen Melba Williams, John Munoz, Jacqueline Nelson and Horace Snyder. *Duncan v. Louisiana,* 391 U.S. 145, 88 S. Ct. 1444 (1968); *Wainwright v. Witt,* 469 U.S. 412, 105 S. Ct. 844 (1985).

**A. Facts in Support.**

**i) Ms. Melba Williams**

Venireperson Melba Williams was examined by the parties on August 19, 1999. 6 RR 6. Upon examination by Petitioner's counsel she was asked:

Q. Now, Special Issue No. 1 asks you: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

Okay. First of all, let me reread the question. And I'm going to change a word. I'm going to ask you, does it affect [sic] its meaning to you.

Do you find from the evidence beyond a reasonable doubt that there is a chance that the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

Does the word probability or chance mean or say the same thing to you?

A. Yes.

Q. Okay. They have no...there is no distinction in your thought process between the word probability and chance?

A. No.

-290-

(6 RR 54-55).

Thus, it is clear from Ms. Williams's responses that she would apply the law as charged in such a manner to answer Special Issue One 'yes" if the evidence showed that there was *any* chance that petitioner would commit future acts of violence. As this was not the proper standard, Ms. Williams was thus subject to a proper challenge for cause. Counsel for Petitioner challenged her for cause, as "[s]he said that probability and chance meant the exact same thing to her." 6 RR 64. The challenge was overruled (6 RR 64) and Petitioner's counsel was forced to use a peremptory challenge against her; exhausted all of his peremptory strikes, and was forced to accept an objectionable juror, Wilcox (22 RR 10-12). The error was preserved on appeal, as it was Point of Error 22 in the direct appeal.[289]

This error cannot be assumed to be harmless. The right to a fair and impartial jury is a cornerstone of federal constitutional trial law. *Duncan v. Louisiana, supra.* The court's denial of a proper challenge for cause against these venirepersons violated Petitioner's rights to a fair trial and an impartial jury. U.S. Const. Amends. VI and XIV.

Petitioner is entitled to a remand for a new trial unless the error can be characterized as harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18 (1967).

**ii) Mr. John Ruben Munoz.**

Venireman John Ruben Munoz was examined by the parties on August 20, 1999. 7 RR 126. Upon examination by Petitioner's counsel, he was asked:

Q. Okay. Let me ask you this. And I'll reread Special Issue No. 1. And I'm going to

---

[289] *See* Exhibit 4.

make a substitution.  I'm going to ask you to look at it again.  Okay?

Do you find from the evidence beyond a reasonable doubt that there is a chance that the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

Okay.  I substituted the word chance for probability.  Does probability and chance mean the same thing to you?

A.  I think probability is more reassuring than chance is.

A.  Okay.  So it means more to you than a mere chance?

A.  Right.

Q.  Is that correct?

How about:  Do you find from the evidence beyond a reasonable doubt that there is a possibility that the defendant will commit criminal acts of violence that would constitute a continuing threat to society?

Just [sic] possibility mean the same thing as probability?

A. Yes.

Q.  Possibility does mean the same thing?

A.  That would be a little closer, yes.

(7 RR 184-185)

Thus, it is clear from the venireperson's response that he would apply the law as charged in such a manner to answer Special Issue One "yes" if the evidence showed that there was *any* chance that petitioner would commit acts of violence in the future.  Petitioner's challenge for

-292-

cause to this venireperson on this ground was overruled (7 RR 186). The error was preserved on appeal, as it was Point of Error 23.[290] For the reasons discussed above, this error cannot be considered harmless.

### iii) Jacqueline Emhoff Nelson.

Venireperson Jacqueline Emhoff Nelson was examined by the parties on August 24, 1999. 10 RR 147. Upon examination by counsel for Petitioner, she was asked the following:

Q. Okay. Now Mrs. Nelson, when you look at that word probability in that first special issue, does probability seem to say the same thing as possibility or chance? Or do you think probability requires them to show you more?

