IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT 6 2005

MICHAEL N. MILBY, CLERK OF COURT

| | |
|---|---|
| ANTHONY CARDELL HAYNES, § | |
| § | |
| Petitioner, § | |
| § | MISCELLANEOUS NO. H-04-319 |
| -VS- § | Judge Sim Lake |
| § | |
| DOUG DRETKE, Director, Texas § | |
| Department of Criminal Justice, § | H-05-3424 |
| Correctional Institutions Division, § | |
| § | |
| Respondent. § | |

# PETITION FOR WRIT OF HABEAS CORPUS

## <u>VOLUME III</u>
## PAGES 299-458

**A. RICHARD ELLIS**
Texas Bar No. 06560400

75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
(415) 389-0251 (FAX)

**Attorney for Petitioner**

**B. The Result of the CCA's Failure to Appoint Competent Counsel Was That Mr. Haynes Did Not Receive the "Competent" Representation to Which He Was Entitled by Texas Law and He Was Thus Deprived of Due process Under the Fourteenth Amendment and Effective Assistance of Counsel Under the Sixth Amendment.**

Evidence of the inadequacy of Mr. Haynes's appointed state habeas corpus counsel is the obviously inadequate writ he filed in state court. It consists of 51 pages (Habeas Tr. 6-69, Exhibit 6) of which all claims are record-based and there is no evidence of any investigation whatsoever.[294] Exhibit 6. Mr. Haynes alleges the following claims concerning state habeas counsel's performance, all of which are supported by the record and by a review of state post-conviction counsel's files:

**1. State habeas counsel was unaware of the necessity of investigating extra-record evidence in post-conviction proceedings.**

State habeas counsel was apparently unaware of the necessity of investigating and developing extra-record evidence in his writ application, and not merely limiting it to record claims. The state writ filed on behalf of Mr. Haynes presents only record-based claims. There was only one affidavit attached to the writ from their client and there is no evidence that any trial or family witnesses were interviewed. Many meritorious claims detailed in this writ were never presented to the state courts. The trial court thus denied an evidentiary hearing.

**2. Despite the available *ex parte* procedure for doing so set out by Tex. Code Crim. Proc. Ann. Art. 11.071 § 3(d), trial counsel failed to request the appointment of an investigator or expert.**

---

[294] *See* Exhibit 6, *Ex Parte Anthony Cardell Haynes,* Cause No.783872-A, Application for a Writ of Habeas Corpus, filed by Richard Wheelan, Esq.

Mr. Haynes's state habeas attorney filed no motions for investigative assistance for the preparation of the state writ, did no investigation into extra-record claims, and did not seek to have an expert appointed in the state writ application. The Texas death penalty statute provided a clear and unambiguous method of applying for such services:

Counsel may incur expenses for habeas corpus investigation, including expenses for experts, without prior approval by the court of criminal appeals. On presentation of a claim for reimbursement, which may be presented ex parte, the court shall order reimbursement of counsel for expenses, if the expenses are reasonably necessary and reasonably incurred.

TEX. CODE CRIM. PROC. ANN. Art. 11.071 § 3(d)

Ineffective assistance of trial counsel claims, by their very nature, are often not totally apparent from the face of the trial record, as they often involve favorable evidence that was not presented or conflicts of interest. Without the services of an investigator, Petitioner was unable to present extra-record evidence concerning this issue and many other issues.

**3.     State habeas counsel performed no extra-record investigation into the circumstances of Mr. Haynes's conviction and death sentence.**

As is apparent from the state habeas record, no investigation was performed, nor were any possible claims presented that were not apparent from the face of the record. This failure, in conjunction with the failure of Mr. Haynes's trial attorneys, meant that this federal writ application is the first time any court has examined significant aspects of the crime, mitigating evidence that should have been presented at the punishment phase, and crucial questions regarding the fairness of Petitioner's trial and sentence of death.

**4.     State habeas counsel did not incorporate any extra-record facts into the state habeas application he filed on behalf of the Petitioner.**

-300-

Because the facts were not investigated, they could not be presented or incorporated into the writ application. These extra-record facts were in fact not known to state habeas counsel. In fact, from reading the state writ, it is not clear that state writ counsel even familiarized himself with or even read, the record itself.

5. **State habeas counsel demonstrated a lack of familiarity with basic doctrines of post-conviction procedure by filing a state habeas corpus application which was devoid of extra-record facts, and which contained only claims which could have been raised on direct review; and claims identical to ones which were raised and rejected on direct review.**

Although Mr. Haynes's state writ consisted of 51 pages, most of those pages were devoted to an attack on the special issues. Some or all of the claims could have been raised on direct appeal.

C. **Petitioner was prejudiced as a result of the CCA's failure to comply with section 2 and appoint competent counsel.**

The Petitioner alleges that state habeas counsel's representation fell below a minimal standard of competence in the following ways: failure to argue the self-defense theory; failure to adequately brief claims; failure to investigate and present extra-record evidence, even though that is the primary purpose of post-conviction proceedings; failure to perform research sufficient to understand basic principles of post-conviction practice; failure to present proper post-conviction claims. Mr. Haynes was prejudiced by this ineffective performance, because, as this Petition demonstrates, viable challenges to his conviction and death sentence could have been, but were not, raised during state post-conviction proceedings.

The purpose of habeas corpus proceedings in Texas, as in other states, is to permit the

introduction of new, **extra-record** evidence bolstering a claim that the defendant's constitutional rights were violated. *See, e.g.*, *Ex Parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996) (defendant not entitled to relief on claim in habeas which could have been litigated on direct appeal because he proffered no additional factual development to back it up); *Ex Parte Torres*, 943 S.W.2d 469, 474 (Tex. Crim. App. 1997) (habeas corpus remedies designed for situations "where direct appeal cannot be expected to provide an adequate record to evaluate the claim in question" and claim must be "substantiated through additional evidence gathering in a habeas corpus proceeding"). The *Torres* court also recognized that, except in rare circumstances, claims of ineffective assistance of counsel must be litigated in post-conviction proceedings because the trial record does not provide an adequate basis for determining the claim. *Id.* (observing that motion for new trial may provide means of introducing extra-record evidence during direct appeal, but "mounting an ineffective assistance attack in a motion for new trial is inherently unlikely if trial counsel remains counsel during the time required to file such a motion"). Performing an investigation to determine the existence of cognizable constitutional violations is a fundamental component of adequate state post-conviction representation:

> Accordingly, where necessary to assure the full and fair adjudication of the client's federal claims, postconviction counsel should request that the state postconviction case be conducted, and should be prepared to conduct it, as a civil trial proceeding, initiated by her on behalf of the client, complete with frequent and productive interaction with the client; comprehensive prefiling and pretrial documentary, field, and legal investigation to identify and prepare to litigate the appropriate causes of action; careful pleadings; motions practice; evidentiary hearings; briefing; and any other procedures that counsel might use in civil litigation on a plaintiff's behalf.

-302-

1 JAMES S. LIEBMAN & RANDY HERTZ, FEDERAL HABEAS CORPUS PRAC. & PROC. § 7.1a, at 274-75 (3rd ed. 1998) (LIEBMAN & HERTZ) (footnotes omitted).  In order to zealously represent the client and preserve an appropriate record for later federal review, state postconviction counsel is under a binding professional and ethical obligation to determine the avenues of investigation which may prove fruitful and request the resources necessary to pursue them, if such a request is necessary:

> At the outset of state postconviction proceedings, counsel should identify the procedures and resources necessary to investigate the case fully and fairly; discover meritorious claims; ascertain the expert and other analyses, evidence, and testimony that effective litigation of those claims will require; and present that information in a meaningful manner, whether by way of an evidentiary hearing or some other procedure.  Thereafter, counsel should request, formally and in writing, each of the necessary procedures and resources and explain with specificity why each is essential, what claim it relates to, what evidence is likely to be generated thereby, and, generally, how the "full and fair" litigation of one or more claims in the petition requires the requested procedure or resource.

