# United States District Court
# Southern District of Texas

## Case Number: H-05- 3424

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _2_ of _____

☐ Exhibit to: _____Vol III_____
    number(s) / letter(s) _____

Other: _____Petition For Writ of_____

_____Habeas Corpus_____

_____

protocol serves no purpose other than to guarantee that the condemned inmate will be forced into a total chemical straightjacket and gag while he consciously experiences the potassium chloride ravaging his internal organs.  Persons viewing the lethal injection procedure and the public will never realize that a cruel fraud is being perpetrated upon them: instead of witnessing an inmate quiet and motionless while being "put to sleep," they are in fact witnessing the cover-up of a deliberate act of excruciating torture for which only the inmate is fully conscious.[333]

### 3.        Potassium Chloride

Finally, the use of potassium chloride itself raises important Eighth Amendment concerns.  James J. Ramsey, a certified perfusionist and currently the Program Director in the Program in Cardiovascular Perfusion at Vanderbilt Medical Center, Nashville, Tennessee, gave a lengthy statement in Abdur Rahman's case regarding the use of potassium chloride in lethal injections.  Perfusion involves the study of medicine related to the artificial circulation technologies, including but not limited to the operation of the heart-lung machine, a medical device commonly used during open-heart surgeries of all kinds.  The arena involving the chemical arrest of the heart lies uniquely within the practice of the clinical perfusionist.

Regarding the administration and efficacy of potassium chloride in the lethal injection context, Ramsey stated that:

> It is my understanding that during the performance of lethal injection as carried out during the death penalty, potassium (and other agents) are administered intravenously to the defendant.  Such administration is, in my professional opinion based upon my knowledge, training, and experience, and within a reasonable degree of medical certainty, *entirely inadequate in order to achieve reasonable cardiac standstill.*  Since

---

[333]  *See also* Exhibit 71, "Critics Say Execution Drug May Hide Suffering" by Adam Liptak, New York Times, Oct. 7, 2003.

the agents are introduced intravenously, there will occur an immediate dilution of the solution, weakening any potential effect it may have. By illustration an 80 kilogram person would have a blood volume of approximately 5.5 to 6 liters. An administration of 100 milli-equivalents of potassium intravenously to the 80 kilogram person would result in a blood concentration of only 16.6 meq/L. Such a dose is according to scientific literature… and as evidenced in my practice, inadequate to achieve cardiac standstill.

Furthermore, it must be remembered that [in contrast to the administration of potassium chloride in the surgical context] such administration is: (1) NOT DIRECTED INTO THE CORONARY ARTERIES; (2) DIRECTED ONLY IN AN ANTEGRADE FASHION; AND (3) IS AT MORMOTHERMIA (37 degrees Celsius, NOT at five degrees Celsius). Without reasonable data regarding any one person's anatomic and pathologic state as to their myocardial function prior to administration of the potassium, there can be no reasonable certainty that the potassium solution intended to arrest the heart would be distributed in a fashion that would arrest the heart. Thus, the very orchestrated and methodical methods used in surgery should not be thought of as optimizing the arrest of the heart, but should be considered to be necessary as the only reasonable means of ensuring that the heart is arrested. If the heart could be arrested by intravenous objections, cardiac surgery today would be a very different animal-science and research tell us that mere intravenous injection of potassium is not sufficient.

…

Additionally, in my professional opinion and within a reasonable degree of medical certainty, barring an effective cardiac arrest, it is entirely possible that a lethal injection as I understand it will serve ONLY to arrest the function of the pulmonary system, thereby causing a state of ischemia to the entire body (no oxygen delivery), which, in turn, will ultimately arrest the heart as well (with no oxygen delivery to it.) *As a result, the defendant is simply suffocated due to lack of oxygen*.

Affidavit of James J. Ramsey, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d

696 (6th Cir. 2000), cert. granted. on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-

9094) (emphasis supplied).

**B.     The danger of lethal injection creating unnecessary suffering and torture is greatly increased by the lack of physician involvement in the execution process**.

The risk of inflicting severe and unnecessary pain and suffering upon Mr. Haynes in the

lethal injection process is particularly grave in Texas because the meager procedures and

protocols designed by TDCJ fail to include safeguards regarding the manner in which the execution is to be carried out, fail to establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, and fail to establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion during the lethal injection procedures. For instance, TDCJ execution protocols do not explain what to do in case an IV port cannot be established. The experience of other states teaches that, in such a case, a medically trained person must perform a "cut down" to expose a deeply buried vein, or perform an infraclavicular catheterization, or other invasive medical procedure to facilitate the subsequent lethal injection such as an attempt to establish a port through the carotid enclosure in the neck. In Texas, the physician's services are limited to his or her pronouncing death.

There are no directions and no standards for the necessary training, education, or expertise of the personnel who will be exercising this critical discretion and performing these tasks and duties. TDCJ guidelines totally fail to articulate the criteria or standards that such personnel must rely upon in exercising this discretion.[334] The consequences of this failure will likely result in the unnecessary and wanton infliction of severe pain and suffering.

Perhaps most importantly, there are no apparent answers to critical questions governing a number of crucial tasks and procedures in the lethal injection procedure such as

(a)   the minimum qualifications and expertise required for the different personnel performing the tasks involved in the lethal injection procedure after the catheter

---

[334]   The protocols also fail to provide any direction regarding how TDCJ is to obtain these controlled substances in a manner that insures the drugs are effective, how to store the drugs in a manner to keep them effective, how to "mix" the drugs, or how to store and label the drugs once they have been prepared and transported to the execution chamber.

is inserted;

(b)     the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

(c)     the manner in which the IV tubing, three-way valve, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(d)     the manner in which the heart monitoring system shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(e)     the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required of the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned and the cut down procedure begun, and the criteria that shall be used in exercising this discretion;[335]

(f)     the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next procedure would not inflict severe and unnecessary pain and suffering on the condemned prisoner;

---

[335] *See* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 106, n. 303 (February 2002) (citing Thomas O. Finks, Lethal Injection: An Uneasy Alliance of Law and Medicine, 4 J. Legal Med. 383, 397 (1983) (explaining that "(l)ethal injections may not work effectively on diabetics, drug users, and people with heavily pigmented skins"); Harold L. Hirsh, Physicians as Executioners, Legal Aspects of Med. Prac., Mar. 1984, at 1 (noting that "if a person is nervous or fearful, his veins become constricted"); *On Lethal Injections and the Death Penalty*, 12 Hastings Center Rep. 2, 2 (Oct. 1982) (explaining that lethal injections are particularly difficult to administer "to people with heavily pigmented skins . . . and to diabetics and drug users"); Jacob Weisberg, *This is Your Death: Capital Punishment: What Really Happens, New Republic,* July 1, 1991, at 23 (describing the 45 minutes required for technicians to find a serviceable vein in a former heroin addict); Another U.S. Execution Amid Criticism Abroad, N.Y. Times Apr. 24, 1992, at B7 (reporting that the difficulty in executing Billy Wayne White was due to his history as a heroin user).)

(g)    the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the condemned prisoner, and the criteria that shall be used in exercising this discretion; and

(h)    the minimum qualifications and expertise required of the person who is given the responsibility and discretion to insure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection procedure, and the criteria that shall be used in exercising this discretion.

