# United States District Court
# Southern District of Texas

Case Number: H-05-3424

## ATTACHMENT

Description:

- ☐ State Court Record
- ☐ State Court Record Continued
- ☐ Administrative Record
- ☐ Document continued - Part 3 of ______
- ☐ Exhibit to: Vol III
  number(s) / letter(s) ______

Other: Petition For Writ of Habeas Corpus

a defendant who has just been convicted of capital murder. In this manner, the jury becomes the victim's means for retribution, rendering it emotionally difficult if not impossible for them to focus on the defendant's individual circumstances or moral culpability.

> Victim impact statements evoke not merely sympathy, pity and compassion for the victim, but also a complex set of emotions directed toward the defendant, including hatred, fear, racial animus, vindictiveness, undifferentiated vengeance, and the desire to purge collective anger. These emotional reactions have a crucial common thread: they all deflect the jury from its duty to consider the individual defendant and his moral culpability.

*Id.* at 403. Thus, victim impact evidence encourages themes of vengeance in a manner that wholly undermines the "guided discretion" that is essential to the validity of our capital punishment system.

Moreover, victim impact evidence is completely irrelevant to the moral culpability of the defendant, the central issue at a sentencing trial. Aspects of the victim's character of which the defendant is unaware at the time of the crime are "wholly unrelated to the blameworthiness of a particular defendant, as often defendants do not know their victims, and rarely select their victims based on the effect it will have on the rest of the family." *Booth*, 482 U.S. at 505.

Victim impact evidence also implies to the jury that the question of whether the defendant should be sentenced to death is in part answered by consideration of the victim's social status and moral worth, thereby encouraging invidious distinctions between individual victims.

> What is not obvious . . . is the way in which the character or reputation [of the victim] in one case may differ from that of other possible victims. Evidence offered to prove such differences can only be intended to identify some victims as more worthy of protection than others. Such proof risks decisions based on the same invidious motives as a prosecutor's decision to seek the death penalty if a victim is white but to accept a

plea bargain if the victim is black.

*Payne*, 501 U.S. at 866 (Stevens, J., dissenting).[350] A sentencing decision that is, if only in part, based on a determination of the worth or character of the victim, is not "a principled way to distinguish cases in which the death penalty was imposed, from the many cases in which it was not." *Booth*, 482 U.S. at 506, citing *Godfrey v. Georgia*, 446 U.S. 420 (1980). Since the quality of the victim's worth or character is wholly fortuitous, imposing the death sentence on this basis is "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman v. Georgia*, 408 U.S. 238, 309 (1972) (Stewart, J., concurring).

Similarly irrelevant factors are introduced through the likelihood that the jury's view of the victim will become dependent upon the eloquence of his or her family members, their skill in testifying in court, and their willingness to testify, factors which are "certainly . . . irrelevant to the decision whether a defendant, who may merit the death penalty, should live or die." *Booth* at 506. *See also Payne*, 501 U.S. at 844 (Marshall, J., dissenting).

"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Thus, the sentencing phase of a capital trial must

[350] Chief Justice Rehnquist purported to answer this criticism in *Payne*, stating that victim impact evidence "is not offered to encourage comparative judgments of this kind . . . It is designed to show instead each victim's 'uniqueness as an individual human being . . . . ' " Id. at 2607. However, the reality of what prosecutors choose to present belies this denial. "In any event, if paeans to the deceased's virtues are not aimed at inviting jurors to make some sort of comparative judgments (whether among various victims or between the victim and the defendant), why do prosecutors never dwell on the dead person's vices? That is hardly an idle question. Presumably, the fact that one victim beat her children or dropped out of school in the ninth grade would reveal her 'uniqueness as an individual human being' as much as another's devotion to her family or graduation at the top of her class." Berger, *Payne and Suffering - A Personal Reflection and a Victim Centered Critique*, 20 Fla. St. U.L. Rev. 21 (1992).

constitute "an individualized determination on the basis of the character of the individual [defendant] and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983), which yields a punishment "tailored to [the defendant's] personal responsibility and moral guilt." *Edmund v. Florida*, 458 U.S. 782, 801 (1982).

*Payne* notwithstanding, these fundamental principles still apply to the sentencing phase of a capital trial. *Payne*'s reversal of *Booth* does not make all victim impact evidence automatically admissible. "We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evidence, 'the Eighth Amendment erects no per se bar.'" *Payne*, 501 U.S. at 831 (O'Connor, J., concurring) (citations omitted).[351]

The *Payne* Court did acknowledge the possibility that the admission of victim impact evidence could be so inflammatory as to render the process completely arbitrary, a result they did not condone. "Evidence about the victim and survivors, and any jury argument predicated on it, can of course be so inflammatory as to risk a verdict impermissibly based on passion, not deliberation. . ." *Payne*, 501 U.S. at 836 (Souter, J., concurring). The standards to be used to avoid such an impermissible result -- never specifically delineated by the *Payne* Court — are defined by the concepts inherent in Due Process. "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of

---

[351] Indeed, there are a number of states that have concluded that the admission of victim impact evidence is either irrelevant to their statutory aggravators or mitigators, or results in a violation of the state constitution. See, e.g., *State v. Guzek*, 906 P.2d 272 (Or. 1995); *Bivins v. State*, 642 N.E. 2d 928 (Ind. 1994), *cert. denied* 133 L.Ed.2d 734 (1996);*State v. Carter*, 888 P.2d 629 (Utah 1992), *cert. denied* 133 L.Ed.2d 105 (1995); *Sermons v. State*, 417 S.E.2d 144, 262 Ga. 286 (1992). *Guzek* is particularly instructive because Oregon modeled its statutory scheme on Texas' and uses very similar special issues in the penalty phase.

the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. In her concurring opinion, Justice O'Connor elaborated on this issue, stating that due process may be violated, "if, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair." *Id.* at 831 (O'Connor, J., concurring).

Within the constraints of Due Process, the starting point for defining the parameters of admissible victim impact evidence is the applicable statute. However, there are overarching principles that must be applied in all cases.

First, victim impact evidence which is designed to invite a retaliatory response, or to provoke a sentencing decision based on emotion and caprice, cannot be allowed. "[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976). *See also Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Lesko v. Lehman*, 925 F.2d 1527, 1541 (3rd Cir.), *cert denied,* 502 U.S. 898 (1991) (Evidence "calculated to incite an unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence" is impermissible, and warrants habeas relief.).

Another principle that must be applied to limit victim impact evidence is the fundamental tenet that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Texas Rule of Criminal Evidence 403; *Payne*, 501 U.S. at 824-825. The probative value of any evidence is judged in relation to the specific fact which the evidence aims to establish or disprove. Texas

Rules of Criminal Evidence 401; 402. *Payne* stated clearly that victim impact evidence is admissible only for the limited purpose of showing "each victim's 'uniqueness as an individual human being,'" and to inform the sentencer in a capital case about the "specific harm caused by the defendant." *Payne*, 501 U.S. at 823; 825. Thus, the *Payne* Court itself disavowed the use of victim impact evidence to encourage comparative judgments about the worth of the victims. *See also Eichel v. New York Cent. R.R.*, 375 U.S. 253, 255 (1963) (excluding evidence because of the likely existence of other evidence "having more probative value and involving less likelihood of prejudice"). Accordingly, a prosecutor's attempt to prove the victim's uniqueness must use the least prejudicial evidence that is sufficiently probative. The admission of such evidence violated Mr. Haynes's's rights under the due process clause of the Fourteenth Amendment, as well as the prohibition against cruel and unusual punishment clauses of the Eighth Amendment. For these reasons, Mr. Haynes is entitled to a new trial.

**<u>CLAIM XVIII</u>: PETITIONER LACKED VOLITIONAL CAPACITY AT THE TIME OF THE CRIME AND HIS SENTENCE VIOLATES THE EIGHTH AMENDMENT AND *ATKINS V. VIRGINIA*.**

It is axiomatic that it is unconstitutional to kill someone for behavior he was powerless to avoid committing, whose free will was impaired or whose actions demonstrate that he could not have formed the specific intent to kill. No defendant has ever been sentenced to death after the fact-finder determined that he lacked volitional control. Yet the State of Texas proposes to execute Anthony Haynes, despite clear and convincing evidence that at the time of the crime he was, to a significant degree, volitionally incapacitated at the time of the

shooting and could not have formed the specific intent necessary for capital murder.

