# United States District Court
# Southern District of Texas

## Case Number: H-05- 3424

## ATTACHMENT

**Description:**

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __4__ of __4__

☐ Exhibit to: _____Vol III:_____
number(s) / letter(s) _____

Other: ___Petition For Writ of_____

_____Habeas Corpus_____

_____

illness.[418]   In addition, for three consecutive years, 1999, 2000, 2001, the United Nations'

Commission on Human Rights has adopted resolutions calling on all states that maintain the

death penalty "[n]ot to impose the death penalty on a person suffering from any form of

mental disorder or to execute any such person."   The Commission interpreted the phrase

"mental disorder" to encompass both mental illness and mental retardation.[419]   As recently as

2000, the U.N. Special Rapporteur on Extrajudicial, Summary, or Arbitrary Executions

called on the United States "to take immediate steps to bring [its] domestic legislation and

legal practice into line with the international standards prohibiting the imposition of death

sentences in regard to minors and mentally ill or handicapped persons."[420]

The prohibition on the execution of the volitionally incapacitated also qualifies as

customary international law because it satisfies the required elements: (1) general practice;

and, (2) *opinio juris*.   The general practice among states with death penalty statutes is to

exclude those whose mental illness prevents them from conforming their actions to the

requirements of the law. *See* Schabas, *supra* at 110-113.   The prohibition satisfies the

second element, *opinio juris*, because several international documents condemn executing

---

[418]   *See* William Schabas, *International Norms on Execution of the Insane and the Mentally Retarded*, 4 Criminal Law Forum 95, 100 (1993).

[419]   *The Question of the Death Penalty*, U.N. Hum. Rts. Comm., U.N. GAOR, 57th Sess., para. 4(e), U.N. Doc. E/CN.4/RES/2001/68 (2001); *The Question of the Death Penalty*, U.N. Hum. Rts. Comm., U.N. GAOR, 56th Sess., para. 3(e), U.N. Doc. E/CN.4/RES/2000/65 (2000); *The Question of the Death Penalty*, U.N. Hum. Rts. Comm., U.N. GAOR, 55th Sess., para. 3(e), U.N. Doc. E/CN.4/RES/1999/68 (1999).

[420]   *Extrajudicial, Summary, or Arbitrary Executions: Report of the Special Rapporteur*, U.N. GAOR, Hum. Rts, Comm., 56th Sess., para. 97, U.N. Doc. E/CN.4/2000/3 (2000).

the mentally ill. Resolution 2001/68 of the Commission of Human Rights condemns the imposition of the death penalty on people who suffer from mental disorders.[421]   The Rome Statute of the International Criminal Court exempts persons from criminal responsibility if the person "suffers from a mental disease or defect that destroys that person's capacity to appreciate the unlawfulness or nature of his or her conduct, or capacity to control his or her conduct to conform to the requirements of the law." ICC Statute, art. 31(1)(a). Also, the International Criminal Tribunal for the former Yugoslavia upheld the mental incapacity defense when "abnormality of mind . . . substantially impaired ability to control."[422]

The Supreme Court has often considered international standards when determining Eighth Amendment questions.[423]   Although the Court rejected and discounted international

---

[421]  U.N. CHR Res. 2001/68, U.N. Doc. E/CN.4/RES/2001/68 (2001).

[422]  ICTY Celebici Camp Trial, November 1998 (Landzo judgment).

[423]  *See Thompson v. Oklahoma*, 487 U.S. 815, 830-831(1988)("The conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community"); *Enmund v. Florida*, 458 U.S. 782, 796 n. 22 (1982)("felony murder has been abolished in England and India, severely restricted in Canada, and a number of other Commonwealth countries, and is unknown in continental Europe."); *Coker v. Georgia*, 433 U.S. 584, 596 n.10 (1977) (noting that the Court previously examined "the climate of international opinion concerning the acceptability of a particular punishment. It is thus not irrelevant here that out of 60 major nations in the world surveyed in1965, only 3 retained the death penalty for rape where death did not ensue (citing United Nations, Department of Economic and Social Affairs, Capital Punishment 40, 86 (1968)); *Trop v. Dulles*, 356 U.S. 86, 100 -103 (1958) (The Court held that the policy of the Eighth Amendment "is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards."). Realizing the history of the Eighth Amendment, Justice Blackmun remarked that "[t]he drafters of the Amendment were concerned at root, with 'dignity

law and opinion in *Stanford v. Kentucky*, 492 U.S. 361, 369, n 1 (1989), when it held that the Eighth Amendment did not bar the death penalty for sixteen and seventeen year old offenders, it did factor international law and opinion into the constitutional calculus in *Atkins*. Just as in *Atkins*, the weight of international law and opinion also reveals that the severely volitionally incapacitated should not be subject to execution.

For all of these reasons, the sentence pronounced upon Anthony Haynes is, without doubt, "opposed by a national consensus, sufficiently uniform and of sufficiently long standing, to render it cruel and unusual punishment within the meaning of the Eighth Amendment." *Thompson v. Oklahoma, supra*, 487 U.S. at 859 (Scalia, J., dissenting). The Eighth Amendment analysis applied by the Court to assess the constitutionality of the death penalty for the mentally retarded *in Atkins v. Virginia*, for rapists in *Coker v. Georgia,*, for non-triggermen in *Enmund v. Florida*, and for fifteen year olds in *Thompson v. Oklahoma*, clearly establishes the inadmissibility of the sentence imposed in this case. The categories of death sentences struck down in *Atkins, Coker, Enmund* and *Thompson* appeared to have been rarely authorized and rarely imposed, but they were not wholly unknown. By contrast, Mr. Haynes's sentence probably would not have been imposed—let alone carried out-- in any other American jurisdiction, and there is no record of a similar sentence ever having been imposed on even a single other convicted murderer. Thus if the sentences imposed on Atkins, Thompson, Coker, and Enmund constituted cruel and unusual punishment, the

of man,' and understood that 'evolving standards of decency' should be measured, in part, against international norms." Harry Blackmun, *The Supreme Court and the Law of Nations*, 104 YALE L.J. 39, 45-46 (1994).

sentence imposed on Anthony Haynes surely does as well.

**2. Imposition of a Death Sentence For Conduct the Defendant was Unable to Control is Grossly Disproportionate to His Personal Moral Culpability and Lacks Penological Justification.**

**a. The moral culpability of volitionally incapacitated offenders does not warrant a death sentence.**

A sentence that is "grossly out of proportion to the severity of the crime" violates the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)(joint opinion of Stewart, Powell and Stevens, JJ.). Determination of the proportionality of a capital sentence, however, cannot be based solely upon the magnitude of harm resulting from the offense "[[F]or purposes of imposing the death penalty. . . punishment must be tailored to [a defendant's] personal responsibility and moral guilt. [424] Thus, in considering claims that particular categories of convicted murderers are not constitutionally punishable by death, the Supreme Court has always focused on the offenders' moral culpability and their degree of personal responsibility for the harm resulting from the offense.[425]

When the Supreme Court accepted the contention that mentally retarded murderers are *categorically* so lacking in moral blameworthiness as to be ineligible for the death

---

[424] *Enmund v. Florida*, 458 U.S. 782 , 801 (1982).See also *California v. Brown*, 479 U.S. 538, 545 (1987)(O'Connor, J. concurring)("[P]unishment should be directly related to the personal culpability of the criminal defendant.")

