# United States District Court
# Southern District of Texas

Case Number: H-05-3424

## ATTACHMENT

Description:

- ☐ State Court Record
- ☐ State Court Record Continued
- ☐ Administrative Record
- ☐ Document continued - Part 2 of ______
- ☐ Exhibit to: Vol I - Exh. 4 cont'd
  number(s) / letter(s) ______

Other: Petition For Writ of Habeas Corpus - Exhibits in Support of Petition

Walker v. State,
842 S.W.2d 301
(Tex. Crim App. 1986) . . . . . . . . . . . . . . . . . 46, 54

Whitsey v. State,
796 S.W.2d 707
(Tex. Crim. App. 1989) . . . . . . . . . . . . . 83, 89, 94, 99

Wicker v. State,
740 S.W.2d 779
(Tex. Crim. App. 1987) . . . . . . . . . . . . . . . . . . 58

Williams v. State,
621 S.W.2d 609
(Tex. Crim. App. 1981) . . . . . . . . . . . . . . . . . . 20

Williams v. State,
804 S.W.2d 95
(Tex. Crim. App. 1991) . . . . . . . . . . . . . . . . . . 86

Wilson v. State,
621 S.W.2d 799
(Tex. Crim. App. 1981) . . . . . . . . . . . . . . . . . . 22

Wong Sun v. United States,
371 U.S. 471,
83 S. Ct. 407,
9 L.Ed.2d 441 (1963) . . . . . . . . . . 26, 27, 36, 42, 51

Wright v. State,
603 S.W.2d 838
(Tex. Crim. App. 1980) . . . . . . . . . . . . . . . . . . 103

Yarborough v. State,
947 S.W.2d 892
(Tex. Crim. App. 1997) . . . . . . . . . . . . . . . 82, 91, 98

Ybarra v. Illinois,
444 U.S. 85,
100 S.Ct. 338,
62 L.Ed.2d 238 (1979) . . . . . . . . . . . . . . . . . . 21

Young v. State,
848 S.W.2d 203
(Tex. App. --Dallas,
1993, pet. ref'd.) . . . . . . . . . . . . . . . . . . . . 96

Zimmerman v. State,
860 S.W.2d 89
(Tex. Crim. App. 1993) . . . . . . . . . . . 65, 70, 73, 76

**CONSTITUTIONS**

U.S. CONST.,

Amend. IV . . . . . . . . . . . . . . . . . . . . . passim

Amend. V . . . . . . . . . . . . . . . . . . . . . passim

Amend. VI . . . . . . . . . . 61, 66, 70, 74, 77, 78, 117, 119

Amend. VIII . . . . . . . . . . . . . . . . . . . 117, 119

Amend. XIV . . . . . . . . . . . . . . . . . . . . . passim

TEX. CONST.

Art. I, §9 . . . . . . . . . . . . . . . 14, 18, 23, 26, 36

Art. I, §10 . . . . . . . . . . . . . . . . passim, 42, 48

Art. I, §19 . . . . . . . . . . . . . . . . . . . . 42, 48

Art. V, § 6 . . . . . . . . . . . . . . . . . . . . . . 107

**STATUTES**

TEX. CODE CRIM. PROC. ANN. (V.A.C.C.P.)

art. 2.03(b) . . . . . . . . . . . . . . . . . . . . . . 124

art. 14.01 . . . . . . . . . . . . . . . . . . . 23, 27, 36

art. 14.02 . . . . . . . . . . . . . . . . . . . . . 27, 36

art. 14.03 . . . . . . . . . . . . . . . . . . . . . 27, 36

art. 14.04 . . . . . . . . . . . . . . . . . . . . . 27, 36

art. 14.06 . . . . . . . . . . . . . . . . . . . . . 27, 36

art. 15.17 . . . . . . . . . . . . . . . . . . . . . . . 44

art. 28.01 . . . . . . . . . . . . . . . 32, 35, 46, 54, 60

art. 35.16(b)(3) . . . . . . . . . . . . . . . . . . . . 65

art. 35.16(c)(2) . . . . . . . . . . . 62, 67, 71, 74, 75, 76

art. 35.261 . . . . . . . . . . . . . . . . . . . . . 85, 94

art. 37.071 § 2(b) . . . . . . . . . . . . . . . 63, 68, 71

art. 37.071 § 2(b)(1) . . . . . . . . . . . . . . . . . 110, 115

art. 37.071 § 2(d) . . . . . . . . . . . . . . . . . . . . 118

art. 37.071 § 2(e) . . . . . . . . . . . . . 110, 115, 118

art. 37.071 § 2(f) . . . . . . . . . . . . . . . . . . . . 118

art. 37.071 § 2(g) . . . . . . . . . . . . . . . . . . . . 118

art. 37.071 § 2(h) . . . . . . . . . . xxix, xxx, 126, 127

art. 38.21 . . . . . . . 39, 42, 43, 48, 49, 51, 52, 53, 55

art. 38.22 . . . . . . . . . . . 42, 43, 48, 51, 52, 53, 55

art. 38.22 §6 . . . . . . . . . . . xxxiii, 56, 57, 58, 60

art. 38.23 . . . . . . . . . . . . . . . . . . . . passim

art. 38.23(a) . . . . . . . . . . . . . . . . . . . passim

art. 44.25 . . . . . . . . . . . . . . . . . . . . . . 107

art. 44.251 . . . . . . . . . . . . . . . . . 111, 114, 116

art. 44.29(a)
33, 38, 48, 56, 66, 70, 73, 76, 106, 110, 111, 14, 116, 120, 128

TEX. PENAL CODE ANN.

§ 2.01 (Vernon) . . . . . . . . . . . . . . . . . . . . 103

§ 12.31(a) (Vernon) . . . . . . . . . . . . . . . . . . 75

§ 19.02 (b) (1) (Vernon) . . . . . . . . . . . . . . . . 100

§ 19.03 (a) (1) (Vernon) . . . . . . . . . . . . . 100, 101

TEX. R. APP.

21.3(h) . . . . . . . . . . . . . . . . . . . . . 126, 127

25.2 . . . . . . . . . . . . . . . . . . . . . . . . . . xxx

33.1(a) . 32, 35, 47, 54, 60, 65, 69, 73, 76, 99, 122, 126

38.1(e) . . . . . . . . . . . . . . . . . . 36, 48, 56, 115

43.2(c) . . . . . . . . . . . . . . . . . . . . . . 106, 110

43.2(d) . . . . . . . . . . . . . . . . . . . . . . . . 128

44.2(a) . . . . . . . . . . 32, 37, 47, 54, 65, 69, 73, 76

44.2(b) . . . . . . . . . . . . . . . . . . . . . 65, 94

TEX. R. EVID.

103(a)(1) . . . . . . . . . . . . . 32, 35, 47, 54, 60, 126

103(a)(2) . . . . . . . . . . . . . . . . 35, 47, 54, 60

TEX. TRANSP. CODE ANN.

