# United States District Court
# Southern District of Texas

## Case Number: H-05-3424

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _6_ of _6_

☐ Exhibit to: _Vol I - Exh. 5_
       number(s) / letter(s) _____

Other: _Petition For Writ of_

_Habeas Corpus_

_— Exhibits in Support of_
_Petition_

TAB 5



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. 73,685

### ANTHONY CARDELL HAYNES, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM HARRIS COUNTY

Keasler, J., *delivered the opinion of the Court which* Keller, P.J., *and* Meyers, Price, Womack, Hervey, Holcomb, *and* Cochran, J.J., *joined.* Johnson, J., *concurred in the result.*

## OPINION

Anthony Cardell Haynes was convicted in September 1999 of capital murder under Section 19.03(a) of the Texas Penal Code.[1]  Pursuant to the jury's answers to the special issues set forth in Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced Haynes to death

---

[1] Unless otherwise indicated all future references to sections refer to the Texas Penal Code and references to articles refer to the Texas Code of Criminal Procedure.

in accordance with Article 37.071, § 2(g). Review by this Court is automatic under Article 37.071, § 2(h). Haynes claims that the trial judge erred in various respects. We find his contentions to be meritless, and we affirm his conviction and sentence.

In his thirty-first point of error, Haynes says that the evidence is legally insufficient to support the jury's verdict that Sergeant Kincaid, the victim, was acting in the lawful discharge of his official duties as a peace officer at the time of his murder.[2] In conducting a legal sufficiency review, we follow the standard prescribed in *Jackson v. Virginia*.[3] We view the evidence in a light most favorable to the verdict, asking whether any rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt.[4] Whether Sergeant Kincaid was on duty was a question of fact for the jury.

The record reflects that on the night of the offense, Sergeant Kincaid and his wife were leaving home in their Jeep Cherokee. They were apparently several blocks outside the Houston city limits when they passed Haynes's vehicle and something hit and cracked the Kincaids' windshield on the driver's side. Sergeant Kincaid turned his vehicle around to investigate the incident, thinking that a rock had been thrown at his windshield. In fact, Haynes had fired a shot at the Kincaids' vehicle. Haynes turned his own vehicle around and parked next to the Kincaids' Jeep. Sergeant Kincaid got out and approached Haynes's truck.

---

[2] Sec. 19.03(a)(1).

[3] 443 U.S. 307 (1979).

[4] *Santellan v. State*, 939 S.W.2d 155, 160 (Tex. Crim. App. 1997).

Sergeant Kincaid calmly told Haynes, "You hit my window." Haynes said, "I accidently threw something at your window." Sergeant Kincaid replied, "I am a police officer. Let's talk about it." As he asked to see Haynes's driver's license, Kincaid reached toward his back pocket, presumably for his police identification. At that instant Haynes shot Kincaid. Sergeant Kincaid was declared brain-dead upon arriving at Hermann Hospital. His organs were harvested for transplantation, and he was declared dead shortly after 3:00 a.m. on May 23, 1998. The cause of death was a gunshot wound to the head.

The record establishes that Sergeant Kincaid was a Houston police officer and that he was off-duty at the time of his death. Assistant Police Chief Jeraldine Stewart testified that department policies require both on-duty and off-duty officers to take prompt and effective police action for any violation of the law committed in their presence. According to Stewart, when an off-duty officer takes such action, he is considered to be discharging his official duty. Stewart testified that Houston police officers are authorized to investigate any offense threatening the public safety outside the City of Houston. Stewart testified that she had reviewed the police report and determined that Sergeant Kincaid had been performing an official duty when he stopped Haynes.

A rational juror could have concluded from this evidence that Sergeant Kincaid was acting in the lawful discharge of an official duty when he was killed.[5] Haynes's thirty-first

_____

[5] *See Moore v. State*, 999 S.W.2d 385, 404 (Tex. Crim. App. 1999), *cert. denied*, 530
(continued....)

point of error is overruled.

In his thirty-second point of error, Haynes avers that the evidence is factually insufficient to show that Sergeant Kincaid was in the lawful discharge of his official duty when he was killed. Haynes argues that the evidence establishing that Kincaid was acting as a private motorist, stopping to exchange information with another motorist who had damaged his vehicle, outweighs the evidence establishing that Kincaid was acting as a peace officer in the line of duty.

