IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT 5 2005

MICHAEL N. MILBY, CLERK OF COURT

| | |
|---|---|
| ANTHONY CARDELL HAYNES, § | |
| § | |
| Petitioner, § | |
| § | |
| -VS- § | MISCELLANEOUS NO. H-04-319 |
| § | Judge Sim Lake |
| DOUG DRETKE, Director, Texas § | |
| Department of Criminal Justice, § | |
| Correctional Institutions Division, § | |
| § | |
| Respondent. § | |

H - 05 - 3424

# PETITION FOR WRIT OF HABEAS CORPUS

## EXHIBITS IN SUPPORT OF PETITION
## VOLUME II
## EXHIBITS 6-17

A. RICHARD ELLIS
Texas Bar No. 06560400

75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
(415) 389-0251 (FAX)

Attorney for Petitioner

## VOLUME I   EXHIBITS 1-5

| EXHIBIT | DOCUMENT |
|---|---|
| 1 | Complaint (filed May 25, 1998) (CR 2) |
| 2 | Indictment (filed July 22, 1998) (CR 7) |
| 3 | Verdict and sentence of death (Sept. 17, 24, 1999) (CR 477-478) |
| 4 | Petitioner's direct appeal brief: *Haynes v. State,* No. 73,685 |
| 5 | Verdict on direct appeal:  *Haynes v. State,* No. AP-73,685 (Tex. Crim. App. Oct. 10, 2001)(slip op.)(not designated for publication) |

## VOLUME II   EXHIBITS 6-17

| EXHIBIT | DOCUMENT |
|---|---|
| 6 | Petitioner's state habeas petition:  *Ex Parte Anthony Cardell Haynes,* Cause No. 783872-A |
| 7 | Trial Court's Findings and Conclusions on state habeas: *Ex Parte Anthony Cardell Haynes,* Cause No. 783872-A (Aug. 5, 2004) |
| 8 | Order on state habeas: *Ex parte Anthony Cardell Haynes,* Np. 59,929-01 (Tex. Crim. App. Oct. 6, 2004) |
| 9 | Jury instructions at punishment phase of trial.  2 CR 451 *et. seq.* |
| 10 | Autopsy report of Deputy Chief Medical Examiner Tommy J. Brown |
| 11 | Declaration of Patrica Davis |
| 12 | Declaration of Donald W. Haynes |
| 13 | Declaration of Eric Haynes |
| 14 | Declaration of Tiffany Deckard |
| 15 | Declaration of Earl Washington, Sr. |
| 16 | Declaration of Myrtle Hinton |

| 17 | Declaration of Dr. Mark Cunningham |

**VOLUME III    EXHIBITS 18-72**

| **EXHIBIT** | **DOCUMENT** |
|---|---|
| 18 | Letter of Dr. Robert Geffner |
| 19 | Letter of Dr. Mitchell Young |
| 20 | MMPI-2 Report on Anthony Haynes, 8/17/99 |
| 21 | Letter of Dr. Susana Rosin, June 28, 2005 |
| 22 | Letter of Dr. Susana Rosin, July 13, 2005 |
| 23 | Affidavit of Dr. Seth Silverman |
| 24 | School transcripts of Anthony Haynes |
| 25 | Neuropsychological Deficit Scale report |
| 26 | Report of The Rosenstock Clinic, by Dr. Harvey A. Rosenstock, April 1, 1992 |
| 27 | Boost program academic records |
| 28 | Collected articles on the effects of methamphetamine |
| 29 | Declaration of Lawrence Hughes |
| 30 | Declaration of Kenneth Porter |
| 31 | Declaration of Lee Ester Porter |
| 32 | Declaration of Beverly Scott |
| 33 | Declaration of Debra Swisher |
| 34 | Declaration of Shelia Haynes |
| 35 | Declaration of Sgt. Allen Harris |

36          Declaration of Earl Washington, Sr.

37          Declaration of Bonita Denyse Thierry

38          Declaration of Leon Tousant

39          Declaration of Barbara Taveras

40          Declaration of Ron Royal

41          Declaration of Debra Haynes

42          Declaration of Richard Haynes

43          Declaration of Sharon McElroy

44          Declaration of Rhonda Jackson

45          Declaration of Shelia Waters

46          Declaration of Socorro Herda

47          Letter of Renee Lewis

48          Declaration of Renita Royal

49          Declaration of Yolondo Gaines

50          Declaration of Debbie Lucas Moerbe

51          Declaration of Lawrence Aaron Tate

52          Declaration of Ryan Braud

53          Declaration of Cherrie McGlory

54          Declaration of Ivory Jackson

55          Declaration of Melvin Brock

56          Declaration of Portia Rose

57          Declaration of Darryl Smith

58          Declaration of Bonita Padmore

59        **Declaration of Devlin Jackson**

60        **Declaration of Nezdra Ward**

61        **Declaration of Toya Terry**

62        **Declaration of Cleophis Lewis**

63        **Declaration of Courtney Erwin Davis**

64        **Declaration of Angela G. Malcolm**

65        **Declaration of Tiombe Davis**

66        **Declaration of Larry Britt**

67        **Motion for New Trial, 3 CR 522-538 and Affidavit of Cynthia Patterson**

68        **Vernon's Tx. Health & S. Code §§ 821.052 and 821.055**

69        **Lethal injection protocol in Texas, from TDCJ website "Death Row Facts"**

70        **Affidavits re lethal injection in the case of *Texas v. Jesus Flores*, No. 877,994A**

71        **"Critics Say Execution Drug May Hide Suffering" by Adam Liptak, New York Times, Oct. 7, 2003**

72        **Report of the AVMA Panel on Animal Euthansia (2000)**

TAB 6

# IN THE COURT OF CRIMINAL APPEALS, AUSTIN, TEXAS

## AND

## IN THE TWO-HUNDRED-SIXTY-THIRD JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

*Ex Parte* ANTHONY CARDELL HAYNES,

        Petitioner

Cause No. 783872-A (73685)

