# United States District Court
# Southern District of Texas

## Case Number: H-05-3424

## ATTACHMENT

Description:

☐ State Court Record        ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _4_ of _____

☐ Exhibit to: _____Vol II - Exhs. 10,11, 12,13,14,15,___
number(s) / letter(s) _____16

Other: _____Petition For Writ of_____

_____Habeas Corpus_____

_____— Exhibits in Support of_____
Petition

TAB 10

**Joye M. Carter, M.D., FCAP**
Chief Medical Examiner

(713) 796-9292
(713) 796-6815
FAX: (713) 796-6842

## OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY
### JOSEPH A. JACHIMCZYK FORENSIC CENTER
#### 1885 OLD SPANISH TRAIL
#### HOUSTON, TEXAS 77054-2098

AUTOPSY REPORT

Case 98 - 1423

May 24, 1998

ON THE BODY OF

Kent Dean Kincaid
7606 Sandy Gate Lane
Houston, Texas

CAUSE OF DEATH:   Gunshot wound of head.

MANNER OF DEATH:   Homicide.

5/28/98
Date

Tommy J. Brown, D.O.
Deputy Chief Medical Examiner

## POSTMORTEM EXAMINATION ON THE BODY OF

Kent Dean Kincaid
7606 Sandy Gate Lane
Houston, Texas

**HISTORY:** This 40 year old, Caucasian male was transported to Hermann Hospital, Houston, Texas, via Life Flight, arriving at 11:54 p.m. on May 22, 1998. He was pronounced dead at 2:34 a.m. on May 23, 1998.

**AUTOPSY:** The autopsy was performed in the Joseph A. Jachimczyk Forensic Center of Harris County by Deputy Chief Medical Examiner Tommy J. Brown, D.O., pursuant to Article 49.25, Texas Code of Criminal Procedure, beginning at 8:00 a.m., on May 24, 1998.

**EVIDENCE OF MEDICAL INTERVENTION:** There was a wrap-around bandage at the top of the head. Upon removal of the bandage, there was gauze over the back of the head. Gauze sponges were over the eyes, bilaterally. Gauze sponges were present within the nostrils, bilaterally. An orogastric tube, an endotracheal tube, and an oral airway were inserted within the mouth. An intravenous line was present within the lateral right neck. Numerous electrocardiogram discs were present over the upper and left lower lateral chest. A fingertip monitor was present over the left index finger. A 23-1/2 inch, vertical, midline incision extended from the jugular notch to the suprapubic area and was closed with sutures. A Foley catheter was in place. Blue adhesive monitors were over the right and left thighs. Intravenous lines were present in the right antecubital space, the right anterior wrist, and the left antecubital space. *12 6*

**EXTERNAL APPEARANCE:** The body was that of a well developed, well nourished, Caucasian male measuring 73 inches in length, weighing 185 pounds, and appearing the stated age of 40 years. There was mild generalized rigor of the body. The hair was brown and measured 2-3/4 inches in length. There was some blood in the right external auditory canal. There was a large purple area within the left mastoid area of the skull. There was an entrance gunshot wound of the upper left orbit, just above the left eyebrow. There was a large amount of hemorrhage within the left periorbital area. A large amount of hemorrhage was present in the sclera and conjunctivae of the left eye. The right eye was closed; the conjunctivae were clear; the right cornea was clear; the iris was brown. The left eye was markedly hemorrhagic. The globe appeared to be intact. A small amount of hemorrhage was present in the medial right periorbital area. The nose and ears were unremarkable. The teeth were natural and in good repair. The neck was symmetrical and without scars. The chest was symmetrical and without scars. The abdomen was flat and without palpable masses or scars. The pubic hair was small to moderate in amount. The penis was circumcised. Both testicles were present within the scrotal sac. Small scars were present of the

6'1" 40 yoA w/M

knees and the anterior lower legs. There were small scars of the forearms and the back of the hands. A fresh needle puncture was present in the back of the right hand. There was a fresh needle puncture in the posterior left hand. There were fresh needle punctures within the left antecubital space. The back had dependent posterior fixed lividity with blanching over the pressure areas.

**INTERNAL EXAMINATION:** <u>Section:</u> The body was opened with a Y-shaped thoracoabdominal incision through the original donation incision. The abdominal panniculus at the level of the umbilicus measured 1-1/4 inches. Five hundred milliliters of a serosanguineous fluid were present within each pleural cavity. A small amount of serosanguineous fluid was present within the abdominal cavity. The heart and left lung were absent. The liver and both kidneys were also absent. The adrenal glands were absent.

**HEART:** The heart was absent.

**LUNGS:** The right lung weighed 475 grams. It had a pink-tan upper pleural surface becoming darker red-brown in the more dependent portions. On sectioning, there was no tumor, infectious process, or hemorrhage. The parenchyma was pink-tan becoming darker red-brown in the more dependent portions.

**LIVER:** The liver and gallbladder were absent.

<u>Pancreas</u>: The pancreas had the usual size and shape. It was red-brown and lobulated on external and cut surface. It was unremarkable.

<u>Adrenals</u>: Both adrenals were absent.

**SPLEEN:** The spleen weighed 400 grams. It had a purple-gray intact capsule. On sectioning, the parenchyma was red-brown. The Malpighian corpuscles were prominent.

**GENITOURINARY TRACT:** Both kidneys were absent. The urinary bladder was empty. The bladder mucosa was gray-tan. The prostate was of normal size and had a homogeneous pink-tan cut surface. There were no nodules. Both testicles were surrounded by a thick tunica albuginea capsule and on sectioning, the parenchyma was tan.

**GASTROINTESTINAL TRACT:** The esophagus had a gray-tan mucosa. The stomach contained 400 to 500 milliliters of a semisolid digestate. Only the small intestine was present. The large intestine was absent at autopsy. The appendix was absent at autopsy.

**NECK:** The internal structures of the neck were removed. The proximal esophagus had a gray-tan mucosa. The larynx contained a small amount of mucus but was otherwise unremarkable. The hyoid

bone, thyroid cartilage, and cricoid cartilage were intact and had no fractures. The thyroid gland had the usual butterfly shape and was red-brown on both external and cut surfaces. There were no nodules. The tongue was sectioned and had no areas of fibrosis or hemorrhage.

