# United States District Court
# Southern District of Texas

## Case Number: H-05- 3424

## ATTACHMENT

**Description:**

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __5__ of _____

☐ Exhibit to: __Vol II - Exh. 17__
number(s) / letter(s) _____

Other: __Petition For Writ of__

__Habeas Corpus__

__— Exhibits in Support ~~to~~ of__
__Petition__

TAB 17

# MARK D. CUNNINGHAM, PH.D., ABPP

**Clinical & Forensic Psychology**

*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260   Lewisville, Texas 75067
972-459-0658      Fax 972-459-0958    mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846, Idaho #PSY-379,*
*Illinois #071-006010, Indiana #20041376, Louisiana #794, New Mexico #0768,*
*Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #2351*

## Declaration of Mark D. Cunningham, Ph.D., ABPP

**Re:**   Anthony Cardell Haynes.

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare:

**1.**      I am a clinical and forensic psychologist, licensed as a psychologist in the states of Arizona, Arkansas, Colorado, Connecticut, Idaho, Indiana, Illinois, Louisiana, New Mexico, Oklahoma, Oregon, South Carolina, Tennessee, and Texas. I am over age 21, have personal knowledge of the facts contained in this affidavit, and am competent to testify about them. My curriculum vitae is attached (Attachment A).

**2.**      I received a Bachelor's degree in Psychology from Abilene Christian College in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. I completed a one-year internship in clinical psychology at the National Naval Medical Center of Bethesda, Maryland. I subsequently served as an active duty Clinical Psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981. I was an assistant professor of psychology at Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981.

**3.**      I was board certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP). This distinction follows a rigorous examination process and is held by approximately 200 psychologists in the United States. I have served as a work sample reviewer and oral examiner for the American Board of Forensic Psychology. I have provided forensic evaluation services in over 450 cases. I have participated in extensive continuing education in the area of forensic psychology. I have served as an ad hoc reviewer for three peer reviewed journals.

**4.**      I have been recognized as a clinical and forensic psychology expert in testifying regarding sentencing determination issues including mitigation and future dangerousness in

both state and federal courts. I have been qualified and testified as a clinical and forensic psychology expert regarding sentencing determination issues in approximately 40 federal capital cases and approximately 65 state capital cases in state and/or federal courts in jurisdictions including Alabama, Arizona, Arkansas, California, Colorado, Idaho, Illinois, Indiana, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Puerto Rico, Ohio, Oklahoma, Oregon, South Carolina, Virginia, and West Virginia. I have provided declarations/affidavits and testimony in state postconviction and federal habeas proceedings.

5.      I am a nationally recognized scholar regarding psychological evaluations at capital sentencing. I am the first author or co-author of over 20 scholarly papers related to forensic psychology published within the past seven years or currently in press in peer reviewed journals, scholarly texts, and professional periodicals. I am first author of the chapter on capital sentencing evaluations in the 12-volume <u>Handbook of Psychology</u>. I have authored or co-authored a number of scholarly papers regarding capital sentencing determinations. These have analyzed case law and statutes relevant to mitigation and violence risk assessment considerations at capital sentencing, discussed routinely observed approaches to these issues by the State and the defense, reviewed methodology that increases the scientific foundation and reliability of capital sentencing evaluations, and/or examined empirical studies and correctional data that can best inform these considerations. My scholarly papers relevant to capital sentencing considerations include the following:

> Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. <u>Behavioral Sciences & the Law, 16</u>, 333-351.

> Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. <u>Behavioral Sciences & the Law, 16</u>, 71-95.

> Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. <u>Criminal Justice and Behavior, 26</u>, 20-43.

> Cunningham, M.D. (2001). Bias in capital sentencing evaluations [invited opinion column]. <u>American Psychology and Law Society News, 21, 2</u>, 8-9.

> Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. <u>Behavioral Sciences & the Law, 19</u>, 473-490.

Reidy, T.J., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M.D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (152-171). New York: Oxford University Press.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. Criminal Justice Policy Review, 15, 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. Behavioral Sciences & the Law, 23, 307-320.

Cunningham, M. D. & Sorensen, J. R. (in press). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. Criminal Justice and Behavior.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

Cunningham, M. D. (manuscript under review). Unparalleled need to know: Informed consent in capital sentencing evaluations.

Cunningham, M. D. & Sorensen, J. R. (manuscript under review). An actuarial model for assessment of prison violence risk among high security inmates: A replication and extension.

3

6.      My scholarly activities have been noted by my peers. I have been selected to receive the 2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy. This award is bestowed on one psychologist annually. The Distinguished Contribution awards are among the highest recognitions extended by the American Psychological Association. The criteria for the Distinguished Contribution to Research in Public Policy recognizes "a psychologist who has made distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work." To my knowledge, I am the first psychologist working outside of a university or research institute setting who has been given this research-related award. I was the 2004 recipient of the John Augustus Award from the National Association of Sentencing Advocates.

7.      The American Academy of Forensic Psychology is an association of psychologists who have been board certified by the American Board of Forensic Psychology.  A primary mission of the Academy is to raise the standard of practice of psychology to the courts. Accordingly, the Academy conducts continuing education workshops on various forensic psychology applications. At the request of the Academy I provided full day workshops under their auspices on:  "The role of the forensic psychologist in death penalty litigation" (March 1998 - Milwaukee, Wisconsin; February 1999 - Austin, Texas; January 2000 - Monterey, California; February 2002 - San Diego, California; September 2003 - Cincinnati, Ohio). These workshops emphasized research literature, statistics, and conceptualizations relevant to assessments of capital defendants. Under the auspices of the Texas Psychological Association, in November 2003 in Dallas, Texas I provided a similar full day continuing education workshop for psychologists.

8.      Federal habeas counsel for Mr. Haynes, Richard Ellis, Esq., has requested my expert forensic psychology consultation regarding what testimony and associated argument regarding mitigation and positive prison adjustment potential (violence risk assessment) could have been presented at the punishment phase of Anthony Cardell Haynes' trial in September 1999. In providing this consultation I have interviewed family members, as well as reviewed the transcript of the punishment phase of the trial, portions of the transcript of the guilt-innocence phase of the trial, numerous records as listed below including reports of psychological consultations, summaries of investigation interviews of third parties, unsigned affidavits of third parties, research regarding the influences and long-term effects of adverse developmental factors, and research and correctional statistics relevant to violence risk assessment at capital sentencing. These types of data and sources are of a sort that are reasonably relied upon by clinical and forensic psychologists in coming to conclusions on relevant issues in this field of expertise.

9.      Because records and third party reports are much less subject to assertions of self-serving distortion or misreport, these are emphasized in forensic psychology evaluations and were the primary basis of my findings. It is acknowledged that I have not interviewed Mr. Haynes. The principle risk of not comprehensively interviewing Mr. Haynes is that additional mitigating factors may remain unidentified, and the psychosocial history lacks

4

anecdotal detail that he might have provided in response to expert probing. Given the reliance of the risk assessment on group statistical data and Mr. Haynes' pre-trial adjustment to incarceration, it is anticipated that information derived from direct interview would have modest or no impact on the risk assessment analysis and findings.  The following findings then are offered with a reasonable degree of psychological certainty.

**10.    Consultation procedures:**

Interviews conducted:

| | | | |
|---|---|---|---|
| Patricia Hinton Davis, Mother | 56 minutes | (9/4/05) | by telephone |
| | 90 minutes | (9/5/05) | by telephone |
| Donald Wayne Haynes, father | 90 minutes | (9/5/05) | by telephone |
| Myrtle L. Hinton, maternal grandmother | 82 minutes | (9/5/05) | by telephone |
| Allisha Prescott, maternal cousin | 45 minutes | (9/6/05) | by telephone |
| Gladys Deloris Prescott, maternal great aunt | 50 minutes | (9/5/05) | by telephone |
| Wanda Wolfe, mother of Courtney Davis, Jr. | 35 minutes | (9/12/05) | by telephone |
| Courtney Davis, Jr., stepbrother | 21 minutes | (9/12/05) | by telephone |

Records reviewed:

1. Declarations
   a. Patrica Davis (2 pages, undated, unsigned), (3 pages, undated, unsigned)
   b. Melinda Martin (1 page, undated, unsigned)
   c. Kenneth Porter (1 page, undated, unsigned)
   d. Lee Esther Porter (1 page, undated, unsigned)
   e. Beverly Scott (1 page, undated, unsigned), (1 page, undated, unsigned)
   f. Eric Haynes (2 pages, undated, unsigned)
   g. Debra Swisher (1 page, undated, unsigned)
   h. Donald Haynes (2 pages, undated, unsigned)
   i. Tiffany Deckard (2 pages, undated, unsigned)
   j. Sheila Haynes (1 page, undated, unsigned)
   k. Sgt. Allen Harris (2 pages, undated, unsigned)
   l. Earl Washington, Sr. (2 pages, undated, unsigned)
   m. Sheila Waters (1 page, undated, unsigned)
   n. Portia Rose (1 page, undated, unsigned)
   o. Ryan Braud (1 page, undated, unsigned)
   p. Tiombe Davis (1 page, undated, unsigned)
   q. Jennifer Clay (1 page, undated, unsigned)
   r. Cherrie McGlory (1 page, undated, unsigned)
   s. Debbie Lucas Moerbe (4 pages, undated, unsigned)
   t. Socorro Herda (4 pages, undated, unsigned)
   u. Lawrence Aaron Tate (1 page, undated, unsigned)
   v. Dexter Scott (1 page, undated, unsigned)
   w. Renita Royal (1 page, undated, unsigned)

5

**Re: Anthony Cardell Haynes**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05**

      x.  Carmen Nickerson (1 page, undated, unsigned)
      y.  Ashley Moss (1 page, undated, unsigned)
      z.  Cleophis Lewis (1 page, undated, unsigned)
     aa. Lawrence Hughes (2 pages, undated, unsigned)
     bb. Shannaiko Bryant (1 page, undated, unsigned)
     cc. Larry Britt (1 page, undated, unsigned)
     dd. Debra Elaine Haynes (1 page, undated, unsigned)
     ee. Richard Haynes (1 page, undated, unsigned)
     ff.  Myrtle Hinton (2 pages, undated, unsigned)
     gg. Sharon Davis McElroy (1 page, undated, unsigned)
     hh. Ron Royal (1 page, undated, unsigned)
     ii.  Barbara Taveras (1 page, undated, unsigned)
     jj.  Leon Tousant (1 page, undated, unsigned)
     kk. Bonita Denyse Thierry (1 page, undated, unsigned)

