# United States District Court
# Southern District of Texas

## Case Number: H-05- 3424

## ATTACHMENT

Description:

☐ State Court Record  ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part 6 of 6

☐ Exhibit to: Vol II - Exh. 17

number(s) / letter(s) _____

Other: Petition For Writ of

Habeas Corpus

— Exhibits in Support of

Petition

These findings are intuitively logical. Social and moral development are strongly influenced by the surrounding community values, mores, and models. Thus peer relationships, particularly during adolescence are quite influential in moral and social development. When community adults and peers are deviant, the risk of an anti-social developmental trajectory increases markedly – and with that the risk of criminality, violence, and homicide. These findings are also supported by crime map comparisons demonstrating the marked over-representation of general crime and violent crime in particular zones in a large metropolitan area. These data and perspectives, and the U.S. Department of Justice and scholarly literature supporting evidence, could have provided an additional explanation for Anthony's criminal activity.

## *Disturbed Trajectory*

**Severe psychological disorder in adolescence with psychiatric hospitalization:**
Anthony's history of ADHD has been previously described. Limited reports of his emotional difficulties were provided by family members in trial testimony and will not be repeated. Anthony's inpatient psychiatric history came to the jury through the admission of his West Oaks Psychiatric Hospital record by the State, and was neither clarified nor interpreted by the defense. To summarize this record, on 11-01-96 Anthony was admitted to West Oaks Psychiatric Hospital after displaying significant volatility and explosiveness, which continued in the hospital until his dosage of Tegretol (anticonvulsant and mood stabilizer), which had been initiated five days previous on an outpatient basis, was increased. On 11-10-96 Anthony had been sufficiently stabilized that he was transferred from the inpatient to the residential unit where he remained until 11-20-96. His admission evaluation described a 4-5 year history of rage episodes. Anthony also reported on admission a history of youth gang involvement and associated violence toward people and animals. This latter history of gang involvement and violence received significant focus in the State's closing arguments, but was markedly inconsistent with numerous family, community, and peer descriptions of Anthony. Anthony now reports that he fabricated this portion of his history. There is some evidence that Anthony was exaggerating his reports to hospital staff. For example, he reported that he broke his dog's back with the shovel shortly before admission, though family described the dog as uninjured.

As has been noted previously, on 09-19-99, on the eve of the sentencing phase of Anthony's capital murder trial, he was evaluated by Mitchell Alan Young, M.D., psychiatrist. In his one page report, Dr. Young identified Anthony as suffering significant psychological disorder:

> There is a longstanding history of mental disorder since early childhood with in the context of unstable and chaotic caretaking environments. Symptoms over his life span included inattention, hyperactivity, rage attacks, destruction of property, pet abuse, suicidal and homicidal ideation, self-mutilatory behaviors, stuttering,

39

running away, alcohol and substance abuse, and violation of the basic rights of others. Treatment occurred on outpatient and inpatient bases with poor compliance and follow up. An EEG was not obtained. Current mental status evaluation revealed stuttering, prominent homicidal ideations and "auditory hallucinations," present since 6th grade, which were specific and command in nature, viewed by the defendant as coming from inside his head.

Dr. Mitchell's diagnoses of Anthony were:

Axis I
 Adult Antisocial Behavior
 Intermittent Explosive Disorder
 Alcohol and Mixed Substance Dependency, predominantly methamphetamine
 History of Attention Deficit Hyperactivity Disorder.
 Rule out.(i.e. possible) emergent thought disorder (i.e. psychosis)

Axis II
 Antisocial Personality Disorder
 Stuttering

Axis III
 Status post recurrent ear infections and oral surgeries in childhood
 Rule out (i.e. possible) cortical irritability

Dr. Mitchell identified Anthony's current level of adaptive functioning as quite impaired. He also noted that Anthony's condition was in a context of a history of abuse, abandonment, neglect, and serial caretaking environments. Importantly, Dr. Mitchell noted that the risk implications of Anthony's disorder could be controlled by a structured environment and appropriate medication support.

**Implications of severe psychological disorder in adolescence with psychiatric hospitalization:** Though offered as aggravation by the State, psychological disorders are not voluntary – anymore than a physical disease is willfully selected. Intermittent Explosive Disorder is not a volitional disease. Similarly, while it is questionable whether Anthony had the necessary childhood conduct disorder symptoms to qualify for an Antisocial Personality Disorder, this disorder is also something that happens to the individual. In other words, no one wakes up one day at age 19 and says: "I think I will be an Antisocial Personality Disorder. Rather, these conditions and other psychological disorders happen to the individual from the interplay of inherited vulnerabilities, neurological dysfunction, deficient or traumatic development, life stresses, and other factors. Psychological disorders in childhood can significantly affect the child's abilities to accomplish developmental tasks and make a healthy transition from childhood to adulthood. Childhood psychological disorders can increase the risk of substance abuse, delinquency, and criminality. The presence of impairing psychological factors acts to reduce moral culpability.

40

Anthony's history of psychological disorders was important in two other specific respects to his capital sentencing. First, their presence demonstrates that Anthony was being adversely affected by the damaging developmental factors detailed in this declaration. Second, Anthony's history of psychological disorders provide an important context for his failure in the Boost program. Contrary to the testimony of Sgt. Quarracy Smith, in my experience as a former active duty clinical psychologist in the U.S. Navy, had Anthony's psychiatric history been known to military it would have disqualified him from enlistment, service academy entrance, and/or officer training.

**Teen onset drug abuse and dependence:**  Anthony reported to a defense investigator in late July 1999 that he had begun abusing marijuana at age 13-14, and thereafter smoked heavily and daily. He described discontinuing marijuana abuse during the time that he was in the Boost program, but resumed a pattern of heavy, daily marijuana smoking after being dropped from the Boost Program in April 1998 and returning to Houston.

Anthony reported that he drank alcohol daily during high school, including before he went to school in the mornings. He described discontinuing use of alcohol in the nine months that he was in Boost program, and resumed this abuse on his return to Houston. Anthony described drinking a 12-pack nightly during the five weeks prior to the offense.

Anthony reported abusing "fry" (i.e. marijuana dipped in a solution of embalming fluid and PCP) on approximately 10 occasions.

Anthony reported daily use of methamphetamine during the five weeks prior to the capital offense.  He described snorting methamphetamine in the morning when he awakened. He described that he would start feeling low at lunchtime and snort some more and smoke a joint. After work he snorted methamphetamine every 30-40 minutes.

As his abuse of methamphetamines increased, Anthony reported that he used more marijuana to calm himself down. Anthony also described abusing Rohypnol (i.e. "roofied") during the 4-week period prior to the capital offense.

**Implications of teen onset alcohol and drug dependence:** Primary risk factors for alcohol and/or drug dependence include genetic predisposition, modeling of substance abuse, developmental trauma, and Attention Deficit Hyperactivity Disorder. All of these risk factors are present in Anthony's history.

Susceptibility to alcohol and drug dependence:

*Genetic predispositions:* As described above, Anthony's maternal grandmother, maternal grandfather, numerous maternal great uncles and aunts, and cousins were alcohol dependent. Also as described above, the presence of this genetic predisposition in his family history had significant implications for Anthony's risk of substance abuse and dependence.

*Modeling:* Second, Anthony's family background involved routine modeling of alcohol abuse by his maternal extended family.

*Developmental trauma:* The third risk factor for substance dependence of developmental trauma is evidenced by Anthony's history of chronic parental hostility, emotional and physical abuse and neglect, and sexually traumatic exposures. Among individuals with histories of developmental trauma, substance abuse can be conceptualized as an attempt at analgesic self-medication of the associated anxiety spectrum symptoms.

*Attention Deficit Hyperactivity Disorder:* In addition to these risk factors for alcohol and substance abuse, Anthony's Attention Deficit Hyperactivity Disorder was another risk factor for substance dependence. Research points to an increased incidence of substance dependence among adolescents and young adults with ADHD.

*Inadequate supervision:* Despite the rigidity of his father's discipline, his effective awareness and supervision of Anthony was obviously deficient in the face of the teen substance abuse described by Anthony. The absence of effective parental supervision or limit setting across adolescence was a further risk factor for alcohol and substance dependence. With all four primary substance abuse risk factors present, as well as inadequate supervision, Anthony was at markedly increased risk to initiate a pattern of alcohol and substance dependence in early adolescence.

Effect of substance dependence on development:

Anthony's choice to begin substance abuse was made as an immature early adolescent with the deficient reasoning and judgment that accompanies that developmental stage, as well as without the support of a stable, mutually supportive family network. The resultant substance dependence impeded further gains in maturity. Substance dependence in adolescence significantly disrupts and blocks the developmental tasks of this stage including growth in maturity and coping capabilities, adaptive socialization, and responsible achievement.

