IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT 5 2005

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| ANTHONY CARDELL HAYNES, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| -VS- | § | MISCELLANEOUS NO. H-04-319 |
| | § | Judge Sim Lake |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | **H-05-3424** |
| | § | |
| Respondent. | § | |

# PETITION FOR WRIT OF HABEAS CORPUS

# EXHIBITS IN SUPPORT OF PETITION
## VOLUME III
## EXHIBITS 18-72

A. RICHARD ELLIS
Texas Bar No. 06560400

75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
(415) 389-0251 (FAX)

Attorney for Petitioner

## VOLUME I   EXHIBITS 1-5

| EXHIBIT | DOCUMENT |
|---|---|
| 1 | Complaint (filed May 25, 1998) (CR 2) |
| 2 | Indictment (filed July 22, 1998) (CR 7) |
| 3 | Verdict and sentence of death (Sept. 17, 24, 1999) (CR 477-478) |
| 4 | Petitioner's direct appeal brief: *Haynes v. State,* No. 73,685 |
| 5 | Verdict on direct appeal:  *Haynes v. State,* No. AP-73,685 (Tex. Crim. App. Oct. 10, 2001)(slip op.)(not designated for publication) |

## VOLUME II   EXHIBITS 6-17

| EXHIBIT | DOCUMENT |
|---|---|
| 6 | Petitioner's state habeas petition:  *Ex Parte Anthony Cardell Haynes,* Cause No. 783872-A |
| 7 | Trial Court's Findings and Conclusions on state habeas: *Ex Parte Anthony Cardell Haynes,* Cause No. 783872-A (Aug. 5, 2004) |
| 8 | Order on state habeas: *Ex parte Anthony Cardell Haynes,* Np. 59,929-01 (Tex. Crim. App. Oct. 6, 2004) |
| 9 | Jury instructions at punishment phase of trial.  2 CR 451 *et. seq.* |
| 10 | Autopsy report of Deputy Chief Medical Examiner Tommy J. Brown |
| 11 | Declaration of Patrica Davis |
| 12 | Declaration of Donald W. Haynes |
| 13 | Declaration of Eric Haynes |
| 14 | Declaration of Tiffany Deckard |
| 15 | Declaration of Earl Washington, Sr. |
| 16 | Declaration of Myrtle Hinton |

| 17 | Declaration of Dr. Mark Cunningham |

## VOLUME III    EXHIBITS 18-72

| EXHIBIT | DOCUMENT |
| --- | --- |
| 18 | Letter of Dr. Robert Geffner |
| 19 | Letter of Dr. Mitchell Young |
| 20 | MMPI-2 Report on Anthony Haynes, 8/17/99 |
| 21 | Letter of Dr. Susana Rosin, June 28, 2005 |
| 22 | Letter of Dr. Susana Rosin, July 13, 2005 |
| 23 | Affidavit of Dr. Seth Silverman |
| 24 | School transcripts of Anthony Haynes |
| 25 | Neuropsychological Deficit Scale report |
| 26 | Report of The Rosenstock Clinic, by Dr. Harvey A. Rosenstock, April 1, 1992 |
| 27 | Boost program academic records |
| 28 | Collected articles on the effects of methamphetamine |
| 29 | Declaration of Lawrence Hughes |
| 30 | Declaration of Kenneth Porter |
| 31 | Declaration of Lee Ester Porter |
| 32 | Declaration of Beverly Scott |
| 33 | Declaration of Debra Swisher |
| 34 | Declaration of Shelia Haynes |
| 35 | Declaration of Sgt. Allen Harris |

| 36 | Declaration of Earl Washington, Sr. |
| 37 | Declaration of Bonita Denyse Thierry |
| 38 | Declaration of Leon Tousant |
| 39 | Declaration of Barbara Taveras |
| 40 | Declaration of Ron Royal |
| 41 | Declaration of Debra Haynes |
| 42 | Declaration of Richard Haynes |
| 43 | Declaration of Sharon McElroy |
| 44 | Declaration of Rhonda Jackson |
| 45 | Declaration of Shelia Waters |
| 46 | Declaration of Socorro Herda |
| 47 | Letter of Renee Lewis |
| 48 | Declaration of Renita Royal |
| 49 | Declaration of Yolondo Gaines |
| 50 | Declaration of Debbie Lucas Moerbe |
| 51 | Declaration of Lawrence Aaron Tate |
| 52 | Declaration of Ryan Braud |
| 53 | Declaration of Cherrie McGlory |
| 54 | Declaration of Ivory Jackson |
| 55 | Declaration of Melvin Brock |
| 56 | Declaration of Portia Rose |
| 57 | Declaration of Darryl Smith |
| 58 | Declaration of Bonita Padmore |

59        **Declaration of Devlin Jackson**

60        **Declaration of Nezdra Ward**

61        **Declaration of Toya Terry**

62        **Declaration of Cleophis Lewis**

63        **Declaration of Courtney Erwin Davis**

64        **Declaration of Angela G. Malcolm**

65        **Declaration of Tiombe Davis**

66        **Declaration of Larry Britt**

67        **Motion for New Trial, 3 CR 522-538 and Affidavit of Cynthia Patterson**

68        **Vernon's Tx. Health & S. Code §§ 821.052 and 821.055**

69        **Lethal injection protocol in Texas, from TDCJ website "Death Row Facts"**

70        **Affidavits re lethal injection in the case of *Texas v. Jesus Flores*, No. 877,994A**

71        **"Critics Say Execution Drug May Hide Suffering" by Adam Liptak, New York Times, Oct. 7, 2003**

72        **Report of the AVMA Panel on Animal Euthansia (2000)**

TAB 18

**Robert Geffner, Ph.D., ABPN and Associates**
*Psychologist/Neuropsychologist/Marriage & Family Therapist*
**3215 Lower Ridge Rd.         San Diego, CA 92130**
*(619) 481-7799        FAX: (619) 481-7756        Email: bgeffner@pacbell.net*

September 12, 1999

Alvin Nunnery, Attorney
1900 N. Loop West, Suite 435
Houston, TX 77018

Dear Mr. Nunnery,

As per you request, We conducted comprehensive neuropsychological and psychological evaluations on your client, Anthony Haynes, with respect to his upcoming capitol murder trial in Houston.   The bill for these services is attached.  As per our agreement, we kept our fees for the evaluations and travel to the $4,500 initially anticipated.  However, I spent additional time reviewing the records to see if it would be worthwhile for me to testify.  I discounted most of this and only charged for two extra hours, making the total bill **$4,800.**  My social security number and address are on the bill.

