# United States District Court
# Southern District of Texas

## Case Number: H-05- 3424

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __6__ of __7__

☐ Exhibit to: __Vol III     Exhs. 67, 68, 69, 70, ~~71, 72~~__
number(s) / letter(s) _____

Other: __Petition For Writ of__

__Habeas Corpus__

__— Exhibits in Support ~~to~~ of__
__Petition__

TAB 67

RECORDER'S MEMORANDUM.
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming.

$\frac{14}{4}$mm/ 91

## CAUSE NO. 783,872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 263RD JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| ANTHONY CARDELL HAYNES | § | HARRIS COUNTY, TEXAS |

### MOTION FOR NEW TRIAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, **ANTHONY CARDELL HAYNES**, Defendant in the above-entitled and numbered cause, by and through his attorney of record, and respectfully moves the Court to set aside its judgment and grant a new trial for the following grounds and reasons, to-wit:

1. The defendant has been denied the presence of counsel at trial; Defendant has been unlawfully tried and sentenced to death.

2. The verdict is contrary to the law and the evidence.

3. The court has misdirected the jury as to the law or has committed other material errors calculated to injure the rights of the Defendant.

4. As law and justice demands.

With regard to the above allegations, Defendant submits that the trial court's actions in this case deprived Defendant of counsel and prevented Defendant's counsel from asserting any defenses or objections as required to protect defendant's Fifth and Sixth Amendment rights, respectively.

### I.

Defendant contends that the trial court's actions in this case forced Defendant's counsel to remain silent during the punishment proceedings of trial, notably, during closing arguments. Defendant submits that the trial court persistently rebuked Defendant's

V2893 P0935

000522

counsel and warned counsel that if he asserted Defendant's rights at trial, voiced any objections to the State's improper comments and arguments, or requested rulings by the trial court on his previously-raised objections, that counsel would be evicted from the court room.

## II.

Defendant asserts that the trial court's actions deprived Defendant of counsel at trial by threatening Defendant's counsel with removal from the courtroom if he asserted Defendant's rights to a fair trial. Defendant contends that the trial court thus constructively "gagged" defendant's counsel with the threat to remove defense counsel from the courtroom and to deny Defendant any opportunity to present argument before the jury. Defendant contends that the trial court's actions in this case created a hostile environment against the Defendant and caused a "de facto" absence of counsel at trial. Defendant further submits that the trial court's actions in this case served as a comment on the weight of the evidence and the merits of Defendant's rights to a fair and impartial trial.

## III.

With regard to all the above allegations, attached hereto as Exhibit A is the affidavit of Alvin Nunnery, an attorney who represented Defendant as "lead counsel" in his trial for capital murder, that describes the trial court's conduct which caused Nunnery's inability to act as counsel and his failure to render assistance of counsel to the Defendant at his trial.

**IV.**

Attached hereto as Exhibit B is the affidavit Robert Alton Jones, an attorney who represented Defendant as co-counsel at trial, which asserts Jones' own inability and failure to present any separate objections to the trial court's actions, above, or to render effective assistance of counsel to the Defendant at his trial because of Jones' own fear that the trial court would hold him in contempt of court.

**V.**

Defendant asks the Court to set this matter for a hearing to determine the factual question whether the trial court's actions served to deny Defendant counsel at trial. Furthermore, Defendant asks the Court to set this matter for a hearing to determine the factual question whether Defendant has been unlawfully tried and sentenced to death.

**VI.**

Defendant intends to proffer videotapes of the trial proceedings which support these contentions. Attached hereto as Exhibit D is copy of an Affidavit of Custodian of Records of Broadcast News Reports, indicating which video recordings of the trial proceedings are available.

**VII.**

Defendant asserts that the trial court in this case has also misdirected the jury as to the law or has committed other material errors calculated to injure the rights of the Defendant. This is demonstrated by the attached Exhibit C, the affidavit of Cynthia Patterson, a licensed private investigator who, at the request of

V2803 P0937

undersigned counsel, Leora Kahn, contacted the jurors in this trial.

## VIII.

Patterson interviewed Ms. Sharon Malazzo, foreperson of the jury, who stated that "the jurors did not know that the failure to reach a unanimous verdict or an agreement of ten jurors" regarding the answers to the Special Issues would result in an automatic imposition of a life sentence to the Defendant. Malazzo expressed the opinion that this information would have made a difference in her verdict.

## IX.

Further, Malazzo stated that in answering Special Issue Number Two, the jurors had misinterpreted the court's instructions to "exclude from their consideration anything that did not reduce the Defendant's moral blameworthiness for the crime itself, **including evidence that they would have otherwise considered as mitigating.**" Because this is a matter outside the record, this Court should conduct a hearing so that Defendant can present evidence to develop this point fully for appellate review, should an appeal be necessary.

**WHEREFORE PREMISES CONSIDERED**, Defendant respectfully asks that this Motion be presented to the Court within ten days so that it can be set for a hearing and that after that hearing, the Court grant a new trial in this cause as law and justice demand.

V2887 PO6308

**F I L E D**

CHARLES BACARISSE
District Clerk

OCT 2 2 1999

Time: _2:00 PM_
Harris County, Texas

By_____
                    Deputy

Respectfully submitted,

_[signature]_

LEORA KAHN
TBC #11073100
Eleven Greenway Plaza
Suite 3010
Houston, Texas  77046
(713) 222-1353
FAX: 713: 621-6933

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing motion was mailed and/or hand delivered to the office of the Harris County District Attorney, 201 Fannin, Suite 200, Houston, Texas  77002, on this the 22nd day of October, 1999.

