# United States District Court
# Southern District of Texas

## Case Number: H-05-3424

## ATTACHMENT

**Description:**

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _3_ of _____

☐ Exhibit to: _____ Vol II _____
    number(s) / letter(s) _____

Other: _____ Petition For Writ of _____

_____ Habeas Corpus _____

_____

if the first two steps are satisfied, the court must determine whether the defendant has carried his ultimate burden of proving purposeful discrimination. Although the burden of production shifts during this inquiry, the burden of proof on the ultimate issue of discrimination always rests with the defendant. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). This burden-shifting process is common to all inquiries into racial discrimination, whether in criminal cases or in the Title VII context.

In *Swain v. Alabama*, 380 U.S. 202 (1965), the Supreme Court first applied the burden-shifting framework to the issue of racial discrimination in the use of peremptory challenges. In a portion of the opinion now superseded by the decision in *Batson*, the Court held that a defendant could make out a *prima facie* case of racial discrimination only by demonstrating that the prosecution had removed jurors "consistently and systematically." *Id.* at 222. If he met this challenge, his proof would create "a fair inference of discrimination . . . which is determinative absent sufficient rebuttal evidence." *Id.* at 227 (emphasis added).

In *Batson*, the Supreme Court modified the first step of the burden-shifting inquiry by holding that a defendant could establish a *prima facie* case of discrimination by demonstrating disproportionate exclusion of jurors in his own case. The Court left unchanged the balance of the three-step burden-shifting analysis, and in fact emphasized that a very strong *prima facie* case – one that showed "total or seriously disproportionate exclusion of Negroes from jury venires" – could create an inference of discrimination strong enough to, "for all practical purposes," demonstrate discrimination. *Batson*, 476 U.S. at 94 (citations omitted).

-227-

The Court's approach in the *Batson* context drew on its Title VII jurisprudence,[257] which had always treated the inquiry into discrimination as a practical assessment of the alleged discrimination's motives. Such an assessment requires consideration of all relevant evidence, including the strength of the *prima facie* case of discrimination. The Court, in a unanimous opinion, recently observed:

> Although the presumption of discrimination [created by the prima facie case] "drops out of the picture" once the defendant meets its burden of [producing race-neutral reasons for its decision], the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citation omitted); *see id.* at 147 ("The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

In *Hernandez v. New York*, 500 U.S. 352 (1991), a plurality of the Supreme Court endorsed the notion, specifically in the context of peremptory strikes, that a very strong *prima facie* case of racial exclusion can make a state actor's asserted race-neutral motives "simply too incredible" to be believed. *Id.* at 369. Concurring, Justice O'Connor joined by Justice Scalia, also emphasized that the strength of the *prima facie* case of discrimination is relevant in assessing the credibility of the prosecutor's proffered reasons for his challenges: "Disproportionate [strikes of African-American jurors] may, of course, constitute evidence of

---

[257] *See Batson*, 476 U.S. at 94 n.18.

-228-

intentional racial discrimination. The trial court may, because of such effect, disbelieve the prosecutor and find that the asserted justification is merely a pretext for intentional race-based discrimination." *Id.* at 375 (citing *Batson*, 476 U.S. at 93). Some lower courts take it as a given that the third step of the *Batson* inquiry is vital, and that it requires a consideration of all relevant evidence, including the defendant's *prima facie* case.[258]

This year the Supreme Court has again reiterated the importance of the *Batson* holding. In *Miller-El v. Dretke,* 125 S. Ct. 2317 (2005) the Court reversed Miller-El's capital murder conviction and death sentence because petitioner, by clear and convincing evidence, rebutted the presumption of correctness attached to the Texas court's factual findings concerning the prosecution's peremptory challenges, and showed that the state court's determination of the facts was unreasonable. The Court held that the jury "selection process [was] replete with evidence

---

[258] *See, e.g., Coulter v. Gilmore*, 155 F.3d 912, 920 (7th Cir. 1998) ("The *Batson* decision makes it clear that, one way or another, a trial court must consider all relevant circumstances before it issues a final ruling on a defendant's motion." (citing *Batson*, 476 U.S. at 96-97)); *United States v. Alvarado*, 951 F.2d 22, 26 (2d. Cir. 1991) ("In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each [purportedly race-neutral] explanation in light of *all the other evidence* relevant to prosecutorial intent." (emphasis added)). The Sixth Circuit explained the process clearly:

> At th[e third] step of the analysis, the district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances, and then to weigh the asserted justification *against the strength of the defendant's prima facie case* under the totality of the circumstances. Thus, even though the issue of whether the defendants made out a prima facie case is moot for purpose of deciding whether they met their burden of production at step one, the district court may still assess the *totality of the circumstances* surrounding the strike in the analysis of whether the defendants have met their ultimate burden of proving purposeful discrimination.

*United States v. Hill*, 133 F.3d 337, 342 (6th Cir. 1998) (emphases added) (citing *Hernandez*); *see also Alvarado*, 951 F.2d at 26 ("As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances.").

that the prosecutors were selecting and rejecting potential jurors because of race." *Miller-El,* 125 S. Ct. at 2339.

Many of the same features that caused the Supreme Court to grant relief in *Miller-El* are also present here:

1) The percentage of the prosecution's strikes against blacks were "remarkable." *Id.* at 2325-2326. In Mr. Haynes's case it was also remarkable in that 1) four out of six African-Americans were struck by the prosecution; 2) one African-American out of five was accepted (20%); or 3) the State had used roughly thirty-three percent of its strikes to remove approximately eighty per cent of the African-Americans from the jury panel. 22 RR 14 *et. seq.*

2) A "side by side" comparison of the struck black panel members and the accepted white ones reveals double standards for blacks, disparate questioning, and similar answers being used to disqualify blacks but not whites. *See infra.* The analysis shows, as in *Miller-El,* that the statements made by African-American prospective jurors with regard to their willingness to impose the death penalty compared with those of seated whites were very similar. While white jurors were mainly asked long "educational" questions by the prosecution, which asked for only simple "yes" or "no" answers, the black jurors were asked for their opinions and feelings on a number of issues, in a very different manner, in what can only be interpreted as an effort to have them disqualified.

3) In *Miller-El, supra,* the Court found that the prosecutor's explanations misrepresented the juror's responses. *Id.* at 2328. *Miller-El* cautions against the exact scenario enacted here by the state courts: uncritical acceptance of the prosecution's "race neutral" reasons for the

-230-

challenges. Here too, in all four cases, especially in regard to Mr. McQueen, the prosecutor's "race neutral" reasons were at almost total variance with the prospective juror's actual answers.

4) The uncritical acceptance of the prosecution's reasons for the strikes was criticized by the Court in *Miller-El*. "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Id* at 2332. Here the prosecution's stated reasons not only do not hold up, but they are patently bogus. Additionally, as the judge ruling on the *Batson* motion did not preside over the voir dire, and the prosecution's stated reasons dealt with demeanor, hesitation, body language and the like, the trial court's acceptance of these reasons could not have been anything but uncritical.

In *Johnson v. California,* 125 S. Ct. 2410 (2005) the Supreme Court again visited the *Batson* holding. In *Johnson,* the Court held that California's "more likely than not" standard "is an appropriate yardstick by which to measure the sufficiency of a *prima facie* case. *California v. Johnson,* 125 S. Ct. At 2416. The Court held that *Batson's* "burden shifting framework" requires only that at step one a defendant produce evidence sufficient to draw an inference that discrimination has occurred." *Id.* It is not until step three, when the trial court has before it "all relevant circumstances, including the prosecutor's explanation" when the defendant must carry his burden of persuasion that the challenge was "more likely than not" race-based. *Id.* at 2417.

