IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANTHONY CARDELL HAYNES, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-3424 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Anthony Cardell Haynes ("Haynes"), a Texas death row inmate, filed a federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Docket Entry No. 1)  This action comes before the court on respondent Nathaniel Quarterman's answer and motion for summary judgment.  (Docket Entry No. 10)  After reviewing the pleadings, the record, and the applicable law – particularly the application of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") – the court will deny Haynes' petition and will dismiss this action.  The court will not certify any issue for appellate review.

## I.  Background

At around 10:30 p.m. on May 22, 1998, off-duty Houston Police Department Officer Kent Kincaid and his wife left their home in a private vehicle on their way to meet some friends at a sports bar. As they drove past a truck driven by Haynes, something hit and

cracked the Kincaid's windshield.  Officer Kincaid thought someone threw a rock at his car; Haynes had actually fired a shot at them. Officer Kincaid turned his car around and followed Haynes' vehicle until the two pulled alongside each other.

Officer Kincaid exited his vehicle, approached Haynes who remained sitting in his truck, and said "You hit my window." Haynes replied, "I accidentally threw something at your window." Officer Kincaid said, "I am a police officer.  Let's talk about it."  After asking for Haynes' license, officer Kincaid reached towards his back pocket, presumably to retrieve his police identification.  Haynes lifted up a pistol, shot officer Kincaid in the head, and fled the scene.  Officer Kincaid died a few hours later.

The police soon arrested Haynes.  Haynes confessed to officer Kincaid's murder.  The State of Texas charged Haynes with the capital murder of a peace officer who was "acting in the lawful discharge of an official duty[.]"  TEX. PENAL CODE § 19.03(a)(1).  A jury convicted Haynes of capital murder.[1]  After a separate punishment hearing, the jury answered Texas's special issues in a manner requiring the imposition of a death sentence.[2]  Haynes

_____

[1]    Two attorneys, Allen Nunnery and Robert Alton Jones, represented Haynes at trial.  For the most part, this court will refer to them conjunctively as "trial counsel."

[2]    Texas law requires the jury to answer two special issue questions in the penalty phase that determine whether a defendant receives a death sentence.  Here, the trial court instructed the jury as follows:

(continued...)

unsuccessfully sought state appellate and habeas relief from his
conviction and sentence.

This court appointed counsel to represent Haynes throughout
federal habeas review. Haynes filed a lengthy petition raising the
following grounds for relief:

    1.    Trial counsel provided ineffective assistance by
        failing to

        (a)  prepare adequately for and present mitigating
             testimony in the punishment phase of trial;

        (b)  present a coherent mitigation defense;

        (c)  adduce testimony relating to Haynes'
             immaturity;

        (d)  present evidence of Haynes' psychological
             disorders;

        (e)  present accurate information concerning
             Haynes' intellectual ability and school
             performance;

---

[2]    (...continued)

<u>Special Issue No. 1</u>

Do you find from the evidence beyond a reasonable doubt
that there is a probability that the defendant, Anthony
Cardell Haynes, would commit criminal acts of violence
that would constitute a continuing threat to society?

<u>Special Issue No. 2</u>

Do you find from the evidence, taking into consideration
all of the evidence, including the circumstances of the
offense, the defendant's character and background, and
the personal moral culpability of the defendant, Anthony
Cardell Haynes, that there is a sufficient mitigating
circumstance or circumstances to warrant a sentence of
life imprisonment rather than a death sentence be
imposed?

Trans. at 458-59.

(f)   present evidence of Haynes' generational family dysfunction;

(g)   present evidence of problems in the life of Haynes' parents;

(h)   present evidence of Haynes' adolescent psycho-logical disturbances;

(i)   present evidence of Haynes' drug abuse and drug intoxication when he murdered the victim;

(j)   argue satisfactorily that Haynes would not be a future danger;

(k)   respond adequately to the prosecution's future-dangerousness argument;

(l)   present evidence of Haynes' good conduct while incarcerated;

(m)   adduce testimony concerning the low risk of violence that capital inmates present while in prison;

(n)   show the low probability that Haynes himself would act violently in prison;

(o)   review Haynes' mental health records;

(p)   object to the intimidating trial atmosphere;

(q)   present good character evidence;

(r)   present evidence of remorse;

(s)   counter evidence of Haynes' violent threats to others;

(t)   object to speculative testimony;

(u)   allow Haynes to testify in his own behalf;

(w)   object to hearsay statements;

(x)   request an instruction limiting the jury's consideration of the State's victim impact evidence; and

-4-

      (y) provide comprehensively adequate representation.

2. The prosecution used its peremptory challenges in a racially discriminatory manner in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

3. Haynes is actually innocent of capital murder because the victim was not acting in the official course of his duties immediately before the murder.

4. Trial counsel provided ineffective assistance by not fashioning Haynes' drug use around the time of the murder into a defense.

5. The trial court violated his constitutional rights by having a judge who did not oversee the jury selection hear his <u>Batson</u> arguments.

6. The prosecution engaged in constitutionally significant misconduct.

7. The trial court violated his Fourth and Fourteenth Amendment rights by not suppressing his audiotaped statements.

8. The admission of Haynes' audiotaped statements violated his Fifth and Fourteenth Amendment rights.

9. The trial court erred in overruling Haynes' attempts to strike several potential jurors.

10. Haynes' attorney on state habeas review violated his rights to due process and meaningful access to the courts.

11. Texas's "12-10 Rule" violates the Eighth and Fourteenth Amendments.

12. Texas's lethal injection procedure violates the Eighth Amendment.

13. Texas's mitigation special issue violates the Constitution by failing to assign a burden of proof to the prosecution.

14. The jury instructions failed to inform the jury of the consequences of not answering one of Texas's special issues.

15. Insufficient evidence supported the jury's finding on the future dangerousness special issue.

16. The trial court erred in denying Haynes' motion for a new trial.

17. The admission of victim impact testimony violated the Eighth Amendment.

18. Haynes' alleged lack of volitional capacity at the time of the murder exempts him from execution under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).

19. Texas's use of the death penalty violates the Constitution's cruel and unusual punishment clause.

20. Haynes' death sentence violates the Eighth Amendment and international law.

21. The trial court violated Haynes' constitutional rights by showing bias in the prosecution's favor.

22. The prosecution suppressed favorable evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

23. The cumulative effect of the trial errors deprived Haynes of due process.

Respondent filed an answer to the habeas petition. (Docket Entry No. 10) Haynes filed a reply. (Docket Entry No. 15) Haynes also asks this court to hold his federal proceedings in abeyance while he exhausts state court remedies. (Docket Entry No. 16) Haynes' petition is ripe for adjudication.

## II.  <u>Standard of Review</u>

"The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate

state trials." Barefoot v. Estelle, 463 U.S. 880, 887 (1983); see also Moore v. Dempsey, 261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved."). "Even less is federal habeas a means by which a defendant is entitled to delay an execution indefinitely." Barefoot, 463 U.S. at 887. Accordingly, federal habeas proceedings honor the "presumption of finality and legality [that] attaches to [a petitioner's] conviction and sentence." Id. at 887.

Federal courts give effect to the traditional limits on habeas relief through the AEDPA's deferential standard of review. "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and to further the principles of comity, finality, and federalism[.]" Woodford v. Garceau, 538 U.S. 202, 206 (2003) (quotation and citation omitted). The AEDPA forbids habeas relief on issues adjudicated on the merits in state court unless the state decision "was contrary to, or an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The AEDPA also requires federal deference to state fact-findings unless a petitioner presents clear and convincing evidence in rebuttal. See 28 U.S.C. § 2254(e)(1).

-7-

Nevertheless, a petitioner's compliance with 28 U.S.C. § 2254(d) does not entitle him to habeas relief. No Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]" Horn v. Banks, 536 U.S. 266, 272 (2002); see also Robertson v. Cain, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, bridle federal habeas relief. See Thacker v. Dretke, 396 F.3d 607, 612 n.2 (5th Cir.), cert. denied, ___ U.S. ___, 126 S. Ct. 80 (2005). Thus, any trial error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" Robertson, 324 F.3d at 304 (quoting Brecht v. Abrahamson, 507 U.S. 619, 629 (1993)); see also Aleman v. Sternes, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). A habeas court likewise cannot grant relief if it would require the creation of new constitutional law. See Horn, 536 U.S. at 272 (relying on Teague v. Lane, 489 U.S. 288 (1989)).

## III.  Exhaustion of State Court Remedies

The AEDPA requires a habeas petitioner to give the state courts the first opportunity to consider his federal constitutional

claims.  See 28 U.S.C. § 2254(b).  The exhaustion requirement "is not jurisdictional, but reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Anderson v. Johnson, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("This rule of comity reduces friction between the state and federal court systems by avoiding the 'unseem[liness]' of a federal district court's overturning a state-court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance.") (alteration in original).  Respondent argues that Haynes has failed to exhaust several of his claims, specifically all but two subparts of claim 1, most of claim 4, all of claims 6, 10, 12, 18 through 23, and possibly claim 17.

While respondent is correct that Haynes has failed to exhaust many claims, he errs with respect to the scope of those omissions. Haynes presented portions of his sixth, seventeenth, and twenty-first claims on state habeas review.  Otherwise, respondent correctly notes that Haynes failed to exhaust most of claims 1 and 4, as well as all of claims 10, 12, 18-20, and 22-23.

This court must decide how to deal with those claims Haynes has not presented in state court.  Haynes asks this court to hold his federal proceedings in abeyance to allow state, and later

-9-

federal, consideration of the issues.   Respondent contends that state procedural law forecloses both state and federal consideration of Haynes' claims.   This court finds that Haynes has not shown that federal or state review is available for his unexhausted claims.

## A.   Stay and Abeyance

Pointing to <u>Rose v. Lundy</u>, 455 U.S. 509 (1989), Haynes argues that this court must allow his return to state court for the exhaustion of remedies.   Under <u>Lundy</u> a mixed petition – that is, one raising both exhausted and unexhausted claims – is subject to a "total exhaustion" rule that requires the dismissal of any petition containing unexhausted claims.   <u>Id.</u> at 522.   <u>Lundy</u>, however, "contemplated that the prisoner could return to federal court after the requisite exhaustion." <u>Slack v. McDaniel</u>, 529 U.S. 473, 486 (2000).   Aside from solidifying traditional judicial limits on habeas review (such as the exhaustion doctrine), the AEDPA enacted a stringent one-year limitations period that does not toll during the pendency of federal proceedings.   <u>See</u> <u>Duncan v. Walker</u>, 533 U.S. 167, 173-74 (2001).   "As a result of the interplay between AEDPA's 1-year statute of limitations and <u>Lundy</u>'s dismissal requirement, petitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims." <u>Rhines v. Weber</u>, 544 U.S. 269, 275 (2005).   A petitioner who files a timely petition

containing unexhausted claims braves the risk of <u>Lundy</u> dismissal after the limitations period runs, possibly closing all federal review.

Recognizing this procedural dilemma, Haynes does not ask for the dismissal of his petition without prejudice.   Instead, he relies on the Supreme Court's recent adoption of a stay-and-abeyance safety valve for the consideration of unexhausted claims. In <u>Rhines</u> the Supreme Court authorized a limited stay-and-abeyance practice in federal court that allows for the development of meritorious claims while preserving the AEDPA's concern for finality and expediency.   <u>See</u> <u>id.</u> at 278; <u>see also</u> <u>Duncan</u>, 533 U.S. at 182-83 (Stevens, J. concurring) (encouraging adoption of a stay-and-abeyance procedure).   <u>Rhines</u>, however, hardly requires federal courts to stay every petition advancing unexhausted claims.   <u>Rhines</u> only authorizes stay and abeyance when the petitioner shows: (1) good cause for failing to exhaust the claim; (2) that the claim is not plainly meritless; and (3) that he has not intentionally engaged in dilatory tactics.   <u>See</u> <u>Rhines</u>, 544 U.S. at 277.

Haynes received one full round of state review.   He made no effort there, either by primary review or in a successive post-conviction proceeding, to advance the numerous claims he raises for the first time in federal court.   Several factors persuade the court that a stay is not appropriate.   First, <u>Rhines</u> prohibits the abeyance of federal proceedings when "a petitioner engages in

abusive litigation tactics or intentional delay[.]" <u>Rhines</u>, 544 U.S. at 278.  A petitioner should request a stay early in the course of federal litigation, preferably by filing a "'protective' petition in federal court" and then expeditiously moving for a stay. <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 416 (2005).  Haynes filed his federal habeas petition on October 5, 2005.  (Docket Entry No. 1)  Haynes waited over a year to file his motion to stay and abate.  By the time this motion came before the court both parties had extensively briefed the legal and factual issues in this case. Delaying the federal action at this late date "frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings" and "also undermines AEDPA's goal of streamlining federal habeas proceedings[.]" <u>Rhines</u>, 544 U.S. at 277.  As an equitable mechanism to ameliorate the AEDPA's harsh provisions, abatement should only be available when a petitioner shows diligence and alacrity in asking for such an extraordinary procedure.  <u>Cf.</u> <u>In re Wilson</u>, 442 F.3d 872, 875 (5th Cir. 2006) ("'Equity is not intended for those who sleep on their rights.'") (quoting <u>Fisher v. Johnson</u>, 174 F.3d 710, 715 (5th Cir. 1999)).  The languid manner in which Haynes requested a return to state court militates against granting a stay.

Second, Haynes does not show good cause for not raising his unexhausted claims until he filed his federal petition.  Haynes' unexhausted claims rely on well-settled constitutional principles

and easily discoverable factual predicates.[3]  Nothing inherent in the structure of Texas's post-conviction review thwarted efforts to bring the unexhausted claims before the Texas Court of Criminal Appeals.  Haynes easily could have raised these issues in his initial state proceedings or, identifying the claims after the appointment of federal counsel, filed a successive state application that would toll the limitations period.  See Villegas v. Johnson, 184 F.3d 467, 473 (5th Cir. 1999) (finding that successive state proceedings toll the AEDPA's limitations period). Haynes could have filed a skeletal federal petition and then expeditiously sought protection under Rhines.  See Pace, 544 U.S. at 416.  Instead, Haynes blames his state habeas attorney for not advancing the claims earlier.