A. I associate probability with possible.

Q. Okay. You think probability means the same thing as possibility?

A. Yes.

Q. Okay. You don't see any distinction between the two? Okay.

A. No.

(10 RR 191)

Thus, it is clear from the venireperson's response that she would apply the law as charged in such a manner to answer Special Issue One "yes" if the evidence showed that there was *any* chance that petitioner would commit acts of violence in the future. Petitioner's challenge for cause to this venireperson on this ground was overruled (10 RR 200). The error

---

[290]  *See* Exhibit 4.

was preserved on appeal, as it was Point of Error 24.[291]   For the reasons discussed above, this error cannot be considered harmless.

### iv) Horace B. Snyder.

Venireperson Snyder was examined by the parties on August 26, 1999.  12 RR 216. Upon examination by counsel for Petitioner, he was asked:

Q. Okay.  Would it be fair to say, before you even heard any evidence as to mitigation, you already have a built-in bias against the existence and/or weighing of it?  Is that a fair...

A.  Of mitigation?

A.  Yes, sir.

A.  To a certain extent.  I guess more than others.  More than what I heard others discuss, yes.

12 RR 264.

Thus it is clear from this venireperson's response that he could not consider the full range of punishment in this case and he was subject to a proper challenge for cause.  Petitioner's challenge for cause to this venireperson on this ground was overruled (12 RR 269). The error was preserved on appeal, as it was Point of Error 25.[292]   For the reasons discussed above, this error cannot be considered harmless.

### B. Argument.

The Sixth Amendment to the United States Constitution states that "[i]n all criminal

---

[291]   *See* Exhibit 4.

[292]   *See* Exhibit 4.

-294-

prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury

of the State and district wherein the crime shall have been committed. . . ." (U.S. Const.,

Amend. VI.) The Fourteenth Amendment extended the right to an impartial jury to criminal

defendants in all state criminal cases. *Duncan v. Louisiana* (1968) 391 U.S. 145. In addition,

the Due Process Clause of the Fourteenth Amendment independently requires the impartiality

of any jury empaneled to try a cause. *Morgan v. Illinois*, 504 U.S.719 at 726, 112 S. Ct. 2222

(1992) The United States Supreme Court has recognized that capital sentencing decisions are

unique; a prospective juror must meet the standards set forth in *Wainwright v. Witt, supra.*

      Whether a prospective capital juror is impartial within the meaning of the Sixth and

Fourteenth Amendments is determined in part on the basis of their opinions regarding the death

penalty. A prospective capital juror is not impartial and "may be excluded for cause because

of his or her views on capital punishment [if] the juror's views would 'prevent or substantially

impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

(*Witt*, 469 U.S. at 424; citing *Adams v. Texas*, *supra*, 448 U.S. at 40.) A prospective juror who

will automatically vote either for or against the death penalty regardless of the court's

instructions will fail to consider in good faith evidence of aggravating and mitigating

circumstances. Such a juror is not impartial and cannot constitutionally remain on a capital jury.

(*Witherspoon*, *supra*; *Morgan v. Illinois, supra*, 504 U.S., at 728, 733-734.)

      As previously noted, in *Witherspoon*, the United States Supreme Court held that capital-

case prospective jurors may not be excused for cause on the basis of moral or ethical opposition

to the death penalty unless those jurors' views would prevent them from judging guilt or

innocence, or would cause them to reject the death penalty regardless of the evidence. Excusal is permissible only if such a prospective juror makes this position "unmistakably clear." (391 U.S. at 522, fn. 21.)

That standard was amplified in *Witt*, where the court, adopting the standard previously enunciated in *Adams v. Texas, supra,* 448 U.S. at 45, held that a prospective juror may be excused if the juror's voir dire responses convey a "definite impression" (*Witt, supra,* 469 U.S. at 426) that the juror's views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Id.* at 424.) The *Witt* standard applies here.

*Witt* requires a trial court to determine "whether the juror's views would prevent or substantially impair performance of his duties as a juror in accordance with his instructions and his oath." (*Witt, supra,* 469 U.S. at 424.) This Court's duty is to

> [E]xamine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of [the juror's] duties . . ." was fairly supported by the record.