*Id.* at 279 (footnote omitted).  This is not an unreasonable or extraordinary burden to place on a lawyer whose client faces execution by lethal injection.  Indeed, it is nothing more or less than what the State of Texas guaranteed to death row inmates by passing Article 11.071 of the Code of Criminal Procedure.

State habeas counsel failed to perform any of these tasks.  As this petition demonstrates, there were viable claims of constitutional error affecting Mr. Haynes's trial and direct appeal proceedings.  Had state habeas counsel performed any investigation into the case, he would have determined that there was significant ineffective assistance of counsel at both the guilt innocence

-303-

phase and the sentencing phase of the trial.   For the sake of brevity, Petitioner incorporates by reference all of the claims in this petition as factual support for what competent state habeas counsel would have discovered.

### D. The Right to Effective Assistance of Counsel Applies to the "Trial Court" Phase of State Post-conviction Proceedings, and was Violated in this Case, thus Prejudicing the Petitioner.

*Coleman v. Thompson*, 501 U.S. 722 (1991) held that, because an inmate has no right to the effective assistance of counsel in post-conviction proceedings, counsel's ineffective performance in such proceedings could not constitute "cause and prejudice" for procedural defaults caused by a post-conviction attorney's late filing of an appeal from a habeas corpus trial-court disposition. *Id*. at 750.  However, in *Coleman,* one question -- a question presented by this case -- was specifically left undecided.  Coleman noted that (1) this Court had guaranteed indigent appellants constitutionally effective counsel during the "one and only appeal" to which they were entitled by state law, even though the appeal itself was not required by the Federal Constitution, *Evitts*, 469 U.S. at 396 (citing *Douglas v. California*, 372 U.S. 353, 357 (1963)); and that (2) Virginia allowed defendants to attack the effectiveness of their trial counsel only in postconviction proceedings. *Coleman*, 501 U.S. at 755.  Thus, *Coleman* asserted, there must be a guarantee of effective assistance of counsel in "the first forum in which a federal claim can be raised" in state court. *Id*.  The Supreme Court found it unnecessary to "answer this question broadly, however, for one state court has addressed Coleman's claims: the state habeas trial court." *Id*.  Coleman

> has had his 'one and only appeal,' if that is what a state collateral proceeding may be considered; the Buchanan County Circuit Court, after a 2-day evidentiary

-304-

hearing, addressed Coleman's claims of trial error, including his ineffective assistance of counsel claims. What Coleman requires here is a right to counsel *on appeal* from that determination. Our case law will not support it.

*Id.* at 756 (emphasis added). Thus, it would "defy logic for us to hold that Coleman had a right to counsel *to appeal* a state collateral determination of his claims of trial error." *Id.* at 756-57 (emphasis added).

Lower federal courts, including the Fifth Circuit, have generally declined to extend the protection of the Sixth Amendment to the area left open by the *Coleman* exception, although not without some controversy.[295] The Ninth Circuit court provided the fullest rationale for its decision:

The actual impact of [a *Coleman*] exception would be the likelihood of an infinite continuum of litigation in many criminal cases. If a Applicant has a Sixth Amendment right to competent counsel in his or her first state postconviction proceeding because that is the first forum in which the ineffectiveness of trial counsel can be alleged, it follows that the Applicant has a Sixth Amendment right to counsel in the second state postconviction proceeding, for that is the first forum in which he or she can raise a challenge based on counsel's performance in the first state postconviction proceeding.

*Bonin v. Vasquez*, 999 F.2d 425, 429 (9th Cir. 1993). *Bonin*'s reasoning is unpersuasive in

---

[295]*See, e.g. Mackall v. Angelone*, 131 F.3d 442, 448-49 (4th Cir. 1997) (en banc), *cert. denied*, 118 S. Ct. 907 (1998) ("*Mackall II*"); *Hill v. Jones*, 81 F.3d 1015, 1025-26 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 967 (1997); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). *Mackall II* vacated the prior opinion of a three-judge panel excusing Mackall's procedural default based on the *Coleman* exception. *See Mackall v. Murray*, 109 F.3d 957 (4th Cir. 1997) ("*Mackall I*"). Two judges dissented from the *en banc* court's decision on the *Coleman* issue, reasoning that Mackall should be allowed, under the exception "recognized and reserved" in *Coleman*, to mount an "attack on the competency of his trial and appellate counsel in the only forum available to him -- a habeas corpus proceeding." *Mackall II*, 131 F.3d at 451-52 (Butzner, J., dissenting, joined by Murnaghan, J.).

several ways. First, several states have guaranteed effective assistance of postconviction counsel without inflicting an "infinite continuum of litigation" on their courts.[296] Second, even if the *Bonin* court's analysis was accurate in 1993, the later enactment of state and federal bars on successive petitions makes *Bonin*'s prediction unlikely indeed.[297] Further, the postconviction attorneys in *Bonin*, *Mackall*, and *Jones* apparently managed to properly present cognizable claims to the postconviction court.[298]

In any event, *Coleman* does not control this case. Texas, like Virginia and virtually all other jurisdictions, recognizes that ineffective assistance of trial counsel claims such as the ones pled in this petition usually cannot be adequately aired until post-conviction proceedings.[299] This case presents the question left open by *Coleman* because Coleman at least received *some* effectual representation. Coleman had a chance to prove his claims and gain relief from his conviction and death sentence in the evidentiary hearing held in Buchanan County. This was

---

[296] In *Commonwealth v. Priovolos*, 715 A.2d 420 (Pa. 1998) the court "recognized that appointed [postconviction] counsel must discharge the responsibilities under [Pennsylvania's postconviction] rule and that a remedy may be fashioned where counsel fails to do so." *Id.* at 422. If an Applicant meets the rigorous standard of proof that the assistance of his postconviction counsel was ineffective, his case will be remanded for representation by different counsel. *Id.* In *Rothering v. McCaughtry*, 556 N.W.2d 136, 137-38 (Wis. Ct. App. 1996), *review denied*, 560 N.W.2d 277 (1997), the court found that an Applicant who had received ineffective assistance of postconviction counsel could raise that issue with the trial court.

[297] Both the state successor bar codified at Art. 11.071 § 5(a) and the federal successor bar found at 28 U.S.C. § 2244(b) have survived constitutional challenges. *See Felker v. Turpin*, 518 U.S. 651 (1996); *Ex Parte Davis*, 947 S.W.2d 216 (Tex. Crim. App. 1996).

[298] *See Hill*, 81 F.3d at 1019; *Mackall I*, 109 F.3d at 957; *Bonin*, 999 F.2d at 426.

[299] *Ex Parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) ("In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim.").

the "main event" of his state post-conviction proceedings, and the appeal from the state hearing to the Virginia Supreme Court would have involved only the most basic scrutiny of what occurred below.[300]

Here, every claim presented in the first state habeas proceedings either was or could have been raised on direct review. State habeas counsel failed to perform any investigation into the case, and thus never learned that such investigation could have supported an ineffective assistance of trial counsel claim.

Another distinction can be made: Coleman did not challenge the adequacy of his trial-court-level habeas representation, *Coleman*, 501 U.S. at 755.    Mr. Haynes presents this challenge here. *See* Claim I, *supra*.