This disturbing lack of outlined medical procedure and personnel in Texas contributes in part to the numerous execution errors in Texas. *See e.g.* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 111 (February 2002) (quoting Fred Leuchter, "the highly controversial and later-discredited creator of much, if not most, of the execution equipment in this country," as admitting that "'about eighty percent' of the lethal injections in Texas "have had one problem or another.").

Some of the previous errors in Texas executions include:[336]

- **Stephen Peter Morin** -- March 13, 1985 – "Technicians" punctured him repeatedly in both arms and legs for 45 minutes before they found a suitable vein.

- **Randy Woolls** – August 20, 1986 – A drug addict, Woolls had to help the executioner technicians find a good vein for the execution.

- **Elliot Johnson** – June 24, 1987 – Executioners struggled for 35 minutes to insert the catheter into his veins.

- **Raymond Landry** -- December 13, 1988 – Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started

---

[336] Sources for this information include: Michael Radelet, "On Botched Executions" Peter Hodgkinson and William Schabas (eds.), *Capital Punishment: Strategies for Abolition* (Cambridge University Press, 2001) and Stephen Trombley, *The Execution Protocol*, (1992).

flowing into his arms.  Two minutes into the killing, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward the witnesses.  The execution team had to reinsert the catheter into the vein.  The curtain was drawn for 14 minutes so witnesses could not see the intermission.

- **Stephen McCoy** -- May 24, 1989 – Had such a violent physical reaction to the drugs (heaving chest, gasping, choking, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness.  Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought that the fainting would catalyze a chain reaction.  The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."

- **Billy Wayne White** – April 23, 1992 – It took 47 minutes for authorities to find a suitable vein, and White eventually had to help.

- **Justin Lee May** – May 7, 1992 – May had an unusually violent reaction to the lethal drugs.  According to Robert Wernsman, a reporter for the Item (Huntsville), Mr. May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze . . ."  Associated Press reporter Michael Graczyk wrote, "He went into coughing spasms, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down.  After he stopped breathing his eyes and mouth remained open."

- **Joseph Cannon** – April 22, 1998 – After his final statement, the execution commenced.  A vein in Cannon's arm collapsed and the needle popped out.  Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone."  Officials then pulled a curtain to block the view of witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and execution process resumed.

## C. Euthanasia Practices that Include the Use of a Sedative in Conjunction with a Neuromuscular Blocking Agent Violate Evolving Standards of Decency.

Recent legislative changes regarding pet euthanasia cast serious doubt as to whether the Texas execution protocol passes constitutional muster.  Since 1981, at least nineteen states, including Texas, have passed laws that preclude the use of a sedative in conjunction with a

neuromuscular blocking agent.[337]  Moreover, in the year 2000, the leading professional association of veterinarians promulgated guidelines for euthanasia that preclude the practice. Those guidelines specifically state that "[a] combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent."  Appendix 5 (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 Journal of the American Veterinary Medical Association, 669, 681 (2001)) at 680.  A euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well, especially in light of the fact that the State may easily accomplish the same result with a more humane combination of chemicals. Given the consistency in the statutory regulation of euthanasia, the method currently practiced by the State of Texas is outside the bounds of evolving standards of decency.

Texas recently passed legislation mandating inhumane methods of euthanizing animals which precludes the use of neuromuscular blocking agents such as pancuronium bromide. TEX. HEALTH & SAFETY CODE ANN. § 821.052(a), (b) (Vernon 2003) (specifically prescribing the methods of euthanasia for cats and dogs in the custody of animal shelters and requiring that shelters euthanize all other animals "only in accordance with the applicable methods, recommendations, and procedures set forth in the 2000 Report of the American Veterinary Medical Association Panel on Euthanasia . . . .").[338]  With this legislation, Texas has joined numerous states with laws recognizing that use of these chemicals would be inhumane in the euthanasia of dogs and cats. *See* Florida, Fla. Stat. §§ 828.058 and 828.065 (enacted in 1984); Georgia, Ga. Code Ann. § 4-11-5.1 (enacted in 1990); Maine, Me.Rev.Stat. Ann., Tit. 17, §

---

[337]  *See* Exhibit 68.

[338]  *Id.*

-344-

1044 (enacted in 1987); Maryland, Md.Code Ann., Criminal Law, § 10-611 (enacted in 2002); Massachusetts, Mass.Gen.Laws § 140:151A (enacted in 1985); New Jersey, N.J.S.A. 4:22-19.3 (enacted in 1987); New York, N.Y.Agric. & Mkts § 374 (enacted in 1987); Oklahoma, Okla. Stat., Tit. 4, § 501 (enacted in 1981); Tennessee, Tenn.Code Ann. § 44-17-303 (enacted in 2001).  Other States have implicitly banned such practices. *See* Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34, Connecticut, Conn. Gen.Stat. § 22-344a; Delaware, Del.Code Ann., Tit. 3, § 8001; Kentucky, Ky.Rev.Stat. Ann. § 321.181(17) and 201 KAR 16:090, § 5(1); South Carolina, S.C.Code Ann. § 47-3-420.

In addition to explicitly forbidding the use of sedative with a neuromuscular blocking agent, the American Veterinary Medical Association stressed that only personnel trained and knowledgeable in anesthetic techniques should administer potassium chloride (the third drug in Texas' lethal injection) in conjunction with any anesthesia:

> [i]t is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously.  Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.
> (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218

Journal of the American Veterinary Medical Association, 669, 681 (2001)).[339]  The statutes in at least five other states, in addition to Texas, expressly reference the AVMA guidelines when delimiting humane methods of animal euthanasia.  Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09;

---

[339]    *See* Exhibit 72, Report of the AVMA Panel on Euthansia (2000).

Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34.

"A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but rather by those that currently prevail." *Atkins*, 536 U.S. at 311. The scope of the substantive protections afforded by the Eighth Amendment, as the *Atkins* Court reiterated, is defined by "evolving standards of decency that mark the progress of a maturing society." *Id.* at 312 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The *Atkins* Court re-emphasized that evolving standards of decency are best reflected in the various relevant laws enacted throughout the country:

> Proportionality review under those evolving standards should be informed by "'objective factors to the maximum possible extent,'" *see Harmelin,* 501 U.S., at 1000, 111 S.Ct. 2680 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274-275, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)). We have pinpointed that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Penry,* 492 U.S., at 331, 109 S.Ct. 2934.

*Id.* Moreover, "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change." *Id.* at 315.

The unmistakable trend over the past two decades of condemning the use of neuromuscular blocking agents, such as pancuronium bromide, in euthanasia is clear evidence that the practice violates the Eighth Amendment ban on cruel and unusual punishment. These recent alterations of euthanasia protocols for pets underscore the inhumanity of the chemicals currently used in Texas. It can hardly be disputed that if certain euthanasia techniques are banned as overly cruel to animals, those same practices must violate our current standards of

decency regarding the execution of humans.

**CLAIM XIII**: **THE SECOND SPECIAL ISSUE IS UNCONSTITUTIONAL BECAUSE IT OMITS A BURDEN OF PROOF AND MAKES IMPOSSIBLE ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S DETERMINATION.**

**A. Facts in Support.**

Petitioner's counsel submitted written pretrial motions alleging that on its face, the mitigation special issue in Art. 37.071, Sec. 2(e), V.A.C.C.P., is infirm as a matter of federal Eighth Amendment law because it omits any burden of proof placing no burden upon the State to prove aggravating factors, remaining silent as to any standard of proof on either party (1 CR 150) and provided no opportunity for a meaningful appellate review of the mitigation verdict. The trial court denied all three propositions. 1 CR 153.