*Atkins v. Virginia,* 122 S. Ct. 2242 (2002), decided in 2002 by the United States Supreme Court, reversing its 1989 holding in *Penry v. Lynaugh*, 492 U.S. 3003 (1989), held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation.[352] Extending this rationale, two state court justices have already opined that the rationale of *Atkins* likewise precludes the execution of severely mentally ill offenders,[353] and two Supreme Court justices have voted to grant a stay of execution in a Texas case of a schizophrenic defendant.[354] *Atkins* has controlling implications in Mr.Haynes's case, as he lacked volitional capacity at the time of the crime. The *Atkins* holding compels the conclusion that executing a defendant for conduct he was unable to control, as in Mr. Haynes's case, is a violation of the Eighth Amendment.[355]

---

[352] More recently, the Supreme Court has extended the prohibition against execution to juveniles in *Roper v. Simmons,* 125 S. Ct. 1183 (2005).

[353] *See Corcoran v State*, 2002 WL 31002914, *6 (Ind. )(Rucker, J., dissenting); *State v. Nelson*, 803 A. 2d 1 47 (N.J. 2002)(Zappala, J., concurring)(applying the reasoning of Atkins to a severely mentally ill defendant as a matter of state constitutional law); *contra State v. Weik*, 2002 WL 1832359 (S.C. 2002)(*Atkins* has no applicability to mentally ill offenders).

[354] *Colburn v. Cockrell*, 2002 WL 31109549 (U.S.).

[355] *See also* Anne S. Emmanuel, *Guilty But Mentally Ill Verdicts and the Death Penalty: An Eighth Amendment Analysis*, 68 N.C.L. REV. 37, 42 n. 33 (1989), and a note, Van W. Ellis, *Guilty But Mentally Ill and the Death Penalty: Punishment Full of Sound and Fury, Signifying Nothing*, 43 DUKE L/J. 87 (1993). Both argue that the imposition of the death penalty on "guilty but mentally ill" (GBMI) defendants violates the Eighth Amendment. Both predate *Atkins*, and neither attempts to count the jurisdictions which preclude execution based upon volitional incapacity, as is required by *Atkins* (as well as the rest of the Supreme Court's Eighth Amendment jurisprudence.)

Part A briefly summarizes the evidence of meth intoxication and the evidence of Anthony Haynes's volitional incapacity at the time of his crime. Part B summarizes relevant Eighth Amendment law, focusing on the Supreme Court's decision in *Atkins*. Part C shows how the *Atkins* rationale prohibits the execution of persons whose mental illness and lack of free will or volitional capacity rendered them unable to control the conduct for which they were prosecuted. The *Atkins* rationale clearly forbids, at the very least, the execution of those whose mental illness[356] rendered them volitionally incapacitated at the time of the crime.

**A. Anthony Haynes, a "non-volitional"[357] offender.**

**I. The Defendant**

The facts relating to Mr. Haynes's drug use at the time of the crime, and its effects on him are not in dispute and, because they were not known to his trial attorneys, were never presented to the jury. Petitioner herein incorporates by reference the facts and arguments from Claims I and IV.

Mr. Haynes, on the night of the shooting, was under the influence of the stimulant crystal methamphetamine. Mr. Haynes used heavy amounts of the drug up to and including the day of the incident. Methamphetamine, particularly in its more potent crystal form, had well-

---

[356] By "mental illness" in this claim we are referring to the condition of an offender such as Mr. Haynes who, at the time of the offense, lacked a significant degree of volitional capacity. *See* the following definition of "non-volitional" offender. Thus, the condition may be temporary. Mr. Haynes, however, does have a history of mental illness pre-dating the offense, including diagnoses of ADHD, bi-polar disorder and the psychiatric hospitalization at West Oaks.

[357] By "non-volitional" offender, we mean a defendant who, in the words of the Texas statute, V.T.C.A. Penal Code §6.01(a)("A person commits an offense only if he voluntarily engages in conduct, including an act or omission or possession.") lacks *sufficient* capacity to control his conduct, or to conform it to the requirements of law. We also use the term "volitionally incapacitated" to refer to a such a person.

documented effects on Mr. Haynes's behavior. He was described as hyperactive, acting "weird," and unable to sleep at the time of the offense. He had impairments in his ability to attend and concentrate. The drug exacerbated the effect of his already-diagnosed Attention Deficit Hyperactivity Disorder. Stimulants are also frequently the drug of choice in the self-treatment of depression, clearly what he was undergoing upon his failure in the BOOST Program.[358]

Methamphetamine intoxication is characterized by maladaptive psychological and behavioral changes. Judgment is impaired and there may be sudden changes in mood, irritability, hypervigilance, hyperactivity, heightened sensitivity, tension and anxiety. The initial stage usually begins with a sense of euphoria. Despite the impairments in judgment, the individual often feels more confident and can be more talkative and outgoing. All aspects of the immediate environment take on intensified qualities but usually there are no hallucinatory perceptual distortions. At higher doses there are typically repetitive and stereotypic behaviors – continually repetitive acts that serve no apparent purpose. There are also concomitant physiological signs or symptoms of intoxication. They include such things as increased or slowed heart rate, elevated or lowered blood pressure, pupillary dilation, psychomotor agitation or retardation. There can also be nausea, vomiting, chills, weight loss, chest pain and cardiac arrhythmias, seizures, confusion or coma. The extent to which any user exhibits these manifestations depends on the individual characteristics of the user. Relevant factors are the rate of absorption, the individual tolerance for the drug, and the chronicity of use.[359]

[358] *See* Exhibits 17, 22, 23 etc.

[359] *See* Exhibit 28.

High-dose amphetamine abuse can lead to what is referred to as an amphetamine psychosis. The individual develops paranoid ideation usually accompanied by perceptions that benign activities are threatening in some way threatening and the development of a well-formed delusional system. The paranoid system is reinforced by the hypervigilant awareness of the environment and is exacerbated by the ensuing isolation as the individual withdraws. In later stages rather than the intense and suspicious observation of others, the user becomes convinced that others are watching or following him. With continued consumption the individual can lose all insight and develop extremely well-formed delusions of persecution. Episodes of violence have occurred in that state, as happened here.[360] There is evidence from the record that Mr. Haynes's amphetamine use on the days preceding the crime resulted in psychotic episodes.[361]

This evidence of methamphetamine abuse at the time of the crime would have been relevant to the culpable mental states of malice, premeditation, and the intent to kill. It would also have been relevant to the defenses of voluntary intoxication, involuntary intoxication, imperfect self-defense, and diminished actuality and diminished volitional capacity.

As a result of the acts and omissions of counsel, the jury's guilt and penalty phase determinations were based on incomplete, misleading, and unreliable evidence. Had these acts and omissions not occurred, there is a reasonable probability that the jury would not have found Mr. Haynes guilty of all counts as charged and would not have found the special issues to be true.

Despite abundant evidence of Anthony's drug abuse and dependence, some of which was

---

[360] *Id.*

[361] *See* Exhibits 17, 22, 23.

known to a defense investigator, this evidence was not presented to his jury. The evidence was as follows:

> Anthony reported to a defense investigator in late July 1999 that he had begun abusing marijuana at age 13-14, and thereafter smoked heavily and daily. He described discontinuing marijuana abuse during the time that he was in the Boost program, but resumed a pattern of heavy, daily marijuana smoking after being dropped from the Boost Program in April 1998 and returning to Houston.
>
> Anthony reported that he drank alcohol daily during high school, including before he went to school in the mornings. He described discontinuing use of alcohol in the nine months that he was in Boost program, and resumed this abuse on his return to Houston. Anthony described drinking a 12-pack nightly during the five weeks prior to the offense.
>
> Anthony reported abusing "fry" (i.e. marijuana dipped in a solution of embalming fluid and PCP) on approximately 10 occasions.
>
> Anthony reported daily use of methamphetamine during the five weeks prior to the capital offense. He described snorting methamphetamine in the morning when he awakened. He described that he would start feeling low at lunchtime and snort some more and smoke a joint. After work he snorted methamphetamine every 30-40 minutes.
>
> As his abuse of methamphetamines increased, Anthony reported that he used more marijuana to calm himself down. Anthony also described abusing Rohypnol (i.e. "roofied") during the 4-week period prior to the capital offense.[362]

Likewise, Dr. Seth Silverman points out the importance of this evidence:

> METHAMPHETAMINE (MA) USE AND ITS INFLUENCE ON BEHAVIOR
> MA is a powerful stimulator of the Dopamine pathways of the Central Nervous System. It was originally synthesized in this country to be used in decongestants and for the treatment of narcolepsy (falling asleep at inappropriate times). It became a popular street drug because
> It is powerful and disorienting

- It can be synthesized in a lab that can be contained in a small suitcase
- Minimal training is required to make MA
- The ingredients to make MA are easily obtainable
- It can be obtained without smuggling

> The initial effects of MA can not be predicted. However, small amounts of the

[362] Affidavit of Dr. Mark Cunningham, Exhibit 17 at 41.

drug can cause euphoria, psychosis, paranoia, irritability, sleeplessness, confusion, tremors, and instant death. Different from Cocaine, the effects of MA last long after the drug has been metabolized. These effects impair the mental state of the individual, cause a delirium, and compromise the capacity of the individual to process and respond to situations logically. MA is well documented to be associated with severe aggressive behaviors.