[425] *Atkins v. Virginia, supra* (death penalty unconstitutional for mentally retarded offenders); *Enmund v. Florida, supra* (death penalty unconstitutional for minor participant who did not intend to kill); *Tison v. Arizona,* 481 U.S. 137 (1986)(death penalty not unconstitutional for nontriggerman who was major participant in dangerous felony and acted with reckless indifference to human life); *Thompson v. Oklahoma*, 487 U.S. 815(1988)(death penalty unconstitutional for offenders under sixteen); *Stanford v. Kentucky*, 492 U.S. 361 (1989)(death penalty not unconstitutional for sixteen- and seventeen- year-old offenders).

penalty, its rationale for doing so compels the conclusion that the volitionally incapacitated are likewise ineligible.[426] The Court noted the obvious cognitive limitations of the retarded, but also stressed their "diminished capacity . . . to control impulses, and the "abundant evidence that they often act on impulse rather than pursuant to a premeditated plan," characterizations that have even greater applicability to those who because of mental illness are completely unable to conform their conduct to the requirements of the law.   Moreover, this inference as to the moral centrality of volitional control is corroborated by the Court's reasoning in determining that execution of persons under the age of sixteen violates the Cruel and Unusual Punishments Clause. *Thompson v. Oklahoma*, 487 U.S. 815,834 (1988) In discussing the lesser "personal culpability" of adolescents, the court cited with approval the following passage from the 1978 Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders:

> Adolescents, particularly in the early and middle teen years , are more vulnerable, more impulsive, and less self-disciplined than adults.  Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults.
> *Id.*(emphasis added).

---

[426] Indeed, even *without  Atkins*, Anthony Haynes's ineligibility for the death penalty is clear because *Penry's* rationale strongly implied the ineligibility of persons who were volitionally incapacitated.  The *Penry* Court was careful to note that by rejecting Penry's insanity defense and convicting him of capital murder under Texas law,  the jury had necessarily found "that Penry knew that his conduct was wrong *and was capable of conforming his conduct to the requirements of the law.*"  492 U.S. 302,333(emphasis added).   Thus Mr. Haynes lacked one of the two characteristics that the *Penry* Court found to be crucial in ascribing to Penry sufficient moral responsibility to justify the death penalty.

Certainly if crimes committed by the retarded and by young adolescents deserve less punishment due to those groups' *lesser* capacity to control their own conduct, the crimes of persons who, by reason of mental illness, lack even *sufficient* capacity to control their conduct are also deserving of less than the most severe punishment.[427]

### b. Neither retribution nor deterrence are served by death sentences for volitionally incapacitated offenders.[428]

A capital sentence violates the Eighth Amendment when it is "so totally lacking in penological justification that it results in the gratuitous infliction of suffering. *Gregg v. Georgia*, 428 U.S. 153, 183 (1976)(joint opinion of Stewart, Powell, and Stevens, JJ.). Unless the death penalty "measurably contributes" to either the goal of deterrence or the goal of retribution, it is "nothing more than the purposeless and needless infliction of pain and suffering," and therefore an unconstitutional punishment. *Enmund v. Florida*, 458 U.S. 782,798(1982). Neither retribution nor deterrence is served by the execution of defendants whose mental illness rendered them powerless to avoid criminal conduct.

Whether a defendant possesses that "degree of culpability associated with the death penalty"(*Penry*, 492 U.S. at 338), cannot be resolved by reliance on state law definitions of crimes and defenses. Although "[s]tates have the authority to make aiders and abettors

---

[427] The philosophical literature on moral culpability, though not invoked by the Court, supports this conclusion.

[428] Ellis, *supra*, argues that the proportionality requirement and the penological justification for retributivism should not be viewed as separate tests, given that both hinge on the culpability of the defendant. Without deciding the merits of that view, we follow the Supreme Court's pattern of analysis here, largely to demonstrate that under any standard the Court might apply, volitionally incapacitated offenders are on the unconstitutional side of the line.

equally responsible with principals, or to enact felony murder statutes," *Lockett v. Ohio*, 438 U.S. 586,602 (1978)(plurality opinion), minor participation in a felony that results in an unanticipated death does not evidence sufficient "moral culpability" to justify the imposition of a death sentence on retributive grounds.[429] Similarly, Texas may, unfettered by the constitution, choose to make those who act without sufficient capacity to conform their requirements to the law "equally responsible" as those who act with completely unimpaired capacity. But in order to justify a capital sentence for such offenders as retribution , it must explain how executing such offenders "measurably contribute[s] to the retributive end of ensuring that the criminal gets his just deserts." *Id.* at 801. This simply cannot be done: Once a fact finder has determined that a defendant's mental illness has deprived him of sufficient capacity to avoid criminal behavior, there can be no measurable contribution to retribution, but only the "exacting of mindless vengeance" forbidden by the Eighth Amendment. [430]

---

[429] *Enmund v. Florida*, 458 U.S. 782,798-801 (1982); *see also Atkins v. Virginia*, 122 S Ct. 2242, 2250-51 ("[The] deficiencies [of mentally retarded offenders] do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.")

[430] *See Ford v. Wainwright*, 477 U.S. 399, 410 (1986)(execution of the insane amounts to the "exacting of mindless vengeance.") The philosophical literature on retribution lends further support for this argument. There is dispute among philosophical theorists as to whether retribution is a legitimate goal of punishment at all. *See, e.g.*, JOHN BRAITHWAIT &PHILIP PETTIT, NOT JUST DESERTS: A REPUBLICAN THEORY OF CRIMINAL JUSTICE 156-201 (1990) (discussing retribution as a flawed penological goal in both theory and practice); Jeffrie Murphy, Retributivism, Moral Education, and the Liberal State, 4 CRIM. JUST. ETHICS 3 (1985) (arguing retribution is a penological goal that should be beyond state power in a liberal society); David Dolinko, Three Mistakes of Retributivism, 39 UCLA L. REV. 1623 (1992) (arguing retribution does not actually support the values it sets for itself); Russ Shafer-Landau, The Failure of Retributivism, 82(3) PHIL. STUD., June 1996, at 289 (arguing retribution is not a comprehensive theory). Even among those theorists who support retribution as a valid and desirable penological goal, none would argue that any retributive purpose is served in the criminal punishment of someone like Anthony Haynes. This is because retributive theorists

-424-

Nor is there a plausible deterrence argument possible to construct, for the death penalty has "little deterrent force against defendants who have *reduced* capacity for considered choice." *Skipper v. South Carolina,* 476 U.S. 1, 13 (1986) (Powell, J., concurring) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 155 n. 11 (1982)) (emphasis added).

Deterrence certainly cannot justify imposing the death penalty upon volitionally incapacitated defendants because by definition, those whose mental disorders robbed them of *sufficient* capacity  to conform their conduct to the requirements of law are incapable of responding to legal rules. [431] In *Thompson v. Oklahoma* the Supreme Court observed that for

---

justify punishment based on the moral culpability and/or blameworthiness of the offender. *See, eg.*, R.A. DUFF, PUNISHMENT, COMMUNICATION, AND COMMUNITY (2001) (arguing that retribution is a valid penological goal and should be based on the blameworthiness of the offender); ANDREW VON HIRSCH, CENSURE AND SANCTIONS (1993) (arguing that retribution requires proportional sentencing and culpability is determined by the blameworthiness of the offender).  In order for an offender to be morally culpable or blameworthy, that person must have been capable of doing other than he or she did. *See, e.g.*, H.L.A. HART, PUNISHMENT AND RESPONSIBILITY 152 (1968) ("What is crucial is that those whom we punish should have had, when they acted, the normal capacities, physical and mental, for abstaining from what it forbids, and a fair opportunity to exercise these capacities"); WOJCIECH SADURSKI, GIVING DESERT ITS DUE 241 (1985) ("Retributivism is the only theory of punishment which takes the notion of human responsibility seriously because it justifies punishment solely on the basis of acts and situations which were under the control of the perpetrator concerned.  Only those acts which are believed to be free human acts are relevant in assessing guilt and deciding about punishment"); Michael Moore, Choice, Character, and Excuse, 7 SOC. PHIL. & POL'Y 29 (1990) (arguing for the choice theory of excuse which requires that to be deserving of punishment an offender must have been able to do other than he or she did).  In Anthony Haynes's case, no philosophical theorist would support any level of criminal punishment  based on retributive ideals and certainly none would support a punishment as severe as the death penalty.  *See* David Dolinko, Three Mistakes of Retributivism, 39 UCLA L. REV. 1623, 1650 (arguing that a case such as Anthony Haynes's would be understood by retributivists as a "gross misunderstanding of what retributivism is").