§ 550.022 . . . . . . . . . . . . . . . . . . . . . . 102

§ 550.023 . . . . . . . . . . . . . . . . . . . . . . 102

NO. 73,685

IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF TEXAS
AT AUSTIN
* * *

ANTHONY CARDELL HAYNES,
Appellant

V.

THE STATE OF TEXAS,
Appellee

* * *

**APPELLANT'S BRIEF**

---

On Appeal in Cause No. 783,872
from the 263rd District Court of Harris County, Texas

---

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

**NOW COMES, ANTHONY CARDELL HAYNES**, Appellant herein, by and through his appointed counsel on appeal, and files his Appellant's Brief in this capital murder case. In support thereof, he would respectfully show the Court as follows:

**PRELIMINARY STATEMENT**

This is an automatic statutory appeal from Appellant's capital murder conviction and death sentence. TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(h) (V.A.C.C.P.). (C.R. III, p. 477). Upon his plea of not guilty, the jury found Appellant guilty of the offense of capital murder of Kent Kincaid, a peace officer

performing an official duty on May 22, 1998. (C.R. III, p.449) [1].

The jury answered two statutory special issues "Yes" and "No," resulting in the mandatory imposition of the death penalty. (C.R. III, pp. 458-459, 460). A Motion for New Trial was filed on October 22, 1999, (C.R. III, pp. 522-540, 541). Following a hearing, on November 12, 1999, the trial court denied Appellant's Motion for New Trial. (C.R. III, p. 541).

Counsel was appointed on appeal and Appellant's Brief is timely filed by placing in the United States Mail on May 10, 2000.

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this cause pursuant to TEX. R. APP. ANN. 25.2 and TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2 (h) (V.A.C.C.P.). All issues brought forward were developed in the trial court.

## REQUEST FOR ORAL ARGUMENT

Pursuant to TEX. R. APP. ANN. 39.1 (Vernon Pamph.2000), Appellant requests oral argument in this cause.

---

[1] References to the record of the trial proceeding appear as: (C.R. - ). The roman numeral references the volume of the Clerks' Record; it is followed by the page number. The Reporter's Record on appeal is referenced as (R.R. - ). The roman numeral references the volume; it is followed by the page number, as marked by the reporter. See, Tex. R. App. Ann. Appendix A(2)(d) & B(1)(h) (Vernon Pamph. 2000).

## POINTS OF ERROR PRESENTED

### POINT OF ERROR ONE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF U.S. CONSTITUTION, AMENDMENTS FOUR AND FOURTEEN.

### POINT OF ERROR TWO

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS CONSTITUTION, ART. I, SEC. 9.

### POINT OF ERROR THREE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS STATUTORY LAW, CHAPTER 14, V.A.C.C.P.

### POINT OF ERROR FOUR

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS STATUTORY LAW, ARTICLE 38.23, V.A.C.C.P.

### POINT OF ERROR FIVE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF U.S. CONSTITUTION, AMENDMENTS FOUR AND FOURTEEN.

### POINT OF ERROR SIX

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS CONSTITUTION, ART. I, SEC. 9.

### POINT OF ERROR SEVEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS STATUTORY LAW, CHAPTER 14, V.A.C.C.P.

POINT OF ERROR EIGHT

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS STATUTORY LAW, ARTICLE 38.23, V.A.C.C.P.

POINT OF ERROR NINE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW, U.S. CONSTITUTION, AMENDMENTS FIVE AND FOURTEEN.

POINT OF ERROR TEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF APPELLANT'S STATE CONSTITUTIONAL RIGHTS, ART. I., SEC. 10.

POINT OF ERROR ELEVEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF APPELLANT'S STATE CONSTITUTIONAL RIGHTS TO DUE COURSE OF LAW, ART. I., SEC. 19.

POINT OF ERROR TWELVE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 38.21 (V.A.C.C.P.).

POINT OF ERROR THIRTEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 38.23 (V.A.C.C.P.).

POINT OF ERROR FOURTEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 14.06 (V.A.C.C.P.).

POINT OF ERROR FIFTEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW, U.S. CONSTITUTION, AMENDMENTS FIVE AND FOURTEEN.

POINT OF ERROR SIXTEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF APPELLANT'S STATE CONSTITUTIONAL RIGHTS, ART. I., SEC. 10.

POINT OF ERROR SEVENTEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF APPELLANT'S STATE CONSTITUTIONAL RIGHTS TO DUE COURSE OF LAW, ART. I., SEC. 19.

POINT OF ERROR EIGHTEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 38.21 (V.A.C.C.P.).

POINT OF ERROR NINETEEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS SECOND AUDIOTAPED CUSTODIAL STATEMENT AS IT WAS INVOLUNTARY, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 38.23 (V.A.C.C.P.).

POINT OF ERROR TWENTY

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO FILE WRITTEN FINDINGS REGARDING THE VOLUNTARINESS OF APPELLANT'S FIRST AUDIOTAPED CUSTODIAL STATEMENT, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 38.22 §6 (V.A.C.C.P.).

POINT OF ERROR TWENTY-ONE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO FILE WRITTEN FINDINGS REGARDING THE VOLUNTARINESS OF APPELLANT'S SECOND AUDIOTAPED CUSTODIAL STATEMENTS, IN VIOLATION OF TEX. CODE CRIM. PROC. ANN. art. 38.22 §6 (V.A.C.C.P.).

POINT OF ERROR TWENTY-TWO

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING APPELLANT'S MOTION TO STRIKE VENIREMAN MELBA LYNET WHITE WILLIAMS FOR CAUSE, AS THE VENIREMAN WAS BIASED AGAINST A LAW THAT APPELLANT WAS ENTITLED TO RELY UPON, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY, U.S. CONSTITUTION, AMENDMENTS SIX AND FOURTEEN.

POINT OF ERROR TWENTY-THREE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING APPELLANT'S MOTION TO STRIKE VENIREMAN JOHN RUBEN MUNOZ FOR CAUSE, AS THE VENIREMAN WAS BIASED AGAINST A LAW THAT APPELLANT WAS ENTITLED TO RELY UPON, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY, U.S. CONSTITUTION, AMENDMENTS SIX AND FOURTEEN.

POINT OF ERROR TWENTY-FOUR

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING APPELLANT'S MOTION TO STRIKE VENIREMAN JACQUELINE EMHOFF NELSON FOR CAUSE, WHERE THE VENIREMAN WAS BIASED AGAINST A LAW THAT APPELLANT WAS ENTITLED TO RELY UPON, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY, U.S. CONSTITUTION, AMENDMENTS SIX AND FOURTEEN.

POINT OF ERROR TWENTY-FIVE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING APPELLANT'S MOTION TO STRIKE VENIREMAN HORACE B. SNYDER FOR CAUSE, AS THE VENIREMAN WAS BIASED AGAINST A LAW THAT APPELLANT WAS ENTITLED TO RELY UPON, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY, U.S. CONSTITUTION, AMENDMENTS SIX AND FOURTEEN.