Under a factual sufficiency review, the verdict may be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[6]   That is not the case here. Haynes's thirty-second point of error is overruled.

In his thirty-third point of error, Haynes says the evidence is legally insufficient to show that he presents a continuing threat to society.[7]   In his thirty-fourth point of error, Haynes argues that he was denied his right to due process because of this insufficiency. In addressing this question, we review all of the evidence in the light most favorable to the verdict. We will uphold it if any rational juror could have found beyond a reasonable doubt

---

[5](...continued)
U.S. 1216 (2000); *Hafdahl v. State*, 805 S.W.2d 396, 401 (Tex. Crim. App. 1990), *cert. denied*, 500 U.S. 948 (1991), *disavowed on other grounds, Madden v. State*, 799 S.W.2d 683, 686 n.3 (Tex. Crim. App. 1990); *see also Selvage v. State*, 680 S.W.2d 17, 21 (Tex. Crm. App.1984), *cert. denied*, 484 U.S. 933 (1987).

[6]  *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).

[7]  Art. 37.071, § 2(b)(1).

that Haynes will probably commit further acts of violence making him a continuing threat to society.[8]

On the night of the offense, Haynes committed a string of armed robberies before he murdered Sergeant Kincaid. Under the pretense of asking for directions, Haynes would call a victim over to his vehicle and then point a gun at him, demanding his wallet. In this manner, Haynes approached three victims immediately before killing Sergeant Kincaid. Haynes then fired his gun out of his vehicle while passing the Kincaids. Haynes admitted that he shot Sergeant Kincaid because he was a police officer and, showing no remorse, bragged to friends that he had killed a police officer. Haynes also told people that he should have killed Nancy Kincaid, so that there would have been no witness to the murder. The State also introduced evidence that, a couple of years before this offense, Haynes had assaulted his three-year-old sister, had attempted to kill the family dog, and had been diagnosed with and hospitalized for intermittent explosive disorder. While hospitalized, he had threatened to kill the staff and attacked a staff-member with a curtain rod. Finally, the State introduced evidence of incidents of violence at school and threats to kill teachers and security officers.

We have held that a history of escalating violence, a lack of remorse, and a

---

[8] *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999).

willingness to commit future crimes evince a continuing threat to society.[9]  The State's evidence established that Haynes is a violent man with an explosive temper whose only regret was not murdering Mrs. Kincaid also.  A rational jury could find that Haynes presents a continuing threat to society.  Haynes's thirty-third and thirty-fourth points of error are overruled.

In his first eight points of error, Haynes complains the trial judge erred in not suppressing his two audio-taped confessions, which he claims were gained as a result of his illegal arrest.  Haynes says that his arrest was made without a warrant or probable cause and was, therefore, unreasonable and in violation of the Fourth and Fourteenth Amendments to the federal constitution and Article I, § 9, of the state constitution.  Haynes also argues his arrest was illegal under Chapter 14 of the Code of Criminal Procedure and admitted into evidence in violation of Article 38.23.  The State responds that Haynes's arrest was legal and reasonable because he  committed two traffic violations in the presence of the arresting officer.

Although great weight should be given to the inferences drawn by the trial judge, determinations of probable cause are reviewed de novo on appeal.[10]  At the suppression hearing, Officer Miller  testified that Haynes ran "a couple of stop signs" in his presence

---

[9]    *See, e.g.,Trevino v. State,* 991 S.W.2d 849, 854 (Tex. Crim. App. 1999).

[10]   *Guzman v. State,* 955 S.W.2d 85, 87 (Tex. Crim. App. 1997)(citing *Ornelas v. United States,* 517 U.S. 690 (1996)).

immediately before his arrest. Section 544.010(a) of the Texas Transportation Code defines this as an offense, and § 543.001 authorizes peace officers to arrest, without a warrant, a person who commits such a violation in his presence. In addition, Article 14.01(b) states that a peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view. So Haynes's arrest was authorized by law. An arrest for offenses committed in the presence of an officer, even minor offenses, is constitutionally reasonable.[11] As the State notes, Miller's assertion at the hearing that he did not arrest Haynes for the traffic offense is unimportant. The subjective intent of the arresting officer does not alter the fact that his arrest was authorized by law and reasonable for purposes of the Fourth Amendment.[12] Accordingly, Haynes's first through eighth points of error are overruled.