**DEATH PENALTY CASE:**
Petitioner's Execution is
Scheduled for _____

---

**PETITION FOR POST-CONVICTION RELIEF TO
VACATE JUDGEMENT AND SENTENCE, WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY
APPLICATION FOR STAY OF EXECUTION AND
EVIDENTIARY HEARING**

---

F I L E D
CHARLES BACARISSE
District Clerk

SEP 1 0 2001

Time: _____
Harris County, Texas
By _____
_____ Deputy

## PRELIMINARY STATEMENT

Pursuant to Tex. Code Crim. Proc. Ann. Art. 11.071 (Vernon 1977 & Supp.), Petitioner files this verified petition for post-conviction relief to vacate judgment and sentence, to stay his imminent execution, and to issue a writ of habeas corpus ordering his release from confinement on the grounds that he is being denied his liberty as a result of an unconstitutional judgment of conviction and sentence of death. In support thereof, Petitioner respectfully shows the Court the following facts as set forth in this petition.

I

000006

# IN THE COURT OF CRIMINAL APPEALS, AUSTIN, TEXAS

## AND

# IN THE TWO-HUNDRED-SIXTY-THIRD JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

*Ex Parte* ANTHONY CARDELL HAYNES,

      Petitioner

Cause No. 783872-A (73685)

**DEATH PENALTY CASE:**
Petitioner's Execution is
Scheduled for _____

---

**PETITION FOR POST-CONVICTION RELIEF TO
VACATE JUDGEMENT AND SENTENCE, WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY,
APPLICATION FOR STAY OF EXECUTION AND
EVIDENTIARY HEARING**

---

## PRELIMINARY STATEMENT

Pursuant to Tex. Code Crim. Proc. Ann. Art. 11.071 (Vernon 1977 & Supp.), Petitioner files this verified petition for post-conviction relief to vacate judgment and sentence, to stay his imminent execution, and to issue a writ of habeas corpus ordering his release from confinement on the grounds that he is being denied his liberty as a result of an unconstitutional judgment of conviction and sentence of death. In support thereof, Petitioner respectfully shows the Court the following facts as set forth in this petition.

I

000007

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . II

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV
          C A S E S . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IV
          S T A T U T E S . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . VI

IDENTITY OF ALL PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      PETITIONER IS ENTITLED TO RELIEF IN THAT THE MITIGATION
            SPECIAL ISSUE AT PUNISHMENT IS INFIRM AS A MATTER
            OF FEDERAL EIGHTH AMENDMENT CONSTITUTIONAL
            LAW BECAUSE IT OMITS A BURDEN OF PROOF; THE
            MITIGATION SPECIAL ISSUE AT PUNISHMENT IS INFIRM AS
            A MATTER OF FEDERAL EIGHTH AMENDMENT
            CONSTITUTIONAL LAW BECAUSE IT MAKES IMPOSSIBLE
            ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S
            DETERMINATION; AND ART. 44.251, V.A.C.C.P., REQUIRING
            APPELLATE REVIEW OF SUFFICIENCY OF ALL CAPITAL
            PUNISHMENT SPECIAL ISSUES, WHEN INTERPRETED IN
            CONJUNCTION WITH ART. 37.071, SEC. 2(e), V.A.C.C.P.,
            PLACING NO BURDEN OF PROOF IN THE MITIGATION
            SPECIAL ISSUE, IS FACIALLY UNCONSTITUTIONAL,
            VIOLATING THE EIGHTH AMENDMENT TO THE UNITED
            STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
      PETITIONER IS ENTITLED TO RELIEF IN THAT THE TRIAL COURT
            ERRED BY DENYING PETITIONER'S MOTION RELATING TO
            INFORMING THE JURY THAT THE FAILURE TO ANSWER A

000008

SPECIAL ISSUE WOULD RESULT IN A LIFE SENTENCE, IN
VIOLATION OF PETITIONER'S RIGHTS AS PROTECTED BY
THE EIGHTH AMENDMENT TO THE UNITED STATES
CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
PETITIONER IS ENTITLED TO RELIEF IN THAT HIS TRIAL
COUNSEL FAILED TO PROVIDE HIM WITH EFFECTIVE
ASSISTANCE OF COUNSEL AS GUARANTEED BY THE
UNITED STATES CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . 44

CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
PETITIONER IS ENTITLED TO RELIEF IN THAT HIS FOURTEENTH
AMENDMENT RIGHT TO DUE PROCESS WAS VIOLATED BY
THE PROSECUTOR'S REPEATED IMPROPER ARGUMENTS
TO THE JURY ON PUNISHMENT. . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

III

000009

## INDEX OF AUTHORITIES

### C A S E S

Anderson v. State, 932 S.W.2d 502 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . . . . .  27

Arnold v. State, 786 S.W.2d 295, at 298 (Tex.Cr.App. 1990) . . . . . . . . . . . . . . . . .  33

Baker v. State, ___ S.W.2d ___ (Tex.Cr.App. No.72,225, decided May 21, 1997)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Baldwin v. State, 499 S.W.2d 7 (Tex. Crim. App. 1973) . . . . . . . . . . . . . . . . . . . . .  49

Barnes v. State, 876 S.W.2d 316 (Tex.Cr.App. 1994) . . . . . . . . . . . . . . . . . . . . . . .  33

Bell v. State, 938 S.W.2d 35 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . .  27

Broussard v. State, 910 S.W.2d 952 (Tex.Cr.App. 1995) . . . . . . . . . . . . . . . . . . . .  26

Clemons v. Mississippi, 494 U.S. 738,749, 1105 S.Ct. 1441. 108 L.Ed.2d725 (1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Colella v. State, 915 S.W.2d 834 (Tex.Cr.App. 1995) . . . . . . . . . . . . . . . . . . .  26, 32