HEAD: The scalp was incised and reflected in the usual manner. There was a 5 by 5 inch area of subscalp hemorrhage over the left posterior frontal/parietal/temporal area extending to the occipital area. A small amount of hemorrhage was present in the occipital area. The top of the skull was removed and had no fractures. There was a large amount of subarachnoid hemorrhage over both cerebral convexities. There was flattening of the gyral surfaces of the brain. The brain weighed 1400 grams. A massive amount of hemorrhage was present at the base of the brain. The vessels at the base of the brain were intact. There was a severe injury to the anterior temporal lobe. The bullet entered the base of the skull in the anterior portion of the left middle cranial fossa. The bullet track entered the left anterior temporal lobe, and traveled across the cerebral hemispheres. The bullet was recovered beneath the leptomeninges in the right posterior parietal area. On sectioning the brain, there were contusions of the inferior frontal lobes, bilaterally, more prominent on the left side. The bullet went through the left temporal lobe, the basal ganglia, and the right centrum ovale before being recovered beneath the leptomeninges in the right posterior parietal area. A small caliber, fully jacketed bullet was recovered. It was blunted on the nose. The initial "T" was placed on the base of the bullet. Sectioning the cerebellum, cerebellum, and brainstem revealed no tumor or infectious process.

DESCRIPTION OF INJURY: There was an entrance gunshot wound of the left orbit, just above the eyelid, located 4 inches below the top of the head and 1 inch to the left of midline. The entrance wound measured 3/16 by 1/8 inch and had a circumferential 1/8 inch abrasion. There was sparse stippling around the entrance wound that measured 3-1/2 by 2-1/4 inches, which was found on the forehead, nose, and the left orbit. The bullet traveled in an anterior to posterior, left to right, and upward direction. The bullet injured the left eye. There was a large amount of hemorrhage in the soft tissue of the left orbit, the sclera, and conjunctiva. The bullet entered the base of the skull at the anterior portion of the left middle cranial fossa. The bullet traveled through the brain and was recovered beneath the leptomeninges in the posterior right parietal area. A small caliber, fully jacketed bullet was recovered and the initial "T" was placed on its base.

PATHOLOGICAL FINDINGS

Gunshot wound of head.

# OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY
## JOSEPH A. JACHIMCZYK FORENSIC CENTER
### 1885 OLD SPANISH TRAIL
### HOUSTON, TEXAS 77054-2098

## REPORT OF ANALYSIS
June 1, 1998

**TO:** Tommy J. Brown, D.O.  
Deputy Chief Medical Examiner

CASE#: ML98-1423

Evidence submitted on 05/26/98.

RESULTS:

Blood (Hospital): Ethanol, Methanol, Acetone, Isopropanol- Not Detected.

Urine (Hospital): Marihuana Metabolite, Cocaine Metabolite, Opiate, Phencyclidine, Amphetamine/Methamphetamine- Not Detected.

Unless otherwise requested, specimens will be discarded one year after date of receipt.

Patricia L. Small, B.S., M.T., ASCP  
Assistant Toxicologist

Ashraf Mozayani, Ph.D., DABFT  
Chief Toxicologist

RECEIVED

JUN 0 5 1998

MEDICAL EXAMINER

Medical Examiner's Initial

# HARRIS COUNTY MEDICAL EXAMINER
## INVESTIGATOR REPORT
### PAGE 1

INVESTIGATOR: _Ebdon_

M.E. CASE # _98-1423_

[] TRACKING SHEET

O.C. CASE # _____

DECEASED: _Kent_           _Dean_           _Kincaid_
            FIRST          MIDDLE / NMN         LAST

☐ AUTOPSY          ☐ VIEW                    ☐ INQUEST ONLY

☐ REQUEST FOR ORGAN DONATION:   (YES)  NO          ☐ CUSTODY DEATH

☐ REQUEST FOR TISSUE DONATION:   YES   NO          ☐ WHILE AT WORK

☑ RELEASED   ☐ DECLINED   PHYSICIAN: _Dr T. Brown_

DATE: _23_ _May_, _1998_      TIME: _6:35_   (A.M.)  P.M.

☐ CORNEAS REMOVED      AT HCME      OTHER: _____

☐ OFFICER TO BE PRESENT: _HPD_   _ACSO_         ☐ COMPANION CASES      _HPD Duty_

_HomDet W. Wendel_                                                        _Lt._
         NAME                                                   _308-3600_
_Pgr (713) 908-0056_                              CASE #         _for Sgt Elliott_
         PHONE                                                  _2 Rw min_
_30 Min_                          _Det Reynolds_   CASE #
LEAD TIME REQUESTED              _IAB Notice_
                                 _Pgr 713-769-9125_  _Home 281-890-8342_

APPEARS TO BE:     NATURAL    ACCIDENT    SUICIDE    (HOMICIDE)    UNDETERMINED

TRAUMA VISIBLE:    NO    YES:    COMMENT / DESCRIPTION: _GSW to Head – Police Ofc_
_Off Duty_

M.E. NOTIFIED: _Ebdon_      DATE: _23_, _May_, _1998_   TIME: _557_   (A.M.)  P.M.

INVESTIGATION:   (PHONE)   SCENE      PHOTOS:   YES   (NO)

         DATE: ___/___/___      TIME: _____    A.M.  P.M.

REPORTEE:   (CHAPLAIN)   MEDICAL PERSONNEL / RN / LVN    FIRE DEPARTMENT    LAW ENFORCEMENT    J P

NAME: _Charlie Flanniger_       TITLE: _____

AGENCY:   HPD   (ACSO)   OTHER: _____   _R. Wedgeworth_

PAYROLL/ID #: _____   BADGE #: _627_   UNIT #: _3125_   CASE #: _9805223252_

CPS   (N/A)   NO   YES   NAME: _____

PHONE:   713   281   OTHER: (____)_____          PRIOR REFERRAL(s):   YES   NO

CASE #: _____          COMMENT: _____

(Rev.01/98)

PAGE - 2 -

M. E. CASE #: 98-1423

DECEASED: Kent        Dean        Kincaid
           FIRST         MIDDLE  /  NMN         LAST