2.  Investigation interview summaries
     a.  LaToya Terry, undated
     b.  Courtney Erwin Davis, 8/5/99, undated
     c.  Patrica Davis, 8/9/99, undated
     d.  Yolando Gaines, undated
     e.  Sheila Haynes
     f.  Anthony Haynes, 7/29/99, 8/20/99
     g.  Courtney Jr, Wanda Wolfe, Don Wolfe, 8/17/99
     h.  Debbie Lucas, 8/12/99
     i.  Donald Haynes, 7/30/99, Statement (undated)
     j.  Evelyn Haynes, 8/18/99
     k.  Ladara Lucas, 8/13/99
     l.  Michael Benedict, 8/20/99
     m. Myrtle Hinton, 8/5/99, Statement (undated)

3.  Statements of Anthony Haynes
     a.  5/25 - 12:32AM
     b.  5/25 - 1:50 by Investigator Miller
     c.  Undated – by Joe D. Patillo

4.  Houston Independent School District
     a.  Special Education
          i.  ARD/IEP Reports
     b.  Report Cards
     c.  Standardized Testing
     d.  Discipline
     e.  Attendance

5.  Fort Bend Independent School District
     a.  Report Cards
     b.  Health/Medications

6.  BOOST Program
     a.  Acknowledgements
     b.  Appeal/Responses Regarding Disenrollment

Re: Anthony Cardell Haynes
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05**

        c.  Incident Notes/Reports
        d.  Medical Records
        e.  College/University Letters Regarding Application Fees
        f.  Transcript
        g.  Productivity Style Report
        h.  NROTC Application
        i.  Disenrollment
        j.  Academic Reviews and Performance
        k.  Correspondence
        l.  Schedules

7.  John Foster Dulles High School
        a.  School Profile
        b.  Report Card
        c.  Discipline Report
        d.  Statement of Events

8.  West Oaks Hospital
        a.  Psychiatric Records
            i.  Progress Notes
            ii.  Evaluations
           iii.  Laboratory Testing
           iv.  Medications
            v.  Seclusion/Restraint

9.  Transcript Summary
10. Narrative Summary
11. Chronology
12. Current Offense Summary
13. Mental Health Records
        a.  Dr. Robert Geffner
            i.  Letter to Attorney Alvin Nunnery, 9/12/99
        b.  Dr. Mitchell Alan Young
            i.  Evaluation
            ii.  Expenses Receipts
        c.  Testing
            i.  Neuropsychological Deficit Scale, 8/23/99
           ii.  Halstead-Reitan Neuropsychological Battery, 8/23/99
           iii.  MMPI-2, 8/17/99
           iv.  Coolidge Axis II Inventory, 8/17/99
            v.  MCMI-II, 8/29/99
           vi.  IBS, 8/17/99
          vii.  Trauma Symptom Inventory, 8/17/99
         viii.  Hare PCL-R, 8/26/99
14. Punishment Phase Transcripts
        a.  Volume 28, pages 155-192
        b.  Volume 29, pages 4-121
        c.  Volume 30, pages 14-65

Re: Anthony Cardell Haynes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

15. Typed Letter from Anthony to Richard Ellis, 2/25/05
16. Psychological Evaluation on Myrtle Hinton by Dr. Charles Scherzer, 11/10/95
17. Memorial Care Medical Records and Consultation Summary, Admit 12/22/86
18. Medical Narrative on Myrtle Hinton by Dr. Harvey Rosenstock, 4/1/92

**11.     Findings:**

**Section I** describes the failures of Mr. Haynes' defense to articulate a coherent theory of
mitigation; to investigate or present adequate evidence of damaging developmental and
mental state factors, and/or to provide expert testimony regarding the nexus of those factors
with problematic outcomes including criminal violence. This section subsequently outlines
adverse developmental factors and experiences in Anthony Haynes' history that singularly
and collectively increased the likelihood of psychological and social maladjustment,
morality deficits, poor impulse control, poor judgment, criminal activity, and violent
criminal offending. Only a few of these factors were touched on in a cursory fashion during
evidence offered by the defense at Mr. Haynes' capital sentencing.  Each adverse
developmental factor detailed in this section is accompanied by a discussion of the
mitigating implications of this factor, and in many cases, associated research available in
September 1999. As the defense obtained only 11th hour mental health expert consultations
and then failed to call such an expert to testify regarding Mr. Haynes' developmental
history; perspectives on the linkage of developmental injury and/or psychological disorder
to criminal violence were entirely absent from Mr. Haynes' capital sentencing phase.
Accordingly, the jury was deprived of a scientifically informed basis to give weight to that
history and psychological status. Mr. Haynes will be referred to as "Anthony" throughout
Section I as this reference is most descriptive of his child status in discussing his
developmental experience, and reduces the potential for confusing him with male relatives.

**Section II** describes evidence that could have been presented by the defense regarding the
application of Special Issue No. 1: "whether there is a probability that the defendant would
commit acts of criminal violence that would constitute a continuing threat to society" as this
applies to Mr. Haynes. Methodology and data relevant to a reliable violence risk assessment
that could have been presented at Mr. Haynes' capital sentencing phase are detailed.

The mitigating factors and implications, as well as the violence risk assessment
conceptualizations and research data, were, with even limited investigation, reasonably
available to defense counsel and testifying mental health experts at Mr. Haynes' capital
murder trial in September 1999.

<h3 style="text-align:center">Section I: Mitigating Factors</h3>

_Failure to investigate, present, or explain the relevance of damaging developmental
experiences:_

Mr. Haynes' defense failed to adequately investigate Anthony's background, identify and
explore the numerous damaging developmental factors apparent in that background, or

8

articulate these factors and the supporting evidence. By failing to identify and provide evidence of such factors, the defense effectively put almost no mitigation before the jury. So sparse was the history and associated damaging developmental factors offered by the defense that the State could assert that there was no mitigation:

> The evidence is also clear that there is no mitigation. The fact that he has had every opportunity in life and still did what he did to Sergeant Kent Kincaid, the fact that he had loving parents who never, even to this day, have not abandoned him, is that mitigation? The fact that he had loving and caring grandparents, is that mitigation? The fact that he chose to take – not take advantage of the opportunity of that abuse [sic Boost] program, the pipeline that enabled him, is that mitigation? The fact that he didn't take advantage of his career scholarship from the Army ROTC to Prairie View A & M, is that mitigation? The fact that he blew all of chances to go to Morehouse College in Atlanta, is that mitigation? Is there anything that you see that mitigates against this. I suggest to you not. What does the defense bring you to show, to suggest that there's mitigation? A bunch of little awards, diplomas, certificates from elementary school that's supposed to be mitigating? (Page 28: lines 4-23)

The failure of the defense to discover and develop this potentially critically important mitigating information appears to lie in the 11th hour nature of the investigation into Anthony's background. My review of the pre-trial mitigation investigation found one interview of Anthony on 7-29-99, only three weeks before voir dire of the jury; and another on 8-21-99, only three days prior to jury voir dire. Most if not all of the interviews of family members were also not performed by defense investigators until August 1999, and were correspondingly limited in number and depth. The evaluation by Robert Geffner, Ph.D., neuropsychologist, took place between 8-19-99 and 8-23-99, on the very eve of voir dire of the jury which began on 8-24-99. A single page letter from Dr. Geffner to Alvin Nunnery summarizing the evaluation findings was dated 9-12-99. Accordingly, this summary would have been received on the literal eve of opening statements - if it had been faxed. The evaluation by Mitchell Young, M.D. was performed on 9-19-99, two days *after* Anthony had been convicted of capital murder, and on the literal eve of the opening of the penalty phase.

The defense-retained experts can hardly be faulted for the less than comprehensive nature of their evaluations under the time and funding restrictions placed on them by defense counsel. Dr. Geffner took pains to explain in his one-page summary why he required an additional two hours to review the file, much less seek additional records or third party data. Beyond funding pressures, the unconscionably late timing of these consultations did not allow sufficient time for the experts to interview family or other third parties. This was a critical lapse, as mental health experts are likely to explore areas that are not apparent to investigators. The role of the interviews undertaken by the mitigation investigators is to provide a foundation for, not act as a substitution for direct interviews of family and third parties by mental health experts. The importance of these interviews and the history they may uncover increases when it is realized that testimony by mental

9

health experts at capital sentencing is most importantly directed toward describing damaging developmental factors and their effects, as opposed to diagnosis.

Similarly, there was insufficient time for the mental health experts to test their hypotheses regarding Anthony against the reports of these third parties or to engage in more specific evaluation procedures. For example, whether Anthony had an Antisocial Personality Disorder as reported by Dr. Geffner and Dr. Young would depend on family and third party reports of evidence of a childhood Conduct Disorder. Though noting an Intermittent Explosive Disorder (which may be associated with the presence of a seizure disorder), Dr. Young acknowledged that an EEG had not been done. Similarly, he identified the potential for an "emergent thought disorder" (i.e. psychosis), but apparently did not have an opportunity to rule this out. Dr. Gessner's was apparently not provided with sufficient background information regarding Anthony to observe the multiple family dysfunctions noted by Dr. Young. Dr. Young's findings in this regard would have arrived too late to allow reasonable consultation with Dr. Gessner for his findings to be supplemented. Further, Dr. Young reported that he had only reviewed "excerpts" from the West Oak Psychiatric Hospital records. His having reviewed these West Oaks records in their entirety appears to have been critical given the emphasis placed on these by the State, and as Anthony now reports that he fabricated the history of delinquent activity that he provided to the West Oak staff. Anthony's disavowal of this history of delinquency is consistent with numerous affidavits from peers and adults who had long, close observation of his interactions and behaviors.

The apparent defense request that the evaluation findings from the mental health experts be boiled down to a one page report (e.g. "Enclosed please find requested one page report…" Cover letter from Dr. Young to Alvin Nunnery dated 9-20-99) only aggravated the cursory nature of the associated summaries. Reducing a mitigation evaluation to a single page can result in the loss of important detail. For example, Dr. Geffner reported: "His [Anthony's] psychological assessment did not indicate psychotic disorders" when, in fact, Anthony likely did not appear overtly psychotic. However, Anthony's MMPI-2 profile obtained by Dr. Geffner raised the potential of a psychotic disorder, or a mood disorder with manic and psychotic features. Dr. Geffner's failure to note this potential is of greater concern in the face of Anthony's historical experience of auditory hallucinations, documented well prior to his capital murder charge, and an adolescent psychiatric hospitalization where he was treated with antipsychotic medication. These failures in evaluation integration again point to insufficient data and insufficient time to adequately consult with mitigation investigators and defense counsel.