Relationship of substance abuse and dependence to criminality and violence:

*Intoxication and violence:* Substance abuse and dependence may be implicated in criminally violent conduct in several ways. First, in the face of his substance dependence, there is an increased likelihood that Anthony was intoxicated at the time of the capital offense. In fact, Anthony described to a defense investigator that he had been snorting methamphetamine on the evening of the robberies and capital offense. Such an intoxication would represent a risk factor for violence in the community and have a nexus to his involvement in the capital offense of conviction. To explain, a number of research studies identify a frequent intersection of alcohol/substance abuse and criminal violence. Murdock et al. (1990) reviewed 26 studies from 11 countries involving 9,000 crimes: 62% of violent offenders were drinking at the time of the crime. Beck et al. (1993) found

42

that 52% of homicide offenders were under the influence of alcohol and/or drugs at the time of the homicide. Gustafson (1993) reviewed experiments of alcohol-related aggressive responding, concluding: intoxication results in increased perception of threat, the predominance of frustration / threat increases aggression when intoxicated, intoxicated individuals are more responsive to peer pressure, the perceptual experience of intoxicated individuals results in a focus on frustration and threat cues to the exclusion of broader perceptions.

*Substance dependence and violence:* The presence of substance dependence, even apart from acute intoxication, is also a substantial risk factor for violence in the community. Research on incarcerated homicide offenders, collected and reported by the U.S. Department of Justice (Greenfeld, 1998), found that 32% of state prison inmates convicted of homicide had had a pattern of daily drinking. Swanson et al. (1990) reported on the interviews of 7000 community respondents in Durham and Los Angeles: alcohol abuse / dependence was associated with an 11-fold greater incidence of violent behavior (one year prevalence 2.28% vs. 23.62%); similar findings were reported for substance abuse; and an adverse combined effect was observed if a co-morbid psychological disorder was present. Such co-morbid psychological disorders were present in Anthony.

*Methamphetamine abuse and violence:* Chronic abuse of cocaine or methamphetamines is associated with marked psychological and behavioral disruption. Further, cocaine and amphetamine abuse set up conditions in which violent behavior is profoundly more likely to occur (Bailey & Shaw, 1989; Ellinwood, 1971; Jaffe, 1989; Kramer, 1969; Machiyama, 1992). To explain, chronic abuse of these stimulants is typically associated with prolonged "runs" of several days to over a week's duration. The subsequent adverse behavioral and physical effects are due not just to the drug, but also to the effects of sleep deprivation and malnutrition. Sustained runs frequently result in marked paranoia, which may develop into a frank psychosis. Impulsiveness, restlessness, irritability, and hypervigilance are also frequently observed. Mood fluctuations associated with chronic abuse may be characterized by abrupt shifts from warmly congenial to furiously hostile for the most trivial of reasons. Suspiciousness often combines with irritability, impulsiveness, and hyperactivity to induce spontaneous and unwanted assaultive behavior. Chronic abusers often simultaneously consume large amounts of alcohol and other drugs. This combination increases violence potential. Mutual enhancement of suspiciousness and paranoid ideas with other "speed freaks" adds to the likelihood of violence. The combination of weapons access and using large doses of amphetamines/cocaine is awesomely dangerous.

Most high dose abusers describe involvement, either as an aggressor or a victim, in episodes where murder or mayhem were avoided by the slimmest of margins. There are, of course, instances in which violence actually occurred. From description of a number of these events, it is clear that they would not have taken place had it not been for the use of amphetamines (Kramer, 1969). For example, one third of the homicides in San Diego County in 1987 involved cocaine, methamphetamine, or both (Bailey & Shaw, 1989).

Additionally, cocaine and amphetamine related homicides are markedly more likely to be associated with over-kill.

While all of the adverse developmental factors described in this declaration contributed to Anthony's risk of delinquency and criminal violence, including the capital offense, his heavy abuse and probable intoxication with methamphetamine during the month preceding and encompassing the evening of the capital offense was the most immediate and significant factor in increasing his sense of vulnerability and impulsive reactivity, as well as impairing his judgment and reducing his volitional capacity at the time of the capital offense.

*Broad impacts of substance dependence:* In examining the effects of substance dependence and/or acute intoxication on the etiology of a criminally violent act, it is not so simple as a dichotomy of being either acutely intoxicated on one hand or completely unaffected on the other. Instead, there is a continuum of the extent to which substance dependence and intoxication undermine the quality of personality and cognitive processes, with associated resentment, projection of blame, inappropriate emotional reactions, poor behavioral control, poor judgment, impaired capacity to consider alternatives, and poor planning. Thus it not necessary for someone to be staggeringly intoxicated before their judgment is impaired by substance abuse – particularly chronic substance abuse. This is part of the rationale of the random drug testing of individuals in critical occupations - even though they show no overt evidence of intoxication. In other words, substance abuse/dependence can significantly affect the quality of judgment and behavioral responses though the individual is still capable of purposeful behavior and may not overtly appear to be under the influence. Further, substance dependence undermines the quality of judgment apart from episodes of intoxication. This is why recovery from substance dependence involves so much more than simply no longer abusing the substance. Rather Alcoholics Anonymous and other treatment efforts are typically necessary to restore adaptive perspectives regarding self and others, to develop healthy coping resources, to assume greater personal responsibility, and to establish psychological maturity. Thus as individuals in recovery from substance dependence reflect on their period of active abuse, they describe not only the behaviors associated with acute intoxication, but also the "stinking thinking" that typified their broader life decisions and interpersonal behaviors. Anthony had had periods of not abusing substances, such as during the Boost program, but had never participated in rehabilitation treatment that would have addressed the underlying cognitive and emotional distortions.

**Failed attempt in transition to adulthood:** Despite his alcohol and drug abuse in high school, and uncertain involvement in delinquent activities, Anthony appears to have been on a largely constructive trajectory. He was involved in high school sports and excelled in ROTC. He graduated from high school. He aspired to attend college, but recognized his need for additional college preparatory work – and the potential scholarships successful completion of this Boost program would make available. He became quite involved with a church, and quoted scripture in his appeal to remain in the Boost program.

44

Re: Anthony Cardell Haynes
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05**

**Implications of failed attempt in transition to adulthood:** When Anthony failed to complete the Boost program, it was a major defeat. This had many elements. Most importantly, there was the personal failure in his first foray into independence and manhood. For a young person on the cusp between being a child and an adult, such a failure can leave a disturbing imprint. Second, there was the loss of a military identity and future. His military identification through ROTC appears to have been an important structuring experience and opportunity for achievement in the face of his lackluster academic performance. Third, there was the embarrassment of facing his parents and friends having been unable to adapt to a military program. Fourth, Anthony's inability to perform academically in this college preparatory program raised obvious doubts about his readiness and ability to perform in actual college coursework.  Sadly, in the face of these difficult emotional realizations, Anthony returned to his historic coping crutch – alcohol and drug abuse. The degree of his struggle with the above issues is reflected in the remarkably high intensity of the substance abuse that characterized the five weeks between his discharge from the Boost program and the capital offense. In the absence of an achieving, college bound, military identity, Anthony appears to have tried on the identity of a thug, however impulsively and ill-conceived, with tragic consequences.

45

### Section 2: Violence Risk Assessment

The perspectives, conceptualizations, and data specific to risk assessments at capital sentencing described below are based on my extensive experience in providing these consultations since 1995, and my scholarship in this area. The broad scientific acceptance of the risk assessment methodology outlined below is demonstrated by both publications I have co-authored that have passed peer review in major forensic psychology journals and edited texts (a sample of these are attached at Appendix C), as well as by my being awarded the 2006 American Psychological Association Award for Distinguished Contribution to Research in Public Policy. It should also be noted that research findings published by me and other scholars since 1999 continues to be consistent with the methodology and fundamental conclusions regarding violence risk assessment at capital sentencing detailed below.