Summaries of his testing results are also enclosed.  The neuropsychological assessment did not indicate brain impairment, but did suggest above average intellectual functioning overall with some specific areas of relative weakness (e.g., in speech and verbal comprehension).  However, even his weaknesses were not in the significantly impaired range.  His psychological assessment did not indicate psychotic disorders.  It did suggest substance abuse or dependence, and explosive disorder, and antisocial tendencies.  His violent history is consistent with such problems.  He would qualify as having an antisocial personality disorder with both his history, the background information, interviews, and testing results.  Unfortunately, there did not appear to be the type of mitigating factors we usually find in many of these cases.  Even though he does have a history of neglect and grew up in an abusive environment, it was not at the level that would explain his subsequent behaviors, anger, hostility, and self-destructive patterns.  He obviously has an impulse control disorder, with substantial anger toward his father.  There may be other issues in his childhood that exacerbated his problems, and the substance abuse added to them.  He tended to act impulsively under stress, and did not have good decision/making skills.  He appears to be doing much better now that he is off drugs, in a structured environment, and has a regular routine.  His functioning now is probably at the highest level in several years.

Good luck with this case.  Thank you for the referral and for your confidence in me.  Please contact me if you have any questions.

Sincerely,

*Robert Geffner, PhD*

, Robert Geffner, Ph.D., ABPN
Licensed Psychologist
Diplomate Clinical Neuropsychology

TAB 19

Mitchell Alan Young, MD.
Clinical, Administrative, & Forensic Psychiatry
1118 Barkdull Street
Houston, Texas 77006
**Tel:** 713-522-4505
**Fax:** 713-522-1447

9-20-99

Alvin Nunnery, Attorney At Law
1900 N. Loop West    Suite 435
Houston, Texas  77018

Dear Mr. Nunnery:

Thank you for the opportunity to consult in the matter of Alfred Haynes.
Enclosed please find requested one page report, testing per Dr. Geffner,
and statement for services rendered.

Sincerely,

Mitchell Alan Young, M.D.

Mitchell Alan Young, MD.
Clinical, Administrative, & Forensic Psychiatry
1118 Barkdull Street
Houston, Texas 77006
**Tel:** 713-522-4505
**Fax:** 713-522-1447

### Pre-Sentencing Evaluation
### A Priveleged and Medically Confidential Defense Report
9-20-99

**Re:** State of Texas v. Anthony Haynes; Cause No. 783872.

**Referral Source:** Anthony Haynes, Attorney for the Defendant.

**Basis of Evaluation:** Review of life chronology including school and medical records, family and associate interviews, per Gerald Bierbaum and Lisa Milstein. Review of excerpts from West Oaks Psychiatric Hospital admission, 11-1-96. Records of Dr. Harvey Rosenstock not available. Review of psychological testing per Robert Geffner, Ph.D., 8-23-99. Clinical interview of defendant, 9-19-99. Structured Interview of Reported Symptoms, (SIRS).

**Findings:** Mr. Haynes was evaluated at the Harris County Jail post capital murder conviction for killing an off duty police officer. Psychological evaluation revealed average intelligence and an absence of profound neuropsychological deficit. Projectives were not obtained. There was a longstanding history of mental disorder since early childhood within the context of unstable and chaotic caretaking environments. Symptoms over his life span included inattention, hyperactivity, rage attacks, destruction of property, pet abuse, suicidal and homicidal ideation, self mutilatory behaviors, stuttering, running away, alcohol and substance abuse, and violation of the basic rights of others. Treatment occurred on outpatient and inpatient bases with poor compliance and follow up. An EEG was not obtained. Current mental status evaluation revealed stuttering, prominent homicidal ideations and "auditory hallucinations", present since 6th grade, which were specific and command in nature, viewed by the defendant to be coming from inside his head. There were paranoid and religious trends not meeting threshold for delusions. On the SIRS, there was a moderately elevated score on the Rare Symptom Scale which measures symptoms that occur very infrequently in bona fide patients. Since the remainder of the SIRS Scales were unremarkable, I would interpret this elevation as an indicator of unreliable reporting. Mr. Haynes has been a model inmate for the 16 months he has been incarcerated. He has previously demonstrated the capacity for remorse and acts of kindness. Although a serious threat with respect to future dangerousness, he is less likely to engage in violent behavior in a highly structured environment when appropriately medicated.

**Diagnoses:**
Axis I: Adult Antisocial Behavior. Intermittent Explosive Disorder. Alcohol and Mixed Substance Dependency, predominantly methamphetamine. History of Attention Deficit Hyperactivity Disorder. Other specified family circumstances- abuse, abandonment, neglect, serial caretaking environments. Rule out emergent thought disorder. Axis II: Antisocial Personality Disorder. Stuttering. Axis III: Status post recurrent ear infections and oral surgeries in childhood. Rule out cortical irritability. IV: Acute- Facing the death penalty. Enduring- abuse, abandonment, neglect, serial caretaking environments. Axis V.: GAF- 20.

*Mitchell Alan Young, MD.*
Mitchell Alan Young, M.D., F.A.P.A.

*TAB 20*

***** MMPI-2 ADULT INTERPRETIVE SYSTEM *****

developed by

Roger L. Greene, Ph.D.
Robert C. Brown, Jr., Ph.D.
and PAR Staff

-- CLIENT INFORMATION --

Client      : Anthony Haynes          Age             : 20

Sex         : Male                    Marital Status  : Single

Education   : 13                      Date of Birth   : 01/22/79

File Name   : HAYNES

Prepared for: Counseling, Testing & Psychiatric Services on 08/17/99

------------------------

      The interpretive information contained in this report
should be viewed as only one source of hypotheses about the
individual being evaluated.  No decisions should be based solely
on the information contained in this report.  This material
should be integrated with all other sources of information in
reaching professional decisions about this individual.  This
report is confidential and intended for use by qualified
professionals only.  It should not be released to the individual
being evaluated.

Copyright (c) 1990 by Psychological Assessment Resources, Inc.
All rights reserved.

MMPI-2 is a registered trademark of the University of Minnesota.