_[signature]_

LEORA KAHN

CAUSE NO. 783,872

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 263RD JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| ANTHONY CARDELL HAYNES | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared LEORA TEICHER KAHN, who being by me duly sworn, deposed as follows:

My name is LEORA KAHN.  I am over the age of twenty-one years and capable of making this affidavit.  I am personally acquainted with the facts as stated below.

I am an attorney in good standing with the State Bar of Texas. I was licensed to practice law on November 1, 1991.  My office is located at Eleven Greenway Plaza, Suite 3010, Houston, Texas.  My telephone number is (713): 222-1353.

On September 29, 1999 I was appointed by the 263rd Judicial District Court, Harris County, Texas to undertake the appeal of the trial of Anthony Cardell Haynes, sentenced to death by lethal injection on September 24, 1999, for the capital murder of Sergeant Kent Kincaid, complainant in Cause No. 783,872, styled State v. Haynes.

On October 1, 1999, I spoke with Mr. Alvin Nunnery, lead counsel for the Defendant in this case.  Nunnery stated that he was prevented by the trial court from representing his client at trial, specifically, Nunnery was denied any opportunity to assert any defenses and objections to the State's numerous improper and prejudicial comments, statements and arguments during the punishment stage of trial because of the court's threats and tongue lashing in the presence of the jury that he would be removed from the courtroom if he pursued any objections or court rulings thereon and would lose any opportunity to argue before the jury and plead for Defendant's life.

On October 10, 1999, I spoke with Mr. Robert Jones, co-counsel for the Defendant in this case.  Mr. Jones stated that he was admonished by the trial court of "the one lawyer-one objector rule" and that the trial court's actions vis a vis Mr. Nunnery and himself served to deny Defendant due process, served to deprive Defendant of counsel at trial, and resulted in the imposition of the death penalty.

On October 20, 1999, I spoke with Ms. Cynthia Patterson, a licensed private investigator, who informed me that she had contacted several jurors in this case, that several jurors flatly refused to speak with her regarding this case, and that juror Malazzo indicated that the jurors had been deprived of material

**EXHIBIT A**

V2893 P0941

000528

knowledge and information regarding their answers to the Special
Issues and had "misinterpreted" the court's instructions regarding
the second Special Issue.

The statements above are true and correct to the best of my
knowledge and belief.

LEORA TEICHER KAHN

SWORN AND SUBSCRIBED BEFORE THE UNDERSIGNED AUTHORITY, ON
this, the 22nd of October, 1999.

VICTORIA S. DURAN
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 6, 2003

NOTARY PUBLIC, STATE OF TEXAS

NO. 783872

| THE STATE OF TEXAS | § IN THE DISTRICT COURT OF |
|---|---|
| VS. | § |
| | § HARRIS COUNTY, TEXAS |
| ANTHONY CARDELL HAYNES | § |
| | § 263RD JUDICIAL DISTRICT |

<u>AFFIDAVIT OF ALVIN E. NUNNERY</u>

BEFORE ME, the undersigned authority, on this day, personally appeared ALVIN E. NUNNERY, who being duly sworn upon oath did depose and state:

"My name is **ALVIN E. NUNNERY**. I am over eighteen years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am an attorney currently licensed and in good standing with the State of Texas. I have been licensed as an attorney since November 1982.

I was appointed to represent **ANTHONY C. HAYNES** on the charge of Capital Murder in the above styled cause. Following a finding of guilt and after both sides rested and closed at punishment, closing arguments commenced with Mr. Don Smith representing the State of Texas.

Mr. Smith made an obvious improper argument to which I objected. Judge Wallace sustained my objection, instructed the jury to disregard the improper argument and denied my motion for mistrial. Immediately thereafter, Mr. Smith ask for additional time because of my " repeated interruptions" whereupon I stood and lodged what I believed to be a valid objection. Judge Wallace told me to sit down. I asked for a ruling on my objection whereupon I

000539

persisted to request the court's ruling upon my objection whereupon Judge Wallace repeatedly ordered me to sit down and remain silent or I would be removed from the courtroom.

Judge Wallace's relentless tirade, rebuke and censure of me and my professional actions as an attorney appeared to convey several clear messages and signals to the jury. First, that nothing presented by the defense at trial was relevant nor meant to be taken seriously and of any import to be considered by the jury. Second, that the defense team, itself, was incompetent.

I understood and perceived the tongue lashing and rebuke directed towards me by Judge Wallace as a clear warning to me that I could not voice any further objections at trial or otherwise protect my client's rights as I would be removed from the courtroom. Indeed, I remained afraid to speak or to raise the necessary objections and defend my client, Anthony Haynes, from that point on. I remained mute at counsel table and waited for the opportunity I hoped I still had to argue before the jury in an attempt to save my client's life, as best I could. But that was made extremely difficult by the vindictiveness portrayed by the judge.

Both the attorneys for the State, Mr. Smith and particularly Mr. Vinson continued to argue before the jury and to make what I perceived to be very prejudicial and inflammatory arguments. I did not voice any further objections in the presence of the jury for fear of further prejudicing my client's rights and sabotaging any opportunity I had to argue for his life. But for my constant fear of retribution from the court, I would have lodged

several objections to the State's improper arguments and sidebar comments, attacking my client "over the head of counsel."

Thus, I could only make a Bill of Exceptions at the end of the trial, in hope of preserving some sense of my client's Fifth and Sixth Amendment rights to a fair trial, to due process, and to the effective assistance of counsel.

I believe the Court's overall contempt for the defense and its angry admonitions were a not too subtle appeal to prejudice and racism; It was quiet clear to me that when he told me to sit down, the real message was "boy" sit down!

I particularly felt hostility from the jury after the Court's rebuke of my professional actions as I attempted to present my closing arguments before the jury and as I pled for my client's life.  The hostility was manifestly obvious in the eyes of the jurors as I gave my closing argument.