The Court held that the evidentiary standards are not state matters and are tethered to the constitutional rule in *Batson.* The Court also left no doubt that the proponent need only raise

-231-

an inference at Step One. *Id.* at 2418 n.6.  The decision reaffirmed the following principles:

1) A proponent may rely upon a variety of evidence, including statistics pertaining to strikes in the particular case at issue;

2) whatever explanation is offered by the prosecution at step two, trial judges must proceed to step three to "determine the persuasiveness of the defendant's constitutional claim," *Id.* at 2417-2418; and

3) the *Batson* inquiry parallels the evaluation of evidence in Title VII cases. *Id.* at 2418 n.7.

Both *Batson* and *Johnson* view a comparative juror analysis by a reviewing court as integral to the analysis.

**The state court erred in denying these claims.**

The Texas Court of Criminal Appeals denied this claim on this basis:

> The record establishes that Haynes is African-American and that, of the fifty people in the venire, seven were African-Americans and six appeared for voir dire.  The State peremptorily struck four of the six and accepted one venirewoman, whom the defense peremptorily struck; one African-American man was seated on the jury. The State offered racially neutral explanations.[259]

The "racially neutral" explanations were accepted by the trial court and the CCA. This holding was erroneous as to all four racially-based challenges.

**Claim II(a):  Petitioner was denied a fair trial by the use of a racially-based challenge to exclude Ms. Kirkling, an African-American woman, from his jury.**

The state court held as follows regarding this claim:

---

[259]  *See* Exhibit 5 at 14.

The prosecutor stated that he had struck T. Kirkling because she avoided taking a firm position on capital punishment. According to the prosecutor, Kirkling had hesitated in responding to questions about the death penalty and had stated that she considered capital punishment "a last resort" and a "necessary evil." The record supports the prosecutor's version of the voir dire. During Kirkland's voir dire, the prosecutor specifically noted Kirkling's hesitation about the death penalty and asked if he should be concerned. She acknowledged her reservations about sentencing someone to death, stating that, "on one hand I'm charged with a duty, and on the other hand I have my own personal opinion." She explained her "personal opinion" as being that "sentencing someone to death is a necessary evil" but "that doesn't mean I have to like it." The record supports the prosecutor's explanation. The trial court's denial of Haynes's *Batson* challenge with respect to Kirkling was not clearly erroneous.[260]

But the record does not bear out this holding. This prospective juror stated she would apply the law and had a duty to do that. 7 RR 31. In fact, Ms. Kirkling testified that if the evidence showed that the defendant should receive the death sentence, then there would be a proper time for that. 7 RR 32. These answers in no way explained the prosecution's striking of this prospective juror, as she clearly stated she could follow the law.

In contrast, the State accepted Michael Bonnin, who eventually sat on Petitioner's jury. 3 Tr. 537. Mr. Bonnin stated that he did not believe in the death penalty in some circumstances. 6 RR 137. Similarly, Sharon Malazzo, who also eventually sat on Petitioner's jury, stated that she could consider that a sentence of probation would be an option in a homicide case. 10 RR 296.

**Claim II(b):** Petitioner was deprived of a fair trial by the prosecution's use of a racially-based challenge to exclude Melba Goodman from his jury.

The state court held the following in regard to this prospective African-American juror:

"Regarding Melba Goodman, the prosecutor stated that he struck her because he

---

[260]  Exhibit 5 at 15.

perceived an underlying reservation with the death penalty.  He stated that she "reluctantly agree[d] that capital punishment for police officers should be available." The record of her voir dire supports such a perception.  Goodman indicated that she believed "killing a person, to me, would be killing a person, whether they were a police officer or just a regular citizen." After the prosecutor explained to her several times that the law provided that killing a police officer was a capital offense while killing a "regular citizen" was not, Goodman continued to waffle on her stance as to whether she could follow the law or not.  She finally stated that she did not have "a problem" with the fact that killing a police officer is a capital offense.  The record supports the prosecutor's explanation for striking Goodman.[261]

However, the voir dire of Ms. Goodman does not bear this out.  There were some initial questions about her attitude toward the death penalty, and Ms. Goodman stated that she thought blacks were more likely to be tried and sent to prison than whites, and that the administration of the death penalty may not be race-neutral in Harris county.  9 RR 174-176.  But she stated that she would not make a judgment in this case based on race.  9 RR 177.  She also stated that in serious crimes, the death penalty might be a deterrent and might be justified.  9 RR 178.  In fact this prospective juror was quite clear about her views on capital punishment: "I believe that the killing of any person, with the other circumstances, you know, premeditate or whatever, not only which includes, yes, a police officer, is a...is a capital crime." 9 RR 183.  The record reflects that Ms. Goodman answered a number of specific questions about capital punishment. 9 RR 182-185.  She had no problem with the fact that the killing of a police officer was a capital crime. 9 RR 184.  Ms. Goodman also stated that she could answer the special issues as the facts indicated. 9 RR 189-190.  In fact she was quite clear as to her answer, with no reluctance expressed:

---

[261] Exhibit 5 at 15-16.

Q. If you don't find mitigation, what's going to happen to the defendant?  A.  He will receive the death penalty."  9 RR 192.

Further questioning only reinforced this:

Q. Okay.  Can you assure Mr. Vinson and myself that if we present a case to you, and you're convinced beyond a reasonable doubt that the defendant is guilty, you'll find him guilty?

A. Yes.

Q. And if we show you, further, that there is no...that the defendant is a future threat to society, would you be able to say so?

A. Yes.

Q.  And if we show you further that there is no mitigating circumstance to avoid imposing the death penalty, would you be able to say so?

A. Yes.

Q. And you's be able to do it even with this defendant...

A. Yes.

Q....this young looking man?  Okay.  You could do that.  Wouldn't harm your conscience, anything like that?

A. No, if I felt that the circumstances warrant it.

(9 RR 192).

However, the State accepted Michael Bonnin, who eventually sat on Petitioner's jury. 3 Tr. 537. Mr. Bonnin stated that he did not believe in the death penalty in some circumstances.

-235-

6 RR 137.  Sharon Malazzo, who also eventually sat on Petitioner's jury, stated that she could

consider that a sentence of probation would be an option in a homicide case.  10 RR 296.

**Claim II(c):  Petitioner was deprived of a fair trial by the prosecution's use of a racially-based challenge to exclude L.V. McQueen from his jury.**

The state court's holding as to this claim was the following:

> The prosecutor explained that he struck L.V. McQueen because his responses and demeanor indicated that he was "weak" on the death penalty and that there were some cases in which he could not impose the death penalty even if the law permitted it.  The record supports this contention.  McQueen stated that the 40-year minimum term before becoming parole eligible was "an extremely long time" and that anybody who takes someone else's life "should have to pay," but not necessarily with his own life.  The trial court's acceptance of the State's explanation was not clearly erroneous.[262]

Yet in examining Mr. McQueen's voir dire, we find virtually no evidence to buttress the

allegedly race-neutral exclusion of this prospective juror.  Mr. McQueen, far from being "weak"

on the death penalty, stated he wouldn't have a problem with imposing the death penalty on Mr.