The Supreme Court has not yet established whether ineffective assistance of habeas counsel provides "good cause" in the stay-and-abeyance context.  In other procedural areas, such as the cause-and-prejudice gateway for overcoming a procedural bar, the Fifth Circuit does not look favorably on blaming prior habeas counsel for failing to advance claims.  See Ruiz v. Quarterman, 460 F.3d 638, 644 (5th Cir. 2006); Henderson v. Cockrell, 333 F.3d 592, 606 (5th

---

[3]     Haynes argues that he could not have advanced his claims until the Supreme Court issued recent decisions such as Wiggins v. Smith, 539 U.S. 510, 522-23 (2003), and Miller-El v. Cockrell, 537 U.S. 322, 336-37 (2003).  Haynes ignores the fact that neither of those cases created new law, but merely reexamined entrenched legal precedent.

Cir. 2003). Even if ineffective assistance of habeas counsel constitutes "good cause" under Rhines, Haynes has not shown that his state representation was deficient. The record before the court only shows that prior counsel did not raise certain claims – a circumstance that arises every time a capital petitioner includes unexhausted claims in his federal petition. Haynes has not shown whether state habeas counsel's (or for that matter, state appellate counsel's) failure to raise those issues sprang from ineptitude, neglect, or strategic decision-making. Haynes has not made a record that would show that ineffective assistance of habeas counsel constitutes good cause in this case.

Third, the exhaustion doctrine, including the stay-and-abeyance safety valve, is predicated on the availability of state court remedies. See 28 U.S.C. § 2254(B)(1). Texas strictly enforces its abuse-of-the-writ doctrine (codified at TEX. CODE CRIM. PRO. art. 11.071 § 5(a)) and generally prohibits the filing of successive habeas applications. While article 11.071 allows the filing of a successive state habeas application in three limited circumstances, Haynes does not establish that he meets its demanding requirements. Article 11.071 § 5(a)(1) authorizes the filing of a successive application when the claims "have not been and could not have been presented previously . . . because the factual or legal basis for the claim was unavailable[.]" Haynes raises claims that he easily could have raised in his initial state applications. Sections 5(a)(2) and (3) require a persuasive

-14-

showing of actual innocence. <u>See</u> <u>Ex parte Davis</u>, 947 S.W.2d 216,
237 (Tex. Crim. App. 1996) (finding that "[t]he 'actual innocence'
standard embodied in Subsections 5(a)(2) and 5(a)(3) mirrors that
for bringing successive writ applications in federal habeas review
of state convictions"). Haynes does not provide a viable argument
that he is actually innocent of capital murder.[4] Because Texas
would apply its procedural law to prohibit the filing of a
successive state application, staying Haynes' federal petition
would insert needless delay into these proceedings.

Finally, as will be discussed in greater depth below, Haynes
has not made a compelling showing that, if presented to the state

---

[4]     The Supreme Court has not recognized actual innocence as
an actionable constitutional claim, <u>see</u> <u>Herrera v. Collins</u>, 506
U.S. 390, 400 (1993), but will allow actual innocence claims to act
as a gateway to the consideration of an otherwise-barred
constitutional claim, <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995).
In making a <u>Schlup</u> actual innocence argument, "[t]o be credible,
such a claim requires petitioner to support his allegations of
constitutional error with new reliable evidence – whether it be
exculpatory scientific evidence, trustworthy eyewitness accounts,
or critical physical evidence – that was not presented at trial."
<u>Schlup</u>, 513 U.S. at 324. Haynes makes two arguments to show actual
innocence. First, he contends that officer Kincaid was not acting
in his official capacity when murdered, thus making his crime not
a capital offense under TEX. PENAL CODE § 19.03(a)(1). That argument
hardly constitutes newly discovered evidence, but instead echoes
Haynes' trial strategy. Second, Haynes alleges that he was high on
drugs when he shot officer Kincaid, rendering him unable to form
the requisite intent for capital murder. While he supports this
argument with a new affidavit vouching for his intoxication in the
days before and after the murder, Haynes knew of those facts well
before trial. Even so, in Texas "evidence of voluntary intoxica-
tion [does not] negate the element of specific intent required for
capital murder." <u>Hernandez v. Johnson</u>, 213 F.3d 243, 250 (5th Cir.
2000). Haynes simply does not provide a viable argument that he is
actually innocent.

courts, his unexhausted claims would entitle him to habeas relief. Because Haynes does not meet the Rhines factors or show that a state habeas avenue of relief remains open to him, this court will deny his motion to abate.

## B.   Application of Texas's Abuse-of-the-Writ Doctrine

Respondent argues that Haynes' failure to exhaust claims procedurally bars federal consideration of their merits.   If no state habeas avenue of relief remains open to Haynes, returning to the state courts would be futile and exhaustion is technically satisfied.   See Woodford v. Ngo, ___ U.S. ___, 126 S. Ct. 2378, 2387 (2006).   "A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"   Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (quoting Coleman v. Thompson, 501 U.S. 722, 734 n.1 (1991)); see also Edwards v. Carpenter, 529 U.S. 446, 454-55 (2000) ("[T]he judge may not issue the writ if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim.") (Breyer, J. concurring); Steele v. Young, 11 F.3d 1518, 1524 (10th Cir. 1993) (holding that when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").

-16-

A Texas court considering Haynes' unexhausted claims in a successive habeas petition would invoke Texas's abuse-of-the-writ doctrine to procedurally bar that action.  Haynes argues that art. 11.071 § 5 is inadequate to block federal consideration of his unexhausted claims because it is "inconsistently applied, deprives Haynes of due process under the Fourteenth Amendment, and violates the Equal Protection Clause of the United States Constitution." (Docket Entry No. 15 at 54)  The Fifth Circuit holds that article 11.071 is an adequate state procedural bar because the rule is strictly and regularly enforced.  See Aquilar v. Dretke, 428 F.3d 526, 533 (5th Cir. 2005), cert. denied, ___ U.S. ___, 126 S. Ct. 2059 (2006); Hughes v. Dretke, 412 F.3d 582, 595 (5th Cir. 2005), cert. denied, ___ U.S. ___, 126 S. Ct. 1347 (2006); Barrientes v. Johnson, 221 F.3d 741, 759 (5th Cir. 2000); Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir. 1998).  As Haynes completely failed to raise his challenged claims in state court, and Texas would find any belated attempt to raise them an abuse of the writ, procedural law bars federal consideration of their merits.

**C.   Haynes' Arguments to Overcome the Procedural Bar**

A procedural bar is not insuperable.  A federal petitioner may overcome the procedural default of his claims after an adequate showing of cause and prejudice.  The Supreme Court has noted that

> [i]n all cases in which a state prisoner has defaulted
> his federal claims in state court pursuant to an
> independent and adequate state procedural rule, federal

-17-

habeas review of the claims is barred unless the prisoner
can demonstrate cause for the default and actual
prejudice as a result of the alleged violation of federal
law, or demonstrate that failure to consider the claims
will result in a fundamental miscarriage of justice.

Coleman, 501 U.S. at 750.

Haynes seeks refuge from the procedural bar by arguing that
state habeas counsel's ineffective assistance should excuse his
failure to exhaust state remedies.[5]  However, "alleged infirmities
in state habeas proceedings are not grounds for federal habeas
relief."  Brown v. Dretke, 419 F.3d 365, 378 (5th Cir. 2005), cert.
denied, ___ U.S. ___, 126 S. Ct. 1434 (2006); see also Elizalde v.
Dretke, 362 F.3d 323, 331 (5th Cir. 2004); Beazley v. Johnson, 242
F.3d 248, 271 (5th Cir. 2001); Trevino v. Johnson, 168 F.3d 173,
180 (5th Cir. 1999); Duff-Smith v. Collins, 973 F.2d 1175, 1182
(5th Cir. 1992).  Under that reasoning "'ineffective assistance of
habeas counsel cannot provide cause for a procedural default.'"
Henderson v. Cockrell, 333 F.3d 592, 606 (5th Cir. 2003) (quoting
Martinez v. Johnson, 255 F.3d 229, 241 (5th Cir. 2001)); see also
Ruiz, 460 F.3d at 644.  Haynes seeks to distinguish this precedent
by arguing that state habeas counsel's representation should serve
as cause when he neglects to raise claims that can only be brought
in that forum.  The Fifth Circuit, however, has repeatedly refused

---

[5]     Haynes also argues that his actual innocence constitutes
a fundamental miscarriage of justice that excuses the procedural
default of the unexhausted claims.  For the same reasons that
argument would not meet the requirements of TEX. CODE CRIM. PRO. art
11.071 § 5, Haynes has not made a persuasive showing of actual
innocence to allow federal review.

to create such an exception to the procedural bar doctrine.  <u>See</u>
<u>Elizalde</u>, 362 F.3d at 330; <u>Martinez</u>, 255 F.3d at 240; <u>Beazley</u>, 242
F.3d at 256.  Haynes therefore cannot blame habeas counsel for his
failure to present the unexhausted claims.  Haynes has not made any
argument that would justify adjudication of his unexhausted claims.

## IV.  <u>Alternative Merits Review</u>

While the court cannot grant relief on those claims Haynes has
not presented in state court, the court pauses briefly to note that
procedural and substantive defects doom the unexhausted claims.
<u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas
corpus may be denied on the merits, notwithstanding the failure of
the applicant to exhaust the remedies available in the courts of
the State.").  For instance, Haynes argues that Texas's lethal
injection procedure violates the Constitution (claim 12).  Recent
Supreme Court precedent forecloses *habeas* relief on Haynes' lethal-
injection claim.  In <u>Hill v. McDonough</u>, ___ U.S. ___, 126 S. Ct.
2096, 2102 (2006), the Supreme Court held that challenges to a
state's method of execution sound in civil rights, not habeas, law.
The court will dismiss Haynes' lethal injection claim without
prejudice so that he may advance his arguments by 42 U.S.C. § 1983
or in state court if he so wishes.[6]

---

[6]     Haynes' petition, therefore, is a "mixed" one in that it
contains both civil rights and habeas claims.  The Fifth Circuit
has stated that "in instances in which a petition combines claims
that should be asserted in habeas with claims that properly may be
(continued...)

Some of Haynes' unexhausted claims rely on the unwarranted extension of federal law.  For instance, Haynes argues that the Supreme Court's decision in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), renders him exempt from execution because his substance abuse at the time of the murder rendered him mentally incapacitated to the degree that he could not comprehend his actions.  The <u>Atkins</u> Court held that the Constitution exempts mentally retarded offenders from execution.  No precedent extends <u>Atkins</u> to substance

---

[6]      (...continued)

pursued as an initial matter under § 1983, and the claims can be separated, federal courts should do so, entertaining the § 1983 claims" and then adjudicating the remainder of the federal petition.  <u>Serio v. Members of Louisiana State Bd. of Pardons</u>, 821 F.2d 1112, 1119 (5th Cir. 1987).  Several reasons prevent this court from severing Haynes' civil rights claim and considering it before turning to his habeas claims.  First, civil-rights plaintiffs face a stringent exhaustion requirement.  <u>See</u> <u>Woodford v. Ngo</u>, ___ U.S. ___, 126 S. Ct. 2378, 2382 (2006); <u>Nelson v. Campbell</u>, 541 U.S. 637, 650 (2004) (stating that federal law "requires that inmates exhaust all available state administrative remedies before bringing a § 1983 action challenging" a state's lethal injection procedure).  Even if the court severed Haynes' § 1983 claim, the unexhausted nature of his civil rights claim would compel its dismissal.  Second, Congress intended to create a more efficient and quicker review of habeas petitions through the AEDPA.  Stopping federal habeas proceedings midstream to consider the merits of claims collateral to Haynes' otherwise-valid conviction and sentence would violate the spirit of the AEDPA.  Third, counsel represents Haynes in this matter.  The court expects counsel to understand the difference between civil rights and habeas law.  Attorneys do not merit the same liberal allowances given to inmates' pleadings.  Counsel can act in a timely manner to preserve Haynes' interests by exhausting his state remedies and then seeking appropriate action.  The principles of federalism and comity that define current habeas practice cannot be subordinate to a prisoner's right to a forum for challenging the circumstances of his confinement when the petitioner fails to comply with established procedure in asserting his rights.

abuse or any other form of mental impairment.  Cf. In re Neville, 440 F.3d 220, 221 (5th Cir. 2006) (finding that Atkins did not exempt mentally ill inmates from execution); In re Woods, 155 Fed. App'x 132, 136 (5th Cir. 2005) (same).

Likewise, Haynes broadly contests Texas's choice to use the death penalty, arguing that its imposition, both in the abstract and in his case, violates both the Constitution and international law (claims 19 and 20).  No federal precedent invalidates Texas's use of the death penalty.  Haynes' argument asks for an unwarranted and unsupported extension of constitutional law.  Similarly, Haynes lodges complaints about his state habeas counsel's performance, but federal law unquestionably shows that such claims are not actionable on federal habeas review.  See Trevino, 168 F.3d at 180 ("[I]nfirmities in state habeas court proceedings do not constitute grounds for relief in federal court.").  Under Teague v. Lane this court generally cannot create new habeas law.

Most of Haynes' unexhausted claims involve unresolved factual issues.  Primarily, those claims attack trial counsel's efforts, but also charge the prosecution with misconduct.  Haynes has apparently spent a significant amount of time developing the factual basis for these claims and has devoted a considerable portion of his already-lengthy petition on those issues.  Without addressing the individual basis for each unexhausted, factually dependant claim, the court notes that none of his arguments facially command habeas relief.

-21-

Particularly, Haynes has taken great pains to develop evidence that he alleges trial counsel should have presented at trial. Yet, as noted by respondent, Haynes' argument is essentially "not that counsels' performance should have been *better*, rather, his argument is that counsel should have investigated and presented evidence at the punishment phase in a completely *different* manner." (Docket Entry No. 10 at 29) The record indicates that the defense counsel (as well as the prosecution and trial court) went to great lengths to ensure that Haynes' constitutional rights were protected and viable defenses pursued. Haynes' allegations do not show flagrant omissions by the players involved in his trial; rather, they merely demonstrate the exercise of strategy and typify the maxim that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). If the constraints of federal review did not command that Haynes first give the state courts an opportunity to adjudicate his claims of error, this court would still not issue a habeas writ.

Having addressed those claims that stand in a procedurally inadequate posture, the court now considers the claims for which federal review is fully or partially available.