(*People v. Miranda* (1987) 44 Cal.3d 57, 94, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 176.)

The United States Supreme Court insists that the jury be provided with a vehicle for expressing its "reasoned moral response" to the evidence presented at the punishment phase of a trial. *Penry v. Lynaugh,* 492 U.S. 302, 109 S. Ct. 2934 (1989). In *Morgan v. Illinois, supra,* the Court made it clear that "life-qualifying" prospective jurors is constitutionally required and thus a prospective juror who would automatically answer a special issue in the affirmative

-296-

whenever a defendant has been found guilty of capital murder would not be qualified.

Errors in failing to excuse a juror for cause when the juror has stated that he or she would automatically vote to impose the death penalty, where sequestered questioning took place, is harmless unless a defendant exhausts all peremptory challenges in selecting the jury, and a juror to whom the defendant objects remains on the panel.  *Ross v. Oklahoma* (1988) 487 U.S. 81, 89. In Mr. Haynes's case, all peremptory challenge were exhausted.  Thus, he was deprived of a fair and unbiased jury which violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

**CLAIM X:  MR. HAYNES  WAS DENIED MEANINGFUL ACCESS TO THE COURTS AND DUE PROCESS OF LAW IN STATE POST-CONVICTION PROCEEDINGS BY HIS COUNSEL'S FAILURE TO ARGUE THE THEORY OF SELF-DEFENSE IN HIS STATE HABEAS APPLICATION.**

**A. Background: The Applicable Provisions of Article 11.071 and How They Apply To Mr. Haynes's Original State Habeas Application.**

By appointing a state habeas lawyer who failed to argue the issue of ineffectiveness of counsel for failure to adequately present  self-defense at trial,  the Texas Court of Criminal Appeals (hereinafter, "CCA") refused to comply with its binding statutory obligation to ensure that death row inmates received "competent" representation in state post-conviction proceedings.  The Texas statute enacted for the legislative purpose of "provid[ing] for the routine and regular appointment of competent counsel to represent indigent, death-sentenced

-297-

inmates in state collateral review,"[293] is codified at Article 11.071 of the Texas Code of Criminal Procedure, and took effect on September 1, 1995.

This statutory scheme ordered the CCA "under rules and standards adopted by the court, [to] appoint competent counsel" for indigent death row inmates for state post-conviction appeals. TEX. CODE CRIM. PROC. Art. 11.071 § 2(d). Such counsel, the statute provided, "shall investigate expeditiously...the factual and legal grounds for the filing of an application for a writ of habeas corpus." *Id.* § 3(a).

Section 2 of article 11.071 guarantees a capital habeas applicant that "competent counsel" will be appointed to represent him or her. Section 2(a). Section 3 mandates that appointed counsel "shall investigate, expeditiously, before and after the appellate record is filed in the court of criminal appeals, the factual and legal grounds for the filing of an application for writ of habeas corpus." Section (3) (a). Section 3 goes on to outline the procedure appointed counsel must follow in order to obtain funding for such an investigation. Mr. Haynes's state habeas attorney did not provide the representation envisaged by the statute because he did not conduct any investigation before filing the initial application. Had he conducted this investigation, he would not have argued that self-defense was not an option at trial.

---

[293] In 1995, as Congress debated legislation that would eventually be enacted as the AEDPA, a legislative compromise emerged by which the States would become entitled to invoke strict timelines in federal habeas proceedings in return for appointing competent counsel according to established standards and paying reasonable litigation expenses in state post-conviction proceedings. *See* 28 U.S.C. §§ 2261-2266; *Calderon v. Ashmus*, 118 S. Ct. 1694, 1696 (1998) (describing "opt-in" scheme). Then Texas' Attorney General, Dan Morales, testified in favor of the AEDPA before the Senate Committee of the Judiciary. *See Federal Habeas Corpus Reform: Eliminating Prisoners' Abuse of the Judicial Process, 1995: Hearings on S. 3 Before the Comm. on the Judiciary*, 104th Congress, 1st Sess. (1995) (statement of Dan Morales at 2).