**E.  Mr. Haynes's Right to Meaningful Access to the State Courts Was Denied by the CCA's Violation of its Statutory Obligation to Afford him Competent State Habeas Counsel.**

In *Murray v. Giarratano*, 492 U.S. 1 (1989) a four-member plurality held that the Federal Constitution did not guarantee indigent death-sentenced inmates counsel in state-court post-conviction appeals. *See id.* at 12 (Rehnquist, J., joined by Scalia, White, and O'Connor, JJ.). Justice Kennedy, who did not join the plurality, wrote in a concurring opinion that "[i]t cannot be denied that collateral relief proceedings are a central part of the review process for prisoners sentenced to death." *Id.* at 14. He also acknowledged the dissenters' point that "a

---

[300]In fact, the order entered on appeal in Coleman's case was itself cursory and ambiguous. *Coleman*, 501 U.S. at 727-28. The state-court practice of reviewing lower-court postconviction decisions with cursory "formulary" orders is so widespread that this Court has developed a doctrine specifically tailored to such situations. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804-05 (1991).

substantial proportion of [death row] prisoners succeed in having their death sentences vacated in habeas corpus proceedings" *Id*. The Court's decision in *Bounds v. Smith*, 430 U.S. 817 (1977), Justice Kennedy observed, required that indigent death row inmates be afforded "meaningful access" to the courts. "The complexity of our jurisprudence in this area, moreover, makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law." *Id*. Nevertheless, Justice Kennedy cautioned, states must be permitted "wide discretion" in implementing such access, and the Court may only evaluate the facts of "the case before us." *Id*. Justice Kennedy reasoned that there was no justification for striking down Virginia's entire system of post-conviction assistance, because "no prisoner on death row in Virginia has been unable to obtain counsel to represent him in post-conviction proceedings, and Virginia's prison system is staffed with institutional lawyers to assist in preparing petitions for postconviction relief." *Id*. at 14-15. Therefore, "[o]n the facts and record of this case," Justice Kennedy joined the majority's result.

Justice Kennedy's *Giarratano* concurrence is the law.[301] Thus, indigent death row inmates' right of meaningful access to the courts may, in certain specific cases, require the assistance of persons "learned in the law." Under the reasoning in Justice Kennedy's *Giarratano* concurrence, Mr. Haynes has been denied meaningful access to the courts. Mr. Haynes has only a high school education and was obviously not capable of investigating,

---

[301] *Marks v. United States*, 430 U.S. 188, 193 (1978) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

researching, and briefing an adequate application for post-conviction relief, *from the confines of Texas's death row*. Mr. Haynes was induced to place his trust in the state's guarantee that it would secure "competent" counsel for him. He relied on state-appointed counsel to investigate, research, and present his claims to the state court. The lawyer instead admittedly failed to investigate the case or plead any extra-record claims.

### F. Mr. Haynes's Rights to Equal protection and Due process of Law Were Denied by the CCA's Violation of Its Statutory Obligation to Afford Him Competent State Habeas Counsel.

#### 1. Fundamental principles of due process and equal protection apply to state post-conviction proceedings.

The Federal Constitution does not require states to afford post-conviction remedies to convicted criminals, even those under sentence of death. *Murray v. Giarratano*, 492 U.S. 1, 9 (1989) (plurality opinion). Nor is the appointment of counsel required in such cases. *Id.*; *see also Pennsylvania v. Finley*, 481 U.S. 551, 558 (1987) (denying general right to counsel in state postconviction proceedings). Nevertheless, state-created forums in which citizens can vindicate fundamental rights must afford due process to litigants.[302] "Upon the state courts, equally with

---

[302]*See, e.g., Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution--and, in particular, in accord with the Due Process clause."); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1979) (holding that state law conferring on defendant the right to have his sentence fixed by a jury, although concededly without a direct federal constitutional dimension, nevertheless created a "substantial and legitimate expectation" that defendant would be sentenced in accordance with state law); *Welch v. Belo*, 355 F.2d 1016, 1020 (5th Cir.) ("Having invoked the Texas statutes granting post-conviction hearings, [the Applicant] had the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment."), *cert. denied*, 385 U.S. 839 (1966).

-309-

the courts of the Union, rests the obligation to guard and enforce every right secured by the] Constitution." *Mooney v. Holohan*, 294 U.S. 103, 113 (1935). Some adequate state forum should be provided both for claims obvious from the record and for postconviction claims, which traditionally rely on extra-record proof:

> A State must give one whom it deprives of his freedom the opportunity to open an inquiry into the intrinsic fairness of a criminal process even though it appears proper on the surface. Questions of fundamental justice protected by the Due Process Clause may be raised, to use lawyers' language, dehors the record.

*Carter v. Illinois*, 329 U.S. 173, 174 (1946) (citing *Mooney*); *Foster v. Illinois*, 332 U.S. 134, 138 (1947) (noting that if Illinois does not provide a forum for vindicating federal claims based on extra-record evidence, Foster should raise "a new claim of denial of due process for want of such relief"); *Frank v. Mangum*, 237 U.S. 309, 334 (1915) (approving Georgia regime allowing for consideration of evidence "not confined to the mere record of conviction, but going at large, and upon evidence adduced outside of that record, into the question whether the processes of justice have been interfered with in the trial court").

The "exhaustion" doctrine requires inmates to give state courts a chance to remedy federal violations before invoking their right to federal review of the claims. *See, e.g., Ex Parte Royall*, 117 U.S. 241 (1886); *Ex Parte Hawk*, 321 U.S. 114, 117-18 (1944); *see also* 28 U.S.C. § 2254(b)(1) (1996) (codifying exhaustion doctrine). The exhaustion requirement is meaningless, however, if the state court either provides no forum for the litigation of federal claims or provides an obviously inadequate forum. *Young v. Ragen*, 337 U.S. 235, 238 (1949) ("The doctrine of exhaustion of state remedies, to which the Supreme Court has required the scrupulous adherence of all federal courts, presupposes that some adequate state remedy

-310-

exists.") (citation omitted).

In *Case v. Nebraska*, 381 U.S. 336 (1965) (*per curiam*), the Court granted certiorari "to decide whether the Fourteenth Amendment requires that the States afford state prisoners some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees." *Id.* at 336.[303] Justices Clark and Brennan wrote separately to urge the creation of simple, fair postconviction forums in which prisoners could exhaust their federal constitutional claims. *See id.* at 336 (declaring that the "wide variety" of then-current postconviction techniques had proven "entirely inadequate" to vindicate federal rights, leading to a "tremendous increase" in federal habeas filings) (Clark, J., concurring); *id.* at 346 (remarking that adequate state procedures were "all too scarce" and that states "should provide a postconviction process at least as broad in scope as existing Federal statutes.") (Brennan, J., concurring). Soon after *Case*, most American states revised their post-conviction procedures to provide an adequate forum for the consideration of extra-record claims. *See* Note, *State Post-Conviction Remedies and Federal Habeas Corpus*, 12 WM. & MARY L. REV. 149, 170 (Table 2, listing effective date of revisions of state postconviction statutes).

The factors that induced the *Case* court to refrain from deciding the ultimate issue presented by the petition are absent here. First, Nebraska's enactment of a comprehensive habeas scheme opened an opportunity for Case of which he had yet to take advantage. Second, the *Case* court knew that later federal review would likely provide Case with at least one forum

---

[303] Nebraska's intervening update of its postconviction procedures rendered the question moot, and the Court remanded so that the Applicants could take advantage of the new procedures. *Id.* at 338.

for consideration of his federal claims. *Case*, 381 U.S. at 346 (Brennan, J., concurring); *see also Woods v. Niersthemier*, 328 U.S. 211, 216 (1946) ("[I]f the State of Illinois should . . . deny all remedies to individuals imprisoned within the state in violation of the Constitution of the United States, the federal courts would be available to provide a remedy to correct such wrongs."). Finally, the fact that this is a death penalty proceeding strengthens the rationale for ensuring fundamental fairness.   The Supreme Court recently reaffirmed the mandate that "capital proceedings be policed *at all stages* by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Monge v. California*, 118 S. Ct. 2246, 2252 (1998) (citing *Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part)) (emphasis added).   The constraints on habeas corpus are familiar, but the Supreme Court has never wavered from the principle that one full and fair opportunity to seek habeas relief is an important part of ensuring fairness in capital proceedings.[304]

> **2. The trial court's and the CCA's decision violates due process by denying access to meaningful appellate remedies without any showing of wrongdoing on Mr. Haynes's part.**

Mr. Haynes's state habeas corpus petition was totally inadequate.   The state courts -- not

---

[304]   *E.g. McFarland v. Scott*, 512 U.S. 849, 858, 859 (1994) ("[Q]uality legal representation is necessary in capital habeas corpus proceedings [which have] a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty."); *Murray v. Giarratano*, 492 U.S. 1, 14 (1989) ("It cannot be denied that collateral relief proceedings are a central part of the review process for prisoners sentenced to death.") (Kennedy, J., concurring); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("The role of federal habeas proceedings [] is important in assuring that constitutional rights are observed."); 135 Cong. Rec. S13483 (1989) (reprinting JUDICIAL CONFERENCE OF THE UNITED STATES, AD HOC COMMITTEE ON FEDERAL HABEAS CORPUS IN CAPITAL CASES  (Powell, J., presiding) (Aug. 23, 1989)) ("In habeas corpus proceedings fairness requires that a defendant be provided a searching and impartial examination of his claims.").