After the trial court overruled these objections to the constitutionality of the mitigation special issue, the jury received the statutory instruction found in Art. 37.071, Sec. 2(e), V.A.C.C.P., telling them they were to proceed to answer the following question:

> Special Issue No 2
> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Anthony Cardell Haynes, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? 2 CR 459.

The court gave the following abstract instructions concerning mitigation:

> This jury in another portion of the instruction was given the definition that limited mitigating evidence on Special Issue No.2 to "evidence that a juror might regard as reducing the defendant's moral blameworthiness . . . " (2 CR 453).
> In determining your answers to the questions, or special issues, submitted to you, you shall consider all the evidence submitted to you in this whole trial, which includes that

-347-

phase of the trial wherein you were called upon to determine the guilt or innocence of the defendant, and this punishment phase of the trial wherein you are now called upon to determine the answers to special issues submitted to you by the Court. 2 CR. 450.

\* \* \*

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there is a mitigating circumstance or circumstances in this case, you must decide how much weight it/they deserve, if any, and thereafter, give effect and consideration to it/them in assessing the defendant's personal culpability at the time you answer the special issue.

You are instructed that mitigating evidence, if any, may be considered by you in answering either or both of the special issues under consideration. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response, let you answers to the special issues reflect that. 2 CR 451.

The State must prove Special Issue No.1 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "YES" or "NO" on Special Issue No.1.

In deliberating on Special Issue No. I you shall consider all the evidence admitted at the guilt or innocence stage and the punishment stage of trial, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. 2 CR 452.

In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that mitigates against the imposition of the death penalty.

(2 CR 453).

## B. Argument.

Petitioner's argument is that the state courts have a federal constitutional duty to review for "sufficiency" the jury's negative answer to the mitigation special issue. What has become apparent is that the Texas death penalty scheme is <u>functioning</u> like the schemes in "weighing" states, even though on its face it is framed in "non-weighing" terms. It has become a fiction to

-348-

say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from <u>any</u> possibility of review for sufficiency.

There are certainly other states which provide the meaningful appellate review the Supreme Court required in *Clemons v. Mississippi*, 494 U.S. 738 (1990) by considering whether the mitigating evidence was outweighed by aggravating evidence. In Texas, however, the result of the code's failure to assign a burden or proof and a standard of proof regarding mitigation is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised by "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

Why should the reviewing court simply defer to the jury's conclusion "that the evidence was not sufficient to warrant a life sentence" without at the same time asking whether it is fair for such a state of affairs to exist?

In *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995) the dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than

-349-

it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The capital jury's mitigation verdict is normative only to the extent that it is informed by subjective analysis of the evidence. Every time a state court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not select some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

After all, the Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency to prove the continuing threat issue. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states.

As for the statutory requirement of review of sufficiency to support a negative mitigation verdict, under Art. 44.251(s), V.A.C.C.P., Petitioner argues that the Legislature having been once burned (by *Penry)* was twice shy, and realistically anticipated that some reviewing court might one day decide that the U. S. Constitution required some kind of sufficiency review of the mitigation special issue. That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use

-350-

extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not involve consideration of aggravating factors," the mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

### i. Omission of Burden of Proof.

As to this mitigating issue, the code is silent as to which party has the burden of production or persuasion. The CCA has held that the defendant, as the only supposed "beneficiary" of the mitigation special issue, bears the burden of production on that issue, and has specifically declined to review the jury's subjective "normative" weighing of mitigation evidence. *McFarland v. State, supra,* 928 S.W.2d at 499.

Acknowledging the Court's *McFarland* opinion, Petitioner respectfully disagrees with its result on this issue, presenting the following arguments which he believes were not advanced in *McFarland* and not addressed by the Court in that case or in any later case. *E.g., Baker v. State, supra* ; *Eldridge v. State,* 940 S.W.2d 646, 652 (Tex. Crim. App. 1996).

The Texas Court of Criminal Appeals has wavered as to whether or not it has a constitutional duty to review for sufficiency the jury's negative answer to the mitigation special issue submitted under Sec. 2(e). Judge Baird has issued a dissenting opinion in which he states, "I joined the majority in *Lawton,* supra and *Broussard v. State,* 910 S.W.2d 952 (Tex. Crim. App. 1995). However, for the reasons stated infra, I now believe my doing so was erroneous." Judge Overstreet, who had joined Judge Clinton in finding review of the mitigation verdict

impossible in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995), joined Judge Baird in his opinion, some two years later, that such review was possible and was constitutionally mandated. *Moms v. State*, ___ S.W.2d ___, (Tex. Crim. App. No.71,799, delivered September 11, 1996) (Baird, J., joined by Overstreet, J., dissenting).

That the dissenting opinion has failed to gain any additional converts is apparent from subsequent opinions.[340] However, what is also apparent is that mitigation counts for nothing in the sufficiency review that is provided under the Texas scheme. In *Soria v. State*, 933 S.W.2d 46 (Tex. Crim.App. 1996), the majority granted the State's motion for rehearing and reversed its original opinion, in which it had reformed the death sentence to life based upon the insufficiency of evidence to prove future dangerousness. In its changed view, the majority adjusted its original assessment of the evidence and found the same evidence sufficient, once all mitigation evidence was disregarded.[341]

Thus, it is clear that in Texas the reviewing court will not balance or weigh mitigating evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

---

[340] *Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996); *Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996), cert. denied 117 S. Ct. 2487; *Bell v. State*, 938 S.W.2d 35 (Tex. Crim. App. 1996); *Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996); *Anderson v. State*, 932 S.W.2d 502 (Tex. Crim. App. 1996), cert. denied, 117 S. Ct. 2517

[341] The defense psychiatrist, who had personally examined the defendant, testified that he did not present a continuing threat. "However," the majority noted, "because we view the evidence in a light most favorable to the verdict, we do not factor that opinion into our analysis or weigh his testimony against the testimony of (the State psychiatrist)." Id. at 47, n.2.

-352-

It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from <u>any</u> possibility of review for sufficiency.

Judge Baird lists, in his *Morris* opinion, other states which provide the meaningful appellate review he maintains the Supreme Court required in *Clemons v. Mississippi,* 494 U.S. 738,749, 1105 S. Ct. 1441 (1990) by considering whether the mitigating evidence was outweighed by aggravating evidence: *State v. Breton,* 663 A.2d 1026, 1039 (Conn. 1995); *State v. Richardson,* 462 S.E.2d 492 (N.C. 1995); *Sheridan v. State,* 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez,* 562 N.E.2d 219 (111. App. 2 Dist. 1990); *Lowery v. State,* 547 N.E.2d 1046 (Ind. 1989) and *Fisher v. State,* 736 P.2d 1003 (Okl.Cr. 1987). *Morris,* supra, (slip opinion at 11 of opinion of Baird, J., joined by Overstreet, J., dissenting).