Records indicated that Mr. Haynes manifested many of the symptoms of MA intoxication during the period when he committed the robberies and fired his gun. His behaviors were much more aggressive than his previous behaviors, and his behaviors did not appear to be well thought out or well planned. His aggressive behaviors are consistent with a reaction to a misperception or distortion of information. Otherwise stated, his diminished capacity, in all medical probability, was due his due to his voluntary use of MA. Data that support the hypothesis that he suffered from a cognitive impairment consistent with MA-induced delirium and a decreased capacity to respond appropriately at the time of the incident is the method that he employed during the robberies and the circumstances surrounding the time when he shot the victim.

Sources indicated that he pointed a gun at the potential robbery victims from the driver's side of a truck and apparently had no back-up or follow-through plan if the victims refused to hand over their money or if they simply ran away from the truck in which he was sitting.

Mr. Haynes manifested more symptoms of MA intoxication and a decreased capacity to respond appropriately when, during the same period of intoxication when he attempted to or actually committed the robberies, he later shot a gun two times. The first time he shot the gun it was an apparent random shot that grazed the windshield of a random individual. The second bullet that he fired eventually killed the random individual. The robberies and killing appear to be

1. More aggressive behaviors than previously manifested by Mr. Haynes
2. Events that occurred during the same time period and
3. Reactions or actions based on misperceptions or cognitive impairments
4. Cognitive impairments consistent with the use of MA and its toxic effects on behavior
5. Influenced by the use of MA and its documented effects on cognitive impairment or decreased capacity
6. Not ingrained behaviors and because of that less likely to reoccur[363]

This evidence of meth addiction would have had crucial importance at the punishment phase according to Dr. Seth Silverman:

[363] *See* Affidavit of Dr. Seth Silverman, Exhibit 23.

Anthony Haynes has been convicted of Capital Murder. It is the medical opinion of this forensic psychiatrist that at the time that he committed the offense, he was probably intoxicated with MA. His behavior appeared to be illogical and to be inconsistent with his previous behaviors and appeared to be influenced by the toxic effects of the MA. His voluntary use of drugs, in particular MA, decreased his volitional capacity.

It is the medical opinion of this forensic psychiatrist that, in all medical probability, Mr. Haynes did not have a complete psychiatric and neurological evaluation prior to the instant offense and prior to the trial. With appropriate diagnostic tests and treatment, his risk to commit future violent offenses or be an ongoing threat to society could be reduced.

In all medical probability, understanding that Mr. Haynes is at lower risk to offend because his behavior is not ingrained, if he is treated for his MA abuse, if he is able to maintain sobriety, if he is accurately diagnosed and appropriately treated, the likelihood that he will commit future violent offenses or be an ongoing risk to the community will be severely and significantly reduced.[364]

All of this evidence attests to Anthony's diminished volitional capacity at the time of the crime.

**ii. Legal Definitions of Insanity and "GBMI" Verdicts as they Relate to Haynes's claim.**

A brief discussion of traditional notions of insanity and the "GBMI" (guilty but mentally ill) verdict will be necessary here in order to appreciate fully the context of Mr. Haynes's Eighth Amendment claim as developed in succeeding sections. The traditional legal definition of insanity was formulated in *MNaghten's* Case[365]: A defendant is insane (and therefore absolved of criminal responsibility) if, due to a defect of reason caused by mental illness, at the time of the act, he did not know either the nature and quality of the act or that the act was wrong. The

---

[364] *Id.*

[365] 8 Eng. Rep. 718 (H.K.1843).

Model Penal Code,[366] which has been widely adopted by the states (and until 1984,[367] by the federal courts of appeal), expands that test in three important ways. First, it relaxes the term "know" to "appreciate;"second, instead of requiring a total lack of capacity to appreciate wrongfulness, it requires only lack of "substantial capacity; and third it adds a second, "volitional" prong, exonerating defendants who lack substantial capacity to control their conduct.

Not surprisingly, the broadening of the insanity defense led to a backlash. "Guilty but mentally ill" (GBMI) verdicts attempt to create a middle ground between guilty verdicts and insanity acquittals by recognizing the role mental illness has played in the offense, yet insisting that the defendant is nonetheless criminally responsible for it, and therefore subject to punishment. In theory at least, the harshness of supplanting insanity acquittals with guilty verdict is mitigated by the guarantee of mental health treatment during the period of their incarceration, though commentators have criticized this promise as illusory. [368]

GBMI verdicts have, in fact, been criticized on a number of grounds,[369] but what is

[366] MPC §4.01 (1985).

[367] 18 U.S.C. § 17 (a) (1987).

[368] *See e.g.*, Comment, *Evaluating Michigan's Guilty But Mentally Ill Verdict: An Empirical Study,* 16 U. MICH. J.L.REF. 77, 79n.10 (1982); McGraw, Farthing-Capowich & Kellitz, *The Guilty But Mentally Ill Plea and Verdict: Current State of the Knowledge*, 30 VILL. L. REV. 117, 120 (1985). *See also* People v. Carter, 481 N.E. 2d 1012, 1020 (1985).

[369] *See e.g.*, American Bar Association, ABA Criminal Justice Mental Health Standards § 7-6.10 at 393 (1987) ( GBMI verdict is "at best confusing and at worst extremely prejudicial"); Woodmansee, *The Guilty But Mentally Ill Verdict: Political Expediency at the Expense of Moral Principles*, 10 NOTRE DAME J.L. ETHICS & PUB. POL'Y 341, 372 (1996) ("If it does not suggest a reduced level of culpability. . ., then the GBMI verdict is no different from a simple guilty verdict, and the designation of 'guilty but mentally ill' is superfluous."; Slobogin, *The Guilty But Mentally Ill Verdict: An Idea Whose Time Should Not Have Come*, 53 GEO. WASH.

relevant to Mr. Haynes's claim is an analysis of to their interaction with the death penalty. Historically, the GBMI verdict originated in Michigan in 1975 in response to the release of sixty-four defendants who had been found not guilty by reason of insanity ("NGRI"), but were subsequently found sane at civil commitment hearings.[370] Two of these defendants committed violent crimes almost as soon as they were released, and the resulting public outrage triggered the first GBMI statute. *Id.* That statute provides that a court may impose any sentence upon a GBMI defendant it could impose on a defendant found guilty.[371]

The Indiana legislature enacted the second GBMI statute in 1981,[372] also in response to a particularly heinous crime in which the insanity defense was offered.[373] Then in 1982, John Hinckley, who was accused of an assassination attempt on then-President Ronald Reagan, raised an insanity defense and was acquitted.[374] In two years, dissatisfaction with the Hinckley acquittal led in ten additional states– including South Carolina– to the creation of GBMI verdicts, sometimes accompanied by the reformulation of the insanity defense to exclude any

---

L. REV. 494, 497 (1985. *See also* Leblacn-Allman, Guilty But Mentally Ill: A Poor Prognosis, S.C.L. REV. 1095 (1998) (Given South Carolina's narrow definition of insanity, GBMI verdict could not serve function of providing gradations in culpability).

[370] Mickenberg, A Pleasant Surprise: The Guilty But Mentally Ill Verdict has Both Succeeded In Its Own Right and Successfully Preserved the Traditional Role of The Insanity Defense, 55 U. Cinn. L. Rev. 943, 973 (1987).

[371] MICH. COMP. LAWS § 768.36 (3) (1982).

[372] IND. CODE ANN. §§ 35-35, 35-36 (1983).

[373] See *Note, Indiana's Guilty But Mentally Ill Statute: Blueprint to Beguile the Jury*, 57 IND. L. J. 639, 639 n.4 (1982).