[431] *Cf. Harris v. State*, 499 N.E. 2d 723 (Ind. 1986), *cert. denied*, 482 U.S. 909 (1987)(deterrence rationale may support execution of Indiana GBMI offenders where  state law defines GBMI offenders as  "not defendants who..fully lacked the capacity to conform their conduct to the law.")

murderers under the age of sixteen, " the likelihood that the.. offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent. *Thompson,* 487 U.S. 815, 837(1988). Young offenders, however, are merely *extremely unlikely* to make choices about unlawful behavior based on possible penalties, whereas  those who lack sufficient the capacity to conform their conduct to the law *can not* make choices about  unlawful behavior, regardless of the stakes. Indeed, just as it is for mentally retarded offenders, the "cold calculus" of cost and benefit is "at the opposite end of the spectrum of behavior" (*Atkins* at 2251) of those who cannot control their own conduct.  Finally, as the Supreme Court also noted concerning an exemption of the retarded from the death penalty, exempting those who are unable to conform their conduct to the requirements of the law will not lessen the deterrent effect  upon other offenders. *Id.*

Thus both logic and precedent dictate the conclusion that the death penalty can serve no deterrent purpose when applied to defendants who lacked sufficient capacity to avoid their criminal acts.   Because the capital sentencing of persons  determined to be unable to control their conduct amounts to execution for essentially non-volitional conduct, neither retribution nor deterrence are thereby measurably advanced.

### c.    Capital Prosecution of Volitionally Incapacitated Offenders Carries Heightened Risks of Unjustified Executions.

In *Atkins*, the Supreme Court cited the enhanced risk faced by retarded defendants "that the death penalty will be imposed in spite of factors which may call for a less severe penalty" (*Atkins* at 2251, quoting *Lockett v. Ohio*, 438 U.S. 586, 60065 (1978)), as a second justification for the national consensus that they should be  categorically excluded from

-426-

eligibility for the death penalty. Volitionally incapacitated defendants such as Anthony Haynes face similar obstacles in "mak[ing] a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors." *Id* at 2252.

Any defendant, such as Mr. Haynes, whose incapacitation at the time of the offense rendered him unable to conform his conduct to the requirements of law is a defendant suffering from at least temporary mental illness. Disordered thought patterns and paranoid delusions cause mistrust. An impediment to effective defense of the volitionally incapacitated lies in the fact that defendants who are unable to conform their conduct to the requirements of law usually are equally unable to conform their conduct to the requirements of courtroom decorum and procedure. They therefore "are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Atkins* at 2252. Moreover, when such defendants are heavily medicated in an attempt to reduce psychotic symptoms and restore competence, the resulting synthetic competence is likely create its own significant impediments to cooperation with attorneys and a stoney-faced demeanor likely to be read as indifference. [432]

Finally, volitional incapacitation that disables a defendant from controlling his own conduct "can be a two-edged sword that may enhance the likelihood that the aggravating factor[433] of future dangerousness will be found by the jury." *Atkins* at 2252. Indeed, it is hard

---

[432] *See Riggins v. Nevada*, 504 U.S. 127. 142 ( Kennedy, J., concurring) ("[D]rugs [that restore competence] can prejudice the accused in two ways: (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom and (2) by rendering him unable or unwilling to assist counsel.")

[433] Future dangerousness is a statutory aggravating factor in Texas, and in Virginia, where Atkins was tried.

to imagine a fact about a defendant that would engender greater fear of future violence, and yet would not reflect moral culpability on his part.

In summary then, the weight of national consensus is greater in Mr. Haynes than it is with respect to mentally retarded defendants whom it is unconstitutional to execute under *Atkins*. Capital punishment is grossly disproportionate to Mr. Haynes's moral culpability, serves no permissible penological goal, and carries an enhanced risk of error. In short, imposing the death penalty on Mr. Haynes is Cruel and Unusual Punishment Clause barred by the Eighth Amendment, and his sentence must be vacated.

**CLAIM XIX: THE DEATH PENALTY, AT LEAST AS PRESENTLY ADMINISTERED IN TEXAS, IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A.    Evolving Standards of Decency Dictate That Capital Punishment Violates the Eighth Amendment.**

In *Trope v. Dulles*, 356 U.S. 86, 101 (1958) the Supreme Court stated that the Eighth Amendment draws its meaning from evolving standards of decency that mark the progress of a maturing society. *Id.* at 101. The constitutional prohibition against cruel and unusual punishment encompasses contemporary standards of decency, which may be reflected in the actions of legislatures and juries as well as in society's history and traditions. *See Gregg v. Georgia*, 428 U.S. 153 (1976). It is these evolving standards of decency which dictate that the death penalty, as presently administered in the State of Texas, constitutes punishment

which is both cruel and unusual and therefore violative of the Eighth and Fourteenth Amendments to the United States Constitution and the Texas Constitution.

In March 1997, the American Bar Association issued a Resolution calling for a moratorium against carrying out the death penalty because of the failure of the post-*Furman* "justice" system to alleviate the constitutional infirmities described in that case. The ABA's decree places that association in harmony with many of the Western industrial nations, and in opposition to such despotic regimes as Nigeria, Iraq and Saudi Arabia. South Africa, long a repressive state under apartheid, has abolished the death penalty. Ironically, the basis for abolition stemmed from their assessment of America's death penalty as a failure and the inequity of the application of capital punishment based on race and economic status.

The Supreme Court has assessed the appropriateness of the death penalty in light of international mores. In *Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988) the Supreme Court examined the issue of executing juveniles in light of the almost total international bar against the practice. *Id.* ; *See also, Gregg v. Georgia*, 428 U.S. at 174-5 n.19.

The United Nations General Assembly has adopted the Second Optional Protocol to the International Covenant on Civil and Political Rights, obligating representative members to take all necessary steps to abolish the death penalty in their jurisdictions. The 1983 Protocol Six to the European Convention on Human Rights deemed desirable the abolition of the death penalty in times of peace on the basis that capital punishment was inhuman and degrading. Finally, despite strong American dissent, the 1984 Protocol to the American Convention on Human Rights to Abolish the Death Penalty resolved, in accordance with the

-429-

spirit of Article 4 of that Convention and the universal trend to eliminate the death penalty, to call on all countries in the Americas to abolish it.