POINT OF ERROR TWENTY-SIX

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO DISCHARGE THE JURY PANEL WHERE THE STATE EXERCISED ITS PEREMPTORY STRIKES AGAINST VENIREMEMBER, TWANNA KIRKLING, IN A RACIALLY DISCRIMINATORY MANNER IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT. U.S. CONST., AMEND. XIV.

POINT OF ERROR TWENTY-SEVEN

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO DISCHARGE THE JURY PANEL WHERE THE STATE EXERCISED ITS PEREMPTORY STRIKES AGAINST VENIREMEMBER, MELBA H. GOODMAN, IN A RACIALLY DISCRIMINATORY MANNER IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT. U.S. CONST., AMEND. XIV.

POINT OF ERROR TWENTY-EIGHT

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO DISCHARGE THE JURY PANEL WHERE THE STATE EXERCISED ITS PEREMPTORY STRIKES AGAINST VENIREMEMBER, BETTY OWENS, IN A RACIALLY DISCRIMINATORY MANNER IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT. U.S. CONST., AMEND. XIV.

POINT OF ERROR TWENTY-NINE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO DISCHARGE THE JURY PANEL WHERE THE STATE EXERCISED ITS PEREMPTORY STRIKES AGAINST VENIREMEMBER, L.V. MCQUEEN, IN A RACIALLY DISCRIMINATORY MANNER IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT. U.S. CONST., AMEND. XIV.

POINT OF ERROR THIRTY

THE TRIAL COURT ERRED IN PRESIDING OVER APPELLANT'S BATSON MOTION WHERE THE COURT HAD NOT BEEN PRESENT DURING INDIVIDUAL VOIR DIRE OF THE PROSPECTIVE VENIREMEMBERS.

POINT OF ERROR THIRTY-ONE

THE EVIDENCE IS INSUFFICIENT, AS A MATTER OF LAW, TO SUPPORT APPELLANT'S CONVICTION FOR CAPITAL MURDER WHERE THE RECORD FAILS TO SHOW THAT THE COMPLAINANT WAS ACTING IN HIS OFFICIAL DUTY AS A PEACE OFFICER AT THE TIME OF HIS HOMICIDE, AS ALLEGED IN THE INDICTMENT.

POINT OF ERROR THIRTY-TWO

THE EVIDENCE IS INSUFFICIENT, AS A MATTER OF FACT, TO SUPPORT APPELLANT'S CONVICTION FOR CAPITAL MURDER WHERE THE RECORD FAILS TO SHOW THAT THE COMPLAINANT WAS ACTING IN HIS OFFICIAL DUTY AS A PEACE OFFICER AT THE TIME OF HIS HOMICIDE, AS ALLEGED IN THE INDICTMENT.

POINT OF ERROR THIRTY-THREE

THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE ONE WHERE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY.

POINT OF ERROR THIRTY-FOUR

THE TRIAL COURT VIOLATED APPELLANT'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE COURSE OF LAW BY SENTENCING APPELLANT TO DEATH WHERE THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S ANSWER TO SPECIAL ISSUE ONE.

POINT OF ERROR THIRTY-FIVE

THE 12-10 TEXAS CAPITAL PUNISHMENT SCHEME IS UNCONSTITUTIONAL, WHERE THE STATUTE CLEARLY SUBJECTS JURORS INCLINED TO ANSWER THE MITIGATION ISSUES FAVORABLY TO THE APPELLANT TO COMPROMISE THEIR VOTE IN FAVOR OF A DEATH SENTENCE, IN VIOLATION OF APPELLANT'S FEDERAL CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.

POINT OF ERROR THIRTY-SIX

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL.

POINT OF ERROR THIRTY-SEVEN

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL WHERE THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL.

## STATEMENT OF FACTS

This appeal lies from appellant's felony jury trial and conviction. Appellant was charged with the murder of Kent Kincaid, a peace officer performing an official duty on May 22, 1998. (C.R.I, p. 7). Appellant entered a plea of not guilty. (R.R. 23, pp. 4-5). Trial before a jury commenced on September 13, 1999.

**Robert T. Stump** testified that on May 22, 1998, at approximately 10:30 p.m., upon his wife's request, he exited his home, walked down the driveway, and looked towards the end of the street. He observed a body lying in the street next to a vehicle with the driver's door open. (R.R. 23, pp. 13, 15-16, 18).

Stump approached the body, and checked for the presence of a pulse. Stump noted a massive swelling on the left side of the man's face. (R.R. 23, p. 18). Stump spoke to the man, rubbed his chest, and alerted a neighbor of the presence of a pulse. (R.R. 23, pp. 18-19). Stump looked into the vehicle, noted that the windshield was cracked on the driver's side and noted that no one else was inside. (R.R. 23, pp. 19-21). Stump did not see any vehicles leaving the scene.

Stump described the clothing worn by the wounded man as "brown cowboy boots and blue jeans and a pullover, greenish blue shirt." Stump's vehicle was not marked as a police vehicle nor did it appear to contain any weapons or law enforcement-related equipment or markings. (R.R. 23, pp. 21-23, 25-26) Stump later learned the identity of the wounded man, the complainant, as

Houston Police Department officer, Sergeant Kent Kincaid. (R.R. 23, pp. 21-23).

**Jeff Patrick**, employed as a deputy in the Harris County, Precinct 5 Constable's Office, (R.R. 23, p. 29), testified that on May 22, 1998, at approximately 11:09 p.m., he was dispatched to 7605 Plumtree Forrest Circle. (R.R. 23, p. 30). Patrick arrived approximately two minutes later at 11:12 p.m. (R.R. 23, p.31), and observed a black Jeep in the middle of the roadway, a male (the complainant) lying on the ground and a female, the complainant's wife, squatting next to him. (R.R. 23, p.31)

Within seconds, an emergency rescue unit arrived. After the scene had been secured, Patrick began searching throughout the area of the scene for a dark pickup truck "with some type of silver on the tailgate," and a younger dark skinned male. (R.R. 23, pp. 36, 42).

**Jeraldine Stewart,** an assistant police chief, Houston Police Department, testified that her responsibilities as an assistant police chief included supervising seven patrol stations, approximately 1700 men and women who provided police service. (R.R. 23, p. 59). Steward noted that the Westside police division was one of the seven patrol division or stations for which she assumed supervisory responsibilities. (R.R. 23, p. 59).

Stewart explained the rules governing the conduct of police officers while on and off duty, respectively. (R.R. 23, p. 60). As stated: "[officers of the Houston Police Department] are required to respond and take prompt and effective police action

for any violations of the law that are committed in their presence ... whether on duty or off duty." (R.R. 23, pp. 60-61, 72, 81). Stewart asserted that police officers were expected to investigate and take action for emergencies or violations of the law even if they were in unmarked personal vehicles. (R.R. 23, p. 61).