In points of error nine through nineteen, Haynes again argues that the trial court erred in overruling his motion to suppress his two confessions. This time, he claims the confessions were produced by coercion and are involuntary and inadmissible as a matter of constitutional and statutory law.[13] Haynes contends that his statements were coerced because the police deliberately delayed in taking him to a magistrate. This delay was particularly

---

[11] *See Atwater v. Lago Vista*, ___ U.S. ___, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).

[12] *Garcia v. State*, 827 S.W.2d 937, 942-44 (Tex. Crim. App. 1992); *Whren v. United States*, 517 U.S. 806 (1996).

[13] U.S. CONST. AMENDS. V and XIV; TEX. CONST. Art. I, §§10 and 19; Arts. 38 21 and 38.23.

coercive, he argues, because he was only eighteen, he was tired and hungry, he was not given the chance to use the restroom, and he was not permitted to call his father, an arson investigator with the Houston Fire Department.

Because the issue of voluntariness of the statements turns on the evaluation of Miller s credibility, we apply a deferential abuse of discretion standard in our review of Haynes's voluntariness claim.[14]  A statement is involuntary if the record reflects that the State's conduct, when judged from the totality of the circumstances, was of such a coercive nature that the statement obtained thereby was unlikely to have been the product of free and unconstrained choice.[15] The failure to take an arrestee before a magistrate in a timely manner will not invalidate a confession unless there is proof of a causal connection between the delay and the confession.[16]  In addition, an unreasonable delay in presenting an arrestee before a magistrate will not vitiate an otherwise voluntary confession if the arrestee was properly advised of his *Miranda* rights.[17]

At the hearing on Haynes's motion, Miller's uncontroverted testimony was the only evidence before the trial court.  According to Miller, Haynes arrived at the police station at

---

[14]  *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000).

[15]  *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

[16]  *Cantu v. State*, 842 S.W.2d 667, 680 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926 (1993).

[17]  *Ibid.*

about 11:52 p.m.  Miller did not take Haynes to the magistrate because he wanted to first

ascertain his involvement, if any, in the aggravated robberies and the capital murder.  He

removed Haynes's handcuffs and placed him in an interview room.  Miller removed his

weapon and entered the interview room.  Miller advised Haynes that he was a suspect in the

robberies and the murder of Sergeant Kincaid and read Haynes his Article 38.22 warnings

(satisfying *Miranda*'s requirements).  Haynes indicated that he understood his rights but that

he did not wish to assert them.  Miller and Haynes were alone during the interview which

produced Haynes's first statement.  Haynes was seated in a cushioned armchair.  Several

times in the course of the interview, Miller offered Haynes something to eat and drink, and

the opportunity to use the restroom or the telephone.  According to Miller, Haynes declined

to use the phone, used the restroom once and requested water two or three times.  Miller

testified that Haynes was awake and alert during the entire interview.  At no time did Haynes

indicate that he wanted to speak to an attorney or to terminate the interview.

Initially, Haynes denied involvement in the offenses but changed his story when

Miller informed him that his accomplice, Timothy Reese, had implicated him in the murder,

that officers were on their way to pick up another accomplice, and that there were

eyewitnesses.  Haynes asked Miller what would happen if he gave a statement, and Miller

replied that he did not know because he did not know what Haynes was going to say.  Haynes

agreed to give an audio-taped statement.  From 12:32 a.m. to 12:52 a.m. Haynes gave his first

statement.

At 1:28 a.m. Miller took Haynes before the magistrate.  Haynes asked the magistrate when he could make a phone call.  The magistrate replied that he could do so after the proceedings were complete.  When they returned to Miller's division at 1:40 a.m., Haynes asked to use the restroom, and after he used the restroom, Miller asked him if he wanted to use the telephone.  Haynes declined, saying that it was too late to call anyone.  Miller told Haynes that he would be booked into the jail shortly and asked if there was anything else that Haynes wanted to say.  Haynes responded that he had left out some details in his first statement, so Miller offered him the opportunity to make a second statement.  Miller again read Haynes his rights before taking his statement.