Cooks v. State, 844 S.W.2d 697 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . . . . . .  49

Eldridge v. State, 940 S.W.2d 646, 652 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . .  26, 27

Fisher v. State, 736 P.2d 1003 (Okl.Cr. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Johnson v. State, ___ S.W.2d ___ (Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . . .  47

Johnson v. State, ___ S.W.2d ___ (Tex.Cr.App. No.72,046, decided April 30, 1997)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Johnson v. Texas, 509 U.S. ___, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) . . . . . . .  29

Lowery v. State, 547 N.E.2d 1046 (Ind. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Matchett v. State, 941 S.W.2d 922 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . . .  27

IV

McFarland v. State, 928 S.W.2d 482 (Tex.Cr.App., 1996) . . . . . . . . . . . . . . . . . . 20

Moms v. State, ___ S.W.2d ___, (Tex.Cr.App. No.71,799, delivered September 11, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Nobles v. State, 843 S.W.2d 503, 510 (Tex.Cr.App. 1992) . . . . . . . . . . . . . . . . . 41

Robertson v. State, 871 S.W.2d 701 (Tex.Cr.App. 1993) . . . . . . . . . . . . . . . . . . 41

Sawyers v. State, 724 S.W.2d 24 (Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . 49

Shannon v. State, 942 S.W.2d 591 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . 27

Sheridan v. State, 852 S.W.2d 772 (Ark. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 28

Smith v. State, 919 S.W.2d 96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Soria v. State, 933 S.W.2d 46 (Tex.Cr.App. 1996) . . . . . . . . . . . . . . . . . . . . . . 27

State v. Breton, 663 A.2d 1026, 1039 (Conn. 1995) . . . . . . . . . . . . . . . . . . . . . 28

State v. Hernandez, 562 N.E.2d 219 (111. App. 2 Dist. 1990) . . . . . . . . . . . . . . . 28

State v. Richardson, 462 S.E.2d 492 (N.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . 28

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 46

Thomas v. State, 693 S.W.2d (Tex. App.–Houston [14th. Dist.] 1985) . . . . . . . . . . . . 49

United States v. Hernandez, 779 F. 2d 456, 460 (8th Cir. 1985) . . . . . . . . . . . . . . . . 49

Walton v. Arizona, 497 U.S. 639, 650, 111 L.Ed.2d 511 (1990) . . . . . . . . . . . 29, 32

Young v. State, 991 S.W.2d 835 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . 47

v

# S T A T U T E S

Tex. Code Crim. Proc. Ann. Art. 11.071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tex. Code Crim. Proc., Article 44.251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Tex.R.App.P. 81(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Texas Penal Code § 19.03(a)(6)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.A.C.C.P. Art. 37.071, Sec. 2(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.A.C.C.P. Art. 44.251(s) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

000012

# IDENTITY OF ALL PARTIES

*PETITIONER*:          ANTHONY CARDELL HAYNES

*RESPONDENT*:          THE STATE OF TEXAS

1

000013

## STATEMENT OF THE CASE

1.      This is a petition for writ of habeas corpus from a conviction for the offense of capital murder pursuant to § 19.03(a)(2) of the Texas Penal Code.  1 CR 2, 7.[1] Following affirmative findings to the special issues submitted during the punishment phase of Petitioner's trial, the trial court sentenced Petitioner to death by lethal injection. 1 CR 477; 31-32 R.

2.      In a complaint filed May 25, 1998, Petitioner was charged with capital murder by shooting a peace officer, alleged to have been committed on May 22, 1998.  1 CR 2. Petitioner was arrested and held without bond. *Id.* The grand jury indicted Petitioner on July 22, 1998.  1 CR 7.

3.      Upon his plea of not guilty, Petitioner was tried and convicted of capital murder on September 17, 1999.  At the penalty stage of the trial the jury found a probability that the Petitioner would commit future acts of criminal violence which would make him a continuing threat to society; that Petitioner himself actually caused the death of Kent Kincaid, or if he did not actually cause his death, he intended to kill him or another, or he anticipated that a human life would be taken.  In the final punishment issue the jurors found there were no mitigating factors which would justify a sentence of life imprisonment rather than one of death.  These answers mandated a sentence of death.  2

---

[1]Citations to the record on appeal are: (volume) CR (page number) = Clerk's Record (formerly Transcript) and (volume number) R (page number) = Reporter's Record (formerly Statement of Facts).  The complete record consists of 4 volume of clerk's record and 42 volumes of the court reporter's record.

2

000014

CR 443, 450; 3 CR 582; 32 R.  Sentence was imposed on September 24, 1999.  Notice of appeal was filed on September 29, 1999.  2 CR 480; 3 CR 582.  Motion for New Trial was denied after a hearing on November 12, 1999.  3 CR 584; 34 R.

4.     Counsel was appointed on appeal and Petitioner's Brief is timely filed by placing in the United States Mail on February 15, 2001.

3

000015

## STATEMENT OF FACTS

### STATEMENT OF FACTS ON GUILT/INNOCENCE
**[THE FOLLOWING RECITATION IS BASED ON TRIAL TESTIMONY VIEWED IN THE LIGHT MOST FAVORABLE TO THE VERDICT AND DOES NOT REPRESENT AN ADMISSION BY PETITIONER]**

5.      The Petitioner was charged with the murder of HPD Officer Kent Kincaid, a peace officer performing an official duty on May 22, 1998. (I CR 7). Petitioner entered a plea of not guilty; and on September 13, 1999, Petitioner's jury trial began. (23 R 4-5).

6.      <u>Mr. Robert T. Stump</u> testified that on May 22, 1998, at approximately 10:30 p.m., upon his wife's request, he went outside his house, walked down the driveway, and looked towards the end of the street. He observed a body lying in the street next to a vehicle with the driver's door open. (23 R 13, 15-16, 18).