ALIAS: _____

RACE: (WHITE)  BLACK   HISPANIC   [ ] OTHER: _____

SEX: (MALE)  FEMALE   AGE: 40 YEARS   D.O.B: 8 / 17 / 57

CHILD AGE: _____ MONTHS   WEEKS   DAYS   HOURS   STILLBORN/ GESTATION: _____

HOME ADDRESS: 7606 Sandy Gate Ln

CITY: (HOUSTON)  OTHER: _____   STATE: (TEXAS)  OTHER: _____

ZIP: 77095   HOME PHONE #: 713 (281)  OTHER: (___) 855-3931

DATE OF DEATH: 23 / May / 1998   TIME: 234 (A.M.)  P.M.   ☐ FOUND

PLACE OF DEATH:   RESIDENCE   (HOSPITAL)   SCENE

ADDRESS: _____

HOSPITAL: Herman        (Bed 22)        ER (NICU)  CCU   MICU

CITY: (HOUSTON)  OTHER: _____

COUNTY: (HARRIS)  OTHER: _____   PRECINCT #: 1  2  3  4  5  6  7  8

STATE: (TEXAS)  ZIP: 77030 PHONE #: (713)  281   OTHER (___) 704-4284

LOCATION POSITION AND SURROUNDINGS OF BODY AT SCENE: _____

_____

_____

LIVIDITY:   YES   (NO)   CONSISTENT WITH BODY POSITION WHEN FOUND:   YES   NO -  DESCRIBE: _____

_____

RIGOR MORTIS:   (NO)   YES   Describe: _____

☐ DECOMPOSED:   EARLY   MODERATE   ADVANCED   BODY TEMPERATURE:   WARM TO TOUCH   COOL TO TOUCH

☐ RECTAL TEMPERATURE: _____   DATE: ____ / ____ / ____   TIME: _____ AM  PM

          SCENE        AT HCME

BROUGHT FROM:   RESIDENCE   SCENE   HOSPITAL / OTHER: 7605 Plum Tree Forest (Rd) D

CHART #: 9895 7089367   REQUESTED: (YES)  NO

☐ HX/ PHYSICAL   ☐ TRANSFER NOTES (If Applicable)   ☐ OPERATIVE NOTES (If Applicable)   ☐ CT / RADIOLOGY REPORTS

☐ INITIAL LAB REPORTS   ☐ DISCHARGE/ DEATH SUMMARY   ☐ CORD / PLACENTA (If Fetal death or Newborn)

☐ FIRST BLOOD (If Suspected Overdose)   ☐ E.R. TEMPERATURE: _____

(Rev.01/98)

PAGE - 4 -   LAST NAME: _Kincaid_   M.E. CASE #: _98-1423_

**IDENTIFICATION:**   (POSITIVE)   PENDING   UNKNOWN

☐ COMPARISON OF PHOTO ID#: _____   ☐ FINGERPRINT COMPARISON

VIEWED PHOTOGRAPH   (VIEWED BODY)   AT SCENE   AT HOME   (AT HOSPITAL)

AGENCY:   HPD   HCSO   DPS   FBI   OTHER: _____   I.D.#: _____

NAME: _____   RELATION: _Wife_

ADDRESS: _____   (SAME AS DECEASED)

CITY: _____   STATE: _____   ZIP: _____

PHONE:   713   281   OTHER: ( _____ ) _____ :

☐ PHOTOCOPY OF WITNESS IDENTIFICATION:   ☐ DL / ID #: _____   STATE: _____

**LEGAL NEXT OF KIN:**   NONE   ☐ UNKNOWN / TRACKING SHEET WORKING   ☐ AT SCENE   ☐ AT HOSPITAL

☑ LEGAL SPOUSE   ☐ COMMON LAW SPOUSE   ☐ SON/DAUGHTER   ☐ BROTHER / SISTER   ☐ FATHER / MOTHER   ☐ GRANDPARENTS

☐ AUNT/UNCLE/ COUSIN   ☐ LEGAL GUARDIAN   ☐ NEXT OF FRIEND   ☐ OTHER: _____

NAME: _Nancy_   _____   _Kincaid_
         FIRST         MIDDLE         LAST

ADDRESS: _____   (SAME AS DECEASED)

CITY:   HOUSTON   OTHER: _____   STATE:   TEXAS   OTHER: _____

ZIP: _____   PHONE:   713   281   OTHER: ( _____ ) _____

NOTIFIED BY:   HCME: _____   HPD/ HCSO/ OTHER: _____

DATE: ____ / ____ / ____   TIME: _____   A.M.   P.M.   AT SCENE   AT HOSPITAL

COMMENT: _____

**BODY TO M.E. BY:**   ☐ HCME TRANSFER SERVICE   DISPATCH DATE: ____ / ____ / ____   TIME: _____   A.M.   P.M.

☑ PREFERENCE: _Klein_   ☐ PENDING

**NARRATIVE**

According to HCSO Hom Det Wedgeworth, this shooting took place 11:05 PM 22 May 1988 at 7605 Plum Tree Forest Dr. This dec is an HPD Ofc who was off Duty at the time of the incident. The dec was driving his 1991 Jeep Cherokee Tex Reg. DBT 31H and the veh was struck on the windshield by an unk Object 45 Blks away from the shooting on Forest Heights and the dec pursued an Unk Blk P/U

(Rev.01/98)

HARRIS COUNT MEDICAL EXAMINER
INVESTIGATOR REPORT

☐ NARRATIVE   ☑ CONTINUATION   ☐ SUPPLEMENT

PAGE #: 6      M. E. CASE #: 98-1423      INVESTIGATOR: Ebdom

DATE: 23 May, 1998   TIME: _____ A.M. _____ P.M.

DECEASED: Kent _____ Dean _____ Kincaid
FIRST                MIDDLE / NMN            LAST

The dec got the Unk Black P/U Truck Stopped at 2605 Plum Tree Forest Dr.

The dec Identified himself as a Houston Police Officer and a shot was fired from inside the Black P/U Truck.

The dec was at the left rear of the Cherokee when he sustained 2 GSW to the Head. The dec had no gun with him.

2 - 25 cal shell casings have been recovered.

Mr Mike McGowan with Life Gift advised they have permission for harvest of. 1. Heart, 2. Lungs, 3. Liver, 4. kidneys, 5. Pancreas, 6. Heart valves, 7. Spleen Nodes, and appropriate papers were faxed to this office.

Dr Brown approved harvest of the above listed 7 organs, with nothing above the neck to be touched.
The dec will then come to HCMR Facility

(Rev. 12/97)   Susp & Weapon fled and are Unk.

## HARRIS COUNT MEDICAL EXAMINER
### INVESTIGATOR REPORT
☐ NARRATIVE   ☐ CONTINUATION   ☑ SUPPLEMENT

PAGE #: _____   M.E. CASE #: 98 1423   INVESTIGATOR: Parker

DATE: 5, 24, 98   TIME: 1:45   A.M.   (P.M)

DECEASED: Kent   Kincaid
FIRST   MIDDLE / NMN   LAST

OFFICE USE ONLY:

This Inv. contacted ~~by~~ Robert Reynolds, HCME Crime Lab, at request of HPD Sgt. Wayne Wendel ~~of~~ Homicide Div. Mr. Reynolds will come in & meet CSU to release ballistic evidence recovered at autopsy, for the purpose of immediate testing.