The failure of defense counsel to adequately consult with the mental health experts also extended to the evaluation procedures. Dr. Geffner administered the Psychopathy Checklist – Revised (PCL-R). This instrument is irrelevant to a defense-retained evaluation at capital sentencing as it does not illuminate how a defendant came to be damaged, and is not predictive of serious violence in American prisons (Cunningham & Reidy, 1998a, 1999, 2001; Cunningham, Sorensen, & Reidy, 2005). This instrument does have the enormously aggravating potential, though, to inject the word "psychopath" into

10

the capital sentencing proceeding.

Defense counsel was then faced with whether to call mental health experts whose
evaluations were rushed and cursory, whose findings were based in part on a paucity of
inadequate 11th hour defense investigation summaries, and whose conclusions might be
aggravating because of evaluation limitations, weaknesses, and incorporation of
irrelevant but potentially profoundly aggravating procedures.

As will be demonstrated at length in this section, the absence of mitigating developmental
factors from the defense case at Anthony's capital sentencing was not occasioned by a
lack of such factors.

### *Failure of the defense to articulate a coherent theory of mitigation:*

While the defense failed to articulate a coherent theory of mitigation for the jury, this
lapse was perhaps unavoidable when the defense offered little to no mitigation for the
jury's consideration. To explain, the concept of moral culpability acknowledges an
elementary psychological reality: we do not all arrive at our choices out of equivalent raw
material. It follows that the degree of "blameworthiness" of an individual for criminal or
even murderous conduct may vary depending on what factors and experiences shaped,
influenced, or compromised that choice. The relationship of developmental damage and
other impairing factors to the exercise of choice, and subsequently to moral culpability is
illustrated in the graphic models below. As the damage and impairing factors (e.g.
psychological disorder, mental deficiency, drug dependency/intoxication, "risk factors"
in the U.S. Department of Justice model) increase, choice is exercised on an increasing
slope, and moral culpability is correspondingly reduced.



That a defendant had a choice is a settled issue at the point of conviction, as is whether

11

the defendant knew right from wrong. A moral culpability analysis at capital sentencing, then, is not a dichotomous determination of whether the defendant had a choice or wrongful awareness. Rather, it is an appraisal of the degree to which the background and circumstances of the defendant influenced, predisposed, or diminished the defendant's moral sensibilities and that exercise of volition or free will.

This consideration, however, becomes irrelevant if the defense offers no evidence regarding how the defendant was adversely shaped, influenced, or compromised. In the absence of investigation and testimony regarding such adverse factors by the defense, it is not surprising that the State advised the jury that Anthony's conduct was simply "merciless," "predatory," and "cold-blooded." Similarly, it is not surprising that the jury would find Anthony's level of moral culpability to be death-worthy.

*DOJ risk and protective factors in Anthony's background:*

To initially illustrate that the failure of the defense to clearly identify mitigating factors in Mr. Haynes' background was not a result of a paucity of relevant developmental features, his developmental experience will be examined through the lens of research sponsored by the U.S. Department of Justice regarding the precursors of serious and chronic delinquency as well as youth violence. Risk factors and protective factors as specified by a U.S. Department of Justice (1995) are listed below. Risk and protective factors that were present in Mr. Haynes' history are placed in *italics*. Inspection of these factors in light of Mr. Haynes' history reveals that Mr. Haynes had numerous risk factors identified by the U.S. Department of Justice as having cumulative impact in leading to chronic delinquency and youth violence; and few of the protective factors.

U.S. Department of Justice Risk Factors (1995)

Conception to age 6

*Perinatal difficulties*
*Minor physical abnormalities*
Brain damage
*Family history of criminal behavior and substance abuse*
*Family management problems*
*Family conflict*
*Parental attitudes favorable toward, and parental involvement in, crime and substance abuse (alcohol abuse of parent figures)*

(Anthony had five of seven of the above risk factors)

Age 6 through adolescence

12

Extreme economic deprivation
*Community disorganization and low neighborhood attachment*
*Transitions and mobility*
*Availability of firearms*
*Media portrayals of violence*
*Family management problems*
*Family conflict*
*Parental attitudes favorable toward, and parental involvement in, crime and
    substance abuse*
Early and persistent antisocial behavior
Academic failure
Lack of commitment to school
*Alienation and rebelliousness*
Association with peers who engage in delinquency and violence
Favorable attitudes towards delinquent and violent behaviors
*Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit
    disorders)*

*(Anthony had 9 of 15 of the above risk factors)*


## U.S. Department of Justice Protective Factors (1995)

### Individual characteristics

Female gender
Intelligence
*Positive social orientation*
Resilient temperament

### Social bonding to positive role models

*Family members*
Teachers
Coaches
Youth leaders
*Friends*

### Other protective factors

Healthy beliefs and clear standards for behavior, including those that promote
    nonviolence and abstinence from drugs.
Effective early interventions

13

**Re: Anthony Cardell Haynes**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05**

The concentration of risk factors for delinquency and criminal violence in Anthony's life would be characterized as *seriously* cumulative. Anthony had the benefit of few of the protective factors.

In considering the nexus between damaging developmental factors and adverse outcomes in adulthood, it is important to note that everyone need not totally succumb to adverse developmental exposures in order for a "toxic" effect to be implicated. Correspondingly, all similarly situated persons need not commit acts of criminal violence or suffer adverse life outcomes, in order to demonstrate a relationship between background and outcome. The analysis of risk, vulnerabilities, and protective factors in the etiology of criminal violence and other adverse life outcomes is quite similar to explanations of why some individuals contract cancer and others do not (i.e. carcinogen exposure, predisposing factors, and protective factors).  All of the children growing up in a neighborhood built on top of a toxic waste dump do not get cancer - rather these children as a group experience a markedly increased incidence of cancer as compared to more benign settings. Similarly, only 20% of heavy smokers eventually suffer from lung cancer – yet the role of this exposure in these cancers is well-established. A history of adverse developmental experiences does not invariably result in a criminally violent or markedly impaired adult outcome - only a much increased likelihood of it.

*Developmental factors that could have been brought to the attention of the jury:*

A *significantly expanded* discussion *of a number of contributing developmental* factors experienced by Anthony Haynes, as well as their history and implications are described in the paragraphs that follow.  Adverse developmental factors that will receive this expanded treatment are listed below:

## Wiring

**Youthfulness**
**Pregnancy and birth complications**
**Congenital physical anomaly**
**Attention Deficit Hyperactivity Disorder**
**Average intellectual ability and school performance**

## Generational Influences

**Generational family dysfunction**
**Genetic predisposition to alcohol and drug dependence**
**Genetic predisposition to psychological disorder**

## Parenting

14

> **Dysfunctional relationship between parents**
> **Alcohol abuse by parent figures**
> **Emotional and supervisory neglect**
> **Physical and emotional abuse**
> **Sexually traumatic exposures**
> **Corruptive community influences**

## *Disturbed Trajectory*

> **Severe psychological disorder in adolescence with psychiatric hospitalization**
> **Teen onset alcohol and drug dependence**
> **Failed attempt to transition to adulthood**

All of the above contributing factors were present in Anthony's life. Testimony that could have been provided the jury at Anthony Haynes' sentencing phase to illustrate these factors, and scholarly perspectives on their implications for adverse and criminally violent outcome will be detailed in the sections that follow.

## *Wiring*

**Youthfulness:** In 1998, at the time of the capital offense, Anthony was only 19 years old.

**Implications of youthfulness:** Anthony's teenage status at the time of the capital offense is critically important to considerations of his moral culpability, and hence his death worthiness. Unfortunately, there was no evidence presented at sentencing regarding the implications of his developmental immaturity. Adolescent immaturity has a clear neuro-developmental basis. To explain, brain development of the frontal lobes continues into the early twenties.

> ...it is now known that mylenization of the frontal cortex and the reduction in the number of synaptic contacts (i.e. synaptic pruning) continues into this period. There is also a change in the brain's electrical activity. The transition from predominantly low-frequency waves seen in children to the characteristic alpha rhythms of adults occurs during the period of adolescence. (Looney & Oldham, 1989)

Executive functions associated with frontal lobe functioning include insight, judgment, impulse control, frustration tolerance, recognition and appreciation of the emotional reactions of others, and recognition of consequences. Significant age related growth in these capabilities, conventionally referred to as "maturing" or "growing up," occurs between the ages of 19 and 22 in all individuals. While the age-related endpoint of adolescence varies by function or role, neurologically it can be considered to continue through this full frontal lobe mylenization in the early to mid-twenties. All 19 year olds are thus "immature" in brain development and in relation to adults. This neurological immaturity is reflected in

15

limitations in psychological functioning and behavioral control, and accounts for the poor decision-making and poor impulse control often observed in adolescents, even in their late teens.

Compounding the judgment and behavior control problems associated with frontal lobe immaturity, the adolescent male brain is experiencing markedly rising levels of testosterone, and subject to the aggression-inducing effects of this hormone. At the same time, physical development is rapidly proceeding, psychosocial roles are changing, and identity is being transformed. Such instability is seen in Anthony's teens as he apparently shifted between respect to adults on one hand and defiance with his mother on the other, or ROTC participation on one hand and delinquent activities on the other. That Anthony would have been hyper-religious during the Boost program, only to commit armed robberies and a capital murder only a month later is further evidence of this adoleslent identity instability.

Additionally, adolescence is also characterized by egocentric perceptions of self-uniqueness, with an associated "personal fable" that the risks and consequences that might befall others do not apply to them. These classically adolescent perspectives explain the involvement of teens in high risk and even illegal activities, and their deficits in identifying and empathizing with others. The almost irresistible striving for independence among adolescents, combined with their continuing perception of themselves as children rather than adults, interferes with their accepting behavioral direction, identifying with the collective community, or perceiving any sense of responsibility for upholding collective moral values. In other words, an adolescent is unable to see beyond his own world, his personal perceptions, and/or his own need to be separate sufficiently to experience a sense of moral responsibility to his community.