*Failure of the defense to accurately conceptualize and respond to mischaracterizations of Special Issue No. 1:*

Not uncommonly at capital sentencing, "probability of acts of criminal violence" is reframed by the State as a question of whether the defendant is "dangerous," or will be a "danger" in the future. This redefining of the special issue in terms of dangerousness departs from the language of the issue, which is focused on the probability of acts (i.e. "Whether there is a probability the defendant would commit acts of criminal violence that would constitute a continuing threat to society." Article 37.071, Texas Code of Criminal Procedure). This special issue as affirmed in *Jurek v Texas* is not an assessment of a static characteristic of dangerousness. Rather it calls for an evaluation of the likelihood of violent acts. This is not an inconsequential distinction (see Cunningham, in press; Cunningham & Goldstein, 2003; Cunningham & Reidy, 1998; 2001). If the special issue is re-framed as "danger," it ceases to be definable or measurable in a scientifically reliable and reasonably discriminating fashion. More problematically, when construed as "dangerousness" the issue loses any individualizing value in the application of the death penalty. All violent felons, and particularly all capital offenders, would be considered to be dangerous. Their "dangerousness" is a significant rationale for their long-term confinement in highly secure correctional facilities. It is understandable why the State would seek to reframe this special issue as "dangerousness" as opposed to "probability of acts of criminal violence." A jury, having just convicted the defendant of a capital murder, is much more likely to agree with the proposition that a defendant is "dangerous" than they are to find that he is disproportionately probable to commit acts of criminal violence in prison or on old age parole - particularly when the jury has the benefit of expert testimony on the relevant probabilities as will be detailed in the sections that follow.

Consistent with the predictable reframing of the special issue as one of "dangerousness" in light of the capital offense, in closing statements the State argued:

> You've already unanimously found that he is guilty of [sic] capital murder of Sergeant Kincaid. You now have to decide whether or not this defendant is a future danger to society, and I argue that includes society in prison. You also have to determine whether there is any mitigation, any reason not to impose the death penalty. If you answer that question unanimously yes, he is a future danger, and you unanimously answer, no, there is no mitigation, he will receive the death penalty. (Page 15: lines 9-18)

> And if you follow your oath and the law and answer to the questions regarding whether this defendant is a future danger is obviously unquestionably yes, he is a future danger. (Page 28: lines 1-4)

> ...there could only be one verdict in this case and that is the answer to Question No. One is future danger, the yes, and the Foreman signs it so. (Page 29: line 17-19)

> The defense attorneys, both of them, no, [sic] he won't be a future danger. (Page 59: 21-22)

> So, just like Mr. Smyth said. We have proven to you, we've proven to you this issue on future dangerousness. We've proven that to you. (Page 61: line 15-17)

Similarly, the State artfully separated the "continuing threat to society" from the essential preceding clause "probability the defendant would commit acts of criminal violence that would constitute a..." – effectively making it a synonym for "future dangerousness."

> In this defendant's background, I don't think there's any question that he is a continuing threat to society. (Page 23: lines 2-4)

Inexplicably, the defense joined the State in this focus on "threat" as opposed to probability to criminal acts of violence:

> With those controls if Anthony Cardell Haynes is a continuing threat to society. (Page 38: lines 4-6)

Equally problematic, the defense failed sponsor expert testimony or provide argument that adequately distinguished between "probability" and "any possibility." If probability as contemplated by the special issue means any risk whatsoever or any possibility, then the answer to the special issue is always "yes." There is a *possibility* that every convicted capital murderer, every convicted murderer, and every defendant convicted of any offense will commit an act of serious violence in prison. Conceptualizing this issue as any risk or any possibility results in the special issue always being answered in the

47

affirmative and, accordingly, having no narrowing or individualizing value in the application of the death penalty. The State's reframing probability as possibility is demonstrated in the retrospective logic of their final argument:

> Well, Sergeant Kincaid's death was predicted not on the 22nd day of May of 1998, it was predicted four years back. And I guarantee you that if we would have made such a prediction, Mr. Smyth and myself, back in 1994 to say, ladies and gentlemen, this will happened [sic], it's going to happen as reasonable – it is reasonable to believe that this person will be a continuing threat, there's the probability there, they would have said no proof, absolutely no proof, he's just having a bad day. That is what they would have said. Mind you, four years before Sergeant Kincaid's death there was some officer out there that was going to die at the hands of this defendant because he was suffering from this intermittent explosive disorder. (Page 55: lines 12-25)

It is also predictably evident in the State's warning of the jury taking any risks:

> Who will be around the next time that it explodes? Ask yourself that. What will the result be? Ask yourself that. What will his excuse be at that point? Will it be another grieving widow? Do you want to run that risk?

This argument of reframing the special issue as an avoidance of any risk is an extension of the testimony of Royce Smithey on cross examination:

> Q:  Yes, sir. Is that a solution to any problems in the prison system?
>
> A:  Sure it is. You have an individual who is violent, he certainly won't be violent after he is executed.  (Page 21: line 18-21)

Such conceptualizations of the special issue as a decision to eliminate any possibility do nothing to individualize the application of the death penalty to Anthony Haynes, or to demonstrate that he was disproportionately likely to commit acts of serious violence in prison. The defense neither provided testimony that would have preempted such a reframing of the special issue nor responded with objection or argument to the "no risk after he's dead" testimony of Royce Smithey or the State's recasting the issue as "dangerousness" in final argument.

More fundamentally, the totality of Royce Smithey's testimony was directed to describing that there is a risk of violence in prison; and accordingly that that risk of institutional violence imputed to the defendant as he would be in prison. With a single exception, nothing in Mr. Smithey's testimony particularized that risk to Anthony Haynes or any characteristic of Anthony Haynes. The possible exception was his assertion regarding "predator-type" murderers on cross examination:

> Q:  And do you find that people who have been convicted of murder, as a rule, are

48

people who you may end up having less trouble because it is a one on one situation?

A: It depends on what you are referring to as a person convicted of murder. There are different types of murders, different types of people, different situations within the murder realm that we could be talking about here. The predator-type murderers are usually the ones we have the most problems out of. The people that are doing time for murder, for passion killings, a heat of type passion type of murder is what I am talking about, those individuals are different that the predator type that are in the – (Page 15: lines 10-21)

There are two problems with this testimony from Mr. Smithey that the defense made no response to, either in expert testimony, objection, or argument. First, Mr. Smithey's assertion that there is a distinction in the prison behavior of "predator-type" and "passion-type" murderers is without supporting data from TDCJ or the scholarly literature. Similarly, his assertion that "predator-type" murderers are disproportionately involved in assaultive prison misconduct is contrary to existing data drawn from TDCJ. As will be discussed in more detail in a later section, both commuted death-sentenced and life-sentenced capital offenders (the majority of whom would be considered predatory-type murderers) had far lower rates of prison violence than other inmates (Marquart, Ekland-Olsen, & Sorensen, 1989). Second, as virtually all capital murders would be characterized as predatory-type murderers, such a distinction does nothing to individualize or narrow the application of the special issue to the particular capital defendant before the jury – in this case Anthony Haynes.


<u>Failure of the defense to provide expert testimony regarding the implications of Mr. Haynes' conduct during his jail incarceration pre-trial and in other structured settings:</u>

While the defense noted that Mr. Haynes had been a model inmate during his pretrial confinement in jail, the defense failed to provide a sound violence risk assessment methodology to the jury that would have informed the implications of this positive jail adjustment. Such testimony, if provided, would have detailed that risk of violence in prison is most accurately forecasted by two methods: 1. examination of the defendant's conduct in a similar context (i.e. jail or prison, and to a lesser degree school and military); and 2. particularization of group statistical data. Accordingly, Mr. Haynes' record of compliant and nonviolent adjustment to jail was an important piece of data. While the jury was advised of this pattern, there was no expert testimony regarding its implications that would have allowed the jury to give informed weight to it.

Also relevant was how Mr. Haynes had responded to other structured situations. In year preceding the capital offense Mr. Haynes had spent over six months in a military preparatory "Boost" program. While he was dropped from this program for academic failure, there were no problems with insubordination or assault. Mr. Haynes had graduated from high school, additional evidence of an ability to broadly comply with

49

structure and authority. Further, he gravitated toward and excelled in ROTC program, a context of more structure and authority hierarchy than typical high school activities. It is acknowledged that Mr. Haynes' high school years were punctuated by two outbursts involving his ROTC commander. These, however, were both isolated and treated as indications of emotional disturbance rather than as antisocial or a reason for expulsion. Finally, numerous adults Mr. Haynes had interacted with in childhood and adolescence described him as respectful and compliant.