MMPI-2 INTERPRETIVE REPORT                                    PAGE   2
PREPARED FOR: Counseling, Testing & Psychiatric Services

-- MMPI-2 PROFILE FOR VALIDITY AND CLINICAL SCALES --

```
            L    F    K   Hs   D   Hy   Pd  Mf   Pa   Pt   Sc   Ma   Si
110 --  --  --   --  --  +  --   --   --   --  --   --   --   --   --  -- 110
         -                +                                              -
         -                +                                              -
         -                +                                              -
         -                +                                              -
100 --                    +                                          -- 100
         -                +                                              -
         -                +                                              -
         -                +                                              -
90 --                     +                                          --  90
         -                +                                              -
         -                +                                              -
         -                +                                              -
         -                +                                              -
80 --                     +                    *             *       --  80
         -                +                               *          -
         -                +                                              -
         -                +                          *                   -
70 --           *         +                                          --  70
         -                +                                              -
         -  --  --   --   +  --   --   --   --  --   --   --   --     -
         -                +  *                                           -
         -                +                *                            -
60 --                     +                                          --  60
         -                +       *                                      -
         -                +                        *                     -
         -            *   +                                              -
50 --   --  --   --   --  +  --   --   --   --  --   --   --   --  --  -- 50
         -                +                                              -
         -   *            +                                              -
         -                +                                              -
40 --                     +                                  *       --  40
         -                +                                              -
         -                +                                              -
         -                +  *                                           -
30 --                     +                                          --  30
         -                +                                              -
         -                +                                              -
         -                +                                              -
20 --   --  --   --   --  +  --   --   --   --  --   --   --   --  --  -- 20
                          1    2    3    4    5    6    7    8    9    0
            L    F    K   Hs   D   Hy   Pd  Mf   Pa   Pt   Sc   Ma   Si
T-Score    43   67   51   64   34  57   79  62   72   55   79   75   37
Unanswered (?) Items = 0
```

Welsh Code:  4896'15-37/02# F-K/L:

MMPI-2 INTERPRETIVE REPORT                           PAGE  3
PREPARED FOR: Counseling, Testing & Psychiatric Services

-- MMPI-2 PROFILE FOR CONTENT SCALES --



| | ANX | FRS | OBS | DEP | HEA | BIZ | ANG | CYN | ASP | TPA | LSE | SOD | FAM | WRK | TRT |
|---|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| T-Score | 46 | 51 | 56 | 57 | 65 | 81 | 72 | 57 | 66 | 55 | 52 | 36 | 66 | 47 | 45 |

MMPI-2 INTERPRETIVE REPORT                                            PAGE   4
PREPARED FOR: Counseling, Testing & Psychiatric Services

## -- PROFILE MATCHES AND SCORES --

|  | Scale | Client Profile | Highest Scale Codetype | Best Fit Codetype |
|---|---|---|---|---|
| Codetype match: | | | 4-8/8-4 | 8-9/9-8 (4) |
| Coefficient of Fit: | | | .45 | .74 |
| Scores: | ? (raw) | 0 | | |
| | L | 43 | 51 | 51 |
| | F | 67 | 85 | 76 |
| | K | 51 | 45 | 45 |
| | Hs (1) | 64 | 61 | 56 |
| | D (2) | 34 | 68 | 52 |
| | Hy (3) | 57 | 60 | 52 |
| | Pd (4) | 79 | 83 | 69 |
| | Mf (5) | 62 | 51 | 47 |
| | Pa (6) | 72 | 69 | 59 |
| | Pt (7) | 55 | 69 | 61 |
| | Sc (8) | 79 | 82 | 75 |
| | Ma (9) | 75 | 63 | 81 |
| | Si (0) | 37 | 59 | 48 |
| Mean Clinical Elevation: | | 64 | 69 | 63 |
| Ave age-males: | | | 28 | 28 |
| Ave age-females: | | | 27 | 30 |
| % of male codetypes: | | | 2.8% | .8% |
| % of female codetypes: | | | 3.0% | .4% |
| % of males within codetype: | | | 66.2% | 80.4% |
| % of females within codetype: | | | 33.8% | 19.6% |

---

Configural clinical scale interpretation is provided in the report for the following codetype(s):

                     4-8/8-4
                     8-9/9-8 (4)

---

-- CONFIGURAL VALIDITY SCALE INTERPRETATION --

There is no information available for this configuration of scores for scales L, F, and K.  Interpretation for each of the individual validity scales is presented below.

-- VALIDITY SCALES --

? (raw) = 0

Scores in this range reflect a relatively small number of unanswered items, which in and of itself should not have an impact on the validity of the profile.

L     T = 43

L scores in this range are usually obtained by individuals who generally respond frankly and openly to the test items and are willing to admit to minor faults.

F     T = 67

F scores in this range are considered to be moderately elevated and suggest the possibility of significant psychological and emotional problems.  Individuals who obtain scores in this range are likely to be described as moody, changeable, dissatisfied, opinionated, restless, unstable, and self-critical.

K     T = 51

Scores in this range are typically obtained by individuals who exhibit an appropriate balance between self-disclosure and self-protection.  These individuals usually are psychologically well adjusted and capable of dealing with problems in their daily lives.  Scores in this range are also indicative of good ego strength, sufficient personal resources to deal with problems, a positive self-image, adaptability, and a wide range of interests. Prognosis for psychological intervention is generally good.

MMPI-2 INTERPRETIVE REPORT                                        PAGE   6
PREPARED FOR: Counseling, Testing & Psychiatric Services

                -- CONFIGURAL CLINICAL SCALE INTERPRETATION --


4-8/8-4 Codetype   (High Match)


Clinical Presentation:

     It is important that measures of consistency and accuracy of
item endorsement as well as other validity scales are within
acceptable ranges.  This codetype can result easily from either
inconsistent or inaccurate patterns of item endorsement.

     These individuals are often perceived by others as rather
odd, peculiar, and unusual, both in terms of their thinking and
behavior.  This pattern may be a very long-term, characterologic
condition or represent the onset of a psychotic process.
Problems in logic and thinking should be ruled out.  They exhibit
poor judgment and are often unpredictable and impulsive.  They
are emotionally distant and have difficulty with close, emotional
relationships.

     These individuals see the world as dangerous and other
people as rejecting and unreliable.  They often feel resentful
and angry, but have difficulty controlling or expressing their
anger appropriately.  They are resentful of authority and control
and are often suspicious of the motives of others.  They are
extrapunitive and accept very little responsibility for their own
problems and behavior.  When crimes are committed by these
individuals, they are often poorly planned and executed and may
involve bizarre or violent behavior.  Sexual deviation and
promiscuity are possible.