The hostile environment created by the actions of the Court was designed to assure that the death penalty was the only appropriate outcome in this case and as such, constituted a comment of the evidence.

The above affidavit is true and correct to the best of my knowledge.

Signed this ___15th___ day of October,1999.

_Alvin E. Nunnery_
ALVIN   E.NUNNERY

Sworn to and Subscribed before me on this ___15th___ day of

___Oct___,1999.

_Joe Patillo_
Notary Public
State of Texas

JOE D. PATILLO
MY COMMISSION EXPIRES
April 14, 2000

V2893 P0946
V2893 P0946

EXHIBIT B

000531

# AFFIDAVIT

STATE OF TEXAS      §

COUNTY OF HARRIS      §

Before me, the undersigned authority, on this day personally appeared Robert A. Jones, who after being duly sworn, stated the following under oath.

"I was co-counsel, with Attorney Alvin Nunnery, in Cause No. 783,872, The State of Texas v. Anthony Cardell Haynes, in the 263rd District Court, Harris County, Texas. The court's actions during that trial affected defendant's due process rights, by creating a hostile environment for defense counsel and defendant. The court's refusal to rule on or acknowledge defendant's proper and timely objections to the state's side bar comments, and to the state's improper arguments, by threatening to remove defense counsel if he pursued his requests, stifled defense counsel and resulted in the "de facto" absence of counsel. Furthermore, the one-lawyer, one-objector rule restricted the ability to effectively represent the defendant, because any objection made by me would be in contempt of court. The rulings of the court allowed the state to attack the defendant with impunity, and to pursue impermissible jury argument without objection.

The court's actions created an impression that the court was biased against the defendant, and the restrictions placed upon Mr. Nunnery and myself deprived the defendant of his due process rights during a trial which resulted in the imposition of the death penalty."

_____
AFFIANT

SUBSCRIBED TO AND SWORN TO BEFORE ME, on this the ____ day of
_Ochaber_____, 1999.

_____
Notary Public in and for the
State of Texas

000535

**EXHIBIT   C**

V2893 P0419

000586

CAUSE NO. 783,872

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| VS. | § | HARRIS COUNTY, TEXAS |
| ANTHONY CARDELL HAYNES | § | 263rd JUDICIAL DISTRICT |

### AFFIDAVIT

Before me, the undersigned authority, personally appeared
Cynthia Patterson being duly sworn, desposes and says:

My name is Cynthia Patterson. I am over 21 years of
age, am of sound mind, and swear that the facts in this
affidavit are true and correct and are within my personal
knowledge.

At the request of Leora Kahn, Attorney, I interviewed
or attempted to interview the following jurors in the
above styled matter.

Jacqueline Emhoff Nelson
Sarah Humphreys Taylor
Craig Alan Vandyke
Marla W. Gorzynski
Lois Miller Thorn
Patrick N. Nformangum
Michael Shane Bonnin
Sharon Sefcik Malazzo
Claire Ruth Sebesta
Rosemary Herrera Sanchez
Jon Dean Wilcox
Douglas Wayne Wiersig

Patrick Nformangum, Marla Gorzynski, and Jon Wilcox
refused to be interviewed.
According to Sharon Malazzo, the jurors did not know
that failure to reach an unanimous verdict or an
agreement of ten jurors in answer to the special issues
would result in an automatic imposition of a life
sentence. Sharon Malazzo expressed the opinion that
knowing that information would have had an impact
on the jury and that it might have made a difference
in their verdict. Malazzo said for her personally,
"yes, it probably would have made a difference".
Malazzo stated that the Jurors started discussing
Special Issue number two late in the day and that it
was "misinterpreted". They interpreted the statutory
definition to exclude from their consideration anything
that did not reduce the defendant's moral blameworthiness

for the crime itself, including evidence that they would have otherwise considered as mitigating.

_Cynthia Patterson_
Cynthia Patterson

Sworn to and subsribed before me, in person, by Cynthia Patterson on this __20th__ day of October, 1999.

Notary Public in and for
The State of Texas

VICTORIA S. DURAN
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 6, 2003

000558

TAB 68

TX HEALTH & S S 821.052     Page 1
V.T.C.A., Health & Safety Code § 821.052
C

VERNON'S TEXAS STATUTES AND CODES ANNOTATED
HEALTH AND SAFETY CODE
TITLE 10. HEALTH AND SAFETY OF ANIMALS
CHAPTER 821. TREATMENT AND DISPOSITION OF ANIMALS
SUBCHAPTER C. EUTHANASIA OF ANIMALS
§ 821.052. Methods of Euthanasia

(a) A person may euthanize a dog or cat in the custody of an animal shelter only by administering sodium pentobarbital or commercially compressed carbon monoxide.

(b) A person may euthanize all other animals in the custody of an animal shelter, including birds and reptiles, only in accordance with the applicable methods, recommendations, and procedures set forth in the 2000 Report of the American Veterinary Medical Association Panel on Euthanasia as modified or superseded by a subsequent report of the American Veterinary Medical Association Panel on Euthanasia that is approved by the board.

CREDIT(S)

Added by Acts 2003, 78th Leg., ch. 30, § 1, eff. Sept. 1, 2003.

&lt; General Materials (GM) - References, Annotations, or Tables &gt;

V. T. C. A., Health & Safety Code § 821.052, TX HEALTH & S § 821.052

Current through end of 2003 Second Called Session

Copr. © West Group 2003. All rights reserved. .

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Citation                        Rank 1 of 1                     Database
TX LEGIS 30 (2003)                                             LEGIS-ALL
 2003 Tex. Sess. Law Serv. Ch. 30 (S.B. 572) (VERNON'S)
**(Publication page references are not available for this document.)**

VERNON'S TEXAS SESSION LAW SERVICE 2003
Seventy-Eighth Legislature, 2003 Regular Session
Copr. © West Group 2003.  All rights reserved.