Haynes: "No, I don't think I have a problem with it.  If you present your case and I find that all

that's within a shadow of a doubt, or reasonable doubt that he's guilty, I wouldn't [have a

problem returning a death verdict]."  14 RR 61.  In fact, this prospective juror, when asked if

he was the governor of a state that did not have the death penalty, testified that he would sign

a bill putting the death penalty on the books in that state.  14 RR 70-71.  He felt that the prison

system did not rehabilitate prisoners, which would not have been favorable for the defense

seeking a life sentence.  14 RR 69.  He also stated that the death penalty does serve a purpose

---

[262]   Exhibit 5 at 16.

-236-

in our society, to make people "think a little bit harder before committing a real violent crime." 14 RR 71. One searches in vain for anything to back up the State's contention that Mr. McQueen was 'weak' on the death penalty, but there is much in the record to indicate the exact opposite. Many other jurors who were accepted onto Mr. Haynes jury also felt that 40 years was a long time (*e.g.* Claire Sebesta, 12 RR 65; Sarah Taylor, who also eventually sat on Petitioner's jury, also found that 40 years was a significant punishment for capital murder. 13 RR 72.).[263] The entire rationale for excluding this juror was pretextual, and, looking at his entire voir dire (14 RR 53-82) it can be seen that the state court's ruling was clearly erroneous.

In contrast, the State accepted white juror Michael Bonnin, who eventually sat on Petitioner's jury. 3 Tr. 537. Mr. Bonnin stated that he did not believe in the death penalty in some circumstances. 6 RR 137. Sharon Malazzo, who eventually sat on Petitioner's jury, stated that she could consider a sentence of probation would be an option in a homicide case. 10 RR 296.

**Claim II(d)**:  **Petitioner was deprived of a fair trial by the prosecution's use of a racially-based challenge to exclude B. Owens from his jury.**

The state court denied this claim as follows:

Finally, as to B. Owens, the prosecutor explained that he struck her because she had a "somewhat humorous" demeanor and "never really did take on a serious attitude during the interview." The prosecutor stated that Owens "would say one thing but her body language would indicate that this is not her true feeling." The record does reflect that

---

[263]  Yet Ms. Claire Sebesta, who eventually sat on Petitioner's jury, also found that a sentence of 40 years for a capital murder was an appropriate punishment. 12 RR 65. Sarah Taylor, who also eventually sat on Petitioner's jury, also found that 40 years was a significant punishment for capital murder. 13 RR 72.

-237-

Owens was congenial and easygoing during voir dire and that her attitude was less formal than that of other veniremembers. The trial judge's acceptance of the State's explanation was not clearly erroneous. These points of error are overruled.[264]

The record does not bear out this conclusion. First of all, the state court erred in calling this reason "race neutral" because it was based entirely on personal and visual observations of the prosecutor and as the judge ruling on the objections (Judge Wallace) was not the judge present at the voir dire (Judge Harper) so Judge Harper had no way of telling whether the prosecution's rationale was based in fact or not.[265]  This factor alone is sufficient for this Court to hold that the state court's holding is erroneous.

Other than being somewhat more talkative than some other venire members, and answering more fully, this explanation is a prime example of what the *Miller-El* court held to be pretextual, as being "congenial and easygoing" and having a "less formal attitude" had no bearing on her ability to be a juror in this matter and posed no prosecution-specific impediment to her so acting.  The state court's rationale was also erroneous because if the prosecution were allowed to posit as a valid reason for a challenge a randomly chosen distinctive feature of a venireperson's voir dire, the entire *Batson* rationale would become meaningless.  A "congenial and easygoing" and "less formal" attitude are irrelevant.  The record reflects this potential juror did not favor either side in her comments, nor were her answers shaded toward either side.  In fact, this potential juror gave some answers that could have been considered very pro-prosecution.  She stated on her questionnaire that she felt that every person who commits

---

[264]   Exhibit 5 at 14-16

[265]   *See* 22 RR 13-20 for a fuller discussion of this; and Exhibit 4 at 79.

-238-

murder should pay with his own life. 18 RR 254. She had absolutely no opposition to capital punishment. 18 RR 231. Ms. Owens also stated that people accused of murder should be treated differently than people accused of other crimes. 18 RR 246.

In fact, the most significant factor that the voir dire of this potential juror is that it shows how the prosecutor questioned African-Americans very differently than the non-African-American jurors and asked them questions that could not be answered with just short "yes" or "no" answers, as with the white jurors. 18 RR 226- 254.[266] A cursory examination of the other non-black venirepersons and those who were ultimately seated on Mr. Haynes's jury will show that their questioning by the prosecution rarely allowed them to answer in anything but short affirmances or denials, and that their questioning was more directed toward educating them about the law than in probing for their possible disqualification. Typical questioning of the non-African-Americans who sat on Petitioner's jury shows lengthy, page-long and more questions, which nominally sought "yes" or "no" answers, but whose real purpose was to educate the jurors on the State's position. This disparity in questioning alone, ignored by the state court, should weigh heavily on the side of finding purposeful race-based motives in the prosecution's disqualification of this potential juror and the others.

---

[266] For instance, some of the prosecution's questions to Ms. Owens were: "How would that impact on your ability to sit and concentrate on evidence and testimony" (18 RR 228); "How would you deal with that;" "How could you do something like that?" (18 RR 233); "How does that corelate there, if it does?" (18 RR 234); "What did you use to make that determination?" (18 RR 244); "What's your posture ma'am?" (18 RR 250). These questions, and many more like them, were dramatically different from the prosecutor's questioning of white prospective jurors, which usually consisted of long narratives lasting a page or more of transcript, to which the juror was usually just perfunctorily asked to confirm or deny.

-239-

**Claim II(e): The cumulative effect of these strikes deprived Petitioner of due process and a fair trial.**

In summary, it is clear that the trial court failed to scrutinize the State's "race neutral" explanations for their exercise of peremptory challenges against veniremembers Kirkling, Goodman, McQueen and Owens.  Had the court properly analyzed these "explanations" it would have found that the "facts" ascribed to the veniremembers by the prosecution were unfounded and unsubstantiated by the record.  This meets the "clearly erroneous" standard of *Batson* and *Miller-El.*

As discussed above, the Equal Protection Clause to the United States Constitution prohibits purposeful discrimination in jury selection on the basis of race. (*Batson v. Kentucky, supra,* 476 U.S. at 85-86) or the assumption that an individual will be biased in a particular case for no reason other than his or her race, *Batson,* 476 U.S. at 97-98.  In *Powers v. Ohio,* 499 U.S. 400, 111 S. Ct. 1364 (1991) the Court stated:

> For over a century, this Court has been unyielding in its protection of the laws when tried before a jury from which members of his or her race have been excluded by the state's purposeful conduct...Although a defendant has no right to a petit jury composed in whole or in part of persons of the defendant's own race, he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria.
> *Id.,* 111 S. Ct. at 1367.

A serious departure from the Supreme Court's Equal Protection jurisprudence – as well as that of most Circuits – was the Texas Court of Criminal Appeals's failure to follow *Batson*'s mandate to consider the "totality of the evidence."  Each individual juror was considered individually, and the damning statistics regarding the percentage of blacks excluded and the percentage challenged never entered into the equation. The CCA ignored Mr. Haynes's *prima*

-240-

*facie* statistical case (the number and percentage of blacks excluded)  in assessing the prosecution's race-neutral reasons and deciding the ultimate question.