## V.  Analysis of Exhausted Claims

Before turning to the merits of Haynes' claims, the court will address the applicability of the AEDPA to Haynes' case. Haynes extensively argues that, for various reasons, the AEDPA does not

-22-

govern his claims.  Haynes, however, fails to escape Congress's restrictions on federal review.  The Texas courts adjudicated the merits of Haynes' exhausted claims, applied procedural law to prevent adjudication of the claims, or a combination of both in alternative rulings.  While Haynes complains about the depth of that review or the strength of the state courts' reasoning, the state courts' substantive adjudication of his claims suffices to trigger the AEDPA deference.  See Neal v. Puckett, 286 F.3d 230, 235 (5th Cir. 2002)) ("In the context of federal habeas proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural.").  Disagreement with the state court adjudication does not negate the statutorily required deference.

By adopting a litigation strategy that distinguishes or ignores the AEDPA, Haynes has left his briefing vulnerable to summary dismissal.  Haynes makes no effort to show that the state court's resolution of his claims was deficient under 28 U.S.C. § 2254(d)(1) or (2).  In fact, Haynes hardly mentions the state courts' rulings or describe how they unreasonably violated federal law.  As Haynes bears the burden of showing entitlement to habeas relief, proceeding in that manner deprives the court of any reasonable basis for finding that the state courts' reasoning did not comply with the AEDPA.  While this court could summarily deny Haynes' petition based on his failure to meet his AEDPA burden

alone, this court will review the merits of each of his claims under the applicable federal standards.

**A.   Haynes' Exhausted Ineffective-Assistance-of-Counsel Claims (Claims 1(u) and (x))**

Haynes raises several complaints relating to his trial counsel's service, but has only exhausted two arguments:  that trial counsel prevented him from testifying in his own behalf and that counsel failed to request a limiting instruction for the victim impact testimony.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." _Strickland v. Washington_, 466 U.S. 668, 686 (1984).  Under the _Strickland_ standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." _Yarborough v. Gentry_, 540 U.S. 1, 3 (2003); _see also_ _Rompilla v. Beard_, ___ U.S. ___, 125 S. Ct. 2456, 2462 (2005); _Wiggins v. Smith_, 539 U.S. 510, 520 (2003).  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." _Strickland_, 466 U.S. at 700.

To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." _Strickland_, 466 U.S. at 687.  The Supreme Court has

"declined to articulate specific guidelines for appropriate attorney conduct." Wiggins, 539 U.S. at 521. Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." Id. at 689. An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" Id. at 689-90.

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534. A reasonable probability is one that is sufficient to undermine confidence in the outcome. See Strickland, 466 U.S. at 689; Wiggins, 539 U.S. at 534. The court does not consider prejudice in a vacuum. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695.

1.   Testifying in His Own Behalf

Haynes claims that he wished to testify at the punishment phase, but his attorneys would not let him. The trial record does

-25-

not give any indication that Haynes wished to testify. Haynes instead bases this claim on an unnotarized affidavit he prepared while incarcerated. State Habeas Record at 67-69. In that document Haynes described how he wanted to testify, but states that his attorneys either convinced him not to or prevented him from doing so. Haynes' affidavit states that his testimony would have allowed him to avert a capital conviction or death sentence, but does not detail the nature or specifics of his proposed testimony.

Haynes raised this claim on state habeas review. Both of Haynes' trial attorneys submitted affidavits refuting his allegation that they prevented him from testifying. Based on those affidavits, the state habeas court entered the following fact findings:

> 16. The Court finds, based on the credible affidavits of trial counsel Robert Jones and Alvin Nunnery that trial counsel thoroughly advised the applicant of the potential risks and benefits of testifying during his capital murder trial; that trial counsel wanted the applicant to testify during the suppression hearing, but the applicant indicated that he was too nervous to testify; that the applicant's fear of testifying increased after the jury was impaneled; that the applicant decided not to testify during his capital murder trial; that trial counsels' assessment of the instant case lead them to the conclusion that it was best that the applicant not testify during the applicant's capital murder trial; that the applicant agreed with trial counsels' recommendation that it was best that the applicant not testify, and the applicant never suggested that he wished to testify; that trial counsel believed that the facts of the case negated the element of the applicant's knowledge of the victim's status; and, that trial counsel believed that the jury could have concluded that the applicant's self-defense claim was contrived at the last minute because the

applicant's alleged defenses were not included in
his confession.

17.   The Court finds, based on the credible affidavits
      of trial counsel Robert Jones and Alvin Nunnery,
      that the applicant decided not to testify during
      his capital murder trial, and the applicant's deci-
      sion not to testify was a voluntary and informed
      decision, intelligently made, with full knowledge
      of circumstances, options, and consequences.

18.   The Court finds, based on the credible affidavits
      of trial counsel Robert Jones and Alvin Nunnery,
      that the applicant agreed to trial counsels' recom-
      mendation that the applicant not testify during his
      capital murder trial.

State Habeas Record at 151.  On that basis, the state habeas court

concluded that Haynes had not met either of Strickland's prongs.

State Habeas Record at 159.  The state habeas court concluded that

it was "a voluntary and informed decision, intelligently made, with

full knowledge of the circumstances, options, and consequences,"

and that trial counsel was not ineffective in advising Haynes not

to testify.  State Habeas Record at 159.

    This court must presume state fact-findings correct.  Haynes

has not rebutted the findings that he did not want to testify and

that trial counsel used strategic decision-making to counsel Haynes

in this regard.  See 28 U.S.C. § 2254(e)(1).  Further Haynes'

failure to describe the content of his proposed testimony prevents

this court from gauging its impact on his trial.[7]  Haynes has

_____

        [7]   Haynes now argues that "he was the only one who could
tell the jury that he fired because he thought, rightly or wrongly,
that he was acting in self-defense . . . [and] did not know
Sgt. Kincaid was a police officer[.]" (Docket Entry No. 15 at 123)
Haynes' affidavit, however, lacks that specificity.  Haynes'
                                                  (continued...)

simply not met his Strickland (or for that matter, AEDPA) burden with respect to this claim.

2.    Requesting a Limiting Instruction

After the prosecution's punishment phase case-in-chief, the defense presented witnesses who discussed Haynes' positive character traits and accomplishments, including his religious devotion, success in school, and non-violent history in prison. The prosecution then called the victim's widow, Nancy Kincaid, in rebuttal.  Mrs. Kincaid testified concerning her husband's good character, his relationship with the family, and how much his children missed him.  Haynes argues that trial counsel should have asked the trial court to instruct the jury only to consider Mrs. Kincaid's testimony in answering the mitigation, but not future dangerousness, special issue.

The Supreme Court has found that the Constitution "erects no per se bar" to victim impact testimony, leaving the admission of that evidence to the states.  See Payne v. Tennessee, 501 U.S. 808, 827 (1991).  Testimony concerning a victim's worth bears no relevance to the future dangerousness issue.  Even so, Haynes has not shown that Texas law required the jury to consider that category of testimony only in answering the mitigation special issue.  When considering this claim on state habeas review, the Texas courts

---

[7]    (...continued)
affidavit obliquely talks about telling his "side of the story" and letting the jury "know what really happened"; Haynes' affidavit does not describe his proposed testimony in detail.

concluded that Haynes "fail[ed] to cite any authority supporting his ground for relief that [he] was entitled to a limiting instruction[.]"   State Habeas Record at 154.   Haynes makes no better showing on federal review.

Even if counsel should have requested such an instruction, Haynes has not shown that the absence of that limiting language prejudiced his defense.   The state habeas court found that Haynes did not meet Strickland's prejudice prong.   The trial court informed the jury not to let "sentiment, conjecture, sympathy, passion, public opinion or public feeling" influence their answers to the special issues.   Trans. at 451, 453.   This instruction, in conjunction with the low chance of the jury finding any basis to discuss officer Kincaid's character when considering Haynes' future dangerousness, prevents Haynes from making a Strickland prejudice showing.   Haynes has not shown that the state court adjudication was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

## B.   The Prosecution's Use of Peremptory Challenges (Claims 2 and 5)

Haynes argues that the prosecution based its use of peremptory challenges in jury selection on impermissible racial characteristics.   The Court of Criminal Appeals reviewed the jury selection as follows:

> The record establishes that Haynes is African-American and that, of the fifty people in the venire, seven were

-29-

> African Americans and six appeared for voir dire. The
> State peremptorily struck four of the six and accepted
> one venirewoman, whom the defense peremptorily struck;
> one African-American man was seated on the jury. At
> trial Haynes raised a *Batson* objection, arguing that the
> State had used roughly thirty-three percent of its
> strikes to remove approximately eighty percent of the
> African-Americans from the jury panel. The State offered
> its racially neutral explanations.

Opinion on Direct Appeal, at p. 14. After reviewing the voir dire

of the four black prospective jurors that the prosecution struck

and the reasons given for their dismissal, the Court of Criminal

Appeals found no reversible error. Haynes reasserts his equal

protection claim on federal review.

Under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the prosecution

violates the equal protection clause when it challenges potential

jurors solely on the basis of race. A court addresses <u>Batson</u>

claims under a three-step, burden-shifting scheme:

> First, the trial court must determine whether the defendant
> has made a prima facie showing that the prosecutor exercised
> a peremptory challenge on the basis of race. Second, if the
> showing is made, the burden shifts to the prosecutor to
> present a race-neutral explanation for striking the juror in
> question. Although the prosecutor must present a
> comprehensible reason, the second step of this process does
> not demand an explanation that is persuasive, or even
> plausible; so long as the reason is not inherently
> discriminatory, it suffices. Third, the court must then
> determine whether the defendant has carried his burden of
> proving purposeful discrimination. This final step involves
> evaluating the persuasiveness of the justification proffered
> by the prosecutor, but the ultimate burden of persuasion
> regarding racial motivation rests with, and never shifts from,
> the opponent of the strike.

<u>Rice v. Collins</u>, ___ U.S. ___, 126 S. Ct. 969, 973-74 (2006)

(quotations and citations omitted); <u>see also</u> <u>Johnson v. California</u>,

545 U.S. 162, 168 (2005); <u>Miller-El v. Dretke</u>, 545 U.S. 231, 251-52
(2005).

    1.   <u>Batson's First Step</u>

    After the questioning of all prospective jurors, the
prosecution and defense used their peremptory challenges.  Tr. Vol.
22 at 5-14.  The defense then made the following <u>Batson</u> motion:

> Your Honor, first of all, for the record, I would ask the
> Court to take judicial notice of the fact that the
> defendant in this cause, Anthony Cardell Haynes, is a
> black American.  I'd ask the record to further take
> notice of the fact that of the 50 jurors in the pool –
> one, two, three, four, five, six, seven, – seven that
> qualified are [of] African American origin.  That with
> the exception of Mr. Alton Moore, juror number 47, who we
> were not able to reach, all the other jurors of African
> American descent were reached.

Tr. Vol. 22 at 14.  The prosecution then pointed out that one
African American juror had been selected to sit on the jury panel.
Tr. Vol. 22 at 14.  The prosecution also noted that the defense
itself removed one African American potential juror by peremptory
strike.  Tr. Vol. 22 at 16.  The defense responded that

> they used one, two – four of their 13 strikes which is
> roughly 30 percent of – 33 percent of their strikes, Your
> Honor, to eliminate roughly 80 percent of those blacks in
> the [pool].  We think just the sheer numbers raise a
> presumption of a racial motive for the strikes, and we
> would ask the Judge to order that they articulate on the
> record why those black jurors were excluded.

Tr. Vol. 22 at 15.  The trial court then required the prosecution
to provide a reason for each strike.  Tr. Vol. 22 at 16.

    Both the trial court and the Court of Criminal Appeals on
direct review assumed that Haynes made a prima facie showing of

-31-

discrimination.   "Once a court has taken that step, we no longer examine whether a prima facie case exits." <u>United States v. Webster</u>, 162 F.3d 308, 349 (5th Cir. 1998).   This court's "decision, then, must rest on (1) whether the government articulated race-neutral explanations for the exercise of its challenges and (2) whether [the petitioner] has demonstrated that those justifications are pre-textual and that the government engaged in purposeful discrimination." <u>Id.</u>

   2.   <u>Batson's Second Step</u>

   The prosecution provided reasons for its dismissal of several minority potential jurors.   Under the second part of the <u>Batson</u> burden-shifting scheme, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995) (finding the prosecution's explanation that the potential juror had long hair and a beard to be a sufficient race-neutral explanation for the purposes of the second step of the <u>Batson</u> analysis); <u>see also Hernandez v. New York</u>, 500 U.S. 352, 359-60 (1991).[8]   "In such cases, a 'legitimate reason' is not a reason that makes sense, but

---

   [8]   "Under <u>Batson</u>, a prosecutor's explanation for a peremptory strike need not rise to the level of a challenge for cause; rather, it merely must contain a clear and reasonably specific articulation of legitimate reasons for the challenge." <u>United States v. Clemons</u>, 941 F.2d 321, 325 (5th Cir. 1991).   At the second step, the "race-neutral explanation tendered by the proponent need not be persuasive, or even plausible." <u>United States v. Huey</u>, 76 F.3d 638, 641 (5th Cir. 1996).   Instead, the explanation "simply must be race-neutral and honest." <u>Webster</u>, 162 F.3d at 349.

a reason that does not deny equal protection." Id.; see also Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) ("In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.").

The prosecution provided an explanation for each of the four potential jurors it dismissed through peremptory challenges: Twanna Kirkling, Melba Goodman, L.V. McQueen, and Betty Owens. The prosecution stated its reason for striking each, beginning with Ms. Kirkling:

> Twanna Kirkling, number 11, the State exercised a strike for Ms. Kirkling because, during her interview, she said capital punishment was a last resort, meaning several times she hesitated in responding to the questions about the death penalty. She never would give a firm conviction, Your Honor. For that purpose, I did not trust her. I would strike her again if I had another strike.

Tr. Vol. 22 at 16. The prosecution also added that

> she looked at capital punishment, she said she sees it as a necessary evil. I felt that it meant indication that there is something impermissible about having such punishment available to the State. She further avoided giving any direct position on capital punishment that it was a viable object for the State and, furthermore, she stated that life, 40 [years], is a justifiable punishment. And for that, since she had a preconceived notion toward capital punishment, we exercised our strike.

Tr. Vol. 22 at 17. With respect to Ms. Kirkling, trial counsel objected that "there were other jurors who articulated the same view that capital punishment is a necessary evil" that the State accepted. Tr. Vol. 22 at 18.

-33-

The prosecutor justified dismissing Ms. Goodman as follows:

> Ms. Goodman during – again, these are my impressions of the interview.  I think I have a right to have that impression.  She opposed death punishment.  She refused to answer questions about capital punishment.  She reluctantly agree[d] that capital punishment for police officers should be available.  She also demonstrated through her demeanor that she was very anti-capital punishment and I have picked a number of capital jurors and I did not trust this juror.