Mr. Haynes -- chose the lawyer who represented him, and did so pursuant to a scheme which promised competent counsel.  Mr. Haynes has paid for the State's failure to live up to its commitment by being forced to present unexhausted claims to the federal district court and being dismissed from federal court without prejudice to exhaust those claims through a subsequent application that was not even examined on the merits.

An attorney acts as his client's agent, and that client must normally be bound by the attorney's mistakes.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991).  However, the consequences of the blind application of this doctrine in this case are so utterly detached from any wrongdoing on the part of the *only* person who must suffer them, that they offend basic principles of ordered liberty.  Legal fictions, such as the fiction which reflexively punishes Mr. Haynes for the mistakes of an incompetent and ineffective state habeas attorney he did not choose, must yield when their application would offend basic principles of fairness and proportionality.[305]

Mr. Haynes was denied a meaningful opportunity to investigate, research, and present post-conviction claims in the state courts.  The forfeiture of appellate review for appellants who escape during their appeals, as an unambiguous "punishment" or "sanction" for their misconduct, has consistently been upheld by the Supreme Court against constitutional challenges.  *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239-41 (1993) (citing cases).

---

[305] *See, e.g., Austin v. United States*, 509 U.S. 602, 618 (1993) (legal fiction identifying drug asset forfeitures as "in rem" proceedings against property itself cannot hide fact that forfeiture is actually a criminal punishment of the property's owner reviewable under the Excessive Fines Clause); *Kennedy v. Mendoza-Shields*, 372 U.S. 144, 165-66 (1963) (rejecting legal fiction that forfeiture-of-citizenship proceedings not subject to constitutional safeguards because they are "civil" in nature).

However, in such cases, punishment is justified by the fact that the appellants have intentionally engaged in misconduct "reasonably calculated to disrupt the very appellate process which they themselves have set in motion." *Estelle v. Dorrough*, 420 U.S. 534, 540 (1975) (per curiam).

The denial of the meaningful representation promised by law to Mr. Haynes is punishment, just as surely as asset forfeitures, citizenship revocations, and appellate dismissals are punishments. This recognition triggers the fundamental due process requirement that adverse government action be at least roughly calibrated to the degree to which its target has intentionally done wrong.[306] With evidence in the record that appointed counsel's performance was not competent but was ineffective  the forfeiture imposed on Mr. Haynes was grossly disproportionate punishment for his attorney's mistake.

### 3.   The State violated Mr. Haynes's due process rights by inviting his reasonable reliance on its promise to provide him with competent counsel, then punishing him when that promise was broken.

When a State enacts a procedure that benefits a particular class of persons, a member of that class can claim a "substantial and legitimate expectation" that the State will apply the procedure to him. *Hicks v. Oklahoma*, 447 U.S. 343, 345 (1980). This expectation is rooted in due process principles which apply even when the state-law benefit at issue is not of federal

---

[306] *See, e.g.*, *Southwestern Telegraph & Telephone Co. v. Danaher*, 238 U.S. 482, 490 (1915) ("[F]undamental principles of justice embraced in the recognized conception of due process of law" prevent punishment of one who committed "no intentional wrongdoing, no departure from any  prescribed or known standard of action, and no reckless conduct"); *cf. United States v. Bajakajian*, 118 S. Ct. 2028, 2039 (1998) (rejecting seizure of $357,144 from defendant under Excessive Fines Clause as punishment for violating reporting requirement because punishment "grossly disproportionate" to defendant's wrongdoing).

constitutional dimension.[307]  Had Mr. Haynes been informed that his counsel might render

inadequate assistance which would render ineffectual his right to state post-conviction review

and jeopardize his opportunity for federal review, *and* that Texas courts would do nothing to

palliate the effect of that error, Mr. Haynes might have made an informed decision to at least

try to proceed pro se earlier than he in fact did,[308] or to find counsel willing to represent him on

a *pro bono* basis.

As it is, he relied on the State's assurances to his detriment.  The Supreme Court recently

reaffirmed that the reasonable reliance interests of state officials should be respected in death

penalty proceedings.  *Thompson v. Calderon*, 118 S. Ct. 1489, 1499 (1998) (criticizing lower

federal court for suddenly reopening seemingly concluded federal habeas proceedings even

though "the executive branch of California's government took extensive action in reliance on

the mandate denying relief").  Mr. Haynes's reliance interests deserve equal respect: just as

California's executive officials were wronged by the federal court's unwarranted decision to

---

[307]  *Id.*; *see also Heckler v. Mathews*, 465 U.S. 728, 746 (1984) (appropriate to consider protection of "reasonable reliance interests" in evaluating government action); *Knox v. Collins*, 928 F.2d 657, 660 (5th Cir. 1991) (although right to exercise peremptory challenges not guaranteed by Constitution, judge's violation of promise to give particular jury instruction violated "essential demands of fairness" when defendant showed that he had relied extensively on promised instruction in determining whom to strike with peremptory challenges).

[308]  In fact, Mr. Haynes might have been better off had he filed a timely *pro se* habeas petition relying on specific factual allegations culled from his memory of the trial and appellate proceedings.  At least he would have been entitled to the benefit of the familiar rule that *pro se* pleadings are to be construed liberally.  *White v. Cole*, 880 S.W.2d 292, 294 (Tex. App. -- Beaumont 1994, writ denied).  However, Texas forbids "hybrid representation."  *See, e.g.*, *Flores v. State*, 871 S.W.2d 714, 723 (Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 926 (1994).  Thus, Mr. Haynes faced an all-or-nothing choice of either representing himself *pro se* or relying on appointed counsel.

delay execution of an exhaustively-reviewed death sentence, Mr. Haynes was wronged by Texas' unwarranted refusal to remedy the consequences of its broken promise to afford him a competent lawyer.

### 4. The trial court and the CCA's decision denied Mr. Haynes the equal protection of the law.

State-court proceedings not mandated by the federal constitution are nevertheless subject to minimal equal-protection standards requiring a "rational basis" to justify differential treatment of similarly-situated individuals. *Dorrough*, 420 U.S. at 568. Members of the Supreme Court have observed that the minimal guarantees of equal protection which apply to clemency proceedings would be violated by "a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Ohio Adult Parole Auth. v. Woodard*, 118 S. Ct. 1244, 1254 (1998) (O'Connor, J., concurring, joined by Souter, Ginsburg, & Breyer, JJ.). Mr. Haynes has been denied any meaningful access to the state postconviction process -- a denial which may affect these proceedings.

What "rational basis" would subject Mr. Haynes to these deprivations while other indigent death row inmates receive "one full and fair round" of habeas review? Evidence of his intentional attempts to sabotage the legal process would certainly qualify. Naturally, different standards, and different outcomes, may be imposed on those who have manipulated or flouted processes designed to safeguard their rights.[309] No such abuse has happened here. The only

---

[309] *See, e.g., Dorrough*, 420 U.S. at 568 (forfeiting appeal rights of those who violate bail during pendency of appellate proceedings); *Cantu-Tzin v. Johnson,* 162 F.3d 295 (5th Cir. 1998) (death row inmate's "flouting" of state court procedures and passing up of the opportunity to pursue habeas relief on the merits does not entitle him to appointment of federal counsel to

distinction between Mr. Haynes and other Texas death row inmates is that the State, in his case, violated its own obligation to appoint him competent counsel, whereas it fulfilled that obligation as to other inmates.