The result of the code's failure to assign a burden of proof and a standard of proof regarding mitigation, even after the CCA has assigned a burden of production, with no possibility of review for the defense, is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised of "all of the evidence, including the

-353-

circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., *Walton v. Arizona*, 497 U.S. 639, 650 (1990) (State's method of allocating the burdens of proof during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory *Penry* special issue, rather than solely to the aggravating factors under the other special issues, this Court should recognize that this special issue is a conduit for aggravating factors (victim impact evidence for example) as well as mitigating factors. By asking jurors to determine whether there are "sufficient ... mitigating circumstances," Art. 37.071, Sec. 2(e), V.A.C.C.P., the statutory special issue in effect tells jurors to consider any possible aggravating factors present in all the evidence, including the circumstances of the case, that may outweigh the mitigating factors. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute, and that is how the state argues the issue. Cf. *Johnson v. Texas*, 113 S. Ct. 2658 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).

In *Walton v. Arizona, supra,* four members of the Supreme Court found constitutionally permissible the Arizona scheme that placed upon capital defendants the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently

-354-

substantial to call for leniency in spite of the fact that the State had established (by what standard, the opinion did not say) the existence of one or more of ten statutorily defined aggravating factors:[342] "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove .... the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, supra, 497 U.S. 639,650 (1990).

The Texas statutory scheme does lessen the State's burden to prove the existence of aggravating factors that fall outside the scope of the special issues that preceded the mitigation special issue. (Again, victim impact evidence, which can only pertain to the mitigation special issue, is the most significant aggravating factor.) If the defendant had to establish mitigating evidence sufficient to overcome or outweigh only the statutorily-defined aggravating circumstances, then the process would be similar to Arizona's -and the defendant could obtain review of the question just as the Arizona defendant did. The syllabus of the *Walton* opinion states that the Arizona Supreme Court "in an independent review" concluded not only that the

---

[342] It is clear from a reading of *Walton* and also from the CCA's opinions cited below in the brief that the State if it bears any burden at all under the mitigation special issue bears only the burden of proving the existence of facts which it may argue are aggravating (or which are defined by statute as aggravating, under the Arizona scheme) while the defendant bears the burden of producing the existence of facts sufficient to warrant a sentence of life rather than death or to call for leniency in the face of aggravating facts.

In fact the CCA held in *McFarland* that the State bears no burden to prove aggravating factors because there is no burden of proof to assign regarding aggravating factors outside the other special issues in the Court's view, ". . . the special issue under Sec. 2(e) does not involve consideration of aggravating factors." *McFarland, supra,* slip opinion at 84. (Yet a plurality of the Court in *Ford*, infra, found victim impact evidence, which is clearly an aggravating factor, to he relevant to the issue of moral blameworthiness under Sec. 2(e). These two positions cannot he resolved without correcting one situation or the other.)

evidence was sufficient to prove the existence of both aggravating factors found by the trial court but also "agreed that there were no mitigating factors sufficient to call for leniency..." *Walton, supra,* Syllabus at 111 L. Ed.2d 511, 519 (1990); 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989).

The Texas defendant, however, as the statute is now interpreted, may obtain review of the sufficiency of the evidence to prove only the aggravating factors upon which the State is assigned the burden of proof. He may not, however, obtain the CCA's review of his proffered mitigation evidence to see if the Court agrees that it was not sufficient to call for a life sentence. See, *McFarland, supra.*

The reality is that in Texas, the State submits in argument many aggravating factors that are not set out in the statute (factors upon which it has no independent burden of proof at guilt or at punishment) for the jury to weigh against the defense's mitigating evidence.

The mitigation special issue in Texas, by omitting a burden of proof entirely, opens up the range of aggravating factors to include whatever the prosecution wishes to argue from the evidence, yet places no burden of proof on the State with respect to those factors; it prevents a reviewing court from evaluating the sufficiency of evidence to prove those extra-statutory aggravating factors[343] and it prevents a rational, meaningful review of the sufficiency of mitigating evidence (even if the sufficiency issue is more precisely a determination whether the jury's answer was against the great weight and preponderance of evidence).

---

[343]  For instance in deciding that the Arizona "heinous and depraved" aggravating factor was not unconstitutionally vague and overbroad, the Supreme Court noted that the State court had not considered as aggravating the fact that the victim had not died for some time from his head wound, that he had floundered, blind in the desert for days before dying of dehydration, starvation and pneumonia. *Walton v. Arizona,* supra, 497 U.S. at 654 111 L.Ed.2d at 529 (1990).

### ii. Impossibility of Reviewing Mitigation under Texas Statute.

Petitioner notes that members of the CCA recently expressed the opinion in dictum (and have now specifically held, in *McFarland*, supra) that the mitigation special issues <u>does</u> impose, at least by implication, a burden of proof and a standard of proof on the capital defendant: he must establish sufficient mitigating facts to overcome the jury's prior answers to the special issue or issues by a preponderance of evidence. He may argue on appeal only that the jury's verdict was against the great weight and preponderance of evidence, yet he may not obtain review as to whether he met his burden. Petitioner cites the following excerpts from the dissenting opinion of Judge Clinton, joined by Judge Overstreet, in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995):

> Appellant nakedly contends that the mitigating evidence was so compelling that we should reform his sentence to life imprisonment. Whether this is a "sufficiency" review appellant thus requests, as the majority characterizes it (slip op. at 16), or a claim that the verdict is against the great weight and preponderance of the evidence, depends upon who carries the burden of proof under Article 37.071, '2(e), supra. We have yet to resolve this question.
>
> We came closest in *Barnes v. State*, 876 S.W.2d 316 (Tex.Cr.App. 1994), where we commented on the question in passing. *Barnes* had argued that the trial court erred not to instruct the jury at the punishment phase of his capital murder trial that the State had a burden to negate evidence proffered in mitigation of the death penalty. This Court held that the trial court had not erred because neither the Eighth Amendment, nor any state provision implementing it, had assigned such a burden to the State. In a footnote we remarked:
>
> "Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden to the beneficiary of a finding of 'sufficient mitigating circumstances to warrant that a sentence of life . . . be imposed. Cf. *Arnold v. State*, 786 S.W.2d 295, at 298 (Tex.Cr.App. 1990) (State has burden of

-357-

proof to establish harmless error under Tex.R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant."
Id., at n.17.

I agree with the *Barnes* footnote that Article 37.071, '2(e) assigns at least a burden of production to the defendant. Before a capital jury can even reach the '2(e) issue, it must have affirmatively found the existence of aggravating facts under Article 37.071, '2(b), for which the State expressly shoulders the burden of proof under '2(c). Once these facts have been established to the jury's satisfaction to a level of confidence beyond a reasonable doubt, the jury proceeds to the '2(e) special issue, viz: "whether. . . there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." (Emphasis added.) If there are not sufficient mitigating circumstances, the default position is that a sentence of death will be imposed. This means that it is the capital defendant who stands to benefit from the presentation of mitigating evidence.

Because appellant is, thus, the beneficiary of mitigating evidence, the burden of production falls to him. *Arnold v. State*, supra. Therefore, if the jury verdict is against him, Petitioner can only argue on appeal that the verdict was against the greater weight and preponderance of the evidence. *Cf., Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Cr.App. 1990) (defendant has burden to prove affirmative defense of insanity, and appellate review of a verdict against him inquires whether verdict as against the great weight and preponderance of the evidence); *Bigby v. State*, 892 S.W.2d 864, at 875 (Tex.Cr.App. 1994) (same). Strictly speaking, the majority errs to characterize Petitioner's contention as a claim that the evidence is not "sufficient."