[374] Taylor, *Jury Finds Hinckley Not Guilty, Accepting His Defense of Insanity*, NY Times, June 22, 1982, § 1, at 1, col. 5.

volitional prong.[375] All of the GBMI statutes copied Michigan's model in providing that any sentence lawfully imposed upon a defendant found guilty may be lawfully imposed upon a defendant found GBMI,[376] generally with no consideration of the question of whether this rule applied to death sentences as well,[377] an issue that could not have arisen in Michigan, given its longstanding abolitionist stance.[378]

Though the label is the same, and the sentencing provisions are the same, the GBMI formulations differed wildly, with some requiring only an impaired capacity to control conduct, and others phrasing their standard in terms that do not match any previous insanity standard, and indeed, make no reference to volitional control.[379] Among the death penalty states, only the

[375] Emmanuel, *Guilty But Mentally Ill Verdicts and the Death Penalty: An Eighth Amendment Analysis*, 68 N.C.L. REV. 37, 42 n. 33 (1989).

[376] *Id.* at 47.

[377] The possible exception is Georgia, whose GBMI statute when enacted included mentally retarded individuals within the umbrella of "mentally ill." Later, it passed legislation forbidding the execution of mentally retarded individuals, but did not forbid the execution of other GBMI defendants, thereby implying that it those defendants could be executed. *See* Emmanuel at 48-49. Nonetheless, the Georgia Supreme Court has twice stated that the question of whether defendants found GBMI can be executed is an open one. *See Ward v. State*, 417 S.E. 2d 130,136 (1992)(explicitly noting that question is undecided; *Spraggins v. State*, 364 S. E. 2d 861 n. 2 (same).

[378] Michigan abolished the death penalty for all crimes except treason in 1846, *see* Frank Zimring & G. Hawkins, CAPITAL PUNISHMENT AND THE AMERICAN AGENDA 28 (1986), and completely abolished it by constitutional amendment in 1963. MICH. CONST. Art 4, § 46 ( 1835, amended 1963).

[379] *See e.g.*, O.C.G.A.§17-7-131 (a) (2) (Disorder that "significantly impairs" judgment, behavior, perception or control); ILL. REV. STAT. 1983, ch. 38, par. 6-2(d) ( "[P]sychiatric disorder which substantially impairs a person's thinking, feeling, or behavior, and impairs the person's ability to function." );Ill. Rev. Stat. 1983, par. 6-2 (d) (Illness that "substantially impairs thinking, feeling, or behavior"); 18 PA. C. S. § 314 (a).(Defendant lacks "substantial capacity" to appreciate wrongfulness or conform his conduct to the requirements of law); 14 S.D.C.L. § 22-1-2 (24)(Defendant suffers from "substantial psychiatric disorder that "impairs a person's judgment").

South Carolina and Delaware statutes clearly require a finding that the accused because of mental disease or defect lacked *sufficient* capacity to conform his conduct to the requirements of law, "[380] and despite that apparent clarity, the Delaware Supreme Court has construed its GBMI statute to require only a finding that the defendant's "volitional capacity was *impaired* by mental illness."[381] The Pennsylvania statute seems to walk the line between requiring impaired capacity and insufficient capacity, requiring that the defendant, by reason of mental illness lacked "substantial capacity" to appreciate wrongfulness or conform his conduct to the requirements of law.[382]

**B. The Eighth Amendment prohibition against cruel and unusual punishments.**

**1. General Principles Determining Whether a Punishment Is Cruel and Unusual.**

"The Cruel and Unusual Punishments Clause of the Eighth Amendment is directed at all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." *Enmund v. Florida*, 458 U.S. 782, 788 (1982)(internal quotations omitted) To determine whether a given punishment is disproportional, "evolving standards of decency that mark the progress of a maturing society" as well as the standards that prevailed at the time the Bill of Rights was adopted, must be considered. *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *Stanford v. Kentucky,* 492 U.S. 361, 369(1989). In establishing these evolving standards, the

---

[380] S.C. CODE §17-24-20(A) (1989 Cum. Supp.).

[381] *Sanders v. State*, 585 A. 2d 117,135(1991)(emphasis added). *See also id.* at 125("[A]ny significant volitional impairment is included with the scope of [the GBMI statute]").

[382] 18 PA. C. S. § 314 (a).

Supreme Court has first looked at the popular will as expressed in the legislative enactments of the people's elected representatives.[383] The Court also noted that another "significant and reliable objective index of contemporary values" regarding the propriety of a given punishment is the sentencing behavior of juries.[384] While less important in the Court's calculus, even prior to *Atkins v. Virginia,* 122 S.Ct. 2242 (2002), public opinion had a role to play in the additional light it sometimes shed on contemporary societal norms regarding criminal punishments.[385]

The Eighth Amendment tests all punishments for their congruence with evolving standards of decency, but capital sentences, because of their extremity, require more. A capital sentence is also violative of the Eighth Amendment when it is "grossly out of proportion to the severity of the crime"[386] or "so totally without penological justification that it results in the gratuitous infliction of suffering." *Id.* at 183. In *Gregg v. Georgia,* the Supreme Court identified retribution and deterrence as the two principal social functions that the death penalty purports to serve, and held in *Enmund v. Florida* that "Unless the death penalty when applied to those in [the defendant's] position measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an

[383] *Id.* at 370; *Enmund v. Florida*, 458 U.S. 782, 788-793 (1982); *Coker v. Georgia*, 433 U.S. 584, 593-596 (1977); *Gregg v. Georgia*, 428 U.S. 153, 179-181 (1976).

[384] *Gregg v. Georgia*, 428 U.S. 153, 181 (1976); *Coker v. Georgia*, 433 U.S. 584, 596 (1977)

[385] *See Penry v. Lynaugh*, 492 U.S. 302, 334-335 (1989(noting poll data reflecting opposition to the execution of mentally retarded defendants, but finding it, standing alone, insufficient evidence of consensus).

[386] *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)(joint opinion of Stewart, Powell, and Stevens, JJ.),

unconstitutional punishment." 458 U.S. 782, 798(1982).

**2. The Application of the Cruel and Unusual Punishment Clause in *Atkins v. Virginia.***

The rationale of *Atkins v. Virginia*, 122 S. Ct. 2242 (2002) makes it clear that the constitution forbids executing a person so mentally impaired that they lack the capacity to conform their conduct to the requirements of the law. In 1989, in *Penry v. Lynaugh*, 492 U.S. 3003 (1989), a majority of the Court found no sufficient national consensus barring the death penalty for retarded persons, but due to the "dramatic shift in the state legislative landscape" that occurred since *Penry*, the Court decided to revisit the issue (*Atkins* at 2247) first granting *certiorari* in *McCarver v. North Carolina*, and then replacing *McCarver* with *Atkins* when *McCarver* became moot due to the passage of legislation in North Carolina prohibiting the execution of persons with mental retardation.

The *Atkins* Court began by establishing that a fundamental "'precept of justice'" is that "'punishment for crime should be graduated and proportioned to the offense.'" *Id.* (quoting *Weems v. United States*, 217 U.S. 349 (1910). This proportionality concept is - and was even before *Atkins* – an integral part of any Eighth Amendment analysis. *Id.* The Court also made clear that determining whether a punishment is constitutionally excessive or cruel and unusual[387] is judged by current standards, not by those which existed at the time the Eighth Amendment was ratified. The core Eighth Amendment concept is the "'dignity of man'" and thus its constitutional content must be informed by "'the evolving standards of decency that mark the

[387] The Court was clear that the Eighth Amendment prohibits "all excessive punishments as well as cruel and unusual punishments which may or may not be excessive." *Id.* at 2247.

progress of a maturing society.'" *Id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). The evolving standard, the Court again reiterated, should be informed by "objective factors" to the maximum extent possible; hence, the most reliable evidence of this standard is found in state legislative enactments and jury verdicts. However, despite the importance of the objective evidence, the Court was adamant that "in the end [its] own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Id.* (quoting *Coker v. Georgia*, 433 U.S. 584, 597 (1977)).