**B.     The Dual Requirements of the Eighth Amendment -- the Elimination of Arbitrary Jury Decisions and the Need for Individualized Sentencing-- Cannot Be Met and Therefore the Current System of Capital Punishment in Texas Violates the Mandate of *Furman*.**

Petitioner herein adopts the cogent arguments of Justice Harry Blackmun, which were recently made in his dissent from denial of certiorari in the Texas capital case of *Callins v. Collins*, 114 S. Ct. 1127 (1994).  Justice Blackmun, who dissented in *Furman* and who voted in the majority in the 1976 cases affirming various states' post-*Furman* death penalty statutes, *see, e.g., Jurek v. Texas*, 428 U.S. 262 (1976), did not condemn capital punishment in the abstract as a cruel and unusual method of punishment that offends "evolving standard of decency."  *Cf. Gregg v. Georgia*, 428 U.S. 153, 227-41 (1976) (Brennan & Marshall, JJ., dissenting).  Rather, Justice Blackmun contended, *inter alia*, that capital sentencing procedures employed in the post-*Furman* era are *per se* unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by *Furman*.  *See Callins*, 114 S. Ct. at 1127-38 ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death ... can never be achieved without compromising and an equally essential component of fundamental fairness -- individualized sentencing.").

Former U.S. Supreme Court Justice Marshall clearly documented his opposition to

-430-

the death penalty: 'I continue to adhere to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments." *Zant v. Stephens,* 462 U.S. 862, 906, 103 S. Ct. 2733, 2757-58 (1983) (Marshall, J., dissenting). Former Justice Brennan agreed and joined Justice Marshall in his dissent in *Zant*:

> Death is today a cruel and unusual punishment prohibited by the Clause. 'Justice of this kind is obviously no less shocking than the crime itself, and the new 'official' murder, far from offering redress for the offense committed against society, adds instead a second defilement to the first.'

> *Gregg v. Georgia,* 428 U.S. 227, 231, 96 S. Ct. 2971, 2973 (1973) (Brennan, J., dissenting).

Justice Brennan also wrote:

> The fatal constitutional infirmity in the punishment of death is that it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded. (It is) thus inconsistent with the fundamental premise of the Clause that even the vilest criminal remains a human being possessed of common human dignity.'
> *Gregg,* 428 U.S. at 231, 96 S. Ct. at 2972.

Justice Blackmun in *Callins* discussed the failure to reconcile the two conflicting requirements of consistency and individualized sentencing. He also discussed the apparent discrimination that still exists in assessing death, that those of certain races and those that are poor are more likely to be sentenced to death. Systematic racism continues to plague the Texas death penalty, particularly regarding racial discrimination based on the race of the victim. Numerous studies of the Texas death penalty have shown that a capital murderer of a white person is as much as five times more likely to receive a death sentence than a person who murders a black. *See, e.g.,* William J. Bowers & Glenn L. Pierce, *Arbitrariness and*

*Discrimination under Post-Furman Capital Statutes*, 26 CRIME & DELINQ. 563, 596 (1980) (study based on Texas homicide data from 1973-78); Sheldon Eckland-Olson, *Structured Discretion, Racial Bias, and the Texas Death Penalty*, 69 POL. SCI. Q. 853 (1988) (study based on Texas capital murder statistics from 1974-88); Jonathen R. Sorensen & James Marquart, *Prosecutorial and Jury Decision-Making in Post-Furman Texas Capital Cases*, 18 N.Y.U. REV. L. & SOC. CH. 743 (1990-91) (study based on Texas capital murder statistics from 1980-86); *see generally* James Marquart et al., THE ROPE, THE CHAIR, AND THE NEEDLE: CAPITAL PUNISHMENT IN TEXAS, 1923-1990 163-75 (1994).

Reports confirm the factor that race plays in capital sentencing:

> The race of the victim plays a crucial role in determining whether the murderer will die. Although more than half of all murder victims are from ethnic minorities, 88 per cent of those executed were convicted for the murder of a white. Racial minorities are also over-represented on Texas' death row, particularly among juvenile offenders: of the 25 juveniles on death row, 23 are from ethnic minorities—an astounding 92 per cent. Death sentences also fall disproportionately on the poorest members of society.
> USA: The Legal Lottery of Execution in Texas (Amnesty International News release, 6 April 1998).

Justice Blackmun further noted the federal courts' lessening role in scrutinizing the constitutionality of death sentences. He concluded that, although the death penalty in the abstract is allowed by the U.S. Constitution, our justice system is unable to fairly administer it. He concluded it must be abolished. *Callins,* 114 S. Ct. at 1138.

In addition to the above noted Supreme Court justices who oppose the death penalty, Federal District Court Judge Lynn Hughes has expressed the following misgivings about it:

> The government's use of the death penalty is both popular and controversial. Both the popularity and controversy are misguided. Aside from vengeful retribution and insipid moralism, no rule can be sound jurisprudentially if it generates a complex,

convoluted, lengthy, and expensive process.

The death penalty has three principal defects. First, the State probably ought not be allowed to do things it cannot undo because it is at least as error prone as other human organizations. Second, the State spends scarce resources on capital punishment that are badly needed elsewhere; Texas spends about $20 million a year more in accomplishing death sentences than it would cost to convict and maintain them for life without parole....Third, the death penalty attracts the attention of law enforcement, prosecution, courts and the public to gruesome, sensational, but largely irrational, episodic murders, deflecting that attention from the routine crimes that actually destroy the quality of life generally.

Beyond those practical factors, reasonable people question whether the infliction of death does not undermine our society's humanity much more than it deters the beasts among us. It is bad policy, and it may be immoral, but it is constitutional.

*Davis v. Johnson,* 8 F. Supp.2d 897, 907 (S.D. Tex. 1998).

Judge Hughes presented a thoughtful analysis of the problems inherent in our capital sentencing scheme. However, Petitioner respectfully urges that Judge Hughes came to the wrong conclusion. If, as he asserted, all these problems exist with the administration and infliction of death, then the death penalty must be a cruel and/or unusual punishment.

Petitioner belongs to two groups in society that tend to face discrimination,  he is African-American, and he was indigent at the time of his trial.  If, as the studies suggest, discrimination still occurs in sentencing capital defendants, Petitioner clearly  would have been a capital defendant that faced such discrimination.  Bias and prejudice cannot play a part in deciding whether a person lives or dies, at least not in a civilized society.

This  scheme of race-based prosecution and death-sentencing  violates the mandate of *Furman* and renders the death penalty, at least as it is presently being administered in Texas, *per se* unconstitutional under the Eighth and Fourteenth Amendments.  Accordingly, this Court should reverse Petitioner's death sentence and order a new trial.

-433-

**CLAIM XX:    PETITIONER'S DEATH SENTENCE VIOLATES INTERNATIONAL LAW, WHICH IS BINDING ON THIS COURT, AS WELL AS THE EIGHTH AMENDMENT**

A few years ago, the Supreme Court of Canada placed the use of the death penalty in the United States for ordinary crimes into an international context:

> Amnesty International reports that in 1948, the year in which the Universal Declaration of Human Rights was adopted, only eight countries were abolitionist. In January 1998, the Secretary-General of the United Nations, in a report submitted to the Commission on Human Rights (U.N. Doc. E/CN.4/1998/82), noted that 90 countries retained the death penalty, while 61 were totally abolitionist, 14 (including Canada at the time) were classified as abolitionist for ordinary crimes and 27 were considered to be abolitionist *de facto* (no executions for the past 10 years) for a total of 102 abolitionist countries. At the present time, it appears that the death penalty is now abolished (apart from exceptional offences such as treason) in 108 countries. These general statistics mask the important point that abolitionist states include all of the major democracies except some of the United States, India and Japan ... According to statistics filed by Amnesty International on this appeal, 85 percent of the world's executions in 1999 were accounted for by only five countries: the United States, China, the Congo, Saudi Arabia and Iran.