Stewart noted that the complainant was employed by the Houston Police Department on May 22, 1998, assigned to the Westside station, third shift or the night shift. On May 22, 1998, the complainant held the rank of sergeant. (R.R. 23, p. 62). Upon cross-examination, Stewart referred to and read from general orders and rules (500-01) governing general police conduct on May 22, 1998. As stated:

> There are two restrictions. It says that 'the off duty police officers will not arrest traffic violators on sight unless the violation poses an immediate threat of bodily injury.' Then there is a second section. It says 'if the off duty officers or members are involved in a dispute that the [sic] requires police action, **off duty officers will not arrest any of the persons involved unless there is an immediate threat of serious bodily injury or death.** A police unit will be called to the scene.

(R.R. 25, pp. 100-103) (emphasis added).

**Jerry C. Chandler,** employed by the City of Houston, Human Resources Department, testified that his job responsibilities included the oversight of the city's worker compensation program, the unemployment compensation program, and the salary continuation programs. (R.R. 23, p. 93). Chandler noted that a line of duty claim had been filed and paid on behalf of the complainant for purposes of compensation benefits to his family.

(R.R. 23, pp. 94-96, 99-100).

**Nancy Kincaid**, wife of the complainant, testified that complainant became a Houston Police Department officer in 1984. (R.R. 23, p. 104). During the evening of May 22, 1998, at approximately 10:30-10:45 p.m., Kincaid and the complainant drove her vehicle, a Jeep Cherokee, to a local sports bar to meet some friends. (R.R. 23, pp. 106-108).

As they drove away from their home, an object tossed from a passing truck hit the windshield of complainant's car on the driver's side . (R.R. 23, pp. 109-111). Upon impact, Kincaid heard a popping sound and noted that the windshield of their vehicle had been cracked. (R.R. 23 p. 111). The complainant turned the vehicle around and proceeded to pursue the truck that had just passed them. (R.R. 23, pp. 111-112). Kincaid described the truck as dark with an open bed. (R.R. 23, p. 112).

Kincaid noted that she and complainant pursued the truck for approximately five blocks. The truck then turned into a street, Plumtree Forest, and pulled into the first driveway. (R.R. 23, p. 113). Immediately thereafter, the truck pulled out of the driveway in reverse and stopped next to complainant's vehicle. (R.R. 23, pp. 113-114).

Kincaid testified that complainant stopped his vehicle, exited, and began to question the driver of the truck who remained seated in his truck. (R.R. 23, pp. 115-116). Kincaid had an opportunity to look into the other vehicle and observed the driver. (Kincaid noted that she believed that a second person sat

in the passenger area but was not certain. She did not believe that there was anyone in the bed of the truck.). (R.R. 23 pp. 112, 123-124). Kincaid described the driver as a fair skinned male, aged 15-20 years. (R.R. 23, pp. 117, 121).

Complainant, dressed in street clothes, then asked the driver of the truck "why he threw the rock at our windshield." (R.R. 23, p. 117). Kincaid could not hear the driver's response. (R.R. 23, p. 118). Complainant repeated his question to the driver. Kincaid then heard complainant identify himself to the occupant/occupants of the truck as a police officer although he did not produce any identification, and requested to see "their driver's license." (R.R. 23, pp. 118, 146). Kincaid testified that a complainant reached into his back pocket for his wallet and identification as a police officer, the driver of the truck shot him. As stated:

> Q.: At the moment your husband said he was a police officer and then was reaching for his identification to show the person, what did they [sic] do?
>
> A.: He, the driver, pulled his hand up and I saw the flash and heard the pop, with his hand up.
>
> Q.: And what happened to your husband then?
>
> A.: He fell. He went down.

(R.R. 23, pp. 119).

Kincaid testified that immediately thereafter, the truck sped away. (R.R. 23, p.119). Kincaid jumped out of the Jeep, saw that her husband was not moving, and cried out for help. (R.R. 23, p. 120). Complainant was transported by emergency units to Hermann Hospital where he was later declared dead at

approximately 3:00 a.m. (R.R. 23, pp. 121-122).

Kincaid identified State's Exhibit No. 11 (S.X. 11), as a composite sketch of the driver of the truck, prepared by an artist of the Houston Police Department on May 23, 1998, based upon the information provided by Kincaid (R.R. 23, pp. 128-130; R.R. 40, p. 16). Kincaid also asserted that State's Exhibit No. 11 was the same person depicted in State's Exhibit No. 12 (S.X. 12), a photograph of Appellant, and the same person seated at counsel table (defendant/Appellant). (R.R. 23, p. 132).

**Kenneth Culver,** employed as a deputy in the Harris County Sheriff's Department, testified that on May 22-23, 1998, he was assigned to crime scene investigations. (R.R. 24, p. 4). Culver stated that during the early hours of May 23, 1998, he was dispatched to the 7600 block of Plumtree Forest Circle. (R.R. 24, pp. 4-5). Culver arrived at approximately 12:25 a.m. (R.R. 24, p. 5).

Culver noted that an area in front of the homes at 7602 and 7605 Plumtree Forest Circle had been roped off with crime scene tape and there were numerous emergency patrol vehicles with emergency lights on. (R.R. 24, p. 5). Inside the perimeter, Culver observed a navy blue Jeep Cherokee; the driver's door was wide open and the passenger door was partially open. (R.R. 24, pp. 4-5). The Jeep was positioned diagonally in the street, facing north. (R.R. 24, p. 6). Culver also observed a large amount of blood in the middle of the street extending east behind the Jeep. (R.R. 24, p. 6).

Inside the Jeep, Culver noted .25 Remington Peters spent fired shell casing on the driver's side floorboard. (R.R. 24, pp. 6, 10). Additionally, Culver observed another .25 Remington Peters fired shell casing approximately four-tenths of a mile down the street near the curb, as well as a can of imported meat. (R.R. 24, pp. 7-8, 11). The can of meat was approximately the same diameter as the fracture of the Jeep's windshield. (R.R. 24, p. 11).

**Charles E. Jackson**, police sergeant, employed by the Houston Police Department, testified that he was on duty on May 22 and 23, 1998. (R.R. 24, pp. 57-58). On May 24, 1998, during roll call, Jackson studied a composite picture of a suspect in this case. (R.R. 24, pp. 60-61). Jackson believed that the suspect depicted in the composite sketch was a person named Timothy Reese. (R.R. 24, p. 61). Jackson recalled three separate interactions with Reese prior to the date of the underlying offense. (R.R. 24, p. 67). Jackson noted that during these "incidents," Reese was a passenger in a pick-up truck. (R.R. 24, pp. 67-68). Jackson noted that State's Exhibit 11 resembled both Appellant and Reese, respectively. (R.R. 24, p. 91).

**Dr. Tommy J. Brown**, deputy chief medical examiner of the Harris County Medical Examiner's Office on May 24, 1998, testified that he conducted the autopsy of the complainant in the instant case. (R.R. 24, pp. 102-103). During the course of the autopsy, Brown recovered a bullet from the posterior parietal area on the right side of complainant's head; it was a small

caliber, fully jacketed bullet, identified as State's Exhibit 38 A. (R.R. 24, pp. 111-112). Brown concluded that the complainant had died from a single gunshot wound to the head. (R.R. 24, p. 116).