The record refutes Haynes's claims that Miller's conduct was overbearing or calculated to overcome his will.  It reflects that Haynes's statement was the product of his free and unconstrained choice. The trial judge did not abuse his discretion.  Points of error nine through nineteen are overruled.

In his twentieth and twenty-first points of error, Haynes contends the trial court failed to make findings of fact and conclusions of law, as mandated by Article 38.22, §6, regarding the admission of Haynes's written statement into evidence.  After Haynes complained, we abated this appeal until the trial judge prepared and filed his findings and conclusions on the voluntariness of Haynes's confession.[18]  Since we have now received those findings and

---

[18] *Haynes v. State*, No. 73,685 (Tex. Crim. App. May 9, 2001) (unpublished).

conclusions, these points of error are moot and are overruled.

-In his twenty-second through twenty-fifth points of error, Haynes avers that the trial judge erred in denying his challenges for cause to four veniremembers. In reviewing such claims, we examine the record as a whole to determine whether it supports the trial court's ruling.[19] Great deference is shown the trial court because of its advantage as fact-finder, and its ruling is reviewed under an abuse of discretion standard.[20]

When the trial court erroneously denies a challenge for cause, the defendant is harmed only if he uses a peremptory strike to remove the venire member and thereafter suffers a detriment from the loss of the strike.[21] Because Haynes received two extra strikes, he cannot establish harm without showing that the trial court erroneously denied challenges for cause to at least three different veniremembers.[22] Haynes identified objectionable jurors whom he would have struck but for the trial court's erroneous denial of his challenges for cause.

Haynes challenged M. Williams on the grounds that she was biased against the law upon which he was entitled to rely because she understood the term "probability" in Article

---

[19] *Satterwhite v. State*, 858 S.W.2d 412, 415 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 970 (1993).

[20] *Ibid.*

[21] *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim. App. 1986), *cert. denied*, 482 U.S. 920 (1987).

[22] *Martinez v. State*, 763 S.W.2d 413, 425 (Tex. Crim. App. 1988).

37.071, § 2(b)(1), to be synonymous with "chance." Similarly, Haynes challenged J. Munoz and J. Nelson on the grounds that they understood "probability" to mean "possibility."

Without conceding that the veniremembers were in fact challengeable for cause, the State notes that before a veniremember can be dismissed for cause under Article 35.16(c)(2), the law upon which the challenge is based must be explained to him.[23] The State argues that since Haynes did not explain the legal meaning of probability as the term is used in Article 37.071 to the veniremembers, he did not establish the merit of his challenge for cause and that the trial court did not, therefore, abuse its discretion. The State is correct. The record reflects that Haynes merely asked the veniremembers whether they viewed these terms as synonymous; he did not explain the meaning of the word "probability." As a result, Haynes's questioning failed to establish that the veniremembers were indeed biased against the law. Haynes's twenty-second, twenty-third, and twenty-fourth points of error are overruled.

In point of error twenty-five, Haynes complains that the trial judge erred in denying his challenge for cause of H. Snyder. Citing *Cumbo v. State*[24] and *Trevino v. State*,[25] Haynes argues that Snyder was prejudiced against the law because he would not consider mitigating evidence. While admitting that Snyder was skeptical of mitigating evidence, the State argues that he would nevertheless consider the evidence presented and could find some very limited

---

[23] *Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995).

[24] 760 S.W.2d 251, 253 (Tex. Crim. App. 1988).

[25] 572 S.W.2d 336, 337 (Tex. Crim. App. 1978).

circumstances to be mitigating.

The record supports the State's argument. In response to defense counsel's inquiry concerning whether a family could, "for lack of a better term, screw it up so bad that the kid didn't really have a chance," Snyder responded that "[t]he individual is still responsible for his or her actions." In addition, Snyder agreed with defense counsel that he had a "bias against finding mitigation." But Snyder also stated that "[t]here are mitigating circumstances, but they may be few and far between," and that "the probability would be quite low" that he would find mitigating circumstances. These statements indicate that Snyder could find some limited circumstances to be mitigating. We conclude Snyder was not challengeable for cause[26] and the trial court did not abuse its discretion. This point of error is overruled.