7.      Stump approached the body, and checked for the presence of a pulse. He noted a massive swelling on the left side of the man's face. (23 R 18). He spoke to the man, rubbed his chest, and alerted a neighbor of the presence of a pulse. (23 R18-19). He looked into the vehicle, noted that the windshield was cracked on the driver's side and noted that no one else was inside. (23 R 19-21). He did not see any vehicles leaving the scene.

8.      Stump described the clothing worn by the wounded man as "brown cowboy boots and blue jeans and a pullover, greenish blue shirt." The victim's vehicle was not marked as a police vehicle nor did it appear to contain any weapons or law enforcement-

4

related equipment or markings. (23 R 21-23, 25-26). He later learned the identity of the wounded man (the victim or the complainant) as Houston Police Department officer, Sergeant Kent Kincaid. (23 R 21-23).

9.  <u>Deputy Jeff Patrick</u>, an employee of Harris County, Precinct 5 Constable's Office, testified that on May 22, 1998, at approximately 11:09 p.m., he was dispatched to 7605 Plumtree Forrest Circle. (23 R 29, 30). He arrived approximately two minutes later at 11:12 p.m. and observed a black Jeep in the middle of the roadway, a male (the complainant) lying on the ground and a female, the complainant's wife, squatting next to him. (23 R 31).

10.  Within seconds, an emergency rescue unit arrived. After the scene had been secured, he began searching throughout the area of the scene for a dark pickup truck "with some type of silver on the tailgate," and a younger dark skinned male. (23 R 36, 42).

11.  <u>Jeraldine Stewart</u>, an assistant police chief, Houston Police Department, testified that her responsibilities as an assistant police chief included supervising seven patrol stations, approximately 1700 men and women who provided police service. (23 R 59). She noted that the Westside police division was one of the seven patrol divisions or stations for which she assumed supervisory responsibilities. (23 R 59).

12.  She explained the rules governing the conduct of police officers while on and off duty, respectively. (23 R 60). As stated: "[officers of the Houston Police Department] are required to respond and take prompt and effective police action for any

5

violations of the law that are committed in their presence .... whether on duty or off

duty." (23 R 60-61, 72, 81). She offered her interpretation of the department's manual,

which was that police officers were expected to investigate and take action for

emergencies or violations of the law even if they were in unmarked personal vehicles.

(23 R 61).

13.    She noted that the complainant was employed by the Houston Police

Department on May 22, 1998, assigned to the Westside station, third shift or the night

shift. On May 22, 1998, the complainant held the rank of sergeant. (23 R 62). Upon

cross-examination, Stewart referred to and read from general orders and rules (500-01)

governing general police conduct on May 22, 1998. As stated:

> There are two restrictions.   It says that 'the off duty police
> officers will not arrest traffic violators on sight unless the
> violation poses an immediate threat of bodily injury.' Then
> there is a second section.  It says 'if the off duty officers or
> members are involved in a dispute that the [sic] requires police
> action, off duty officers will not arrest any of the persons
> involved unless there is an immediate threat of serious bodily
> injury or death.  A police unit will be called to the scene.

(25 R 100-103) (emphasis added).

14.    Jerry C. Chandler, employed by the City of Houston, Human Resources

Department, testified that his job responsibilities included the oversight of the city's

worker compensation program, the unemployment compensation program, and the salary

continuation programs. (23 R 93). He noted that a line of duty claim had been filed and

paid on behalf of the complainant for purposes of compensation benefits to his family.

6

(23 R 94-96, 99-100).

15.    Nancy Kincaid, wife of the complainant, testified that complainant became a Houston Police Department officer in 1984. (23 R 104).  During the evening of May 22, 1998, at approximately 10:30-10:45 p.m., she and the complainant drove her vehicle, a Jeep Cherokee, to a local sports bar to meet some friends.  (23 R 106-108).  Her husband was not working that evening and was not officially on duty.

16.    As they drove away from their home, an object tossed from a passing truck hit the windshield of complainant's car on the driver's side.  (23 R 109-111).  Upon impact, she heard a popping sound and noted that the windshield of their vehicle had been cracked.  (23 R 111).  The complainant turned the vehicle around and proceeded to pursue the truck that had just passed them.  (23 R 111-112).  She described the truck as dark with an open bed.  (23 R 112).

17.    Mrs. Kincaid noted that she and the complainant pursued the truck for approximately five blocks.  The truck then turned into a street, Plumtree Forest, and pulled into the first driveway.  (23 R. 113).  Immediately thereafter, the truck pulled out of the driveway in reverse and stopped next to complainant's vehicle.  (23 R. 113-114).

18.    She testified that complainant stopped his vehicle, stepped out, and began to question the driver of the truck who remained seated in his truck.  (23 R 115-116).  She had an opportunity to look into the other vehicle and observed the driver.  (She noted that she believed that a second person sat in the passenger area but was not certain. She did not believe that there was anyone in the bed of the truck.).  (23 R 112, 123-124).  She

7

000019

described the driver as a fair skinned male, about 15-20 years old. (23 R 117, 121).

19.  The complainant, dressed in street clothes, then asked the driver of the truck "why he threw the rock at our windshield." (23 R 117).  She could not hear the driver's response. (23 R 118).  The complainant repeated his question to the driver.  She then heard complainant identify himself to the occupant/occupants of the truck as a police officer although he did not produce any identification, and requested to see "their driver's license." (23 R 118, 146).  She testified that as the complainant reached toward his back pocket [presumably] for his wallet and identification as a police officer, the driver of the truck shot him.  As stated:

> Q.  At the moment your husband said he was a police officer and then was reaching for his identification to show the person, what did they [sic] do?
>
> A.  He, the driver, pulled his hand up and I saw the flash and heard the pop, with his hand up.
>
> Q.  And what happened to your husband then?
>
> A.  He fell.  He went down.