(Rev. 12/97)

TAB 11

# DECLARATION OF PATRIC͟A DAVIS

My name is Patric͟a Davis. My address is 13333 West Rose Road #1112, Houston, TX 77041. I am Anthony Haynes' mother.

When Anthony was growing up, he was well behaved and did not get into fights with other kids at school or in the neighborhood. He was well-liked by the students at his school as well as his teachers. He was not aggressive but mannered and respectful. He would do tasks asked of him and I never had to keep on him to get things done. Anthony was respectful of me and of his grandparents.

I first became aware of Anthony's drug use the day he was admitted to the West Oaks Treatment Center. The day of the blow-up at school involving Col. Davis, I drove Anthony to school. I had not returned to the house when I received a call, from either Cl. Davis or Sgt. Harris, about a problem with Anthony.   Returned to the school and Anthony was handcuffed in the nurse's room. This is when I suspected drug use.

Someone, perhaps Donald's mother or one of the teachers,   suggested West Oaks as a treatment facility. Anthony was not expelled from school, as he graduated normally, but he was in the facility for several weeks. Anthony did well at West Oaks.

All I knew was that Anthony was on marijuana. I found out later that around the time of the shooting of the police officer, he had taken some stuff that Lawrence had given him. Some of this drug usage involved mixing embalming fluid with marijuana, as I understood it.

When Anthony was arrested, we first retained Mr. Robert Jones for my son's defense. The fees went higher and higher, more than we could afford, and eventually Mr. Alvin Nunnery was appointed by the court, with Mr. Jones as co-counsel. After this appointment, Mr. Nunnery more or less took over the case.

We had one meeting with Mr. Jones, in his office. This occurred immediately after Anthony was arrested. It was Mr. Jones's first capital case. He quoted us one fee but it changed over time. He said the cost of the trial would run over $100,000.00, but he had said $50,000.00 earlier.

After this, we went to court for a hearing on the case, and the prosecutor recommended Mr. Nunnery. The prosecutor Mark Vinson said he was a good attorney and the judge then appointed him. Mark Vinson asked about Anthony taking a plea to life but we were not interested as the officer was not on duty and Anthony did not intend to shoot him.

After Mr. Nunnery was appointed, we only met with him once in his office. We told him who the investigator was, but Mr. Nunnery did not meet with him. Mr. Nunnery did not obtain the records from West Oaks Hospital; the prosecutor did and introduced them at trial.

I made a list of people for Mr. Nunnery to talk to, but none of the people on the list were contacted. These people included 4 or 5 neighbors. The list had at least ten people on it, including teachers at his school and his counselor. But the attorneys never talked to most of these people, and they were not called as witnesses at Anthony's trial. They never followed through on contacting these people on the list. I was never given a reason why this

was not done. There were some military people on the list but they too were not contacted. Mr. Nunnery told me that he had people that would testify. Mr. Nunnery also told me, as a reason why more witnesses were not called, that "we can't make the deceased look bad," but none of the potential witnesses had anything to do with the victim. I also wanted to testify, but Mr. Nunnery said it would not be a good idea, without saying why.

Anthony complained to me about the attorneys during the trial, because they did not call the witnesses they said they would. He told me they were not doing a good job.

When Anthony was incarcerated at the county facility, I visited him weekly. He had a good attitude, and did not get into fights.

I attended my son's trial. During the part where the jury was chosen, the judge presiding over it, Judge Lon Harper, was cleaning a pistol while he was on the bench, in full view of the potential jurors. I looked up from the public seating and I was able to see the chamber of the gun. This happened in front of one or two potential jurors.

We called and talked to Mr. Nunnery during the breaks in testimony. My husband would ask him why he was not doing this or that, and he would reply that "you can't make the victim look bad" even though the questions had nothing to do with the victim. It felt like he was intimidated by the prosecutor and the judge, as if he did not want to get them annoyed.

I once told Mr. Nunnery about a girlfriend I worked with at United Airlines, who knew the girlfriend of the victim. She told me he had a son from his girlfriend. But she would not tell this to Mr. Nunnery.

During the trial, the victim's family were identifiable by decorative jewelry, round pins that they wore. The victim's wife was always escorted by police officers and they sat with her and her family at the trial. There were 6 to 8 family members at the trial most days, in two rows, and usually close to a dozen uniformed police officers. They wore pins on their clothing identifying them, such as "Big Sister," or "Baby Sister." I felt like they were trying to intimidate the jury.

During the trial, Mr. Nunnery pretty much ran the defense. He and Mr. Jones did not seem like they were a team. This was Mr. Jones's first capital case. When he would cross-examine, his questions did not seem relevant. Anthony would pass noted to them, but they would not respond. The attorneys did not want Anthony to testify, as they said the district attorney would discredit him.

I told the attorneys I wanted to be a witness, but they said it would not be a good idea. Mr. Nunnery never told me why it was not a good idea.

I remember asking Mr. Jones about the victim's toxicology report, but he said it had been destroyed. He told me there was no sign of liquor in the victim's body, but I felt this could not be true as they had been partying and were on their way to a sports bar that night.

Had the defense attorneys or investigators talked to me in detail, I would have told them about many aspects of Anthony's good character, positive upbringing, and non-violent nature that were not mentioned at his trial. I was willing to be a witness, but after they told me it would not be a good idea, without specifying why, I was never called upon to do so by Anthony's attorneys or investigators.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on _9 Sept 2005,_ 2005 in _Houston_ , Texas.


PATRIKA DAVIS

## DECLARATION OF PATRIKA DAVIS

My name is Patrika Davis.  My address is 13333 West Rose #1112, Houston, TX 77041.  I am Anthony Haynes' mother.

When Anthony was growing up, he was well behaved and did not get into fights with other kids at school or in the neighborhood.  He was well-liked by the students at his school as well as his teachers.  He was not aggressive but mannered and respectful.  He would do tasks asked of him and I never had to keep on him to get things done.  Anthony was respectful of me and of his grandparents.

I first became aware of Anthony's drug use the day he was admitted to the West Oaks Treatment Center. The day of the blow-up at school involving Col. Davis, I drove Anthony to school.  I had not returned to the house when I received a call, from either Cl. Davis or Sgt. Harris, about a problem with Anthony.   Returned to the school and Anthony was handcuffed in the nurse's room.  This is when I suspected drug use.

Someone, perhaps Donald's mother or one of the teachers,   suggested West Oaks as a treatment facility. Anthony was not expelled from school, as he graduated normally, but he was in the facility for several weeks. Anthony did well at West Oaks.