Thus an immature brain is confronted with the additional psychological instability of significant hormonal, interpersonal, and identity upheaval - at times with disastrous behavioral results. As Esman (1988) summarized:

> The young person traversing this phase is confronted by a number of crucial developmental "tasks" requiring major adaptations in many aspects of life....It is not an easy time, and a fair number of adolescents do succumb to the stresses of the phase or to the predisposition they bring with them from their earlier years and experience of significant psychopathology. (p. 219)

Accordingly, our society broadly regards 19 year olds as still in need of some social restriction, as reflected in age for alcohol purchasing. Further, in most families, 19 year olds are still receiving some degree of financial and emotional support, as well as guidance. Their insufficient capacity for fully adult roles is also reflected in their deficient ability to adhere to the requirements of the law – particularly when outside of effective adult supervision for extended periods of time. To explain, adherence to the law among adults variously stems from effective impulse control, a realistic appraisal of apprehension, a recognition of long-term consequences to personal outcome, identification and empathy with potential victims, a clear identity as a law-abiding and/or moral individual, a sense of obligation to family and

16

others, an identification with the community, an appreciation of the collective good, and/or a mature commitment to a religious or ethical belief system. Quite simply, teens lack the mental capability and psychological development to effectively exercise any of these characteristics, and thus are unable to act with the same level of moral culpability as adults.

Corroborative research findings formed the basis for a brief of the American Society for Adolescent Psychiatry and the American Orthopsychiatric Association filed as an *amici curiae* in *Thompson v Oklahoma* (1986) in the U.S. Supreme Court. Though commenting on the status of 16-17 year olds, these observations apply to some degree to teens closer to age 20. Regarding characteristics of adolescence confirmed by research, the brief summarized:

> …adolescents tend to be less mature, more impulsive, and less capable of controlling their conduct and thinking in terms of long-range consequences. Adolescence is a stage of human development in which one's character and moral judgment are incomplete and still undergoing formation. (p. 2)

> Psychiatrists, psychologists, and other child development experts recognize that adolescence is a transitional period between childhood and adulthood in which young people are still developing the cognitive ability, judgment and fully formed identity or character of adults. (p. 267)

Additional evidence of Anthony's adolescent status at the time of this offense demonstrated in the interpersonal context of the armed robberies and capital offense on May 22, 1998. First, there was an aimless and shifting plan for the evening's activities, which did not initially contemplate criminal activities. Second, the offenses are committed in the presence of two male peers, one of whom initially indicated a willingness to participate in the armed robberies and one who was simply along as an observer. This is a classically adolescent pattern of behaving as, or in the company of, a group. Adolescents define themselves, their identity, and the meaning of their behavior and relationships by how their peers perceive and react to them. They live their life in the group. Thus Anthony engaged in armed robberies in a group setting, even though the presence of his two peers created witnesses, might require a distribution of the proceeds, and dramatically increased the likelihood of eventual apprehension. That one of the accompanying youth, Timothy Reese, apparently expected that he could ride along during armed robberies without becoming implicated in the associated conduct also reflected the operation of an adolescent group process that does not appreciate the role of collective responsibility and the associated law of parties.

Anthony's inability to keep the offense to himself is also reflective of his adolescent psychological status. Within hours after the offense, Anthony telephoned Sergeant Quarracy Lamar Smith, recent Boost program mentor, and confessed his participation in the shooting of a police officer. That same night, Anthony telephoned LaToya Terry, a friend, and confessed to her as well. Tiffany Deckard, another friend, reported that Anthony came to her the day after the shooting and confessed. This need to disclose, even when creating grave jeopardy for himself, is typical of adolescent processing of a disturbing event. Obviously, it is inconsistent with a cool, hardened killer. Anthony's reported "bragging" regarding the

17

offense is also most appropriately viewed through the lens of his being a teenager.

Beyond the typical immaturity in cognitive capability, judgment, impulse control, modulation of emotion, and moral development, there is reason to believe that Anthony was even more psychologically *immature* at age 19 than most of his age mates. There are three lines of evidence supporting this assertion.

1.  ADHD (hyperactivity, attention/concentration deficits, and impulsivity) implicates mild nervous system immaturity reflected in deficiencies in motor inhibition, attention, and impulse control processes. This serves to reduce the effectiveness of cognitive processes associated with "maturity."

2.  The adverse developmental factors in Anthony's childhood would act to delay functional emotional maturity. This factors associated with this disrupted developmental trajectory are detailed in above sections of this affidavit.

3.  As described above, Anthony's heavy alcohol and substance abuse during his teen years would act to slow the onset of age-appropriate coping capacity and functional maturity.

4.  That Anthony's social and psychological development lagged behind his peers is also evident in his being unable to adapt to the academic and social requirements of the Boost college preparatory program.

Engaging in delinquent activities and the associated commission of murder does not indicate that the perpetrator is more psychologically or developmentally mature than his age would otherwise indicate.

The relevance of youthfulness to risk of criminality and violence in the community does not end with the teen years, rather peaks in the early twenties and then progressively falls across the later twenties, thirties, forties, and fifties. This trend is one of the most well-established in the field of criminality. Hirschi and Gottfredson (1989) presented arrest record data from an English cohort in 1842-1844 and a 1977 U.S. Department of Justice annual crime report which demonstrated almost identical and dramatically disproportionate over-representation of younger offenders (twenties). Miller, Dinitz, and Conrad (1982) reported similar decreasing incidences of arrest for aging cohorts after age 30 when tracking incidence of murder, rape, or robbery. Swanson, Holzer, Granju, and Jono (1990) described NIMH Epidemiologic Catchment Area data which found a marked progressive reduction in rates of community violence among successively older community members. This community data on preceding year prevalence of violent behavior by age is quite relevant to base rate estimates in risk assessments as demonstrated by findings for males shown in the graph below. These data on community violence and age parallel the historic age-arrest relationship described by Hirschi and Gottfredson.



*Swanson et al.: Community prevalence of violent behavior by age*

This graph demonstrates that a male between the ages of 18-29 is 73 times more likely to commit an act of violence in the community in any given year than a male over age 65.

**Pregnancy and birth complications:**  Patrica reported that she only gained seven pounds during her pregnancy with Anthony secondary to severe, chronic nausea. She described a "horrific" 50+ hour labor with Anthony that finally culminated in an emergency c-section. A portion of the placenta was left inside her post-delivery, resulting in a life-threatening infection and several weeks of additional hospitalization.

**Implications of pregnancy and birth complications:** Pregnancy and birth complications are among the factors identified in DOJ-sponsored publications as increasing the risk of teen and adult delinquency, criminality, and violence. A history of pregnancy and birth complications is also a risk factor for Attention Deficit Hyperactivity Disorder. It is additionally notable that Anthony was identified as having "unintelligible speech at times and seeming articulation difficulties" at age 9, resulting in his referral for evaluation. He subsequently qualified as being speech handicapped.

**Congenital physical anomaly:** Anthony suffered from a congenital malformation that resulted in his feet turning inward. He slept in corrective shoes and leg brace as a young child to correct this deformity.

19

Re: Anthony Cardell Haynes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

**Implications of congenital physical anomaly:** The presence of minor congenital physical anomaly is one of the factors identified by DOJ-sponsored research summaries as increasing the risk of delinquency and violence in adolescence and early adulthood.

**Attention Deficit Hyperactivity Disorder:** In elementary school Anthony was diagnosed as suffering from Attention Deficit Hyperactivity Disorder and was treated with Ritalin. His maternal grandmother, Myrtle, reported that Anthony had always been hyper, and as a child had difficulty focusing his attention as he jumped from one activity to another. Patrica also described Anthony as being very busy and being unable to focus on one play activity. Even when watching television Anthony would be moving. Patrica reported that in school Anthony had trouble sitting still, often did not complete his seat work, talked excessively in class, and disrupted his peers. She described that Anthony was often moved away from other students so that he would not distract them. Patrica reported that Anthony's ADHD symptoms were reduced by Ritalin (stimulant medication), which he took for several years until Junior High. Unfortunately, there is no indication that either of his parents reported Anthony's history of ADHD diagnosis and treatment to the mental health professionals evaluating him when he was admitted to West Oaks psychiatric hospital.

Patrica reported that Anthony's younger half-sister, Alexandra (age 11) has also been diagnosed with ADHD and is medicated with Concerta.

**Implications of Attention Deficit Disorder with Hyperactivity (ADHD):** ADHD is characterized by a triad of symptoms: inattention, impulsivity, and excessive motor activity. It is a form of brain dysfunction that can have a hereditary as well as congenital or neurological insult etiology. The presence of this disorder is a significant risk factor for disturbed peer relationships, school failure and maladjustment, conduct disorder, antisocial traits and behaviors, alcohol and drug abuse, juvenile delinquency, and adult criminal activity (Mannuzza, Klein, Konig, & Giampino, 1989).

Barkley (1990) summarizes some of the risk outcomes for ADHD. First, ADHD typically persists into adolescence as 83% of hyperactive children still meet criteria for ADHD as teenagers. Quite commonly there is the co-morbid presence of a behavior disorder. Fifty-nine percent of children diagnosed as ADHD have a co-existing Oppositional Defiant Disorder, and 43% have a co-existing Conduct Disorder. Thus as Anthony's mother complained about his resistance to authority when he was admitted to West Oaks psychiatric hospital, that was entirely consistent with a teenage expression of this disorder. Three times as many hyperactive adolescents fail a grade as compared to normal adolescents (29.3% vs. 10%). ADHD teens are suspended from school 10 times more often and expelled 7 times more often than normal teens. Hyperactive teens are at substantially higher risk for negative outcomes: psychiatric, social, legal, and academic.

Adults with a history of ADHD are more likely to develop conduct disorders, alcoholism, and sociopathy. Relatives of individuals with ADHD are more likely to suffer ADHD, antisocial behaviors, and mood disorders. For that reason, it is notable that Anthony's

20

younger sister has been diagnosed with ADHD. Individuals with a history of childhood hyperactivity are 7 times more likely to suffer from an antisocial personality disorder or drug abuse problem. Childhood hyperactivity has a significant relationship with alcohol problems and violent offending. The combination of ADHD and conduct disorder was a strong risk factor for adult criminality. A childhood history of ADHD and/or conduct disorder is commonly observed among male prison inmates:

> Conduct Disorder History: 63%  (vs. 6-16% community)
> ADHD history:          41%  (vs. 3-5 % community)

Only 11% of ADHD children as adults are free of any psychiatric diagnosis, function well, and have no significant symptoms of their disorder (Vitelli, 1996).