Much of the State's case at sentencing focused on the involvement of Mr. Haynes in several armed robberies in the hours before the capital offense. These offenses, however, were in the company of the same companions as were present at the shooting of Sergeant Kincaid, and were part and parcel of a sequence of conduct on the evening in question that encompassed the capital offense. As such, these make only a minor contribution to the defendant's risk of violence in prison, and may represent a form of "double counting" regarding the special issue. An armed robbery associated with the capital offense was present in a significant proportion of the capital inmates studied by Marquart, Ekland-Olsen, and Sorensen (1989). This factor was incorporated, then, in their finding that the majority of former death-sentenced and life-sentenced capital offenders did not exhibit serious violence in prison. Research findings since 1999, based on a retrospective review of the institutional histories of over 6,000 convicted murderers in TDCJ and an associated risk extrapolation, found that the presence of an armed robbery in a murder offense modestly increases the life-time risk of serious violence in prison by 7.4% (from 16.4% to 23.8%)

Failure of the defense to describe the low predictive utility of past community violence or the capital offense for risk of violence in prison:

The primary emphasis of the State regarding Special Issue No. 1 was on the capital offense, the armed robberies earlier in the evening of the capital offense, and behaviors exhibited during isolated instances of mood lability and temper. Despite ample scholarly and correctional perspectives, the defense failed to put on evidence that these factors are *not* reliably predictive of serious violence in prison. Stated plainly, prison violence does not predictably follow from pre-confinement violence or the capital offense of conviction. To illustrate, summaries of research sponsored by the U.S. Justice Department (Alexander & Austin, 1992; National Institute of Corrections, 1992) have concluded:

1. Past community violence is not strongly or consistently associated with prison violence.

2. Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.

50

3. Severity of offense is not a good predictor of prison adjustment.

The explanation for this disconnect between community violence and prison violence is that much violence is a product of the interaction or convergence of situational factors, interpersonal relationships and other contributors, as well as individual violence proclivity (Shah, 1978; Monahan, 1981, 1996). Hall (1987) conceptualized the likelihood of violence as involving the interaction of the individual with environmental factors at a certain time, place and setting. Hall asserted: "Individual persons are never dangerous in toto" (p.10). The convergence of these factors that resulted in the capital offense may well not be replicated in prison. There is ample research to support this proposition.

To illustrate this research, Flanagan (1979) identified that inmates facing more that five years of confinement (47% of whom were murderers) had lower rates of disciplinary infractions than did short-term inmates. In other words, inmates convicted of more serious offenses and facing longer prison sentences displayed better prison adjustment than short-term, less serious offenders. Disciplinary offenses of any sort among long-term inmates in this study ranged from approximately .5 to 1.5 per inmate annually depending on the age of the inmate at initial incarceration. Only 11.8% of these infrequent disciplinary write-ups were for fighting or some form of physical assault. Flanagan hypothesized that long-term inmates adopt a perspective regarding doing time that promotes adaptation. Similar counter-intuitive findings were reported by the U.S. Bureau of Justice Statistics (1986), as inmates convicted of violent offenses had lower rates of prison disciplinary infractions than property offenders. Consistent with the above, Cooper & Werner (1990) found that severity of the offense of conviction did not predict violent infractions in the first six months of federal prison confinement, despite expectations of prison caseworkers and psychologists that this was an important predictive factor. Recent data, obviously not available in 1999, confirms this pre-1999 research. Analysis of disciplinary data from the entire Florida Department of Corrections on over 50,000 inmates incarcerated for the entirety of 2003 revealed that inmates who had been convicted of first degree murder were less likely to have general disciplinary infractions and had equivalent rates of assault as compared to property offenders and all inmates (Sorensen & Cunningham, in preparation).

More specific to the comparative conduct of Texas capital offenders in prison, Marquart, Ekland-Olson, and Sorensen (1989) examined the institutional disciplinary records (1974-1988) of 92 Texas capital murderers convicted post 1973 (i.e. post *Jurek v Texas*) who were released from death row by commutation to life, retrial and sentence to prison, or case dismissal. The prison experience of these commuted death penalty inmates was compared to a group of Texas life sentence capital murderers, as well as the prison behavior of inmates "system wide" in the Texas Department of Corrections, and inmates at a Texas high security prison facility. The prior criminal histories and homicide characteristics of the capital murderers reflected a broad range of past arrests and homicide contexts.

51

Of greatest comparative significance is the review of total infractions on a yearly average per 100 inmates. This represents an annual base rate or estimated experience per 100 inmates per year as displayed in Figure 1.



*Figure 1. Reported serious violent prison rule violations: Average number of violations per 100 inmates per year (Homicide, assault with weapon, sexual abuse by threat, striking officer)*

It will be noted that the "release from death row" base rate of 1.61 (i.e. 1.61 violent rule infractions per 100 inmates per year) is less than that of the "life sentence" inmates of 2.60, is 1/7 of the "systemwide" base rate of 11.66 and 1/12 that of the high security prison. These base rates provide both a specific and comparative framework for the risk of serious violent rule violations. Again, these findings dispute Mr. Smithey's assertion that predatory-type murderers are disproportionately involved in prison misconduct.

Marquart et al. noted that approximately 90% of both the former death row inmates and the life sentence control cohorts who were still incarcerated held trustee status. A minority of death row inmates exhibited persistent serious disciplinary problems. Marquart et al. indicated that 8 of the former death row prisoners and six of the control life sentence group were identified as prison gang members and confined indefinitely in administrative segregation. Of course, there was no reason at trial to believe that Mr. Haynes would be particularly likely to affiliate with a prison gang.

It is notable that the above low rates of institutional violence were maintained in spite of many of these commuted capital offenders having histories of criminal and/or violent behavior that predated their capital offense. Specifically, 40% had had police contact for violent incidents, 18% had been convicted of prior UCR violent crimes (murder, aggravated assault, armed robbery, and rape), 46% had been convicted of prior UCR property crimes (burglary, auto theft, arson, and larceny), and 34% had prior adult incarcerations.

52

Failure of the defense to individualize Mr. Haynes' risk of violence in prison in light of the low rates of serious violence in TDCJ:

A fundamental anchoring point for specifying and individualizing Mr. Haynes' risk of serious violence in prison is the rate of such violence in TDCJ – particularly in light of the types of offenders and their prison recidivism histories confined in TDCJ. Because of the sensationalizing representation of popular media that serious violence in prison is routine, a capital jury is likely to profoundly over-estimate this rate. This tendency would be aggravated by general testimony about the occurrence of violence in prison. Statistical data that would accurately inform the jury regarding these rates is contained in monthly "Emergency Action Center Reports" compiled and published by the Executive Services Department of TDCJ and from the annual "TDCJ Fiscal Year Statistical Report." These reports would have detailed that approximately half of the inmates in TDCJ in 1999 were serving sentences for violent felonies, including approximately 10% (i.e. 14,000 inmates) for homicide. Approximately one-third of inmates in TDCJ in 1999 had had a prior period of confinement in prison.

Despite the community violence histories and recidivism of these inmates, the rate of serious violence in TDCJ in 1999 was quite low. According to TDCJ Emergency Action Center Select Statistics from 1999 (certainly known to Mr. Smithey and available to defense counsel with a phone call to the TDCJ Executive Services), only 1% of inmates were cited for inmate-on-inmate assaults during 1998, and only 1% were involved in assaults on staff. Of those staff assaults, less than 5% were with an actual weapon. Thus when Mr. Smithey testified that there were "many" instances of violence in TDCJ (Page 7: line 6) he was technically correct: inmates committed over 3,000 assaults in TDCJ in 1998. What was misleading by omission is that these involved 2% or fewer of the inmates in Texas prisons that year. This is not unlike an inquiry regarding whether there are many homicides in the United States each year (i.e. there were over 15,000 in 1996), yet the likelihood in 1996 of being a homicide victim was exceedingly remote (8.2 per 100,000 community residents). Without this detailed statistical data, the jury had no way to make an informed appraisal of Mr. Smithey's characterization of "many" and its associated risk implications.

This same observation holds for homicide in prison. The rate of inmate-on-inmate homicide in TDCJ in 1998 was 4.2 per 100,000 inmates. By comparison, the rate of homicide in the free community of Houston in 1995 was 18.2 per 100,000 community residents, and in 1996 was 14.7 per 100,000 community residents (Sourcebook of Criminal Justice Statistics, 1998). If a more equivalent comparison is made, acknowledging the predominantly male make-up of the TDCJ inmate population (90%+) and the fact that males commit over 90% of the homicides in the community, the rate of homicide perpetrated by males in Houston 1995-1996 those years averaged approximately 30 per 100,000 male community residents. This homicide rate is 7 times the rate observed in TDCJ even though the TDCJ inmate population is entirely criminal and almost half have violent offenses of conviction.

These statistics demonstrating the remarkable violence-containment effect of prison incarceration among an at-risk population are a convincing rebuttal to Mr. Smithey's assertion that rehabilitation or violence is entirely up to the inmate:

> A: Yes, sir. I would say probably 98% of their rehabilitation depends on that individual. (Page 15: line 8-9)

> A: …you know, like I testified before, if that inmate wants to be violent, he can be violent. (Page 22: line 14-15)

The rate of inmate-on-staff homicide is also extraordinarily low – approximately 1 per million state prison inmates per year. Such a tragedy has occurred only 1-2 times in TDCJ in the past 20 years. This was particularly important to bring to the jury's attention as Mr. Smithey described the access of inmates to these prison staff members:

> Q: Will that inmate come into contact with people who are not prisoners?