     These individuals are chronically maladjusted.  Suicide
attempts and substance abuse are quite frequent.  In response to
stress, these individuals are likely to either withdraw
completely or act out their angry impulses.  These individuals
have a very high need for affection and attention.  Their
tendency to feel rejected by others often leads to hostility and
conflict, which only exacerbates their feelings of being
alienated from others.

     The self-concept of these individuals is frequently very
poor.  They are likely to feel insecure, isolated, rejected, and
unwanted.  They are threatened by a world which they view as
hostile and dangerous.

     The interpersonal relationships of these individuals are
often marked by conflict, distress, defensiveness, a lack of
empathy, and a strong tendency to be manipulative.  These
individuals often lack basic social skills and tend to be
socially withdrawn and isolated.  They see their family as
uncaring and critical.  They view their home life as being
unpleasant.

Case 4:05-cv-03424   Document 1-24   Filed in TXSD on 10/05/95   Page 18 of 40

Treatment:

The prognosis is generally very poor because of the
characterologic nature of the process.  Interventions focused on
specific behavioral objectives may be useful rather than any
insight-oriented therapy.


Possible Diagnoses:

>    Axis I     - Rule Out Adjustment Disorder
>               Rule Out Schizophrenia, Paranoid Type
>               Rule Out Paranoid Disorders
>               Rule Out Psychoactive Substance Abuse Disorders
>
>    Axis II    - Rule Out Schizoid Personality Disorder
>               Rule Out Antisocial Personality Disorder
>               Rule Out Schizotypal Personality Disorder
>               Rule Out Paranoid Personality Disorder
>               Rule Out Borderline Personality Disorder


8-9/9-8 (4) Codetype   (Best Fit)


Clinical Presentation:

These individuals exhibit serious psychopathology.  They
often are first seen in an acute state of hyperactivity,
excitement, confusion, and disorientation.  They are likely to be
emotionally labile, demanding, hostile, irritable, evasive,
suspicious, and distrustful.  They may have difficulty
concentrating and thinking clearly.  Their thinking may be
autistic, retarded, and circumstantial, and they may exhibit
evidence of delusions and hallucinations.  A mood disorder with
psychotic features should be ruled out.

Their behavior may be unpredictable and they may act out
unexpectedly.  Their judgment and reality testing may be quite
poor.  They may also have poor sexual adjustment.  In response
to stress, these individuals are likely to become more
disorganized and agitated and/or engage in more daydreaming and
fantasy.  They are very prone to abuse substances.  They are in
good physical health.

These individuals often have a high need for achievement
although the disorganized quality of their life often leads to
poor accomplishment of their goals, giving rise to blame and
self-condemnation.  They also often have a high need for

MMPI-2 INTERPRETIVE REPORT                                    PAGE   8
PREPARED FOR: Counseling, Testing & Psychiatric Services

attention and become resentful and angry when their demands for
attention are not met.  They may persist at accomplishing their
goals to the extent that it irritates others.

Although these individuals may exaggerate their self-worth
and appear boastful and egocentric, their self-concept is
actually quite poor and they often feel inferior and inadequate.

These individuals are fearful of relating to others;
consequently, close relationships are usually lacking.  When
present, they are often marked by distrust, suspicion, and anger.

Treatment:

The prognosis is generally poor; however,
psychopharmacologic intervention may be helpful in reducing
agitation.  The difficulties these individuals experience in
focusing on specific issues and their fear of relating to others
often precludes good therapeutic contact and outcome.

Possible Diagnoses:

        Axis I     - Rule Out Mood Disorders
                       Manic Episode
                       Hypomanic Episode
                  Rule Out Schizoaffective Disorder

        Axis II    - Rule Out Borderline Personality Disorder
                  Rule Out Schizotypal Personality Disorder


                    -- CLINICAL SCALES --


Hs (1)  T = 64

     Scores in the lower end of this range (T scores = 58-61) are
typical for individuals with valid physical complaints or who are
physically handicapped.  Scores in the upper part of this range
(T > 60) indicate the possibility of exaggeration of physical
problems even with individuals who are physically ill.

D  (2)  T = 34

     Scores in this range are typically obtained by individuals
who are cheerful, alert, optimistic, and self-confident.  Be sure
that scores in this range are consistent with the person's
reasons for taking the MMPI-2, i.e., psychiatric patients should
rarely be described in these terms.

Hy (3)  T = 57

Scores in this range are considered to be within normal limits.

Pd (4)  T = 79

Scores in this range are typically obtained by individuals who are characterized as angry, belligerent, rebellious, resentful of rules and regulations, and hostile toward authority figures. These individuals are likely to be impulsive, unreliable, egocentric, and irresponsible. They often have little regard for social standards. They often show poor judgment and seem to have difficulty planning ahead and benefiting from their previous experiences. They make good first impressions but long term relationships tend to be rather superficial and unsatisfying. Analysis of the Content Scales and/or the Harris-Lingoes Subscales may facilitate interpretation of scores within this range.

Mf (5)  T = 62

Scores in this range are typically obtained by males who have an interest in aesthetics and may be rather passive. This is the typical range for most college-educated males in the liberal arts. Elevations in this range are sometimes associated with acute neurotic conflicts marked by passivity and inability to find acceptable solutions to situational problems.

Pa (6)  T = 72

Scores in this range are frequently obtained by 1) individuals who are suspicious, hostile, and feel as if they are being mistreated, or by 2) individuals who are hypersensitive to the reactions of others. The Dominance (Do) Scale is helpful in distinguishing between these groups of individuals -- high Do scores indicating the first group and low Do scores indicating the second group. Individuals in both groups will often blame others for their difficulties. The first group of individuals may manifest psychotic behavior and a thought disorder may be readily apparent. Ideas of reference and delusions of persecution also may be present.

Pt (7)  T = 55

Scores in this range are considered to be within normal limits.

Sc (8)   T = 79

Scores in this range are suggestive of serious psychopathology including confused thinking, distorted perceptions and other psychotic processes. Difficulties in logic and concentration, impaired judgment, and the presence of a thought disorder should be evaluated. Be sure that measures of consistency and accuracy of item endorsement are within acceptable ranges.

Ma (9)   T = 75

Scores in this range typically are obtained by individuals who are described as overactive, have difficulties in concentrating and attending, and find it difficult to relax. They often are quite creative people who start many projects but find it difficult to see them through to completion. As the elevation on this scale increases, there is the increasing probability that the individual is likely to be seen as emotionally labile, impulsive, experiencing flight of ideas, restless, and exhibiting manic features. They may also exhibit maladaptive hyperactivity, grandiosity, verbosity, irritability, unpredictability, and insufficient inhibitory capacities.