Additions are indicated by <<+Text+>>; deletions by
<<-~~Text~~->>.  Changes in tables are made but not highlighted.

CHAPTER 30
S.B. No. 572
EUTHANASIA OF AN ANIMAL BY AN ANIMAL SHELTER;  PROVIDING CRIMINAL PENALTIES

Ch. 30

AN ACT
 relating to the euthanasia of an animal by an animal shelter;  providing
criminal penalties.

Be it enacted by the Legislature of the State of Texas:

Ch. 30, § 1
 SECTION 1. Chapter 821, Health and Safety Code, is amended by adding
Subchapter C to read as follows:
<<+SUBCHAPTER C. EUTHANASIA OF ANIMALS+>>

<< TX HEALTH & S § 821.051 >>

 <<+Sec. 821.051. DEFINITIONS.  In this subchapter:+>>
 <<+(1) "Animal" has the meaning assigned by Section 821. 001.+>>
 <<+(2) "Animal shelter" means a facility that collects, impounds, or keeps
stray, homeless, abandoned, or unwanted animals.+>>
 <<+(3) "Board" means the Texas Board of Health.+>>
 <<+(4) "Department" means the Texas Department of Health.+>>

<< TX HEALTH & S § 821.052 >>

 <<+Sec. 821.052. METHODS OF EUTHANASIA.  (a) A person may euthanize a dog or
cat in the custody of an animal shelter only by administering sodium
pentobarbital or commercially compressed carbon monoxide.+>>
 <<+(b) A person may euthanize all other animals in the custody of an animal
shelter, including birds and reptiles, only in accordance with the applicable
methods, recommendations, and procedures set forth in the 2000 Report of the +>>
<<+American Veterinary Medical Association Panel on Euthanasia as modified or
superseded by a subsequent report of the American Veterinary Medical Association
Panel on Euthanasia that is approved by the board.+>>

Copr. © 2003 West Group.  All rights reserved.

TX LEGIS 30 (2003)
**(Publication page references are not available for this document.)**

Ch. 30, § 1

<< TX HEALTH & S § 821.053 >>

<<+Sec. 821.053. REQUIREMENTS FOR USE OF SODIUM PENTOBARBITAL.  (a) The board
by rule shall establish the requirements and procedures for administering sodium
pentobarbital to euthanize an animal in the custody of an animal shelter.+>>
 <<+(b) A person may administer sodium pentobarbital to euthanize an animal in
the custody of an animal shelter only in accordance with the requirements and
procedures established by board rule.+>>

<< TX HEALTH & S § 821.054 >>

<<+Sec. 821.054. REQUIREMENTS FOR USE OF COMMERCIALLY COMPRESSED CARBON
MONOXIDE.  (a) The board by rule shall establish:+>>
 <<+(1) standards for a carbon monoxide chamber used to euthanize an animal in
the custody of an animal shelter;  and+>>
 <<+(2) requirements and procedures for administering commercially compressed
+>><<+ carbon monoxide to euthanize an animal in the custody of an animal
shelter.+>>
 <<+(b) A person administering commercially compressed carbon monoxide to
euthanize an animal in the custody of an animal shelter:+>>
 <<+(1) may use only a carbon monoxide chamber that meets the standards
established by board rule;  and+>>
 <<+(2) may administer the commercially compressed carbon monoxide only in
accordance with the requirements and procedures established by board rule.+>>

<< TX HEALTH & S § 821.055 >>

<<+Sec. 821.055. TRAINING FOR EUTHANASIA TECHNICIANS.  (a) A person may not
euthanize an animal in the custody of an animal shelter unless the person has
successfully completed, not more than three years before the date the person
euthanizes the animal, a training course in the proper methods and techniques
for euthanizing animals.  The training course curriculum must include:+>>
 <<+(1) the pharmacology, proper administration, and storage of euthanasia
solutions;+>>
 <<+(2) federal and state law regulating the storage and accountability of
euthanasia solutions;+>>
 <<+(3) euthanasia technician stress management;+>>
 <<+(4) proper restraint and handling of an animal during euthanasia;+>>
 <<+(5) the procedures for administering commercially compressed carbon
monoxide to an animal;+>>
 <<+(6) techniques for verifying an animal's death;  and+>>
 <<+(7) the proper disposal of a euthanized animal.+>>
 <<+(b) The department must approve the sponsors and curriculum of the training
course required by this section.+>>
 <<+(c) This section does not apply to a person licensed to practice veterinary
medicine in this state.+>>
 <<+(d) Notwithstanding Subsection (a), an employee of an animal shelter is not

Copr. © 2003 West Group.  All rights reserved.

TX LEGIS 30 (2003)
**(Publication page references are not available for this document.)**

**Ch. 30, § 1**
required to have successfully completed the training course before the 120th day
following the date of initial employment.+>>

<< TX HEALTH & S § 821.056 >>

<<+Sec. 821.056. OFFENSE AND PENALTY.  (a) A person commits an offense if the
person violates this subchapter or a board rule adopted under this
subchapter.+>>
<<+(b) An offense under this section is a Class B misdemeanor.+>>

<< TX HEALTH & S § 821.057 >>

<<+Sec. 821.057. INJUNCTION.  A court of competent jurisdiction, on the
petition of any person, may prohibit by injunction the substantial violation of
this subchapter or a board rule adopted under this subchapter.+>>
Ch. 30, § 2