After refusing to consider the *prima facie* case, the CCA rubber-stamped the purportedly race-neutral reasons advanced by the prosecution at trial. But that analysis, taken virtually verbatim from the prosecution's trial statements,  did not comport with the record and at least in some cases, the reason proffered and accepted by the CCA was facially incorrect.  It is clear that the trial judge, having not presided over the individual voir dire process of the prospective venire, abdicated his position of judicial impartiality by fully accepting the State's explanations for their strikes against the prospective minority veniremembers. The CCA did not even examine  the disparate questioning of African-American jurors.  Taken cumulatively, as well as individually, the exclusion of these jurors violated *Batson* and *Miller-El* and deprived petitioner of a fair trial.

**The state courts decision here, if allowed to stand, will effectively insulate discriminatory practices from review even if there is overwhelming evidence of prosecutorial bias.**

Deciding the ultimate issue of discrimination is "sensitive and difficult."[267] The Supreme Court has warned lower courts against distorting the three-step burden-shifting inquiry – a "sensible, orderly way to evaluate evidence [of discrimination] in light of common experience" – by applying it in a "rigid, mechanical, or ritualistic" way.[268] The state courts in Mr. Haynes's

---

[267] *United States Post. Serv. v. Aikens*, 460 U.S. 711, 716 (1983).

[268] *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978); *see also Aikens*, 460 U.S. at 716 (noting that excessive focus on procedural structure makes inquiry into the actor's state of mind "even more difficult" than it already is).

-241-

case did not heed this warning. The lower courts erroneously proceeded on the assumption that the *prima facie* case "drops out of the picture" *for all purposes* once the State advances race-neutral reasons for its peremptory challenges.

In fact, the *prima facie* case is relevant to the issue of whether the prosecutor's proffered race-neutral reasons withstand scrutiny at the third phase of the *Batson* inquiry. The strength of the *prima facie* case helps determine the level of scrutiny to be applied to the proffered race-neutral reasons. Thus, an actor who stands indicted by a particularly formidable *prima facie* case will face greater scrutiny during the third, determinative stage, at which a court will weigh the totality of the evidence.

A *Batson* claim is an individual-instance claim, and the burden of proof therefore never shifts to the prosecution no matter how strong the *prima facie* case. However, as the discussion above shows, a court must subject the prosecutor's strike reasons to more searching scrutiny at the *third* stage of the *Batson* inquiry when the defendant has proven a "pattern and practice" of racial discrimination at the first stage. This requirement is not only in harmony with the three-step procedure set out under *Batson*, it is actually part of it. *See Purkett v. Elem*, 514 U.S. 765, at 768 (1995) (noting that the third step of the *Batson* inquiry is the proper time to evaluate the "persuasiveness" of the prosecution's proffered race-neutral reasons and, in light of the record as a whole, determine the ultimate issue of whether the defendant has carried his burden of proving discrimination).

If a *prima facie* case such as Mr. Haynes's can be defeated by an unconvincing race-neutral explanation, it is difficult to imagine how *any* defendant could prevail in a *Batson*

challenge, short of extracting a confession of discriminatory intent from the prosecutor. The decision of the state court severely damages a powerful incentive to comply with constitutional standards, and can thus only be regarded as a setback in the struggle to rid the American criminal justice system of racial discrimination.

### Conclusion

This Court should grant relief on this claim not only to ensure meaningful and uniform enforcement of constitutional guarantees, but also to prevent the unseemly spectacle of an inmate being denied a fair trial – and being executed – after a trial so obviously tainted by intentional racial discrimination.

## CLAIM III: PETITIONER IS ACTUALLY INNOCENT OF CAPITAL MURDER BECAUSE THE RECORD FAILS TO SHOW THAT THE VICTIM WAS ACTING IN HIS OFFICIAL DUTY AS A POLICE OFFICER AT THE TIME OF HIS SHOOTING.

### A. Facts in Support of Claim.

A person commits the offense of capital murder where, inter alia, he commits murder as defined under Tex. Penal Code Ann. Sec. 19.02 (b)(1), *and* the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman. Tex. Penal Code Ann. Sec. 19.03(a)(1) (Vernon 1994). The evidence in the instant case was insufficient, as a matter of federal constitutional law, to support

-243-

Petitioner's conviction for capital murder, as the State failed to prove that the victim was killed while acting in his official duty as a peace officer, as alleged in the indictment. The state court's holding that the evidence was sufficient "resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under Section 2254(d)(1) of AEDPA. Petitioner hereby incorporates by reference the statement of facts, *supra.*

In addition, the Court The Court gave the following erroneous instruction:

"It is the duty of every peace officer to preserve the peace within its jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case where he is authorized by the provisions of this code interfere without warrant to prevent..." 27 RR 7. The defense objected to this charge, as it limited the duties to the Code of Criminal Procedure and omitted the general rules and orders of the Houston Police Department which the defense introduced as exhibits. 27 RR 8. Had the jury been given the proper standard, they would not have found that the officer was acting withing his official duties.

**B. Argument.**

The State is required to prove each essential averment or element of an offence as alleged in the indictment. *Doyle v. State,* 661 S.W.2d 726 (Tex. Crim. App. 1983); *Tew v. State,* 551 S.W.2d 375 (Tex. Crim. App. 1977). The indictment returned against Petitioner alleged, in part, that he:

> in Harris County, Texas, ANTHONY CARDELL HAYNES, HEREAFTER STYLED THE Defendant, on or about May 22, 1998, did then and there unlawfully, intentionally and knowingly cause the death of KENT KINCAID, hereinafter styled the Complainant,

a PEACE OFFICER in the lawful discharge of an official duty, by SHOOTING
COMPLAINANT WITH A DEADLY WEAPON, A FIREARM, knowing at the time
that the Complainant was a PEACE OFFICER.
(1 CR 7)

Thus the State was required to prove not only that the complainant was a peace officer,

but that the complainant was killed while discharging an official duty..

In the instant case, the only evidence presented by the State that the complainant was

acting in his official capacity as a peace officer at the time that he was killed was advanced via

two principal sources: testimony by the complainant's wife that the complainant had identified

himself as a police officer shortly before he was shot (23 RR 118) and by the testimony of

Jeraldine Stewart that an off-duty Houston Police Officer would be required to investigate a

breach of the peace such as the circumstances surrounding the damage to complainant's

windshield which allegedly occurred in the underlying case immediately prior to the death of

the officer.[269]

The probative nature of this evidence, the testimony of Stewart and Mrs. Kincaid,

respectively, derived from the fact that at first blush it seemed a logical explanation for the

complainant's actions.  Thus, it would appear that the only reason that the complainant stopped

Petitioner's vehicle immediately prior to his death was to conduct a police investigation of the

facts and circumstances which resulted in the damage to complainant's windshield.

However, a more plausible inference from the evidence is raised by the application of

---

[269]  Mrs. Kincaid testified that the complainant was reaching into his back pocket at the
time of the shooting.  23 RR 119.  Thus, an inference was made that the complainant was
reaching into his pocket for his badge in order to display it and properly identify himself to
Petitioner.

-245-

Tex. Transp. Code Ann. Secs. 550.022 and 550.023 (Vernon 1999). When a motorist is involved in a traffic accident wherein property damage occurs, a motorist is required to stop and exchange certain information. *Id.* While the statute obviously applies to the motorist causing the damage, the literal text of the statute does not distinguish between a motorist who has caused an accident and a motorist whose vehicle has been damaged by another. In the instant case, the record fails to refute any reasonable inference that the complainant was not obeying the requirements of Sec. 550.022 and 550-023 of the Transportation Code. Following an accident involving damage to his vehicle.