Tr. Vol. 22 at 18.  The defense made no argument.

The prosecution found various reasons for excluding Mr. McQueen:

> And where M[r]. McQueen, again, when questioned, M[r]. McQueen would give me all the indications that in responses to my questions by the language of demeanor that he was very weak on the death punishment and did not – and stated that there were some cases that I could not give a death sentence even if the law permitted such and again I struck him as well.

Tr. Vol. 22 at 18.  The defense noted that Mr. McQueen's jury questionnaire indicated support for the death penalty.  Tr. Vol. 22 at 18-19.

The prosecution used a peremptory strike on Ms. Owens for both her demeanor and her answers to questions about the death penalty:

> During the interview, this lady's demeanor was one, I guess, the best I can describe it, somewhat humourous. She never did really take on a serious attitude during the interview.  She would say one thing but her body language would indicate that this is not her true feeling.  And I'm sure [trial counsel] reasonably expected us to strike this lady after she was interviewed because I think [trial counsel] voir dired her and he only talked to her for a very short time because he was very pleased with the things she said, more as she was leaning toward them.  If the defendant was found guilty, she would certainly be leaning toward a life sentence.

-34-

> And with that, I drew a conclusion in my mind, based on
> my observation, that she already had a predisposition and
> would not look at it in a neutral fashion.

Tr. Vol. 22 at 19.   Trial counsel, however, objected that

Ms. Owens' jury questionnaire suggested that she would favor the

prosecution and that her answers on voir dire showed that she could

be impartial.   Tr. Vol. 22 at 20.   The defense then accused the

prosecution of removing her because "the State does not want

educated blacks on their jury . . . she would probably bring

thought processes and that's something the State has consistently

shown not to be interested in."   Tr. Vol. 22 at 20.   The

prosecution countered:

> I find that offensive.  I tried many cases, I think, in
> this court and I have tried and I have never had a jury
> in this court or any court in Harris County, Texas, that
> consisted of all whites and I find that offensive.

Tr. Vol. 22 at 20.   The trial court found the prosecution's

explanation to be race neutral.   Tr. Vol. 22 at 20.

The Court of Criminal Appeals reviewed the record of each

black potential juror that the prosecution dismissed by peremptory

challenge.   The Court of Criminal Appeals found that the record

supported each justification.   This is not a for-cause challenge

where the trial court must clearly establish disqualifying bias;

the record supports the trial prosecutor's justification in

striking the prospective jurors.[9]   The court finds that the Court

---

[9]      Haynes argues that there is no record support for the
prosecution's challenge to Mr. McQueen.  The record weakly shows
that Mr. McQueen could not be strongly counted on in the
(continued...)

of Criminal Appeals did not err in finding that the prosecution met Batson's second step.

### 3.   Batson's Third Step

When the trial court considered Haynes' Batson objection, Haynes argued that a pattern of improper strikes existed.   The prosecution then provided what the trial court considered a race-neutral explanation for the strikes.   Moving to the third step of Batson, the defense needed to show purposeful discrimination.   At trial, Haynes took issue with the validity of some of the strikes, accusing the prosecution of dishonesty.   With each potential juror, Haynes now tries to show that the justification did not match the jury questioning.

Haynes accuses the Court of Criminal Appeals of "uncritical acceptance of the prosecution's reasons for the strikes[.]" (Docket Entry No. 1 at 231)   The Court of Criminal Appeals necessarily relied on the trial court's findings to some extent, but also "review[ed] the totality of the circumstances, including the composition of the venire and jury panels, the record of the voir dire examination, and Haynes' rebuttal and impeachment of the State's explanations."   Opinion on Direct Appeal, at 14.   The state

---

[9]   (...continued)
prosecution's favor, and that he would have some difficulty in assessing a death sentence over a long prison term.   The prosecution's justification for striking him, however, focused on his demeanor in answering those questions, suggesting that the record possibly belies his feelings as manifested through his in-court deportment.

court fact-findings in this case, particularly the trial court's explicit finding that the prosecution's justifications were not pretextual and its implicit finding that Haynes had not shown purposeful discrimination, merit a presumption of correctness. <u>See</u> <u>Collins</u>, ___ U.S. at ___, 126 S. Ct. at 974.[10]  Haynes can overcome that presumption through the production of clear and convincing evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1).  Haynes also bears the ultimate burden of showing that the state court determination was unreasonable.  <u>See</u> 28 U.S.C. § 2254(d)(1).  Haynes has not met this burden.

Haynes tries to draw comparison between his case and <u>Miller-El</u> <u>v. Dretke</u>, 545 U.S. 231 (2005), where the Supreme Court granted relief on a <u>Batson</u> claim.  In <u>Miller-El</u>, a case where the "selection process [was] replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race," 545 U.S. at 265, the Supreme Court looked at "broader patterns of practice during the jury selection" to find that the prosecution used its peremptory challenges in a discriminatory manner.

---

[10]    Haynes also alleges that the trial court violated his constitutional rights by not having the judge who oversaw the jury selection rule on his <u>Batson</u> objection.  While it would be useful to have the same judge who viewed the prospective jurors' demeanor, facial expressions, and attitude rule on <u>Batson</u> issues, Haynes has not shown that the Constitution requires it.  Instead, his claim seems to be a vehicle to remove this case from AEDPA deference. The Supreme Court has not held that 28 U.S.C. § 2254(e)(1) does not apply when the trial judge did not observe jury selection.  Here, the trial court did not see the particular jurors, but still could observe and make credibility determinations about the prosecutor's motive in making the peremptory strikes.

_Miller-El_, 545 U.S. at 253.   The _Miller-El_ Court noted a "remarkable" pattern of excluding black prospective jurors from the panel: "Out of 20 black members of the 108-person venire panel for Miller-El's trial, only 1 served.   Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution." _Miller-El_, 545 U.S. at 240-41.   In a side-by-side comparison between the challenged black potential jurors and the white ones, the _Miller-El_ record revealed that white jurors were accepted when voicing views similar to the excluded jurors and showed that the prosecution questioned the black prospective jurors differently than others.   The prosecutor's explanations also did not jibe with the record of potential juror questioning.   Finally, the _Miller-El_ Court criticized the lower courts for blindly accepting the prosecutor's explanations and, in some cases, creating new justifications for the peremptory strikes.

Haynes has not shown that racism permeated his case like in _Miller-El_.   Importantly, the _Miller-El_ Court faced a case where the prosecutors had a 20-year history of engaging in racial discrimination in the jury selection process.   The record contains no such evidence in this case.   In fact, when accused of racism the prosecutor in Haynes' trial heatedly defended his race-neutral record in selecting juries.   Nothing before the court suggests that a tradition of racism saturated Harris County's jury selection process.

Haynes makes much of the fact that the prosecution used peremptory strikes to exclude four of six African-American panelists.  While <u>Miller-El</u> by no means established a threshold percentage that indicates the use of racism, this case does not present the same glaring evidence as in <u>Miller-El</u> where the prosecution struck or agreed to the removal of 19 of the 20 black potential jurors.  <u>See</u> <u>Jackson v. Dretke</u>, 181 Fed. App.'x 400, 407 n.5 (5th Cir. 2006) (finding that the removal of 45% of black potential jurors had "little meaning" without further information).

Haynes takes two approaches in reviewing the record of jury questioning.  Haynes tries to show that the record does not support the prosecution's justifications for their peremptory strikes. Haynes then alleges that those justifications are mere pretexts because they would equally apply to jurors the prosecution allowed to serve.  Federal review of the cold record provides only a partial view of what transpired at trial.  Time and the limitations of not viewing a juror's tone, demeanor, and characterizations may impair an ability to truly compare the statements of two potential jurors.  As the Fifth Circuit recently noted in a different context,

> [l]ay persons come to the courthouse with varying levels of education and thought about capital punishment.  The opening of a capital trial is an alien environment to citizens called from jobs and homes.  Lay persons are confronted by skilled lawyers engaged in an adversarial contest who probe their views on a profound and divisive social issue, usually with a goal of retention or exclusion shaping the questions.  We know from experience

> that the result is often a series of responses that seem
> to shift and turn and even conflict as questions are
> framed, reframed and just repeated.  A stranger to the
> trial reading the bare transcript is left with incomplete
> sentences and elliptic answers with no reconciling theme.
> Yet one present at trial may well have had a quite
> different picture.  Inflection of voice and body move-
> ments of each cast member, absent from the transcript,
> are present at trial.

Ruiz, 460 F.3d at 646.  Difficulty in this case arises because the

prosecution based its strikes, as in the case of Mr. McQueen and

Ms. Owens, not just on potential jurors' statements about the death

penalty, but their demeanor and physiognomy in answering.  Even so,

the record must provide support for the conclusion that the

prosecution did not act out of racial animus:

> It is true that peremptories are often the subjects of
> instinct, and it can sometimes be hard to say what the
> reason is.  But when illegitimate grounds like race are
> in issue, a prosecutor simply has got to state his
> reasons as best he can and stand or fall on the
> plausibility of the reasons he gives.  A Batson challenge
> does not call for a mere exercise in thinking up any
> rational basis.

Miller-El, 545 U.S. at 252.

Haynes has not shown that the state courts were unreasonable

in finding no purposeful discrimination.  Without providing record

citations, Haynes argues that "[w]hile white jurors were mainly

asked long 'educational' questions by the prosecution, which asked

for only simple 'yes' or 'no' answers, the black jurors were asked

for their opinions and feelings on a number of issues, in a very

different manner, in what can only be interpreted as an effort to

have them disqualified." (Docket Entry No. 1 at 230)  The record,

however, does not divulge any obvious difference in questioning strategy that hinged on a prospective juror's race.

Haynes also compares jurors whom the prosecution did not dismiss with those who were peremptorily struck to show that race was the only difference between the two. Haynes places special emphasis on the questioning of Michael Bonnin and Sharon Malazzo, who sat on the jury, arguing that their attitudes and answers mirrored those of the struck jurors. Haynes emphasizes that Mr. Bonnin stated that he did not believe in the death penalty in some circumstances. Tr. Vol. 6 at 137. The law does not allow the imposition of the death penalty in all circumstances and Bonnin never displayed an inability to impose the death penalty in those circumstances that the law allows. Mr. Bonnin's answers contrast sharply with the jurors who the prosecution removed such as, for instance, Ms. Goodman who displayed strong feelings against the death penalty in general and specifically to its application to police officers as a special class. Tr. Vol. 9 at 173-81.

Haynes also relies on the fact that Ms. Malazzo stated that she could consider probation as a sentencing option in a homicide case. Tr. Vol. 10 at 296. Ms. Malazzo, however, is hardly similarly situated to those potential jurors the prosecution excused by peremptory strike because she never waivered on her opinion of capital punishment or showed an incapacity to consider death as a sentencing option. Comparison with those jurors whom

-41-

the prosecution did not strike does not reveal a racist intent in the prosecution's approach to jury selection.

This is not a case where "[t]he State's attempt at a race-neutral rationalization thus simply fails to explain what the prosecutors did." Miller-El, 545 U.S. at 260. The record provides support for the prosecution's use of peremptory challenges. Haynes has not shown a pattern or practice of discriminatory questioning of minority prospective jurors. The court concludes that Haynes has not established that the Court of Criminal Appeals' rejection of this claim was unreasonable. See 28 U.S.C. § 2254(d). The court **DENIES** this claim.

## C.   Actual Innocence Due to the Victim's Off-Duty Status (Claim 3)

Haynes argues that he is actually innocent of capital murder because officer Kincaid was not acting in an official capacity when Haynes shot him. Under Tex. Penal Code Ann. § 19.03(a)(1), Haynes' jury could only convict after finding all the elements of murder, plus: (1) the victim was a "peace officer"; (2) the victim was "acting in the lawful discharge of an official duty"; and (3) Haynes knew he was a peace officer. Haynes contends that only two pieces of evidence showed that officer Kincaid was acting in an official capacity: (1) Mrs. Kincaid's testimony that her husband identified himself as a police officer; and (2) the testimony of Jeraldine Stewart, an assistant Police Chief, who stated that off-duty officers were obligated to investigate any breach of the

-42-

peace.    Haynes  disputes  that  evidence,  arguing  that  a  more plausible explanation for officer Kincaid's actions was that he was behaving  as  a  private  individual,  seeking  to  exchange  insurance information  for  the  damage  to  his  vehicle's  windshield.    Haynes supports  this  theory  with  the  same  testimony  and  argument  his attorneys  presented  at  trial,  such  as  that  the  autopsy  report listed officer Kincaid's status as "off-duty" at the time of his death.    Haynes  argues  that  he  was  eligible  only  for  a  non-capital conviction, thus rendering him actually innocent of capital murder.

Haynes  does  not  advance  a  cognizable  ground  for  relief.    The Fifth  Circuit  has  repeatedly  held  that  Supreme  Court  jurisprudence has  not  created  an  independent  actual-innocence  claim.    See  Foster v. Quarterman, 466 F.3d 359, 367 (5th Cir.), cert. denied, ___ U.S. ___, 127 S. Ct. 141 (2006); Graves v. Cockrell, 351 F.3d 143, 151 (5th Cir. 2003); Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000);  Graham  v.  Johnson,  168  F.3d  762,  788  (5th  Cir.  1999); Robison v. Johnson, 151 F.3d 256, 267 (5th Cir. 1998); Lucas v. Johnson, 132 F.3d 1069, 1074-75 (5th Cir. 1998).    This conclusion finds  support  in  Supreme  Court  precedent.    In  Herrera  v.  Collins the  Supreme  Court  stated  that  "[c]laims  of  actual  innocence  based on newly discovered evidence have never been held to state a ground for  federal  habeas  relief  absent  an  independent  constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. 390, 400 (1993).    Similarly, in Schlup v. Delo the Supreme

Court again noted that a petitioner's "claim of innocence does not
by itself provide a basis for relief." 513 U.S. 298, 315 (1995).
This is true, in part, because a defendant who has received a fair
trial no longer enjoys any presumption of innocence. Herrera, 506
U.S. at 399-400. "Thus, in the eyes of the law, petitioner does
not come before the Court as one who is 'innocent,' but, on the
contrary, as one who has been convicted by due process of law of
[a] brutal murder[]." Id. at 400. This court cannot grant relief
on Haynes' actual innocence claim that is not recognized by the
Constitution. See 28 U.S.C. § 2254(a).