The very importance of the right at stake here illustrates the Supreme Court's recognition that equal protection and due process principles can sometimes "converge." *M.L.B. v. S.L.J.*, 117 S. Ct. 555, 556 (1996). In cases dealing with the right of access to courts in proceedings not required by the Constitution, the proper equal protection analysis balances "the character and intensity of the individual interest at stake, on the one hand, and the State's justification for its exaction, on the other." *Id.* (citing *Bearden v. Georgia*, 461 U.S. 660, 666-67 (1983)).[310] Mr. Haynes's interest in receiving full and fair scrutiny of his conviction and death sentence is unquestionably substantial and legitimate.

The trial court's and the CCA's justifications for its actions are not in the record. Indeed, it is difficult to think of a legitimate reason for the CCA to ignore its clear statutory duty to ensure competent representation by failing to ensure the appointment of competent counsel *ex ante* or, at least by affording relief in cases where it has become clear that appointed counsel

---

address the merits of time-barred habeas petition); *United States v. Dunnigan*, 507 U.S. 87, 96 (1993) (enhancing defendant's sentence based on her perjury during trial); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) (denying review of claims to Applicants who cause "severe . . . disruptions" by filing piecemeal, successive habeas writs).

[310] Another factor in determining whether appellate equal protection or due process rights have been violated is the likelihood that the determination being appealed is correct. *Id.* As five members of the Supreme Court acknowledged, "a substantial proportion of [death row] prisoners succeed in having their death sentences vacated in habeas corpus proceedings." *Murray v. Giarratano*, 492 U.S. 1, 14 (Kennedy, J., concurring) (citing *id.* at 25 n.13 (Stevens, J., dissenting, joined by Marshall, Brennan and Blackmun, JJ.)).

performed below the standard required by 11.071.

Federal courts' respect for the State's sovereign power has always assumed that the state itself has shown reciprocal respect for federal rights by affording adequate review to indigents. *See, e.g., Thompson*, 118 S. Ct. at 1501. (observing that state court had considered and rejected challenges to inmates sentence four times, that the Governor had reviewed the death sentence "in a comprehensive and public decision"); *Murray v. Carrier*, 477 U.S. 478, 487 (1986) (deference owed to states' "good-faith attempts to honor constitutional rights"). Here, the State's own conduct undermined its ability to claim respect for its judgments in federal court.

**CLAIM XI:   ARTICLE 37.071(e) & (g)'S PROHIBITION AGAINST INFORMING JURORS THAT A SINGLE HOLDOUT JUROR WILL CAUSE THE IMPOSITION OF A LIFE SENTENCE VIOLATED MR. HAYNES'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A.     **Texas' "12-10 rule" violated Mr. Haynes's rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, section 13 of the Texas Constitution**

The version of TEX. CODE CRIM. PRO. Art. 37.071 in operation at the time of Petitioner's trial provided that in order for the trial court to impose a death sentence, all twelve jurors had to answer both of the "special issues" affirmatively; to impose a life sentence, at least ten jurors had to answer any of the special issues negatively.  A failure of a capital sentencing jury to garner the requisite number of votes either way resulted in the imposition of a life sentence.  However,

-318-

Petitioner's **jurors were not informed that if they failed to reach a collective decision either way -- if one juror answered "no" to any special issue -- the court would impose a life sentence.** Instead, they were instructed by the trial court that the jury must either unanimously agree to answer both of the "special issues" affirmatively (in which case a death sentence would be imposed), or ten or more jurors were to agree to answer one or more of the "special issues" negatively (in which case a life sentence would be imposed).[311]   As we shall see, this had dramatic consequences for Mr. Haynes's jury.

The collective operation of these provisions of Article 37.071, upon which Texas capital sentencing jury charges are modeled, has come to be known as the "12-10 rule."[312]   This feature of 37.071 creates the potential for considerable confusion among reasonable jurors. The United States Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *See California v. Brown*, 479 U.S. 538, 541 (1985); *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985). The Texas statute implicitly informs a juror that, absent similar votes from nine

---

[311]   The court instructed Mr. Haynes's jury:
> In deliberating on Special Issue No. 1 you shall consider all the evidence admitted at the guilt or innocence stage and the punishment stage of trial, including evidence of the defendant's background, character, the personal moral culpability or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.
> You may not answer Special Issue No. 1 "Yes" unless you agree unanimously.
> You may not answer Special Issue No. 1 "No" unless ten (10) or more jurors agree...
> You may not answer Special Issue No. 2 "No" unless you agree unanimously, and you
may not answer Special Issue No. 2 "Yes" unless ten (10) or more of you agree to do so.
> 2 CR 452-453.

[312]   *See* Robert J. Clary, "Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure," 19 *St. Mary's L. J.* 353, 358-59 (1987).

other jurors, his or her "no" vote to a special issue -- e.g. a vote against the imposition of the death penalty -- is meaningless because it alone cannot be sufficient to result in a life sentence.

Texas' 12-10 rule generates the danger that confused jurors otherwise disposed to vote for a life sentence will conform to a "majority rules" mentality. Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them; if a majority of other jurors are firmly voting "yes," a single juror may feel obliged to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383 (1988) ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are expressly instructed to do so."). Such a belief on the part of a juror is contrary to Texas law, which dictates that if a capital juror is unable to agree on answer to any of the special issues, the court must sentence the defendant to life.

Mr. Haynes has demonstrated that the "12-10" rule prejudiced him in this case. A motion for a new trial was brought, based partly on this claim. As part of that motion, direct appeal counsel investigator Cynthia Patterson attempted to interview all jurors. She did interview juror Sharon Malazzo:

> According to Sharon Malazzo, the jurors did not know that failure to reach a unanimous verdict or an agreement of ten jurors in answer to the special issues would result in an automatic imposition of a life sentence. Sharon Malazzo expressed the opinion that knowing that information would have had an impact on the jury and that it might have made a difference in their verdict. Malazzo said for her personally, 'yes, it probably would have made a difference." Malazzo stated that the jurors started discussing Special Issue number two late in the day and that it was "misinterpreted." They interpreted the statutory definition to exclude from their consideration anything that did not reduce the

defendant's moral blameworthiness for the crime itself, including evidence that they would have otherwise considered as mitigating.[313]

This proved that Petitioner was prejudiced by the working of this rule.

In *Davis v. State*, 782 S.W.2d 211 (Tex. Crim. App. 1989), the Court acknowledged the possibility that "'a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock.'" *Id.* at 221, quoting *Barfield v. Harris*, 540 F.Supp. 451, 472 n. 17 (E.D.N.C. 1982), *affirmed*, 719 F.2d 58 (4th Cir. 1983), *cert. denied*, 467 U.S. 1210 (1984). However, the *Barfield* opinion quoted in *Davis* also speculated that it was just as likely that a life-prone juror would refuse to consider the evidence and the views of her fellow jurors in favor of a death sentence if she knew her steadfastness would result in a life sentence. *Id.* The *Barfield* opinion, cited with approval by the Texas Court of Criminal appeals concluded that:

> Neither scenario results in a "reliable" or desirable process of deliberation, but the court cannot say that the first scenario is significantly more likely to occur as a result of not giving the instruction than is the second as of giving it. *Id.*

Support for the proposition that a juror in the minority may be subject to coercion, and that such coercion results in a constitutionally unreliable sentence, is found in the United States Supreme Court's cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to requiring further jury deliberations. *See, e.g., Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988); *Brasfield v. United States*, 272 U.S. 448, 450 (1926).

---

[313]   *See* Motion for New Trial, 3 CR 522-538 at 537-538, Affidavit of Cynthia Patterson, Exhibit 67.

In such cases, the Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear `in some degree, serious although not measurable, an improper influence upon the jury.'" *Lowenfield*, 484 U.S. at 239 (citing *Brasfield*, 272 U.S. at 450). Put another way, Texas' "12-10 rule" is a built-in impermissible "dynamite charge," which the Supreme Court has recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield*, 484 U.S. at 240-41. In *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989), the United States Court of Appeals for the Seventh Circuit noted that the instructions to Kubat's jury stated both correctly and incorrectly the law as to whether a unanimous verdict was required to find a mitigating circumstance.[314] However, they reasoned that the fact that the jury had heard a correct explanation of the law did not rescue the law's constitutionality:

> At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits. At best, it may have entered the jury room confused. Indeed, even if only one juror had been confused, the reliability of the verdict is undermined. For if that one juror thought that the death penalty should not be imposed, he or she might have submitted to the views of the other eleven because of the mistaken belief that unanimity was required.

*Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989). As the reasoning of the Seventh Circuit reveals, there is little constitutional difference between a jury being instructed that they must find a mitigating circumstance unanimously, and a jury being instructed that they must answer

---

[314] Mr. Haynes's jury received similarly ambiguous instructions. They were told that "You may not answer Special Issue No. 1 "Yes" unless you agree unanimously.

You may not answer Special Issue No. 1 "No" unless ten (10) or more jurors agree...

You may not answer Special Issue No. 2 "No" unless you agree unanimously, and you may not answer Special Issue No. 2 "Yes" unless ten (10) or more of you agree to do so.

2 CR 452-453. They were also told that the burden of proof in Special Issue No. 1 rests upon the State, and it must prove that issue beyond a reasonable doubt. *Id.* at 452

a special issue unanimously or by a majority of 10 jurors.

The United States Supreme Court has held that the possibility that a jury may be confused about facts important to their capital-sentencing role has constitutional implications. In *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994) the Court held that a criminal defendant must be given the opportunity to inform the jury that he would never be eligible for parole if given a life sentence. *Id.* at 2196 (plurality opinion per Blackmun). The plurality reasoned that "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested." *Id.* at 2195. The information about petitioner's parole eligibility was of "obvious relevance . . . to the jury's formidable sentencing task." *Id.* at 2197. The parallel is obvious: the significance of an **individual** vote of "no" to either of the special issues was of "obvious relevance" to any jury, but they were denied information on this point. Justice Souter's concurring opinion in *Simmons* makes the reliability concerns raised by potential jury confusion even clearer: "Whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning. . . ." *Id.* at 2198 (Souter, J., concurring). The jurors in petitioner's case were told they could vote "no" to a special issue, but were never told what the result of that single vote would be, as a result, they may have misunderstood the meaning of their vote. Thus, the Texas capital-sentencing scheme "diminish[ed] the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980).

In this way, Article 37.071's "12-10 Rule" injected arbitrariness into the proceedings and

-323-

created an **unreliable** sentencing determination -- a constitutional violation of the highest order in the capital sentencing context.[315] *See State v. Williams*, 392 So.2d 619, 631 (La. 1980) (on rehearing). In *Williams*, the court stated:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. They were not told that, by their failure to decide unanimously, they would in fact decide that the court must impose a sentence of life imprisonment. . . . **Instead, the members of the sentencing body were left free to speculate as to what outcome would be in the event there was no unanimity**. Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required.

*Williams*, 392 So.2d at 631 (emphasis added). Such a risk of speculation and confusion was held to be a constitutional violation by the Louisiana Supreme Court. *Id. See also State v. Ramseur*, 524 A.2d 188, 284 (N.J. 1987). Like the statute under which Mr. Haynes was sentenced, the sentencing statute at issue in *Williams* required the trial court automatically to impose a life sentence if the jury deliberations ended in a deadlock. *See* TEX. CODE CRIM. PRO. Art. 37.071(e) (Vernon's 1994). *Williams* deemed constitutionally impermissible the **potential** for speculation and confusion on the part of the jury. Mr. Haynes is similarly entitled to relief.

> **2. Texas' 12-10 rule violated Mr. Haynes's rights under the Eighth Amendment to the United States Constitution, as construed by the**

---

[315] *See Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988) (noting that capital sentencing proceedings made unreliable by coercion of jurors violate Eighth Amendment); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Stevens, & Powell, JJ.) (holding that mandatory death sentences deprive defendants of reliable, individualized sentences in violation of Eighth Amendment); *Cf. Gardner v. Florida*, 430 U.S. 349 (1977) (plurality opinion) (holding that capital-sentencing procedures which restrict defendant's ability to offer mitigating evidence lead to unreliable capital sentencing proceedings that violate due process clause of Fourteenth Amendment).

**United States Supreme Court's decision in *Mills v. Maryland*[316]**

The 12-10 rule also violates the Eighth Amendment principle in *Mills v. Maryland*, 486 U.S. 367 (1988),[317] that it is unconstitutional to instruct capital sentencing jurors in a manner leading reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors are in agreement a that particular mitigating factor or factors exist. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct that there must be a meeting of the minds among some threshold number of jurors[318] as to whether the mitigating evidence offered by the capital defendant warrants a negative answer to at least one special issue, thus resulting in the imposition of a life sentence. *See Mills*, 486 U.S. at 373-75. Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will cave into a "majority rules" mentality is too great under the Eighth Amendment. *See Mills*, 486 U.S. at 383 ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so.").

Under *Mills*, a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in

---

[316] 486 U.S. 367, 383 (1988).

[317] *See also McKoy v. North Carolina*, 494 U.S. 433 (1990) (holding that it is a violation of the Eighth Amendment to require a unanimous verdict as to mitigating circumstances in capital sentencing trials).

[318] In *Mills*, the threshold number was twelve; under the Texas statute, the threshold number is ten.

favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.[319]  *See Kubat v. Thieret*, 867 F.2d 351, 369-73 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989).  In *Kubat*, in finding a *Mills* violation, the Seventh Circuit was faced with a capital sentencing scheme virtually identical[320] to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to  death. . . .  [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373; *cf. Andres v. United States*, 333 U.S. 740, 752 (1948) (reasoning that, in a federal death penalty case, a juror uninformed as to the consequences of a less-than-unanimous verdict "might reasonably conclude that, if they cannot all agree to grant mercy, then the verdict

---

[319]  Under the Texas statute at issue here, jurors were not asked to find specific mitigating factors which were to be weighed against specific aggravating factors, as was true in *Mills*. Rather, as this Court is aware, Texas' unique capital sentencing scheme instead only asks jurors to answer three "special issues" -- whether a capital defendant committed the crime "deliberately" and whether the capital defendant would pose a "future threat" to society if given a life sentence. *See* Tex. Code. Crim. Pro. Art. 37.071(b) (Vernon's 1989).

However, as the United States Supreme Court has repeatedly held, Article 37.071(b)'s "special issue" format permits juries to consider and give proper mitigating effect to almost all types of mitigating evidence. *See Johnson v. Texas*, 119 S. Ct. 2658, 2670 (1993) ("A Texas capital jury deliberating over the Special Issues . . . is likely to weigh mitigating evidence as it formulates . . . answers in a manner similar to that employed by capital juries in `pure balancing' states."); *Adams v. Texas*, 448 U.S. 38, 46 (1980) (in deliberating special issues, jurors answer "on the basis of all relevant evidence not only why the death sentence should be imposed but also why it should not be imposed").  Thus, for purposes of Petitioner's arguments herein, this Court must treat the Texas capital sentencing scheme as one in which jurors weigh mitigating factors against aggravating factors, just as jurors do under a "pure" balancing statute.

[320]  In *Kubat*, as in *Mills,* the jury was instructed that the threshold number of jurors required for a life sentence was twelve; in Texas, capital sentencing juries are instructed that the threshold number is ten.  The difference is irrelevant since the possibility for one or more jurors "caving in" and not voting for a life sentence based on particular mitigating evidence is identical.

of death must stand unqualified").

The Ninth Circuit has similarly construed the Court's decision in *Mills*. *Mak v. Blodgett*,

970 F.2d 614, 624-625 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993). The *Mak* court

stated:

> The Supreme Court has held that, where the underlying statute does not require
> unanimity [in assessing a life sentence], due process will not tolerate instructions
> that could reasonably be interpreted by a jury to preclude consideration of any
> mitigating factor unless a such a factor was unanimously found to exist. . . . As
> in *Mills*, "[u]nless we can rule out the substantial possibility that the jury may
> have rested its verdict on the `improper' ground, we must remand for
> resentencing."