In any event the majority is correct that we cannot review the claim on appeal, however we characterize it. Subsection 2(f)(4) of Article 37.071 defines as mitigating anything "that a juror might regard as reducing the defendant's moral blameworthiness." (Emphasis added.) Thus the statute assigns exclusively to the jury the task of evaluating what evidence proffered in mitigation of the death penalty is sufficient and what is not. We cannot say that evidence was mitigating as a matter of law any more than we can say, in a non-capital case, that the evidence is insufficient to support a twenty year sentence, or that the greater weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated. There is simply no way for an appellate court to review the jury's normative judgment "that the evidence was not sufficient to warrant a sentence of life imprisonment." Slip op. at 16. Though it should not have reached this sub-contention in appellant's fifth point of error, the majority correctly disposes of it on the merits.

*Colella v. State*, supra, (Clinton, J., dissenting, joined by Overstreet, J.) (Emphasis in Opinion).

The majority opinion in *Colella* began its answer to the Petitioner's sufficiency argument on mitigation by stating that no burden of proof exists for either the State or the defendant "to

-358-

disprove or prove the mitigation evidence." *Colella v. State*, *supra*, slip opinion at 16. Noting that there is no evidence that is per se mitigating, i.e., that a juror must view as reducing a defendant's moral blameworthiness under the Texas definition of mitigation, the majority declined to review the evidence on that issue to see if it supported the jurors' subjective determination that it did not warrant a life sentence. *Id.*

Petitioner submits that if a listing of aggravating and mitigating factors, together with an assignment of a burden of proof and a requirement of special findings as to those factors, permits appellate review like the review in *Walton*, supra, and the Texas scheme with its lack of specific factors and its omission of burdens of proof forecloses appellate review, then the Texas procedure is unconstitutional on its face.

It is rare, certainly, for the defense to ask for a burden of proof. Nevertheless, if the defense could at the same time require the State to shoulder a burden it should bear (in proving extra-statutory aggravating circumstances it offers in opposition to the mitigating circumstances) and thereby obtain review of the mitigation verdict similar to the kind of review available in Arizona, then he should welcome the burden. He could then obtain review of the State's evidence offered as aggravating on the mitigation special issue as well, just as in *Walton* the reviewing courts assessed and approved the narrow application of the "heinousness" aggravating factor to the facts of the case.

The Texas appellate courts now sit routinely as a "thirteenth juror" on review of factual sufficiency when the Petitioner claims he met his burden of proving some defensive issue; the appellate courts determine whether the verdict was so against the great weight and

-359-

preponderance of evidence as to be manifestly unjust. E.g., *Meraz v. State*, supra, cited in the *Colella* dissent.

The *Colella* dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The CCA does, after all, review the jury's "subjective" and "normative" judgment that the evidence was sufficient to prove the defendant's future dangerousness. After all, the answer is based upon evidence that any juror might regard as increasing the likelihood, to the required degree, that the defendant will be a continuing threat. In the face of longstanding defense arguments that such a prediction is too subjective and too abstract to be proven or reviewed, the Court has taken on and performed the task of reviewing the sufficiency of evidence on that issue. The Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states. This Court could do it by its opinions, as it has on the future dangerousness issue, or it could hold that the present statute as framed does not permit a fair review and is therefore unconstitutional, leaving the Texas Legislature to formulate a structure

that will permit review.

The CCA's review of "sufficiency" under a preponderance standard would not be similar to the setting aside of a term of years and assigning a different term of years as the dissent stated in *Colella*. Neither the State nor the defense bears any burden of proving the proper term of punishment in a non-capital case. The capital jury's mitigation verdict is "normative" only to the extent that it is informed by subjective analysis of the evidence. Every time a State court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not choose some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

### iii. Statute Requires Sufficiency Review of Mitigation Verdict.

Article 44.251(a) of the Code of Criminal Procedure requires that a State court shall reform a sentence of death to a sentence of life imprisonment if the Court finds there is insufficient evidence to support "a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071 of the Code. Appellants have argued in the past that the statute mandates a sufficiency review of a negative ' 2(e) answer. The CCA has answered by finding, essentially, that the Legislature in adding the mitigation-review was attempting to avoid a loophole by which an appellant who successfully challenged sufficiency under 2(e) could gain an entirely new trial, when in fact the intent of the statute when first passed was to avoid retrial. By providing this "remedy" for a possible unwarranted mitigation verdict, the CCA has held the Legislature did not mean to create any additional scope for review or relief for a capital

-361-

defendant. See, e.g., *McFarland*, supra, (concurring opinion of Keller, J.).

Petitioner can hardly argue that the Legislature ever intended to enlarge upon the opportunities for a capital Petitioner to gain review of any issue that would result in a life sentence where a death sentence had been pronounced. He does argue that the Legislature having been once burned (by *Penry*) was twice shy, and realistically anticipated that some reviewing court (the CCA or the Supreme Court) might one day decide that the Constitution required some kind of sufficiency review of the mitigation special issue.

That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors." *McFarland, supra,* 928 S.W.2d at 520 The mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

Petitioner submits that as a consequence the Court should either grant habeas relief and reform his sentence to life imprisonment or remand his case to the state courts for retrial of the punishment issue pursuant to a scheme that permits the proper assignment of the burden of production (if not proof) the proper introduction of evidence pursuant to that scheme followed by the meaningful review of the mitigation answer if it is negative.

**<u>CLAIM XIV</u>: THE TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION RELATING TO INFORMING THE JURY THAT THE FAILURE TO ANSWER A SPECIAL ISSUE WOULD RESULT IN A LIFE SENTENCE, IN VIOLATION OF PETITIONER'S RIGHTS AS PROTECTED BY THE EIGHTH AMENDMENT TO**

**THE UNITED STATES CONSTITUTION.**

Petitioner raised this point by written pretrial motion, but it was denied. 2 CR 335-350. Petitioner offered mitigating testimony from several witnesses concerning his remorse and general good conduct. *See* factual summary, *supra*. He also offered evidence through cross-examination of a state's witness of the means available in the Texas prison system to prevent inmates from inflicting harm on other inmates and prison employees. *Id.*

**A. Argument and Authorities.**

The jury in Petitioner's case was charged in accordance with Art. 37.071, Sec. 2(d)(2), V.A.C.C.P. that they could not answer the future dangerousness special issue "yes" unless they agreed unanimously and could not answer it "no" unless 10 or more of them agreed. 2 CR. 450. They were also instructed in accordance with the statute, section (f)(2) that they could not answer the mitigation issue "no" except by unanimous agreement and could not answer "yes" unless 10 or more agreed.

In accordance with the statute's prohibition in 37.071 Sec. 2(a), the jurors were never informed that the effect of their failure to agree on a "yes" or "no" answer under the above guidelines would be the automatic assessment of a life sentence under the mandate of Section 2(g) of the same statute.