Its course set, the Supreme Court first reviewed the lay of the legislative land. The Court seemed greatly impressed with the fact that at the time of *Penry* only two death penalty states and the federal government proscribed the death penalty for mentally retarded offenders, but that since *Penry,* an additional sixteen states had taken death off the punishment table for the mentally retarded. Moreover, the Court noted, it "is not so much the number of States that is significant, but the consistency of the direction of change." *Id.* These enactments, "[g]iven the well-known popularity of anti-crime legislation," provided the Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* at 2249. In its successful search for a national consensus, the Court relied heavily upon the fact that the legislatures passing the laws voted "overwhelmingly in favor of the prohibition." The Court also looked to the opinions of social and professional organizations with "germane expertise,"[388] the opposition to the practice by "widely diverse religious

[388] For example, the American Psychological Association. *Id.* at 2249 n. 21.

organizations,"[389] international practice [390]and polling data.[391] While "not dispositive" these factors gave further support to the Court's opinion there was a consensus opposing the practice "among those that have addressed the issue." *Id.* Finally, the Court also noted that even in those states that retained the death penalty for the retarded, only five had actually carried out the execution of a mentally retarded individual since *Penry*. *Id.* Since the practice had become "truly unusual," it was "fair to say," according to the Court, that "a national consensus has developed against it." *Id.*

The Court then examined the underlying merits of the consensus, beginning with the observation that it reflected a judgment about the "relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty," (*Id.* at 2250) a judgment the Court itself ultimately endorsed. The Court noted that due to their impairments those with mental retardation "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to control impulses and to understand the reactions of others." *Id.* These deficiencies, while not justifying an exemption from criminal liability, do diminish the personal culpability of retarded individuals to the extent that neither of the justifications advanced by states in support of the death penalty – retribution and deterrence – would be served by

[389] The Court noted that representatives of Christian, Jewish, Muslim an Buddhist organizations believed that the execution of persons with mental retardation could not be justified. *Id.*

[390] "[W]ithin the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved." *Id.*

[391] "[P]olling data shows a widespread consensus among Americans, even those that support the death penalty, that executing the mentally retarded is wrong." *Id.*

permitting their execution. *Id.* at 2250-51.

Retribution in the capital context has been limited to ensuring that "only the most deserving of execution are put to death." *Id.* at 2251. Since "just deserts," necessarily depends on the culpability of the offender, the most extreme punishment was excessive due to the "lesser culpability of the mentally retarded offender." The Court also concluded that deterrence interests are not served by the execution of offenders with mental retardation, reasoning that capital punishment can only serve as a deterrent when a crime is the result of premeditation and deliberation, i.e., when the threat of death will "inhibit criminal actors from carrying out murderous conduct," (*Id.*) but that this type of calculus is at the "opposite end of the spectrum" from the behavior of the mentally retarded due to their cognitive and behavioral impairments. [392]

In addition to its conclusion that retaining the death penalty for the mentally retarded would not further legitimate interests in retribution or deterrence, the Court also found that the reduced capacity of mentally retarded offenders provides a "second justification for a categorical rule making such offenders ineligible for the death penalty." *Id.* Due to their impairments, there were a host of reasons, including the increased risk of false confessions, the likelihood of difficulties in communicating with counsel, a lesser ability (due to limited communication skill) to effectively testify on their own behalf that, "in the aggregate," carried rendered retarded

[392] *Id.* The Court also concluded that exempting the retarded would not diminish any other deterrent interests associated with the death penalty because those without mental retardation are "not protected by the exemption." *Id.*

offenders subject to an unacceptable "risk of wrongful executions."[393] The Court also noted the particular danger that a mentally retarded person's demeanor "may create an unwarranted impression of lack of remorse for their crimes" which could enhance the likelihood that the jury will impose the death penalty due to a belief that they pose a future danger. *Id.*

Thus, the Court concluded that its "independent evaluation of the issue reveals no reasons to disagree with the judgment of the legislatures that have . . . concluded that death is not a suitable punishment for a mentally retarded criminal," and that therefore, the Constitution "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender."[394]

### C. *Atkins* applies to non-volitional offenders such as Mr. Haynes.[395]

In *Atkins v. Virginia* (2002) 122 S. Ct. 2242, the United States Supreme Court declared that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation. The decision in *Atkins* relies upon three related rationales: The empirically established consensus against executing the mentally retarded; the Court's independent determination that retaining the death penalty for the mentally

---

[393] *Id.* at 2251-52. The Court also noted the danger that a mentally retarded person's demeanor "may create an unwarranted impression of lack of remorse for their crimes" which could enhance the likelihood that the jury will impose the death penalty due to a belief that they pose a future danger. *Id.*

[394] *Id.* *(quoting Ford v. Wainwright*, 477 U.S. 399 (1986)).

[395] The national data supporting the argument that evolving standards of decency do not support the execution of those who were volitionally incapacitated at the time of the offense, as well as the methodology, are taken from John Blume and Sheri Lynn Johnson, KILLING THE UNWILLING: *ATKINS*, THE VOLITIONALLY INCAPACITATED AND THE DEATH PENALTY, 55 S.C.L. REV. VOL. 1 (Fall 2003).

retarded would not further any interest in retribution or deterrence; and the fact that the nature of the impairment of mental retardation leads to an unacceptable "risk of wrongful executions." (*Id.* at 2249-52.) All three of these rationales apply equally to persons, such as Mr. Haynes, who are unable to control their conduct due to meth intoxication and pre-existing mental problems that the meth use exacerbated.

The imposition of the death penalty on offenders that are unable to control their behavior to the extent that they are volitionally incapacitated offends a longstanding collective judgment of the American people, as expressed in their laws and sentencing practices, is grossly disproportionate to such offenders' moral culpability, serves no permissible penological goal, and carries an enhanced risk of error. Because such an anomalous sentence was imposed upon Mr.Haynes, the Cruel and Unusual Punishment Clause of the Eighth Amendment requires the vacating of that sentence.

*Atkins* provides specific directions for calibrating the Eighth Amendment standard to evaluate whether it is excessive or cruel and unusual punishment to execute a person who, due to his mental illness, lacks the free will or volitional capacity to conform their conduct to the requirements of the law. First, we must look to the objective evidence of the acceptance of the practice expressed in state legislative enactments, jury verdicts[396] and others who have closely examined the issue. Second, we need to analyze the moral culpability of those who cannot conform their conduct or lack volitional capacity, and third, the related question of whether the

[396] Even the three dissenting justices agreed that the relevant Eighth Amendment inquiry must take into account the "work product of legislatures and sentencing jury determinations" in ascertaining "contemporary American conceptions of decency for purposes of the Eighth Amendment." *Atkins* at 2253 (Rehnquist, C.J. dissenting).

execution of such offenders will further any legitimate retributive or deterrent interest. Finally, *Atkins* requires that we also investigate whether due to the severity of their mental illness there is a heightened risk of wrongful execution. Application of this framework to Anthony Haynes's death sentence, imposed for a crime in which his volitional capacity and free will were vastly diminished, compels the modest conclusion that his death sentence is an unconstitutional punishment.

**1. Evolving Standards of Decency Prohibit the Execution of a Person for Conduct He Was Unable to Control.**

The pertinent question in answering whether a national consensus exists that would prohibit such a defendant's execution is *not* answered by comparing how many jurisdictions with GBMI statutes have authorized the imposition of the death penalty for persons who fall within their definition of "guilty but mentally ill" with the number of jurisdictions with GBMI statutes that do not authorize the imposition of the death penalty on GBMI defendants. Such a comparison confounds at least four issues: (1)which jurisdictions have a death penalty; (2) what the definition of GBMI in that jurisdiction covers; (3) how GBMI defendants are sentenced in comparison to other defendants, and whether that jurisdiction has explicitly authorized, prohibited, or failed to mention death sentences for GBMI defendants. Focus on GBMI states also ignores the possibility that some jurisdictions without GBMI statutes regulate the disposition of defendants who are unable to control their conduct through other statutes or forms of appellate review.

Instead of focusing on the states which coincidentally treat some mentally ill offenders under the same nominal rubric, the proper question is how many states preclude death sentences

for defendants who "lacked sufficient capacity to conform their conduct to the requirements of the law."

**a. States whose laws preclude the execution of volitionally-incapacitated offenders.**

In seventeen states, a finding of volitional incapacity shields a defendant from *all* criminal responsibility and *all* punishment.[397] Of the seventeen states that have a volitional prong as part of their insanity defense, seven do not presently have a death penalty. Nevertheless, they contribute equally to the legislative consensus that the death penalty may not be imposed based upon conduct the defendant was powerless to avoid. It is not their prohibition of the death penalty, but their recognition of the radically lesser culpability of non-volitional actors that contributes to this consensus.[398] If any of these seven states were to enact a death penalty tomorrow, persons who were volitionally incapacitated would be ineligible for death sentencing for precisely the same reason they are presently ineligible in the ten volitional prong-

[397] ARK. STAT. ANN.§5-2-312 (1995); CONN. GEN. STAT..§ 53A-13 (1994);GA. CODE ANN.§16-3-2 (1996); HAW. REV. STAT.§704-400(1996);KY. REV. STAT. ANN.§504.020 (MICHIE 1995); MD. HEALTH-GEN. CODE §12-108(1995); MICH. STAT. ANN.§28.1044(1); OR. REV. STAT.§ 161.295(1995); 13 VT. STAT. ANN.§ 4801 (1995); WIS. STAT. 971.15 (1994); WYO. STAT. 7-11-304(1996); *Commonwealth v. McHoul*, 226 N.E. 2d 556 (Mass. 1967); *State v. Cegelis*, 638 A. 2d 783 (N.H. 1994);*State v. White*, 270 P. 2d 727 (N.M. 1954); *State v. Johnson*, 399 A.2d 469 (R.I. 1979); *Thompson v. Commonwealth* 70 S.E. 2d 284 (Va. 1952); *State v. Myers* 222 S.E. 2d 300 (W.V. 1976).