(*Minister of Justice v. Burns* (2001) 1 S.C.R. 283 [2001 SCC 7], ¶ 91.) The California death penalty scheme violates the provisions of international treaties and the fundamental precepts of international human rights. Because international treaties ratified by the United States are binding on state courts, the imposition of the death penalty is unlawful. To the extent that international legal norms are incorporated into the Eighth Amendment determination of evolving standards of decency, Appellant raises this argument under the Eighth Amendment as well. (*See Atkins v. Virginia* (2002) 536 U.S. 304, 316, fn. 21; *Stanford v. Kentucky* (1989) 492 U.S. 361, 389-390 (Brennan, J., dissenting.).)

## A.    International Law

Article VII of the International Covenant of Civil and Political Rights ("ICCPR")

-434-

prohibits "cruel, inhuman or degrading treatment or punishment." Article VI, section 1 of the ICCPR prohibits the arbitrary deprivation of life, providing that "[e]very human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of life."

The ICCPR was ratified by the United States in 1992, and applies to the states under the Supremacy Clause of the federal Constitution. (U.S. CONST., art. VI, § 1, cl. 2.) Consequently, this Court is bound by the ICCPR.[434] The United States Court of Appeals for the Eleventh Circuit has held that when the United States Senate ratified the ICCPR "the treaty became, coexistent with the United States Constitution and federal statutes, the supreme law of the land" and must be applied as written. (*United States v. Duarte-Acero* (11th Cir. 2000) 208 F.3d 1282, 1284; *but see Beazley v. Johnson* (5th Cir. 2001) 242 F.3d 248, 267-268.)

Mr. Haynes's death sentence violates the ICCPR. Because of the improprieties of the capital sentencing process challenged in this appeal, the imposition of the death penalty on him constitutes "cruel, inhuman or degrading treatment or punishment" in violation of Article VII of the ICCPR. There is a growing recognition that international human rights

---

[434] The Senate attempted to place reservations on the language of the ICCPR, including a declaration that the covenant was not self-executing. (*See* 138 Cong. Rec. S4784, § III(1).) These qualifications do not preclude Appellant's reliance on the treaty because, inter alia, (1) the treaty is self-executing under the factors set forth in *Frolova v. U.S.S.R.* (7th Cir. 1985) 761 F.2d 370, 373; (2) the declaration impermissibly conflicts with the object and purpose of the treaty, which is to protect the individual's rights enumerated therein (*see* RIESENFELD & ABBOT, *The Scope of the U.S. Senate Control Over the Conclusion and Operation of Treaties* (1991) 68 Chi.-Kent L. Rev. 571, 608); and (3) the legislative history indicates that the Senate only intended to prohibit private and independent causes of action (*see* 138 Cong. Rec. S4784) and did not intend to prevent defensive use of the treaty (*see* Quigley, *Human Rights Defenses in U.S. Courts* (1998) 20 Hum. Rts. Q. 555, 581-582).

norms in general, and the ICCPR in particular, should be applied to the United States. (*See United States v. Duarte-Acero, supra*, 208 F.3d at 1284; *McKenzie v. Daye* (9th Cir. 1995) 57 F.3d 1461, 1487 (Norris, J., dissenting).)  Thus, Petitioner requests that the Court reconsider and, in the context of this case, find his death sentence violates international law. (*See Smith v. Murray* (1986) 477 U.S. 527 [holding that even issues settled under state law must be reasserted to preserve the issue for federal habeas corpus review].)

### B.    The Eighth Amendment

As noted above, the abolition of the death penalty, or its limitation to exceptional crimes such as treason – as opposed to its use as a regular punishment for ordinary crimes – is particularly uniform in the nations of Western Europe. (*See, e.g., Stanford v. Kentucky* (1989) 492 U.S. 361, 389 (Brennan, J., dissenting.); *Thompson v. Oklahoma, supra*, 487 U.S. at 830 (Stevens, J., plurality opinion)).  Indeed, *all* nations of Western Europe – plus Canada, Australia, and New Zealand – have abolished the death penalty.  (Amnesty International, "The Death Penalty:  List of Abolitionist and Retentionist Countries" (as of August 2002) at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)[435]

This consistent view is especially important in considering the constitutionality of the death penalty under the Eighth Amendment because our Founding Fathers looked to the nations of Western Europe for the "law of nations" as models on which the laws of civilized nations were founded and for the meaning of terms in the Constitution.  "When the United

---

[435] Many other countries including almost all Eastern European, Central American, and South American nations also have abolished the death penalty either completely or for ordinary crimes. (*See* Amnesty International's  "List of Abolitionist and Retentionist Countries," *supra*, at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)

States became an independent nation, they became, to use the language of Chancellor Kent, 'subject to that system of rules which reason, morality, and custom had established among the civilized nations of Europe as their public law.'" (*Miller v. United States* (1870) 78 U.S. 268, 315 (Field, J., dissenting), quoting 1 Kent's Commentaries 1; *Hilton v. Guyot* (1895) 159 U.S. 113, 163, 227; *Sabariego v. Maverick* (1888) 124 U.S. 261, 291-292.) Thus, for example, Congress's power to prosecute war is, as a matter of constitutional law, limited by the law of nations; what civilized Europe forbade, such as using poison weapons or selling prisoners of war into slavery, was constitutionally forbidden here. (*Miller v. United States*, *supra*, 78 U.S. at 315-316, fn. 57 (Field, J., dissenting).)

"Cruel and unusual punishment" as defined in the Constitution is not limited to whatever violated the standards of decency that existed within the civilized nations of Europe in the 18th century. The Eighth Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." (*Trop v. Dulles* (1958) 356 U.S. 86, 100.) And if the standards of decency as perceived by the civilized nations of Europe to which our Framers looked as models have evolved, the Eighth Amendment requires that we evolve with them. The Eighth Amendment thus prohibits the use of forms of punishment not recognized by several of our states and the civilized nations of Europe, or used by only a handful of countries throughout the world – including totalitarian regimes whose own "standards of decency" are supposed to be antithetical to our own. (*See Atkins v. Virginia*, *supra*, 536 U.S. at 316, fn. 21 [basing determination that executing mentally retarded persons violated Eighth Amendment in part on disapproval in "the world

community"]; *Thompson v. Oklahoma, supra*, 487 U.S. at 830, fn. 31 ["We have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual"].)

Assuming *arguendo* that capital punishment itself is not contrary to international norms of human decency, its use as regular punishment for substantial numbers of crimes – as opposed to extraordinary punishment for extraordinary crimes – is contrary to those norms. Nations in the Western world no longer accept the death penalty, and the Eighth Amendment does not permit jurisdictions in this nation to lag so far behind. (*See Hilton v. Guyot, supra*, 159 U.S. 113; *see also Jecker, Torre & Co. v. Montgomery* (1855) 59 U.S. 110, 112 [municipal jurisdictions of every country are subject to law of nations principle that citizens of warring nations are enemies].) Thus, Texas's use of death as a regular punishment, as in this case, violates the Eighth and Fourteenth Amendments, and Petitioner's death sentence should be set aside.

## CLAIM XXI: THE TRIAL COURT SHOWED PARTIALITY TO THE PROSECUTION AND THUS DEPRIVED PETITIONER OF HIS RIGHT TO A FAIR TRIAL.

The trial judge repeatedly threatened defense counsel with sanctions over minor matters, told him to sit down, and threatened to have him removed from the courtroom, depriving Petitioner of due process and his right to a fair trial under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### A. Facts in Support.