**Sgt. C. E. Elliott**, assigned to the homicide division of the Houston Police Department on May 22 and 23, 1998, testified that he investigated the death of the complainant in the instant case. (R.R. 24, pp. 127-128). Elliott and other investigators canvassed the streets and neighborhood surrounding the scene of the offense for leads and evidence in this case. (R.R. 24, pp. 134-135).

Based upon his investigation, Elliott identified a vehicle that might have been involved in the offense as well as description of suspects. (R.R. 24, p. 135). On May 24, 1998, Elliott was contacted by Sgt. C.D. Jackson. (R.R. 24, p. 135). Thereafter, a photospread was prepared of possible suspects in this case, including an individual named Timothy Reese. (R.R. 24, pp. 137-138). (At this time, police suspected that three individuals were involved in the underlying offense.) (R.R. 24, p. 139).

On May 24, 1998, at 7:45 p.m., Elliott obtained a warrant for the arrest of Timothy Reese. (R.R. 24, p. 138). A surveillance team was set up at Reese's house that evening. (R.R. 24, p. 139). At approximately 10:50 p.m., a dark brown van arrived at Reese's home, and Reese was observed exiting the van and entering the home. (R.R. 24, p. 140).

Shortly thereafter, as police planned to serve the warrant,

Elliott observed another vehicle, a dark blue Chevy S-10 pickup truck with a large chrome bumper and a "chrome-type strip" across the tailgate, pulling up to Reese's home. (R.R. 24, pp. 141-142). Elliott noted that this vehicle matched the description of the vehicle sought by the police in this case. (R.R. 24, p. 142).

Elliott observed a black male exit the van and approach the front door of the house. Immediately thereafter, Reese appeared and both drove away in the truck. (R.R. 24, pp. 142-143, 172-173). Soonafter, police units stopped the truck driven by Appellant and arrested the occupants including Reese, Appellant and a juvenile. (R.R. 24, pp. 144-145). They were transported in separate vehicles to the Harris County Sheriff's Department, homicide division, at 601 Lockwood. (R.R. 24, pp. 145-146).

**Todd William Miller,** a homicide investigator with the Houston Police Department (HPD), testified that he participated in the investigation of the underlying offense. (R.R. 25, pp. 165-167). Miller assisted other officers in locating Reese and in setting up surveillance of the area surrounding his home. (R.R. 25, pp. 171). Miller participated in the interception and apprehension of Reese and the occupants of the van on May 24, 1998 at approximately 11:00 p.m.. (R.R. 25, pp. 178, 185).

Upon Appellant's arrival at 601 Lockwood at approximately midnight, Miller began to interrogate Appellant. (R.R. 25, p. 184). Miller testified that he gave Appellant the proper Miranda warnings and informed him that he was a suspect in the death of Kincaid. (R.R. 25, pp. 189-190). Miller stated that Appellant

denied any involvement in this offense. (R.R. 25, p. 190). Miller noted that Appellant became very nervous when he subsequently informed him that Reese had implicated him in the underlying offense. (R.R. 25, pp. 191-192).

When Miller informed Appellant that officers were en route to arrest the juvenile in this case, Appellant responded: "[a]ll right, I'll tell you what happened." (R.R. 25, p. 194). Miller identified State's Exhibit No. 52A (S.X. 52A) as a tape recording of Appellant's custodial statement. (R.R. 25, p. 200).

Miller noted that after Appellant had given his tape recorded statement, he was taken before a magistrate whereupon he received further Miranda warnings. (R.R. 26, p. 23). Thereafter, Appellant was returned to 601 Lockwood where he provided a second custodial tape recorded statement. (R.R. 26, p. 27). Miller identified State's Exhibit No. 54A (S.X. 54A) as Appellant's second custodial statement. (R.R. 26, p. 27).

Miller informed the jury that upon completing his second tape recorded statement, he transported Appellant to 17904 West Little York, where Appellant showed the officer the location of a .25 caliber ammunition clip he had previously discarded and hidden by throwing it into a storm drain. (R.R. 26, pp. 30-31). Thereafter, Appellant was transported to 1200 Guadalupe, Missouri City, Texas. (R.R. 26, p. 32). Miller stated that Appellant informed the officers that he had also previously discarded a firearm in the field at this location. (R.R. 26, p. 34). The field appeared to be full of tall weeds. (R.R. 26, p. 34).

Miller was not present when the firearm was recovered. (R.R. 26, p. 34).

**Robert Baldwin**, a firearms examiner, employed by the Houston Police Department, testified that he conducted an examination of the bullet recovered from complainant's body. (R.R. 26, p. 102). Upon comparing the markings on the bullet retrieved from the head of the complainant with the handgun recovered by officers in a search of a field in Missouri City, Baldwin concluded that the single bullet recovered from complainant's body had been fired from the handgun recovered in the field. (R.R. 26, pp. 110-112).

**Timothy Wayne Reese**, aged 18 at trial, testified in this case. (R.R. 25, p. 13). Reese stated that he had known Appellant for several years and that on May 22, 1998, he, Appellant and another friend, Mike Tunson, drove to Appellant's home in Appellant's truck, a "dark blue S-10." (R.R. 25, p. 20). They remained in Appellant's home during most of the evening, played basketball and listened to music. (R.R. 25, pp. 20-21). Later, they left Appellant's home, ate at "Jack N Box," [sic], and drove to Willowbrook Mall "as it was getting close to closing time." (R.R. 25, pp. 21-22).

Reese stated that he asked Appellant to take him home, however, Appellant continued to "ride around" and parked for a short while in an apartment complex. As Appellant and Tunson left the truck, Reese began to walk away. Shortly thereafter, Appellant and Tunson pulled up behind Reese and Reese returned to the open bed of the truck. (R.R. 25, pp. 25-26). With Appellant

as the driver and Tunson as a passenger, the truck continued and made approximately three stops. (R.R. 25, pp. 28-29).

Reese alleged that as he was riding in the bed of Appellant's truck, he heard a bang. (R.R. 25, p. 29). Reese peeked out from the bed of the truck and observed a dark colored Bronco or Cherokee-type truck. (R.R. 25, p. 32). At first, the truck seemed to be headed away from the truck in which Reese was riding. It then turned around and began to follow Appellant's truck. (R.R. 25, pp. 32-33).

Reese noted that when Appellant's truck stopped, he peeped out and observed the driver of the Cherokee standing outside his vehicle. Reese then overheard the driver of the Cherokee say: "You hit my window," (R.R. 25, p. 36); whereupon Appellant replied: "I accidentally threw something at your window." (R.R. 25, p. 37).

In response, Reese testified that the driver of the Cherokee said: "I am a police officer, let's talk about it." (R.R. 25, p. 37). Reese then heard a gunshot and observed the driver of the Cherokee "drop down to the ground very fast." (R.R. 25, p. 39).