In points of error twenty-six through twenty-nine, Haynes argues that the trial court erred in overruling his *Batson v. Kentucky*[27] objections to the State's peremptory challenges against four veniremembers: T. Kirkling, M. Goodman, L.V. McQueen, and B. Owens. The *Batson* analysis has three prongs: First, the opponent of the strike has to prove a prima facie case of racial discrimination. In response, the proponent must then produce a racially-neutral explanation for the strike. The challenger may then rebut or impeach this explanation. Next, the trial judge must determine if the challenger has met his burden of establishing purposeful

---

[26] *See Heiselbetz v. State*, 906 S.W.2d 500, 508-09 (Tex. Crim. App. 1995).

[27] 476 U.S. 79 (1986).

racial discrimination.[28]  The proponent of the challenge has the burden of production and persuasion.[29]

We review the trial court's finding under a clearly erroneous standard and will not disturb a trial court's ruling unless it is clear from the record that a mistake has been committed.[30] In making this determination, we review the totality of the circumstances, including the composition of the venire and jury panels, the record of the voir dire examination, and Haynes's rebuttal and impeachment of the State's explanations.[31]

The record establishes that Haynes is African-American and that, of the fifty people in the venire, seven were African-Americans and six appeared for voir dire.  The State peremptorily struck four of the six and accepted one venirewoman, whom the defense peremptorily struck; one African-American man was seated on the jury.  At trial Haynes raised a *Batson* objection, arguing that the State had used roughly thirty-three percent of its strikes to remove approximately eighty percent of the African-Americans from the jury panel. The State offered its racially neutral explanations.

The prosecutor stated that he had struck T. Kirkling because she avoided taking a firm

---

[28]  *Hernandez v. New York*, 500 U.S. 352, 356 (1991).

[29]  *Williams v. State*, 804 S.W.2d 95, 97 (Tex. Crim. App.), *cert. denied*, 501 U.S. 1239 (1991).

[30]  *Rhoades v. State*, 934 S.W.2d 113, 123 (Tex. Crim. App. 1996).

[31]  *Ibid.*

position on capital punishment.  According to the prosecutor, Kirkling had hesitated in responding to questions about the death penalty and had stated that she considered capital punishment "a last resort" and a "necessary evil."  The record supports the prosecutor's version of the voir dire.  During Kirkling's voir dire, the prosecutor specifically noted Kirkling's hesitation about the death penalty and asked if he should be concerned.  She acknowledged her reservations about sentencing someone to death, stating that, "on one hand I'm charged with a duty, and on the other hand I have my own personal opinion."  She explained her "personal opinion" as being that "sentencing someone to death is a necessary evil" but "that doesn't mean I have to like it."  The record supports the prosecutor's explanation.  The trial court's denial of Haynes's *Batson* challenge with respect to Kirkling was not clearly erroneous.

Regarding M. Goodman, the prosecutor stated that he struck her because he perceived an underlying reservation with the death penalty.  He stated that she "reluctantly agree[d] that capital punishment for police officers should be available."  The record of her voir dire supports such a perception.  Goodman indicated that she believed "killing a person, to me, would be killing a person, whether they were a police officer or just a regular citizen."  After the prosecutor explained to her several times that the law provided that killing a police officer was a capital offense while killing a "regular citizen" was not, Goodman continued to waffle on her stance as to whether she could follow the law or not.  She finally stated that she did not have "a problem" with the fact that killing a police officer is a capital offense.

The record supports the prosecutor's explanation for striking Goodman.

The prosecutor explained that he struck L.V. McQueen because his responses and demeanor indicated that he was "weak" on the death penalty and that there were some cases in which he could not impose the death penalty even if the law permitted it. The record supports this contention. McQueen stated that the 40-year minimum term before becoming parole eligible was "an extremely long time" and that anybody who takes someone else's life "should have to pay," but not necessarily with his own life. The trial court's acceptance of the State's explanation was not clearly erroneous.

Finally, as to B. Owens, the prosecutor explained that he struck her because she had a "somewhat humorous" demeanor and "never really did take on a serious attitude during the interview." The prosecutor stated that Owens "would say one thing but her body language would indicate that this is not her true feeling." Based on her demeanor, the prosecutor believed that, if guilt was established, Owens was "leaning toward a life sentence." The record does reflect that Owens was congenial and easygoing during voir dire and that her attitude was less formal than that of other veniremembers. The trial judge's acceptance of the State's explanation was not clearly erroneous. These points of error are overruled.