(23 R 119).

20.  She testified that immediately thereafter, the truck sped away.  (23 R 119).  She jumped out of the Jeep, saw that her husband was not moving, and cried out for help.  (23 R 120).  The complainant was transported by emergency units to Hermann Hospital where he was later declared dead at approximately 3:00 am.  (23 R 121-122).

21.  She identified State's Exhibit No. 11 (S.X. 11), as a composite sketch of the

8

000020

driver of the truck, prepared by an artist of the Houston Police Department on May 23, 1998, based upon the information provided by her (23 R 128-130; 40 R 16).  She also asserted that State's Exhibit No. 11 was the same person depicted in State's Exhibit No. 12 (S.X. 12), a photograph of the Petitioner, and the same person seated at counsel table. (23 R 132).

22.    Kenneth Culver, employed as a deputy in the Harris County Sheriff's Department, testified that on May 22-23, 1998, he was assigned to crime scene investigations.  (24 R 4).  Culver stated that during the early hours of May 23, 1998, he was dispatched to the 7600 block of Plumtree Forest Circle.  (24 R 4-5).  Culver arrived at approximately 12:25 a.m.  (24 R 5).

23.    He noted that an area in front of the homes at 7602 and 7605 Plumtree Forest Circle had been roped off with crime scene tape and there were numerous emergency patrol vehicles with emergency lights on.  (24 R 5).  Inside the perimeter, he observed a navy blue Jeep Cherokee, the driver's door was wide open and the passenger door was partially open.  (24 R 4-5).  The Jeep was positioned diagonally in the street, facing north.  (24 R 6).  He also observed a large amount of blood in the middle of the street extending east behind the Jeep.  (24 R 6).

24.    Inside the Jeep, he noted a .25 Remington Peters spent fired shell casing on the driver's side floorboard.  (24 R 6, 10).  In addition, he observed another .25 Remington Peters fired shell casing approximately four-tenths of a mile down the street near the curb, as well as a can of imported meat.  (24 R 7-8, 11).  The can of meat was

9

000021

approximately the same diameter as the fracture of the Jeep's windshield. (24 R 11).

25.   Charles E. Jackson, a police sergeant, employed by the Houston Police Department, testified that he was on duty on May 22 and 23, 1998. (24 R 57-58). On May 24, 1998, during roll call, he studied a composite picture of a suspect in this case. (24 R 60-61). He believed that the suspect depicted in the composite sketch was a person named Timothy Reese. (24 R 61). He recalled three separate interactions with Reese prior to the date of the underlying offense. (24 R 67). He noted that during these incidents, Reese was a passenger in a pick-up truck. (24 R 67-68). He noted that State's Exhibit 11 resembled both the Petitioner and Reese, respectively. (24 R 91).

26.   Dr. Tommy J. Brown, deputy chief medical examiner of the Harris County Medical Examiner's Office on May 24, 1998, testified that he conducted the autopsy of the complainant in the instant case. (24 R 102-103). During the course of the autopsy, he recovered a bullet from the posterior parietal area on the right side of complainant's head; it was a small caliber, fully jacketed bullet, identified as State's Exhibit 38 A. (24 R 111-112). He concluded that the complainant had died from a single gunshot wound to the head. (24 R 116).

27.   Sgt. C. E. Elliott, assigned to the homicide division of the Houston Police Department on May 22 and 23, 1998, testified that he investigated the death of the complainant in the instant case. (24 R 127-128). He and other investigators canvassed the streets and neighborhood surrounding the scene of the offense for leads and evidence in this case. (24 R 134-135).

000022

28.    Based upon his investigation, he identified a vehicle that might have been involved in the offense as well as description of suspects. (24 R 135). On May 24, 1998, he was contacted by Sgt. C.D. Jackson. (24 R 135). Thereafter, a photospread was prepared of possible suspects in this case, including an individual named Timothy Reese. (24 R 137-138). (At this time, police suspected that three individuals were involved in the underlying offense.) (24 R 139).

29.    On May 24, 1998, at 7:45 pm., he obtained a warrant for the arrest of Timothy Reese. (24 R 138). A surveillance team was set up at Reese's house that evening. (24 R 139). At approximately 10:50 pm., a dark brown van arrived at Reese's home, and Reese was observed exiting the van and entering the home. (24 R 140).

30.    Shortly thereafter, as police planned to serve the warrant, Elliott observed another vehicle, a dark blue Chevy S-10 pickup truck with a large chrome bumper and a "chrome-type strip" across the tailgate, pulling up to Reese's home. (24 R 141-142). He noted that this vehicle matched the description of the vehicle sought by the police in this case. (24 R 142).

31.    Elliott observed a black male exit the van and approach the front door of the house. Immediately thereafter, Reese appeared and both drove away in the truck. (24 R 142-143, 172-173). Soon after, police units stopped the truck driven by Petitioner and arrested the occupants including Reese, the Petitioner and a juvenile. (24 R 144-145). They were transported in separate vehicles to the Harris County Sheriff's Department, homicide division, at 601 Lockwood. (24 R 145-146).

11

000023

32.     Todd William Miller, a homicide investigator with the Houston Police Department (HPD), testified that he participated in the investigation of the underlying offense. (25 R 165-167).  He assisted other officers in locating Reese and in setting up surveillance of the area surrounding his home. (25 R 171).  He participated in the interception and apprehension of Reese and the occupants of the van on May 24, 1998 at approximately 11:00 p.m. (25 R 178, 185).

33.     Upon Petitioner's arrival at 601 Lockwood at approximately midnight, Miller began to interrogate the Petitioner. (25 R 184).  He testified that he gave Petitioner the proper Miranda warnings and informed him that he was a suspect in the death of Kincaid. (25 R 189-190).  He stated that Petitioner denied any involvement in this offense. (25 R 190).  He noted that the Petitioner became very nervous when he subsequently informed him that Reese had implicated him in the underlying offense. (25 R 191-192).