All I knew was that Anthony was on marijuana. I found out later that around the time of the shooting of the police officer, he had taken some stuff that Lawrence had given him.  Some of this drug usage involved mixing embalming fluid with marijuana, as I understood it.

When Anthony was arrested, we first retained Mr. Robert Jones for my son's defense.  The fees went higher and higher, more than we could afford, and eventually Mr. Alvin Nunnery was appointed by the court, with Mr. Jones as co-counsel.  After this appointment, Mr. Nunnery more or less took over the case.

I made a list of people for Mr. Nunnery to talk to, but none of the people on the list were contacted.  These people included 4 or 5 neighbors.  The list had at least ten people on it, including teachers at his school and his counselor. But the attorneys never talked to most of these people, and they were not called as witnesses at Anthony's trial.  They never followed through on contacting these people on the list. I was never given any reason why this was not done.  There were some military people on the list but they too were not contacted. Mr. Nunnery told me that he had people that would testify. Mr. Nunnery also told me, as a reason why more witnesses were not called, that "we can't make the deceased look bad," but none of the potential witnesses had anything to do with the victim.  I also wanted to testify, but Mr. Nunnery said it would not be a good idea, without saying why.

When Anthony was incarcerated at the county facility, I visited him weekly.  He had a good attitude, and did not get into fights.

I attended my son's trial.  During the part where the jury was chosen, the judge presiding over it, Judge Lon Harper, was cleaning a pistol while he was on the bench, in full view of the potential jurors.  I looked up from the public seating and I was able to see the chamber of the gun.  This happened in front of one or two potential jurors.

During the trial, the victim's family were identifiable by decorative jewelry, round

pins that they wore. The victim's wife was always escorted by police officers and they sat with her and her family at the trial. There were 6 to 8 family members at the trial most days, in two rows, and usually close to a dozen uniformed police officers. I felt like they were trying to intimidate the jury.

Had the defense attorneys or investigators talked to me in detail, I would have told them what I have said here in this declaration. I was willing to be a witness, but after they told me it would not be a good idea, without specifying why, I was never called upon to do so by Anthony's attorneys or investigators.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on June 23, 2005 in Houston, Texas.


PATRICIA H. DAVIS

TAB 12

# DECLARATION OF DONALD W. HAYNES

My name is Donald W. Haynes. I am Anthony Haynes' father. My address is 1827 Wood Orchard Drive, Missouri City, Texas 77489.

My son Anthony Haynes was born in Houston. At first, he lived with his mother and his grandmother, Ms. Hinton. When Anthony was about 6 years old, his mother went to live in California and left Anthony here in Texas. Eventually, Anthony's mother took him to California with her. Because his mother had a job with United Airlines which required her to be out of town frequently, I agreed to have Anthony live with me.

Anthony attended Paul Revere Elementary School and Missouri City Middle School and eventually enrolled in Dulles High School in the Houston area. He wanted to enroll in Dulles because of the ROTC program, and because the makeup of the school was more diverse. Anthony did well in school and got good grades. He played in the band in high school and also was on the football team. Because football required a lot of time, his grades suffered and he eventually dropped the sport.

When Anthony graduated from high school, I gave him a truck. Generally, he was responsible with it.

I did not realize Anthony was messing around with drugs until his junior year and the beginning of his senior year. He was experimenting with marijuana and marijuana mixed with other things. As part of my job, I ad attended drug seminars, but I did not know Anthony was using more serious drugs.

I remember an incident when Anthony was disciplined at school. Col. Davis told him he was going to be dropped from the ROTC program. At that time, Anthony was taking lithium. Anthony liked the military and the discipline.

I remember the incident referred to at trial regarding Anthony and a gun. I had disciplined him and he went out the back door. Anthony came back and said he had bad thoughts and that he needed treatment. So I put him in a treatment program at West Oaks shortly after the blow-up at school.

A Mr. Bailey was his therapist. They worked well together. But West Oaks was not a success. They were interested in medication, such a lithium, which did not agree with Anthony. He did not like taking it. He took the medication up until the beginning of his senior year and stopped it after that.

In his senior year, Anthony calmed down and he was able to graduate. Anthony was one of the highest award winners in the ROTC program and he eventually received a four-year scholarship to Prairie View A & M. He attended the BOOST program after high school in Rhode Island. This was a program designed for high-achieving students who were possibly headed to one of the service academies. If Anthony had successfully finished the BOOST program, he would have received a four-year scholarship to Moorehouse College in Georgia.

When Anthony returned from the BOOST program, he may have been somewhat depressed. He then went to live with his mother. At the time of this incident, his mother Pat and her husband were out of the country on a vacation.

I was not satisfied with the job Anthony's attorneys did for him both before and at his trial. Mr. Nunnery did not properly prepare me to testify in that he did not go over some of the important details I wanted brought out and he did not prepare me for questions the prosecutor was likely to ask me. I once went to Mr. Nunnery's office. A family friend, Cynthia Brown, was there. Mr. Nunnery just outlined in vague terms what the prosecutor would ask, not in any depth. He talked Cynthia Brown out of testifying.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on _September 15_, 2005 in _Houston_, Texas.

1

# DECLARATION OF DONALD W. HAYNES

My name is Donald Wayne Haynes; I am the Father of Anthony Cardell Haynes. I reside at 1827 Wood Orchard Dr. Missouri City, Texas 77489. My home telephone number is 281-437-7557. I have been employed with the Houston Fire Department since June 23, 1975 (30 years). I am presently an Asst. Chief Investigator assigned to the Fire and Arson Investigation Division. I have been a Certified Peace Officer in the State of Texas for over (20) twenty years. I graduated from Sam Houston State University with a M.S. in Criminal Justice Management in 1988. I am also a graduate of the 166th Session of the National Academy Federal Bureau of Investigation.

My son Anthony Cardell Haynes was born on January 22, 1979. Anthony lived with his Mother Patrica Hinton-Davis and his Grandmother Mrs. Myrtle Hinton during the first years of his life. Anthony and his mother moved from Houston, Texas and lived in California for a few years. After they returned to Houston, Texas an agreement was made between his mother and I that Anthony would live with me during the school year and with her during the summer months. This was done because his mother had a job with United Airlines which required her to be out of town frequently.

Anthony attended Paul Revere Elementary and Lanier Middle School in Houston, Texas. When he actually came to live with me, he attended Missouri City Middle School and Dulles High School. He wanted to enroll in Dulles because of the ROTC program and because the school was more diverse. Anthony did well in school and got good grades. He played in the High School Band and was also on the football team. Since football required a lot of time, whenever his grades suffered I made him drop the sport. Anthony was given access to a truck in the latter part of his junior year. He was responsible with it and he was given the truck as a present when he graduated.