Anthony's treatment for ADHD ended in adolescence. This is inexplicable as his emotional and behavioral problems continued. The ceasing of medication support also appears to generally coincide with his beginning to self-medicate with marijuana. Anthony's problems with anger regulation and impulsive over-reaction are also consistent with ADHD. Anthony's untreated ADHD provides some explanation for his delinquent activities as a teen. ADHD is also an important factor in explaining his difficulty focusing on his academics when in the Boost program. Obviously, the role of ADHD in Anthony's life trajectory would be far less pejorative than that ascribed by the State:

> …This is the complete opposite. This is a kid that had every opportunity, a young man that had a chance to be somebody, to make something of his life. (Page 24: lines 10-13)

> …He had those opportunities, every opportunity he was given he stomped on, he walked away from it. (Page 63: lines 5-7)

In the absence of adequate investigation and consultation, the defense embraced the State's characterization of Anthony willfully failing to take advantage of the opportunities afforded him, rather than as psychologically compromised:

> He didn't avail himself of all the opportunities they [his family] had. (Page 41: line 2).

The impulsivity which is a core symptom of ADHD also has a nexus with his conduct on the night of the capital offense, and in his shooting of Officer Kincaid. Broadly, there are two types of impulsivity. Anthony exhibited both of these on the night of the offense. There is what might be described as reactive impulsivity, where there is an immediate and unreflective action. Anthony's shooting of Officer Kincaid in response to the officer reaching toward his back pocket and/or having just announced that he was a police officer would represent this reactive form of impulsivity. This reactive impulsivity gives little opportunity for considerations of mercy or the setting aside of compassion.

21

Accordingly, reactive impulsivity is an important consideration in weighing whether a given act is "merciless" or "cold-blooded." Reactive impulsivity is also without sufficient planning to be reasonably considered as "predatory." In the absence of an explanation of reactive impulsivity, all of these pejorative characterizations of Anthony's capital conduct were asserted by the State:

> You learned that prior to the cold-blooded, senseless, merciless killing of Sergeant Kent Kincaid he had robbed three other people. (Page 15: line 23 to Page 16: line 1)

> ...before Sergeant Kincaid was mercilessly killed.

> This is a dangerous predator that nothing can mitigate. He showed no mercy whatsoever to Sergeant Kincaid, and just because he was good in school and is a young person, that is insufficient. (Page 65: lines 1-3)

The second type of impulsivity may demonstrate some planning, but is still characterized by profoundly poor judgment and failure to consider the consequences. For example, a man might meet a woman in the morning, spend lunchtime planning the wedding and their lives together, and marry her that afternoon. Though by no means "reactive," and while demonstrating some planning, the act of meeting and marrying on the same day is profoundly impulsive. Anthony's behavior in committing the armed robberies that preceded the capital offense represents this second type of impulsivity. Such explanations of impulsivity, and the relationship of both youthfulness and ADHD to impulsivity, were important data for the jury to consider in weighing the arguments of the State.

**Average intellectual capability and school performance:** In closing argument, the defense reported that Anthony was an "intelligent person" and an "honor student."

> But yes, he was an intelligent person. He was an honor student. He had opportunity. (Page 40: lines 16-18).

State characterized Anthony as having "above average intelligence" and as being "good in school."

> Let's take a real quick look at some of the offenses of Anthony Haynes. He is a person of above-average intelligence. Above-average intelligence. So that tells you he is going to put his mind to work. (Page 54: lines 12-16)

> ...and just because he was good in school and is a young person, that is insufficient. (Page 65: lines 3-4)

In fact, both the defense and State characterizations of Anthony's intellectual ability and scholastic performance were inaccurate. Review of Anthony's Dulles High School Transcript revealed grades in core subjects (excluding PE, ROTC, Band, keyboard, office

22

aide) that ranged from "D" to low "B." In Anthony's entire 4-year high school transcript I identified only a single low "A," scoring a 90 in the second semester of Spanish in his sophomore year. In averaging his grade for core subjects during his high school tenure, Anthony averaged 78.4 in 9th grade, 78 in 10th grade, 80.5 in 11th grade, and 82 in 12th grade. Anthony's rank in his graduating class was 184 in a class of 460, placing him in the middle third of the class. While such performance was adequate, it would hardly qualify him to be characterized as an "honor student," nor would it point to exceptional intellectual ability.

Consistent with the above school performance, intellectual assessment by Dr. Gessner in August 1999 revealed a WAIS-R Full Scale IQ score of 109. This score would be considered in the "average range" and would correspond to the 73rd percentile. There is reason to believe, however, that this IQ score is inflated by the "Flynn Effect" – an increasing inflation of IQ scores as the time from test standardization increases. Correcting Anthony's IQ score for the Flynn Effect would result in a Full Scale IQ score of 103 which corresponds to the 53rd percentile. To place Anthony's intellectual ability in some perspective, the average IQ score of professionals (doctor, lawyer, architect, college professor) is 125. The minimum IQ score to function as an attorney is considered to be 115.

**Implications of average intellectual capability and school performance:**  It is inexplicable why defense counsel would inflate Anthony's intellectual ability and academic potential. Certainly, this misrepresentation facilitated the State's assertions that Anthony was a young man with "every opportunity" which he had proceeded to "stomp on." In fact, Anthony was a teen of simply average intellectual ability and mediocre academic achievement. In light of this limited ability, it is not surprising that Anthony was in need of the Boost college preparatory assistance or that he struggled with the academic demands of the program after arriving there. Anthony's only average intellectual capabilities, combined with his untreated ADHD, emotional problems, and history of substance dependence provides a very different explanation of his Boost program failure than his simply squandering this opportunity to attend a service academy.

## *Generation Influences*

**Generational family dysfunction:**  Anthony was the product of a family system that had been significantly dysfunctional for generations. Discovering this multi-generational family history required no more than interviewing Anthony's parents and extended family regarding their family history. Had the defense conducted an adequate investigation, it would have discovered the following.

Anthony's maternal great-grandparents were Jimmy and Hattie Butler. Jimmy Butler was an alcoholic who was violently abusive of Hatti and his children. In one of these episodes of domestic violence, a police officer who responded to the residence shot Jimmy. Jimmy then

23

retrieved his own gun and shot the officer (who survived). Jimmy was apparently acquitted at trial. His children, however, were taunted by their peers about this offense. This story is well-known in the family to the younger generation. Jimmy was also exploitative as he would demand half of his daughter's (Myrtle's – subsequently maternal grandmother of Anthony) paycheck from working in a café at age 14-15 to fund his purchase of alcohol. Jimmy and Hattie had 14 children. According to Myrtle, many of her siblings had checkered and sometimes tragic histories:

Jim Jr. drank heavily and was jailed for DWI. Alford was stabbed to death in a bar when Myrtle was age 13. Maylene had psychiatric problems and suffered domestic violence. Joe Nathan "ran women" and drank heavily. Matthew had alcohol-related arrests and would not repay the money he borrowed. According to Gladys (see below), Matthew was shot to death by a girlfriend. Marie drank heavily, had emotional problems, and survived a suicide attempt of shooting herself in the stomach after breaking up with a married man. Charles was confined in an institution for the mentally retarded from childhood. David was described as suffering from psychological problems, with symptoms that implicate bi-polar disorder (i.e. social isolation, hyperactivity, impatience, and belligerence). He also drank heavily and was violent when drinking. Gladys was a heavy drinker and recurrently exploited in her domestic relationships. Regarding other siblings of Myrtle, Patrica reported that Billy was schizophrenic, and that Richard "had issues." Gladys described that Louise "got tipsy" on weekends, but that Rachel did not drink after becoming violently ill on alcohol as a teen.

Gladys' son, Andre, who Anthony grew up with, has a history of confinement in the California Youth Authority and the California Department of Correction. Andre is currently in TDCJ on drug possession/distribution charges. Matthew's son, Keith, shot a by-stander "by accident" and was recently released from prison for this offense. Rachel's son was tried for murder.

Myrtle, Anthony's maternal grandmother, was the 9th of the 14 children. She became pregnant out of wedlock at age 17 by Joseph Hinton and then married him. (Patrica, Anthony's mother is the child of this union). The marriage ended after five years as Joseph "shot pool and smoked up his paycheck on weed." When Patrica was age 12 Joseph was shot to death in Dallas in a dispute with a white service station owner who allegedly swapped out a tire Joseph had left to be repaired with a much more worn tire. As the family understands it, the service station owner was never prosecuted for this shooting. Patrica reported being devastated by the death of her father, and attempting suicide by drug overdose. Myrtle reported that Patrica was "like a zombie."

Myrtle reported that several years after her divorce from Joseph, Myrtle married Cornell McCall. This marriage lasted only 30 days as he began physically abusing her on their wedding night. Myrtle then had 14-year relationship with Thomas Hawkins who was recurrently physically abusive of her. Ultimately Thomas Hawkins had to be removed from the house by the police. Patrica (Anthony's mother), however, reported that Myrtle's domestic history was more complicated. She described that following the divorce of her

24

parents her mother was married for several years to a man who was regularly physically abusive of her. Patrica described that Myrtle was then married for six years to another man who regularly abused her. Patrica described observing these men beat her mother, and routinely observing her mother's black eyes, busted lips, swollen face, and bruises. She estimated that Myrtle was beaten up approximately twice monthly for over 6-7 years of Patrica's childhood and adolescence. Patrica described that the instances of Myrtle being beaten often occurred when both she and her partner were drunk.

Additionally, Patrica reported that her mother was involved in relationships with many other men who were in and out of the house, with these men typically being in the household for 1-2 months. As a result of the chaos and priority of her mother's involvement in romantic relationships, Patrica reported that when younger she was often in the care of her maternal grandparents, and from age 10 was often left alone in the home while Myrtle went out. Patrica reported that her mother would "fuss and cuss" in her parenting. More disturbingly, Patrica reported routinely being exposed to her mother's sexual interactions with these men. She described that she and her mother resided in a very small 2-bedroom house, so that she could often overhear noisy sexual activity in the next room. Because Patrica had to go through her mother's bedroom to access the toilet or other parts of the residence, Patrica repeated observed her mother having intercourse with these men.

The chaos and indiscretion of the home setting was no doubt aggravated by Myrtle's pattern of heavy alcohol consumption. Patrica reported her mother went out 2-3 nights during the week and always on weekends. As a teen, Patrica accompanied her mother to these clubs, and then watched television in the back while her mother drank. Patrica described that her mother had been arrested 1-2 times for DWI. Patrica also described her mother as being emotionally disturbed, characterizing her as "having issues" and being a hypochondriac. Myrtle acknowledged a lengthy outpatient psychiatric history.