> A: Yes, sir.

> Q: Who could that be?

> A: Certainly you have your prison guards. You have employees that work within the system, secretaries, doctors, nurses, librarians, teachers. Each unit has educational facilities within the unit. You have maintenance personnel. So you have a wide variety of civilian employees that work in the system other than the security guards. (Page 9: line 20 to Page 10: line 4)

There are two compelling conclusions from this data regarding serious violence in TDCJ. The obvious implication of these base rates is that prison works. The restrictions, structure, and supervision of prison are effective in limiting the incidence of serious violence within the institution. The critical factor in containing the violence of Mr. Haynes or any violent felon in prison is not based on the inmate changing the attitudes that he displayed in the community. Rather, it is the security, structure, supervision, sanctions, and incentives of prison that keep serious violence at low levels – even among a group of individuals that exhibited serious violence in the community. TDCJ is able to reasonably contain the violence of thousands of violent offenders.

These data point to Mr. Haynes' risk of serious assaults or homicide in prison ranging from quite low to extraordinarily low depending on the violent act being forecasted. Contrary to the State's assertion in closing statements, these data demonstrate the very high likelihood that being confined to prison would have been sufficient to provide for the "protection of society."

54

Expert testimony or informed cross examination of Mr. Smithey with the readily available data on assaults and homicides in TDCJ, as well as explanations for the control that prison offers, would also have preempted final arguments of the State that embraced Mr. Smithey's assertion that prison violence is simply the choice of the inmate:

> And remember, the mind is a powerful thing. I can do what I want when I chose to do it and I can pick my own timing and nobody in that jury box can stop me. You know why? Because I am in control of my mind and you are not. You may control my body but you don't control my mind. And that's true. You won't control his mind. When he makes his mind up he is going to do what he wants to do. And I suggest to you can a leopard change his spots? I say no. Nor can he change his conduct. (Page 61: line 3-12)

Failure of the defense to individualize Mr. Haynes' risk from group statistical data on capital offenders:

*Rationale for the application of group statistical data in assessments of individual risk of violence:*

Mr. Haynes' likelihood of an adaptation to prison without serious violence could also have been projected in 1999 by particularizing group statistical data. A number of scholars have characterized group statistical or actuarial data as making an indispensable contribution to a scientifically informed violence risk assessment. Actuarial or group statistic methods have been repeatedly described as not just an adjunct to, but rather superior to clinical methods in predicting the behavior of individuals (Dawes et al., 1989; Meehl, 1954; Monahan, 1981, 1996; Showalter & Bonnie, 1984; Tonry, 1987). As Poythress (1992) summarized,

> In virtually every area of behavior that researchers have pitted clinical prediction against statistical prediction, clinical prediction has been shown to be inferior. This is true in the case of violence prediction studies also... (p. 142).

Thus, integration of actuarial (group statistical) data may reduce error associated with either under or over estimation of violent recidivism (Litwak et al., 1993). Dawes, Faust, and Meehl (1989) identified group statistics as quite relevant and applicable to individuals:

> A common anti-actuarial argument, or misconception, is that group statistics do not apply to single individuals or events. The argument abuses basic principles of probability. Although individuals and events may exhibit unique features, they typically share common features with other persons or events that permit tallied observations or generalizations to achieve predictive power (p. 1642).

The fundamental group statistic in risk assessment is the base rate, which is the statistical prevalence of a particular behavior in a given group over a set period of time (usually one

year). Monahan (1981) emphasized the importance of anchoring any estimate of the probability of violence in the individual case to the statistical base rate, describing: "knowledge of the appropriate base rate is the most important single piece of information necessary to make an accurate prediction" (p. 60). Prosecutors and juries at capital sentencing may err by inappropriately emphasizing predictive ramifications of the instant offense or limited case information while neglecting base rates. As Smith (1993) stated:

> The most common significant error made by clinicians in the prediction of violent behavior relates to ignorance of information surrounding the statistical base rate of violence in the population in question. (p. 539)

Base rate data is incorporated in multiple risk assessment models described in the scholarly literature, with empirically validated factors being employed to cautiously individualize this base rate. The summary of various risk assessment models which follows is not intended to be exhaustive, but will serve to illustrate specific variations around a generally consistent theme of individualizing group base rates.

A. Monahan (1981) described approaching the risk assessment task with a combination of:

1. Actuarial methods,
2. Dispositional/Interactional/Contextual approaches.

Monahan recommended beginning with a base rate. This base rate or actuarial estimate would then be conservatively individualized by examining individually specific dispositional, interactional, and contextual information.

B. Morris and Miller (1985) described risk assessments of future violence as being of three types:

1. Actuarial (using how people like the defendant have behaved to estimate how the defendant will behave);
2. Anamnestic or past pattern (using how the individual behaved in the past to estimate behavior in similar circumstances);
3. Clinical (using life experience, training, knowledge of mental illness, observations, and diagnosis to estimate future behavior).

Actuarial techniques require relevantly applicable group outcome data. Anamnestic reliability is dependent on a sufficiently established pattern and a continuing close similarity of context. Clinical assessments rely on traditional methods of interview, testing, inference, and diagnosis. Morris and Miller asserted that actuarial and anamnestic approaches are more reliable than clinical approaches, which they described may add little to the accuracy of actuarial or anamnestic assessments.

C. Hall (1987) proposed varying formulas for risk assessment depending on whether long-range, short-term, or imminent forecasting of violence was being attempted:

56

1. Long-range violence is best estimated by the base rate of violence in the group to which the individual belongs.
2. Short-term (next several months) violence potential is a function of the interaction of historical variables (nature of violent exposure, experience, and behavior), current operating variables (long-term disposition and short-term triggers), opportunity variables, and inhibitory variables.
3. Imminent (next several days) violence is a function of perpetrator variables, contextual stimuli, victim characteristics, and inhibitory factors.

D. Serin and Amos (1995) proposed a decision tree for the assessment of dangerousness that consisted of four sequential steps:

1. Derive a group base rate estimate from relevant group demographic and dispositional factors.
2. Consider clinical information regarding past use of violence, disinhibitors, and persistence of antisocial behavior in conservatively revising the group base rate estimate to an individual base rate estimate.
3. Evaluate what risk management variables and what contextual factors might be modified to reduce the likelihood of violence.
4. Establish a final revised estimate of violence potential.

It should be noted that the fundamental reliance of violence risk assessment models on base rates is not restricted to capital sentencing. Actuarial violence risk assessment applications also include non-capital sentencing determinations, prison classification, parole eligibility, and civil commitment and release. In addition to violence risk assessment, use of actuarial techniques in evaluating risk of all types has had a longstanding role as the principal methodology in the insurance industry. Group statistical data also forms the fundamental scientific underpinning of the practice of medicine and pharmacology. For example, the prescription of an antibiotic for a given infection is based on the clinical trials with this drug (i.e. the statistical response of a group of patients with a similar infection to this medication). Actuarial methodology then has demonstrated reliability and validity in a broad arena of commercial and clinical applications.

*Applicable group statistical studies of prison violence among capital offenders and murderers:*

Studies of the post-commutation and/or general prison population behavior of capital offenders published prior to 1999 have had variable geographic samples and time periods of follow-up: national (1972-1987), Texas (1924-1971), Texas (1973-1988), Texas (1979-1987), and New Jersey (1906-1960). An additional study followed (1980-1995) samples of Missouri death row inmates as well as convicted murderers serving life with or life without parole. There are a number of factors, however, that indicate a reasonable basis to generalize the findings of other geographic samples and time periods to the evaluation of the 1999 violence risk of a Texas capital inmate facing a life term in TDCJ. These include:

57

1. The underlying capital offenses were sufficiently violent and aggravated that a death sentence was sought and returned.
2. The offense distribution of state prison inmates is quite similar from state to state.
3. Fundamental aspects of state prison incarceration have a high degree of similarity from state to state and over time, particularly over the past 30 years.
4. There is no study, regardless of geographic region or time period sampled that controverts the other studies. Thus, despite the diversity of settings and time periods, the violence incidence of capital offenders and convicted murderers in the general prison population is broadly similar from study to study - reflecting a robust finding.
5. Much of this research has been done on samples in the Texas prison system.
6. Broad application of capital offender base rates to defendants in varied jurisdictions has passed peer review in multiple scholarly papers.