Si (0)   T = 37

Scores in this range are usually obtained by individuals who are socially extroverted, outgoing, and gregarious. These individuals have a strong need to be around other people. Very low scores are suggestive of individuals who generally form superficial and insincere social relationships. They may be seen by others as impulsive, immature, opportunistic, and manipulative. They may have difficulty forming meaningful, intimate relationships.


-- ADDITIONAL SCALES --


SUPPLEMENTARY SCALES

Anxiety (A) = 56

Scores in this range are considered to be within normal limits.

Repression (R) = 34

    Low R scorers are generally willing to discuss whatever problems they perceive themselves as having.  They are likely to be outgoing, excitable, emotional, spontaneous, and assertive.

Ego Strength (Es) = 43

    Low Es scorers are likely to have limited personal resources for coping with their problems and stresses, have a poor self-concept, and show poor response to psychological treatment.

MacAndrew Alcoholism-Revised (MAC-R) = 67

    Scores in this range are considered to be within normal limits.

Overcontrolled Hostility (O-H) = 48

    Scores in this range are considered to be within normal limits.

Dominance (Do) = 41

    Low Do scorers tend to be passive and unassertive.  They prefer to have others take responsibility for their lives.  They lack self-confidence and do not feel adequate to handle problems. They often give up easily.

Social Responsibility (Re) = 32

    Low Re scorers are unwilling to accept responsibility for their own behavior and lack a strong sense of responsibility to the social group.  They are rather flexible and are willing to explore values different from their own.

College Maladjustment (Mt) = 59

    Scores in this range are considered to be within normal limits.

Gender Role-Masculine (GM) = 49

    Scores in this range are considered to be within normal limits.

Gender Role-Feminine (GF) = 47

    Scores in this range are considered to be within normal limits.

MMPI-2 INTERPRETIVE REPORT                                PAGE    12
PREPARED FOR: Counseling, Testing & Psychiatric Services

Post-Traumatic Stress Disorder-Keane (PK) = 67

    Scores in this range are considered to be within normal limits.

Post-Traumatic Stress Disorder-Schlenger (PS) = 66

    Scores in this range are considered to be within normal limits.

Shyness/Self-Consciousness (Si1) = 36

    Low Si1 scorers are comfortable interacting with others.

Social Avoidance (Si2) = 41

    Low Si2 scorers like to be with groups of people and will seek them out if given the opportunity.

Alienation-Self and Others (Si3) = 47

    Scores in this range are considered to be within normal limits.


CONTENT SCALES

    Since the content of the items on these scales are face-valid, it is important that scales/indices of overreporting and underreporting of psychopathology be evaluated carefully when interpreting these scales. Also, the deviant response for most of these items is true, so any patient who tends to respond "true" to items regardless of their content will elevate these scales. There are no data at this time for interpretation of low scores on these scales other than the absence of the qualities seen in high scorers.

Anxiety (ANX) = 46

    Scores in this range are considered to be within normal limits.

Fears (FRS) = 51

    Scores in this range are considered to be within normal limits.

Obsessiveness (OBS) = 56

    Scores in this range are considered to be within normal limits.

Depression (DEP) = 57

Scores in this range are considered to be within normal limits.

Health Concerns (HEA) = 65

High HEA scorers report a variety of specific and vague physical complaints that are unlikely to be seen in actual cases of physical illness. These physical complaints involve a number of bodily systems and functions. These people worry excessively about their health.

Bizarre Mentation (BIZ) = 81

High BIZ scorers are reporting blatantly psychotic behaviors with a strong paranoid quality. These psychotic behaviors should be readily apparent if they have endorsed the items accurately. Patients who abuse drugs tend to have an elevation on this scale, even though they are not psychotic.

Anger (ANG) = 72

High ANG scorers may be reporting either that they are moody, irritable, and grouchy, or that they actually physically express their anger. Patients' responses to items 540, 542, and 548 will be important to check in distinguishing how their anger is expressed.

Cynicism (CYN) = 57

Scores in this range are considered to be within normal limits.

Antisocial Practices (ASP) = 66

High ASP scorers may have a set of attitudes similar to individuals who engage in antisocial behavior or they may actually engage in such behavior. Over two-thirds of the items on ASP reflect attitudinal rather than behavioral qualities, so the patient should have a history of actual antisocial behaviors before such statements are made from this scale.

Type A (TPA) = 55

Scores in this range are considered to be within normal limits.

Low Self-Esteem (LSE) = 52

Scores in this range are considered to be within normal limits.

MMPI-2 INTERPRETIVE REPORT
PREPARED FOR: Counseling, Testing & Psychiatric Services

PAGE   14

Social Discomfort (SOD) = 36

No interpretation is available for scores in this range.

Family Problems (FAM) = 66

High FAM scorers see their family as critical and unsupportive. Their home life is not pleasant. Familial discord is a way of life for these individuals.

Work Interference (WRK) = 47

Scores in this range are considered to be within normal limits.

Negative Treatment Indicators (TRT) = 45

Scores in this range are considered to be within normal limits.

HARRIS-LINGOES SUBSCALES

Subjective Depression (D1) = 42

Scores in this range are considered to be within normal limits.

Psychomotor Retardation (D2) = 32

Low D2 scorers describe themselves as active and involved. They do not have problems in getting started on things, and they find their everyday lives interesting and rewarding. They admit to having hostile and aggressive impulses at times.

Physical Malfunctioning (D3) = 51

Scores in this range are considered to be within normal limits.

Mental Dullness (D4) = 43

Scores in this range are considered to be within normal limits.

Brooding (D5) = 51

Scores in this range are considered to be within normal limits.

Denial of Social Anxiety (Hy1) = 61

    Scores in this range are considered to be within normal limits.

Need for Affection (Hy2) = 43

    Scores in this range are considered to be within normal limits.

Lassitude-Malaise (Hy3) = 52

    Scores in this range are considered to be within normal limits.

Somatic Complaints (Hy4) = 67

    Scores in this range are considered to be within normal limits.

Inhibition of Aggression (Hy5) = 40

    Scores in this range are considered to be within normal limits.

Familial Discord (Pd1) = 71

    High Pd1 scorers view their home situations as unpleasant and lacking in love, support, and understanding.  They describe their families as rejecting, critical, and controlling.