<< Repealed:  TX HEALTH & S § 823.006 >>

  SECTION 2. Section 823.006, Health and Safety Code, is repealed.
Ch. 30, § 3

<< Note:  TX HEALTH & S §§ 821.053, 821.054 >>

  SECTION 3. The Texas Board of Health shall adopt the rules required by
Sections 821.053 and 821.054, Health and Safety Code, as added by this Act, not
later than June 1, 2004.
Ch. 30, § 4

<< Note:  TX HEALTH & S § 821.055 >>

  SECTION 4. The Texas Department of Health shall develop procedures to approve
the sponsors and curriculum for the training course required by Section 821.055,
Health and Safety Code, as added by this Act, not later than June 1, 2004.
Ch. 30, § 5

<< Note:  TX HEALTH & S § 823.006 >>

  SECTION 5. (a) The change in law made by the repeal of Section 823.006, Health
and Safety Code, by this Act applies only to an offense committed on or after
September 1, 2003.  For purposes of this section, an offense is committed before
September 1, 2003, if any element of the offense occurs before that date.
  (b) An offense committed under Section 823.006, Health and Safety Code, before
the repeal of that section by this Act is covered by the law in effect when the
offense was committed, and the former law is continued in effect for that
purpose.
Ch. 30, § 6

          Copr. © 2003 West Group.  All rights reserved.

TX LEGIS 30 (2003)
**(Publication page references are not available for this document.)**

**Ch. 30, § 6**
  SECTION 6. This Act takes effect September 1, 2003, except that Sections
821.053, 821.054, and 821.055, Health and Safety Code, as added by this Act,
take effect January 1, 2005.
  Passed the Senate on March 27, 2003:  Yeas 31, Nays 0;  the Senate concurred in
House amendment on April 30, 2003, by a viva-voce vote;  passed the House, with
amendment, on April 23, 2003, by a non-record vote.

Approved May 14, 2003.

Effective September 1, 2003, with exceptions.

TX LEGIS 30 (2003)
END OF DOCUMENT

Copr. © 2003 West Group.  All rights reserved.

VERNON'S TEXAS STATUTES AND CODES ANNOTATED
HEALTH AND SAFETY CODE
TITLE 10. HEALTH AND SAFETY OF ANIMALS
CHAPTER 821. TREATMENT AND DISPOSITION OF ANIMALS
SUBCHAPTER C. EUTHANASIA OF ANIMALS
§ 821.055. Training for Euthanasia Technicians

<Text of section effective January 1, 2005>

(a) A person may not euthanize an animal in the custody of an animal shelter unless the person has successfully completed, not more than three years before the date the person euthanizes the animal, a training course in the proper methods and techniques for euthanizing animals. The training course curriculum must include:

(1) the pharmacology, proper administration, and storage of euthanasia solutions;

(2) federal and state law regulating the storage and accountability of euthanasia solutions;

(3) euthanasia technician stress management;

(4) proper restraint and handling of an animal during euthanasia;

(5) the procedures for administering commercially compressed carbon monoxide to an animal;

(6) techniques for verifying an animal's death; and

(7) the proper disposal of a euthanized animal.

(b) The department must approve the sponsors and curriculum of the training course required by this section.

(c) This section does not apply to a person licensed to practice veterinary medicine in this state.

(d) Notwithstanding Subsection (a), an employee of an animal shelter is not required to have successfully completed the training course before the 120th day following the date of initial employment.

CREDIT(S)

Added by Acts 2003, 78th Leg., ch. 30, § 1, eff. Jan. 1, 2005.

<General Materials (GM) - References, Annotations, or Tables>

HISTORICAL AND STATUTORY NOTES

2003 Electronic Pocket Part Update

2003 Legislation

Section 4 of Acts 2003, 78th Leg., ch. 30 provides:

"The Texas Department of Health shall develop procedures to approve the sponsors and curriculum for the training course required by Section 821.055, Health and Safety Code, as added by this Act, not later than June 1, 2004."

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

TAB 69

 Texas Department of Criminal Justice  

**Return to Death Row Page**

# Death Row Facts

| Cost per Day per Offender: |
| --- |
| $61.58  (based on FY2002) |
| |

| History |
| --- |
| Death row was located in the East Building of the Huntsville Unit from 1928 to 1952.  From 1952 until 1965, the electric chair was located in a building by the East Wall of the Huntsville Unit. |
| The men on death row were moved from the Huntsville Unit to the Ellis Unit in 1965.  Death row remained at the Ellis Unit until 1999.  In 1999, the TDCJ moved death row to the Polunsky Unit. Death row offenders are housed separately in single-person cells measuring 60 square feet, with each cell having a window.  Death row offenders are also recreated individually. Offenders on death row receive a regular diet, have access to reading, writing, and legal materials. Depending upon their custody level, some death row offenders are allowed to have a radio. Offenders on death row do not have regular TDCJ-ID numbers, but have special death row numbers. |
| Hanging was means of execution between 1819 and 1923. |
| The State of Texas authorized the use of the electric chair in 1923, and ordered all executions to be carried out by the State in Huntsville. Prior to 1923, Texas counties were responsible for their own executions. |
| The State of Texas executed the first offender by electrocution on 2/8/1924. Charles Reynolds from Red River County was executed. On that same date, four additional offenders, Ewell Morris, George Washington, Mack Matthews, and Melvin Johnson were executed. |
| State of Texas executed brothers on six occasions:<br>Frank & Lorenzo Noel electrocuted 7/3/1925;<br>S.A. & Forest Robins electrocuted 4/6/1926;<br>Oscar & Mack Brown electrocuted 7/1/1936;<br>Roscoe & Henderson Brown electrocuted 5/6/1938;<br>Curtis 7/1/1993 & Danny 7/30/1993 Harris (both by lethal injection);<br>Jessie 9/16/1994 & Jose 11/18/1999 Gutierrez (both by lethal injection). |
| One of the most notorious offenders to be executed was Raymond Hamilton, member of the "Bonnie and Clyde" gang. He was sentenced from Walker County and executed on May 10, 1935, for murder. Hamilton and another man had escaped from death row, only to be captured and return to death row. |
| The State of Texas executed the last offender by electrocution on 7/30/1964. Joseph Johnson from Harris County was executed. |
| A total of 361 inmates were electrocuted in the State of Texas. |
| When capital punishment was declared "cruel and unusual punishment" by the U.S. Supreme Court on June 29, 1972, there were 45 men on death row in Texas and 7 in county jails with a death sentence. All of the sentences were commuted to life sentences by the Governor of Texas, and death row was clear by March 1973. |