In addition, there is evidence that the complainant was not acting in his official capacity as a police officer at the time of the shooting. Jeraldine Stewart testified that under the general orders of the HPD, off-duty officers such as the complainant were directed not to effect arrests unless a breach of the peace or serious was imminent. 25 RR 100-102. There is nothing in the record to suggest that complainant thought that a breach of the peace was imminent. The record, at best, supports a finding that the complainant was attempting to exchange information with petitioner, as required by law.

The State's theory was that the complainant, while on the way to a bar in civilian clothes and his personal unmarked vehicle, suddenly switched to on-duty status and either attempted to investigate the incident or attempted an arrest of Petitioner while his wife was in his vehicle. This is far less plausible than the foregoing.

Equally probative, the autopsy report listed the complainant's status as "off-duty," a sign that only later, when the case was charged as a capital offense, did the State attempt to portray

-246-

the complainant as "on duty."[270] Sgt. Kincaid's autopsy, on the first page of the "Harris County Medical Examiner Investigator Report," in the space labeled "comment/description" reads "GSW [gun-shot wound] to head–Police Ofc. Off duty."[271]   Page 4 of the same report has the notation that "according to HCSO [Harris County Sheriff's Office] Hom[icide]  . Det.Wedgeworth,...this dec.[edent] is an HPD Ofc. Who was off duty at the time of the incident."[272] This evidence is much more probative of the fact that the officer was off-duty than the year-later opinions of Assistant Chief. Stewart, who had an obvious motive to make it appear as if the officer was on duty.[273]   However, her testimony that if Officer Kincaid was "off-duty" at the time of his death, as the CCA held[274], then he also was not acting within his official capacities and hence Mr. Haynes could not have been guilty of capital murder. The CCA's acceptance that he was "off-duty" leaves the factual basis of their conclusion without support.

The State bears the burden of proof requiring each and every element of the offense. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970); *Apprendi v. New Jersey,* 120 S. Ct. 2348 (2000). *See also* Tex. Penal Code. Ann. Sec. 2.01 (Vernon 1994).  Proof beyond a reasonable

---

[270]   *See* autopsy report of Kent Kincaid, Exhibit 10.  The CCA accepted the fact that the officer was "off-duty" at the time of his death.  Exhibit 5 at 3.

[271]   *Id.*

[272]   *Id.*

[273]   Petitioner requested investigative funds to investigate this exhausted claim, and others, but was denied any funding.  Due to this lack of funding, Petitioner was unable to further investigate this claim.  Had funds been available, Petitioner would have continued the investigation further.

[274]   Exhibit 5 at 3, opinion on direct appeal.

-247-

doubt requires that the State produce evidence showing something more than a strong suspicion of the guilt of the accused, and this standard of "proof beyond a reasonable doubt" is a federal constitutional one, guaranteed by a citizen's federal constitutional right to due process of law. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

In reviewing the sufficiency of the evidence to support a criminal conviction on appeal, the court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, supra,* 443 U.S. at 319. The *Jackson* standard was established to ensure that innocent persons would not be convicted. "The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence." *Jackson,* 443 U.S. at 323, 99 S. Ct. at 2791.

Here, a rational trier of fact could not have found, beyond a reasonable doubt that the complainant was killed while discharging an official duty as a police officer, as alleged in the indictment. Additionally, the state court's finding denying this point of error on direct appeal "resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under Section 2254(d)(1) of AEDPA. Petitioner is entitled to relief on this claim.

**CLAIM IV:   TRIAL COUNSEL'S DEFICIENT PERFORMANCE IN NOT PRESENTING A VIABLE DEFENSE SHOWING PETITIONER'S ACTUAL INNOCENCE AS A RESULT OF HIS DRUG USE AT THE TIME OF THE CRIME**

**CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL AND DEPRIVED PETITIONER OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

### A. Facts in Support of Claim.

Petitioner incorporates herein by reference the facts, argument and references from the preceding claims.

As discussed in Claim I, Mr. Haynes, on the night of the shooting, was under the influence of the stimulant crystal methamphetamine. Mr. Haynes used heavy amounts of the drug up to and including the day of the incident. Methamphetamine, particularly in its more potent crystal form, had well-documented effects on Mr. Haynes's behavior. He was described as hyperactive, acting "weird," and unable to sleep at the time of the offense. He had impairments in his ability to attend and concentrate. The drug exacerbated the effect of his already-diagnosed Attention Deficit Hyperactivity Disorder. Stimulants are also frequently the drug of choice in the self-treatment of depression, clearly what he was undergoing upon his failure in the BOOST Program.

Methamphetamine intoxication is characterized by maladaptive psychological and behavioral changes. Judgment is impaired and there may be sudden changes in mood, irritability, hypervigilance, hyperactivity, heightened sensitivity, tension and anxiety. The initial stage usually begins with a sense of euphoria. Despite the impairments in judgment, the individual often feels more confident and can be more talkative and outgoing. All aspects of the immediate environment take on intensified qualities but usually there are no hallucinatory

-249-

perceptual distortions. At higher doses there are typically repetitive and stereotypic behaviors — continually repetitive acts that serve no apparent purpose. There are also concomitant physiological signs or symptoms of intoxication. They include such things as increased or slowed heart rate, elevated or lowered blood pressure, pupillary dilation, psychomotor agitation or retardation. There can also be nausea, vomiting, chills, weight loss, chest pain and cardiac arrhythmias, seizures, confusion or coma. The extent to which any user exhibits these manifestations depends on the individual characteristics of the user. Relevant factors are the rate of absorption, the individual tolerance for the drug, and the chronicity of use.[275]

High-dose amphetamine abuse can lead to what is referred to as an amphetamine psychosis. The individual develops paranoid ideation usually accompanied by perceptions that benign activities are threatening in some way (ideas of reference) and the development of a well-formed delusional system. The paranoid system is reinforced by the hypervigilant awareness of the environment and is exacerbated by the ensuing isolation as the individual withdraws. In later stages rather than the intense and suspicious observation of others, the user becomes convinced that others are watching or following him. With continued consumption the individual can lose all insight and develop extremely well-formed delusions of persecution. Episodes of violence have occurred in that state, as happened here. There is evidence from the record that Mr. Haynes's amphetamine use on the days preceding the crime resulted in psychotic episodes.

This evidence of methamphetamine abuse at the time of the crime would have been

---

[275] *See* Exhibit 28 on effects of methamphetamine.

relevant to the culpable mental states of malice, premeditation, intent to kill, knowledge of the victim as a police officer, and intent to rob the alleged earlier victims. It would also have been relevant to the defenses of voluntary intoxication, involuntary intoxication, imperfect self-defense, and diminished actuality.[276]

With respect to the guilt phase, the affidavit of Dr. Mark Cunningham identifies two major areas of deficiency in the defense investigation, preparation and presentation: attacks on the prosecution's case in chief and affirmative testimony relating to Mr. Haynes's drug intoxication and mental impairments at the time of the crime. Mr. Haynes's counsel did not adequately investigate and pursue *either* strategy. No reasonable tactical choice justified counsel's failure to investigate adequately, so the failure to investigate amounted to ineffective assistance in violation of the Constitution. *See Seidel v. Merkle,* 146 F.3d 750, 756-57 (9th Cir. 1998).

As a result of the acts and omissions of counsel, the jury's guilt and special issues determinations were based on incomplete, misleading, and unreliable evidence. Had these acts and omissions not occurred, there is a reasonable probability that the jury would not have found Mr. Haynes guilty of all counts as charged and would not have found the special issues to be true.