The Fifth Circuit has observed that even if such a
constitutional claim existed, the petitioner would have to show the
following:

> (1) the evidence is newly discovered and was unknown to
> the defendant at the time of the trial; (2) the
> defendant's failure to detect the evidence was not due to
> a lack of diligence; (3) the evidence is material, not
> merely cumulative or impeaching; and (4) the evidence
> would probably produce acquittal at a new trial.

Lucas, 132 F.3d at 1076 (citation omitted). Here, Haynes does not
rely on "newly discovered evidence." In fact, he does not rely on
any evidence at all. See Schlup, 513 U.S. at 324 ("To be credible,
such a claim requires petitioner to support his allegations of
constitutional error with new reliable evidence – whether it be
exculpatory scientific evidence, trustworthy eyewitness accounts,
or critical physical evidence – that was not presented at trial.").
Instead, he makes arguments that track closely his trial efforts at

-44-

showing that officer Kincaid was not acting in his official capacity when Haynes shot him.  In that regard, the instant claim more closely resembles the <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), sufficiency-of-the-evidence claim that Haynes exhausted on direct review.

Even if Haynes intends to reassert his <u>Jackson</u> claim, he has not shown entitlement to habeas relief.  In determining the sufficiency of the evidence, this court asks "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Miller v. Johnson</u>, 200 F.3d 274, 286 (5th Cir. 2000) (applying the <u>Jackson</u> standard in the capital context).  In determining the sufficiency of the evidence, this court may not substitute its view of the evidence for that of the fact-finder, but must consider all of the evidence in the light most favorable to the prosecution and decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Miller</u>, 200 F.3d at 286.[11]

---

[11]     This court can only grant habeas relief if Haynes shows that the Court of Criminal Appeals unreasonably applied <u>Jackson</u>. <u>See</u> 28 U.S.C. § 2254(d).  Haynes' arguments lie at the intersection of two highly deferential standards of review.  As previously noted, the AEDPA authorizes a deeply forgiving review of state-
(continued...)

The Court of Criminal Appeals found that sufficient evidence supported Haynes' capital conviction:

> The record established that Sergeant Kincaid was a Houston police officer and that he was off-duty at the time of his death. Assistant Police Chief Jeraldine Stewart testified that department policies require both on-duty and off-duty officers to take prompt and effective police action for any violation of the law committed in their presence. According to Stewart, when an off-duty officer takes such action, he is considered to be discharging his official duty. Stewart testified that Houston police officers are authorized to investigate any offense threatening the public safety outside the City of Houston. Stewart testified that she had reviewed the police report and determined that Sergeant Kincaid had been performing an official duty when he stopped Haynes.

Opinion on Direct Appeal, at 3.   On that basis, the Court of Criminal Appeals held that "[a] rational juror could have concluded

---

[11]     (...continued)
court determinations.   In habeas sufficiency-of-the-evidence claims, the constitutionally deferential Jackson standard converges with the statutorily mandated federal habeas standards to create a most daunting burden for federal petitioners. See Garcia v. Carey, 395 F.3d 1099, 1103 (9th Cir. 2005) (noting that the AEDPA "adds a second level of deference" to the Jackson standard); Torres v. Mullin, 317 F.3d 1145, 1151 (10th Cir. 2003) ("[The] AEDPA ha[s] added an additional degree of deference to state courts' resolution of sufficiency of the evidence questions.").   A petitioner must not only show that a rational juror could not have found him worthy of death, he must show that the state court was unreasonable in its assessment of his arguments.   The doubly deferential standard utilized in habeas insufficiency claims creates a high, though not completely insurmountable, barrier to federal habeas relief.   The court, therefore, reviews the state court's prosecution-friendly Jackson analysis not for error, per se, but to decide if the Court of Criminal Appeals unreasonably applied Jackson to Haynes' case or refused to extend Jackson to the operative facts of the case.   See Williams v. Taylor, 529 U.S. 362, 407 (2000).

from this evidence that Sergeant Kincaid was acting in the lawful discharge of an official duty when he was killed." Opinion on Direct Appeal, at 3.

Haynes fails to show that the state court's determination was unreasonable. Haynes' argument emphasizes that officer Kincaid was "off duty" when he encountered Haynes, but the trial testimony still allowed for the discharge of his "official duty" as required by statute. As recognized by the Court of Criminal Appeals, officer Kincaid could have been acting as a police officer when asking for Haynes' license. Given these facts, viewed in a light most favorable to the prosecution, a reasonable juror could have reached the conclusion that officer Kincaid acted in the lawful discharge of an official duty when Haynes shot him. Haynes has not proved that his challenge to officer Kincaid's status mandates relief in either the actual-innocence or sufficiency-of-the-evidence context.

**D.    Prosecutorial Misconduct (Claim 6)**

Haynes contends that the prosecution made several improper statements that prejudiced his case and rendered his trial fundamentally unfair. Haynes cites several examples of questions and statements that the prosecution made, which he considers improper or inflammatory in nature. When Haynes raised a similar challenge in state court, however, he only objected to one portion of the prosecution's closing argument. This court can only

consider the portions of Haynes' prosecutorial misconduct claim that he exhausted in state court.[12]

The exhausted portion of Haynes' claim relates only to the prosecution's punishment phase argument, which began with the prosecutor stating that his argument "comes from the heart."  Tr. Vol. 30 at 14-15.  Haynes particularly faults the prosecution for the following interchange during final arguments:

> The State:       But let's just look at May the 22nd, 1998, before Sergeant Kincaid was merciless[ly] killed. The defendant goes up. It's his idea[]. He listens to the tape. He wants to get some gas money. Gas money for his truck. He could have asked his mom, he could have asked his dad. He'd rather steal. He goes to some unknown person in a parking lot at Willowbrook Mall, hey, buddy, can you give me directions to so and so. The guy starts giving him directions. *I'll bet the next time someone comes or hollers at you to give directions you are going to think about him, look at him. He looks so innocent he couldn't hurt anybody. And that is what those three people that night thought. And before you walk up to another car – I know I would. I'm not going to walk up. I'm going to step back and maybe I'll tell them the directions but I'm not going –*
>
> Trial counsel:   Your Honor, I'm going to go ahead and object at this time to what he would do. It is improper. He is testifying, giving his opinion.
>
> Trial court:     Sustained.

---

[12]     The court notes, however, that a review of the entirety of Haynes' prosecutorial misconduct claim does not suggest that the prosecution violated his constitutional rights.

Trial counsel: I ask the jury to be instructed to disregard.

Trial court:   The jury will disregard that.

Trial counsel: Move for a mistrial, Your Honor.

Trial court:   Denied.
The State:     *You know your whole life is going to change because of this trial. You know–*

Trial counsel: I'm going to object to that comment, too, Your Honor, that their whole life is going to change. That's improper jury argument. That's him personalizing with the jury, which is outside the record and improper jury argument.

Trial court:   It's overruled.

Tr. Vol. 30 at 17-18 (emphasis added). When trial counsel objected to another statement by the prosecution, the trial court ordered trial counsel to sit down or face removal from the courtroom. Tr. Vol. 30 at 18-19. Trial counsel made no more objections during the prosecution's final argument, even when the prosecution told the jury that officer Kincaid "would be alive today if he hadn't" identified himself as a police officer. Tr. Vol. 30 at 232. The state habeas court found that these statements did not violate Haynes' constitutional rights.[13]

"In habeas corpus proceedings, [this Court] review[s] allegedly improper prosecutorial statements under a strict

_____

[13]   When Haynes raised this claim on state habeas review the state courts procedurally barred the portion of this claim based on statements to which trial counsel did not object.   State Habeas Record at 160.   In a footnote respondent asks this court to forego federal review based on that determination.   Any procedural bar would only apply to the portion of the prosecution's statement to which trial counsel did not object.

standard." <u>Dowthitt</u>, 230 F.3d at 755.  A federal habeas court's
review of prosecutorial misconduct claims is "'the narrow one of
due process, and not the broad exercise of supervisory power.'"
<u>Darden v. Wainwright</u>, 477 U.S. 168, 180 (1986) (quoting <u>Donnelly v.
DeChristoforo</u>, 416 U.S. 637, 642 (1974)).[14]  Accordingly, "'[a]
criminal conviction is not to be lightly overturned on the basis of
a prosecutor's comments standing alone.  The determinative question
is whether the prosecutor's remarks cast serious doubt on the
correctness of the jury's verdict.'"  <u>United States v. Bernard</u>, 299
F.3d 467, 488 (5th Cir. 2002) (quoting <u>United States v. Iredia</u>, 866
F.2d 114, 117 (5th Cir. 1989)); <u>see also</u>  <u>Styron v. Johnson</u>, 262
F.3d 438, 449 (5th Cir. 2001); <u>Ortega v. McCotter</u>, 808 F.2d 406,
408 (5th Cir. 1987) ("'A prosecutor's improper argument will, in
itself, exceed constitutional limitations in only the most
egregious cases.'").[15]

---

[14]    The Supreme Court relied on six factors in evaluating the
due process claim in <u>Darden</u>:  (1) whether the prosecutor manipu-
lated or misstated the evidence, (2) whether the comments
implicated other specific rights of the accused, (3) whether
defense counsel invited the comments, (4) whether the curative
instructions ameliorated the harm, (5) whether the evidence weighed
heavily against the defendant, and (6) whether the defense had an
opportunity to rebut the prosecutor's comments.  While the Supreme
Court looked at these factors, it did not purport to establish a
constitutional test based on them.  Other factors may influence a
court's review.  Also, the Supreme Court did not accord any
particular weight to the above-mentioned factors.  In the end, this
court's ultimate review focuses on whether the comments rendered
the trial fundamentally unfair.  <u>See</u> <u>Darden</u>, 477 U.S. at 181.

[15]    Under Texas law closing arguments must be based on trial
evidence, the logical assumptions flowing from that evidence, a
response to defense argumentation, or a plea for law enforcement.
<u>See</u> <u>Wilson v. State</u>, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999).

Haynes objects to three categories of argument: (1) the prosecution's assurance that his argument came from the heart, (2) the prosecution's personalization of Haynes' robberies, (3) the speculation that officer Kincaid would be alive had he not identified himself as a police officer. First, while the prosecutor stated that his argument came "from the heart," that statement in and of itself bore no prejudice to Haynes and added little, if anything, to the jury's consideration of the special issues. Second, the trial court instructed the jury to disregard the greater portion of those statements in which the prosecutor discussed the murder's impact on his, and the jury members', life. "'[J]uries are presumed to follow their instructions.'" Zafiro v. United States, 506 U.S. 534, 540 (1993) (quotation omitted); see also Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant."). This presumption exists "unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the prosecutorial misconduct] is devastating." United States v. Tomblin, 46 F.3d 1369, 1390 (5th Cir. 1995) (internal quotation marks and citation omitted); see also United States v. Wyly, 193

F.3d 289, 299 (5th Cir. 1999).   Haynes has not described any
deficiency in the trial court's curative instruction.   There is no
indication that the trial court's instruction was insufficient to
remove any prejudice introduced by the State's comment.   The only
portion of the statements that the trial court did not instruct the
jury on – that the trial would change the jury's life – did not
itself render Haynes' trial fundamentally unfair.   That statement
neither increased the likelihood of Haynes' receiving a death
sentence nor brashly disregarded the Constitution.

Finally, the prosecutor speculated that Haynes only killed
officer Kincaid because of his status as a police officer.   In
considering a related claim on direct appeal, the Court of Criminal
Appeals did not find anything in that portion of the prosecution's
argument that would violate the Constitution.   Opinion on Direct
Appeal, at 21-22.   By the time the prosecutor made that statement,
the jury had already returned a verdict that, in essence, found
that Haynes knew that his victim was a police officer.   The
evidence amply allowed the prosecutor to suggest that the victim's
status alone brought about his death.   In fact, that assumption
formed the heart of the prosecution's case.   The Constitution by no
means prohibits prosecutors from making reasonable and logical
deductions from the evidence.   Haynes has failed to shown that the
prosecution engaged in misconduct that made his trial fundamentally
unfair.   See 28 U.S.C. § 2254(d)(1).   The court **DENIES** this claim.

## E.    The Admissibility of Audiotaped Statements (Claims 7 and 8)

At trial the prosecution presented two audiotaped confessions in which Haynes admitted to shooting officer Kincaid. Haynes challenged the admissibility of both statements before trial. Officer Todd William Miller, a homicide investigator with the Houston Police Department who took both Haynes' confessions, was the only person to testify at trial about the circumstances leading to Haynes' arrest and his subsequent statements. Officer Miller testified that Timothy Reese became an early suspect in officer Kincaid's murder. The police secured a warrant for Reese and set up surveillance at his home. On May 24, 1998, Reese returned to his house but soon left with another individual, later identified as Haynes, in a vehicle matching the description of the one driven by the murderer. Officer Miller arrested the two men in the car. Officer Miller gave three reasons for arresting Haynes:  (1) he admitted to owning the vehicle matching the one driven by the murderer, (2) his vehicle also matched one used as a get-away car in a robbery, and (3) Haynes matched Mrs. Kincaid's description of the murderer. The police took Haynes to the police station and officer Miller interviewed him, resulting in the two audiotaped statements in which Haynes confessed to the murder. The trial court allowed the statements to come before the jury.

Haynes' federal habeas petition raises two claims challenging the admission of the audiotapes. First, Haynes argues that the

police had no probable cause to arrest him, and thus the Fourth
Amendment should have prevented his statements from coming before
the jury.   Second, Haynes contends that the circumstances
surrounding his confession rendered those admissions involuntary
and unreliable.   The Court of Criminal Appeals rejected both
arguments on direct appeal.  This court will review that determina-
tion under the AEDPA standard.

     1.   <u>Fourth Amendment Claim</u>

     Haynes contends that the trial court should have suppressed
his audiotaped statements because of the police officer's illegal
"seizure" of his person, thus violating the Fourth and Fourteenth
Amendments.  Federal law prevents this court from considering the
merits of Haynes' Fourth Amendment claim.  "[W]here the State has
provided an opportunity for full and fair litigation of a Fourth
Amendment claim, a state prisoner may not be granted federal habeas
corpus relief on the ground that evidence obtained in an
unconstitutional search or seizure was introduced at his trial."
<u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976) (footnote omitted).  The
existence of state processes allowing an opportunity for full and
fair litigation of Fourth Amendment claims, rather than a
defendant's use of those processes, serves the policies underlying
the exclusionary rule and bars federal habeas corpus consideration
of claims under <u>Stone</u>.  <u>See</u> <u>Caver v. State of Alabama</u>, 577 F.2d
1188, 1192-93 (5th Cir. 1978).  The <u>Stone</u> bar applies despite an

-54-

error by the state court in deciding the claim's merits.  See Swicegood v. Alabama, 577 F.2d 1322, 1324-25 (5th Cir. 1978). Stone applies to capital cases.  See Jones v. Johnson, 171 F.3d 270, 278 (5th Cir. 1999); Lucas, 132 F.3d at 1083; Andrews v. Collins, 21 F.3d 612, 631-32 (5th Cir. 1994).