*Id.* at 625 (citations omitted) (quoting *Mills v. Maryland*, 486 U.S. 367, 377 (1988)).

In *Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992) the appellant argued the

12-10 rule could mislead the jury to believe that a sentence less than death was not possible

unless ten or more jurors answered one of the special issues in the negative. *Id.* at 337. The

*Draughon* opinion recognized that "it is conceivable that. . .[the jury] will surmise later

instructions requiring ten votes for a negative answer [to] mean that a life sentence will not be

imposed otherwise." *Id.* The Court further acknowledged that is was "troubled" by the

implication of Draughon's argument "that. . .[the Texas sentencing scheme], by requiring [a]

consensus [of ten votes for a "no" answer to a special issue], inhibit[s] the free exercise by each

juror of his individual judgment about the propriety of a death sentence." *Id.* at 338. However,

the Court stated:

> [I]t is the danger that jurors, unaware of the operation of the law, might
> mistakenly think a sentence other than death to be **impossible** unless ten of them
> agree that renders the procedure constitutionally suspect. But, because the jury
> instructions of which Appellant here complains are not reasonably susceptible of

-327-

such an interpretation, we are satisfied that no juror would be misled by them into thinking that an affirmative answer should be given unless ten or more jurors agree to give a negative one.

*Id.* at 338. However, the Court of Criminal Appeals failed to consider the possibility that Texas' 12-10 rule would mislead the jury to believe a mistrial would result from the jury's failure to garner 12 "yes" votes or 10 ten "no" votes, resulting in one or more jurors basing his or her determination on an incorrect understanding of the law. As we have seen, this was indeed the case here, as Sharon Malazzo has stated that, had she known the operation of this confusing rule, that it "probably would have made a difference" as to her vote.[321]

Even before the United States Supreme Court's decision in *Mills*, at least one other state court has recognized the constitutional infirmity in a sentencing determination made after a jury had "thrown away" their dissenting vote because they could not sway a majority of their fellow jurors. In *People v. Durre*, 690 P.2d 165 (Colo. 1984), the jury was instructed according to Colorado law, which called for them to explicitly note any mitigating or "additional mitigating" factors they found and weigh them against the aggravating factors they found. *Id.* at 175-76. The jury was not told how to find the mitigating factors or whether they had to agree on which factor called for leniency. *Id.* The foreman returned a jury form reflecting that they had found aggravating circumstances and had found no mitigating circumstances, and thus that Durre should be sentenced to death. *Id.* at 170. However, the foreman attached a note to the form saying that though they could neither "claim the mitigating circumstances" nor "deny the aggravating circumstances," nevertheless several jurors had concluded that Durre should not die.

---

[321] *See* Exhibit 67 at 537.

*Id.* The trial judge personally interviewed the five dissenting jurors, who told him that even though they felt that Durre should be spared, they agreed with the "verdict." *Id.* at 170 & n.10. The trial judge, however, dismissed their votes against death as the product of mere "conscientious difficulties" and sentenced the defendant to death in accordance with the general verdict. *Id.* at 170.

The Colorado Supreme Court reversed the death sentence, dismissing as "faulty" the state's contention that "jury findings on mitigation and aggravation involve no consideration whatever of the issue of punishment." *Id.* at 171. That court intoned:

> Without such an instruction [on the effect of their verdict], the jury will not only be required to labor in the dark about what it is actually deciding by its verdicts but also, of equal importance, will be ill-equipped to fulfill its function of serving as the vital link between contemporary community values and the propriety of the life-and-death decision which its verdicts necessarily resolve.

*Id.* at 173. Therefore, the Colorado Supreme Court ruled that jurors must be explicitly informed of the results of their findings of mitigating and aggravating circumstances. *Id.* at 174 & n.15. Here, Mr. Haynes's jurors were never informed of the results of any individual juror's decision to stick to his verdict for life. This is no different from not being told what the consequences of the entire jury's verdict would be[322]. Any one of Mr. Haynes's jurors may have believed that by holding out for a life sentence, a mistrial would be declared.[323] This aspect of Texas' 12-10

---

[322]This is especially troubling, and constitutionally infirm, given the failure of the trial court to give instructions allowing the jurors to consider mitigating evidence not specifically addressed within the special issues. *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

[323] The Louisiana Supreme Court explained the consequences of leaving the jury in the dark thus:

> Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial before

-329-

rule is a *Mills* violation *a fortiori*.  That is, a reasonable juror may have believed, contrary to Texas law, that they had no ability to give mitigating effect to **any and all types of mitigating circumstances** unless at least nine other jurors also voted for life.  This very circumstance **actually occurred in Mr. Haynes's jury, as juror Sharon Malazzo has stated.**[324]

This failure to instruct each individual juror of the consequences of his or her firmly held beliefs was condemned by the Supreme Court over 100 years ago in *Calton v. Utah*, 130 U.S. 83 (1889).  In *Calton*, the Supreme Court reversed a conviction under the Utah territorial statutes where the jury had not been informed of the right to recommend a sentence other than death.  The Court wrote that if the jury had their attention called to the alternative sentence then "it may be that they might have made such a recommendation and thereby enable the sentence to be a life sentence."  In his opinion for the Court, the first Mr. Justice Harlan adopted the lower court's dissent:

> The prisoner was deprived of a substantial right. The determination of the question as to whether he should suffer death or imprisonment was one of vital consequence to him. The jury, to whom the statute commits the determination of that question, at least in part, were not informed of their duty and responsibility in the matter, so as to require them to exercise their judgment and discretion in relation to it, and by the verdict they rendered the court had none.

*Id.* quoting *Territory v. Catton*, 16 P. 902, 910 (Utah 1888) *rev sub nom Calton v. Utah*, 130 U.S. 83 (1889).

---

> another jury would be required.  Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings.

*State v. Williams*, 392 So.2d 619, 634-35 (La. 1980).

[324] *See* Exhibit 67 at 537.

Petitioner recognizes that "[a] critical assumption underlying [the] system [of trial by jury] is that juries will follow the instructions given them by the trial judge." *Parker v. Randolph*, 442 U.S. 62, 73 (1979) (plurality opinion). Here, though, the instructions themselves were deficient: they "did not tell the whole truth, because [they] did not tell the jurors what to do in the event of a disagreement." *Gacy v. Welborn*, 994 F.2d 305, 307 (7th Cir. 1993), *cert. denied* 114 S. Ct. 269 (1993). Where one instruction contradicts another instruction, it has constitutional consequences. Contradictory instructions make it impossible to know which instructions jurors used in reaching their verdict. *Cabana v. Bullock*, 106 S. Ct. 689, 695 n.2 (1986). Here, the jurors were instructed that each must be convinced beyond a reasonable doubt, but also instructed that it would take 10 votes to impose a life sentence. Such contrary instructions were constitutionally deficient. In *Boyde v. California*, 494 U.S. 370, 380 (1990), the Court held that the proper inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence." Petitioner has demonstrated not only that there is a reasonable likelihood that the jury applied Texas' 12-10 scheme in an unconstitutional manner resulting in an unreliable sentencing determination, but that **it actually occurred at his trial.**[325]

## CLAIM XII: LETHAL INJECTION – AS IT IS CURRENTLY ADMINISTERED IN TEXAS – PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.

---

[325] *See* Exhibit 67 at 537.