The State might suggest that this request is improper under this Court's decision in *Robertson v. State*, 871 S.W.2d 701 (Tex.Crim. App. 1993). However, in *Robertson* the defendant requested a charge which would allow the jury to answer "yes," "no"or "we can't decide." That is not the request here. Petitioner's requested charge sought to inform the jury of

-363-

the effect of their failure to answer -- that Petitioner would receive a life sentence. This Court in *Robertson* did cite *Nobles v. State,* 843 S.W.2d 503, 510 (Tex. Crim. App. 1992), for the proposition that informing the jurors of the effect of their answers would somehow cause them to "skirt this responsibility by failing to return a vote."

The cases cited above somehow suggest that a vote of 6 "yes"and 6 "no" is not an answer, or is a "skirting of responsibility" by the jury. Any such suggestion ignores the fact that each juror answers the issue, and a sentence is entered based upon those answers, whatever the combination. If the answers are any combination other than 12-0 or 10-2, the verdict is one of life. To contend that a juror should not be informed of the effect of anything less than a "12-0" or "10-2" vote is to continue to hide information from jurors against the great trend of our criminal system.

The CCA's consideration of the issue in *Nobles v. State*, 843 S.W.2d 503 (Tex. Crim. App. 1992), Petitioner respectfully submits, misses the point. The Court equates a split vote with a juror who refuses to vote. The jury is told what happens at a 12-0 and 10-2 vote, and they are told that death cannot be imposed on <u>this</u> verdict unless the death vote is unanimous. They are simply left to wonder what happens to the case after a vote that did not produce a 12-0 or a 10-2 result.

Returning to the suspect logic in *Nobles,* at 509, n. 12, the Court notes that the instruction is not necessary anyway because "based upon what is usually told to the panel-members at voir dire, jurors are capable of surmising Article 37.071's mandated outcome", citing *Draughon v. State,* 831 S.W.2d 331, 337-38 (Tex. Crim. App. 1992). Apparently then it is acceptable for a

juror to surmise something but not to be instructed on the point. With no citation to the record, it is not possible to know how the Court surmises what a juror surmised. Indeed, as argued in the foregoing point of error, it is quite consistent with common sense that a juror might fear there would be a mistrial if anything did not go according to the rules, and that a retrial might be impossible. What does the surmise do then to the fear of a juror skirting his responsibility to vote "yes" or "no"? The Court does not condemn the knowledge, just the instruction. These cases are not defensible on this point. Should those cases stand, they do not defeat Petitioner's simple request that the jury be informed what business it is about. The importance of providing information to the jury as to what each individual's vote means cannot be overemphasized. The foreman of the trial jury has stated that it would probably have made a difference to her if she knew that her vote alone could have secured a life sentence for Petitioner.[344]

The statutory scheme encourages jurors to change their decisions, rationally reached on the basis of the evidence, and return a verdict contrary to their considered judgment, solely in order to satisfy a numerical balance they are led to believe they <u>must</u> satisfy in order to avoid an imagined retrial or even the release of the defendant. The scheme is inherently flawed, and encourages the arbitrary and wanton imposition of the death penalty, in violation of both federal and state guarantees against cruel and/or unusual punishment, United States Constitution, Eighth Amendment.

Petitioner asks for reversal based upon the unconstitutionality of this statutory scheme, and its unconstitutional application in his case.

---

[344] Exhibit 67 at 537.

-365-

**CLAIM XV: PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW, AS THE EVIDENCE SUPPORTING SPECIAL ISSUE NUMBER ONE WAS INSUFFICIENT.**

The evidence in this matter was legally insufficient to support the jury's answer to Special Issue No. One as the State failed to prove beyond a reasonable doubt that there is a probability that Mr. Haynes would commit criminal acts of violence and would constitute a continuing threat to society. Thus, Petitioner's sentence of death violates his constitutional right to due process of law. U.S. Const., amends IV, V and XIV.

The trial court at the punishment phase of Petitioner's trial submitted a jury charge which contained the "continuing threat" Special Issue No. One and the mitigation special issue was number two. The jury answered these issues. Exhibit 3. Thereafter, the court pronounced Petitioner's sentence of death by lethal injection based upon these two answers. This sentence violated Petitioner's federal constitutional right to due process of law.

On direct appeal, Petitioner asserted that Special Issue No. One, relating to future acts of criminal violence, should be submitted to a sufficiency review. Exhibit 4 at 110 *et. seq.*

The standard of review for the legal sufficiency for the issue of future dangerousness is whether a rational trier of fact could have concluded beyond a reasonable doubt that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781 (1979).

The State bears the burden of proof requiring each and every element of the offense. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970); *Apprendi v. New Jersey,* 120 S. Ct. 2348 (2000). *See also* Tex. Penal Code. Ann. Sec. 2.01 (Vernon 1994). Proof beyond a reasonable

doubt requires that the State produce evidence showing something more than a strong suspicion, and this standard of "proof beyond a reasonable doubt" is a federal constitutional one, guaranteed by a citizen's federal constitutional right to due process of law. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

In this case, the State failed to prove beyond a reasonable doubt that petitioner would commit future acts of violence that would constitute a continuing threat to society. The State's key witness at the punishment phase of the trial, Todd Miller, testified that during the course of his investigation, Petitioner admitted his participation in three aggravated robberies. 28 RR 8. Chris Dickens testified during the punishment phase that during the evening of the underlying offense, as he stood in his driveway, a truck drove up and the driver pulled a handgun and took Dickens' wallet. 28 RR 20. While Dickens was never asked to identify Petitioner in court as either the driver or the robber, Dickens identified a tattoo on Petitioner's arm and stated it was similar to one he had observed on the driver's arm. 28 RR 19, 23.

Alexandro Aglesis testified during the punishment phase that while he was visiting a friend a truck pulled up and the driver demanded all his money. 28 RR 35. Aglesis did not identify Petitioner as the robber. 28 RR 38.

Additional testimony concerned a verbal altercation at Petitioner's high school with an ROTC officer, Col. Davis. The State's use of this trivial and non-violent incident was a strong indication that their case on Special Issue No. One was deficient.

Thus, at best, the State's evidence at the punishment phase regarding Special Issue No. One consisted solely of unadjudicated offenses loosely attributed to Petitioner, that on the night

-367-

of the underlying offense, he robbed or attempted to rob several individuals. Additionally the evidence revealed that Petitioner, born on January 22, 1979, was only nineteen at the time of the alleged offense. 1 CR 7.

Given Petitioner's age and youth at the time of the underlying offense, and given the lack of any verifiable evidence of his commission of the extraneous offenses, it is not rational to conclude that he would constitute a continuing threat to society if sentenced to imprisonment for life. In this case, the punishment evidence admitted against Petitioner fails to rise to the level where a rational trier of fact could conclude, beyond a reasonable doubt, that Petitioner would commit criminal acts of violence and would constitute a continuing threat to society. This violated Petitioner's rights to due process and a fair trial under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Additionally, the state court's finding denying this point of error on direct appeal "resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under Section 2254(d)(1) of AEDPA.

## CLAIM XVI: THE TRIAL COURT ERRED IN DENYING PETITIONER'S MOTION FOR A NEW TRIAL AFTER VIOLATING HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

The trial court committed reversible error during the punishment phase of Petitioner's trial by forbidding Petitioner's counsel to timely assert proper objections to the State's improper arguments. The trial court's actions effectively denied Petitioner effective assistance of counsel at trial, in violation of his constitutional rights. U.S. Const., amends IV, V, VI and XIV.