[398] *Stanford v. Kentucky*, 492 U.S. 361 (1988) is not to the contrary. *Stanford* held that abolitionist states reveal nothing about the proportionality of executing sixteen- and seventeen-year olds. *Id.* at 371 n.2. But the reason that abolitionist states are not probative is that nothing in their treatment of sixteen and seventeen year olds demonstrates a view that they are substantially less morally culpable, or that they would be shielded from imposition of the death penalty were it enacted in such a state. If, contrary to fact, one of those states had laws that rendered juveniles of those ages *ineligible* for treatment as adult offenders, such laws would indeed be probative regarding a consensus of the appropriateness of the death penalty for juveniles; because none of them had such laws, their abolitionist stand reflected only a view on the death penalty, and not a view on whether juveniles were peculiarly inappropriate candidates for it.

death penalty states: because such persons are deemed undeserving of any criminal sanction at all.

In one state, Montana, a barrier closely related to the volitional prong of the insanity defense would preclude execution of a person unable to avoid his criminal act. Although Montana allows mental illness to *excuse* criminal conduct only when it proves that the defendant did not have the requisite mental state,[399] the existence of a mental disease or defect at the time of the offense that rendered the defendant unable ..."to conform the defendant's behavior to the requirements of law,"[400], affects the sentencing of that defendant. Upon a finding that the defendant lacked the ability to conform his conduct, "the court shall sentence him to be committed to the custody of the director of the department of corrections to be placed in an appropriate institution for custody, care, and treatment for a definite period of time not to exceed the maximum term of imprisonment that could be imposed [upon a finding that the defendant did not suffer from such a mental disease or defect]."[401] Thus, in Montana as well as in the seventeen volitional prong states listed above, no criminal punishment may be imposed on a person who lacked the capacity to conform his conduct to the requirements of law.

In addition to the eighteen states in which persons who are unable to control their conduct would be totally excused from criminal punishment, in at least one more state such defendants are ineligible for a death sentence because their volitional incapacity would provide an affirmative defense that mitigates murder to manslaughter. In New York, it is an affirmative

[399] MONT. CODE ANN.§ 46-14-102 (1995).

[400] *Id.* at .§ 46-14-311.

[401] *Id.* at § 46-14-312.

defense to murder that the defendant "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." [402] Defendants who are unable to control their conduct would, by virtue of that impairment, be under the influence of extreme emotional disturbance. [403] Therefore, the total number of states who have made a judgment that volitionally incapacitated offenders are categorically ineligible for the death penalty is nineteen – one more than the eighteen the Court found sufficient for the evolving standard of decency in *Atkins.*

In at least six additional states--Arizona, Florida, Indiana, Mississippi, Ohio and Nevada--proportionality review has served to remove many mentally ill offenders (where the existence of serious mental illness is not disputed) from the ranks of the condemned despite the apparent availability of capital punishment in such cases.[404] While these proportionality decisions do not

[402] N.Y. Penal L. §125.27 (Consol. 1996).

[403] In states such as Delaware and Montana, a similar "extreme emotional disturbance" formula would often result in the mitigation of murder to manslaughter for volitionally impaired defendants, but might not always do so because those states require that the reasonableness of the explanation for the disturbance be judged by *a reasonable person* in the accused's situation, thus precluding reliance upon the illness itself to form part of the explanation. Del. Code. Ann. tit. 11, § 641 (1995); Mont. Code. Ann.§ 45-5-103 (1995). Because New York requires that the disturbance be judged from the viewpoint of *a person* in the defendant's situation under the circumstances the defendant perceives, the defendant's "situation" would include his mental illness, and his resultant incapacity to control his conduct would provide the only required explanation for his emotional disturbance.

[404] *See e.g., State v. Jimenez,* 799 P.2d 785, 797-801 (Ariz. 1990) (reducing death sentence to life imprisonment based on defendant's mental incapacity); *State v. Fierro*, 804 P.2d 90 (Ariz. 1990) (death penalty held disproportionate due in part to defendant's "history of psychological illness"); *State v. Doss*, 568 P.2d 1054, 1061 (Ariz. 1977)(same); *Jones v. State*, 332 So.2d 615, 619 (Fla. 1976) (reducing death sentence to life based on evidence of defendant's

correspond precisely to the so-called "irresistible impulse" category at issue here, they help explain why these state courts may not have had to squarely faced the issue of the permissibility of death sentences for conduct the defendant was incapable of controlling. Moreover, the fact that these jurisdictions have used proportionality review to strike down sentences of mentally ill offenders whose illness has left them with *some* capacity to control their conduct suggests that they might well adopt a per se rule prohibiting the execution of offenders totally lacking in that capacity if such an offender were in fact sentenced to death in that jurisdiction.

The Supreme Court has rejected the notion that states without a death penalty contribute any information to the question of evolving consensus on the eligibility of particular classes of offenders.[405] Nonetheless, it is worth noting that in addition to the 25 states in which the volitionally incapacitated in particular would likely be exempted from the death penalty, in five more states such a person could not face the death penalty because there is no death penalty to

mental illness); *Burch v. State*, 343 So.2d 831 (Fla. 1977) (same); *Huckaby v. State*, 343 So.2d 29 (Fla. 1977) (evidence of mental illness outweighed evidence in aggravation and required reduction of sentence from death to life imprisonment; while defendant "may have comprehended the difference between right and wrong his capacity to appreciate the criminality of his conduct and to conform it to the law was substantially impaired"); *Knowles v. State,* 632 So. 2d 62 (Fla. 1993)(mitigating factors of defendant's mental illness, including his impaired capacity to control his conduct outweighted aggravating factors); *Besaraba v. State*, 656 So 2d 441 (Fla. 1995)(death sentence overturned where defendant was under the influence of great emotional disturbance); *Evans v. State*, 598 N.E. 2d 516, 519 (Ind. 1992)(where defendant produced uncontradicted evidence of psychiatric disorder, and parental neglect, death penalty inappropriate despite aggravate4d nature of crime and defendant's prior violent history); *State v. Claytor,* 61 Ohio St. 3d 234 (1991)(where defendant produced unrebutted evidence that he lacked substantial capacity to conform, impact of that mitigating factor should have been given more weight and a life sentence imposed); *Edwards v. State*, 441 So.2d 84, 92-94 (Miss. 1983) (plurality opinion) (vacating death sentence based on offender's mental illness); *Haynes v. State*, 103 Nev. 309, 739 P.2d 497 (1987) (vacating as disproportionate death sentence imposed on mentally ill offender).

[405] *Stanford v. Kentucky*, 492 U.S. 361, 371n.2 (holding that abolitionist states reveal nothing about the proportionality of executing sixteen- and seventeen- year olds).

face. Chart 1 summarizes the 30 states whose laws preclude the execution of volitionally incapacitated persons, giving the reasons for ineligibility so that the reader may grant whatever weight to the absence of a death penalty, or the probable ineligibility due to proportionality review, as he or she deems appropriate:

Chart 1

Reasons for Ineligibility of Defendants with "Insufficient Capacity" to Control their Conduct by State

| State | Insanity defense with volitional prong | Extreme emotional disturbance mitigates murder to murder manslaughter | Statutory provision limits punishment to imprisonment | Proportionality review removes severely mentally ill offenders | No death penalty |
|---|---|---|---|---|---|
| Alaska | | | | | X |
| Arizona | | | | X | |
| Arkansas | X | | | | |
| Connecticut | X | | | | |
| Florida | | | | X | |
| Georgia | X | | | | |
| Hawaii | X | | | | X |
| Indiana | | | | X | |
| Iowa | | | | | X |
| Kentucky | X | | | | |
| Maine | | | | | X |
| Maryland | X | | | | |
| Massachusetts | X | | | | X |
| Michigan | X | | | | X |
| Minnesota | | | | | X |
| Mississippi | | | | X | |

| | | | | | |
|---|---|---|---|---|---|
| Montana | | | X | | |
| Nevada | | | | X | |
| New Hampshire | X | | | | |
| New Mexico | X | | | | |
| New York | | X | | | |
| North Dakota | | | | | X |
| Ohio | | | | X | |
| Oregon | X | | | | |
| Rhode Island | X | | | | X |
| Vermont | X | | | | X |
| Virginia | X | | | | |
| West Virginia | X | | | | X |
| Wisconsin | X | | | | X |
| Wyoming | X | | | | |
| **TOTAL: 30** | 17 | 1 | 1 | 6 | 12 |
| | | | | | |

**b. States that permit execution of volitionally incapacitated defendants.**

Thus nineteen states have statutes that explicitly preclude execution of a defendant for conduct he was incapable of controlling, and an additional five have judicial decisions that raise a strong inference that volitionally incapacitated offenders are ineligible for execution. In contrast, only South Carolina affirmatively sanctions execution of a defendant for conduct he was unable to control.