**i. The trial court, in front of the jury, threatened to eject defense counsel from the courtroom.**

-438-

At punishment phase arguments, th following colloquy took place:

SMYTH: Thank you judge.   Could I have additional time to continue due to argument?

NUNNERY: Your Honor, I'm going to object to his sidebar remarks.

THE COURT: Have a seat.  Have a seat.  Have a seat.

NUNNERY: Your Honor, can I have a ruling on my objection?

THE COURT: I said sit down, Mr. Nunnery.

NUNNERY: Your Honor, I'm required by law to ask for a ruling for objection.

THE COURT: You have one second to sit down or I'll remove you from the courtroom.  Do we understand each other?

30 RR 18-19.

Counsel for the State continued his argument and suggested that petitioner's counsel's repeated interruptions had caused the State to require additional time in which to argue (30 RR 18); that Petitioner's counsel had attempted to hide and exclude evidence from the jury of the victim's personality (30 RR 53-54); encouraged the jury to speculate that petitioner had participated in other "extraneous" robberies not introduced into evidence during the trial (30 RR 59); and attempted to inflame the minds of the jurors with repeated references to the victim's widow and her children and what they would face in the future without him.  30 RR 64.

**ii. The Court allowed improper questioning of the victim's widow.**

The trial court allowed questions of Mrs. Kincaid that she was not qualified to

-439-

answer. For instance, the prosecutor asked her the following series of questions, which went to the ultimate question in the guilt/innocence phase of the trial:

Q. Under the circumstances, based on your perception, under the circumstances, you were there, even as tragic as it turned out to be, did he appear to be doing what was proper under the circumstances?

MR. NUNNERY: Your Honor, I am going to object to that. That's asking for an opinion based upon a qualification that she has not been shown to have.

THE COURT: It's overruled.

Q. Based on your observation, ma'am.

A. What is the question again?

Q. Based on your observation, even as tragic as it may have turned out to be, did it appear that he was doing the correct thing when he turned and followed that vehicle?

A. Yes.

Q. Did it appear that he was doing the right thing when he asked the driver for his driver's license and made him aware what had happened?

MR. NUNNERY: Again, your Honor, for the purposes of the way the question is phrased "the proper thing," I will renew my objection as it is calling for an opinion from the witness that has not been shown to have an expertise in the area what is proper police procedure or not and I renew my objection.

THE COURT: he's not asking about police procedure. It's overruled.

Q. Did you hear it?

-440-

A.. Yes.

Q. Did it appear that he was trying to resolve this issue in a peaceful manner by reaching for his identification?

A.. Yes.

Q. Did it appear that he was trying to solve it in a peaceful manner by identifying himself as a peace officer?

A. Yes.

23 RR 155-157.

### iii. The trial court allowed needlessly gruesome photographs of the autopsy of the victim.

The trial court erroneously and prejudicially admitted gruesome autopsy photographs of the victim that were not needed by the prosecution.

The State called Rudolpho G. Flores, Jr., the custodian of records for the Harris County Medical Examiner's Office. 24 RR 92. Mr. Flores brought 58 photos of the autopsy in this case. 24 RR 97. He authenticated a photograph, State's Exhibit 34, to which the defense objected as its prejudicial effect was far outweighed by its probative value. 24 RR 97. Over the defense objection, the photo was admitted. 24 RR 97.

### iv. The trial court allowed Mr. Reece to testify without counsel present.

Co-defendant Mr. Reece was allowed to testify without benefit of counsel. He testified he was facing charges on an aggravated assault charge, and that he was represented by a Mr. Philips. 25 RR 83-84. However, no attorney was present in court while he was testifying and possibly incriminating himself. There was no defense objection to this

-441-

incriminating testimony or any efforts to secure the presence of an attorney for Mr. Reece. There were inquiries regarding communications between Mr. Reece and his attorney, and the prosecution had to assert the attorney-client privilege for the witness. 25 RR 85.

**v. The trial court erroneously allowed hearsay.**

The trial court repeatedly allowed hearsay testimony to be received, despite objections from defense counsel:

Q. I say after talking with her in the proximity she was to the man who was laying in the street, did you draw a conclusion if she was with him at the time.

MR. NUNNERY: Object. First, the only way that he could possibly know that if she told him and that's hearsay.

THE COURT: Overruled. Answer.

23 RR 17.

The trial court also erred in admitting pure speculation testimony from the medical examiner. During the testimony of Dr. Tommy J. Brown, the medical examiner, the following testimony occurred;

Q. Do you also have an opinion...does the way you describe the strippling tell you anything about the position of the head in relationship to the gun being discharged?

A. The strippling and the gunshot wound track would indicate that the head, instead of placing the gun barrel straight on, the head was slightly turned in this direction as the bullet entered. In other words, the head was slightly turned and slightly turned up.

Q. Would that description that you have just given slightly turned and would that be

-442-

as a defensive (sic) to get away type of movement.

MR. JONES: Your Honor, object to that unless we have testimony of velocity distance. And it's purely speculation on his part.

MR. SMYTH: Your Honor, based on the strippling that he observed, the way it was deposited.

THE COURT: It's overruled. You may answer.

24 RR 115-116.

## B. Argument.

The trial court's bias against the defense made a mockery of the adversarial system of justice, whose proper functioning is the most essential principle informing our notions of what "process" is "due" under the Constitution. *See Faretta v. California*, 422 U.S. 806, 818 (1975) (the protections in the Bill of Rights are "basic to our adversary system of criminal justice [and thus] part of 'due process of law' [as] guaranteed by the Fourteenth Amendment"); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir. 1987) (adversary system serves the principles of due process).

The adversary system has been recognized as particularly critical to our system of criminal justice.[436] *See Thompson*, 827 F.2d at 1258 ("The right of a criminal defendant to an adversarial proceeding is fundamental") (citations omitted); *see also Rock v. Arkansas*, 483 U.S. 44, 51 n.8 (1987). Two key elements in such an adversarial system are the firm

---

[436] Indeed, most of the fundamental protections afforded in criminal cases by the Bill of Rights indirectly or directly relate to the adversarial process. *See* U.S. Const., Amendment V (Self-Incrimination Clause); Amendment VI (Impartial Jury Clause; Notice-of-Nature-and-Cause-and-Accusation Clause; Confrontation Clause; Compulsory Process Clause; Assistance of Counsel Clause).

-443-

neutrality of an "unbiased judge," *cf. Johnson v. Mississippi*, 403 U.S. 212, 216 (1971), and the minimal requirements of procedural due process, namely, "notice and opportunity to be heard." *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). Both fundamental requirements were subverted during Mr. Haynes's trial when the trial court openly displayed bias against the defense attorneys and threatened to eject Mr. Nunnery.

## CLAIM XXII : THE STATE'S FAILURE TO DISCLOSE EVIDENCE FAVORABLE TO THE DEFENDANT UNDERMINES CONFIDENCE IN THE RELIABILITY OF THE VERDICT IN VIOLATION OF *BRADY v. MARYLAND*[437].

### A. Facts in Support.

Petitioner herein incorporates by reference the facts and argument from the preceding claims. Certain claims listed below have not been fully developed but are brought here in incomplete form in order to preserve them for possible appeal of this Court's denial of investigative and expert funds.