Appellant did not testify during the guilt or innocence phase of trial nor during the punishment phase. The jury was authorized to convict Appellant for the offense of capital murder, or murder. (C.R. I, p. 443). The jury found Appellant guilty of the offense of capital murder, as charged in the indictment. (C.R. II, p. 449). During the punishment phase of trial, the jury was instructed regarding the existence of parole

and the application of the law of parole vis a vis a sentence of life for the offense of capital murder. (C.R.II, pp. 450-457. Having found Appellant guilty of the offense of capital murder, the jury answered the statutory special issues "Yes" and "No," resulting in the court's mandatory imposition of Appellant's penalty of death. (C.R. II, pp. 449, 458-459; R.R. 27, p. 63; R.R. 32, p. 3).

Additional facts are stated under each point of error, below.

POINT OF ERROR ONE (RESTATED)

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF U.S. CONSTITUTION, AMENDMENTS FOUR AND FOURTEEN.

POINT OF ERROR TWO (RESTATED)

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS CONSTITUTION, ART. I, SEC. 9.

POINT OF ERROR THREE (RESTATED)

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS STATUTORY LAW, CHAPTER 14, V.A.C.C.P.

POINT OF ERROR FOUR (RESTATED)

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO GRANT APPELLANT'S MOTION TO SUPPRESS HIS FIRST AUDIOTAPED CUSTODIAL STATEMENT OBTAINED WHILE APPELLANT WAS UNLAWFULLY ARRESTED, IN VIOLATION OF TEXAS STATUTORY LAW, ARTICLE 38.23, V.A.C.C.P.

STATEMENT OF FACTS:

Appellant filed two pretrial motions asking the trial court to conduct a hearing and suppress all evidence tainted by

Appellant's illegal warrantless arrest, including Appellant's first and second audiotaped custodial statements/confessions. (C.R.I, pp. 131, 169). In support of these motions, Appellant invoked the Fourth and Fourteenth Amendments to the United States Constitution, the parallel protection of Article I, Sec. 9, of the Texas Constitution, Chapter 14 of the Texas Code of Criminal Procedure (prohibiting warrantless arrests), and Article 38.23 V.A.C.C.P. which prohibits the use in a criminal trial of any evidence "obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America." (C.R.I, pp. 131, 169).

A hearing of these motions was conducted on August 16, 1999. (C.R. III, pp. 547-548; R.R. 3, pp. 65, 68). Following the hearing on these suppression requests, the trial court denied the motions. (C.R. I, pp. 169-173; R.R. 3, pp. 143-144).

**Todd William Miller,** a homicide investigator with HPD, testified that he initially participated in the investigation of the underlying offense during the early morning of May 23, 1998. (R.R. 3, p. 67). Miller was originally assigned to investigate a robbery which led to the identification of Timothy Reese as a possible suspect. (R.R. 3, pp. 67-69). A warrant for the arrest of Timothy Reese was obtained. (R.R. 3, p. 69).

A police surveillance of Reese's home was set up on May 24, 1998. (R.R. 3, p. 70). Several hours later, Reese was observed returning to his home in a dark-colored pickup truck.

Approximately ten minutes later, at 11:00 p.m., a car drove up to Reese's house and the driver exited the vehicle and approached the front door of the house. (R.R. 3, pp. 70-71). Moments later, both the driver and Reese got into the vehicle and drove away. (R.R. 3, p. 71).

Miller arranged for uniformed officers to stop the vehicle. (R.R. 3, p. 73). Miller noted that Appellant as the driver of the vehicle,(R.R. 3, pp. 70-73), was detained, arrested and questioned immediately. (R.R. 3, pp. 73, 119-120). While Appellant was cooperative, admitted owning the vehicle in which he was driving, presented proof of a valid driver's license and ownership of the truck, he was immediately handcuffed and transported to HPD's Detective Division for interrogation. (R.R. 3, pp. 105-106).

Miller agreed that prior to and including the time of Appellant's arrest, "no one had identified Anthony Haynes as even a participant in an aggravated robbery case." (R.R. 3, pp. 101, 104). Thus, Miller explained: "[a]fter examining the vehicle and observing the defendant in this case, it was my opinion that this defendant was involved in not only the aggravated robbery, but very well **could have been involved** in the murder of Sergeant Kincaid." (R.R. 3, p. 73) (emphasis added). Miller conceded that there was no warrant for Appellant's arrest and that he had not observed Appellant commit any breaches of the peace nor any felony aggravated robbery or homicide. (R.R. 3, pp. 101-103, 113). Additionally, Miller conceded that at the time of

Appellant's arrest, he had no reason to believe that he would or intended to flee the jurisdiction. (R.R. 3, p. 113). However, Miller listed the following reasons for Appellant's immediate arrest on May 24, 1998: (1) Appellant admitted to owning the vehicle in which he was driving; (2) the vehicle matched the description of a get-a-way vehicle described by a complainant in a robbery offense which was under investigation at this time; (3) Appellant's vehicle matched a description of a vehicle, based upon information provided to police by Sergeant Kincaid's wife; and (4) Appellant matched a composite picture of a suspect, based upon information provided to the police by Sergeant Kincaid's wife. (R.R. 3, pp. 73-75; 107-109).

Thus, upon the police-initiated traffic stop, Appellant was immediately handcuffed and arrested on May 24, 1998, at 11:00 p.m., placed in a police vehicle, and transported to the Harris County Sheriff's Department's homicide headquarters, located at 601 Lockwood. (R.R. 3, pp. 70, 83, 85, 106). Appellant's vehicle was impounded and towed away. (R.R. 3, p.111). Miller and Appellant, handcuffed, arrived in the homicide offices, Detective Division, 601 Lockwood, at 11:52 p.m. (R.R. 3, pp. 76, 116-117).

Miller noted that prior to escorting Appellant into the homicide offices, he chose not to take Appellant before a magistrate to receive the proper admonishments and Miranda warnings because he wanted to investigate Appellant's level of involvement in "either/or the murder or the robbery." (C.R. 3, pp. 114-115). Miller asserted that upon arrival at homicide's

headquarters, Appellant was escorted to an interview room. (R.R. 3, p. 77). Miller gave Appellant Miranda warnings, and informed him that he was a suspect in both a robbery and the death of Kincaid. (R.R. 3 pp. 78, 84). Appellant initially denied any involvement in a robbery or a shooting of a police officer. (R.R. 3, p. 84).

Miller noted that Appellant became very nervous when he subsequently informed him that Reese, also arrested and interrogated in a separate room) had implicated Appellant in the underlying offense. (R.R. 3, p. 84). When Miller informed Appellant that officers were en route to arrest a juvenile suspect, Michael Tunson, Appellant asked what would happen to him if he gave a statement. (R.R. 3, p. 85). Miller answered that it depended upon Appellant's statement. (R.R. 3, p. 85). Appellant then asked Miller whether there were any witnesses to the alleged robbery and shooting death of Kincaid. (R.R. 3, p. 86). Miller asserted that there were witnesses and that Appellant would be placed in a lineup for identification. (R.R. 3, p. 86).