In point of error thirty, Haynes argues that the trial judge erred and denied him due process by presiding over the *Batson* hearing even though he had not presided over the voir dire examination. But Haynes did not preserve any alleged error. At the *Batson* hearing, Haynes's lawyer said, "Your Honor, just for the record, two things I would like to at this

point assert:  The record needs to reflect in this matter that with respect to the individuals voir dired that this Judge, namely, Judge Wallace, was not present but Judge Harper so the Court does not have the benefit of having participated in the individual voir dire."  Counsel then continued with his "second" point, rebutting one of the State's arguments regarding its strikes being race-neutral.  The record reflects that counsel never objected to the trial judge's presiding over the hearing.  He simply asked that the record reflect that this was the case.  The trial judge never responded to counsel's comment in any way.  Haynes's complaint is procedurally defaulted.

Within this point of error, Haynes also argues that deference cannot be given to the trial judge's rulings because the judge lacked the "healthy skepticism" necessary to preside fairly over a *Batson* hearing.[32]  He claims that because the trial judge did not observe the voir dire, he could not accurately assess or scrutinize the prosecutor's explanations which were largely based on the demeanor of the particular veniremembers.

Haynes is partly correct.  Because the trial judge did not witness the actual voir dire at issue, his position as fact-finder with regard to the demeanor of the veniremembers at issue is no better than that of this Court.  Thus, we owe him no deference.[33]  We do not agree, however, that a trial judge who did not witness the actual voir dire cannot, as a matter of law, fairly evaluate a *Batson* challenge.  There are many factors which a trial judge – even one

---

[32] *Citing Daniels v. State*, 768 S.W.2d 314, 317 (Tex. App. – Tyler 1988, pet. ref'd).

[33] *See, e.g., Garcia*, 15 S.W.3d at 535-36.

who did not preside over the voir dire examinations – can consider in determining whether the opponent of the peremptory strikes has met his burden. These include the nature and strength of the parties' arguments during the *Batson* hearing and the attorneys' demeanor and credibility.[34] And, when necessary, a trial judge who has not witnessed the voir dire may refer to the record.

Haynes argues that the trial judge in this case ignored the record and accepted the prosecutor's explanations at face value, thereby abdicating his constitutional obligation to fairly evaluate, and not merely rubber stamp, the State's explanations.[35] But regardless of whether the trial judge referred to the record, any concern arising from this situation is moot, because we have not given him deference and have ourselves reviewed the voir dire record. We overrule this point of error.

In his thirty-fifth point of error, Haynes argues Article 37.071, § 2(f)(2), violates the Eighth Amendment. Specifically, Haynes argues the 10-12 instruction does not allow individual jurors to give effect to their finding that certain evidence is mitigating. Haynes's arguments are indistinguishable from arguments we have repeatedly addressed and rejected.[36]

---

[34] *See Purkett v. Elem*, 514 U.S. 765 (1995) (focus is on whether opponent of strike has met burdens); *Ford v. State*, 1 S.W.3d 691, 693-94 (Tex. Crim. App. 1999).

[35] *Keeton v. State*, 749 S.W.2d 861, 865-68 (Tex. Crim. App. 1988) (opinion after abatement).

[36] *E.g., Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000).

This point of error is overruled.

In his thirty-sixth point of error, Haynes argues that the trial judge denied him a fair trial. Haynes argues that the judge betrayed a bias, violated his right to counsel, and sabotaged his appeal when he silenced his attorney's objections to the State's closing arguments by ordering counsel to sit down and then threatening to have counsel removed from the courtroom. In point of error thirty-seven, Haynes argues the trial judge erred in denying his motion for a new trial based on the same complaints.