34.     When Miller informed the Petitioner that officers were en route to arrest the juvenile in this case, Petitioner responded: "all right, I'll tell you what happened." (25 R 194).  He identified State's Exhibit No. 52A (S.X. 52A) as a tape recording of Petitioner's custodial statement. (25 R 200).

35.     He noted that after Petitioner had given his tape recorded statement, he was taken before a magistrate whereupon he received further Miranda warnings. (26 R 23).  Thereafter, the Petitioner was returned to 601 Lockwood where he provided a second custodial tape recorded statement. (26 R 27).  He identified State's Exhibit No. 54A (S.X.

12

S4A) as Petitioner's second custodial statement. (26 R 27).

36.    He informed the jury that upon completing his second tape recorded statement, he transported Petitioner to 17904 West Little York, where Petitioner showed the officer the location of a .25 caliber ammunition clip he had previously discarded and hidden by throwing it into a storm drain. (26 R 30-31). Then, the Petitioner was transported to 1200 Guadalupe, Missouri City, Texas. (26 R 32). He stated that Petitioner informed the officers that he had also previously discarded a firearm in the field at this location. (26 R 34). The field appeared to be full of tall weeds. (26 R 34). He was not present when the firearm was recovered. (26 R 34).

37.    Robert Baldwin, a firearms examiner, employed by the Houston Police Department, testified that he conducted an examination of the bullet recovered from complainant's body. (26 R 102). Upon comparing the markings on the bullet retrieved from the head of the complainant with the handgun recovered by officers in a search of a field in Missouri City, he concluded that the single bullet recovered from complainant's body had been fired from the handgun recovered in the field. (26 R 110-112).

38.    Timothy Wayne Reese, 18 year old at trial, testified in this case. (25 R 13). He stated that he had known Petitioner for several years and that on May 22, 1998, he; the Petitioner; and another friend; Mike Tunson, drove to Petitioner's home in the Petitioner's truck, a "dark blue 5-10." (25 R 20). They remained in the Petitioner's home during most of the evening, played basketball and listened to music. (25 R 20-21). Later, they left Petitioner's home, ate at "Jack N Box," [sic], and drove to Willowbrook Mall "as

13

it was getting close to closing time." (25 R 21-22).

39.     He stated that he asked Petitioner to take him home, however, Petitioner continued to "ride around" and parked for a short while in an apartment complex. As Petitioner and Tunson left the truck, Reese began to walk away. Shortly thereafter, Petitioner and Tunson pulled up behind Reese and Reese returned to the open bed of the truck. (25 R 25-26). With Petitioner as the driver and Tunson as a passenger, the truck continued and made approximately three stops. (25 R 28-29).

40.     He alleged that as he was riding in the bed of Petitioner's truck, he heard a bang. (25 R 29). Reese peeked out from the bed of the truck and observed a dark colored Bronco or Cherokee-type truck. (25 R 32). At first, the truck seemed to be headed away from the truck in which Reese was riding. It then turned around and began to follow Petitioner's truck. (25 R 32-33).

41.     Reese noted that when Petitioner's truck stopped, he peeped out and observed the driver of the Cherokee standing outside his vehicle. He then overheard the driver of the Cherokee say: "You hit my window," whereupon Petitioner replied: "I accidentally threw something at your window." (25 R 36, 37).

42.     In response, Reese testified that the driver of the Cherokee said: "I am a police officer, let's talk about it." (25 R37). He then heard a gunshot and observed the driver of the Cherokee "drop down to the ground very fast." (25 R 39).

43.     The Petitioner did not testify during the guilt or innocence phase of trial nor during the punishment phase. The jury was authorized to convict Petitioner for the

14

**000026**

offense of capital murder, or murder. (I CR 443). The jury found Petitioner guilty of the offense of capital murder, as charged in the indictment. (II CR 449). During the punishment phase of trial, the jury was instructed regarding the existence of parole and the application of the law of parole as it related to a sentence of life for the offense of capital murder. (II CR 450-457). Having found Petitioner guilty of the offense of capital murder, the jury answered the statutory special issues "Yes" and "No," resulting in the court's mandatory imposition of Petitioner's penalty of death. (II CR 449, 458-459; 27 R 63; 32 R 3).

44.   Additional facts are stated under each point of error, below.

### STATEMENT OF FACTS ON PUNISHMENT

45.   Officer Todd Miller testified that Petitioner had implicated himself in three robberies when he gave a taped statement regarding his involvement in the shooting of Mr. Kincaid (The audio tapes of Petitioner's statement played before the jury during guilt-innocence had been edited to exclude the references to the extraneous robberies). 28 R 4-9.

46.   Chris Dicken testified that he had been robbed at gunpoint by Petitioner and some other boys on May 22, 1998, 28 R 14-26.

47.   Alexandro Aglesis testified that some young men in a dark truck attempted to rob him of his money at gunpoint on May 22, 1998. 28 R 30-40. Although he could not identify any of the robbers, he said the truck was very similar to Petitioner's. 28 R

15

000027

40.

48.     Larry Davis testified that Petitioner had been a student in an ROTC class that he taught, and that Petitioner once became unruly because he was dissatisfied with the results of an exam. 28 R 44-54. He also stated that Petitioner once told him he had pointed a gun to his father's head while they were arguing. 28 R 57.

49.     A school-district police officer told the jury that Petitioner once became loud and abusive when the officers attempted to search Petitioner's backpack. 28 R 76-89. Eventually the officers were able to search the bag, but they found no contraband. 28 R 97. A second officer gave testimony which reiterated the first officer's testimony.