I did not realize that Anthony was experimenting with drugs until the end of his junior year and the beginning of his senior year. He was experimenting with marijuana and marijuana mixed with other things. As part of my job I had some knowledge about drugs and I had also taken some seminars at the University of Houston Continuing Education Drug Counseling Program. I did not know Anthony was using more serious drugs.

I remember the incident referred to at Anthony's trial regarding Anthony and a gun. I had just disciplined him and given him some chores to do. He started doing the chores and he later went out the back door of the house. Anthony came back crying with a gun in his hand and said he had bad thoughts and that he needed some kind of treatment. His mother and I immediately put him in a treatment program. His therapist was Mr. Bailey and they worked well together. The treatment program was interested in medication, such as lithium which did not agree with Anthony. Anthony did not like taking the lithium. He took the medication until the end of his senior year and stopped taking it after that.

There was an incident at the beginning of Anthony's senior year between him and Col Davis. Col. Davis wanted to discipline Anthony by dropping him from the ROTC program. At that time Anthony was taking lithium and he had not taken his medication that day. Anthony liked the military and its discipline and was terribly upset when Col. Davis threatened to drop him from the ROTC program and they had a few words. I was called to Dulles High School about Anthony's behavior. When I arrived at the school Anthony was handcuffed to a chair in the nurse's office. After discussing the whole situation with the police officers, they released him to me and I immediately placed him in West Oaks Hospital. Anthony was at the West Oaks Hospital for about a month, he was allowed to return the Dulles High School and remained in the ROTC program.

In his senior year, Anthony calmed down and he was able to graduate. Anthony was one of the highest award winners in the ROTC program and he eventually received a four year Army scholarship to Prairie View A & M University. Since he chose to attend the BOOST Program in Newport, Rhode Island after high school he forfeited his Army ROTC scholarship. This is a program designed for high achieving students who were possibly headed to one of the Service Academies or a ROTC Program at a college of their choice. Anthony wanted to attend Moorehouse College, in Georgia where he would receive a four year Naval ROTC scholarship.

While in Newport, Rhode Island Anthony became seriously involved in a Pentecostal Church. Anthony came home on his Christmas vacation in December 1997, and he was doing fine. I could tell that he had really been studying the Bible by our long discussions and conversations about theology and the witnessing he was doing. After he returned to Newport, Rhode Island he became so involved in the Pentecostal Church that his mother and I had to remind him to continue to communicate with us and his purpose in being in Rhode Island.

Anthony did not complete the BOOST Program in Rhode Island and was sent home in April, 1998. He had planned to attend Prairie View A &M University in the fall of 1998, get into the Army ROTC program and hopefully regain his scholarship. When Anthony returned home from the BOOST program he may have been somewhat depressed and disenchanted. He immediately went to live with his mother (Patricia Hinton-Davis) and his stepfather (Courtney Davis) as soon as he arrived in Houston, Texas.

Anthony called me early Saturday morning May 23, 1998 and told me that he was coming by the house to spend some time with me and that he was sick and had been throwing up all night long. He came by that afternoon and we went to a high school graduation party that was being held at Mrs. Cynthia Brewer's house for her son. After the party we drove to my house and he left in his truck to see some of his friends on this side of town.

On Monday, May 25, 2005 there was a knock on my door and a couple Investigators that work with me (Kent, and Woods) informed me that Anthony had been involved in a killing of an off duty police officer named Kincaid.

3

I did not believe it and I was totally devastated and I did not know what to do. I tried to contact some attorneys and I later went to the Harris County Jail, but they would not let me see Anthony. I have always taught Anthony to make sure he called me if he got into any legal of trouble. I was surprised that he was not allowed to call me on the day he was arrested. I was not allowed to see Anthony until later on that week, after I had hired Mr. Jones to be his attorney.

Mr. Jones was referred to me by Ms. Denise Thierry, an attorney for the NAACP. Mr. Jones led me to believe that he was certified to handle capital murder cases. I found out much later that he was not certified to handle capital murder cases. Mr. Jones told Patrica Hinton-Davis and I that it would cost over $100,000.00 to represent Anthony on a capital murder case. Since we could not afford it a court appointed attorney was assign to the case. The first attorney that the judge appointed refused the case because the Judge wanted him to be ready for trial in 2 or 3 months. The Judge later appointed Mr. Nunnery to the case and Mr. Jones agreed to work with him.

Mr. Nunnery and Mr. Jones did not get along before and during the trial. On one occasion Mr. Nunnery asked me why Mr. Jones was still involved in this case. Mr. Nunnery would complain that he asked Mr. Jones to do certain things but he (Mr. Jones) didn't do them. It is my opinion that Mr. Nunnery did not have a strategy to defend Anthony. This was especially evident when he only presented one person (Quazie) in the guilt and innocent phase of the trial. He was informed that Anthony had communicated with Toya Terry, Tiffany Deckard, and Carmen Nickerson before and after the incident but he chose not to have them testify at all in the trial. There were also a number of people Mr. Nunnery could have called to testify about Anthony's character (Mr. Brock, Mr. Brown, Mr. Washington, Rev. T.R. Williams his Pastor, and many more were willing to testify.

I was not satisfied with the manner in which Anthony's attorneys represented him both before and during his trial. Mr. Nunnery did not properly prepare me to testify, in that he did not go over some of the important details and he did not prepare me for questions the prosecutor was likely to ask me. I once went to Mr. Nunnery's office with a family friend, Cynthia Brewer. Mr. Nunnery just outlined in vague terms what the prosecutor would ask, not in any depth. I believe he talked Cynthia Brewer out of testifying. The private investigators Mr. Nunnery hired were incompetent and inadequate. It seemed like a low-budget or no-budget operation.

The only people who actually knew that Mr. Kincaid was an off duty police officer was Mr. and Mrs. Kincaid. There is no way that Anthony could have known that Mr. Kincaid was a police officer since he was wearing civilian clothes and driving his personal car with his wife. Since Mr. Kincaid was coming from a party where he had been drinking alcoholic beverages, he should have taken down the truck's license plate number and referred it to the proper authority after his windshield struck by an object. Instead Mr. Kincaid decided to chase Anthony for 5 to 15 minutes, cornered him in a cul-de-sac street at night and confront him without properly identifying himself as an off duty police officer.