Anthony's paternal family system has also been troubled. Anthony's father, Donald Haynes, is the product of a relationship between Talmadge Blueatt and Evelyn Jackson Haynes, who were never married to each other. Donald did not meet his father until age 18, and did not see him again until he was almost 40. Evelyn subsequently married Elwin Haynes, who was a career enlisted man in the U.S. Navy. Elwin and Evelyn had three children: Richard, Sheila, and Eric. Donald reported that both Richard and Eric are both daily drinkers, consuming 2-4 beers daily. Richard's daughter, Brandi, was released from prison this past year on a 4-5 year sentence for drug possession/distribution.

None of this history of extensive generational dysfunction was presented to the jury at Anthony's sentencing.

**Implications of dysfunctional family system:** Family history is critically important to character and background. There are several reasons for this. Some personality characteristics and vulnerabilities are genetically transmitted. Genetic susceptibility to substance abuse and psychological disorder that Anthony faced will be discussed in

25

subsequent sections. Other dysfunctional patterns are conveyed by scripts and modeling, as well as by sequential damage from generation to generation.

Family scripts are broad outlines of behavior and life sequence that are conveyed both verbally and more importantly by example in the lives of parents, grandparents, siblings, and extended family. Such scripts in Anthony's generational extended family included substance (alcohol) abuse and dependence, violence, irresponsibility, family instability, and emotional neglect or abandonment of children.

Individuals tend to model their behavior after the behavior of family members near them in childhood, whether or not these "role models" are positive. In Anthony's multigenerational family system, "role models" presented mixed models. On one hand there were histories of education and employment. At the same time the lives of various models were characterized by substance abuse and dependence, volatile reactions and relationships, irresponsibility, poor sexual boundaries, and/or other deviant processes.

Maladaptive behaviors, including criminal activity and violence, may also be the result of sequential emotional damage. In other words, individuals who have been significantly emotionally damaged in childhood come into adulthood with limited emotional resources, and as a result may not parent their own children humanely or effectively. Consistent with this observation, Green (1988) reported that "the childhood history and background of abusing parents include a high frequency of physical abuse and neglect, scapegoating, maternal deprivation, and exploitation" (843). The children of these abusive parents are then in turn emotionally damaged themselves and thus at greater risk for broad adverse adult outcomes including parental abuse and neglect, substance dependence, criminal activity, and violence. Sequential generational neglect is particularly damaging. Because effective emotional regulation, interpersonal relationship capacity, and social functioning throughout life begin with stable secure attachments to a primary parent figure, deficient parental care and attachment results in fundamental damage to the foundations of personality and interpersonal functioning. The problematic effects of early abandonment and disrupted primary parental attachment may not be evident until adolescence or early adulthood. This sequential damage is particularly notable in Anthony's maternal family system. His maternal grandmother, Myrtle, was emotionally impacted by the chaos and violence of her own childhood. She in turn reared Patrica, Anthony's mother, in a context of alcohol dependence, family violence, traumatic sexual exposures, and emotional neglect. Importantly, these emotionally limited individuals were Anthony's primary mother figures during his childhood.

**Genetic predisposition to alcohol and drug dependence:** As is detailed above, there is an extensive history of alcohol and drug abuse and dependence in Anthony's extended family. This includes: maternal great-grandfather, maternal grandfather, maternal grandmother, at least seven maternal great aunts and uncles, and various cousins.

**Implications of genetic predisposition to alcohol and drug dependence:** Heredity is the primary risk factor for alcohol and drug dependence. The incidence of alcoholism

26

among first degree relatives of alcoholics is 4-5 times the rate in the general population (Cotton, 1979). Twin and adoption studies across 20 years of research have provided evidence of significant genetic influences on the familial transmission of alcoholism (Schuckit, 1987). A large scale, multidisciplinary study of 2,551 adult male biological relatives of alcoholics involving six research centers across the U.S. reported that two-thirds were heavy drinkers or severely affected alcoholics (Begleiter, 1995).

Consistent with Anthony's abuse of alcohol, marijuana, and methamphetamine, clinical findings point toward a common biological vulnerability to dependence on alcohol and other drugs. Research findings clearly support a uniform theory for a neurochemical basis of alcohol and drug addiction (Miller & Gold, 1993). In a study of 150 cocaine addicts: 90% were alcoholic; half were cannabis dependent; and half had family history of alcoholism (Miller, Gold, & Belkin, 1989). In a study of 82 subjects: there was an 89% chance the cocaine addict was also an alcoholic; and half of the cocaine addicts had a family history of a first or second degree relative with alcoholism (Kosten, Rounsaville, & Kleber, 1987).

**Genetic predisposition to psychological disorder:** As noted above, psychological disorders are also present in Anthony's family system. The behavior patterns of some extended family members implicate personality disorders. Others appear to have suffered from mood (bi-polar) and psychotic spectrum disorders. Review of the portions of the mental health records of Myrtle Hinton, Anthony's maternal grandmother, reflects her experience of anxiety and depression. She was followed as an outpatient by a psychiatrist for a number of years. Though never treated, the explosive reactivity that others described in Patrica, as well as her interaction pattern, also point to emotional problems.

**Implications of genetic predisposition to psychological disorder:** A family history of psychological disorder has a number of disturbing implications – particularly given Anthony's history of psychiatric hospitalization and past diagnoses of Attention Deficit Hyperactivity Disorder, Intermittent Explosive Disorder, Conduct Disorder with Intermittent Explosive Disorder; and treatment with anticonvulsant, anti-anxiety, and antipsychotic medications.

First, heredity is a significant risk factor in Bipolar Disorder, Schizophrenia, personality traits and disorders, other psychological disorders, and substance dependence (DSM-IV). Learning disabilities and Attention Deficit Hyperactivity Disorder can also have a significant hereditary component. Regarding hereditary components of Bipolar Disorder, DSM-IV (1994) describes that first degree relatives of individuals with Bipolar Disorder have increased rates of various forms of Bipolar Disorder, as well as Major Depressive Disorder. Klein, Depue, and Slater (1985) found that mood disorders occur 7.6 times as often in children with at least one affectively ill parent (38%) compared to those without (5.0%). Akiskal et al. (1985) in a prospective investigation of the offspring and younger siblings of patients with Bipolar Disorder found that 57% of these close family relatives were diagnosed with a disorder on the Bipolar spectrum within four years. It is notable that

27

Anthony is described from early childhood as having difficulty with mood regulation and impulse control.

Second, parental psychological disorder and instability often intrude on parenting attitudes and behaviors, reducing stability and supervision, and increasing the likelihood of neglect and/or abuse. This was demonstrated in the deficient parental capacities displayed by both of Anthony's parents.

## *Parenting*

**Dysfunctional relationship of parents:** Anthony is the product of the relationship of Patrica Hinton Davis and Donald Haynes. The relationship between Patrica and Donald was characterized by chronic conflict throughout Anthony's childhood. The pregnancy was unplanned. Patrica and Donald lived together for approximately six months during Anthony's second year of life, but never married. Donald reported that he had not married Patrica because he did not trust her, and regarded her as self-centered, manipulative, and a recurrent liar. He described her as failing to have parenting as a first priority. Patrica characterized Donald as rigid, controlling, and punitive. There are medical records of his having physically abused Anthony at age seven. Donald acknowledged that he continued to use corporal punishment with Anthony into his senior year of high school. Donald reported that he had questioned his paternity of Anthony, particularly as Anthony was so much lighter in skin tone than Donald. This resulted in a paternity blood test when Anthony was approximately age five. Donald does not consider this test to be as conclusive as a DNA test, which has never been performed. There is a marked discrepancy in Donald's involvement with Anthony as a pre-schooler. Patrica reported that neither Donald nor his parents were significantly involved in Anthony's life until Anthony was age five. Donald asserted that he had every other weekend visitation with Anthony during these years. Patrica moved from Houston to California when Anthony was approximately age seven, and Anthony resided with her there for 20 months. During this tenure Donald's contact with Anthony was reduced. Patrica then became an airline stewardess with United Airlines, and Anthony returned to the household of his maternal grandmother until age 12. He then resided with Donald from about age 12 through high school, though with recurrent shifts back to Patrica for periods of time.  Both parents acknowledged that they had very different discipline and parenting philosophies. A cooperative posture of co-parenting was never established. Neither Anthony's subsequent shifts between parents nor other aspects of his parenting reflected joint consensus regarding his best interest. This contributed to inconsistent limits and chronic tension as each parent acted unilaterally.

**Implications of dysfunctional relationship between parents:**  Chronic hostility between parents has been identified as a key factor in the adjustment of children of divorce both in childhood and continuing into adulthood. The unending loyalty conflicts experienced by the children of such chronically estranged family settings takes a

28

significant emotional toll. Additionally, as these children come into adolescence they are more likely to play the parents off against each other, undermining important, if at times uncomfortable, supervision and guidance supports that could otherwise be provided by the parents.

**Alcohol abuse of parental figures:** During Anthony's first seven years of life he was jointly cared for by his maternal grandmother, Myrtle, and his mother, Patrica. Patrica reported that her mother drank heavily until approximately 1983 – until Anthony was age four. She acknowledged that her mother had been slowing down her alcohol abuse for 6-7 years before this. Myrtle reported that she markedly reduced her alcohol consumption when Anthony was a baby after being arrested for DWI while going to the grocery store to buy milk for his bottle.

In California, care for Anthony was provided for weeks at a time by his maternal great aunt Gladys, who was a contemporary of Patrica (7 years older than Patrica). Gladys acknowledged being a heavy drinker at times during her adulthood. Her daughter, Alisha, recalled Gladys and Patrica as coming home under the influence of alcohol.

**Implications of alcohol abuse by parent figures:** Alcohol abuse represents a corruptive model of how to cope with life demands and stresses. A substantial aspect of parental socialization of a child occurs through modeling – as the child absorbs behavior patterns from observing the actions of parents, and subsequently imitates these. When this parental modeling is faulty or corruptive, the patterns that have been instilled from early childhood may wreak substantial havoc in the child's own adult behavior.

Second, children who grow up in a home characterized by parent figure alcohol abuse are at substantially increased risk of psychological injury. Specifically, a parent figure who is abusing alcohol is more likely to be emotionally detached – a product of both being under the influence and being preoccupied with alcohol-seeking behavior.

Third, the children of an alcohol abusing parent figure are more likely to be neglected and inadequately supervised. An alcoholic parent is both more likely to physically or emotionally abuse the children of the household, as well as to fail to protect the children from abuse or other risks perpetrated by other persons in the household. Children in such a home also often experience marked inconsistency and unpredictability associated with the wide fluctuations in parental reactions and competency.