The relevant group statistical data or base rates of prison violence among commuted death row inmates will be summarized below.

The findings of Marquart, Ekland-Olson, and Sorensen (1989) have already been described in an earlier section. Quite similar base rate data emerge from other retrospective tracking studies of commuted capital offenders. Marquart and Sorensen (1989) reported on the institutional behavior of 533 capital offender former death row inmates nationwide who sentences were commuted following the 1972 *Furman v Georgia* decision, and whose disciplinary behavior was tracked across the following 15 years. The results of this study are depicted in Figure 2 below:



*Figure 2.* Serious prison rule violations committed by death row inmates over 15 years

Inspection of the associated base rates in this study indicate that slightly less than 1/3 of the former death row inmates committed serious prison rule violations. Over half of those inmates committing serious rule violations were involved in only one rule violation, and another fourth were involved in only two rule violations. The authors concluded: "These data demonstrate, at least among these violators, that most serious infractions were one time events or situations. In short, most of the *Furman* inmates were not violent menaces to the institutional order." The authors additionally observed that a small group of chronic offenders (7.4% of the total *Furman* inmates on whom disciplinary information was available) were involved in three of more serious rule violations, accounting for approximately half of the total serious rule violations. The authors concluded: "This finding supports previous studies which have shown that within the prison community, as in the free world, a small group of offenders accounts for the majority of offenses" (p. 20). Regarding the incidence of most serious violence, among the *Furman* group of commuted death sentence capital murders, 1.3% committed another homicide in the institutional setting. Of the other 59 serious acts of violence which were defined as weapons related aggravated assaults, 7% of the inmates were involved.

Marquart and Sorensen (1988) studied the institutional behavior of 47 capital offender former death row inmates in Texas whose sentences were commuted following *Furman v Georgia* in 1972. Across a 13-year period of confinement in a general prison population, these 47 former death row inmates committed 3 weapons related offenses. Additionally, there were two incidents of striking a guard. Among this Texas *Furman* group, 75% had no

serious disciplinary infractions, and 93% committed no aggravated assaults or assaultive weapons offenses while incarcerated in the Texas Department of Corrections. An argument could be advanced that the low rate of serious violence among former death row inmates was secondary to the psychological impact of their death sentences and death row confinement. Comparison of these *Furman* commutees, though, with a matched set of 156 life sentence inmates revealed quite similar institutional rates of serious disciplinary infractions or violent offenses (Marquart, Ekland-Olson, & Sorensen, 1994).

Sorensen and Wrinkle (1996) analyzed the institutional violence rates of 648 Missouri death row, life-without-parole, and life-with-parole convicted murderers, finding that 78.2% had no reported assaults across 15 years of follow-up. Of the assaults that did occur, 1/3 were classified as minor. The type of sentence did not significantly affect prison violence rates. These data have remained consistent across decades, and thus are likely to remain robust into the foreseeable future. Wagner (1988) conducted an extensive analysis of the prison behavior of 100 commuted capital offenders who were followed between the years 1924 and 1971 in the Texas Department of Corrections. He found that 80 commutees (80%) did not commit any serious violent prison rule violations. Three of the commuted capital offenders (4%) killed 4 fellow inmates. Earlier, Bedau (1964) found no allegations of unmanageable behavior during incarceration among 55 New Jersey capital offenders who had been released from death row between 1907 and 1960 and were serving life imprisonment terms.

Repetitive serious prison violence was observed in these studies of former death row inmates, but tended to involve only a small minority of them. Corollary but unspecified base rate perspective of the prison behaviors of murderers in general was provided by Flanagan (1980) who identified murderers as being "settled" prisoners who are infrequently involved in violent behavior within the institution.

In particularizing this group data to Mr. Haynes, base rate data regarding capital offenders and their disciplinary outcome in the general prison population revealed that 20-30% committed acts of assaultive violence. Less than 10% were guilty of chronic violent rule infractions - and these inmates could be managed in administrative segregation. Cumulative incidence of inmate-on-inmate homicide across multi-year follow-up in these studies was approximately 1%. Incidence of inmate on staff homicide is approximately one per million inmates annually.

<u>Failure of defense counsel to individualize Mr. Haynes' risk of committing serious violence in prison in light of preventive interventions available in TDCJ:</u>

Assessment of violence risk is not simply a static enterprise. It also involves consideration of what preventive measures can be undertaken that would modify or reduce the level of violence risk posed by a particular inmate (Serin & Amos, 1995). Accordingly, Heilbrun (1997) identified two broad forensically relevant models of violence risk assessment (a) accurately forecasting the probability of violence, and (b)

60

managing risk to reduce violence incidence. In a prison setting, violence risk reduction interventions include medication or treatment for psychological disorders, application of disciplinary contingencies, rehabilitation programming, isolation from co-defendants or fellow gang members, special management provisions, or modified confinement. All of these are relevant to a capital jury's consideration of the violence likelihood of a particular defendant.

Two of these interventions bear particular relevance in relation to reducing the risk of Mr. Haynes exhibiting serious violence in prison. The first of these options involves psychotropic medication. In final argument the State emphasized Mr. Hayne's having been diagnosed with Intermittent Explosive Disorder, and made this mitigating factor double-edged by asserting that it resulted in a potential for unpredictably violent over-reaction:

> Here are the records. We told you we would bring you everything we possibly could to help you make this decision. Look on – page after page after page talks about this defendant and how dangerous he is, how his explosive personality. That explosive personality just didn't happened [sic] back in November of 1996. From the records here you will see that his explosive personality began before that. [and continuing regarding explosive incidents for five pages] (Page 23: line 2-12)

> Mind you, four years before Sergeant Kincaid's death there was some officer out there that was going to die at the hands of this defendant because he was suffering from this intermittent explosive behavior. He was diagnosed with it. (Page 55: line 22 to Page 55: line 1)

Unfortunately, the defense did not sponsor expert testimony regarding the management of Intermittent Explosive Disorder. This management typically involves treatment with anticonvulsant medications and mood stabilizers. These were the medications utilized in Mr. Haynes adolescent psychiatric hospitalization at West Oaks. Importantly, these medications were effective in treating his rage symptoms so that he was considered stable to discharge to outpatient follow-up. In Mr. Haynes' case, he was also treated with antipsychotic medication, likely in response to his report of hearing voices and to provide additional treatment of rage responses. This same medication regimen was available in TDCJ. Additionally, the defense failed to provide the jury with an informed perspective regarding how common psychiatric disorders are among the inmate population in TDCJ. For example, 22% (33,000) of TDCJ inmates are former MHMR clients. Such high prevalence rates of mental disorder coupled with relatively low rates of violence in Texas prisons demonstrates the capacity of TDCJ to treat and/or safely contain such mentally disturbed inmates.

A second primary intervention the defense failed to inform the jury of was the presence of over 10,000 administrative segregation beds/cells in TDCJ. Under an administrative segregation level of confinement in TDCJ, an inmate is single-celled and locked down 23 hours daily, with solitary exercise, and shackled movement under escort. Under such

Re: Anthony Cardell Haynes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

conditions of security, opportunities for serious violence toward others are greatly
reduced. For example, extrapolating from annual rates of assault on staff, an inmate
serving 40 years in administrative segregation would have a 2.4% likelihood of an assault
on staff requiring more than first aid treatment. Although administrative segregation
confinement is most typically in response to serious misconduct during prison
confinement, such confinement may be ordered preemptively – before a TDCJ inmate
exhibits serious institutional violence. Thus, should TDCJ determine that a defendant is a
disproportionate risk of serious violence in prison, there are facilities where any
opportunity a capital defendant would have to act out in a seriously violent way would be
substantially minimized. This capability in TDCJ was particularly important given the
State's assertion that future violence was simply a matter of the choices of Mr. Haynes.