Authority Problems (Pd2) = 68

    Scores in this range are considered to be within normal limits.

Social Imperturbability (Pd3) = 58

    Scores in this range are considered to be within normal limits.

Social Alienation (Pd4) = 78

    High Pd4 scorers feel misunderstood, alienated, isolated, and estranged from others.  They are lonely, unhappy, and uninvolved people.  They blame others for their own problems and shortcomings.  They are often insensitive and inconsiderate in relationships and later will verbalize regret and remorse for their actions.

MMPI-2 INTERPRETIVE REPORT                                PAGE  16
PREPARED FOR: Counseling, Testing & Psychiatric Services

Self-Alienation (Pd5) = 63

     Scores in this range are considered to be within normal
limits.

Persecutory Ideas (Pa1) = 94

     High Pa1 scorers view the world as very threatening.  They
feel misunderstood and unfairly blamed or punished.  They are
suspicious and mistrustful, and they may have delusions of
persecution.  They externalize blame for their problems.

Poignancy (Pa2) = 55

     Scores in this range are considered to be within normal
limits.

Naivete (Pa3) = 41

     Scores in this range are considered to be within normal
limits.

Social Alienation (Sc1) = 59

     Scores in this range are considered to be within normal
limits.

Emotional Alienation (Sc2) = 59

     Scores in this range are considered to be within normal
limits.

Lack of Ego Mastery, Cognitive (Sc3) = 60

     Scores in this range are considered to be within normal
limits.

Lack of Ego Mastery, Conative (Sc4) = 49

     Scores in this range are considered to be within normal
limits.

Lack of Ego Mastery, Defective Inhibition (Sc5) = 54

     Scores in this range are considered to be within normal
limits.

Bizarre Sensory Experiences (Sc6) = 85

     High Sc6 scorers admit to very unusual experiences which may
include hallucinations, unusual thought content, ideas of
external influence, and strange bodily experiences.  They
experience feelings of depersonalization and estrangement.

Amorality (Ma1) = 50

    Scores in this range are considered to be within normal limits.

Psychomotor Acceleration (Ma2) = 53

    Scores in this range are considered to be within normal limits.

Imperturbability (Ma3) = 53

    Scores in this range are considered to be within normal limits.

Ego Inflation (Ma4) = 69

    Scores in this range are considered to be within normal limits.


WIENER-HARMON SUBTLE-OBVIOUS SUBSCALES

Depression, Obvious (D-O) = 46

    Scores in this range are considered to be within normal limits.

Depression, Subtle (D-S) = 25

    Low D-S scorers do not endorse items more subtly reflective of depression.

Hysteria, Obvious (Hy-O) = 56

    Scores in this range are considered to be within normal limits.

Hysteria, Subtle (Hy-S) = 52

    Scores in this range are considered to be within normal limits.

Psychopathic Deviate, Obvious (Pd-O) = 74

    High Pd-O scorers endorse more obvious items related to difficulties with authority figures, family problems, dissatisfaction with life, and general social maladjustment.

Psychopathic Deviate, Subtle (Pd-S) = 64

Scores in this range are considered to be within normal limits.

Paranoia, Obvious (Pa-O) = 79

High Pa-O scorers endorse more obvious items related to paranoid symptoms such as ideas of reference, feelings of persecution, a grandiose self-concept, and suspiciousness.

Paranoia, Subtle (Pa-S) = 48

Scores in this range are considered to be within normal limits.

Hypomania, Obvious (Ma-O) = 67

Scores in this range are considered to be within normal limits.

Hypomania, Subtle (Ma-S) = 65

Scores in this range are considered to be within normal limits.


                        END OF REPORT
                        ********

TAB 21

SUSANA A. ROSIN, PH.D.
CLINICAL PSYCHOLOGIST
3730 KIRBY DR., SUITE 825
HOUSTON, TEXAS 77098

TELEPHONE (713) 523-0000

June 28, 2005

Mr. A. Richard Ellis
Attorney at Law
75 Magee Avenue
Mill Valley, California 94941

Re: Anthony Haynes

Dear Mr. Ellis:

I have had the opportunity to review the documents regarding your client, Mr. Haynes. These include statements by several family members, school records, the summary of the trial, a psychological evaluation, and the BOOST records. Unfortunately, two sets of very pertinent records were not included, and I am uncertain whether these will be available for review. These include Mr. Haynes' West Oaks hospitalization records and other outpatient therapy records dating to Mr. Haynes' high school junior and senior years.

While Mr. Haynes' family and friends described him as a generally cooperative, respectful and easy going young man until the year prior to the unfortunate shooting of Mr. Kinkaid, from a mental health expert's point of view, Mr. Hayes' records contain many red flags regarding the possible early onset of mental illness. Mr. Haynes, for example, was apparently first diagnosed as suffering from A.D.H.D. and placed on Ritalin by a Dr. Rosenstock at age six. This decision suggests that Anthony must have displayed early behavior management and/or academic difficulties that led his parents to pursue this treatment option.

Mr. Haynes' records further indicate that he began to experience difficulties with anger management and explosive outbursts in middle school. In addition, Mr. Haynes' began experimenting with drugs and alcohol around this time. From this point forward, I read several accounts of incidents involving Mr. Haynes' losing his temper, and escalating problems with self-regulation and self-control. Although Mr. Haynes was at one point diagnosed as suffering from, both, an intermittent explosive disorder and an oppositional defiant disorder, the early onset of these types of anger management problems are often associated with the later development of a major mood disorder, such as a Bipolar disorder. Although I unfortunately did not have the opportunity to review Mr. Haynes' West Oaks hospitalization records, other records suggest that he was highly agitated, hearing voices, expressing homicidal/suicidal ideation, and experiencing anger

2.

outbursts at the time of this hospitalization. These symptoms, along with the medications he was prescribed while at the hospital, i.e., Thorazine and Depakote, suggest that his treating physician or physicians might have suspected a major mood disorder at that time. Unfortunately, Mr. Haynes' opted to cease taking the prescribed medications following his release from West Oaks, and the many of the troubling symptoms appeared to have resurfaced shortly thereafter. Mr. Haynes' records then continue to make reference to substance abuse, explosive outbursts, abuse of pets, homicidal threats made against the father (as reported by Mr. Hayes' therapist), etc. Mr. Hayne's BOOST records indicate that he became involved in several incidents that eventually led to his being dropped from the program. These incidents, again, suggest to a mental health expert that Mr. Haynes was still experiencing difficulties with self-regulation and impulse control. In retrospect, Mr. Haynes appeared to have become depressed following his ejection from the BOOST program, as this appeared to have been something he truly wanted to accomplish in order to move on to the Naval Academy and attend college. Instead, Mr. Haynes returned to Houston, continued to abuse substances and go into a downward spiral that included purchasing a gun, participating in robbing several individuals and finally shooting Mr. Kinkaid.