Case 4:05-cv-03424   Document 1-29   Filed in TXSD on 10/25/05   Page 29 of 40

In 1973, revision to the Texas Penal Code once again allowed assessment of the death penalty and allowed for executions to resume effective 1/1/1974. Under the new statute, the first man (#507 John Devries) was placed on death row on 2/15/1974. Devries committed suicide 7/1/1974 by hanging himself with bed sheets.

The State of Texas adopted lethal injection as means of execution in 1977.

The State of Texas executed the first offender by lethal injection on 12/7/1982. Charlie Brooks of Tarrant County was executed for the kidnap/murder of a Fort Worth auto mechanic.

Effective January 12, 1996, close relatives and friends of the deceased victim were allowed to witness executions.

*Information from here to the bottom of the page relates to death row after 1973.*
*For information relating to death row from 1923-1973, <u>click here</u>.*

**Texas Capital Offenses:**

The following crimes are Capital Murder in Texas: murder of a public safety officer or firefighter; murder during the commission of kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation; murder for remuneration; murder during prison escape; murder of a correctional employee; murder by a state prison inmate who is serving a life sentence for any of five offenses (murder, capital murder, aggravated kidnapping, aggravated sexual assault, or aggravated robbery); multiple murders; murder of an individual under six years of age.

|  |
| --- |

**United States Capital Punishment:**

As of December 31,1999, the death penalty was authorized by 38 states and the Federal Government.

Texas leads nation in the number of executions since death penalty was reinstated in 1976.

Texas, California, and Florida have the largest death row populations.

3,581 offenders were under sentence of death in the United States as of December 31, 2001.

There are five methods of execution in the United States: lethal injection, electrocution, lethal gas, hanging, and firing squad.

Jurisdictions without death penalty statutes: Alaska, District of Columbia, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, North Dakota, Rhode Island, Vermont, West Virginia, Wisconsin.

For more on Capital Punishment in the United States:
<u>Bureau of Justice Statistics-Capital Punishment</u>

**Lethal Injection Consists Of:**

Sodium Thiopental (lethal dose - sedates person)

Pancuronium Bromide (muscle relaxant-collapses diaphragm and lungs)

Potassium Chloride (stops heart beat)

The offender is usually pronounced dead approximately 7 minutes after the lethal injection begins.

Cost per execution for drugs used : $86.08

|  |
| --- |

**Average Time on Death Row prior to Execution:**

TAB 70

## AFFIDAVIT OF DR DENNIS GEISER, PROFESSOR OF VETERINARY SCIENCE

### STATE OF TEXAS V JESUS FLORES

### NO. 877994A

IN THE COUNTY OF ___Knox_____ }

THE STATE OF TENNESSEE                    }

BEFORE ME, the undersigned authority, did personally appear Dr. Dennis Geiser, and having been duly sworn, did state upon his oath the following:

"My name is Dr Dennis Geiser. I am a professor of veterinary science at the University of Tennessee and the Chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee.

**Pancuronium Bromide is Prohibited in the Euthanasia of Animals**

It is significantly below the standard of acceptable practice to use an injection of a neuromuscular blocking agent (of which Pancuronium Bromide is one) for animal euthanasia. The use of that drug is outlawed in a number of States. The use of that drug is inhumane because neuromuscular blocking agents do not produce depression of the central nervous system that would results in anesthesia or analgesia These agents produce a peripheral paralysis of skeletal muscles, rendering an individual unable to respond to external stimuli while still being able to perceive pain and discomfort.

The use of pancuronium bromide is strictly prohibited by the ethical standards of the American Veterinary Medical Association which apply throughout the country. Under the American Veterinary Medical Association standards, there is no allowance for the use of pancuronium bromide in euthanasia under any set of circumstances.

**Sodium Thiopental is Not a Proper Anesthetic**

Sodium thiopental is not a proper anesthetic for use in lethal injection. Indeed, the American Veterinary Medical Association standards for euthanasia indicate that the ideal barbituric acid derivative for use in euthanasia should be potent, long acting, stable in solution, and inexpensive. Sodium pentobarbital (not sodium thiopental) best fits this criteria. Sodium pentothai is a potent barbituric acid derivative but very short acting with one therapeutic dose.

The AVMA guidelines also state that the use of sodium pentobarbital and neuromuscular blocking agent is an unacceptable euthanasia procedure in animals.

All of the foregoing is true and correct."

Signed: _____

Dr Dennis Geiser
University of Tennessee


SWORN AND SUBSCRIBED BEFORE ME this __12__ day of November, 2003

Signed: _____

Notary Public in and for the State of Tennessee

My commission expires June 28, 2006

## AFFIDAVIT OF DR. MARK HEATH, ANESTHESIOLOGIST

## STATE OF TEXAS V JESUS FLORES

## NO. 877994A

IN THE COUNTY OF  NEW  YORK     }

THE STATE OF NEW YORK          }

BEFORE ME, the undersigned authority, did personally appear Dr. Mark Heath, and having been duly sworn, did state upon his oath the following:

"My name is Dr Mark Heath and I am assistant professor of clinical anesthesia at Columbia University. I obtained my bachelor of arts from Harvard University in 1983 magna cum laude and graduated with honors from University of North Carolina Medical School in 1987. My practice is devoted one-third to clinical patient care, one-third education of residents and fellows, and one-third research.