Each of the acts and omissions of counsel described in this claim fell below an objective standard of reasonableness and was without legitimate strategic purpose. To the extent that trial counsel's actions and omissions were the product of purported strategic and or tactical decisions, such decisions were based upon inadequate and unreasonable investigation, discovery and

---

[276] *Id.*

-251-

consultation with trained independent experts and therefore were not reasonable, rational or informed. But for counsel's unreasonable acts and omissions, individually and collectively, there is a reasonable probability that a result more favorable to Mr. Haynes would have occurred at the trial.

### B. Argument in Support of Claim.

### 1. General Principles.

Every crime has as an element its own distinctive *mens rea*. TEX. PENAL CODE § 6.02; *see* JEROME HALL, GENERAL PRINCIPLES OF CRIMINAL LAW 142 (1960). The State is constitutionally required to prove beyond a reasonable doubt every element of the crime with which a defendant is charged. *In re Winship*, 397 U.S. 358, 364 (1970); *Apprendi v. New Jersey,* 120 S. Ct. 2348 (2000). Due process and the Compulsory Process Clause of the Sixth Amendment require that a defendant be allowed to introduce testimony relevant to the State's proof. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Washington v. Texas*, 388 U.S. 14 (1967). Trial counsel's failure to present Petitioner's counsels' abandonment of his only defense prejudiced him by denying him a fundamentally fair trial.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court recognized a criminal defendant's Sixth Amendment right to effective assistance of counsel. The Court stated:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge

-252-

> is necessary to accord defendants the ample opportunity to meet the case of the
> prosecution to which they are entitled.

*Strickland*, 466 U.S. at 685 (internal citations and quotation marks omitted).  A defendant

claiming ineffective assistance of counsel must show that (1) counsel's performance was

deficient, falling below an "objective standard of reasonableness," and (2) the deficient

performance prejudiced the defense.  *Id.* at 687; *see Bryant v. Scott*, 28 F.3d 1411 (5th Cir.

1994); *Vela v. Estelle*, 708 F.2d 954, 963-64 (5th Cir. 1983), *cert. denied*, 464 U.S. 1053 (1984).

Trial counsel failed to ensure that Mr. Haynes's trial was a genuine adversary contest.  As there

is certainly a "reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different," *Strickland*, 466 U.S. at 694, Mr. Haynes is entitled

to habeas relief.

> While *Strickland* holds that courts must give deference to counsel's strategic
> decisions, such deference is due only when counsel has first fulfilled his duty to
> make "reasonable investigations" or "a reasonable decision that makes particular
> investigations unnecessary." *Strickland*, 466 U.S. at 690-91.  Counsel's function
> . . . is to make the adversarial testimony process work in the particular case.
> Because that testing process generally will not function properly unless defense
> counsel has done some investigation into the prosecution's case and into various
> defense strategies, . . . counsel has a duty to make reasonable investigations or to
> make a reasonable decision that makes particular investigations unnecessary.

*Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (internal citations and quotation marks

omitted).  Although the courts give great deference to *informed* strategic choices, they "closely

scrutinize an attorney's preparatory activities." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir.

1993) (citing *Chambers v. Amrontrout*, 907 F.2d 825, 831, 835 (8th Cir.) (en banc), *cert. denied*,

498 U.S. 950 (1990)).  "An attorney's strategic choices made after less than complete

-253-

investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Foster*, 9 F.3d at 726 (quoting *Strickland*, 466 U.S. at 690-91).

### 2.    Counsel's performance was deficient.[277]

To function effectively as "counsel" contemplated by the Sixth Amendment, defense counsel must familiarize himself with the legal definitions and rules that will foreseeably govern significant portions of the trial. *See, e.g., Burley v. Cabana*, 818 F.2d 414, 417 (5th Cir. 1987) (counsel ineffective for failure to adequately investigate sentencing law applicable to client); *Martinez-Macias v. Collins*, 810 F. Supp. 782 (W.D. Tex. 1991) (counsel ineffective for making significant trial decisions based on mistaken understanding of other-crimes evidence caused by inadequate preparation), *aff'd*, 979 F.2d 1067 (5th Cir. 1992); *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir. 1983) (counsel must familiarize self with "elementary . . . blackletter rules of procedure"), *cert. denied*, 464 U.S. 1053 (1984).

Clearly, Mr. Haynes had a defense that could have raised a reasonable doubt on the self-defense issue, and the only way to present that testimony was through Mr. Haynes himself.

The profound and pervasive performance failure of Petitioner's trial counsel to present this defense, as well as those detailed in Claim I, were prejudicial and denied him "the counsel guaranteed by the Sixth Amendment," as per the mandate of *Strickland v. Washington*, 466 U.S. 668, 686 (1984) because Petitioner was deprived of "a trial whose result [was] reliable." *Id.*

---

[277]  Petitioner herein incorporates by reference the facts and legal argument from Claim I, *supra.*

at 687. Counsel's failure to present a viable defense by calling Mr. Haynes as a witness produced no conceivable benefit to the defense.

### 3. Counsel's deficient performance was prejudicial.

The harm from counsel's ineffective assistance of his duties was incalculably prejudicial. The very essence of the defenses role is to present the defendant's story to the jury if it can raise a doubt in the minds of the jurors.

Counsel's performance fell well below a minimal standard of competence, and significantly harmed his client. Had counsel performed effectively, the jury would have heard the true facts about the victim, facts that would have leant credibility to the claim of self-defense. Not hearing that version was inherently prejudicial. Counsel's performance undermines confidence in the outcome of the trial. *Strickland*, 668 U.S. at 694.

Petitioner was prejudiced because trial counsel, unprofessionally, and unreasonably failed to present this defense, precluding reliance upon a plausible alternative defensive theory that was supported by credible witnesses. See *Whitley*, 977 F.2d at 158-59 & nn. 21-22; *Profitt*, 831 F.2d at 1249; *Lyons v. McCotter*, 770 F.2d 529, 534-35 (5th Cir. 1985) *(Strickland* does not require deference when there is no conceivable strategic purpose that would explain counsel's conduct).

Failure to present a viable defense is clearly a Sixth Amendment violation when it undermines confidence in the outcome. In light of the wealth of evidence that could have been presented on Petitioner's claim of self-defense, had these witnesses been presented by trial counsel, confidence in the verdicts is undermined. Unequivocally, therefore, under fundamental

-255-

and basic law establishing the standard of care and the duty to investigate, by failing to conduct an independent investigation, trial counsel based their entire defense, indeed their fundamental approach to the defense of this case, upon uninformed, non-strategic "preparatory choices" in the language of the court in *Foster v. Lockhart, supra.* As that court said, "*an attorney's preparatory choices,*" are subject to "close[] scrutin[y]" *Id.* at 726.

When subjected to close scrutiny, the preparatory choices by Petitioner's trial counsel demonstrate the prejudice that resulted and how Petitioner was denied a fair trial and a reliable outcome. Trial counsel's omissions acted individually and collectively to deny him the effective assistance of counsel and a fair determination of his guilt and punishment. "[T]he touchstone of an ineffective assistance claim is the fairness of the adversary proceeding." *Lockhart v. Fretwell,* 113 S. Ct. 838, 843 (1993); *Nix v. Whiteside,* 475 U.S. 157, 175 (1986). The "defendant has no entitlement to the luck of a lawless decision maker." *Strickland, supra,* at 695. Because the focus of an inquiry into effective assistance of counsel has to be on whether counsel's errors "so upset the adversarial balance between defense and prosecution" that "the result of the proceeding was fundamentally unfair or unreliable," *Lockhart, supra* at 842, and because Petitioner has proved that he received ineffective assistance of counsel because he has shown that counsels' performance was professionally deficient in not presenting a viable defense, and that he suffered prejudice, i.e., that "counsel's errors were so serious as to deprive [him] of a fair trial," (*Id.* quoting *Strickland, supra* at 687), Petitioner's conviction for capital murder and his death sentence must be set aside and a new trial with competent counsel should be ordered upon remand from this court.