Haynes seeks to skirt Stone's constraints by alleging that he did not have a full and fair opportunity to develop his claim in state court.  Haynes also alleges that the state court's reasoning in rejecting his claim failed to appreciate fully that no probable cause existed for his arrest.  Further, Haynes argues that the trial court's failure to issue written factual findings and legal conclusions resulted in a less-than-full and not-quite-fair hearing.  Thus, Haynes argues that Stone should not bar considera- tion of his Fourth Amendment claim.

"Errors in adjudicating Fourth Amendment claims are not an exception to Stone's bar."  Moreno v. Dretke, 450 F.3d 158, 167 (5th Cir. 2006); see also Swicegood, 577 F.2d at 1324-25.  The Fifth Circuit has emphasized that the "'opportunity for full and fair litigation' [means] just that:  'an opportunity.'"  Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002) (quoting Caver, 577 F.2d at 1192).  "[A]bsent additional allegations that state processes routinely or systematically are applied in such a way as to prevent the actual litigation of Fourth Amendment claims, mistakes that thwart the presentation of Fourth Amendment claims do not render the Stone bar inapplicable."  Janecka, 301 F.3d at 321.

Haynes had an opportunity to present his claims before trial – an opportunity of which he took full advantage. Haynes availed himself of the full and fair chance to present his claims to the Court of Criminal Appeals. Even if the state trial court's reasons for denying the claim were not completely evident or satisfying to Haynes, the Court of Criminal Appeals adjudicated this claim. Disagreement with the outcome does not remove the Stone bar. Because Haynes took advantage of the opportunity to present his claims in state court, Stone requires this court to forego a renewed analysis of the "seizure."[16]

---

[16]    Even if Stone did not bar federal consideration of Haynes' Fourth Amendment claim, the Court of Criminal Appeals adequately addressed this claim on direct review:

> Although great weight should be given to the inferences drawn by the trial judge, determinations of probable cause are reviewed de novo on appeal. At the suppression hearing, officer Miller testified that Haynes ran "a couple of stop signs" in his presence immediately before his arrest. Section 544.010(a) of the Texas Transportation Code defines this as an offense, and § 543.001 authorizes police officers to arrest, without a warrant, a person who commits such a violation in his presence. In addition, Article 14.01(b) states that a peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view. So Haynes' arrest was authorized by law. An arrest for offenses committed in the presence of an officer, even minor offenses, is constitutionally reasonable. As the State notes, Miller's assertion at the hearing that he did not arrest Haynes for the traffic offense is unimportant. The subjective intent of the arresting officer does not alter the fact that his arrest was authorized by law and reasonable for the purposes of the Fourth Amendment.

Opinion on Direct Appeal, at 6-7.

-56-

2.   Fifth Amendment Claim

Haynes also alleges that he did not voluntarily confess to the murder.   Haynes contends that his youth made his confession involuntary, in conjunction with other factors including that he

> did not eat anything during the course of or prior to his interrogation, was not afforded an opportunity to use the restroom, was not provided the opportunity to call his father despite frequent requests and was extremely fatigued . . . was not able to pay attention during this interrogation [and] . . . was under the influence of methamphetamine.

(Docket Entry No. 1 at p. 287)  Haynes also contends that he "was deliberately not taken before a magistrate as required prior to his interrogation and the making of his first statement."  (Docket Entry No. 1 at 287)  Haynes argues that officer Miller overbearingly manipulated the circumstances to overcome his will.

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice."  United States v. Broussard, 80 F.3d 1025, 1033 (5th Cir. 1996).  "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception . . . ."  Oregon v. Elstad, 470 U.S. 298, 305 (1985).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

-57-

"Cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); see also Dickerson v. United States, 530 U.S. 428, 444 (2000). Similarly, "Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." Connelly, 479 U.S. at 170. "[B]oth the characteristics of the accused and the details of the interrogation" should be considered in determining voluntariness. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

The state court's finding that the police did not engage in coercive tactics is a factual question that this court presumes correct. See Carter v. Johnson, 131 F.3d 452, 462 (5th Cir. 1997); 28 U.S.C. § 2254(e)(1). The Court of Criminal Appeals competently reviewed the facts surrounding Haynes' confession in a way vastly different from that alleged in Haynes' petition:

> At the hearing on Haynes' motion, [Officer] Miller's uncontroverted testimony was the only evidence before the trial court. According to Miller, Haynes arrived at the police station at about 11:52 p.m. Miller did not take Haynes to the magistrate because he wanted to first ascertain his involvement, if any, in the aggravated robberies and the capital murder. He removed Haynes' handcuffs and placed him in an interview room. Miller removed his weapon and entered the interview room. Miller advised Haynes that he was a suspect in the robberies and the murder of Sergeant Kincaid and read Haynes his Article 38.22 warnings (satisfying Miranda's

-58-

requirements).  Haynes indicated that he understood his
rights but that he did not wish to assert them.  Miller
and Haynes were alone during the interview which produced
Haynes' first statement.  Haynes was seated in a
cushioned armchair.  Several times in the course of the
interview, Miller offered Haynes something to eat and
drink, and the opportunity to use the restroom or
telephone.  According to Miller, Haynes declined to use
the phone, used the restroom once, and requested water
two or three times.  Miller testified that Haynes was
awake and alert during the entire interview.  At no time
did Haynes indicate that he wanted to speak to an
attorney or terminate the interview.

Initially, Haynes denied involvement in the offenses but
changed his story when Miller informed him that his
accomplice, Timothy Reese, had implicated him in the
murder, that officers were on their way to pick up
another accomplice, and that there were eyewitnesses.
Haynes asked Miller what would happen if he gave a
statement, and Miller replied that he did not know
because he did not know what Haynes was going to say.
Haynes agreed to give an audio-taped statement.  From
12:32 a.m. to 12:52 a.m. Haynes gave his first statement.

At 1:28 a.m. Miller took Haynes before the magistrate.
Haynes asked the magistrate when he could make a phone
call.  The magistrate replied that he could do so after
the proceedings were complete.  When they returned to
Miller's division at 1:40 a.m., Haynes asked to use the
restroom, and after he used the restroom, Miller asked
him if he wanted to use the telephone.  Haynes declined,
saying that it was too late to call anyone.  Miller told
Haynes that he would be booked into the jail shortly and
asked if there was anything else that Haynes wanted to
say.  Haynes responded that he had left out some details
in his first statement, so Miller offered him the
opportunity to make a second statement.  Miller again
read Haynes his rights before taking his statement.

Opinion on Direct Appeal, at 8-10.  After reviewing the suppression

hearing testimony, the Court of Criminal Appeals found that Haynes'

statement "was the product of his free and unconstrained choice."

Opinion on Direct Appeal, at 10.

Ultimately, the voluntariness of a confession is a legal determination. See Miller v. Fenton, 474 U.S. 104, 112 (1985). The transcript from the suppression hearing reveals that Haynes was informed of his rights and waived those rights. The record contains no indication that Haynes' waiver of his rights was involuntary or that the circumstances surrounding his confession were somehow oppressive, especially in light of officer Miller's testimony, which the trial court obviously found credible. Haynes has not demonstrated that the state court's adjudication of this claim was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1). This claim is **DENIED**.

## F.    Refusal to Strike Potential Jurors (Claim 9)

Haynes complains that the trial court violated his rights under the Sixth and Fourteenth Amendments by not granting his challenges for cause against potential jurors Melba Williams, John Ruben Munoz, Jacqueline Emhoff Nelson, and Horace B. Snyder. Haynes used a peremptory challenge to remove Williams, Munoz, and Snyder from the jury panel. Thus, they were "removed from the jury as effectively as if the trial court had excused [them] for cause." Ross v. Oklahoma, 487 U.S. 81, 86 (1988). Under federal precedent "[a]ny claim that the jury was not impartial, therefore, must focus not on [the peremptorily challenged jurors], but on the jurors who ultimately sat." Id. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to

-60-

achieve that result does not mean that the Sixth Amendment was violated." Id. at 88; see also Webster, 162 F.3d at 342 n.36 ("The failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him. Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury."). Therefore, this court's focus "begins and ends" with a determination of whether a juror who sat possessed "views [that] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quotation omitted); see also Jones v. Dretke, 375 F.3d 352, 356 (5th Cir. 2004) ("Following Ross, . . . our review of Jones's Sixth Amendment claim is limited to whether the jurors that actually sat were impartial.").

Other than to generally allege that his jury was not impartial, Haynes only identifies two jurors whom he felt could not evaluate the evidence impartially. First, Haynes argues that the expenditure of all his peremptory challenges forced him to accept an "objectionable" juror, Jon Wilcox. A constitutional violation only occurs when the jury that sits is not "impartial." Ross, 487 U.S. at 85. Courts have recognized that Ross does not establish a low-threshold for demonstrating error; to grant relief courts have found that the juror for which a petitioner would have expended a

peremptory challenge must not be "partial," that is, "properly subject to strikes for cause." Nethery v. Collins, 993 F.2d 1154, 1161 n.20 (5th Cir. 1993); see also United States v. Martinez-Salazar, 528 U.S. 304, 313 (2000) (finding that error under Ross results when a court seats any juror "who should have been excused for cause"); Webster, 162 F.3d at 341-42 (distinguishing between an objectionable and partial juror); Nichols v. Scott, 69 F.3d 1255, 1287 (5th Cir. 1995) (focusing on the impartiality of jurors). Haynes does not specify why Wilcox was an "objectionable juror," and much less why the trial court should have removed him for cause.

Second, Haynes argues that the trial court erroneously denied his challenge to juror Nelson. Trial counsel objected to Ms. Nelson "for her equating possibility and probability," Tr. Vol. 10 at 200, apparently referring to the following discussion during her voir dire:

> Trial counsel: Okay. Now, Mrs. Nelson, when you look at that word probability in the first special issue, does probability seem to say the same things as possibility or chance? Or do you think probability requires them to show more?

> Ms. Nelson:    I associate probability with possible.

> Trial counsel: Okay. You think probability means the same thing as possibility?

> Ms. Nelson:    Yes.

Tr. Vol. 10 at 191. Trial counsel did not pursue this line of questioning further or make any attempt to clarify the legal

-62-

distinction between those terms with respect to the future
dangerousness special issue.

This court's inquiry focuses on whether the potential juror's
views would have "'prevent or substantially impair the performance of
[her] duties as a juror in accordance with [her] instructions and
[her] oath.'" Wainwright, 469 U.S. at 424 (quoting Adams v. Texas,
448 U.S. 38, 45 (1985)).  Haynes' failure to develop this issue in
jury selection hinders this court's ability to find that
Ms. Nelson's views would have prevented her ability to be an
impartial juror.  The brief mention of the future dangerousness
issue's "probability" language showed some confusion on her part.
However, "[w]here a party seeks to exclude a venire member because
of bias, that party must demonstrate through questioning that the
potential juror lacks impartiality." Fuller v. Johnson, 114 F.3d
491, 499-500 (5th Cir. 1997).   Texas state law will not find
potential jurors to be biased or prejudiced against the law unless
the law is first explained to them. See Sells v. State, 121 S.W.3d
748, 759 (Tex. Crim. App. 2003); Chambers v. State, 903 S.W.2d 21,
29 (Tex. Crim. App. 1995).  The failure of Haynes to explore the
issue with Ms. Nelson prevented him from developing a record of
whether she "could set aside her personal opinions and apply the
law, or whether those beliefs would distort her view of the facts
or alter her answers to the two special issues." Fuller, 114 F.3d
at 500.  Other than to refer to the meager record on this issue,
Haynes has not shown that Ms. Nelson was not an impartial juror.

Haynes removed by peremptory challenge three of the potential jurors whom the trial court refused to excuse for cause. Haynes has not shown that the fourth potential juror, or any other juror who sat at trial, could not impartially consider his case. The state court's judgment, therefore, survives review under the AEDPA. The court will deny this claim.

**G.    Statutory Requirement of Jury Unanimity (Claims 11 and 14)**

Haynes argues that the trial court's punishment phase instructions confused the jury and made a death sentence more likely. The trial court instructed the jury that any answer to Texas's special issues that could result in Haynes receiving a death sentence must be unanimous, but that ten or more jurors would have to agree to any answer supporting a life sentence. Trans. at 453. The trial court fashioned those instructions after then-effective TEX. CODE CRIM. PRO. art. 37.071. In Texas this is commonly called either the "10-12" or "12-10" Rule. See Resendiz v. State, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003); Prystash v. State, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999). The trial court did not inform the jury that a failure to reach the required consensus in answering the special issues would automatically result in a life sentence. Haynes contends that, by not informing the jury of the effect of a single dissenting vote or of a single holdout juror the instructions predisposed the jurors to impose a death sentence, thus violating the Eighth Amendment.

Haynes argues that the trial court should have instead instructed the jury that should any juror refuse to answer the special issues in unanimity with the others, Haynes would receive a life sentence.  At the time of trial TEX. CODE CRIM. PRO. art. 37.071(g) prohibited the parties and the trial court from providing the jury with that information.  The Court of Criminal Appeals rejected this claim because "Haynes's arguments are indistinguishable from arguments [that court] ha[s] repeatedly addressed and rejected."  Opinion on Direct Appeal, at 18.

The non-retroactivity principle established in Teague v. Lane, 489 U.S. 288 (1989), bars this Court from granting relief on Haynes' "12-10 rule" claim.  Teague precludes federal relief on claims that impose a new obligation not "'dictated by precedent existing at the time the defendant's conviction became final.'" Graham v. Collins, 506 U.S. 461, 467 (1993) (quoting Teague, 489 U.S. at 301).  The Fifth Circuit has previously addressed virtually indistinguishable claims to the one before this court and found them to violate Teague.  See Alexander v. Johnson, 211 F.3d 895, 897 (5th Cir. 2000); Davis v. Scott, 51 F.3d 457, 466 (5th Cir. 1995); Webb v. Collins, 2 F.3d 93, 95-96 (5th Cir. 1993).  The Fifth Circuit has found that nothing in Supreme Court precedent requires Texas to inform a capital jury about the effect of any non-unanimous or holdout jurors.  See Alexander, 211 F.3d at 897; Webb, 2 F.3d at 95-96.  Haynes does not show the applicability of

any exception to the Teague doctrine or otherwise distinguish the Fifth Circuit's binding precedent.   Accordingly, Teague's non-retroactivity bar forecloses relief on Haynes' "12-10 rule" claim.