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); *Fierro v. Gomez*, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous. Death is not extremely rapid or within a matter of seconds. Rather . . . inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains . . . acute anxiety, and struggling to breath"), *aff'd,* 77 F.3d 301, 308 (9th Cir. 1996), *vacated on other grounds,* 519 U.S. 918 (1996). Further, "[p]unishments are cruel when they involve . . . a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890). A punishment is particularly constitutionally offensive if it involves the *foreseeable* infliction of suffering. *Furman v. Georgia*, 408 U.S. 238, 273 (1973), citing *Resweber*, *supra* (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

It is not only foreseeable, it is predictable that death by lethal injection as it is currently practiced in Texas – using a paralytic agent in combination with a sedative – will produce unnecessary pain, torture, and lingering death. Evidence has existed for at least fifty years that the "drugs used in lethal injections pose a substantial threat of torturous pain to persons being executed." *Chaney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), *overturned on other grounds,*

-332-

*Heckler v. Chaney*, 470 U.S. 821 (1985) (citing ROYAL COMMISSION ON CAPITAL

PUNISHMENT, 1949-1953 REPORT (1953)).  The Court of Appeals found that

> Appellants have presented substantial and uncontroverted evidence to support their claim
> that execution by lethal injection poses a serious risk of cruel, protracted death.  See
> ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 REPORT (1953),
> Exhibit 1 to Letter to the Secretary, supra, JA 34-40.  Even a slight error in dosage or
> administration can leave a prisoner conscious but paralyzed while dying, a sentient
> witness of his or her own slow, lingering asphyxiation.
> *Id.* at 1191.

Further, an employee of the Texas Department of Criminal Justice has admitted that the

Texas lethal injection protocol has not changed since it was first used in 1982.  *Judge Denies*

*Stays of Three Executions*, HOUSTON CHRONICLE, Dec. 9, 2003, at A29 (quoting a TDCJ official

who acknowledges that no changes have been made to the procedure in place since 1982).

What has changed over the last two decades, however, is that numerous states, most

recently the State of Texas, have enacted statutes regulating the euthanasia of animals which

preclude using the same combination of drugs currently administered to human beings during

executions.[326]  If evolving standards of decency, as reflected by legislative action and

professional association of veterinarians, preclude the use of these particular drugs when killing

a dog or a cat, then certainly those same standards of decency would require a more humane,

readily available version of the lethal injection for human beings as well.  "'The basic concept

underlying the Eighth Amendment is nothing less than the dignity of man . . . . The Amendment

must draw its meaning from the evolving standards of decency that mark the progress of a

maturing society.'" *Atkins v. Virginia*, 311-312 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86,

---

[326]  *See* Exhibit 68, Vernon's Tx. Health & S. §821.052 and 821.055 and related statutes
forbidding for animal euthanasia the combination of drugs used to execute humans in Texas.

-333-

100-101(1958)).

**A.    The combination of chemicals used to execute inmates in Texas creates a strong probability of unnecessary suffering and torture.**

The State of Texas proposes to execute Mr. Haynes by poisoning him with a lethal combination of three chemical substances: Sodium Thiopental, or Sodium Pentothal (an ultrashort-acting barbiturate); Pancuronium Bromide, or Pavulon (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the person's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).[327] While each of these chemicals individually creates concern about their use in the execution process, in combination they cannot pass constitutional muster.  Far from producing a rapid and sustained loss of consciousness and humane death, this particular combination of chemicals often causes the inmate to consciously suffer an excruciatingly painful and protracted death.

**1.    Sodium Thiopental**

Sodium thiopental, or sodium pentothal, is a short-acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on their own power if any complications arise in inserting a breathing tube pre-surgery.  Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process.

---

[327] *See* Exhibit 69, drugs used to execute in Texas, from TDCJ website "Death Row Facts" at p. 2.

-334-

Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the

College of Veterinary Medicine at the University of Tennessee, recently explained:

> Sodium thiopental is not a proper anesthetic for use in lethal injection. Indeed, the
> American Veterinary Medical Association standards for euthanasia indicate that the ideal
> barbituric acid derivative for animal euthanasia should be potent, long acting, stable in
> solution, and inexpensive. Sodium pentobarbital (not sodium thiopental) best fits these
> criteria. Sodium thiopental is a potent barbituric acid derivative but very short acting
> with one therapeutic dose.

(Affidavit of Dr. Dennis Geiser, in the case of *Texas v. Jesus Flores*, No. 877,994A).[328]

Due to the chemical combination used in the Texas execution process, there is also a

probability that the sedative effect of the sodium thiopental is neutralized by the second

chemical, pancuronium bromide. As Dr. Mark Heath, Assistant Professor of Clinical

Anesthesia at Columbia University states:

> Sodium thiopental is an ultra short-acting barbiturate. It would not be used to maintain
> a patient in a surgical plane of anesthesia for purposes of performing surgical procedures.
> It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure.
> If the solution of sodium thiopental comes into contact with another chemical, such as
> pancuronium bromide, the mixture of the two will cause the sodium thiopental
> immediately to precipitate or crystallize. These factors are significant in the risk of the
> inmate not being properly anesthetized, especially since no-one checks that the inmate
> is unconscious before the second drug is administered.

(Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).[329]

Concerns about using sodium thiopental are heightened by the lack of medical personnel,

the lack of proper monitoring of the inmate during the process and the lack of inmate-specific

dosing of the barbiturate. According to Dr. Geiser:

> [T]he dosage of thiopental sodium must be measured with some degree of precision, and

---

[328]   *See* Exhibit 70.

[329]   *See* Exhibit 70.

the administration of the proper amount of the dosage will depend on the concentration of the drug and the size and condition of the subject. Additionally, the drug must be administered properly so that the full amount of the dosage will directly enter the subject's blood stream at the proper rate. If the dosage is not correct, or if the drug is not properly administered, then *it will not adequately anaesthetize the subject, and the subject may experience the untoward effects of the neuromuscular blocking agent...* Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted on other grounds*, 122 S .Ct. 1463 (U.S. April 8, 2002) (No. 01-9094).(emphasis supplied).[330]

Moreover, drug manufacturers warn that without careful medical supervision of dosage and administration, sedatives can cause "paradoxical excitement" and can heighten sensitivity to pain. *See* Physicians Desk Reference, 50th Ed. (1996) at 438-440. Manufacturers warn against administration by intravenous injection unless a patient is unconscious or out of control. *Id.*

## 2.  Pancuronium Bromide

The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent. If, as is probable in the Texas execution process, the sedative effect of the sodium thiopental is ineffective or neutralized, the pancuronium bromide would serve only to mask the excruciating pain of the condemned inmate.

---

[330]  The problems inherent in Texas' use of sodium thiopental and pancuronium bromide cannot be directly discounted because of TDCJ's sudden administrative decision in 1989 to cease conducting autopsies of executed individuals. Texas' failure to collect any post-mortem data precludes the State from presenting any direct evidence to argue that the dosage of sodium pentothal injected into the veins of Texas condemned inmates still provides therapeutic levels of sodium pentothal: the terrible specter of inadequate anesthesia can never be ruled out for any Texas condemned inmate.

-336-

Pancuronium bromide makes the patient look serene because of its paralytic effect on the muscles. The face muscles cannot move or contract to show pain and suffering. It therefore provides a 'chemical veil' over the proceedings. By completely paralyzing the inmate, pancuronium bromide masks the normal physical parameters that an anesthesiologist or surgeon would rely upon to determine if a patient is completely unconscious and within a proper surgical plane of anesthesia. Because pancuronium bromide is an invisible chemical veil and not a physical veil like a blanket or hood that is easily identifiable, the use of pancuronium bromide in lethal injection creates a double veil. It disguises the fact that there is a disguise over the process.

(Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).[331]

In *Abdur' Rahman v. Bell*, Dr. Geiser asserted that while Pavulon paralyzes skeletal muscles, including the diaphragm, it has *no effect on consciousness or the perception of pain or suffering.* Administration of Pavulon is "*like being tied to a tree, having darts thrown at you, and feeling the pain without any ability to respond.*" Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted* on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis added). This assertion is corroborated by the experience of eye surgery patient, Carol Weihrer. During Ms. Weihrer's surgery the sedative she received was ineffectual and Ms. Weihrer was conscious of the entire surgery. Due to the administration of a neuromuscular blocking agent like pancuronium bromide, however, she was unable to indicate her consciousness to doctors:

I experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move. It burnt like the fires of hell. It was the most terrifying, torturous experience you can imagine. The experience was worse than death.

(Affidavit of Carol Weihrer, in the case of *Texas v. Jesus Flores*, No. 877,994A)[332].

In short, the second chemical, pancuronium bromide, or Pavulon, in the lethal injection

---

[331] Exhibit 70.

[332] *Id.*

-337-