### A. Facts in Support.

The prosecutor, during his argument at the punishment phase of the trial, told the jury "I'll bet you the next time somebody comes or hollers at you to give directions you are going to think about [petitioner]. He added, "[b]efore you ever walk up to another car, I know I would." 30 RR 17. The defense objected until an adverse ruling was obtained, thus preserving error. *Id.* The prosecutor went on to state, "You know your life will be changed because of this trial."*Id.* at 18. Again the defense objected and preserved error. The court overruled the objection and the prosecutor asked for more time to argue due to the defense objections. The defense objected to this sidebar, but the court, without ruling on the defense objection, instructed defense counsel to be seated. Counsel asked for a ruling but was told to remain seated lest he be removed from the courtroom. *Id.* at 18-19. This is what transpired:

> SMYTH: Thank you judge. Could I have additional time to continue due to argument?
>
> NUNNERY: Your Honor, I'm going to object to his sidebar remarks.
>
> THE COURT: Have a seat. Have a seat. Have a seat.
>
> NUNNERY: Your Honor, can I have a ruling on my objection?
>
> THE COURT: I said sit down, Mr. Nunnery.
>
> NUNNERY: Your Honor, I'm required by law to ask for a ruling for objection.
>
> THE COURT: You have one second to sit down or I'll remove you from the courtroom. Do we understand each other?
>
> 30 RR 18-19.

Counsel for the State continued his argument and suggested that petitioner's counsel's repeated interruptions had caused the State to require additional time in which to argue (30 RR

-369-

18); that Petitioner's counsel had attempted to hide and exclude evidence from the jury of the victim's personality (30 RR 53-54); encouraged the jury to speculate that petitioner had participated in other "extraneous" robberies not introduced into evidence during the trial (30 RR 59); and attempted to inflame the minds of the jurors with repeated references to the victim's widow and her children and what they would face in the future without him. 30 RR 64.

Upon completion of the final arguments and immediately upon the retiring of the jury, Petitioner's counsel made an informal bill of exceptions. Tex. R. App. P. 33.1(a) (Vernon Pamph. 2000). Petitioner's counsel stated that he had been intimidated by the judge's threats during arguments to have him physically removed from the courtroom. 30 RR 66-67. Petitioner's counsel reiterated that the State had presented numerous improper and highly prejudicial arguments and that he had failed to object to any of them for fear that he would in fact be removed and would not be permitted to plead for his client's life. 30 RR 66-67.

Counsel for Petitioner addressed this issue once again in a motion for a new trial. 3 CR 522. During the hearing of Petitioner's motion, trial counsel Alvin Nunnery testified that when he had attempted to assert timely objections to the State's improper arguments and sidebar comments, that he was shocked and offended by the reaction of the trial court. As Mr. Nunnery stated:

> At the moment the Court said, 'Have a seat, have a seat, have a seat,' I had no initial reaction of feeling. I was quite frankly flabbergasted and in a state of shock. In the 15 or 17 years when I practiced in Harris County, Texas, I have never, not on the county lew [sic], not at the district level or in federal court ever had a judge talk to me as rudely as the Judge of the 263rd did at that moment
> 34 RR 14.

Mr. Nunnery testified that when the Court announced "You have one second to sit down

or I'll remove you from the courtroom" and "Do we understand each other?" that he felt "degraded, humiliated, threatened" and numbed and he completely lost his composure. Thus, he failed to pursue any further objections for the duration of the trial. 34 RR 16-18.[345]

Co-counsel for Petitioner, Robert A. Jones, also testified during the motion for a new trial and asserted that he believed that Mr. Nunnery had been intimidated and silenced by the trial court during the prosecution's final arguments. 33 RR 29.[346] Mr. Jones added that he also did not object to the State's improper arguments and comments during the closing arguments pursuant to the "one lawyer, one objection" rule. Thus Mr. Jones believed that only Mr. Nunnery could raise objections and pursue the Court's rulings during the punishment phase arguments. 33 RR 16, 27.

At the conclusion of the motion for a new trial, the Court overruled Petitioner's motion. 3 CR 542; 34 RR 62.

### B. Argument.

A defendant has a federal constitutional right to a fair trial and effective assistance of counsel, as detailed *supra* in the discussion of the applicable law in Claim I, which is hereby incorporated by reference. Thus, where a trial judge denies a defendant the right to make a closing argument at trial, the defendant has been denied effective assistance of counsel. *Herring v. New York,* 422 U.S. 853, 95 S. Ct. 2550 (1975). Here, the trial court committed reversible error by forbidding Petitioner's counsel from timely asserting proper objections to the State's

---

[345] *See also* Mr. Nunnery's affidavit accompanying the motion for a new trial. Exhibit 67.

[346] Mr. Jones also submitted an affidavit in support of this motion. Exhibit 67.

-371-

improper comments and arguments and by threatening Petitioner's counsel, in full view of the jury. The threats to remove Mr. Nunnery from the courtroom during the remainder of the punishment phase would have had a dramatic impact on the jury which was soon to decide Petitioner's fate. The trial court's actions effectively "muzzled" Petitioner's counsel and deprived Petitioner of his federal constitutional rights to effective assistance of counsel.

Under Texas law, permissible jury arguments by the State must fall into one of the following categories: 1) Summation of the evidence, 2) reasonable deductions drawn from the evidence in the record, 3) pleas for law enforcement and 4) responses to arguments made by opposing counsel. *Gaddis v. State,* 753 S.W.2d 396 (Tex. Crim. App. 1988); *Modden v. State,* 721 S.W.2d 859 (Tex. Crim. App. 1986). The State's arguments did not fall into any of these categories and were improper. An improper jury argument can be cured if there is an objection, but the court's warnings forbade Petitioner's counsel to object to assert timely objections to the arguments. The trial court committed reversible error by depriving Petitioner of effective assistance of counsel during the punishment phase of his trial. The trial court's errors also prevented Petitioner from seeking rulings on the objections and thus preserving the issues for appeal, so in addition his right to an appeal was also compromised. Where the court and the state interfere with the ability of the accused's counsel to make independent decisions about how to conduct the defense, the accused is denied his right to effective assistance of counsel. *Strickland v. Washington, supra,* 466 U.S. at 674. Here, the trial court committed reversible error by abandoning its neutral stance and forbidding counsel from seeking rulings on the objectionable arguments of the State. This violated Petitioner's rights to due process and a fair

-372-

trial under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

Additionally, the state court's finding denying this point of error on direct appeal "resulted in

a decision that was contrary to, and involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" under Section

2254(d)(1) of AEDPA.


**CLAIM XVII:** **THE ADMISSION OF VICTIM IMPACT EVIDENCE AT THE PUNISHMENT PHASE OF PETITIONER'S TRIAL DEPRIVED HIM OF A FAIR TRIAL UNDER THE EIGHTH AMENDMENT.**

### A. Facts in Support.

At the punishment phase of Petitioner's trial, the State proposed calling the victim's wife

in rebuttal as "victim impact testimony." 29 RR 121. The defense objected that such testimony

was circumscribed by seven factors:

1) the evidence must be relevant to a special issue during punishment or offer to rebut

a defense theory;

2) the probative value cannot be outweighed by the danger of undue prejudice;

3) the testimony must come from the surviving victim of the crime itself or from a family

member or a legal guardian of the victim, specifically the testimony must regard the impact the

crime has had on that individual's life but the testimony cannot create a comparative judgment

situation i.e., it must show the uniqueness of the loss of the victim as an individual only as it

pertains to the immediate family, guardian or survivors;

4) the evidence may not pertain to the character of the victim unless it is introduced in

-373-

rebuttal of the defensive theory offered during the punishment; and

> 5) the testimony may not discuss the value of the individual to the community as such testimony could create a comparative judgment situation which has been expressly discouraged.