**c. The silent states.**

Although eight other death penalty states have "GBMI "statutes that on first glance would seem to *include* volitionally incapacitated defendants, three of them in fact would

exonerate volitionally incapacitated defendants through their insanity defenses,[406] and the remaining five have not yet determined the question. Three states have upheld death sentences in "GBMI" cases, but none of these cases involved defendants that lacked sufficient capacity to control their conduct. Although the Delaware statute on its face appears to allow an offender to be found GBMI only if he wholly lacked the capacity to control his conduct, and the Delaware Supreme Court *has* held that a GBMI verdict does not preclude a death sentence, it did so (1) in the course of reversing that defendant's sentence on another ground, and (2) only after construing the GBMI verdict to require only a finding that the defendant's "volitional capacity was *impaired* by mental illness"[407] In explaining why the legislature deemed punishment as well as treatment appropriate for GBMI defendants, the court explained that "an individual whose willpower was undermined by disease... might, in theory at least, have resisted the urge to commit the crime with which he is charged." *Id.* at 126. Reiterating that a GBMI verdict is not inconsistent with the possibility that the defendant "might have resisted his pathological impulses," *Id.* at 134, the *Sanders* court explicitly reserved the question of whether a person who, as a result of mental illness, had "*insufficient willpower to choose*" whether or not he would commit the crime with which he was charged could be executed for that crime. *Id.* at 135.

In Illinois, a "GBMI" defendant has been held to be eligible for the death penalty, but because the insanity defense in effect at that time had a volitional prong, by virtue of being

---

[406] GA. CODE ANN.§16-3-2 (1996); KY. REV. STAT. ANN.@504.020 (Michie 1995); *State v. White*, 270 P. 2d 727 (N.M. 1954).

[407] *Sanders v. State*, 585 A. 2d 117,135(1991)(emphasis added). *See also id.* at 125("[A]ny significant volitional impairment is included with the scope of [the GBMI statute]").

found sane, that defendant had been determined to be "able to conform his conduct to the requirements of law." [408]Indeed, the court cited this finding on insanity as the reason for finding that "deterrence and retribution remain valid considerations in his punishment." *Id.* Illinois no longer has a volitional prong to its insanity defense, but the Illinois courts have yet to rule upon the death eligibility of GBMI defendants under its new insanity defense.

Indiana has affirmed the death sentence of a GBMI defendant, but there was no indication that that defendant lacked the ability to control his conduct;[409] in Indiana, a GBMI finding implies nothing about volitional capacity, requiring only that the defendant suffered from "a psychiatric disorder which substantially impairs a person's thinking, feeling, or behavior and impairs the persons ability to function."[410] Moreover, as mentioned previously, the Indiana Supreme Court has used proportionality review at least once to reverse the death sentence of mentally ill offender who was not even psychotic, thereby suggesting that *a fortiori*, a more severe mental illness would also render a death sentence inappropriate.[411]

Of the remaining[412] GBMI states, South Dakota and Pennsylvania all have yet to rule on

---

[408] *State v. Crews*, 522 N.E.2d 1167,1174(1988), *cert. denied*, 492 U.S. 925 (1989).

[409] *Harris v. Indiana*, 499 N.E. 2d 723 (1987).

[410] IND. CODE § 35-36-2-3, 35-36-1-1.

[411] *See Evans v. State*, 598 N.E. 2d 516, 519 (Ind. 1992). The Court's decision in Evans was made in the context of a very aggravated crime and a defendant with a history of sexual assault, burglary, and child molestation. *Id.*

[412] Nevada was one of the original GBMI death penalty states, but its Supreme Court has held that the GBMI statute is unconstitutional. *Finger v. State*, 27 P. 3d 66, 85 (Nev. 2001). Georgia does have a GBMI statute, and has explicitly reserved the question of whether GBMI defendants are death-eligible, *see Ward v. State*, 417 S.E. 2d 130,136 (Ga. 1992); *Spraggins v. State*, 364 S. E. 2d 861 n. 2. (Ga.), but because it has a volitional prong to its insanity defense, a defendant without sufficient capacity to control his conduct would not be found GBMI.

whether a GBMI defendant is eligible for the death sentence. But, to the best of counsel's knowledge, no person found GBMI has been sentenced to death in either of these states.

If we look to the death penalty states *without* GBMI statutes ( and, of course, without volitional prongs to their insanity defenses), none has held, or said in dicta, or even suggested, that the death penalty may be applied to offenders who lack sufficient capacity to conform their conduct to the requirements of law. In the five such states with very small death row populations - Colorado, Kansas, Nebraska, New Jersey, and Washington- the dearth of death penalty cases means that no valid inferences can be drawn about the views of sentencing juries or the interpretation of state law that would be made on this issue. There remain three such states --California, Idaho and Louisiana--which have imposed and affirmed relatively large numbers of death sentences, and which have neither any formal method of determining whether mentally ill defendants meet the "irresistible impulse" test nor a record of reversing death sentences of mentally ill offenders on proportionality grounds. But even these jurisdictions do not reflect, for eighth amendment purposes, any "considered judgment approving the imposition of capital punishment" on mentally ill offenders who were unable to conform their conduct. *Thompson v. Oklahoma,* 487 U.S. 815, 852 (1988) (O'Connor, J., concurring). Rather, like the states' laws governing waiver of juvenile offenders for trial as adults which were considered in *Thompson,* the states' substantive insanity standards reflect a myriad of legislative considerations far more pressing than their theoretical effect on eligibility for capital punishment. 487 U.S. 815, 852 (1988). A state's decision to reject or abandon use of the capacity-to-conform prong of criminal responsibility simply does not constitute reliable evidence of a legislative or public attitude in

favor of using the death penalty in such cases. *Id.* In the absence of actual death sentences and executions of volitionally incapacitated offenders, the lack of legislative or judicial preclusion of such sentences is similarly ambiguous; silence under these circumstances signifies neither approval nor disapproval. Moreover, even these states have not been entirely silent on the issue; all three recognize *impaired* capacity to conform conduct to legal requirements as a statutory mitigating factor.[413] One plausible inference from these statutory mitigation schemes is that legislators anticipated that, at the extreme, those rare cases where the defendant possess *insufficient* capacity to conform his conduct to the law, juries instructed on the mitigating significance of *impaired* capacity will not impose the death penalty. While this is not the only possible inference from the overall statutory schemes, it is at least as likely as the silence-equals-approval inference. Indeed, as discussed below, if legislators have assumed that juries will give life sentences in extreme cases of impaired volitional capacity, such an assumption would seem to comport with the actual behavior of juries.