Petitioner requested funds for various areas of investigation, but all funds were denied in the Court's order of March 25, 2005. He sought funding for various claims that were exhausted in state court, all of which would fall under the rubric of *Brady v. Maryland.* Had the requested funds been granted, he would have further investigated or developed the following claims, which he believes have merit:

a) The victim, Sgt. Kincaid, was off-duty at the time of his death, and hence not acting in his official duties and capacities as a police officer, and the Houston Police

---

[437] *Brady v. Maryland,* 373 U.S. 83 (1963).

Department has falsified and concealed evidence to make it appear as if he was on-duty.

b) Evidence has been concealed and falsified regarding Petitioner's actions, which were in self-defense, and his non-knowledge of the victim's status as a police officer.

c) Concealed deals were made with Tim Reece in order to induce him to testify falsely against Petitioner.[438]

d) Petitioner's statements were coerced.

Petitioner has brought forth herein some evidence to substantiate these claims, such as the autopsy report of the victim and statements regarding the falseness of Petitioner's confessions, but he is unable to proceed further with these claims due to the lack of investigative and expert funding. Had this funding been provided, Petitioner would have proceeded to conduct the investigation outlined in his motions for expert and investigative assistance regarding these claims.

**B. Potential claims of state misconduct and *Brady* claims cannot be procedurally defaulted.**

*Banks v. Dretke,* 124 S. Ct. 1256, 1273-76 (2004) has held that a federal habeas

---

[438] The defense filed a motion for discovery of all *Brady* material before the trial 25 RR 92. This motion was granted. 25 RR 92. The motion included any statements made by the defendant to the police or any private citizen whether written or oral. 25 RR 92-93. The defense was not told of Mr. Reece's statement that the defendant had told him he should also have killed the victim's wife. 25 RR 90-93. The prosecution was made aware of the statement on September 9, 1999, when they re-interviewed Mr. Reece, when they were preparing him to testify. 25 RR 93. The prosecution stated they were not aware of the motion, and that they were not required to divulge the statement as it was not made to a police officer. 25 RR 94. The court stated that it could not see the harm in the violation. 25 RR 95. The defense stated the harm was that they were deprived of an opportunity to interview the witness and ask him about the statement. The court replied that the witness was under no obligation to meet with the defense. 25 RR 96. The defense stated that the non-disclosure was a violation of the discovery motion. 25 RR 96-97. This

-445-

corpus petitioner had "cause for failing to investigate, in state post-conviction proceedings, [prosecution's witness's] connections to [a] Deputy Sheriff" for purposes of a *Brady* [*v. Maryland,* 373 U.S. 83 (1963)] claim "because the State persisted in hiding [witness's] informant status and misleadingly represented that it had complied in full with its *Brady* disclosure obligations;" rejecting state's argument that cause was not present given "Banks's failure, during state post-conviction proceedings, to 'attempt to locate [witness] and ascertain his true status,' or to 'interview the investigating officers...to ascertain [witness's status]. *Banks* holds that even when there is an "open-file" police policy, as in Houston, the default is still the state's fault. Petitioner brings these incomplete claims here in order to preserve them should further evidence surface and in order to preserve them for appeal.

Mr. Haynes has shown in his prior motions for funding and herein that federal funds are required for him to properly present his habeas claims to this Court because he was not given competent counsel as *guaranteed* by the applicable state statute, Texas Code of Criminal Procedure, Article 11.071. This statute explicitly states that "competent" counsel *shall* be appointed. Article 11.071, Section 2.

However, he was not provided with competent counsel, in violation of the state's own statute, and this is the sole reason for any alleged defaults in state habeas. Clearly, United States Supreme Court case law indicates that, in certain situations, the Court would not rule out ineffectiveness or incompetence of state habeas counsel as satisfying the cause prong of the cause and prejudice standard.

-446-

## C. Argument.

A capital murder trial is not a game. The state's obligation is to do justice, not to seek the short-term victories of gamesmanship. *Berger v. United States,* 295 U.S. 78, 80 (1935). Consequently, when the state knows that testimony is false, it cannot rely upon that testimony to secure a conviction at either stages of trial; few rules are more clearly established in constitutional criminal jurisprudence than this. *Mooney v. Holohan* , 294 U.S. 103 (1935); *Napue v. Illinois,* 360 U.S. 264 (1959). In addition, the state must turn over to the accused all evidence in its custody that is "both favorable to the accused and material to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Such evidence includes any evidence concerning the credibility of a state's witness. *Giglio v. United States,* 405 U.S. 150 (1972).

Because the State violated these well-settled principles by knowingly presenting false testimony, without which Mr.Haynes might not have been given the death penalty, his sentence must be reversed. In the alternative, Mr. Haynes must be granted an evidentiary hearing to present witnesses and documentary evidence regarding the above serious allegations of state misconduct.

It is a fundamental tenet of constitutional criminal procedure that "the government must turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie,* 480 U.S. 39, 57 (1987) (*citing United States v. Agurs*, 427 U.S. 97 (1976) and *Brady v. Maryland* , 373 U.S. 83, 87 (1963)). The

-447-

materiality requirement of *Brady* is judged by whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  The defendant meets this burden if he shows that the suppressed evidence could have created a reasonable doubt -- either as to the defendant's guilt or as to whether the death penalty would have been imposed -- that did not otherwise exist.      *Agurs*, 427 U.S. at 112; *McDowell v. Dixon* , 850 F.2d 740 (4th Cir. 1988).     The State failed to provide this information to the defense which  constitutes the suppression of material evidence which "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, __ U.S. __, 115 S.Ct. 1555, 1566 (1995).

### D. The Materiality Standard.

In *Brady v. Maryland* , 373 U.S. 83 (1963), the Supreme Court held that the prosecution's suppression of evidence favorable to a defendant violates due process where the evidence is material either to guilt or to punishment. *Id.* at 87.  Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution suppressed favorable evidence; and (2) the evidence was material to either guilt or punishment*Kyles v. Whitley*, 115 S.Ct. 1555, 1565 (1995);  *Bagley*, 473 at 683;  *Brady*, 373 U.S. at 87; *Blackmon v. Scott* , 22 F.3d 560, 564 (5th Cir. 1994). The Court has rejected any distinction between impeachment and exculpatory evidence for purposes of         *Brady*

-448-

analysis. *United States v. Bagley,* 473 U.S. 667, 677 (1985); *Giglio v. United States,* 405 U.S. 150, 154 (1972).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 115 S.Ct. at 1565; *Bagley*, 473 U.S. at 682. In *Kyles,* the Supreme Court clarified four significant aspects of the materiality analysis. First, to demonstrate materiality, the petitioner is not required to prove by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 115 S.Ct. at 1566-67. The inquiry is more properly whether, in the absence of the suppressed evidence, the defendant received a fair trial. *Id.* at 1566. The Court has stated that a fair trial is "a trial resulting in a verdict worthy of confidence." *Id.* Accordingly, a "reasonable probability" of a different result occurs when the State's suppression of evidence undermines confidence in the jury's verdict. *Id.*

Second, the *Kyles* Court emphasized that materiality analysis "*is not a sufficiency of the evidence test.*" *Id.* (emphasis added). The Court explained that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* Instead, a petitioner can prove a *Brady* violation by "showing that the favorable evidence *could reasonably be taken to put the whole case in such a different light* as to undermine confidence in the verdict." *Id.* (footnote omitted) (emphasis added); *see Lindsey v. King,*

769 F.2d 1034, 1042 (5th Cir. 1985) (noting that suppressed evidence may have consequences far beyond discrediting a witness's testimony).