Miller testified that at this time, Appellant said: "all right, I'll tell you about it." (R.R. 3, p. 86). Thereafter, Appellant finally agreed to provide a formal statement and assented to the creation of an audiotaped recording. (R.R. 3, p. 87). Miller identified State's Exhibit No. 1H (S.X. 1H) as the recording of Appellant's statement; the process of recording Appellant's first custodial statement began at 12:32 a.m., May 25, 1998 and concluded at 12:52 a.m., May 25, 1998. (R.R. 3, pp.

87, 92).

ARGUMENT AND AUTHORITIES

Embodied in centuries of precedent is the principle that seizures of the person are reasonable only if supported by probable cause. In the instant case, Appellant's detention and seizure for questioning intruded so severely upon the interests protected by the Fourth Amendment of the United States Constitution and Article I, Sec. 9 of the Texas Constitution as necessarily to trigger the traditional safeguards against illegal arrest.

It is an important factor that Texas has long required additional safeguards for these interests by statute. Texas peace officers must have not only probable cause to arrest, but except in certain very limited circumstances not present in Appellant's case, they must also obtain a warrant, subjecting their probable cause to judicial scrutiny, before they may arrest. Chapter 14, V.A.C.C.P. Generally, encounters between individuals and police fall into three categories: (1) consensual meetings; (2) detention based upon reasonable suspicion; and (3) full arrests based upon and requiring probable cause. United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Amores v. State, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991).

In a motion to suppress hearing, the movant bears the burden of proof to show that a warrantless arrest or search has occurred. Once a movant (the defendant) has proven that the contested arrest or search was, in fact, warrantless, the burden

of proof shifts to the State to present sufficient facts to justify this action. Russell v. State, 717 S.W.2d 7 (Tex. Crim. App. 1986).

Probable cause for a warrantless arrest exists when at the moment of a persons' arrest, facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information, warrant a reasonable and prudent person to believe that a particular person has committed or is committing an offense. Smith v. State, 739 S.W.2d 848 (Tex. Crim. App. 1987); Hawkins v. State, 660 S.W.2d 65 (Tex. Crim. App. 1983); Jones v. State, 565 S.W.2d 934 (Tex. Crim. App. 1978).

As noted above, Miller attempted to defend the warrantless arrest of Appellant in this case by stating: " ... it was my opinion that this defendant ... very well **could have been involved** in the murder of Sergeant Kincaid." (R.R. 3, p. 73) (emphasis added). Where the facts presented for an individual's arrest are nothing more than an officer's mere conclusions, probable cause for arrest has not been established. A detention based on a hunch or a guess is illegal. Williams v. State, 621 S.W.2d 609 (Tex. Crim. App. 1981); Dickey v. State, 716 S.W.2d 499, 504 (Tex. Crim. App. 1986) (quoting Armstrong v. State, 550 S.W.2d 25 (Tex. Crim. App. 1976)). The police may not verify their suspicions by means that approach an arrest. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

A trial court may find probable cause for arrest based solely upon facts, not conclusions. Aguilar v. Texas, 378 U.S.

108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1963); Green v. State, 615 S.W.2d 700 (Tex. Crim. App. 1980). Terry v. Ohio, 392 U.S. 1, 13, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); Dickey v. State, 716 S.W.2d at 504. Thus, was is insufficient for the State (Miller) to simply provide conclusory explanations for Appellant's warrantless arrest. Rather, the State was required to provide proof that the offense had occurred within the view of the officer, Epson v. State, 743 S.W.2d 311, 312 (Tex. App.--Houston [1st Dist.] 1987, no pet.) ("the State failed . . . to show that the offense was committed within the view of the officer"), or must otherwise demonstrate a basis for the officer's knowledge. In the instant case, Miller's conclusory statements without more were insufficient as a matter of law to establish reasonable suspicion or probable cause.

Additionally, Miller testified that he arrested Appellant for two reasons. (R.R. 3, p.107). The first reason was that Appellant's truck matched a description of the truck used in an aggravated robbery wherein Timothy Reese was a suspect. (R.R. 3, p. 107). Appellant asserts that the fact that Reese was determined to be a passenger in Appellant's truck at the time of the arrest merely establishes Appellant's proximity to the suspect, Timothy Reese. Moreover, an individual may not be arrested simply because of his proximity to others suspected of criminal activity or to the scene of the alleged crime. Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); Lippert v. State, 664 S.W.2d 712 (Tex. Crim. App. 1984); Visor v.

State, 660 S.W.2d 816 (Tex. Crim. App. 1983).

The second reason Miller outlined for Appellant's arrest is that he believed Appellant matched a description of the driver of the truck implicated in the death of Sergeant Kincaid, provided by Mrs. Kincaid. (R.R. 3, p. 108). However, the actual description of the driver, as provided to police by Mrs. Kincaid and professed to have been considered by Miller in his decision to arrest Appellant was not included or presented to the court during the hearing of Appellant's pretrial motions.

Thus, the trial court was restricted to Officer Miller's conclusory opinions, alone, unsupported by any evidence, that Appellant matched a description of a driver sought by investigators in the death of Kincaid (the underlying case). Appellant reiterates that the record in this case simply fails to supply the missing evidentiary link required to establish probable cause for Appellant's arrest.[2]

The standard for showing the legality of a warrantless arrest is no less stringent than that required to be shown to a magistrate for the issuance of a warrant. Wilson v. State, 621 S.W.2d 799 (Tex. Crim. App. 1981); Barber v. State, 611 S.W.2d 67, 68 (Tex. Crim. App. 1981). Indeed, it would make little sense

[2] Appellant notes that during Appellant's trial, Deputy Jeff Patrick, testified that he began to search for a dark skinned male, following an interview with Mrs. Kincaid at the scene. (R.R. 23, p. 36). Presumably, this ambiguous description was the same provided to all the investigators in this case, including Miller. Moreover, the record failed to show that Appellant was a dark skinned male.

for it to be otherwise.[3] The Court is required to examine the totality of the circumstances to determine if the proffered facts amount to probable cause. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed. 527 (1983). In essence, the statement of facts from suppression hearing becomes the four corners of the proof and information submitted to the magistrate from which the probable cause determination is to be made.[4]

As noted above, the State had the burden of proof to introduce sufficient facts to establish the legality or reasonableness, if any, of Appellant's arrest and the seizure of evidence in this case. Amores v. State, 816 S.W.2d at 413; Lalande v. State, 676 S.W.2d 115 (Tex. Crim. App. 1984); Hooper v. State, 533 S.W.2d 762 (Tex. Crim. App. 1975). See also, Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The State failed to sustain its burden to establish probable cause. The State failed to present specific articulable facts to support the warrantless arrest of Appellant.

The record is clear that Appellant was handcuffed and arrested without a warrant, without probable cause, and

---

[3] If anything, a warrantless arrest should be tested more stringently than an arrest with a warrant since in the case of a warrant, there has been a judicial determination of probable cause before the search or seizure has occurred.