The incident Haynes complains about occurred during the State's closing arguments at the punishment phase of trial. Mr. Smyth represented the State. Mr. Nunnery was Haynes's lead counsel.

| | |
|---|---|
| Smyth: | You know your whole life is going to be changed by this trial. You know – |
| Nunnery: | I'm going to object to that comment, too, your Honor, that their whole life is going to change. That's improper jury argument. That's him personalizing with the jury, which is outside the record and improper jury argument. |
| The Court: | It's overruled. |
| Smyth: | Thank you, Judge. Could I have additional time to continue due to argument? |
| Nunnery: | Your Honor, I'm going to object to his sidebar remarks. |
| The Court: | Have a seat. Have a seat. Have a seat. |
| Nunnery: | Your Honor, can I have a ruling on my objection. |
| The Court: | I said sit down, Mr. Nunnery. |
| Nunnery: | Your Honor, I'm required by law to ask for a ruling for [sic] objection. |
| The Court: | You have one second to sit down or I'll remove you from the courtroom. Do we understand each other? |

The closing arguments continued without any further objections from the defense. At the

close of arguments, after the jury was dismissed, Mr. Nunnery identified various instances

of alleged improper jury argument and stated:

> [I] ask the record to reflect that I would have objected to each and every one
> of those comments but for the court's admonition that if I stood again you
> would have me removed from the court.  And in that manner I believe that I
> was not permitted to render a Sixth Amendment effective assistance of counsel
> to my client with respect to the argument.

The trial court took the opportunity to explain its ruling:

> Let the record reflect that at no time was counsel ordered not to stand and
> make an objection.  The ruling of the Court at the time was for counsel to sit
> down at that time with regard to that particular confrontation or objection that
> he had and in no way did the Court ever instruct counsel that he was not able
> to effectively represent his client by making objections.   And counsel's
> interpretation of that is for counsel's purposes only.

At the hearing on the motion for new trial, Mr. Nunnery testified that in seventeen years of

practice he had never been threatened by a judge and that he felt  degraded and humiliated

by the trial judge's threats.  Mr. Nunnery testified that after the judge threatened him, he

sought to protect himself from further humiliation and expulsion from the courtroom at the

expense of his client's interests, meaning that though he should have raised further

objections, he failed to do so for fear of being removed from the courtroom.

Every defendant is guaranteed a fair trial and the atmosphere essential to this end must

be maintained by the trial judge at all costs.[37]  A judge must govern the proceedings and

himself to ensure this result.  An attorney must be free to play the critical role necessary in

---

[37] *Estes v. Texas*, 381 U.S. 532, 540 (1965).

our adversarial system.  A trial judge violates this right when he interferes with counsel's ability to make independent decisions.[38]  He must not restrict counsel's constitutional function of defending against a criminal prosecution.[39]

We must determine, under the totality of the circumstances, whether Haynes received a fair trial.[40]  This requires close scrutiny of the record with particular focus on the trial judge's conduct in view of the allegations raised.[41]

The record does not support Haynes's allegation of judicial bias.  The harsher effects of the court's ruling were inadvertent.  Haynes does not allege a pattern of intrusion with defense counsel's ability to make decisions, and we find no such pattern.  Most importantly, we find no evidence that counsel was in fact denied the opportunity to object to improper arguments.  Mr. Nunnery asserted at the hearing on his motion for new trial:

> What I am saying there weren't things there that I thought so glaring that it might make any difference on appeal. . . . I did not see any glaring mischaracterization of evidence on your part so all I am simply saying is that I may have raised some objections at that time but they may not have been the type that when I walked out of here and talked to the appellate lawyer and say look at Mr. Smyth's argument.  I didn't see any of that at all in your arguments.

And when asked directly, Mr. Nunnery claimed no objectionable argument was actually

---

[38]  *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).

[39]  *Herring v. New York*, 422 U.S. 853, 857-58 (1975).

[40]  *See Ex parte Adams*, 768 S.W.2d 281, 293 (Tex. Crim. App. 1989).

[41]  *E.g., Zima v. State*, 553 S.W.2d 378, 380 (Tex. Crim. App. 1977).

found in the record.

| | |
|---|---|
| Smyth: | Even with twenty-twenty hindsight and reading the printed argument of Mr. Smyth, there was really nothing objectionable in that particular argument? |
| Nunnery: | In my opinion, again, nothing that I would say was so glaring that t was absolutely essential. |

Counsel's failure to identify any arguments so egregious that his objection would have required reversal or at least an instruction to disregard confirms our conclusion that the State made no such arguments. We cannot hold that Haynes was denied the opportunity to raise objections when the record reveals that there in fact were no objections to be made. Haynes's thirty-sixth and thirty-seventh points of error are overruled.

The judgment of the trial court is affirmed.

DATE DELIVERED: October 10, 2001

DO NOT PUBLISH