50.     A custodian of records for a psychiatric treatment facility testified from the medical records that Petitioner was treated in that facility for intermittent explosive disorder, that he had attempted to attack a staff member with a curtain rod, that he had–prior to admission– tried to kill the family dog, and that he had been assaultive toward his three-year-old sister. 28 R 143-148. A record custodian from a second psychiatric treatment center gave similar testimony. 28 R 149-154.

51.     An employee out of the governor's office testified about security and the opportunity to commit crimes in prison. 29 R 4-13.

52.     The defense called a marine who had been a mentor to Petitioner in a military program in Newport, Rhode Island. 28 R 155-160. He told the jury that on May 23, 1998, the day after the Kincaid shooting, Petitioner called him long-distance and told him that he had killed a man; he also related that Petitioner was choked-up and

16

remorseful.  28 R 165-168.

53.    A staff chaplain with the county jail where Petitioner was housed prior to conviction testified that he saw Petitioner frequently in the jail and Petitioner was well-behaved while incarcerated.  29 R 25-31.

54.    A man who worked with Petitioner's father told the jury that he had known Petitioner for years, and that he knew him to be of good character, a person who volunteered for community and church activities.  29 R 36-40.

55.    A director of a community center testified that Petitioner had participated in one of the center's summer programs, and had been a good participant.  29 R 47-50.

56.    Petitioner's paternal grandmother testified that Petitioner had always been a good student and a giving, respectful, young man.  29 R 50-59.  Petitioner's maternal grandmother testified that he had been a good student and went to church with her.  She identified numerous certificates which Petitioner had been awarded in school and various programs.  29 R 63-74.

57.    Petitioner's father testified that Petitioner had been shuffled between his mother, his grandmother, and his father.  29 R 77-81.  He related that Petitioner had been a good student, and that he had been diagnosed with attention deficit disorder and placed on the drug ritalin.  29 R 83-84.  On cross-examination, Mr. Haynes indicated that his son, Petitioner, received counseling and medical treatment for anger management, and that on one occasion after he had disciplined his son, his son had a gun in his hand and told his father that something bad was happening and he was having bad thoughts.  29 R

17

87-95.

58.    The wife of the deceased then testified for the state, indicating that her two daughters were upset and struggling with the loss of their father, as she, herself, was struggling with her loss.  29 R 126-129.

18

000030

## JURISDICTION AND VENUE

59.    Jurisdiction and venue of this proceeding are conferred upon the Court by

Tex. Code Crim. Proc. Ann. Art. 11.071.

000031

## CLAIMS FOR RELIEF

## CLAIM I

**PETITIONER IS ENTITLED TO RELIEF IN THAT THE MITIGATION SPECIAL ISSUE AT PUNISHMENT IS INFIRM AS A MATTER OF FEDERAL EIGHTH AMENDMENT CONSTITUTIONAL LAW BECAUSE IT OMITS A BURDEN OF PROOF; THE MITIGATION SPECIAL ISSUE AT PUNISHMENT IS INFIRM AS A MATTER OF FEDERAL EIGHTH AMENDMENT CONSTITUTIONAL LAW BECAUSE IT MAKES IMPOSSIBLE ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S DETERMINATION; AND ART. 44.251, V.A.C.C.P., REQUIRING APPELLATE REVIEW OF SUFFICIENCY OF ALL CAPITAL PUNISHMENT SPECIAL ISSUES, WHEN INTERPRETED IN CONJUNCTION WITH ART. 37.071, SEC. 2(e), V.A.C.C.P., PLACING NO BURDEN OF PROOF IN THE MITIGATION SPECIAL ISSUE, IS FACIALLY UNCONSTITUTIONAL, VIOLATING THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

59.    Petitioner submitted written pretrial motions alleging that on its face, the mitigation special issue in Art. 37.071, Sec. 2(e), V.A.C.C.P., is infirm as a matter of federal Eighth Amendment law because it omits any burden of proof placing no burden upon the State to prove aggravating factors, remaining silent as to any standard of proof on either party (1CR. 150) and providing no opportunity for a meaningful appellate review of the mitigation verdict.  The trial court denied all three propositions. 1 CR.153.

60.    Because this Court has discussed the lack of burden of proof on mitigation in conjunction with the lack of appellate review of mitigation, for example, in *McFarland v. State*, 928 S.W.2d 482 (Tex.Cr.App., 1996), and has declined to analyze the matter any further since *McFarland, e.g., Baker v. State*, ___ S.W.2d ___ (Tex.Cr.App. No.72,225, decided May 21, 1997), Petitioner argues these points together for the sake of clarity.

20

000032

Petitioner submits that *McFarland* did not sufficiently address or resolve these important questions.

A.   <u>Summary of Argument</u>.

61.   Petitioner asks the Court to renew its analysis of whether it has a constitutional duty to review for "sufficiency" the jury's negative answer to the mitigation special issue. What has become apparent is that the Texas death penalty scheme is <u>functioning</u> like the schemes in "weighing" states, even though on its face it is framed in "non-weighing" terms. This Court's review should correspond to the reality of the situation.

62.   It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from <u>any</u> possibility of review for sufficiency.

63.   There are certainly other states which provide the meaningful appellate review the Supreme Court required in *Clemons v. Mississippi*, infra, by considering whether the mitigating evidence was outweighed by aggravating evidence. In Texas,

21

000033

however, the result of the code's failure to assign a burden or proof and a standard of proof regarding mitigation even after this Court has assigned a burden of production, with no possibility of review for the defense, is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised by "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

64.    Why should the reviewing court simply defer to the jury's conclusion "that the evidence was not sufficient to warrant a life sentence" without at the same time asking whether it is fair for such a state of affairs to exist? The "our hands are tied" statement in the majority and dissenting opinions in *Colella v. State*, infra, should be the beginning of a search for Eighth Amendment fairness -- not the end of the matter.