4

Mr. Kincaid had enough time to properly identify himself with his badge and police identification as soon as he confronted Anthony. I believe that Anthony was in fear of his life and acted in self defense when he shot Mr. Kincaid only once as he (Kincaid) reached behind his back for something. That something, could have easily been a gun or any other type of weapon. If I had been in the same situation I probably would have acted in the same manner in which Anthony did, because of lag time, or reaction time and fear of my life.

There have been many cases in Harris County in which people have illegally posed as police officers. In some of these cases the perpetrators even wore police uniforms and badges. There is no way any average citizen in Houston, Texas would have believed a person who only articulated that he was a police officer without uniform, badge, proper police identification and driving his personal vehicle with a female passenger.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on September 30, 2005 in Houston, Texas.


Donald W. Haynes

TAB 13

## DECLARATION OF ERIC HAYNES

My name is Eric Haynes. My date of birth is September 18, 1962. My address is 5303 Newkirk, Houston, Texas 77021.

I am the youngest brother of Donald Haynes, Anthony Haynes' brother. I have known and been around Anthony since his birth. Anthony was a good kid, always very respectful. He was my first nephew, and we did a lot of things together.

When Anthony was young, he lived with his mother, and then he went to live with his father. Donald wanted Anthony around and Anthony liked being around males. He could do his sports better living with his father. Anthony played soccer, baseball and was on the football team at Dulles High School.

Anthony rarely got into trouble. I was aware of his drug use when he was in high school, but as far as I knew it was just marijuana, like most kids. I did not know he was using other drugs such as methamphetamine or mixing marijuana with embalming fluid.

Anthony would do things with my kids, who were younger than Anthony. They are now aged 18, 15, and 13. Anthony would teach them, take them places, babysit them, and would be like a big brother to them. I never saw Anthony show anger or blow up around my boys.

From my point of view, judging his actions, when Anthony did get into trouble it was mainly through peer pressure. Anthony was a good student, well above average. His father made him act respectable and get good grades. Donald bought Anthony a truck, and there were conditions on him to earn it.

Anthony was proud of being in the ROTC and being selected for the BOOST program. From the information we received, he was doing well in the program. When he came back after not making it in the program, he said he was going to try again in the program. Anthony said he enjoyed the freedom he had while he was in the BOOST program. Through the program, he qualified for a scholarship.

I attended 3 or 4 days of the trial. I observed uniformed police officers present during the trial, at least 4 to 6 when I was there. The victim's family sat up front. One day, there were quite a few officers present at the trial, about 15 or 20 in uniform.

I remember an incident when defense attorney Nunnery was thrown out of the courtroom for something he had said. The judge told Mr. Nunnery to sit down and he walked out. I felt like the judge was biased against the defense attorneys. I also felt that they could have done a better job.

I spoke once with Mr. Jones about six months before the trial, and maybe once more. I just met Mr. Nunnery once but did not really speak to him. I never spoke with a defense investigator.

When I heard about Anthony's arrest for the killing of the police officer, I was shocked. Based on my knowledge of Anthony Haynes, I believe he would be a very low risk of committing future dangerous acts or acts of violence. This was my belief at the time of the trial and it is my belief now.

Neither of the defense attorneys spoke to me at the time of the trial. I was living at

home in the Houston area at the time of the trial, and I was easy to reach.

Once the trial started, Mr. Nunnery took over.  It seemed the trial was rushed because of finances.  Suddenly, they were going to trial in a few weeks.  If the defense attorneys or the investigator had talked to me at the time of the trial, I would have told them what I have said in this declaration.  Had they asked me to be a witness for Anthony at the trial. I would have been willing to do so.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on July 31, 2005, 2005 in Houston, Texas.

TAB 14

## DECLARATION OF TIFFANY DECKARD

My name is Tiffany Deckard. I am 23 years old. My address is 16506 Quail Park Drive, Missouri City, Texas 77489. I am currently in Houston Community College Police Academy, in training to be a police officer.

I knew Anthony through Dulles High School, where I attended with him. He was a junior when I was a freshman. I was also in the ROTC program. Anthony and I spent time together and we would hang out at Ashley's house. We did date in my sophomore year, for about two months, and we were friends after that. Anthony played football at Dulles High. I knew Anthony up until this incident happened.

Anthony did well in the ROTC program. Col. Davis, who testified at the trial, lied about Anthony.

I have seen Anthony get mad but nothing serious. He would help people out, share food with them and loan money. He never displayed any hostility toward authority figures. At the time of the trial, it was my opinion that Anthony was a very low risk for committing future dangerous or violent acts, and I would have told Anthony's jury this if I had been called as a witness. Today, this is still my opinion, that Anthony is essentially a very non-violent person.

The day after the incident, Anthony showed up at my house. He was scared and did not know what to do. Someone turned on the Channel Two News and his picture was on. Anthony said he had shot someone and said he had done some things with other people first. In these other incidents, he said he did not point the gun at them, but they saw it. Regarding the incident when he shot someone, he aid the man was reaching for something in his back. Anthony also said the person was cursing and calling him names. Anthony also said he was trapped by the guy who was cursing up a storm. As soon as the person walked up, Anthony said his voice got louder and Anthony said he felt that he was going to be grabbed or dragged out of his vehicle. The man's hand went to his back and Anthony felt he had to protect himself. As soon as the gun went off, Anthony said he was in shock. Anthony said he was sorry and remorseful. He told me all this the next afternoon, when I was life-guarding at a local pool. I told him to go to the police.

I attended the whole trial, along with some friends Carmen and Terise. It seemed to me that the judge favored the prosecution. At times, the judge read a newspaper during the proceedings. His attitude seemed to be to hurry up and get it over with.

During the trial, I talked with Mr. Jones, one of te defense attorneys, twice, and with Mr. Nunnery four times, but this was just outside the courtroom. But they never went into detail about anything I had to say. Mr. Nunnery would just want to know things quickly, and once he knew I was "the girlfriend," he did not want to know anything else. A male investigator talked to me once for about five minutes. I told the attorneys about the incident when Anthony told me about the shooting and how he was remorseful, but Mr. Nunnery told me he was not going to put me on the stand because I had a short relationship with Anthony. Terese was angry with Mr. Nunnery for not doing anything. I did not talk with Mr. Jones at all, and he was distant. Mr. Jones basically brushed me off.

I was aware that Mr. Jones and Mr. Nunnery had problems working together. They did not want to work with each other. I had the feeling their heart was not in it.

I attended the trial every day, thinking that I was going to be a witness. The attorneys never asked me to testify. If they had, I would have been willing to testify and I would have told them what I have said here.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on _09/13_, 2005 in _Houston_, Texas.