Fourth, in the face of the impairment of a alcohol abusing parent figure, the children of the household are frequently compelled to assume roles of premature responsibility. Such demands for precocious maturity are not a benign developmental event. Increased traumatic and corruptive exposures, inadequate parental structure and guidance, chronic anxiety regarding the unpredictability of the home, feelings of incompetence in not being able to prevent the parent figure from drinking are all risks. Profoundly ambivalent feelings toward parents and parent figures are common as the child feels protective on one hand but harbors much anger on the other at the lack of support. Not uncommonly, these

29

Re: Anthony Cardell Hughes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

conflicted feelings are evidenced in significant depression, anger, and behavior problems.

In summary, parent figure alcoholism or substance dependence is a broad social/psychological risk factor for relationship problems, self-control deficits and behavior disorders, feelings of defectiveness, psychological disorders, and criminal behavior. This latter association between parental substance abuse, as well as attitudes favorable to substance abuse, and serious violence in adolescence and early adulthood has been confirmed by research reviews sponsored by the U.S. Department of Justice (1995).

**Emotional and supervisory neglect:** The quality and stability of relationship and nurturance that Anthony received from his parents early in life is uncertain. He and his mother resided in the household of his maternal grandmother, Myrtle. His father only resided in the household briefly, and then was involved only in twice monthly visitation at best. There is some reason for concern that the quality of primary maternal nurturance and attachment provided Anthony in early childhood was inadequate. First, responsibility for Anthony appears to have been divided between his mother and his maternal grandmother. As noted above, Myrtle was still drinking – at the very least during his infancy and perhaps through most of his preschool years. Further, Myrtle had been a less than effective parent to Patrica. Second, a number of factors raise questions regarding the quality of Patrica's emotional bond with Anthony. His pregnancy derailed Patrica's college matriculation. Others described her as not making her parenting a priority. Her going unaccompanied to California, and subsequently taking a job as an airline stewardess, were obviously at the expense of the functional role as primary parent. Both of these behaviors also point to her viewing her mother as responsible for Anthony day in and day out. As will be described below, the emotional and supervisory neglect Anthony and his cousin describe experiencing in California cast doubt on the quality of parent-child bond.

As has been described above, during the period of time between ages 7 and 9 that Anthony resided in California he routinely stayed for periods of 2-3 weeks in the household of his maternal great aunt Gladys approximately and her two children, Alisha (32 months older than Anthony) and Andre (one month older than Anthony). During this era, Gladys and her children resided with Patrica and Anthony for a period of time, as well. Because the dysfunction of this household impacted on Anthony as a child, it will be described.

Gladys reported that Jimmy, her husband and the father of Alisha and Andre, had been a physically abusive weekend drinker. Gladys noted that the associated chaos and violence had adversely affected Alisha and Andre. Jimmy died on 6-30-86 (approximately six months before Anthony joined his mother in California). At the time of their father's death, Andre was age 7 ½ and Alisha was age 10). Alisha described that both she and her brother were devastated by the loss of their father. Alisha recalled that eventually their possessions were liquidated and they moved in with Patrica and Anthony for a period of time. Alisha reported that their mother, Gladys, took out her frustrations with the

30

financial problems on the children. Alisha described that Gladys and Patrica began to go out together in the evenings. She reported that the three children were often left in the overnight care of other adults who the children did not know well and where they felt uncomfortable. Sometimes when Gladys and Pat returned it was obvious that they had been drinking a lot. Alisha described that both her mother and Patrica had a lot of men in and out of their lives. She regarded them as both emotionally needy and promiscuous. Alisha observed that the attempts of both her mother and Patrica to get their own needs met interfered with their being effective parents. Alisha summarized that the children were left to emotionally fend for themselves.

When interviewed by a defense investigator three weeks prior to jury selection, Anthony gave a similar account of emotional neglect. He reported that when he and his mother lived in California she went out frequently on dates and left him unattended in their apartment for hours. He described that he would be particularly frightened when this occurred at night as they were living in a run-down area in Inglewood where gunshots were routinely heard at night. Anthony reported that his mother left him alone in the evenings 3-4 nights weekly. Anthony also reported that it disturbed him to think about his mother going out with many different men. He was described as beginning to stutter in speaking of his mother and her leaving him home alone to date. Anthony reported that he learned to disrespect authority figures from his cousin in California.

**Implications of emotional neglect:** Child neglect may be physical or emotional. Regardless of its form, neglect has been identified as more psychologically and developmentally damaging than physical abuse. Widom (1989) described neglected children as being at greater risk for adult violence than abused children. This is a function of insufficient stability and/or security in parental attachments, daily life, or practical care; as well as unmet physical and emotional needs. The long-term impact of child neglect includes distorted cognitive, perceptual, emotional, and interpersonal capacities; pervasive anxiety; identity disturbance; insufficient capacity for emotional self-regulation and behavioral control; psychological disorder; behavior disturbance; and violent and criminal conduct.

Child maltreatment can also involve the failure to provide supervision, appropriate discipline, and moral guidance. Healthy child development requires not only practical nurturance in the context of a stable and secure relationship with a parent, but also limit-setting and guidance through structure and appropriate discipline. In the absence of ample structure and consistent, appropriate discipline and limit-setting, there is grave risk to psychological health and positive socialization. These fundamental tenets are supported by research (Friday, 1994; Patterson, DeBaryshe, & Ramsey, 1989; Staub, 1996). Quite simply, lack of parental structure and appropriate discipline contribute to aggressiveness and predisposes to violence in the community. In the absence of guidance, "self-control does not develop and aggression can unfold and bring instrumental gain" (p.122, Staub, 1996). Children need order and external structures to develop internal structures and capacity for self-guidance. Thus Patterson et al. described the relationship of poor parental structure/discipline/ limit-setting to childhood and adolescent conduct disturbances as a

31

Re:  Anthony Cardell ●nes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

developmental progression.

It is illuminating to note that callousness and potential criminality can be conceptualized in many cases as the emotional damage from neglect and abuse "all grown up" (Meloy, 1988). Green (1988) described the impact of deprivations in parental nurturance:

> Early and persistent exposure to parental rejections, assault, and deprivation impairs the child's capacity to form subsequent relationships....Most abused children are unable to achieve Erickson's (1950) stage of basic trust. They learn to regard violence and rejection as the major ingredients of human encounters. (p. 850)

This nexus of disordered family/attachment damage and violent offending is not a matter of personal conjecture. Career investigators from the Behavioral Science Unit of the FBI in studying the causes of a particular type of homicide have asserted that the quality of the attachments to parents and other members of the family during childhood was central to the etiology of these offenses (Ressler, Burgess, & Douglas, 1988).

While Anthony has no full siblings who experienced his childhood side by side with him, it is informative to review the trajectories of Alisha and Andre who shared Anthony's experience of emotional neglect for a period of time. Alisha reported that as a child she had much anger and did not know how to communicate her feelings to others. She reported that she was repeatedly in and out of school secondary to being suspended for fighting. Alisha reported allowing herself to be exploited as she sought love and acceptance. She was arrested for shoplifting in her teens. Alisha reported that she used drugs recreationally in her teens and has been treated with antidepressant medication. Andre was involved in gang-related activity from age 10-11. He was repeatedly expelled from school. At age 12 Andre entered the California Youth Authority. He has been in prison in California and Texas.

It is important to note that parental neglect is not an indication that the parent does not "love" the child. Rather, the quality of love that the parent is providing is inadequate. "Love" in this context is most accurately viewed as continuum from healthy and affirming to destructive and injurious. This is consistent with the earlier discussion of sequential emotional damage and other trans-generational influences that may result in poor parenting and "love" expressions that are on the lower end of the continuum.

**Physical and emotional abuse:**  While there was limited reference to an incident of reported abuse in sentencing phase testimony, neither the extent nor implications of this incident were made known to the jury. A Memorial Southwest Hospital record dated 12-22-86 that was in the possession of Anthony's maternal grandmother, Myrtle, recounted that at age 7 Anthony was being examined in the hospital for a high fever and vomitting when it was discovered that he had bruising over both sides of his buttocks that appeared several days old. Photographs of Anthony and his injuries are attached at Appendix B. The Memorial Southwest Hospital record described:

> In the course of the examination, it was noted that the boy had rather severe

> ecchymosis of both buttocks. There was no swelling of the buttocks and there was
> no induration, that is to say they were soft. But black and blue marks were noted
> rather uniformly over both buttocks. They had the appearance of a few days of
> age – estimated at three or four. History at the time from the grandmother
> disclosed that there was apparently some problem over a Christmas gift at
> school….The buttock contusions were reported to the police department and a
> notation on the chart notes that his is incident either Y02864 or 402864. A
> diagnosis was made of a viral syndrome and contusion of buttocks. He was
> allowed to leave the hospital in the company of his grandmother…

Myrtle and Patrica independently described that this bruising on Anthony was the result
of a beating administered by Donald for misconduct at school. Anthony had been residing
with Donald, after Donald asserted custody of him after Patrica had moved to California
and left Anthony in the temporary care of Myrtle (maternal grandmother). Donald
acknowledged this incident as well, but displayed little insight into this discipline being
abusive. He described that in response to an incident of school misconduct, he had
spanked Anthony, told Anthony that he would be spanked again the next day as
continuing punishment for this offense, and then did spank him the following day.
Donald minimized the marks on Anthony's buttocks, characterizing them as "some red
marks." He reported that Child Protective Services investigated and recommended other
forms of discipline, but took no other action. Myrtle and Patrica recalled that Patrica
returned from California on an emergency basis, and that her resuming care of Anthony
was a part of the official response to the case. She then relocated Anthony to California
with her. Anthony reported to a defense investigator that his father whipped him twice a
day for a week prior to the bruising being discovered.

While there is only a single documented instance of bruising to Anthony from corporal
punishment by his father, several aspects of this incident raise concerns for physical and
emotional abuse. Donald minimized what had occurred, reflecting no recognition of
excessive force being employed or that he had responded inappropriately. He further
displayed no recognition to the psychologically terrorizing effect of an announced
regimen of another whipping the following day. In spite of this incident, Donald by his
own admission, continued to employ corporal punishment of Anthony into Anthony's
senior year of high school. Even parents who have employed corporal punishment with
their younger children typically recognize that to beat a high school senior risks far
greater psychological and relationship repercussions than is balanced by the deterrence of
corporal punishment. This would particularly seem the case with Anthony whose
psychologically vulnerability had been demonstrated as a teen by his having been
psychiatrically hospitalized and who was struggling with his own aggressive thoughts.
This incident, then, points to Donald's discipline being both emotionally and physically
abusive on a broader scale than a single incident, as well as his being insensitive to the
psychological status, needs, and vulnerabilities of his son.