Failure of defense counsel to equip the jury to avoid predictable error:

In the absence of detailed testimony regarding group statistic methodology and data,
ultimately particularized to Mr. Haynes, the jury's considerations of this issue are subject
to grave error. The basis for these errors include the following easily anticipated factors:

    a.  Individuals undertaking violence risk assessment are likely to commit a number
        of fundamental errors unless guided by reliable scientific methodology and data
        (see Cunningham & Reidy, 1999; Dawes, Faust, & Meehl, 1989; Monahan, 1981;
        Morris & Miller, 1985; Shah, 1978). These errors more often result in an
        overestimation of violence risk source (Monahan 1981; McNeil & Binder, 1991;
        Serin & Barbaree, 1993). The jury is unlikely to have knowledge of this
        methodology and research data unless informed by expert testimony.

    b.  A capital jury's familiarity with the heinousness of the capital offense and
        knowledge of other aggravating factors or acts are likely in many instances to
        result in a perception of high future violence risk in prison that is not justified by
        research (see Shah, 1979).

    c.  The combination of these factors is likely to result in a capital sentencing jury that
        is strongly biased toward overestimation of violence risk when scientifically
        grounded expert testimony is not made available to them.

    d.  In the absence of expert testimony, a capital jury has no mechanism to understand
        or incorporate base rate data, appreciate the importance of context, avoid illusory
        correlation, maintain skepticism of clinical methods, understand the implications
        of Antisocial Personality Disorder or related characterizations, incorporate the
        effects of aging, reliably evaluate patterns of behavior, factor in preventive
        measures, acquire the broad information relevant to violence risk considerations,
        appreciate the probabilistic nature of their task, or critically evaluate the
        arguments of the State or the defense.

    e.  The scientific methodology and data relevant to violence risk assessment of

capital offenders is based on multiple independent research studies, has been subjected to peer-review, articulates an error rate through the range of probabilities expressed, and is generally accepted in the violence risk assessment scientific community.

f.   A Texas capital jury is at best almost certain to be ignorant of rates of prison violence, inmate demographics and criminal histories, and prison confinement options and security procedures. At worst a Texas capital jury comes to capital sentencing risk assessment holding assumptions regarding future dangerousness that are false. Such false assumptions spring from intuitive but erroneous beliefs. It must be emphasized that much of the research data on the violence risk assessment of prison inmates is counter-intuitive.

Avoidance of fundamental errors in violence risk assessment at capital sentencing requires the testimony of an expert to inform the jury of scientifically sound methodology and empirical data. Particularly when accompanied by demonstrative exhibits that assist the jury's understanding and retention, testimony detailing violence risk assessment methodology and empirical data could have been presented in a clear, organized, logical fashion that neither confuses nor misleads the jury.

**Re: Anthony Cardell Haynes**
**Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05**

I hereby declare under the penalty of perjury of the laws of the State of Texas and the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 19th day of September, 2005 at Lewisville, Texas.

Mark D. Cunningham, Ph.D., ABPP
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

64

# REFERENCES

Akiskal, H.S., Downs, J., Jordan, P., Watson, S., Daugherty, D., & Pruitt, D.B. (1985). Affective disorders in referred children and younger siblings of manic-depressives: Mode of onset and prospective course. Archives of General Psychiatry, 42, 996-1003.

Alexander, J. & Austin, J. (1992).  Handbook for Evaluating  Objective Prison Classification Systems.  National Council on  Crime and Delinquency, San Francisco.

American Psychological Association (1996).  Effects of abuse on children. Presidential Task Force on Violence and the Family. Author.

American Society for Adolescent Psychiatry & the American Orthopsychiatric Association filed as an amici curiae in Thompson v Oklahoma (1986).

Barkley, R.A. (1990). Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment. New York: Guilford Press.

Bailey, D. N., & Shaw, R. F. (1989). Cocaine and methamphetamine related deaths in San Diego County (1987): Homicides and accidental overdoses. Journal of Forensic Sciences, 407-422.

Bedau, H. A. (1964). Death sentences in New Jersey, 1907-1960. Rutgers Law Review, 19, 1-64.

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., Morton, D., (1993). Survey of state prison inmates, 1991. U.S. Department of Justice, Bureau of Justice Statistics,  NCJ-136949.

Begleiter, H. (1995).  The collaborative study on the genetics of alcoholism. Alcohol Health & Research World,19, 228-236.

Briere, J., Evans, D., Runtz, M., & Wall, T. (1988). Symptomatology in men who were molested as children:  A comparison study.  American Journal of Orthopsychiatry, 457- 461.

Chaiken, M. R. (March, 2000). Violent neighborhoods, violent kids. Office of Juvenile Justice and Delinquency Prevention. U.S. Department of Justice.

Cotton, N.S. (1979). The familial incidence of alcoholism:  A review.  Journal of Studies on Alcohol, 40, 89-116.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected criminal issues. To be published by the Capacity for Justice.

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11 of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. & Reidy, T.J. (1998).  Integrating base rate data in violence risk assessments at capital sentencing.  Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D., & Reidy, T.J. (1998).  Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 333-351.

Cunningham, M.D., & Reidy, T.J. (1999).  Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death:  Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. Assessment, 12, 40-49.

Dawes, R. M., Faust, D., & Meehl, P. E. (1989).  Clinical versus actuarial judgment. Science, 243, 1668-1674.

Ellinwood, E.H. (1971). Assault and homicide associated with amphetamine abuse. American Journal of Psychiatry, 127, 1170-1175.

Esman, A.H. (1988). Assessment of the adolescent. In C.J. Kestenbaum & D.T. Williams (Eds.) Handbook of clinical assessment of children and adolescents (pp. 217-231). New York: New York University Press.

Finkelhor, D., & Brown, A. (1985).  The traumatic impact of child sexual abuse, a conceptualization.  American Journal of Orthopsychiatry, 55, 530-542.

Flanagan, T. J. (1979). Long term prisoners: A study of the characteristics, institutional experience and perspectives of long term inmates in State correctional facilities (Doctoral dissertation, State University of New York, 1979). Dissertation Abstracts International, 41A, 812.

66

Flanagan (1980). Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. Journal of Criminal Justice, 8, 357-367.

Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403-409.

Furman v. Georgia, 408 U.S. 238 (1972)

Green, A.H. (1988). The abused child and adolescent. In C.J. Kestenbaum & D.T. Williams (Eds.) Handbook of clinical assessment of children and adolescents (pp. 842-863). New York: New York University Press.

Greenfeld, L.A. (1998). Alcohol and crime: An analysis of alcohol involvement in crime, U.S. Department of Justice, Bureau of Justice Statistics, NCJ-168632

Gustafson, R. (1993).  What do experimental paradigms tell us about alcohol-related aggressive responding?  Journal of Studies on Alcohol, Supplement No. 11: 20-29. Murdock, D., Pihl, R., & Ross, D. Alcohol crimes of violence: Present issues. The International Journal of the Addictions, 25, 1065-1081.

Hall, H.V. (1987). Violence prediction: Guidelines for the forensic practitioner. Springfield, IL: Charles C. Thomas.

Heilbrun, K. (1997). Prediction versus management models relevant to risk assessment: The importance of legal decision-making context. Law and Human Behavior, 21, 347-359.

Hirschi, T. & Gottfredson, M. (1989). Age and the explanation of crime.  American Journal of Sociology, 89, 552-584.

Jaffe, J.H. (1985). Drug addiction and drug abuse. In Goodmand &   Gelman (Editors) The Pharmocological Basis of Therepeutics (7th Edition). New York: Macmillan Publishing Co.

Klein, D.N., Depue, R.A., & Slater, J.F. (1985). Cyclothymia in the offspring of parents with bipolar affective disorder. Journal of Abnormal Psychology, 94, 115-127.

Kramer, J. C. (1969). Introduction to amphetamine abuse. Journal of Psychadellic Drugs, 2, 1-15.

Looney J.G. & Oldham, D.G. (1989). Normal adolescent development. In H.I. Kaplan & B.J. Sadock (Eds). Comprehensive textbook of psychiatry, 5th Edition (p.1710). Baltimore: Williams & Wilkins.

Machiyama, Y. (1992). Relapse of paranoid psychotic state in methamphetamine model of schizophrenia. Schizophrenia Bulletin, 18, 115-122.

Maguire, K. & Pastore, A.L.,eds. (1998). Sourcebook of criminal justice statistics - 1997. U.S. Department of Justice, Bureau of Justice Statistics. Washington,D.C.

Mannuzza, S., Klein, R.G., Konig, P.H., & Giampino, T.L. (1989). Hyperactive boys almost grown up. Archives of General Psychiatry, 46, 1073-1079.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23, 449-468.

Marquart, J. W., Ekland-Olson, S., & Sorensen, J. R. (1994). The rope, the chair, and the needle: Capital punishment in Texas, 1923-1990. Austin, TX: University of Texas Press.

Marquart, J. W., & Sorensen, J. R. (1988).  Institutional and post release behavior of Furman-commuted inmates in Texas. Criminology, 26, 677-693.

Marquart, J. W., & Sorensen, J. R. (1989).  A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders.  Loyola of Los Angeles Law Review, 23, 5-28.

McNeil, D. E., & Binder, R. L. (1991). Clinical assessment of risk of violence among psychiatric inpatients. American Journal of Psychiatry, 148, 1317-1321.