Mr. Haynes' father at one point stated for the record that his son had always been healthy and not shown any evidence of any type of serious health problem or neurological impairment. However, to my knowledge, Mr. Anthony Haynes has never received a proper neurological work-up to rule out a seizure disorder or some other type of neurological impairment that could help account for the onset of the explosive outbursts in early adolescence. In addition, Mr. Haynes has developed and displayed through the years symptoms that strongly suggest a more serious form of mental illness, i.e., a Bipolar Mood Disorder. In fact, Mr. Haynes' anger, his drug abuse (possibly as a form of self-medication), his explosive outbursts and disinhibition, all strongly suggest to me that he may suffer from a major mood disorder. It is possible that the physicians who evaluated him at West Oak might have noted several of his symptoms and considered a major mood disorder diagnosis at that time. He was certainly prescribed medications that are typically prescribed to help treat symptoms of thought disorder and mood deregulation. However, without access to those medical records, it is impossible for me to ascertain whether such diagnoses were ever considered. At any rate, it is my opinion that these inpatient treatment records are extremely important and the potential that Mr. Haynes suffers from a serious form of mental illness should have been included as a mitigating factor at Mr. Haynes' trial. The use of any drugs by an individual with a genetic or constitutional predisposition to a mood disorder can also have devastating effects. Drugs can exacerbate or precipitate psychotic and manic symptoms and certainly lead someone to engage in atypical and risky behaviors.

3.

I agree with your assessment that Mr. Haynes showed a lot of potential as a youth, and he appeared to have made efforts to come to terms with his symptoms through various means. His decision to enter the BOOST program, for example, appeared to have represented such an effort on his part to have external structure impose some type of order into his internal chaos, i.e., the anger outbursts, the alleged auditory hallucinations, the suicidal thoughts, etc. Unfortunately, if my assessment is correct and Mr. Haynes does indeed suffer from a major mood disorder, this is a type of mental illness that requires pharmacological management.

It will be important to obtain and review all of Mr. Haynes' treatment records to ascertain to what extent other treating physicians and mental health personnel saw early signs of a mood disorder in this young man. As a psychologist who often works with children and adolescents, I immediately thought of Mr. Haynes as likely suffering from an untreated major mood disorder when I read his records, the history of the unfolding of his symptoms and the escalating cycle of drug abuse and erratic, impulsive behaviors that culminated in the tragic shooting of Mr. Kinkaid.

I understand Dr. Silverman will also be reviewing these records and he can certainly offer an opinion regarding the onset of major mood disorders in adolescents, the types of medications that are used to treat these disorders and how individuals who suffer from these types of major mood disorders often resort to alcohol and/or marijuana abuse in efforts to self-medicate.

In addition, I will recommend that Mr. Haynes undergo a proper neurological workup. I want to recommend Dr. Meyer Proler who is an expert at conducting computerized EEG's. This is a highly sophisticated procedure that can often pick up on the types of structural and metabolic deficits in the brain that are associated with seizures and other types of mental illness. Dr. Proler could also assist you in determining what other types of neurological tests could best assist you in documenting a possible diagnosis of a Bipolar and/or seizure disorder in Mr. Haynes. You can contact Dr. Proler at 713-658-9300.

With respect to future dangerousness, were Mr. Haynes to be properly diagnosed and treated for his psychiatric difficulties, he would likely be at a very low risk to commit capital murder or other such violent crime again. Without proper diagnosis and treatment, however, Mr. Haynes would be at high risk to re-offend, given that, in my opinion, he likely suffers from a type of mental illness that can lead to poor impulse control, erratic behaviors and, sometimes, violence when not properly treated. I should underscore that a majority of individuals who suffer from Bipolar disorders do not commit violent crimes. However, the presence of this type of mental illness can certainly increase the risk to engage in violent behavior when other variables come into play. In this case, Mr. Haynes was simultaneously using drugs, became involved with less than ideal company,

4.

was not being properly supervised, was not taking medication or seeing a psychiatrist, had lost the external structure provided by school, etc.

It is, indeed, a tragedy that this is a young man who appears to have fallen through the cracks with respect to proper diagnosis and follow up for his psychiatric symptoms. His father, though likely well intentioned, did not pursue psychiatric treatment for Mr. Haynes following Mr. Haynes' release from West Oaks Hospital. There is no record that he continued to see a psychiatrist or take medication following his hospital discharge. In addition, it is my impression that the therapist who followed Mr. Haynes through this period of time was not a doctoral level trained professional, and likely not trained to diagnose and/or treat major mood disorders. The records indicate that the therapist at one point told Mr. Haynes' father that Mr. Haynes had been making homicidal threats against the father. However, there is no indication from the records I reviewed that the father felt in any type of danger or was provided with options by the therapist.

Unfortunately, we also live during times when insurance companies are only willing to pay minimally for health care and many necessary tests are often not conducted, even when they appear indicated. There is no record of Mr. Haynes undergoing an EEG, MRI or seeing a neurologist to help rule out a seizure disorder as a possible causative factor of his explosive outbursts. There is also no mention of seeing a psychiatrist during middle school when Mr. Haynes began to display the anger outbursts and mood swings. Mr. Haynes also did not continue to see a psychiatrist after his release from West Oaks, even though he had appeared agitated and psychotic upon admission just ten days earlier.

To summarize my opinions and recommendations, it is very likely that Mr. Haynes suffers from a major mood disorder and began to show symptoms of such a disorder in early adolescence. Reviewing his psychiatric and other outpatient therapy records will be paramount in ascertaining whether other treating professionals entertained similar opinions at the time. The presence of a major mood disorder or even its possibility should have been introduced at Mr. Haynes' trial given that he exhibited such serious symptoms, i.e., auditory hallucinations, agitation, explosive outbursts, disrespect toward authority figures he previously respected, escalating drug use, academic failure, etc. A psychiatrist should also review Mr. Haynes' medical/psychiatric records to render an opinion regarding the use of Thorazine and Depakote in treating these types of disorders. Thorazine and Depakote are certainly not typically used to treat uncomplicated depression or an adjustment/behavior disorder. In addition, Mr. Haynes should receive a proper neurological workup that includes the types of diagnostic tests, i.e., computerized EEG and/or MRI, that can help document the presence of neuropsychological deficits and/or seizure disorders.