### The Use and Effects of Pancuronium Bromide

Pancuronium bromide is a neuromuscular blocking agent. Its effect is that it renders the muscles unable to contract but it does not affect the brain or the nerves. It is used in surgery to ensure that there is no movement and that the patient is securely paralyzed so that surgery can be performed without contraction of the muscles. Pancuronium bromide is not administered until the patient is under a proper plane of anesthesia. The anesthesia must first be administered such that the patient is unconscious and does not feel, see or perceive the procedure.

### The Chemical Veil

Pancuronium bromide makes the patient look serene because of its paralytic effect on the muscles. The face muscles cannot move or contract to show pain and suffering. It therefore provides a 'chemical veil' over the proceedings. By completely paralyzing the inmate, pancuronium bromide masks the normal physical parameters that an anesthesiologist or surgeon would rely upon to determine if a patient is completely unconscious and within a proper surgical plane of anesthesia. Because pancuronium bromide is an invisible chemical veil and not a physical veil like a blanket or hood that is easily identifiable, the use of pancuronium bromide in lethal injection creates a double veil. It disguises the fact that there is a disguise over the process

### Pancuronium Bromide is Unnecessary in Lethal Injections

If pancuronium bromide were eliminated from the lethal injection method, it would not decrease the efficacy or the humaneness of the procedure. It is unnecessary for administering a dose of drugs in the course of an execution. It serves no legitimate purpose.

## The Substantial Risks of Inhumane Suffering

There are significant risks that the inmate in Texas' lethal injection procedure will not be rendered unconscious by the sodium thiopental (the first drug of the series to be administered), and will therefore experience the psychologically horrific effects of pancuronium bromide.

Sodium thiopental is an ultra short-acting barbiturate. It would not be used to maintain a patient in a surgical plane of anesthesia for purposes of performing surgical procedures. It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure. If the solution of Sodium thiopental comes into contact with another chemical, such as pancuronium bromide, the mixture of the two will cause the sodium thiopental immediately to precipitate or crystallize. These factors are significant in the risk of the inmate not being properly anesthetized, especially since no-one checks that the inmate is unconscious before the second drug is administered.

Sometimes batches of drugs from the manufacturer are bad – they either do not have any potency, or the manufacturer mistakenly mislabels the drug. Also, the sodium thiopental may have been stored in powder form beyond its shelf life, or the sodium thiopental might not be properly mixed into solution form.

The numerous contingencies on administering an IV- missing the vein, an extravenous injection, solution washing back into the IV bag- require a physician to monitor the intake of the solution not just paramedics. The physical distance between the executioner, the person pushing the syringe, and the inmate introduces additional needless risk. The fall back procedure for inability to locate a vein is a cut down procedure instead of a percutaneous, more modern procedure. This increases the risk of excessive suffering.

The third, fatal, drug to be administered is potassium chloride. Potassium activates all the nerve fibers inside the vein and the veins have many nerve fibers inside them. It would basically deliver the maximum amount of pain the veins can deliver. It would be agonizing for an inmate who is not properly anesthetized.

All of the foregoing is true and correct."

Signed: _____

Dr Mark Heath
Department of Anesthesiology
Columbia University
New York
New York


SWORN AND SUBSCRIBED BEFORE ME this 13th day of November, 2003


Signed: _____

Notary Public in and for the State of New York

LIA PASCALE
Notary Public, State of New York
No. 02PA6015971
Qualified in New York County
Commission Expires 7/21/07

# AFFIDAVIT OF CAROL WEIHRER

## STATE OF TEXAS V JESUS FLORES

### NO. 877994A

| | |
|---|---|
| IN THE COUNTY OF FAIRFAX | } |
| THE STATE OF VIRGINIA | } |

BEFORE ME, the undersigned authority, did personally appear Carol Weihrer, and having been duly sworn, did state upon her oath the following:

"My name is Carol Weihrer. I underwent an eye operation in which full general anesthesia was administered but the brain scrambling drugs were not effective. I therefore experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move. It burnt like the fires of hell. It was the most terrifying, torturous experience you can imagine. The experience was worse than death.

To the best of my knowledge, all of the foregoing is true and correct."

Signed: _Carol Weihrer_

Carol Weihrer
President and Founder
Anesthesia Awareness Campaign, Inc.
http://www.anesthesiaawareness.com

SWORN AND SUBSCRIBED BEFORE ME this _6th_ day of November, 2003

Signed: _____

Notary Public in and for the State of Virginia

TAB 71



## Archive

**The**


This page is print-ready, and this article will remain available for 90 days. Instructions for Saving | About this Service | Purchase History

October 7, 2003, Tuesday

NATIONAL DESK

# Critics Say Execution Drug May Hide Suffering

**By ADAM LIPTAK (NYT) 1661 words**

NASHVILLE, Oct. 1 -- At the Riverbend Maximum Security Institution here, through a set of double doors next to several vending machines, a gurney stands ready to deliver prisoners to their executions by lethal injection.

Just about every aspect of the death penalty provokes acrimonious debate, but this method of killing, by common consensus, is as humane as medicine can make it. People who have witnessed injection executions say the deaths appeared hauntingly serene, more evocative of the operating room than of the gallows.

But a growing number of legal and medical experts are warning that the apparent tranquillity of a lethal injection may be deceptive. They say the standard method of executing people in most states could lead to paralysis that masks intense distress, leaving a wide-awake inmate unable to speak or cry out as he slowly suffocates.