-256-

This Court should, at the very least, (1) to hold an evidentiary hearing to permit him to fully develop the facts of this claim in order to demonstrate that he is entitled to habeas relief, or (2) remand Petitioner's case for a hearing in state court, or (3) remand to state court with instructions to hold a new sentencing hearing or reform the sentence to a life sentence because trial counsels' unprofessional and deficient failure to investigate or present a defense at guilt / innocence resulted in prejudice to Petitioner.

**CLAIM V: PETITIONER WAS DEPRIVED OF HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THE JUDGE WHO RULED ON HIS *BATSON* MOTION WAS NOT THE JUDGE WHO WAS PRESENT DURING THE *VOIR DIRE.***

Petitioner was deprived of due process and his right to a fair trial when, over objection, Judge Wallace ruled on the *Batson* motion, but did not preside at the *voir dire* of the prospective jurors. This deprived Petitioner of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

**A. Facts in Support.**

Petitioner hereby incorporates by reference the factual summary from the prior *Batson* claim (Claim II). Counsel for Petitioner objected to Judge Wallace ruling on the *Batson* motion, as recounted in that claim's factual summary. *See, e.g.,* 22 RR 16.

-257-

## B. Argument.

Petitioner hereby incorporates by reference the argument from the prior *Batson* claim. In Claim II, Petitioner argued that the trial court erred in concluding that the State exercised its challenges to four African-Americans in a race-neutral manner and that the CCA's upholding of the trial court's ruling was erroneous. In Claim II, Petitioner argued that one factor that this Court can look to is the fact that the judge that ruled on the *Batson* motion was not the judge who observed the prospective jurors during *voir dire,* and hence he was not in a position to judge their demeanor, responses and the validity of the prosecution's proffered "race neutral" explanations for the strikes. In that claim, Petitioner also argued that the trial judge, having not presided over the individual voir dire process of the prospective venire, abdicated his position of judicial impartiality by fully accepting the State's explanations for their strikes against the prospective minority veniremembers.

No "deference" can be given to the trial court's findings of racial neutrality in the state's exercise of peremptory strikes as the trial judge was not qualified to preside over the *Batson* hearing with "healthy skepticism." *Daniels v. State,* 768 S.W.2d 314, 317 (Tex. App. Tyler 1988). Judge Wallace could not have observed the demeanor of the venire members, their body language, responses, attitudes, and characteristics, and he could not access or scrutinize the veracity of the prosecutor's explanations and observations regarding the reasons for the strikes. Thus, Judge Wallace merely accepted all of the prosecution's explanations at face value, without even referring to the record, which contradicted them. A trial court's determination of a *Batson* challenge must necessarily be based upon the facial validity of the prosecutor's explanation in

-258-

light of the trial court's direct evaluation of the venire, their respective statements, responses and demeanor.

The state courts have recognized both implicitly and explicitly that the trial judge must have witnessed the actual voir dire in order to judge the validity and credibility of the prosecutor's "race-neutral" explanations upon a *Batson* challenge. *Ramirez v. State,* 862 S.W.2d 648 (Tex. App.-Dallas, 1993)(the trial judge was required to assess both objectively and subjectively the entire voir dire in determining whether the prosecutor's exercise of a peremptory strike was racially motivated); *Moss v. State,* 877 S.W.2d 895 (Tex. App.-Waco, 1994).

Where a trial court accepts all of a prosecutor's explanations at face value, and has no way to independently scrutinize their validity, the trial court abdicates its judicial responsibilities and violates a defendant's rights to due process. The trial courts actions in this case, its decision to preside over the *Batson* hearing, constituted an abdication of its constitutional responsibilities and obligations. The findings of the trial court that the State's exercise of peremptory strikes was racially neutral was invalid, unconstitutional and a violation of due process. *Keeton v. State,* 749 S.W.2d 861, 865 (Tex. Crim. App. 1988). State law in Texas holds that "when the State strikes a juror on a basis that cannot easily or objectively be determined by the reviewing court, the basis must be substantiated by something other than the prosecutor's statement and that something must be on the record." *Yarborough v. State,* 947 S.W.2d 892, 905 (Tex. Crim. App. 1997). Here, the record is silent regarding the demeanor and body language and attitudes of the individual prospective veniremembers. The record is devoid of any testimony or facts

-259-

which support the prosecutor's bald assertions of racial neutrality in the exercise of peremptory strikes.   The trial court's finding of racial neutrality in each case is clearly erroneous, unsupported by the record and unsupported by any of the trial court's own observations.

Based upon its absence from the individual voir dire proceedings, the court here failed to scrutinize the State's "race neutral" explanations for the exercise of peremptory challenges against prospective veniremembers Kirkling, Goodman, McQueen and Owens.   Moreover, the trial court's "inattentiveness" to the State's explanations served to "transform *Batson*'s protection against racial discrimination in jury selection into an illusion and the *Batson* haring into an empty ceremony." *Daniels, supra,* 768 S.W.2d at 317.

The record reflects that Petitioner timely objected to Judge Wallace's hearing of Petitioner's *Batson* motion when he had not been present during the individual voir dire of the prospective minority veniremembers. 22 RR 12-13, 16.   This issue was also brought on direct appeal as Point of Error 30.   Exhibit 4 at 94-99.

The CCA's actions deprived Petitioner of his right to a fair trial and due process of law, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and is directly contrary to the analysis of *Batson, Miller-El* and *Johnson, supra.*

**i) The state court findings as to this claim are not entitled to any presumption of correctness as there was no evidentiary hearing and the state habeas judge that ruled on this claim was not the trial judge that presided over the voir dire.**

The judge that presided over petitioner's trial, Judge Wallace, was not the trial judge for the voir dire, which was presided over by Judge Harper.   A long line of Fifth Circuit cases have consistently refused to accord any deference or presumption of correctness to state court

-260-

findings made without an evidentiary hearing when the state habeas judge was not the trial judge. Additionally, that Court has repeatedly recognized that the existence of *any* exception to the presumption of correctness will entitle a petitioner to both discovery and an evidentiary hearing.

The Fifth Circuit has held that the fact that the state habeas judge was not the trial judge is not a prerequisite to according the presumption of correctness to state court findings. *Carter v. Johnson,* 131 F.3d 452, 460 n. 13 (5th Cir. 1997). But this is only *one* of the factors at play here. The other vital factor is the lack of an evidentiary hearing on disputed factual issues on which the state habeas court made factfindings, so-called "paper hearings."[278] In the circumstances of Mr. Haynes's case, there should be no presumption of correctness to this claim.

A review of the Fifth Circuit's holdings on the appropriateness of "paper hearings" will show that, in the circumstances of the *Batson* claim (this issue and the prior one) they were inadequate and inappropriate, and are not entitled to any presumption of correctness in this Court. The question is broader than merely a focus on credibility determinations by a 'judicial entity' other than the state habeas judge. It involves the circumstances under which a paper hearing is entitled to a presumption of correctness.