The Fifth Circuit has also expressly found similar claims to be without merit.   See Alexander, 211 F.3d at 897 n.5; Miller v. Johnson, 200 F.3d 274, 288-89 (5th Cir. 2000); Jacobs v. Scott, 31 F.3d 1319, 1328-29 (5th Cir. 1994).   Finding support in the Supreme Court case of Jones v. United States, 527 U.S. 373 (1999), the Fifth Circuit recognizes that the Constitution creates no right to instruct a jury on potential deadlock.   See Alexander, 211 F.3d at 897 n.5.   Haynes fails to distinguish the binding federal precedent rejecting the merits of this claim.

Haynes' "12-10 rule" claim is both Teague-barred and without merit.   The state court's rejection of this claim, therefore, was not contrary to or an unreasonable application of federal law.   See 28 U.S.C. § 2254(d)(1).

## H.   Burden of Proof on and Appellate Review of Texas's Mitigation Special Issue (Claim 13)

Haynes argues that Texas's capital sentencing scheme violates the federal Constitution because it fails to allocate a burden of proof for, and then gives no opportunity for appellate review of, the mitigation special issue.   Respondent argues in a footnote that Haynes procedurally defaulted this claim in state court.   The state habeas court found that since "a post-conviction writ of habeas

-66-

corpus should not be used as a substitute for direct appeal," the court could not consider the merits of that argument.  State Habeas Record at 148, 158.  This state procedural ruling serves as a bar to federal consideration of his claim's merits.  See Aquilar, 428 F.3d at 535.  Since Haynes makes no effort to surmount the procedural bar, this court need not consider his challenge to Texas's mitigation special issue.

In the interest of justice, however, this court also finds that his barred claim does not present a viable ground for habeas relief.  The state habeas court alternatively found that Haynes

> fail[ed] to show (a) that his constitutional rights were violated based on the lack of a burden of proof in the mitigation issue; (b) that the lack of such burden of proof prevents meaningful appellate review; (c) and that TEX. CODE CRIM. PROC. ANN. art. 44.251 requires a sufficiency review of a negative answer to the mitigation special issue.

State Habeas Record at 158.  Haynes must show that this alternative determination was contrary to or an unreasonable application of federal law.  See 28 U.S.C. § 2254(d)(1).

1.   Burden of Proof on Mitigating Special Issue

Haynes argues that the prosecution should bear the burden of proof with respect to the mitigation special issue, presumably requiring the prosecution to disprove the absence of mitigating circumstances beyond a reasonable doubt.  The trial court's instructions did not assign a specific burden to either party on the second special issue, but generally stated that "[t]he burden

of proof in [the punishment] phase still rests upon the State and never shifts to the defendant." Trans. at 450. Under Texas law "[n]o burden of proof exists for either the state or the defendant to disprove or prove the mitigating evidence. Thus, each juror individually and subjectively determines what evidence, if any, is sufficient to mitigate against the imposition of the death penalty." <u>Woods v. Cockrell</u>, 307 F.3d 353, 359 (5th Cir. 2002) (citing <u>Colella v. State</u>, 915 S.W.2d 834, 844 (Tex. Crim. App. 1995)); <u>see also</u> <u>Prystash</u>, 3 S.W.3d at 535. However, the practical reality of trial anticipates that a capital defendant will present mitigating evidence, *implicitly* placing on the defense a burden of production to present mitigating evidence and to convince the jury of its significance. <u>See</u> <u>Lawton v. State</u>, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995) ("[T]he burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case.").

Haynes' proposed assigning of a burden for the prosecution to disprove mitigating evidence "ignores the distinction the [Supreme] Court has often recognized between facts in aggravation of punishment and facts in mitigation." <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 n.16 (2000) (citations omitted). Supreme Court authority anticipates that

> [s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating

circumstances sufficiently substantial to call for
leniency.

_Walton v. Arizona_, 497 U.S. 639, 650 (1990).[17]  Supreme Court
precedent does not contain "any hint of [such] a limiting
principle."  _Id._ at 688.  The Fifth Circuit in rejecting similar
claims has held that "no Supreme Court or Fifth Circuit authority
requires the State to prove the absence of mitigating circumstances
beyond a reasonable doubt."  _Rowell v. Dretke_, 398 F.3d 370, 378
(5th Cir. 2005); _see also_ _Martinez v. Dretke_, 173 Fed. App'x 347,
354 (5th Cir. 2006) (unpublished); _Lewis v. Cockrell_, 58 Fed. App'x
596 (5th Cir. 2003) (unpublished); _McWilliams v. Cockrell_, 74 Fed.
App'x 345, 349-50 (5th Cir. 2003) (unpublished).

     Here, the State proved the elements of capital murder beyond
a reasonable doubt in the guilt/innocence phase.  The trial court's
instructions also informed the jury that the State had the
responsibility of showing future dangerousness beyond a reasonable
doubt.  Trans. at 452.  Texas does not violate the Constitution by
expecting the defense to present mitigating evidence in the
punishment phase; the practical reality of trial assumes that a
capital defendant will present mitigating evidence.  In fact, any
burden implicitly transferred to the defense by the second special

---

     [17]     The Supreme Court in _Ring v. Arizona_, 536 U.S. 584, 598
(2002), recently reversed _Walton_'s holding that "the Sixth
Amendment does not require that the specific findings authorizing
the imposition of the sentence of death be made by the jury."  The
Supreme Court, however, did not overrule _Walton_'s consideration of
the burden of proof regarding mitigating evidence.  _See_ _Ring_, 536
U.S. at 609.

issue is logically related to trial counsel's Sixth Amendment obligation to investigate and prepare mitigating evidence. The second special issue's recognition of that fact does not violate the Constitution. Since no Supreme Court authority requires the State to prove the absence of mitigating circumstances beyond a reasonable doubt, this court could not rule otherwise except by creating a new rule of constitutional law in violation of Teague.

2. Meaningful Appellate Review of the Mitigation Special Issue

Haynes also contends that the Constitution requires a state appellate court to review an inmate's mitigating evidence, presumably in much the same way that it can consider the sufficiency of the evidence supporting an inmate's conviction under Jackson v. Virginia, 443 U.S. 307 (1979). Haynes argues that the Court of Criminal Appeals' refusal to reconsider and reweigh the mitigating evidence a capital defendant presented at trial violates the Constitution's guarantee to meaningful appellate review.

"[M]eaningful appellate review" in capital cases "serves as a check against the random or arbitrary imposition of the death penalty." Gregg v. Georgia, 428 U.S. 153, 195, 206 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). The Fifth Circuit, however, has repeatedly rejected claims that the Constitution requires the Court of Criminal Appeals to reconsider the jury's evaluation of the mitigating evidence. See Rowell, 398 F.3d at 377; Johnson v. Cockrell, 306 F.3d 249, 256 (5th Cir. 2002); Woods v. Cockrell, 307

-70-

F.3d 353, 359-60 (5th Cir. 2002); <u>Beazley</u>, 242 F.3d at 261; <u>Moore</u>
<u>v. Johnson</u>, 225 F.3d 495, 506-07 (5th Cir. 2001); <u>Hughes v.</u>
<u>Johnson</u>, 191 F.3d 607, 621-23 (5th Cir. 1999).[18]  Haynes makes no
attempt to distinguish the binding Fifth Circuit precedent that
governs this claim.

No federal precedent anticipates that a capital defendant has
a right to appellate *mitigation* review, though the Supreme Court
has repeatedly emphasized that a State must provide meaningful
appellate review of death sentences.  <u>See, e.g.</u>, <u>Parker v. Dugger</u>,
498 U.S. 308, 321 (1991); <u>Clemons v. Mississippi</u>, 494 U.S. 738, 749
(1990).  Meaningful appellate review requires "an *individualized*
determination on the basis of the character of the individual and
the circumstances of the crime."  <u>Zant v. Stephens</u>, 462 U.S. 862,
879 (1983); <u>see also</u> <u>Parker</u>, 498 U.S. at 321.  This appellate
review, however, must give way to the Supreme Court's "much more
explicit directives" that respect a jury's "narrowly cabined but
unbridled discretion to consider any mitigating factors submitted
by the defendants and weighed as the jury sees fit . . . ."  <u>Moore</u>,
225 F.3d at 506-07.  The Court of Criminal Appeals allows the jury
unbridled discretion in its evaluation of mitigating circumstances
and refuses to review whether sufficient evidence supported the

---

[18]    The Fifth Circuit also has summarily dismissed similar
claims in unpublished decisions.  <u>See, e.g.</u>, <u>Fuentes v. Dretke</u>,
No. 03-20456, 2004 WL 256559 (5th Cir. Feb. 11, 2004); <u>Reneau v.</u>
<u>Cockrell</u>, 01-50371 (5th Cir. Dec. 5, 2001); <u>Baker v. Cockrell</u>,
No. 01-20308 (5th Cir. Oct. 19, 2001).

jury's answers to the mitigation special issue.  See, e.g., McFarland v. State, 928 S.W.2d 482, 498 (Tex. Crim. App. 1996) ("Because the weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror, we decline to review that evidence for 'sufficiency.'").  By bestowing upon the jury the narrowly cabined, but unbridled, discretion to consider mitigating evidence, Texas has "followed Supreme Court instructions to the letter."  Moore, 225 F.3d at 506.  Accordingly, "[n]o court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious."  Id.; see also Woods, 307 F.3d at 360.[19]

No clearly established Supreme Court law creates a right to independent review of mitigating factors on direct or collateral review.  See Beazley, 242 F.3d at 260; Hughes, 191 F.3d at 623.[20] The state court's rejection of this claim withstands AEDPA review. See 28 U.S.C. § 2254(d)(1).  The court **DENIES** this claim.

---

[19]   Haynes also argues that a Texas statute, TEX. CRIM. PRO. art. 44.251, requires the Court of Criminal Appeals to perform an appellate mitigation review.  "[T]he proper interpretation of state law is not cognizable in federal habeas proceedings."  Beazley, 242 F.3d at 261 (refusing to consider whether TEX. CRIM. PRO. art. 44.251 implicated federal constitutional concerns).

[20]   In addition, Haynes' meaningful-appellate-review claim anticipates the creation of a new rule that would violate Teague's non-retroactivity principle.  See Woods, 307 F.3d at 360; Beazley, 242 F.3d at 263.

**I.  Insufficient Evidence of Haynes' Future Danger to Society (Claim 15)**

Haynes argues that the evidence insufficiently supported the jury's answer to the future-dangerousness special issue.  The trial court instructed the jury to answer the following question:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Anthony Cardell Haynes, would commit criminal acts of violence that would constitute a continuing threat to society?

Trans. at 458.  Haynes argues that given his mitigation evidence and the weak aggravating evidence against him no rational jury would have answered that special issue affirmatively.  Haynes portrays the aggravating evidence against him as consisting only of the unadjudicated armed robberies he committed before shooting officer Kincaid, and then asserts that "[g]iven Petitioner's age and youth at the time of the underlying offense, it is not rational to conclude that he would constitute a continuing threat to society if sentenced to imprisonment for life."  (Docket Entry No. 1 at p. 368)  The Court of Criminal Appeals on direct appeal, however, reviewed the facts supporting the jury's future-dangerousness verdict much differently:

> On the night of the offense, Haynes committed a string of armed robberies before he murdered Sergeant Kincaid. Under the pretense of asking for directions, Haynes would call a victim over to his vehicle and then point a gun at him, demanding his wallet.  In this manner, Haynes approached three victims immediately before killing Sergeant Kincaid.  Haynes then fired his gun out of his vehicle while passing the Kincaids.  Haynes admitted that he shot Sergeant Kincaid because he was a police officer and, showing no remorse, bragged to friends that he had killed a police officer.  Haynes also told people that he should have killed Nancy Kincaid, so that there would

-73-

have been no witness to the murder.  The State also
introduced evidence that, a couple of years before this
offense, Haynes had assaulted his three-year-old sister,
had attempted to kill the family dog, and had been
diagnosed with and hospitalized for intermittent
explosive disorder.  While hospitalized, he had
threatened to kill the staff and attacked a staff-member
with a curtain rod.  Finally the State introduced
evidence of incidents of violence at school and threats
to kill teachers and security officers.

Opinion on Direct Appeal, at 5.[21]  The Court of Criminal Appeals

denied Haynes' claim as follows:

We have held that a history of escalating violence, a
lack of remorse, and a willingness to commit future
crimes evince a continuing threat to society.  The
State's evidence established that Haynes is a violent man
with an explosive temper whose only regret was not
murdering Mrs. Kincaid also.  A rational jury could find
that Haynes presents a continuing threat to society.

Opinion on Direct Appeal, at 5-6 (footnote omitted).

Haynes approaches the evidence presented against him without

considering it in a light most favorable to the prosecution.  The

_____

[21]    The Court of Criminal Appeals has described the review of
the future dangerousness issues as follows:

[W]e first look at the facts of the crime itself.  If the
offense was shown to be sufficiently cold-blooded or
calculated, then the facts of the offense alone may support a
finding that the defendant will pose a continuing threat to
society.  If, however, the facts of the case were not
sufficiently compelling, we look for other evidence to support
the jury's finding, such as psychiatric evidence, character
evidence, prior criminal record, prior extraneous offenses,
and possible mitigating factors such as the defendant's youth
or state of mind at the time of the offense.

Kunkle, 771 S.W.2d at 449; see also Johnson v. Texas, 509 U.S. 350,
371 (1993) (noting Texas's reliance on eight factors to determine
the sufficiency of evidence supporting a jury's future-
dangerousness decision) (citing Ellason v. State, 815 S.W.2d 656,
660 (Tex. Crim. App. 1991)).