29 RR 122.

Despite the fact that the proposed testimony violated all of these prohibitions, the Court denied the defense motion to exclude it and allowed the testimony.  29 RR 126.

Nancy Kincaid, the victim's widow then testified that she had a very strong relationship with her husband, that they were married for 18 years, and were very close.  29 RR 127. Everybody liked the victim, according to Mrs. Kincaid, he would help people when they needed it, and he was very handy.  29 RR 127.  He worked the night shift so that he could be around his two daughters a lot.  29 RR 128.  He helped them with softball and tee ball and karate classes.  29 RR 128.  His daughter Courtney was six at the time and it was hard for her to understand what was going on.  29 RR 128.  As she had a hard time verbalizing, she did a lot of crying and had temper tantrums, and was at the nurse and counselor a lot at school.  29 RR 128.  The other daughter, Jenna, who is now eleven, was devastated and would cry at night for two hours for several months, and, although she has gotten stronger, it still affects her a lot.  29 RR 129.  Mrs. Kincaid depended on her husband a lot, he took care of the cars and the household, and she had to take a full-time job.  29 RR 129.  The particularly prejudicial aspect of this testimony was highlighted by the fact that this was the State's last witness before they rested.  29 RR 130.

**B.  Argument.**

-374-

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court overturned fairly recent precedent[347] to hold that the Eighth Amendment does not prohibit admission of victim impact evidence at the penalty phase of a capital trial. The Court's effort in *Payne* resulted in a total of six separate opinions[348], amounting to a divided and fractured response to *Booth v. Maryland*, 482 U.S. 496 (1987).

In *Booth*, the Supreme Court set forth a blanket ban on the use of victim impact evidence at the sentencing phase. Its use, the Court found, violated two Eighth Amendment requirements for all capital sentencing proceedings: that they meet standards of "heightened reliability", and that they consist of an "individualized determination" based on the "character of the [defendant] and the circumstances of the crime." *Booth*, 482 U.S. at 502, citing *Zant v. Stephens*, 462 U.S. 862 (1983). Victim impact evidence, the Court found, is irrelevant to the individualized consideration of the defendant's guilt, and "its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.*

The *Payne* Court disagreed, finding that *Booth*

unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,' or demonstrating the loss to the victim's family and to society which have resulted from the defendant's homicide.

---

[347] *See Booth v. Maryland*, 482 U.S. 496 (1987); *South Carolina v. Gathers*, 490 U.S. 805 (1989). As *Gathers* simply extended the holding of *Booth* to the prosecutors punishment phase argument, it is not addressed herein.

[348] *See Payne*, 501 U.S. 808 (1991); *id.* at 830 (O'Connor, J., concurring); *id.* at 833 (Scalia, J., concurring); *id.* at 835 (Souter, J., concurring); *id.* at 844 (Marshall, J., dissenting); and *id.* at 856 (Stevens, J., dissenting).

-375-

*Payne*, 501 U.S. at 823, citing *Mills v. Maryland*, 486 U.S. 367, 397 (1988) (Rehnquist, J.,

dissenting). The Court dismissed the *Booth* Court's concerns that victim impact evidence would

invite decisions based on the "worth" of the victim, stating that it "is not offered to encourage

comparative judgments of this kind . . . [but] is designed to show instead each victim's

'uniqueness as an individual human being' . . . [and] is simply another form or method of

informing the sentencing authority about the specific harm caused by the crime in question."

*Payne*, 501 U.S. at 823; 825.  Thus, in the *Payne* Court's view, its admission merely balances

scales that have long been skewed in favor of the capital defendant.  To do otherwise would be

to "deprive the State of the full moral force of its evidence. . . " *Id.* at 825.  In conclusion, the

Court held that "if the State chooses to permit the admission of victim impact evidence and

prosecutorial argument on that subject, the Eighth Amendment erects no per se bar."  The only

nod to the *Booth* Court's fears about the undue prejudice resulting from the use of such evidence

was the Court's statement that "[i]n the event that evidence is introduced that is so unduly

prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the

Fourteenth Amendment provides a mechanism for relief." *Id.* at 825.

 Mr. Haynes agrees with Justice Stevens and Justice Marshall, dissenting, that the *Payne*

decision was erroneous, resulted from political pressures and concerns,[349] and is contrary to the

---

[349] As have others, Justice Stevens noted these concerns in the conclusion to his dissent
to the *Payne* majority decision: "Given the current popularity of capital punishment in a
crime-ridden society, the political appeal of arguments that assume that increasing the severity of
sentences is the best cure for the cancer of crime, and the political strength of the 'victims'
rights' movement, I recognize that today's decision will be greeted with enthusiasm by a large
number of concerned and  thoughtful citizens. The great tragedy of the decision, however, is the
danger that the 'hydraulic pressure' of public opinion that Justice Holmes once described -- and
that properly influences the deliberations of democratic legislatures -- has played a role not only
in the Court's decision to hear this case, and in its decision to reach the constitutional question

dictates of the Eighth Amendment in the capital sentencing context.

To begin, the rationale that admission of victim impact evidence merely levels a playing field which has long held that evidence about the character of the defendant or the circumstances of the crime cannot be limited, misconceives the purpose of the doctrine and the dangers of the alleged solution found.

> This argument is a classic non sequitur: The victim is not on trial; her character, whether good or bad, cannot therefore constitute either an aggravating or a mitigating circumstance. . . . The conclusion that exclusion of victim impact evidence results in a significantly imbalanced sentencing procedure is simply inaccurate. Just as the defendant is entitled to introduce any relevant mitigating evidence, so the State may rebut that evidence and may designate any relevant conduct to be an aggravating factor provided that the factor is sufficiently well defined and consistently applied to cabin the sentencer's discretion. The premise that a criminal prosecution requires an evenhanded balance between the State and the defendant is also incorrect. The Constitution grants certain rights to the criminal defendant and imposes special limitations on the State designed to protect the individual from overreaching by the disproportionately powerful State.

*Payne*, 501 U.S. at 859 (Stevens, J., dissenting).

Mr. Haynes submits that, in fact, the admission of victim impact evidence skews the playing field in favor of the government. The jury enters every capital sentencing trial having just convicted the defendant of what is by definition a heinous crime. Having done so, they are far more likely to begin the penalty phase feeling empathy towards the victim than the defendant. Upon hearing directly from the victim witnesses, how could a jury not feel absolutely compelled to revenge the immense suffering expressed from the stand? To not do so would be to betray that witness, who certainly appears to deserve their sympathies more than

---

without pausing to consider affirming on the basis of the Tennessee Supreme Court's rationale, but even in its resolution of the constitutional issue involved. Today is a sad day for a great institution." *Payne,* 501 U.S. at 866 (Stevens, J. dissenting) (citations omitted).