Thus, speculation about silent states can run in either direction. But the incontrovertible fact is that *no* state--including Texas--has by express legislative enactment rendered offenders who lacked sufficient capacity to conform their conduct to the requirements of law eligible for capital punishment. No court has ever construed the laws of any American state to permit such a result. At least nineteen states' laws clearly preclude the possibility of such a sentence, and this virtual unanimity among those states whose laws speak directly to this issue more than establishes the "evolving standard of decency" that precludes the execution of a class of

[413] Cal. Penal Code § 190.3 (Deering 1996); Idaho Code § 19-2523 (1996); La. Code Crim. Proc. Art.905.5 (1996).

offenders.[414]

**d. Behavior of sentencing juries.**

The silence of many death penalty states on the question of the death eligibility of a person totally lacking in the ability to control his conduct appears to be attributable to the screening behavior of prosecutors and the sentencing behavior of juries. The latter is itself another "significant and reliable objective index of contemporary values" regarding a given punishment. *Gregg v. Georgia*, 428 U.S. 153, 181 (1976); *Coker v. Georgia*, 433 U.S. 584, 596 (1977); *see also Atkins v. Virginia* 122 S.Ct. 2242 (2002)(same). Assessing the willingness of juries to impose death sentences on defendants *who have been formally determined* to lack the capacity to conform their conduct to the law is undeniably problematic, for the revealing reason that in only two states--South Carolina and Pennsylvania--are such sentences *even theoretically* possible. In these two states, it does not appear that death has been made available as a sentencing option to juries in any significant number of cases. One cannot find *even one other case* in which a death sentence has been pronounced upon a person found unable to control his conduct.

In some jurisdictions, it is possible that some offenders who juries *believed* were unable to control their conduct were sentenced to death, but that no record has been left of that finding because the statutory structure does not ask the jury to make such a determination. But certainly if such situations were *common*, one would expect capital defense attorneys, zealous in their representation, to have raised this as an issue at some point in the appellate proceedings. Since

---

[414] *Atkins v. Virginia*, 122 S.Ct. 2242 (2002); *Coker v. Georgia*, 433 U.S. 584 (1977); *Enmund v. Florida*, 458 U.S. 782 (1982); *Thompson v. Oklahoma,* 487 U.S. 815 (1988).

no court in the nation has ever determined whether volitionally incapacitated defendants are death eligible absent a GBMI statute, and only the South Carolina Supreme Court has determined this question under such a statute, the number of such cases must be very small indeed.

It is virtually impossible to determine the number of times in which such sentences have been *submitted* to juries. But whether juries have been given few or many opportunities to impose such sentences, the undeniable fact is that the imposition of death sentences on such volitionally impaired offenders by American juries is so infrequent as to be virtually unknown. And if we turn to the indicator of previous *executions*, the picture is even more stark: There are none. In contrast, the *Atkins* court deemed the practice of executing the mentally retarded "truly unusual" because actual executions were limited to *five states*. *Atkins v. Virginia*, 122 S.Ct. 2242, 2249 (2002). If ever there was a punishment whose "freakish" rarity establishes its unconstitutionality under the Eighth Amendment, it is this one.

Chart 2 summarizes the extremity of Anthony Haynes's sentence, whether measured by the governing legal standard, the number of death sentence imposed, or the number of executions:

Chart 2

Death Penalty Eligibility of Defendants with "Insufficient Capacity" to Control their Conduct

| State | Eligible? | Number of Death Sentences | Number of Executions |
|---|---|---|---|
| Alabama | Hasn't decided | 0 | 0 |
| Alaska | Hasn't decided (but no death penalty) | 0 | 0 |
| Arizona | Probably not | 0 | 0 |
| Arkansas | NO | 0 | 0 |
| California | Hasn't decided | 0 | 0 |
| Colorado | Hasn't decided | 0 | 0 |
| Connecticut | NO | 0 | 0 |
| Delaware | Hasn't decided | 0 | 0 |
| Florida | Probably not | 0 | 0 |
| Georgia | NO | 0 | 0 |
| Hawaii | NO | 0 | 0 |
| Idaho | Hasn't decided | 0 | 0 |
| Illinois | Hasn't decided | 0 | 0 |
| Indiana | Probably not | 0 | 0 |
| Iowa | Hasn't decided (but no death penalty) | 0 | 0 |
| Kansas | Hasn't decided | 0 | 0 |
| Kentucky | NO | 0 | 0 |
| Louisiana | Hasn't decided | 0 | 0 |
| Maine | Hasn't decided (but no death penalty) | 0 | 0 |
| Maryland | NO | 0 | 0 |
| Massachusetts | NO | 0 | 0 |
| Michigan | NO | 0 | 0 |
| Minnesota | Hasn't decided (but no death penalty) | 0 | 0 |
| Mississippi | Probably not | 0 | 0 |
| Missouri | Hasn't decided | 0 | 0 |

| Montana | NO | 0 | 0 |
|---|---|---|---|
| Nebraska | Hasn't decided | 0 | 0 |
| Nevada | Probably not | 0 | 0 |
| New Hampshire | NO | 0 | 0 |
| New Jersey | Hasn't decided | 0 | 0 |
| New Mexico | NO | 0 | 0 |
| New York | NO | 0 | 0 |
| North Carolina | Hasn't decided | 0 | 0 |
| North Dakota | Hasn't decided (but no death penalty) | 0 | 0 |
| Ohio | Probably not | 0 | 0 |
| Oklahoma | Hasn't decided | 0 | 0 |
| Oregon | NO | 0 | 0 |
| Pennsylvania | Hasn't decided | 0 | 0 |
| Rhode Island | NO | 0 | 0 |
| South Carolina | YES | 1 | 0 |
| South Dakota | Hasn't decided | 0 | 0 |
| Tennessee | Hasn't decided | 0 | 0 |
| Texas | Hasn't decided | 0 | 0 |
| Utah | Hasn't decided | 0 | 0 |
| Vermont | NO | 0 | 0 |
| Virginia | NO | 0 | 0 |
| Washington | Hasn't decided | 0 | 0 |
| West Virginia | NO | 0 | 0 |
| Wisconsin | NO | 0 | 0 |
| Wyoming | NO | 0 | 0 |
| | | | |

**e. Public opinion.**

Public opinion, as reflected by polling data and by informed public commentary, may in some cases shed additional light on contemporary societal norms regarding criminal

punishments.[415] Little such direct evidence is available concerning contemporary public attitudes toward the narrow question raised in this case, most probably because the question has so rarely arisen. Indeed, because of the lack of persons sentenced to death after an express finding that they lacked sufficient capacity to conform their conduct to the law, it is not surprising that no public opinion research has been undertaken to probe Americans' views concerning such sentences.

Similarly, professional associations in the mental health field have not had any reason to focus on the execution of the volitionally incapacitated. Viewed more broadly, however, nearly every major mental health association in the United States has published a policy statement addressing the umbrella issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented. Although these organizations differ on whether to outlaw or suspend such executions, they unanimously agree that the current capital punishment system inadequately addresses the complexity of cases involving mentally ill defendants. [416]

---

[415] *See Atkins v. Virginia*, 122 S. Ct. 2242, 2249 n. 21 (2002) (reviewing public opinion survey data and positions of pertinent professional associations on question of executing mentally retarded offenders).

[416] American Psychiatric Association, *Moratorium on Capital Punishment in the United States* (approved October 200), APA Document Reference No. 200006; American Psychological Association, *Resolution on the Death penalty in the United States*, National Alliance for the Mentally Ill, *The Criminalization of People with Mental Illness*; National Mental Health Association, *Death Penalty and People with Mental Illness* (approved March 10, 2001).Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." NMHA, *Death Penalty and People with Mental Illness.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill.APA,

It is obvious from these general statements about a wide range of mentally ill offenders that these organizations adamantly oppose the execution of persons as severely volitionally incapacitated as Anthony Haynes was at the time of his crime. The reason for the paucity of direct evidence of public and expert attitudes towards the execution of the subcategory of defendants who lack the capacity to control their behavior is not hard to discern. The issue is no longer a subject of investigation or public debate because such executions are by and large nonexistent. The use of the death penalty as a punishment for essentially involuntary crimes has long ago disappeared both from our society's arsenal of criminal sanctions and from our public consciousness. And but for this one anomalous case, this narrow question might never have been raised again.

Anthony Haynes's death sentence also runs afoul of international law and opinion. The International Covenant on Civil and Political Rights (ICCPR) specifically forbids the use of the death penalty in an arbitrary manner.[417] The Human Rights Committee of the United Nations interpreted the treaty to forbid the execution of persons with severe mental

---

*Resolution on the Death Penalty in the United States*. Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). AMPA, *Moratorium on Capital Punishment in the United States*. Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without realizing that any illness existed and, therefore, without considering that illness as a mitigating factor. All of these organizations favor a moratorium. The National Alliance for the Mentally Ill (NAMI) has voiced a stronger opinion, advocating for an outright ban on death sentences for individuals with any type of brain disorder. NAMI, *The Criminalization of People with Mental Illness*. NAMI asserts that the overwhelming number of violent acts committed by the mentally ill is the result of neglect or inadequate treatment of the illness and concludes that the answer therefore is "treatment, not punishment." NAMI, *The Criminalization of People with Mental Illness*.

[417] International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6.