The third aspect of materiality noted by the *Kyles* Court is that harmless error analysis is not applicable to *Brady* violations. *Kyles*, 115 S.Ct. at 1566. The Court stated that "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id.*

Finally, the Court explained that materiality involves the assessment of the "suppressed evidence *considered collectively*, not item by item." *Id.* at 1567 (emphasis added). Because materiality is assessed cumulatively, the prosecution has the responsibility of gauging the net effect of all exculpatory evidence and making disclosure to the defense when the point of "reasonable probability" is reached. *Id.* The *Kyles* Court criticized the materiality assessment that the lower court made in its review of that case. The Court recognized that "[t]he result reached by the Fifth Circuit majority is compatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by *Bagley*." *Id.* at 1569. Consequently, "the individual prosecutor has *duty to learn of any favorable evidence* known to the others acting on the government's behalf in the case." *Id.* (emphasis added). In other words, the prosecutor cannot ignore information gathered by a police agency to duck his duty to disclose favorable information to the defense, and he also has an affirmative duty to look for and disclose favorable evidence such as the criminal history of his witnesses or the decedent if, as here, it is

-450-

relevant to the defense. *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980).

In *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980), the Fifth Circuit held that the prosecution has constructive possession of criminal history information about witnesses that a routine search of FBI and state crime databases would reveal. *Id.* at 481; *see Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) (holding that "the prosecution is deemed to have knowledge of information readily available to it"); *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975) (holding that, under *Brady*, the prosecution has an obligation "to produce certain evidence actually or *constructively* in its possession or accessible to it in the interests of inherent fairness"), *cert. denied*, 425 U.S. 911 (1976) (emphasis added).

### E. Assessing the Cumulative Effect of the Exculpatory Evidence.

*Kyles* emphasizes that materiality involves a cumulative assessment of exculpatory evidence rather than a piecemeal analysis of each failure by the prosecution to disclose favorable evidence. 115 S.Ct. at 1567. A witness by witness, item by item approach to materiality analysis cannot take into account the full extent to which the credibility of the State's entire case is damaged by disclosure of favorable evidence. In addition to *Kyles*, the Fifth Circuit has also rejected such an "arithmetical approach" to materiality *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

-451-

**CLAIM XXIII:    THE CUMULATIVE EFFECT OF THE ERRORS AT MR. HAYNES'S TRIAL DENIED HIM OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.[439]**

In his presentation of the above claims, Petitioner has shown how each individually merits relief as a denial of his constitutional rights or a violation of federal law. However, there are situations in which a petitioner alleges several constitutional errors or violations of federal law, each of which is found harmless by the court, or none of which is found to be a constitutional violation, but which, in the aggregate, deny the petitioner a fair trial. Hence, this claim is presented in the alternative to the analysis of Mr. Haynes's other claims contained in this writ, not as a comment on their individual merits.

In *Taylor v. Kentucky,* 436 U.S. 478 (1978), the Supreme Court accepted the notion that several errors, none of which individually rise to constitutional dimensions, may have the cumulative effect of denying a defendant a fair trial. In *Taylor,* the Court did not assess each error to determine whether it was individually harmless. Nor did the Court concern itself only with errors which individually were of constitutional dimension. Instead, the Court evaluated the circumstances surrounding the defendant's trial to determine that the state had denied the defendant fundamental fairness as guaranteed by the Due Process Clause of the Fourteenth Amendment. As the Fifth Circuit has held, a trial is fundamentally unfair if "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn,* 777 F.2d 272, 278-79 (5th Cir. 1985), *cert. denied,* 476 U.S. 1178 (1986).

---

[439] This claim is argued in the alternative to the above claims, each of which merits relief individually.

-452-

The Fifth Circuit, in *Derden v. McNeel,* 978 F.2d 1453 (5th Cir. 1992)(en banc), *cert.*

*denied,* 113 S. Ct. 2928 (1993)*,* recognized that, "[w]ith one exception, however, our sister

circuits have held in dicta that federal habeas relief may issue if a defendant was denied

fourteenth amendment  due process by the cumulative effect of errors committed in a state

trial, which together deny fundamental fairness." *Id.,* at 1456.  Adopting a "particularly

cautious approach to granting habeas relief for cumulative errors", the *Derden* court

articulated a four-prong test delineating the types of errors the court will consider:

> First, any cumulative error theory must refer only to errors committed in the state trial court.  A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors...
> Second, the error complained of must not have been procedurally barred from habeas corpus review...Beyond the notion of procedural bar, it is important that a defendant objected to errors to demonstrate that they were believed at the time of trial to have had an adverse effect on the defense...
> Third, errors of state law, including evidentiary errors, are not cognizable in [federal] habeas corpus as such... Errors of state law rise to constitutional dimension only if they "so infused the trial with unfairness as to deny due process of law...
> Fourth, the federal court must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict.
> *Derden,* at 1457-58.

The Fifth Circuit's approach in *Derden* imposed three limitations that are not part of

cumulative error analysis in federal criminal cases or in direct appeal cases.  Once federal

courts recognize the concept of cumulative error analysis, as they have overwhelmingly

done, the next question is whether courts should apply a different analysis depending on

whether the claim is raised in a direct appeal or in a habeas corpus petition.

In *Derden,* the Fifth Circuit justified the more limited standard for cumulative error

on habeas review for several reasons.  First, "[t]he standard for reversal on direct appeal of a

criminal conviction...should logically be more flexible than that available on collateral

-453-

review." *Id.* at 1457. But the opinion, by Judge Jones, failed to explain why this should "logically" be so. Rather, the Court pointed to Supreme Court opinions that limited the application of the Due Process Clause, and that "the category of infractions that violate 'fundamental fairness' [has been defined] very narrowly." *Id.,* quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990). Therefore, courts must exercise caution, the *Derden* court held, in holding that an error which does not amount to a constitutional error "by itself might suddenly, when aggregated with other non-constitutional errors, become worthy of habeas relief." *Id.*

However, the Supreme Court has not imposed a different standard for fundamental fairness in habeas corpus cases. The Court has never developed or implemented different standards for other constitutional rights when a habeas petitioner has alleged a violation. An allegation that a defendant has been deprived of a fair trial is a constitutional claim. Cumulative error analysis usually centers on the fairness of the trial, and thus constitutes a claim that the petitioner has been denied due process under the Fourteenth Amendment. The Fifth Circuit's four-pronged test is therefore too restrictive because it eliminates errors which, although individually are "non-constitutional", excludes the possibility that several individually non-constitutional errors might operate in the aggregate to deprive a defendant of a fair trial. In *Taylor v. Kentucky,* 436 U.S. 478 (1978) the Supreme Court held that several non-constitutional errors cumulatively deprived the defendant of a fair trial. *Id.* at 487-88. A similar approach should be taken to an analysis of Mr. Haynes's claim of cumulative error.

## V.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Haynes prays that this Honorable Court:

A. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

B. Conduct a hearing at which evidence and argument may be offered concerning the allegations of his petition;

C. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition;

D. Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;

E. Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new trial and sentencing hearing, and

F. Grant such other relief as may be necessary and appropriate.

-455-

Respectfully submitted,

*A. Richard Ellis*

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941

Dated: October 3, 2005.

-456-

## VERIFICATION

I, A. Richard Ellis, am the attorney for Anthony Cardell Haynes, the petitioner in the foregoing Petition for Writ of Habeas Corpus.  I have read the petition and am familiar with its contents.  On behalf of Anthony Cardell Haynes  and upon information and belief, I hereby verify, under penalty of perjury, that the factual matters stated in the petition are true and correct.

DATED: October 3, 2005.

_____
A. RICHARD ELLIS