[4] Much like a reviewing magistrate is not allowed to look beyond the four corners of an arrest or search warrant affidavit to determine if the issuing magistrate based his decision on evidence not in the affidavit, this Court is not allowed to look beyond the four corners of the statement of facts to determine if the trial court based her decision of probable cause on evidence outside the record. In both cases, the review is a question of law and is strictly limited to the facts that were properly before the reviewing magistrate.

transported to police headquarters. (R.R. 3, p. 101, 113). Appellant's immediate arrest for custodial interrogation was unreasonable, illegal, in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 9 of the Texas Constitution. Hulit v. State, 982 S.W.2d 431 (Tex. Crim. App. 1998).

Appellant's warrantless arrest also violated the statutory protection set forth in Chapter 14, V.A.C.C.P. The right to arrest without a warrant in Texas is and has long been controlled by statute. Giacona v. State, 298 S.W.2d 587 (Tex. Crim. App. 1957). See, Chapter 14, (V.A.C.C.P.). The courts have long been directed to give a strict construction to the few statutory exceptions. Hardison v. State, 597 S.W.2d 355 (Tex. Crim. App. 1980); Lowery v. State, 499 S.W.2d 160 (Tex. Crim. App. 1973). Appellant's arrest without a warrant was not justified in this case by any statutory exception.

In the instant case, there was no evidence that Miller had observed Appellant commit any breaches of the peace or any felony, (R.R. 3, pp. 101-103, 113), TEX. CODE CRIM. PROC. ANN. art. 14.01 (V.A.C.C.P.). There was no evidence that a magistrate had observed Appellant commit any breaches of the peace or any felony. TEX. CODE CRIM. PROC. ANN. art. 14.02 (V.A.C.C.P.). There was no evidence that Appellant was found in a suspicious place or was about to commit an offense. There was no evidence that Appellant had committed an assault resulting in bodily injury to another or that there was danger of further bodily injury to

another; there was no evidence that Appellant had violated a protective order. TEX. CODE CRIM. PROC. ANN. art. 14.03 (V.A.C.C.P.). There was no evidence that Appellant had committed a felony and was about to escape. TEX. CODE CRIM. PROC. ANN. art. 14.04 (V.A.C.C.P.). The State failed to meet its burden of proving any exceptions to the warrant requirement.

As noted above, under Texas law, a peace officer may effect a warrantless arrest for a felony offense not committed within his view, if he has reason to believe that the offender is about to escape. Art. 14.04, supra. It is necessary for the State to show that the arresting officer had reason to believe that the offender was about to escape. Pearson v. State, 657 S.W.2d 120 (Tex. Crim. App. 1983); Randall v. State, 656 S.W.2d 487 (Tex. Crim. App. 1983); Hardison v. State, 597 S.W.2d at 355).

This requirement of a reasonable belief of flight is dictated by Texas statute, and is not required by the Fourth Amendment. Milton v. State, 549 S.W.2d 190 (Tex. Crim. App. 1977).

At the time of Appellant's arrest, there was no showing or suggestion that he was preparing to flee or escape. Stanton v. State, 743 S.W.2d 233 (Tex. Crim. App. 1988); See also, Sklar v. State, 764 S.W.2d 778 (Tex. Crim. App. 1987). Indeed, Miller stated that he had no reason to believe that Appellant was about to flee the jurisdiction. (R.R. 3, p. 113).

Additionally, the record reflects that Appellant was arrested at the same time as Timothy Reese; the latter, for an

**unrelated robbery offense**, pursuant to a warrant. (R.R. 3, p. 73; R.R.25, pp. 170-171). Where police come upon a defendant under circumstances suggesting that the defendant might flee before a warrant can be obtained, police may conduct a warrantless arrest. TEX. CODE CRIM. PROC. ANN. art. 14.04 (V.A.C.C.P.); Fearance v. State, 771 S.W.2d 486 (Tex. Crim. App. 1988). However, not all police confrontations with defendants will result in the dispensing of the statutory need for officers to obtain a warrant. Dowthitt v. State, 931 S.W.2d 244 (Tex. Crim. App. 1996); Hogan v. State, 631 S.W.2d 159 (Tex. Crim. App. 1982).

In Appellant's case, the police sought to arrest Timothy Reese; Appellant was not even a suspect at the time of his encounter with the police. The decision to arrest Appellant should not have been made by Miller but by a magistrate.

Where a search and seizure of a suspect is conducted in violation of the Fourth Amendment, all fruits of the illegal activity must be suppressed. Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963). The legality of an arrest, for Fourth Amendment purposes, turns first upon whether the arrest is lawful under state law or statute. Michigan v. DeFlippo, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

In the instant case, Miller's unfounded failure to obtain a warrant before arresting Appellant requires the suppression of all evidence obtained as result of Appellant's arrest. English v. State, 647 S.W.2d 667 (Tex. Crim. App. 1983); Hardison v. State, supra. Appellant's first audiotaped custodial statement clearly

constitutes a fruit of Miller's unlawful arrest of Appellant.

A defendant's custodial statement must be suppressed where it is the fruit of an unlawful arrest. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963); Comer v. State, 754 S.W.2d 656, 658 (Tex. Crim. App. 1986); Baldwin v. State, 606 S.W.2d 872 (Tex. Crim. App. 1980).

Moreover, the fruit of the poisonous tree doctrine serves to exclude as evidence not only the direct products but also the indirect products of Fourth Amendment violations. Armstrong v. State, 550 S.W.2d at 31. In the instant case, Appellant's first audiotaped custodial statement was the direct result or fruit of his unlawful arrest.

The trial court committed reversible error in failing to grant Appellant's motion to suppress his first audiotaped custodial statement as it was obtained as a result of Appellant's unlawful and unreasonable arrest, in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 9 of the Texas Constitution. Dunaway v. New York, supra; Wong Sun v. United States, supra.

TEX. CODE CRIM. PROC. ANN. art. 38.23 (V.A.C.C.P.), the Texas exclusionary rule, requires that a trial court exclude evidence seized as result of an illegal arrest or search. Art. 38.23 in pertinent part reads:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United

> States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (V.A.C.C.P.). The federal exclusionary rule was made applicable to the states in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

For purposes of Art. 38.23, Appellant's first audiotaped statement was inadmissible as the product of his unauthorized arrest on May 24, 1998, in violation of his constitutional rights against unreasonable searches and seizures, U.S. CONST., Amends. IV and XIV; TEX. CONST. Art. I, § 9, and his parallel statutory rights, Chapter 14, arts. 14.01, 14.02, 14.03, and 14.04 (V.A.C.C.P.). This evidence was clearly a product of Appellant's unlawful arrest and should have been excluded at Appellant's trial. TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (V.A.C.C.P.).

Under Fourth Amendment analysis and state law analysis, which focuses upon the causal relationship between police misconduct and the obtaining of a confession, factors to be considered in determining whether the confession was obtained by exploitation of the illegal detention include: the giving of Miranda warnings, the temporal proximity of the arrest and the confession, the presence of any significant intervening circumstances and, the purpose and flagrancy of any police misconduct. In the instant case, the record is clear that there were no intervening circumstances of any significance between Appellant's unlawful arrest and the making of his confession (first audiotaped statement).