65.    The *Colella* dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

66.    The capital jury's mitigation verdict is normative only to the extent that it is

22

informed by subjective analysis of the evidence. Every time this Court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not select some other punishment it finds appropriate, it substitutes the proper answer to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

67.   After all, the Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency to prove the continuing threat issue. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states. This Court could do the same by its opinions, as it has on the future dangerousness issue, or it could hold that the present statute as framed does not permit a fair review and is therefore unconstitutional, leaving the Legislature to formulate a structure that will permit review.

68.   As for the statutory requirement of review of sufficiency to support a negative mitigation verdict, under Art. 44.251(s), V.A.C.C.P., Petitioner argues that the Legislature having been once burned (by *Penry)* was twice shy, and realistically anticipated that some reviewing court (this Court or the Supreme Court) might one day decide that the Constitution required some kind of sufficiency review of the mitigation special issue.

69.   That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-

23

statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not involve consideration of aggravating factors," the mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

B.    Argument and Authorities.

Omission of Burden of Proof.

70.    After the trial court overruled the above objections to the constitutionality of the mitigation special issue, the jury received the statutory instruction found in Art. 37.071, Sec. 2(e), V.A.C.C.P., telling them they were to proceed to answer the following question:

Special Issue No 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, AnthonyCardell Haynes, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?[2] 3 CR. 459.

71.    The court gave the following abstract instructions concerning mitigation:

In determining your answers to the questions, or special issues, submitted to you, you shall consider all the evidence submitted to you in this

_____

[2]This jury in another portion of the instruction was given the definition that limited mitigating evidence on Special Issue No.2 to "evidence that a juror might regard as reducing the defendant's moral blameworthiness . . . " (CR. 438).

24

000036

whole trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the defendant, and this punishment phase of the trial wherein you are now called upon to determine the answers to special issues submitted to you by the Court. 3 CR. 450.

* * *

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there is a mitigating circumstance or circumstances in this case, you must decide how much weight it/they deserve, if any, and thereafter, give effect and consideration to it/them in assessing the defendant's personal culpability at the time you answer the special issue.

You are instructed that mitigating evidence, if any, may be considered by you in answering either or both of the special issues under consideration. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response, let you answers to the special issues reflect that. 3 CR., 451.

The State must prove Special Issue No. 1 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "YES" or "NO" on Special Issue No. 1.

In deliberating on Special Issue No. I you shall consider all the evidence admitted at the guilt or innocence stage and the punishment stage of trial, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. 3 CR. 453.

In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that mitigates against the imposition of the death penalty. 3 CR. 453.

25

72.    As to this mitigating issue, the code is silent as to which party has the burden of production or persuasion. This Court has now held that the defendant, as the only supposed "beneficiary" of the mitigation special issue, bears the burden of production on that issue, and has specifically declined to review the jury's subjective "normative" weighing of mitigation evidence. *McFarland v. State*, supra, 928 S.W.2d at 499.

73.    Acknowledging the Court's *McFarland* opinion, Petitioner respectfully disagrees with its result on this issue, presenting the following arguments which he believes were not advanced in *McFarland* and not addressed by the Court in that case or in any later case. E.g., *Baker v. State*, supra; *Johnson v. State*, ___ S.W.2d ___ (Tex.Cr.App. No.72,046, decided April 30, 1997), rehearing granted; *Eldridge v. State*, 940 S.W.2d 646, 652 (Tex.Cr.App. 1996), rehearing denied, 1997.

74.    This Court has wavered as to whether or not it has a constitutional duty to review for sufficiency the jury's negative answer to the mitigation special issue submitted under Sec. 2(e). Judge Baird has issued a dissenting opinion in which he states, "I joined the majority in *Lawton*, supra and *Broussard v. State*, 910 S.W.2d 952 (Tex.Cr.App. 1995). However, for the reasons stated infra, I now believe my doing so was erroneous." Judge Overstreet, who had joined Judge Clinton in finding review of the mitigation verdict impossible in *Colella v. State*, 915 S.W.2d 834 (Tex.Cr.App. 1995), joined Judge Baird in his opinion, some two years later, that such review was possible and was constitutionally mandated. *Moms v. State*, ___ S.W.2d ___, (Tex.Cr.App. No.71,799,

26

delivered September 11, 1996) (Baird, J., joined by Overstreet, J., dissenting).

75.     That the dissenting opinion has failed to gain any additional converts is apparent from subsequent opinions.[3]   However, what is also apparent is that mitigation counts for nothing in the sufficiency review that is provided under the Texas scheme.  In *Soria v. State*, 933 S.W.2d 46 (Tex.Cr.App. 1996), the majority granted the State's motion for rehearing and reversed its original opinion, in which it had reformed the death sentence to life based upon the insufficiency of evidence to prove future dangerousness. In its changed view, the majority adjusted its original assessment of the evidence and found the same evidence sufficient, once all mitigation evidence was disregarded.[4]

76.     Thus, it is clear that in Texas the reviewing court will not balance or weigh mitigating evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

77.     It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered

---

[3]*Shannon v. State*, 942 S.W.2d 591 (Tex.Cr.App. 1996)
  *Matchett v. State*, 941 S.W.2d 922 (Tex.Cr.App. 1996), cert. denied 117 S.Ct. 2487
  *Bell v. State*, 938 S.W.2d 35 (Tex.Cr.App. 1996)
  *Eldridge v. State*, 940 S.W.2d 646 (Tex.Cr.App. 1996)
  *Anderson v. State*, 932 S.W.2d 502 (Tex.Cr.App. 1996), cert. denied, 117 S.Ct. 2517

[4]The defense psychiatrist, who had personally examined the defendant, testified that he did not present a continuing threat.  "However," the majority noted, "because we view the evidence in a light most favorable to the verdict, we do not factor that opinion into our analysis or weigh his testimony against the testimony of (the State psychiatrist)."  Id. at 47, n.2.

000039