Tiffany K. Deckard

TAB 15

# EARL WASHINGTON, SR.

My name is Earl Washington, Sr. I am 50 years old. I live at 9811 Bent Spur Lane, Houston, Texas 77064.

I am a firefighter in the Houston Fire Department, where I have been for 27 years. I have known Anthony Haynes since he was born, right up until the incident when he was charged with killing the police officer. Anthony's father and I used to work in the same department.

Anthony's father, Donald Haynes helped me get a job in the Department, and we have been good friends since. My son is 20 years old, and his name is Earl Washington, Jr. He is 4 or 5 years younger than Anthony. I have known Donald since before Anthony was born, and I also know Patrika, Anthony's mother. I used to live in Missouri City, and we were in the same neighborhood.

I treated Anthony like my own son, and I was like a second father to him. My son and Anthony played T-ball together, and I would take them to games. Anthony was very interested in sports, such as flag football. We would have birthday parties and go on out-of-town trips, such as a visit to 6 Flags Amusement Park.

We all went to church together, to New Faith Baptist Church. Anthony would regularly attend church with his father. Anthony attended Sunday school and was in the youth ministry, an after-church program. Instead of hanging around, he was in various programs. When I moved from Missouri City, I did not change churches, so I kept in contact with Anthony and his dad.

At school, Anthony joined the ROTC, and he spoke well of it. His aim was to obtain a navy scholarship. Anthony did tell me of a blow-up at school. I met Col. Davis after the incident, and in court. He spoke highly of Anthony at the court. He said he had been trying to persuade Anthony to pursue higher degrees and extend his scholarship. Col. Davis said he could not believe what happened in regard to the killing of the police officer. At court, Col. Davis' opinion of Anthony was twisted around.

I think Anthony became involved with the wrong people. I saw his friends but I did not talk with them. I assumed they were good kids. Anthony played football at Dulles High School. He was in the BOOST program later.

Anthony was a good kid. He was respectful to adults, and would always say "Yes sir" or "No sir." He would cooperate.

I did attend two days of the trial. I saw some officers in uniform, 2 or 3. There were also some out of uniform when I attended, 2 or 3 or 4. I knew their faces. The judge seemed to favor the prosecution.

I had seen Anthony shortly before the incident, at church. He was acting normally. I did not see any indication anything was out of the ordinary. I never knew Anthony to use drugs. Anthony was taking Ritalin. It seemed OK since Anthony was doing well in school on it.

I don't think the defense attorneys were sufficiently on the offensive. It did not look like they were giving it their all. They really did not get down to defending Anthony. While

*When I first heard that my honey was involved in A criminal act, I could not believe it because that was not his character. I learned of the offense from the Newspaper and television News report.*

~~I knew Anthony had done the crime,~~ I did not think the punishment was appropriate, as it was his first time in trouble with the law.

Anthony's defense attorneys and investigators never talked to me. Donald Haynes had a list of people to whom the defense attorneys started to talk, and I was on that list. However, they never contacted me, and I was surprised at this. If I had been contacted by them, I would have told them what I have said in this declaration. If they had asked me to be a witness on behalf of Anthony, I would have been willing to testify, and I would have told the jury what I have said here.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on *8/9/05* , 2005 in *Houston* , Texas.


*Earl Washington Sr.*
Earl Washington, Sr.

TAB 16

## DECLARATION OF MYRTLE HINTON

My name is Myrtle Hinton. I am Anthony Haynes's grandmother. I am over the age of eighteen and am competent to make this declaration. My address is 4716 Providence Street, Houston, Texas 77020. My phone number is 713-672-2702. I have been retired since 1991. My former occupation was as an insurance collector for Memorial Hospital, for 13 years. At the time of Anthony's trial, I was living where I am now.

I have known Anthony Haynes all his life. I took a big part in raising him in the first twelve years of his life. When his mother started working with the airline, she asked me to keep Anthony. Anthony's father Donald agreed.

Anthony Haynes was very active in sports and church. His mother taught him how to get to and from school on the city bus, and he was independent from an early age. Anthony was also very considerate of other people. He attended Canaan Baptist Church at 5111 Lockwood Drive in Houston. Anthony sang in the church choir and attended Sunday School. His father belonged to another church.

After living with me, Anthony went to California to live with his mother for three years. After that, he returned to Houston to live with his dad for three years, when he graduated from high school. He then went into the BOOST Program in Newport, Rhode Island.

Anthony wanted to be an officer in the military and then attend college. One of his relations was in the Navy and that may have influenced him.

Anthony returned from the BOOST Program in April of 1998. I remember because his mother had foot surgery and couldn't get around. He was depressed and also hyper at the same time. He would say "It didn't work for me." Anthony said that in Rhode Island, he had gotten into using marijuana. Pat and her husband were afraid of the way he was acting after he returned, and Anthony was acting out of character. We did not know he was on drugs nor was he acting suicidal, but he was hyper. Within a short time of when he returned, he was arrested.

When Anthony was arrested, the police read him the statement that he gave. Anthony told me this, and he said he was forced to read it. He was forced into making his "confession." I asked him why he read it if it wasn't true. He said someone was standing over him with a gun and he could have shot him and said he was resisting. I know he was forced into making the statement. He had just been robbed. In his wallet were receipts for property belonging to him that he had pawned, rings, necklaces and jewelry.

Anthony's attorneys did not talk to me extensively before the trial. One meeting was for about 30 or 35 minutes when I went to Mr. Jones's office to take him money for the case. Mr. Nunnery had not yet been involved in the case. They did not properly prepare me to testify and I was asked only a few questions at this meeting.

Later, there were seven or eight of us at Mr. Nunnery's office for a meeting on a Saturday. We were questioned together as a group and then he called us in individually and these individual meetings only lasted a few minutes. This was the only time I talked to Mr. Nunnery.

I could have told the jury a lot more than I did about Anthony's background when I testified at his trial, but because the attorneys did not ask me much about Anthony's background, they didn't ask me.  On the stand, I said I would not change the way I had dealt with Anthony.  At the time of the trial, I did not think there was a high probability of Anthony committing future violent or dangerous acts.  Anthony never did anything around me that was a problem.  He was not violent, he was always considerate and wanted to help people.  I would have testified that he was not a future danger if I had been asked by his attorneys.  I also heard that some of the jurors voted for death because they thought he would have a chance to have it overturned on appeal.

Although I did briefly talk with Anthony's defense attorneys, and was called as a witness, they did not ask me much of what is in this declaration.  If they had, I would have been willing to tell the jury what I have said in this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on _09 - 11 - 2005_, 2005 in _Houston_ , Texas.


MYRTLE HINTON