When interviewed by defense investigators three weeks before jury selection, Anthony
described that while the beatings his father administered were justified, those he received

33

from his mother often were not. Anthony reported that his mother would "fly off the handle" for no reason. He reported that on these occasions she had variously hit him with her hand or a belt, pushed him, bitten him, thrown keys at him, and once threw a phone that struck him in the head. Anthony described that his mother is "totally crazy" at times, and would scream at him at the top of her lungs for an extended period. He reported that on a handful of occasions this had lasted for hours. Anthony reported that his mother's temper outbursts were much like his own.

Anthony's step-sibling, Courtney Davis, Jr., confirmed Patrica's emotional volatility. He described her as being routinely emotionally rejecting and critical of Anthony, noting that Patrica was "always fussing at Anthony" and that nothing Anthony did was ever good enough for her. He described that she was easily angered and would "snap." Courtney Jr. observed Patrica physically attack Anthony. He described that Anthony got up from the table and tried to walk away from an argument with Patrica. Patrica pursued Anthony, jumping on his back, and inflicting a bite on Anthony's shoulder that broke the skin. Courtney Jr. described having observed Patrica pinch and hit Anthony. He reported that Patrica physically attacked him on occasion as well, including ripping a t-shirt off of him (she did not believe the Houston Marathon t-shirt had been given to him by his father, Courtney, Sr.),  pulling knife on him, and slapping him.  Courtney Jr. regarded Patrica as reacting illogically and having "mental problems," "like she sniffed a bad chemical and messed up her brain for good."

**Implications of physical and emotional abuse:**  The American Psychological Association Presidential Task Force on Violence and the Family (1996) concluded that maltreated children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including low self esteem, depression, anger, exaggerated fears, suicidal feelings, poor concentration, eating disorders, excessive compliance, regressive behavior, health problems, withdrawal, poor peer relations, acting out, anxiety disorders, sleep disturbance, lack of trust, secretive behavior, excessively rebellious behavior, drug or alcohol problems.  The task force further identified the following broad conclusions:

1. Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulty in self control.

2. Abused and not treated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

3. When abused children are not given appropriate treatment for the effects of the abuse, the lifetime cost to society for an abused child is very high.

Thornberry (1994) described additional data from the Rochester Youth Development Study regarding the association of family violence exposure and subsequent rates of serious youth violence from these families. Three types of family violence exposure were

studied: spouse abuse, abuse of children, climate of violence and hostility. Among children without a history of family violence, the rate of serious youth violence was 38%. If one type of family violence was present, the rate of serious youth violence was 60%, increasing to 73% and 78% with an exposure history to two and three types of family violence respectively.

**Sexually traumatic exposures:**  As is sometimes observed in household where role boundaries are not maintained and where the children are being emotionally neglected, Alisha, Andre, and Anthony turned to each other. For approximately a six month period when Alisha was 11 ½ and Anthony and Andre were age 9 they interacted sexually with each other. This began with touching and progressed to having sexual intercourse in each other's presence. There were other corruptive contributing factors to the emotionally damaging sexual exchanges between these children. Alisha recalled that prior to beginning this sexual activity the children had had access to pornographic books containing graphic depictions of sexual acts. She does not recall whether these were in her own household or in the household of one of the babysitters. Alisha reported that she had previously been sexually molested (fondled) in childhood on many occasions, though she could not recall the specific perpetrators. Additionally, Gladys and Patrica had not maintained appropriate modesty boundaries. Alisha recalled that when in a hurry their mothers put all three children into the shower together when Alisha was age 12, even though she had entered puberty at age 9-10.  Alisha reported that Patrica gave no guidance to her early puberty, instead only telling her that she would be pregnant by age 14.  Alisha believes that her mother was aware of the sexual interactions of the children with each other.

**Implications of traumatic sexual exposures:**  Sexually traumatic experience in childhood is broader than inappropriate genital interactions with an adult. Other sexual exposures during childhood that are psychologically damaging include precocious exposure to adult sexual exchange, perverse family atmosphere, perverse and/or promiscuous parental sexuality, inappropriately sexualized relationships, observed sexual abuse of another, and premature sexualization. Anthony experienced multiple forms of traumatic sexual experience and exposure. These included exposure to graphic pornography, precocious sexualization, observation of graphic sexual activity between his cousins, engagement in sexual intercourse before puberty, and awareness of the potential promiscuity of his mother and aunt.

Much of the research on the effects of sexual trauma is based on studies of children who were suffered abusive erotic touch. There is good reason to believe, however, that sexually traumatic exposures other than physical sexual abuse are also exploitative and developmentally damaging to a child – and accordingly are of concern not only to mental health professionals, but also to child welfare agencies, law enforcement agencies, and the court. Thus the discussion of research that follows provides perspective on the continuum of developmental damage and aberrant processes that may be associated with the spectrum of sexually traumatic experiences and exposures.

35

Finkelhor & Brown (1985) identified four broad traumatic impacts of being sexually abused as a child. Traumatic sexualization may occur as the child's sexuality is inappropriately shaped by the abuse experience. Being sexually abused represents a profound betrayal as someone whom the child was dependent or vulnerable to has caused them harm. This may subsequently be associated with relationship distrust, feeling unlovable, interpersonal dependency, and retaliatory aggression. The child experiences a profound sense of powerlessness in the face of sexual abuse as his will and sense of control are overwhelmed. This may result in continuing feelings of incompetence, depression, anxiety, and adult victimization or domination. The sexually abused child may experience a significant sense of stigmatization as badness, shame, and guilt become incorporated into the child's self image. This may result in low self-esteem, anticipation of rejection, poor relationship choices, or promiscuity. These four traumagenic dynamics of sexual abuse - traumatic sexualization, betrayal, powerlessness, and stigmatization - were subsequently the conceptual basis for a brief four amicus curiae filed with the U.S. Supreme Court in Maryland v Craig (1989) by the American Psychological Association.

A history of childhood sexual victimization appears to be associated with equal levels of later psychological dysfunction in both male and female clinical subjects (Briere et al., 1988). These psychological dysfunctions include dissociation, anxiety, depression, anger, sleep disturbance, and post sexual abuse trauma. Interestingly, males displayed as much psychological disturbance as females though reporting less extensive and less extended abuse. This suggests one of two hypothesis: (1) There is an equivalent impact of sexual abuse for males or females regardless of any differences in its severity or duration between the sexes, (2) sexual abuse is more traumatic for males since lower male abuse levels were associated with symptoms that were equal to that of more severely abused females.

A number of factors may negatively affect the recovery of males from sexual abuse. These include reluctance to seek treatment, minimizing the experience of victimization, difficulty accepting shame and guilt, exaggerated efforts to reassert masculinity, difficulties with male intimacy, confusion about sexual identity, power/control behavior patterns, externalization of feelings, vulnerability to compulsive behaviors, greater difficulty in adjusting to stress, and difficulty in expressing and communicating affect (Struve, 1990; Urquiza & Keating, 1990).

Urquiza and Capra (1990) described that sexual abuse creates unique disclosure problems for male victims. In other words, males tend not to disclose their complaint about the sexual abuse experiences as readily as do females. The authors note that boys are sexualized with a male ethic of self-reliance that inhibits disclosure of victimization. Disclosing same sex abuse to peers or parents might threaten a boy's developing masculinity or pose a risk of being labeled as homosexual. Additionally, disclosure may result in a loss or curtailment of the boy's greater independence and freedom.

Urquiza and Capra described initial effects on males following sexual abuse as most commonly involving behavioral disturbances including aggression, delinquency, and non-compliance. Other problematic initial effects may include emotional distress; displays of

36

guilt, shame, negative self-concept; psychosomatic symptoms; confusion regarding sexual identify and sexual preference; problematic sexual behaviors; and vulnerability to juvenile sexual offenses.  Long-term effects of sexual abuse as described by Urquiza and Capra include increased risk for depression, somatic disturbance, self esteem deficits; difficulty maintaining intimate relationships; problems with sexual adjustment; alcohol and substance abuse; and sexual offending.

**Corruptive community influences:**  A bi-product of residing with his maternal grandmother in Houston, or with his mother and great aunt in California, was Anthony's exposure to corruptive neighborhoods and associated values.

**Implications of corruptive community influences:**  A low income urban community setting such as the Fifth Ward in Houston or the Inglewood area in Los Angeles has a strong interactive effect with parental and family deficiencies that are over-represented in this inner-city context.  Such family and parenting vulnerabilities include mother head of household, poor supervision, and corruptive family influences. The combined effects of family vulnerability and corruptive community results in markedly increasing risk of youth delinquency and criminality/violence in early adulthood. The corruptive influence of such low income inner-city settings on male delinquency has long been reported, and is illustrated by research published by the U.S. Department of Justice (Chaiken, 2000). These findings are depicted in the pie chart below.

37

Re: Anthony Cardell ███nes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

## Delinquency Rates of Male Teens in Three Violent DC Neighborhoods



21.6%
No Criminal Acts
(1/3 have recent
status offenses)

31.9
Property
Offenders

19.2%
Fighters
(Assaults only)

4.7%
Drug Dealers

7%
Robbers
(Also likely to commit
other offenses)

15.5%
Property Offenders /
Drug Dealers

Chaiken, M.R. (March, 2000). Violent neighborhoods, violent kids. Office of Juvenile Justice and Delinquency Prevention. U.S. Department of Justice.

Inspection of the above figure demonstrates that almost 80% of the male teens in these neighborhoods were actively involved in criminal activity. Such high rates cannot be explained by individual deviant choices. Rather, these rates point to epidemic level corruptive community influences that are pulling the majority of male youth in these neighborhoods into criminal activity. This study does not stand in isolation. A study sponsored by the NAACP and conducted by the Harvard Law School (Ogletree et al., 1995) reported that in 1991, on any given day, approximately half of the Black males aged 18-35 in Washington, D.C. and Baltimore were in the criminal justice system. The interaction of family, community, and social factors is also implicated in homicides (Pridemore, 2002 – note: published after 1999 but reviewing extensive data available in 1999). For example, the annual rate of homicide among Black males age 18-24 nationwide (1989-1994) was 237-347 per 100,000 community residents vs. 26-33 per 100,000 for white males (Pastore and Maguire, 1998). Pridemore emphasized that these differences are NOT a function of race. Rather, they reflect the disproportionate incidence of adverse family, community, and social factors in the lives of Black adolescents and young adults.

38