Meloy, J. R. (1988). Psychopathic mind: Origin, dynamics, and treatment. Northvale, NJ: Jason Aronson.

Miller, N. S. & Gold, M. S. (1988). Cocaine and alcoholism: Distinct or part of a spectrum. Psychiatric Annals, 18, 538-539.

Miller, S. J., Dinitz, S., & Conrad, J. P. (1982). Careers of the violent: The dangerous offender and criminal justice. Lexington, MA: Lexington Books.

Monahan, J. (1981). Predicting violent behavior: An assessment of clinical techniques.  Beverly Hills:  Sage.

Monahan, J. (1996). Violence prediction: The past twenty years. Criminal Justice and Behavior, 23, 107-120.

Morris, N., & Miller, M. (1985). Predictions of dangerousness.  Crime and justice: An annual review of  research, In  M. Tonry & N. Morris (Eds.) (Vol. 6).  Chicago: University of Chicago Press, 1-50.

Murdock, D., Pihl, R. O., & Ross, D. (1990). Alcohol and crimes of violence: Present issues. The International Journal of the Addictions, 25, 1065-1081.

National Institute of Corrections, U.S. Department of Justice. (1992). Jail classification system development: A review of the literature, revised edition. Washington, DC: Author.

Ogletree et al., (1995). Harvard Law School, NAACP

Pastore, A.L. & Maguire, K. (2000). Sourcebook of criminal justice statistics – 1999. Bureau of Justice Statistics, U.S. Department of Justice. NCJ-183727.

Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.

Pridemore, W. A. (2002). What we know about the social structure of homicide. A review of the theoretical and empirical literature. Violence and Victims, 17, 127-156.

Reidy, T.J., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Ressler, R.K., Burgess, A.W., & Douglas, J.E. (1988). Sexual homicide: Patterns and motives. New York: Lexington Books.

Schuckit, M.A. (1987). Biological vulnerability to alcoholism. Journal of Consulting and Clinical Psychology, 55, 301-30.

Serin, R. C. & Amos, N. L. (1995). The role of psychopathy in the assessment of dangerousness. International Journal of Law and Psychiatry, 18, 231-238.

Serin, R. C., & Barbaree, H. E. (1993). Decision issues in risk assessment. Forum on Corrections Research, 5, 22-25.

Shah, S. (1978). Dangerousness: A paradigm for exploring some issues in law and psychology. American Psychologist, 33, 224-238.

Smith, S. M. (1993). The prediction of dangerous behavior. In P. J. Resnick (Ed.) Forensic Psychiatry Review Course, American Academy of Psychiatry and the Law. 539-541.

Sorensen, J. & Wrinkle, R.D. (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. Criminal Justice and Behavior, 23, 542-552.

69

Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

Struve, J. (1990). Dancing with the patriarchy: The politics of sexual abuse. In M. Hunter(Ed.), The sexually abused male. New York: Lexington Books.

Swanson, J. W., Holzer, C. E. III, Granju, V.K., & Jono, R. T. (1990). Violence and psychiatric disorder in the community: Evidence from the epidemiologic catchment area surveys. Hospital and Community Psychiatry, 41, 761-770.

Thornberry, T.P. (December, 1994). Violent families and youth violence. Fact sheet #21. National Criminal Justice Resources and Statistics. U.S. Department of Justice.

Urquiza, A.J., & Capra, M., (1990). The impact of sexual abuse: Initial and long-term effects.In The sexually abused male, edited by M. Hunter, 106-135. New York: Lexington Books.

Urquiza, A.J., & Keating, L.M., (1990). The prevalence of sexual victimization of males. In The sexually abused male, edited by M. Hunter, 89-103. New York: Lexington Books.

U.S. Census (2000). Accessed 10-05-04 from the World Wide Web (http://www.ci.houston.tx.us/departme/planning/planning_dev_web/long_range/demographics/poverty_age.htm)

U.S. Department of Justice (1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders, Juvenile Justice Bulletin, Juvenile Justice Clearinghouse, Washington, D.C.

Wagner, A. (1988). A commutation study of ex-capital offenders in Texas, 1924-1971. Unpublished dissertation, Sam Houston State University, Huntsville, TX.

Widom, C.S. (1989). Child abuse, neglect, and adult behavior: Research design and findings on criminality, violence, and child abuse. American Journal of Orthopsychiatric Association, 59, 355-367.

Vitelli, R. (1996). Prevalence of Childhood Conduct and Attention-Deficit Hyperactivity Disorders in adult maximum-security inmates. International Journal of Offender Therapy and Comparative Criminology, 40 (4), 263-271.

Re: Anthony Cardell Haynes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

Attachment A

## CURRICULUM VITAE OF MARK D. CUNNINGHAM, PH.D., ABPP

### EDUCATION

**Undergraduate:**   Abilene Christian College, Abilene, Texas
*Bachelor of Arts*, (May 1973)
Majors: Psychology, Mass Communications

**Graduate:**   Oklahoma State University, Stillwater, Oklahoma
*Master of Science* (December 1976)
*Doctor of Philosophy* (December 1977)
Specialty: Clinical Psychology (APA accredited)

**Internship:**   National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty: Clinical Psychology (APA accredited)

### BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376 | Louisiana #794 | New Mexico #0768 |
| Oklahoma #1002 | Oregon #1333 | South Carolina #764 |
| Tennessee #2255 | Texas #2351 | |

71

## CURRICULUM VITAE (2)

## HONORS, AWARDS, AND DISTINCTIONS

*American Psychological Association Award for Distinguished Contribution to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient

*John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004 recipient

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology, 1995-

*Al Brown Memorial Award* – award bestowed for outstanding achievement, NIMH Sex Therapy Training Program, Yale University School of Medicine, 1979-1981

*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980

*Magna cum Laude* - Bachelor of Arts, Abilene Christian College, 1973

## PROFESSIONAL PRACTICE

**1981 - date**   Clinical and Forensic Psychologist, Private practice

**1978 - 1981**   Clinical Psychologist (Lieutenant, MSC, USNR)
                  Naval Submarine Medical Center, Groton, Connecticut

## ACADEMIC APPOINTMENTS

**1981 - 1983**   Assistant Professor: Psychology Department,
                  Hardin-Simmons University, Abilene, Texas

**1978 - 1980**   Instructor (part-time): Psychology Department,
                  Old Dominion University (U.S. Submarine Base Extension);
                  Mohegan Community College, Norwich, Connecticut

**1974 - 1977**   Teaching Assistant: Psychology Department
                  Oklahoma State University, Stillwater, Oklahoma

72

Re: Anthony Cardell Haynes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

## CURRICULUM VITAE (3)

### EDITORIAL

Ad hoc reviewer: *Assessment*
*Behavioral Sciences & the Law*
*Law & Human Behavior*

### PROFESSIONAL AFFILIATIONS

American Board of Professional Psychology (ABFP examiner)
American Academy of Forensic Psychology (workshop teaching faculty)
Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology

### SCHOLARLY PUBLICATIONS

*Chapters in edited books:*

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D. (in press). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), *Forensic evaluations under Texas law: Selected criminal issues*. To be published by the Capacity for Justice.

*Papers in peer-reviewed journals:*

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. *Journal of Learning Disabilities, 14*, 204 -208.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16*, 71-95.

## CURRICULUM VITAE (4)

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16,* 333-351.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26,* 20-43.

Cunningham, M. D. & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. *Criminal Justice and Behavior, 26,* 293-321.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28,* 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19,* 473-490.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29,* 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20,* 191-210.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34,* 233-239.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15,* 365-376.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320.

## CURRICULUM VITAE (5)

Cunningham, M. D. & Sorensen, J. R. (*in press*). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior*.


*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (*in press*) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law*.


*Invited case reports and teaching points:*

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (114-115). New York: Oxford University Press.


*Articles in professional periodicals:*

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, *U.S. Navy Medicine, 69,* 26-28.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20,* 9-11.

75

Re: Anthony Cardell Haynes
Declaration of Mark D. Cunningham, Ph.D., ABPP, 09-19-05

## CURRICULUM VITAE (6)

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21, 2,* 8-9.

*Manuscripts under review:*

Cunningham, M. D. *(manuscript under review).* Unparalleled need to know: Informed consent in capital sentencing evaluations.

Cunningham, M. D. & Sorensen, J. R. *(manuscript under review).* An actuarial model for assessment of prison violence risk among high security inmates: A replication and extension.

*Manuscripts in preparation:*

Sorensen, J. R. & Cunningham, M. D. *(manuscript in preparation).* Does the severity of the offense predict prison adjustment? A comparative study of the violent institutional misconduct rates of convicted murderers and other offenders.