5.

All these should be considered mitigating factors and could have certainly been introduced at his capital murder trial. While the testimony of family and friends could have certainly helped present a more balanced picture of Mr. Haynes at trial, the type of medical and neurological evidence that I am suggesting should clearly carry greater scientific weight.

Please, do not hesitate to contact me once you have had the opportunity to review this document. I will be glad to rewrite its contents in the form of an affidavit or be of assistance in any other way I can.

Sincerely,

Susana Aceituno Rosin, Ph.D.
Licensed Clinical Psychologist
Texas License 22995

TAB 22

SUSANA A. ROSIN, PH.D.
CLINICAL PSYCHOLOGIST
3730 KIRBY DR., SUITE 825
HOUSTON, TEXAS 77098
—
TELEPHONE (713) 523-0000

July 13, 2005

A. Richard Ellis
Attorney at Law
75 Magee Avenue
Mill Valley, California 94941

Re: Haynes, Anthony Cordell

Dear Mr. Ellis:

It is with great interest that I reviewed the records you recently sent me regarding Mr. Haynes. As you recall, I had expressed my opinion regarding the importance of obtaining and reviewing these records in tracking the history and evolution of Mr. Haynes' mental illness.

First, it is noteworthy that when Mr. Haynes was initially admitted into West Oaks Hospital while a senior in high school, his toxicology screen **did not** reveal the presence of any drugs whatsoever in his system. This is a very significant finding because street drug use **cannot** then be used to help explain what was described as Mr. Haynes' violent and erratic behaviors, and mood swings at the time of admission. Other medical and psychiatric factors were likely at play.

Secondly, Mr. Haynes was treated for his severe emotional and behavior problems while at West Oaks with drugs that have both **antipsychotic** and **mood stabilizing** properties. These drugs included Tegretol and Depakote. Although I am not a medical doctor nor licensed to prescribe medications, the types of medications that were used to treat Mr. Haynes are **not** considered typical for the treatment of an uncomplicated depression.

Thirdly, several of the nursing and group therapy notes I reviewed described Mr. Haynes as exhibiting behaviors and expressing comments that raise questions regarding his reality testing. For example, Mr. Haynes made comments during one particular group session whereby he claimed to have participated in several drive-by shootings, and killed several people and animals. It should be noted that, at this point in time, there had not been any evidence whatsoever that Mr. Haynes had ever killed any human beings or animals. Therefore, these comments, which were apparently made seriously and appeared believable to the group leader, lead me to suspect that Mr. Haynes could have been potentially expressing delusional ideation during at least a portion of his hospitalization.

2.

In addition, there were apparently several instances during which Mr. Haynes became so out of control and aggressive toward the staff at West Oaks that he had to be restrained. These behaviors again suggest to me the presence of an underlying major mood disorder. Mr. Haynes was described at times as acting erratically and violently and unable to control his impulses or reactions. In addition, his outlandish claims of having killed many people and animals and beaten people with baseball bats lead me to suspect emerging difficulties with reality testing in this young man at the time.

Mr. Haynes was followed by a Dr. Robert Woodham while at West Oaks, and received diagnoses that appeared to address his symptoms at a more superficial level. These include: Intermittent Explosive Disorder (DSM IV 312.34) and Cannabis Dependence (DSM IV 304.30). In addition, Rule out Major Depression was listed as an additional potential diagnosis for Mr. Haynes. It is well known and accepted, however, that major mood disorders will typically first manifest themselves in children and adolescents as difficulties with anger control and uncontrollable rages. The fact that Mr. Haynes appeared to have responded well to the Tegretol and Depakote offers, in my opinion, yet more supporting evidence that Mr. Haynes was beginning to develop a major mood disorder, such as Bipolar Mood Disorder, during this time. It is unfortunate that Mr. Haynes did not continue to take his medications and be followed up psychiatrically once he left the West Oak Program. If Mr. Haynes, as I suspect, was in the process of developing a major mood disorder during this time, he would have required ongoing pharmacological treatment and psychiatric follow-up to control his symptoms.

It is my strong opinion that this information should have been presented to the jury at the time of Mr. Haynes' original capital murder trial. The presence of an untreated manic-depressive or bipolar illness could have certainly contributed to impair Mr. Haynes' judgment and volitional capacity at the time of the offense. In addition, as I discussed in my prior letter, the defense attorneys did not explore other possibilities at the time of trial to help account for Mr. Haynes' escalating behaviors and rage episodes. These other medical possibilities can include a focal lesion in the brain, temporal lobe seizures and/or other metabolic conditions. To my knowledge and from the review of these additional records, Mr. Haynes was never administered any neurological tests such as a computerized EEG, CT scan or MRI in an effort to rule out neuro-physiological problems. It is still my strong recommendation that Mr. Haynes be evaluated by a neurologist to rule out any of these problems.

These medical records and Mr. Haynes' mental health history should have been introduced and discussed at the time of his trial. It is highly probably that Mr. Haynes was in the process of developing a major mood disorder throughout his adolescence. It is also tragic that psychiatric treatment was not continued, particularly the medication, as

3.

mood stabilizers have been found highly effective in controlling the mood swings, manic phases and anger episodes in these individuals. However, it would have also been a mitigating factor and highly important for the jury to consider that Mr. Haynes had been treated for his emotional problems with anti-psychotics and mood stabilizers. I also find it very significant that nobody at West Oaks ever labeled this young man as an antisocial personality disorder. Therefore, it is likely that the treating staff held the opinion that all the behaviors displayed by Mr. Haynes at that time were largely out of his control. That is, in my opinion, another highly significant finding that should have been presented to the jury. Back then, it would have been possible for Dr. Woodham to testify at trial and discuss his impressions and treatment of Mr. Haynes for the jury. All these are important sources of information that the jury in this case was not able to hear or consider.

Please let me know if other documents become available for review and/or if I can be of assistance in any other way in this case. I included Dr. Proler's information on my prior letter and will, therefore, not repeat it here. However, it may still be very important for Mr. Haynes to be evaluated in order to document other potential medical/neurological causes for his emotional problems and rage episodes.

Sincerely,

Susana A. Rosin, Ph.D.
Licensed Clinical Psychologist
Texas License 22995

*TAB 23*