In 2001, it became a crime for veterinarians in Tennessee to use one of the chemicals in that standard method to euthanize pets.

The chemical, pancuronium bromide, has been among those specified for use in lethal injections since Oklahoma first adopted that method of execution in 1977. Only now, though, is widespread attention starting to focus on it.

Spurred by a lawsuit by a death row inmate here, advances in human and veterinary medicine, and a study last year that revealed for the first time the chemicals that many other states use to carry out executions, experts have started to question this part of the standard lethal injection method.

Pancuronium bromide paralyzes the skeletal muscles but does not affect the brain or nerves. A person injected with it remains conscious but cannot move or speak.

In Tennessee and about 30 other states, the chemical is used in combination with two others. The other chemicals can either ease or exacerbate the suffering the pancuronium bromide causes, depending on the dosages and the expertise of the prison personnel who administer them.

A judge here recently found that pancuronium bromide, marketed under the trade name Pavulon, has "no legitimate purpose."

"The subject gives all the appearances of a serene expiration when actually the subject is feeling and perceiving the excruciatingly painful ordeal of death by lethal injection," the judge, Ellen Hobbs Lyle, wrote, describing the worst-case scenario. "The Pavulon gives a false impression of serenity to viewers, making punishment by death more palatable and acceptable to society."

A simpler and more humane alternative to the three-chemical combination, many experts agree, is the method usually used in animal euthanasia: a single lethal dose of a barbiturate called sodium pentobarbital.

Dr. Sherwin B. Nuland, who teaches medicine at Yale and wrote "How We Die" (Knopf, 1994) said he was baffled to hear that pancuronium bromide was used in executions.

"It strikes me that it makes no sense to use a muscle relaxant in executing people," he said. "Complete muscle paralysis does not mean loss of pain sensation."

Dr. Nuland, who described himself as a cautious supporter of the death penalty, said a humane death could be achieved in other ways, including by using the other two chemicals in the standard method, without the pancuronium bromide.

The challenge to the use of pancuronium bromide was brought in chancery court here by Abu-Ali Abdur'Rahman, who is on death row for a 1986 murder. Judge Lyle wrote that the use of the chemical "taps into every citizen's fear that the government manipulates the setting and gilds the lily." But despite her misgivings, she ruled that the use of the drug did not violate the Constitution's ban on cruel and unusual punishment, because it was widely used and because "there is less than a remote chance that the prisoner will be subjected to unnecessary physical pain or psychological suffering."

The case is on appeal.

Mr. Abdur'Rahman, 52, is being held at the Riverbend prison, along with 92 other death row inmates. He is short and slight, and his long beard has turned gray. He spoke to a visitor through thick glass.

"They're saying I'm less than an animal," Mr. Abdur'Rahman said. "The poison they put into our veins needs to be challenged. Had my attorneys not researched this, I doubt very much it would have come to light."

The American Veterinary Medical Association condemns pancuronium bromide when it is the sole chemical used or when it is used in combination with the usual animal euthanasia drug, sodium pentobarbital. That is because, an association report in 2000 said, "the animal may perceive pain and distress after it is immobilized."

Lethal injection is now the dominant way Americans are executed. It is used in all 38 states that have the death penalty except Nebraska, which uses electrocution. In 10 states, prisoners may choose between lethal injection and a second method, including hanging, firing squad, electrocution and lethal gas.

In most methods of lethal injection, pancuronium bromide is the second drug in a three-chemica

sequence.

The first is sodium thiopental, a so-called ultra-short-acting barbiturate. It can be effective for only minutes. In surgery, it is used to induce rather than maintain anesthesia. Doctors like it because patients who encounter immediate complications awaken quickly enough to be saved.

The third is potassium chloride, which stops the heart and causes excruciating pain if the prisoner is conscious.

"It would basically deliver the maximum amount of pain the veins can deliver, which is a lot," Dr Mark J. S. Heath, an anesthesiologist who teaches at Columbia, testified at a hearing for Mr. Abdur'Rahman.

One problem with the combination of chemicals, Dr. Heath said in an interview, is that the sodium thiopental could be inadequate or wear off. That would leave the prisoner conscious, paralyzed, suffocating and subject to extreme pain from the potassium chloride.

"You're in a chemical tomb," he said.

The possibility of improper doses or sequences and of bungled injections is increased, Dr. Heath said, because doctors may not take part in executions under most codes of medical ethics.

The reason for pancuronium bromide in the standard lethal injection method is not well understood. Judge Lyle found that Tennessee's method "was developed simply by copying the same method used in some 30 other states."

Deborah W. Denno, a law professor at Fordham University who published a study of the chemicals used in lethal injections last year, said that assembling information for it was difficult.

"The process has been so hidden," said Professor Denno, who described herself as an opponent of the death penalty.

Four states said their protocols for lethal injection were confidential; three said they had none. Except for New Jersey, which does not use pancuronium bromide, all 28 states that supplied Professor Denno with information used the same three-chemical combination. So does the federal government.

"The idea of even having a lethal injection protocol specifying exact chemicals is a very recent phenomenon," Professor Denno said, "and that's only because prison officials have been pressed to provide them. Nobody really knew what chemicals were being used."

The earliest protocol, in Oklahoma, was based on advice solicited by a state senator from a professor in the state's medical school. The professor, Stanley Deutsch, recommended an ultra-short-acting barbituate and a neuromuscular blocking drug like pancuronium bromide.

"I can assure you that this is a rapid, pleasant way of producing unconsciousness," Dr. Deutsch wrote in 1977.

In a recent interview, Dr. Deutsch stood by his initial finding, saying his method does not cause suffering. "They use such a massive amount of the penthothal that I don't think there is any chance