In *Sumner v. Mata*, 499 U.S. 539 (1981), it was held that the presumption of correctness

---

[278]   The term "paper hearings" refer to the trial court and the CCA's denial of the *Batson* claims without an evidentiary hearing. These claims concern a portion of the trial (*voir dire*) when there was not an identity of trial and habeas judges, where "paper hearings" have been held to afford no presumption of correctness.

of state court fact-finding only applies to those proceedings that are found to be adequate, and the "presumption of correctness is defeated by a showing that "the fact-finding procedure employed by the state was not adequate to afford a full and fair hearing."" citing *Cabana v. Bullock*, 474 U.S. 376, 399 (1986).[279]

In *Nethery v. Collins*, 993 F.2d 1154 (5th Cir. 1993) the Fifth Circuit again took up the question of whether findings made after a "paper hearing" should be accorded a presumption of correctness. In *Nethery*, the Fifth Circuit held that the state habeas court's finding was not entitled to a presumption of correctness where that court never conducted an evidentiary hearing and adopted in whole the state's proposed findings of fact two days after the petition was filed.

In *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994) the Fifth Circuit again held that "a presumption of correctness will not apply to a state court finding of fact if the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." *Id.*, at 207. Again, in *Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995) the Fifth Circuit again held that "[f]actual findings based solely on a paper hearing are not automatically entitled to a Sec. 2254(d) presumption of correctness." *Id*, at 347.

Thus, time and time again, the Fifth Circuit has held that the major, and not infrequently the only factor in upholding state habeas "paper hearings" is this unity of state trial and habeas

---

[279] One factor highlighting the unfairness of the state court procedures was the state court's verbatim adoption of the state's pleadings. In *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) the Supreme Court stated: "We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Id.*, at 572.

-262-

judge. The fact that this claim was not ruled on by the trial judge who presided over the voir dire is a major reason to not afford a presumption of correctness to the state court's findings as to this issue.

In *Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996), the Fifth Circuit, quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), held that where there is a "factual dispute, [that,] if resolved in the Petitioner's favor, would entitle [her] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing", there is no presumption of correctness. *Id.* at 444. The holding did not require that the petitioner prove the allegations at the pleading stage, but held that they were sufficient to merit an evidentiary hearing.

Even more important for Mr. Haynes's case is the reaffirmation in *Perillo* that "[s]tate court fact-findings are presumed correct only when there has been a full and fair hearing." *Id.*, at 446, citing *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994). In *Perillo*, the decisive factor was the fact that the state habeas judge was different from the trial judge.

In *Salazar v. Johnson*, 96 F.3d 789 (5th Cir. 1996), the Fifth Circuit refused to grant any presumption of correctness to a state court finding when the state judge who presided over Salazar's plea did not conduct the habeas proceeding, and remanded the matter for an evidentiary hearing.

Thus, no presumption of correctness applies to this or the previous claims regarding the *Batson* issue, and Petitioner is entitled to relief.

**CLAIM VI: MR. HAYNES WAS DENIED A FAIR TRIAL AND DUE PROCESS OF**

-263-

LAW BY THE MISCONDUCT OF THE PROSECUTOR.

During Mr. Haynes's trial, numerous improper and prejudicial statements by the prosecutors so infected the proceedings as to make the trial and sentencing phase of that trial fundamentally unfair. These comments and argument denied Mr. Haynes due process of law as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

   **A. Facts in Support:**

**Claim VI(a):** **The prosecutor asked improper and inflammatory questions in order to garner sympathy from the jury.**

   I) In questioning Assistant Chief Stewart of the Houston Police Department on redirect, lead prosecutor Mr. Vinson asked the following:

> Q.  I am having a conversation with you.  I walk up and notice you committed an infraction and I tell you I am a police officer.  Would you expect me to show you some identification?
> A.  Yes, sir, I would.
> Q.  If I am reaching for the identification, would you shoot me?
> MR. NUNNERY: Object to that.
> 23 RR 80.

Although the objection was sustained, the prosecutor's obviously improper question would have had the effect of tainting the jury's view of the crime through presenting an improper hypothesis that was not supported by the evidence.

   ii) This was not an isolated instance. Shortly thereafter, the same prosecutor again asked a similarly inflammatory and obviously improper question of Assistant Chief Stewart:

> Q.  Would it be safe to say that he went off duty permanently the minute he was shot in the head?
> A.  Yes, sir, on that particular day, yes.
> 23 RR 84.

There was no objection from the defense to this question.

iii) The misconduct continued. The prosecutor asked the victim's widow "[d]id your husband donate his organs?" 23 RR 134. This obviously irrelevant question could have had no purpose except to prejudice the jury against the petitioner. Even though the question was objected to, and the objection sustained, the damage was done.

The prosecutor actually admitted that he was trying to inflame the emotions of the jury and to elicit sympathy for the victim:

> THE COURT: This has nothing to do with the cause of death. This is just to engender sympathy.
> MR. SMYTH: That whole trial is just for that purpose.
> 24 RR 108.

### Claim VI(b): The prosecution failed to provide the defense with a crucial statement allegedly made by petitioner.

The defense filed a motion for discovery before the trial and the motion was granted. 25 RR 92. The motion's scope included any statements made by the defendant to the police or any private citizen whether written or oral. 25 RR 92-93. The defense was not told of Mr. Reece's statement that the defendant had allegedly told him he should also have killed the victim's wife. 25 RR 90-93. The prosecution was made aware of the statement on September 9, 1999, when they re-interviewed Mr. Reece, when they were preparing him to testify. 25 RR 93. The prosecution stated they were not aware of the motion, and that they were not required to divulge the statement as it was not made to a police officer. 25 RR 94. The court stated that it could not see the harm in the violation. 25 RR 95. The defense stated the harm was that they were deprived of an opportunity to interview the witness and ask him about the statement. The

-265-

court replied that the witness was under no obligation to meet with the defense. 25 RR 96. In

the past, he had not spoken with the defense. *Id.* The defense stated that the non-disclosure was

a violation of the discovery motion. 25 RR 96-97.

**Claim VI(c): The prosecution engaged in erroneous argument designed to prejudice the jury.**

The prosecutor gave an incorrect definition of capital murder to the jury. He stated that

> And the things that I would like to point out to you in the charge is what is capital murder. We talked about it to each of you on voir dire. And in this charge it tells you a person commits the offense of capital under if he murders as herein defined as with the intentional and knowing taking of a human life without legal justification or with the intent to do serious bodily injury intentionally commits an act clearly dangerous to human life, that's murder. That's two ways to commit murder. If he commits that kind of a murder or that kind of killing and the person that he murders is a peace officer who is acting in the lawful discharge of an official duty and he knows the person he killed was a peace officer...
> 27 RR 13.

The defense objected on the basis that "only an intentional killing coupled with a police

officer equals capital murder, not doing an act clearly dangerous and knowing it is a peace

officer equals capital murder." 27 RR 13-14. The Court sustained the objection. The

prosecutor then referred to the objection as an "interruption." 27 RR 14.

**Claim VI(d): The prosecutor stated his personal belief in the case.**

The prosecutor committed a serious breach of ethics when he personally vouched for the

State's case. At final argument at the guilt/innocence phase, prosecutor Mr. Vinson stated "I

strongly believe in this case." 27 RR 49. An objection was made by the defense and sustained.

*Id.* The prosecutor then stated, "Ladies and gentlemen, I wouldn't be standing before you if I

didn't believe this defendant committed the offense." *Id.* The defense again objected and was

-266-