-74-

prosecution not only presented evidence of the officer's death as the culmination of a night of violence, but presented evidence showing an escalating pattern of aggression that increasingly endangered others.  In a light most favorable to the prosecution, the jury could rationally find that the confluence of Haynes' brutal crime with his periodic violence, needless aggression, and remorselessness rendered him a societal threat.  Haynes does not meet the exacting standards required to merit relief on a habeas insufficiency-of-the-evidence claim.  See 28 U.S.C. § 2254(d).  The court **DENIES** this claim.

## J.   The Trial Court Showed Impermissible Bias (Claims 16 and 21)

Haynes alleges that the trial court possessed a biased disposition that made his trial fundamentally unfair.[22]  Haynes complains about several incidents in which he feels the trial court displayed an impermissible bias, including:  (1) when the trial court threatened to expel defense counsel from closing arguments, (2) failing to stop the prosecution's alleged improper questioning of the victim's widow, (3) allowing the admission of gruesome

---

[22]   Respondent incorrectly argues that Haynes completely neglected to exhaust claim 21 in state court.  As discussed in the text that follows above, Haynes' state proceedings only raised some of the allegations presented in his habeas petition.  Haynes, however, unquestionably exhausted some portion of his twenty-first claim in state court.  The court notes that respondent fails to brief the merits of either Haynes' sixteenth or twenty-first claim in the answer.  This court, however, accepts respondent's general statement that Haynes fails to meet the AEDPA standard with respect to all his claims to allow adjudication of these two deficiently briefed claims.

photographs, (4) permitting a co-defendant to testify without counsel present, (5) allowing hearsay testimony to come before the jury, and (6) denying his motion for a new trial. Of those circumstances, however, Haynes only exhausted in state court the allegations relating to closing arguments. Since Haynes makes no procedural showing that federal review is available for the remainder of his allegations, this court will only consider the exhausted portion of his claim. The court notes, however, that nothing in the record indicates that the trial court was biased against Haynes.

Haynes' claim focuses on an exchange that followed trial counsel's objections to how the prosecution personalized the case before the jury, which this court has already addressed in claim 6. After the trial court overruled Haynes' objection about prosecutorial argument, the prosecutor asked for more time for his closing argument due to that expended in resolving Haynes' objections. The following exchange then occurred:

> Trial counsel: Your Honor, I'm going to object to his sidebar remarks.
>
> Trial court:   Have a seat. Have a seat. Have a seat.
> Trial counsel: Your Honor, can I have a ruling on my objection.
>
> Trial court:   I said sit down, Mr. Nunnery.
>
> Trial counsel: Your Honor, I'm required by law to ask for a ruling for objection.
>
> Trial court:   You have one second to sit down or I'll remove you from the courtroom. Do we understand each other?

Tr. Vol. 30 at 18-19.[23]  Trial counsel made no further objections during the prosecution's closing argument.

After the end of closing arguments, trial counsel stated that he would have made additional objections during the prosecution's closing arguments "but for the Court's admonition that if I stood again you would have me removed from the court.  And in that manner I believe that I was not permitted to render a Sixth Amendment effective assistance of counsel to my client with respect to that argument."  Tr. Vol. 30 at 67.  The trial court then clarified its intent in asking counsel to sit down:

> Let the record reflect that at no time was counsel ordered not to stand and make an objection.  The ruling of the Court at that time was for counsel to sit down at that time with regard to that particular confrontation or objection that he had and in no way did the Court ever instruct counsel that he was not able to effectively represent his client by making objections.  And counsel's interpretation of that is for counsel's purposes only.

Tr. Vol. 30 at 67.

Haynes filed a motion for a new trial based, in part, on his allegation that the trial court chilled his ability to raise effective objections by asking him to sit down.  The trial court held a hearing on that claim.  Trial counsel testified about how he felt that the trial court's comment inhibited his ability to object

---

[23]    Trial court previously admonished the parties to discontinue side bar comments.  See Tr. Vol. 23 at 91-92; Vol. 27 at 14.  By closing arguments, the trial court had already threatened the parties with sanctions if they continued making improper comments.  See Tr. Vol. 23 at 91-92.

at the punishment phase.  Of particular interest, the trial court reemphasized that he "never told Mr. Nunnery to remain silent. [He] told Mr. Nunnery to take his seat[.]"  Tr. Vol. 33 at 40.  The trial court denied Haynes' motion for a new trial.

On direct appeal Haynes complained that the trial court's actions impaired his right to counsel, indicated that the trial court took up the role as an advocate for the prosecution, and prevented trial counsel from objecting.  The Texas Court of Criminal Appeals found that the trial court did not display any improper judicial bias in telling trial counsel to sit down:

> The record does not support Haynes's allegation of judicial bias.  The harsher effects of the court's ruling were inadvertent.  Haynes does not allege a pattern of intrusion with defense counsel's ability to make decisions, and we find no such pattern.  Most importantly, we find no evidence that counsel was in fact denied the opportunity to object to improper argument. Mr. Nunnery asserted at the hearing on his motion for a new trial:

>> What I am saying there weren't things there that I thought so glaring that it might make any difference on appeal. . . . I did not see any glaring mischaracterization of evidence on your part so all I am simply saying is that I may have raised some objections at that time but they may not have been the type when I walked out of there and talked to the appellate lawyer and say look at Mr. Smyth's argument.  I didn't see any of that at all in your arguments.

> And when asked directly, Mr. Nunnery claimed no objectionable argument was actually found in the record.

>> Smyth:   Even with twenty-twenty hindsight and reading the printed argument of Mr. Smyth, there was really nothing

-78-

>>                objectionable   in   that   particular
>>                argument?
>
>> Nunnery:      In my opinion, again, nothing that I
>>                would say was so glaring that it was
>>                absolutely essential.

Counsel's failure to identify any arguments so egregious that his objection would have required reversal or at least an instruction to disregard confirms our conclusion that the State made no such arguments.  We cannot hold that Haynes was denied the opportunity to raise objections when the record reveals that there were in fact no objections to be made.

Opinion on Direct Appeal, at 21-22.  Haynes must show that this adjudication was contrary to or an unreasonable application of federal law.  See 28 U.S.C. § 2254(d)(1).

The Constitution promises through the operation of due process that an impartial judge will preside over trial proceedings.  See Republican Party of Minnesota v. White, 536 U.S. 765, 775-76 (2002); Johnson v. Mississippi, 403 U.S. 212, 216 (1971); In re Murchison, 349 U.S. 133, 136 (1955).  Due process requires "the lack of bias for or against any *party* to the proceeding. Impartiality in this sense assures equal application of the law. That is, it guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party."  White, 536 U.S. at 776.  Most challenges to a judge's impartiality do not raise a constitutional concern "because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."  Bracy v. Gramley, 520 U.S. 899, 904 (1997); Federal Trade Comm'n v. Cement Institute,

333 U.S. 683, 702 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level."); <u>Turney v. State of Ohio</u>, 273 U.S. 510, 523 (1927) ("All questions of judicial qualification may not involve constitutional validity."). "[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." <u>Bracy</u>, 520 U.S. at 904-05 (quotation omitted); <u>Bigby v. Dretke</u>, 402 F.3d 551, 558 (5th Cir.) ("Stated succinctly, the cornerstone of the American judicial system is the right to a fair and impartial process."), <u>cert. denied</u>, ___ U.S. ___, 126 S. Ct. 239 (2005).

     The record does not indicate that the Court of Criminal Appeals erred in finding no bias on the trial judge's part.  In state court, Haynes only highlighted one isolated episode in which he accused the trial judge of being partial.[24]  Even that incident does not necessarily display partiality, but possibly frustration. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).

---

     [24]   Even now, most of Haynes' allegations against the trial judge focus on his legal rulings.  "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).

"*Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display.  A judge's ordinary efforts at courtroom administration - even a stern and short-tempered judge's ordinary efforts at courtroom administration - remain immune."  <u>Id.</u> at 555-56.  Haynes has not shown that the trial court adopted an attitude that rendered his trial fundamentally unfair.  Haynes fails to show that the AEDPA would allow relief with respect to this claim.  The court **DENIES** this claim.

**K.    Admission of Victim Impact Testimony (Claim 17)**

Over the defense's objection, the trial court allowed the victim's wife to testify in the punishment phase regarding her relationship with her husband, his character, and the grief that she and her family felt at his death.   Haynes argues that Mrs. Kincaid's testimony went beyond showing her husband's uniqueness as a human being and forced the jury to enter into a comparative judgment about the worth of his life and the victim's. Haynes argues that the introduction of Mrs. Kincaid's testimony violated both the Eighth and Fourteenth Amendments.[25]

---

[25]    Haynes did not exhaust this precise claim in state court. On state habeas review, however, he raised a claim that trial counsel should have sought a limiting instruction with respect to the victim impact testimony.  Haynes' presentation of this claim with a new legal foundation on federal review likely renders it unexhausted.

If a State "chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." <u>Payne v. Tennessee</u>, 501 U.S. 808, 827 (1991).   Texas allows the introduction of victim-impact testimony, so long as it is relevant.   <u>See</u> <u>Ford v. State</u>, 919 S.W.2d 107, 114 (Tex. Crim. App. 1996).   The Supreme Court has elaborated that a State may conclude that "evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.   There is no reason to treat such evidence differently than other relevant evidence is treated." <u>Payne</u>, 501 U.S. at 827.   The Supreme Court has reasoned "that victim impact evidence did not overstep the bounds of the Fourteenth Amendment unless the evidence introduced 'is so unduly prejudicial that it renders the trial fundamentally unfair.'" <u>Black v. Collins</u>, 962 F.2d 394, 408 (5th Cir. 1992) (quoting <u>Payne</u>, 501 U.S. at 825).   The Supreme Court recognized that a state has a

> legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

<u>Payne</u>, 501 U.S. at 825 (quotation omitted).   The <u>Payne</u> Court noted that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." <u>Payne</u>, 501 U.S. at 825.

Relying heavily on the dissenting opinion in <u>Payne</u>, Haynes argues that the Supreme Court wrongly decided that case and that a trial court should never allow victim impact testimony to come before the jury.  Reversing <u>Payne</u> is beyond this court's authority or power; this court must follow <u>Payne</u>'s holding.  The Eighth Amendment, therefore, erected no barrier to the admission of Mrs. Kincaid's testimony about her husband.

Undeterred, Haynes also argues that the highly inflammatory nature of Mrs. Haynes' testimony violated his rights under the Due Process Clause.  Haynes contends that Texas Rule of Criminal Evidence 403, which allows for the exclusion of evidence when unfair prejudice outweighs the probative nature of proposed testimony, should have prevented the introduction of Mrs. Kincaid's testimony.  This court's role on habeas is not to review the application of state law.  See <u>Young v. Dretke</u>, 356 F.3d 616, 628 (5th Cir. 2004) ( "[I]n our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law.").  Federal law explicitly prevents granting habeas relief based on error in the application of state law.  See 28 U.S.C. § 2254(a) (cabining federal relief to a "violation of the Constitution or laws or treaties of the United States").  Whether or not Texas correctly applied its evidentiary law to allow Mrs. Kincaid's testimony is a question beyond the scope of federal habeas review.

Mrs. Kincaid's brief testimony was not the only evidence that would have influenced the jury to impose a death sentence. The needless manner of the killing, Haynes' remorselessness, and his past history of escalating violence by far overshadowed Mrs. Kincaid's statements. Cf. Payne, 501 U.S. at 832 ("[S]urely this brief statement did not inflame [the jury's] passions more than did the facts of the crime[ ].") (O'Connor, J., concurring). The challenged testimony only reminded the jury that "just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique death to society." Id. at 825. The trial court instructed the jury not to let "sentiment, conjecture, sympathy, passion, public opinion or public feeling" influence their answers to the special issues, Trans. at 451, 453, and thus sufficiently removed the possibility that Mrs. Kincaid's testimony would unduly prejudice the verdict. See Bernard, 299 F.3d at 481 (finding that a similar instruction removed any taint from victim-impact testimony). Mrs. Kincaid's testimony was not inherently inflammatory or unduly prejudicial. See Westley v. Johnson, 83 F.3d 714, 722 (5th Cir. 1996) (finding victim's wife's testimony about his good deeds and prosecutorial argument about the impact on his family to be proper); Ward v. Whitley, 21 F.3d 1355, 1364 (5th Cir. 1994) (finding testimony that victim was a good provider to be permissible); Black, 962 F.2d at 408 (finding testimony concerning character and impact of victim's

loss on family members to be permissible).[26]  Haynes has not shown that the state-court decision was contrary to, or an unreasonable application of, federal law.  See 28 U.S.C. § 2254(d)(1).  This court **DENIES** Haynes' victim-impact-testimony claim.

## VI.  Certificate of Appealability

Haynes has not yet requested that this court grant him a Certificate of Appealability ("COA"), although this court can consider the issue sua sponte.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000).  Under the AEDPA a prisoner cannot seek appellate review from a lower court's judgment without receiving a COA.  28 U.S.C. § 2253(c).  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  Slack v. McDaniel, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

---

[26]  The testimony in this case was no more inflammatory than that in Payne.  See Payne, 501 U.S. at 814-15.  In Payne the defendant slaughtered a mother and her two-year old daughter with a butcher knife while her three-year old son looked on.  At trial the grandmother of the boy testified that "[the son] cries for his mom. He doesn't seem to understand why she doesn't come home.  And he cries for his sister Lacie.  He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie.  And I tell him yes.  He says, I'm worried about my Lacie."  Id.  The prosecution then elaborated on the impact of the murder during closing arguments.  The Supreme Court found that those statements did not violate the Constitution.  The testimony in the instant case was no more inflammatory or prejudicial than the heart-wrenching testimony in Payne.

The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows:  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack, 529 U.S. at 484; Miller-El, 537 U.S. at 336-38.  On the other hand, a district court that has denied a habeas petition on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  Slack, 529 U.S. at 484; Miller-El, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."  Slack, 529 U.S. at 484.

Under the appropriate standard the court finds that Haynes has not shown that this court should certify any issue for appellate consideration.  This court **DENIES** Haynes a COA on all the claims raised by his petition.

## VII.  Conclusion

For the reasons described above, the court finds that Haynes has not shown entitlement to federal habeas relief.  Accordingly,

the court **DENIES** Haynes' petition and will dismiss this action with prejudice, with the exception of Haynes' lethal-injection challenge, which this court will dismiss without prejudice. Haynes' Motion to Hold Proceedings in Abeyance to Allow Petitioner to Exhaust Claims in State Court (Docket Entry No. 16) is **DENIED**. No Certificate of Appealability will issue.

      **SIGNED** at Houston, Texas, on this 25th day of January, 2007.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE